No. 25-2113

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

RHODE ISLAND LATINO ARTS; NATIONAL QUEER THEATER; THE
THEATER OFFENSIVE; THEATRE COMMUNICATIONS GROUP,

Plaintiffs-Appellees,

v.

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in the
official capacity as Acting Chair of the National Endowment for the Arts,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Rhode Island

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES CALENDA
  *United States Attorney*

DANIEL TENNY
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

STATEMENT OF JURISDICTION ......................................................................... 3

STATEMENT OF THE ISSUE ............................................................................... 3

STATEMENT OF THE CASE ................................................................................ 3

      A.      Statutory Background ............................................................. 3

      B.      Factual Background.................................................................. 7

      C.      Prior Proceedings ................................................................. 10

SUMMARY OF ARGUMENT .............................................................................. 13

STANDARD OF REVIEW .................................................................................... 17

ARGUMENT .......................................................................................................... 18

I.      The Final Notice Does Not Violate The Administrative Procedure Act .......... 18

      A.      The Final Notice is Consistent with the Existing Statutory Framework Governing Evaluation of Applications for Competitive Grant Funding........................................................ 18

      B.      The Final Notice is Reasonable and Reasonably Explained ................... 25

II.      The Final Notice Does Not Violate The First Amendment .............................. 28

III.      At the Very Least, the Remedy Is Overbroad ................................................... 42

CONCLUSION ....................................................................................................... 47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) .............................................................. 16, 30, 35, 36

*American Pub. Health Ass'n v. National Inst. of Health,*
145 F.4th 39 (1st Cir. 2025) ................................................................ 44

*Buchanan v. Evans,*
439 U.S. 1360 (1978) ......................................................................... 42

*Collazo v. Nicholson,*
535 F.3d 41 (1st Cir. 2008) ................................................................ 17

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ........................................................................... 25

*Gill v. Whitford,*
585 U.S. 48 (2018) ............................................................................. 43

*Finley v. National Endowment for the Arts,*
100 F.3d 671, 683 (9th Cir. 1996), *rev'd*, 524 U.S. 569 (1998). ............... 38

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ........................................................................... 44

*Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,*
15 F.3d 1222 (1st Cir. 1994) ......................................................... 46-47

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
508 U.S. 384 (1993) ........................................................................... 36

*Legal Aid Servs. Of Or. v. Legal Servs. Corp.,*
608 F.3d 1084 (9th Cir. 2010) ............................................................ 41

*Legal Services Corporation v. Velazquez,*
531 U.S. 533 (2001) ............................................................... 40, 41, 42

*Littlefield v. U.S. Dep't of the Interior,*
85 F.4th 635 (1st Cir. 2023) ............................................................... 26

*Marijuana Policy Project v. United States*,
  304 F.3d 82 (D.C. Cir. 2002) ................................................ 41

*Matal v. Tam*,
  582 U.S. 2183 (2017) ...................................................... 30, 31, 36

*McGriff v. City of Miami Beach*,
  84 F.4th 1330 (11th Cir. 2023) ............................................ 33

*Mezibov v. Allen*,
  411 F.3d 712 (6th Cir. 2005) .............................................. 41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................ 25

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ...................................................... 26-27

*National Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998)
  ........................ 1, 2, 4, 5, 6, 7, 12, 14, 16, 19, 23, 28, 29, 30, 31, 33, 34, 37, 38, 39, 42

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
  414 F.3d 23 (D.C. Cir. 2005) ............................................. 30, 33

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ...................................................... 30

*Price v. Garland*,
  45 F.4th 1059 (D.C. Cir. 2022) ........................................... 39

*Ridley v. Massachusetts Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004) .............................................. 30

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ...................................................... 37

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ...................................................... 7, 29, 34, 35, 37

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022) ...................................................... 30

*TEC Eng'g Corp. v. Budget Molders Supply, Inc.*,
  82 F.3d 542 (1st Cir. 1996) .............................................. 46

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ........................................................................ 17, 42, 45

*United States v. American Libr. Ass'n*,
   539 U.S. 194 (2003) ................................................................................. 36

*United States v. Texas*,
   599 U.S. 670 (2023) ................................................................................. 42

**Statutes**

Arts, Humanities, and Museums Amendment of 1990,
 Pub. L. No. 101-512, § 318, 104 Stat. 1915 (1990) ...................................... 6

Department of the Interior and Related Agencies Appropriations Act, 1990,
 Pub. L. No. 101-121, 103 Stat. 738 (1990) ................................................. 5

National Foundation on the Arts and the Humanities Act of 1964,
 Pub. L. No. 89-209, 79 Stat. 845 (1965) ..................................................... 4

5 U.S.C. § 702 ........................................................................................... 44

5 U.S.C. § 706 ..................................................................................... 17, 45

20 U.S.C. § 951 *et seq.* ............................................................................ 1, 4

20 U.S.C. § 951(5) ....................................................... 6, 18, 24, 29, 32, 34

20 U.S.C. § 951(6) ..................................................................................... 18

20 U.S.C. § 951(11) .................................................................................... 22

20 U.S.C. § 954(c) ................................................................................... 4, 5

20 U.S.C. § 954(d)(1) ................................... 1, 2, 6, 14, 16, 18, 20, 23, 24, 28, 31

20 U.S.C. § 954(d)(2) ....................................................... 6, 18, 24, 32

20 U.S.C. § 954(e) ...................................................................................... 4

20 U.S.C. § 955 .......................................................................................... 4

20 U.S.C. § 955(f) ....................................................................... 14, 21, 24, 25

20 U.S.C. § 959(f)(3) ................................................................................. 32

28 U.S.C. § 1291 ........................................................................................ 3

28 U.S.C. § 1331 ........................................................................................ 3

**Rules**

Fed. R. App. P. 4 ....................................................................................... 3

**Other Authority**

Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) .............................. 2, 8, 9, 27

## INTRODUCTION

The National Foundation on the Arts and the Humanities Act of 1965, 20 U.S.C. § 951, *et seq.*, provides the National Endowment for the Arts (NEA) with substantial discretion to award financial grants to support the arts. As amended in 1990, the statute requires the Chairperson of the NEA to ensure that "artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* § 954(d)(1). In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Supreme Court held that the statutory amendments requiring the NEA Chairperson to make funding determinations that considered general views of "decency and respect" did not violate the First Amendment. In so holding, the Supreme Court rejected the view espoused by the Court of Appeals that the statute was unconstitutional because the "decency and respect" standard impermissibly discriminates on the basis of viewpoint. *Id.* at 587-88.

As the Court explained, when Congress authorized the NEA to award highly competitive funding, it did not create a forum for private expression. *Finley*, 524 U.S. at 586-87. The NEA could thus permissibly "allocate [its] competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 587-88. This includes the right to "selectively fund a program to encourage certain activities it believes to be in the public interest, without

at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 588 (quotation marks omitted). In doing so, "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* at 588 (quotation marks omitted). And the Court recognized that the statute necessarily directed the NEA to make subjective judgments in determining which projects were worthy of funding. *Id.* at 585-86.

At issue in this case is agency guidance discussing how the NEA will implement Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025), which directs executive agencies to take all necessary steps permitted by law to ensure that agency funds are not used to promote gender ideology. The guidance states that the NEA Chairperson may lawfully consider whether a proposed art project, including those that promote gender ideology, comports with the statutory standards for approval, including whether it aligns with her views of the "general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1); ADD.49-50. The guidance further states that the NEA Chairperson may deny applications that have been recommended to her for approval if she determines, in her independent judgment, that the project does not warrant funding under the subjective statutory criteria she is entitled to consider. ADD.49-50. Notwithstanding the clear statutory language contemplating such subjective determinations and the holding of *Finley*, the district court declared that the guidance was facially unconstitutional and inconsistent with the statute because it permitted the NEA

2

Chairperson to discriminate based on viewpoint. That holding cannot be reconciled with directly-on-point Supreme Court precedent or the text of the applicable statute. This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs asserted claims under the United States Constitution and the Administrative Procedure Act (APA). The district court had jurisdiction under 28 U.S.C. § 1331. The district court entered judgment on September 19, 2025. JA588. A timely notice of appeal was filed on November 17, 2025. JA589; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

1. Whether the district court erred in concluding that the process outlined in the NEA's final notice is unlawful or arbitrary and capricious under the APA.

2. Whether the district court erred in concluding that the final notice is facially unconstitutional.

3. Whether the district court's remedy is overbroad.

## STATEMENT OF THE CASE

### A.      Statutory Background

1. In the National Foundation on the Arts and the Humanities Act of 1964, Congress embarked on a "broadly conceived national policy of support . . . for the arts," pledging federal funds to "help create and sustain not only a climate

encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release . . . of creative talent." National Foundation on the Arts and the Humanities Act of 1964, Pub. L. No. 89-209, §§ 2(5), 4(b), 79 Stat. 845, 845-46 (1965) (codified at 20 U.S.C. § 951 *et seq.*); *see generally National Endowment for the Arts v. Finley*, 524 U.S. 569, 573-77 (1998). Through that Act, Congress created the National Endowment for the Arts, and authorized the NEA Chairperson—with the advice of the newly established 26-member National Council on the Arts, 20 U.S.C. § 955—"to establish and carry out a program" that provides "grants-in-aid" to groups and individuals of "exceptional talent engaged in or concerned with the arts" to support their artistic endeavors, *id.* § 954(c). These grants-in-aid may cover up to 50% of a proposed project's total cost. *Id.* § 954(e).

NEA funding is available only "upon application . . . submitted to the National Endowment for the Arts in accordance with regulations issued and procedures established by" the NEA Chairperson. 20 U.S.C. § 954(d). As the Supreme Court has recognized, the NEA has "substantial discretion" to determine which applications to approve for funding. *Finley*, 524 U.S. at 573. The NEA's enabling statute identifies "only the broadest funding priorities" to guide this discretion, *id.*, including projects with "substantial national or international artistic and cultural significance," projects of "significant merit" that without assistance "would otherwise be unavailable to our citizens for geographic or economic reasons," and those that "encourage public

knowledge, education, understanding, and appreciation of the arts," 20 U.S.C. § 954(c)(1), (2), (5).

2. In 1990, Congress amended the NEA's enabling statute in response to public controversy surrounding the use of NEA funding to exhibit two provocative works: one that "included homoerotic photographs that several Members of Congress condemned as pornographic," and another of a "photograph of a crucifix immersed in urine." *Finley*, 524 U.S. at 574. In the immediate aftermath of the controversy, the 1990 appropriations bill for the NEA deducted the amount spent on those exhibitions, prohibited NEA funding for "obscene" projects, and created an Independent Commission "to review the NEA's grant-making procedures and assess the possibility of more focused standards for public arts funding." *Finley*, 524 U.S. at 574-75; Department of the Interior and Related Agencies Appropriations Act, 1990, Pub. L. No. 101-121, 103 Stat. 738-42 (1990).

The Independent Commission established by Congress found that grant-making for the arts is "not an objective activity," The Independent Commission, A REPORT TO CONGRESS ON THE NATIONAL ENDOWMENT FOR THE ARTS 19 (Sept. 1990) (hereinafter "Report"), and recommended that Congress revise the Act's purposes to clarify that the government "must be sensitive to the nature of public sponsorship" when awarding federal funds, *id.* at 60. The Commission also suggested procedural changes to enhance the NEA's public accountability, including to emphasize and increase the scope of the Chairperson's final authority, *id.* at 63-65, and

5

to modify the role of advisory panels, *id.* at 65-68, 71-77.  The Commission discouraged the adoption of content-based restrictions on funding but suggested that considerations of content and public reception to that content could be relevant to the NEA's "ultimate aesthetic judgment" of whether a project had sufficient "artistic excellence" to approve funding.  *Id.* at 89-91.

With the benefit of this Report, Congress amended the enabling statute's declarations of findings and purposes to state that, in providing funding for the arts, the federal government "must be sensitive to the nature of public sponsorship."  Arts, Humanities, and Museums Amendment of 1990, Pub. L. No. 101-512, § 318, 104 Stat. 1915, 1961 (1990) (codified at 20 U.S.C. § 951(5)).  "Such funding should contribute to public support and confidence in the use of taxpayer funds," and must "ultimately serve public purposes the Congress defines."  20 U.S.C. § 951(5).  Congress further directed that any regulations and procedures established by the NEA Chairperson ensure that grant applications "are consistent with the purposes" of the statute, *id.* § 954(d)(2), and that they are judged based on "artistic excellence and artistic merit, . . . taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," *id.* § 954(d)(1).

Shortly thereafter, a group of artists sued the NEA to challenge the facial validity of Section 954(d)(1), claiming that the provision violates the First Amendment because it constrains the agency's ability to fund artistic speech that "either fails to respect mainstream values or offends standards of decency," or that the subjective

6

criteria can be used by the agency to "engage in viewpoint discrimination." *Finley*, 524 U.S. at 580, 583. The Supreme Court rejected that challenge, explaining that the government may permissibly "allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 587-88. Thus, the government may "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 588 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). In so doing, the government "has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* (quoting *Rust*, 500 U.S. at 193).

**B. Factual Background**

**1. The Grants for Arts Project**

The NEA opens applications for grants from the Grants for Arts Project—the NEA's premier grant program—on a semiannual basis. Depending on the availability of congressionally appropriated funds, approved grant applications will typically receive between $10,000 to $100,000 for "specific, definable activities" outlined in the application. *See* JA347. In advance of these application cycles, NEA historically has encouraged applications for projects covering certain topics, which often reflect issues of contemporary significance or other administration priorities. For example, the current Grants for Arts Projects Program guidelines encourage projects that, *inter alia*, spotlight America's artistic and cultural traditions as they may intersect with activities

7

celebrating the 2028 Olympic games; projects that originate from, or are in collaboration with various ethnic groups; and projects that advance the well-being of military service members, patients recovering from opioid addiction, individuals with intellectual disabilities, and others.  *See* https://www.arts.gov/grants/priorities.  The NEA typically denies funding for more than half of all proposed projects.

In February 2025, NEA published on its website the procedures governing the submission and consideration for grant applications in fiscal year 2026 (FY2026).  JA322-361.  Consistent with the statute, those procedures state that all applications that meet program eligibility requirements will be reviewed by advisory panels and by the National Council on the Arts, who makes recommendations to the NEA Chairperson.  The NEA Chairperson "reviews [the Council's] recommendations for grants in all funding categories and makes the final decision on all grant awards."  JA348.  At each stage of the process, applications will be reviewed for "artistic excellence," and "artistic merit," which includes "the value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency."  JA347.

### 2. Executive Order 14168

Approximately three weeks before the application deadline for the Grants for Arts Project, President Trump signed Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  90 Fed. Reg. 8615 (Jan. 30, 2025) (JA317-21).  As relevant here,

Executive Order 14,168 declares that, to the extent "consistent with applicable law," *id.* at 8618, "[f]ederal funds shall not be used to promote gender ideology," *id.* at 8616. The Executive Order further directs federal agencies to "assess grant conditions and grant preferences and ensure grant funds do not promote gender ideology." *Id.* at 8616.

The NEA responded by updating its grant procedures to require applicants to certify that federal funds would not be used to promote gender ideology, in compliance with the Executive Order. JA96. In light of this change, the NEA extended the final deadline for applications. JA113-14. After this lawsuit was initiated, the NEA rescinded this certification requirement, further delayed the application deadline, and stated that it would reevaluate how to implement the Executive Order. JA146-47, JA217-18.

The NEA then published a "final notice" that detailed its decision regarding the implementation of Executive Order 14168. ADD.46-54. That notice stated that the NEA would not require applicants to certify compliance with Executive Order 14168 or to certify that federal funds would not be used to promote gender ideology, nor would the agency implement a categorical bar on funding eligibility for projects that promote gender ideology. ADD.46. Instead, applications for projects that promote gender ideology would be evaluated according to the same terms and procedures as all other applications. ADD.46, ADD.50-51. In all cases, applications would be assessed on a grant-by-grant basis by advisory panels, the Council, and (if

recommended by the Council) the NEA Chairperson for "artistic excellence and merit." ADD.45, ADD.48-51. The notice further acknowledges, consistent with *Finley*, that the enabling statute permits the NEA Chairperson to consider the content of a proposed project as part of her evaluation of the project's artistic merit and excellence. ADD.50. The notice therefore states that the NEA Chairperson may permissibly implement the Executive Order in a manner consistent with the NEA's statutory framework by considering whether the specific elements of any project she determines promote gender ideology align with the relevant subjective considerations she is statutorily permitted to consider. ADD.51. For example, the Chair could consider whether or not the specific project "align[s] with general standards of decency and respect for the diverse beliefs and values of the American public," "whether those elements indicate a sufficient level of anticipated public interest in or appreciation of the project," or whether it is "likely to be suitable for or appeal to intended audiences." ADD.51.

### C.   Prior Proceedings

1. Plaintiffs are three individual arts groups who were prospective applicants for the FY2026 funding from the Grants for Arts Project—the Rhode Island Latino Arts, National Queer Theater, and The Theater Offensive—and one member organization—Theatre Communications Group—whose members were prospective applicants. Their lawsuit originally challenged the NEA's requirement that applicants certify compliance with Executive Order 14168, *see* JA11, JA36-39, and they requested

a preliminary injunction prohibiting defendants from imposing this requirement and from imposing any prohibition on funding that promotes gender ideology. After the NEA rescinded the certification requirement, the district court denied plaintiffs' motion, JA229-75, concluding that the balance of equities and public interest weighed against issuing an injunction that would "short circuit" the NEA's reevaluation of how to implement the Executive Order, JA271. Plaintiffs subsequently filed an amended complaint challenging the policy announced in the NEA's subsequent notice under the First and Fifth Amendments and the Administrative Procedure Act. *See* JA276-313.

2. The district court granted summary judgment for plaintiffs on their First Amendment and APA claims; it granted summary judgment in favor of the government on plaintiffs' Fifth Amendment claim (which is therefore not discussed further in this brief). ADD.1-45.

At the outset, the court held that the final notice constitutes an unconstitutional viewpoint-based restriction on speech. ADD.12. The district court construed the notice as categorically announcing a policy that projects deemed to "promote" gender ideology are "less likely to receive NEA funding." ADD.28. The court stated that this type of viewpoint discrimination "is presumptively invalid," ADD.29, and that the government had not satisfied its burden to demonstrate that the restriction satisfies strict scrutiny, ADD.30.

The district court did not attempt to reconcile this holding with the Supreme Court's admonition in *Finley* that the NEA may permissibly limit arts funding to activities it believes "contribute to public support and confidence in the use of taxpayer funds" without running afoul of the First Amendment. 524 U.S. at 578-88. The district court essentially treated the government's funding decision as if it were a restriction on the artist's ability to engage in protected speech, rejecting the government's argument that plaintiffs' speech was not restricted, and that the only speech controlled by the NEA was government speech in the form of an endorsement of certain projects that does not detract in any way from the ability of artists to engage in protected speech without the government's support. ADD.15-26.

The court further held that the final notice is contrary to law because, in the court's view, the NEA "Chairperson's role in the application review process is designed to be more formal than substantive," ADD.38, and the authorizing statute "does not empower the Chairperson to categorically disfavor applications for promoting certain views," ADD.33. The court also held that the notice is arbitrary and capricious because it "is devoid of reasoned policy analysis," and does not explain "what it means for a project to 'promote gender ideology'" or how that concept

relates to considerations the Chairperson is entitled to consider under the statute. ADD.39.[1]

The court vacated the final notice. ADD.43-45. The court also permanently enjoined the defendants from "(1) applying to Plaintiffs . . . a viewpoint-based standard of review that disfavors applications deemed 'to promote gender ideology,' and (2) requiring Plaintiffs . . . to comply with the [Executive Order] when using NEA funds." ADD.43.

## SUMMARY OF ARGUMENT

I. The district court erred in holding that the final notice violates the Administrative Procedure Act. Although the district court criticized the notice as a categorical ban on funding of certain projects, the notice actually reflects the rescission of such a categorical ban in place of a reaffirmation of the framework that has long governed grant decisions under the governing statute. The possibility that the NEA Chairperson will take account of the President's views in the context of exercising her broad discretion under the statute is entirely unremarkable.

A. As the Supreme Court recognized in *National Endowment for the Arts v. Finley*, the NEA has limited resources to allocate and must "deny the majority of grant

---

[1] As for plaintiffs' Fifth Amendment claim, the court concluded that the final notice was not unconstitutionally vague because it "does not broaden the Chairperson's discretion; rather, it specifies how the Chairperson intends to use that discretion." ADD.42.

applications that it receives, including many that propose 'artistically excellent' projects." 524 U.S. at 587. Congress has thus provided the agency with wide latitude to render determinations about which projects to subsidize. *Id.* The statute directs the agency to evaluate all applications for funding on the basis of "artistic excellence and artistic merit, . . . taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). This highly subjective standard permits the agency to choose to fund (or not fund) a proposed project "for a wide variety of reasons." *Finley*, 524 U.S. at 585.

Although the NEA originally implemented an Executive Order by requiring applicants to certify that they would not expend federal funds to promote gender ideology, the notice at issue here retreated from that categorical approach. In particular, the notice eschews any categorical ban on funding eligibility and removes any certification requirement. ADD.46. It instead generally directs the NEA Chairperson—who has "final authority" to approve a grant application, *see* 20 U.S.C. § 955(f)—to consider each grant application recommended to her by the Council individually in light of the factors that Congress directed her to consider. ADD.49-51. Plaintiffs object to the final notice insofar as it recognizes that the NEA Chairperson, in the course of that evaluation, may permissibly consider whether, in her view, a proposed project promotes gender ideology, and if so, whether allocating limited NEA funding to that project aligns with the applicable statutory criteria. *See* ADD.51. There is nothing unlawful about that, as no provision of the statute takes such

considerations off the table, and the notice expressly reaffirms the Chairperson's obligation to analyze each application pursuant to the statutory guidelines.

Nor does consideration of an application's promotion of gender ideology contravene the agency's statute. Congress directed the agency to make subjective judgments about the costs and benefits of promoting various types of art projects, and the district court provided no support for the surprising notion that Congress expects the agency to do so without regard to the President's views on certain priority policy issues.

B. For similar reasons, the final notice is reasonable and reasonably explained. As noted above, the notice's main operative effect was to clarify that the agency intended neither to create any categorical bar nor to impose any certification requirement but instead would direct the NEA Chairperson to apply the statutory criteria on an individual basis to each grant application. Plaintiffs cannot take issue with any of that. The agency generally has no obligation to explain the individualized subjective judgments it makes when determining which art projects are worthy of government funding, and its expression of an intent to respect the President's policy preferences when exercising its statutory authority should not require any significant explanation or justification.

II. The district court likewise erred in concluding that the final notice violates the First Amendment. The district court's fundamental error was to treat the NEA's determination about which art projects to fund as if they were a restriction on private

15

speech.  But a constitutional condition on a grant does not restrict speech.  *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  Indeed, the Supreme Court squarely rejected the district court's approach in *Finley*, making clear that when acting as a *patron* rather than a *regulator*, the government can generally choose what to fund without regard to principles of viewpoint neutrality that apply in other contexts.  524 U.S. at 587-88.  Plaintiffs cannot seriously take issue with that proposition.  Were it otherwise, the fact that the NEA determined to fund a project that promotes democracy would require it to equally fund projects that denounce it.  The Constitution does not demand that result.

For this same reason, the district court erred in assuming that the relevant question in this case was whether the art projects that the NEA subsidizes are private speech or government speech.  *See* ADD.15 n.4.  When the NEA declines to award competitive funding to an art project, it does not restrict that artist's speech, it merely declines to subsidize it.  *Finley*, 524 U.S. at 587-88.  To the extent the decisions at issue here effect a regulation of speech, it is the NEA's *own* speech in stating—implicitly through funding and explicitly by adding various indicia of NEA approval to funded products—that the agency believes that the art project meets the highest standards of artistic excellence and merit, "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1), and that it is worthy of public funding and sponsorship.  The government need not be viewpoint neutral in expressing its own views.

III. At the very least, the district court's remedy is overbroad. As the Supreme Court has admonished, equitable relief should be no more burdensome on the government than necessary to afford complete relief to plaintiffs' injuries. *Trump v. CASA, Inc.*, 606 U.S. 831, 843-44 (2025). The district court here found that plaintiffs have been irreparably injured by the contents of the final notice. An injunction prohibiting the application of the notice to the plaintiffs plainly provides relief for the only injury that gave rise to the case or controversy before the Court, and having determined that such an injunction was appropriate, the district court should not have gone further. At a minimum, the district court's failure to make any factual findings to justify its conclusion that additional relief was necessary warrants a remand.

## STANDARD OF REVIEW

This Court reviews a district court's de novo a district court's grant of summary judgment. *Collazo v. Nicholson*, 535 F.3d 41, 44 (1st Cir. 2008). Like the district court, this Court applies the APA standard, under which a court may set aside an agency decision if that decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

## ARGUMENT

## I.     The Final Notice Does Not Violate The Administrative Procedure Act

### A.     The Final Notice is Consistent with the Existing Statutory Framework Governing Evaluation of Applications for Competitive Grant Funding

1. Congress has determined that the NEA should provide federal financial support for the arts through a program that provides limited grants, on a highly selective basis, to specific categories of art projects. Congress's decision to fund art proposals selectively has necessarily required the creation of a process for distinguishing among grant proposals based on "artistic excellence and merit." 20 U.S.C. § 954(d)(1). Through the 1990 amendments to the NEA's enabling statute, Congress clarified and enlarged the criteria that inform this selection process, specifying that the NEA should "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1), and ensure that applications are "consistent with the purposes" of the statute, *id.* § 954(d)(2). These purposes include Congress's objective to fund art that reflects the "rich cultural heritage" of the United States, *id.* § 951(6), and its concern that any "public sponsorship" of art "should contribute to public support and confidence in the use of taxpayer funds," *id.* § 951(5).

As the Supreme Court recognized in *National Endowment for the Arts v. Finley*, these criteria require a substantial element of subjective judgment and necessarily

provide the NEA wide latitude in determining how to allocate funding. 524 U.S. 569, 586-87 (1995). Because the NEA has limited resources, it "must deny the majority of the grant applications that it receives, including many that propose 'artistically excellent' projects." *Id.* The NEA thus may choose to fund (or not fund) a particular project "for a wide variety of reasons," including "the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, it suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form." *Id.*

It should therefore be beyond dispute that the NEA can apply subjective criteria to determine which art projects are most worthy of funding, and that considerations beyond the proposed work's technical artistic merit are appropriate. When this lawsuit was originally filed, the NEA had layered some additional requirements on top of the statutory considerations. In particular, the NEA stated that it would impose a categorical bar on funding projects that promote gender ideology and require applicants to certify that they would not use federal funding to promote such ideology. *See* JA96. But the agency withdrew that decision, JA146-47, JA217-18, and replaced it with the notice at issue here, which rejected both of those alternatives, *see* ADD.46 ("Applicants will not be required to certify that no federal

19

funds are used to promote gender ideology. Thus, there is no eligibility bar to submitting an application related to promoting gender ideology.").

Instead, the notice clarified, applications for projects that may be deemed to promote gender ideology will be evaluated according to the same terms and procedures as all other applications. ADD.46. In all cases, applications will be assessed on a grant-by-grant basis by advisory panels, the Council, and (if recommended by the Council) the NEA Chairperson for "Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." ADD.46; 20 U.S.C. § 955(d)(1). Thus, rather than imposing any additional requirements, the NEA Chairperson will consider the President's policy directive in Executive Order 14168 only to the extent it is relevant to the criteria expressed in the statute. ADD.46 ("The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced."). The notice also identifies statutory criteria that may be relevant to that evaluation such as "whether or not the specific elements of [a] project [that promotes gender ideology] align with general standards of decency and respect for the diverse beliefs and values of the American public, or whether those elements indicate a sufficient level of anticipated public interest in or appreciation of the project, or are likely to be suitable for or appeal to intended audiences." ADD.51.

The notice further reiterates the statutory allocation of responsibility among the various actors within the NEA. In particular, like the statute, the notice states that the NEA Chairperson has final authority to approve or deny an application that has been recommended for funding, 20 U.S.C. § 955(f), and thus has broad discretion to award or deny a grant recommended to her by the Council on the basis of her independent judgment regarding the subjective statutory criteria, ADD.50. For example, the Chairperson may decline to award funding to a project if she determines that, "despite the Council's recommendation, the contemporary relevance of a particular application or its suitability to a special audience, or that its educational value leaves something to be desired." ADD.50.

2. There is thus very little in the notice with which to find fault, as the notice largely operated to rescind the features of the initial policy that plaintiffs had deemed most problematic and to retreat to the statutory standard. The district court nonetheless held that the final notice is unlawful because, in the court's view, it announces a policy that the NEA "intends to disfavor applications that promote gender ideology precisely because they promote gender ideology." ADD.28. The court concluded that this was inconsistent with the statute because, in the court's view, the NEA Chairperson cannot "categorically disfavor applications for promoting certain views." ADD.33.

It is not entirely clear what the district court meant by this pronouncement. As noted, there is nothing categorical about the notice, which rejected the ban on

projects promoting gender ideology in favor of a case-by-case approach. ADD.46 ("[T]here is no eligibility bar to submitting an application related to promoting gender ideology."); ADD.51 ("In reviewing applications, the Chair will make the decision on a grant-by-grant basis, relying on the [statutory] criteria outlined in Section II above," *i.e.*, the same criteria that apply to all applications); ADD.52 ("[T]he NEA will not impose an eligibility bar and will not engage in viewpoint discrimination."); *see also* JA373-74 ("[T]he NEA will not consider a project's potential promotion of gender ideology in evaluating whether the project is eligible for grant funding.").

The district court noted that the government had represented that the fact that a project promotes gender ideology "could" weigh against the project's final approval. ADD.28 (citing JA373). But to the extent that the district court meant to suggest that the Chairperson may not uniformly treat the promotion of certain views as detrimental, rather than beneficial, to an application, that is plainly incorrect. To take just one example, one of the statutory purposes of the grant program is to help "achieve an orderly continuation of free society." 20 U.S.C. § 951(11). Given this stated purpose, it can hardly be expected that NEA funding decisions would be agnostic as to whether a proposed art project promotes democratic ideals or other forms of government. The NEA Chairperson may very well conclude that an technically proficient art project that promotes democracy warrants government funding under this standard and that a technically proficient project espousing a conflicting view does not.

The NEA Chairperson is no less entitled to take into account the President's views on the value of projects promoting gender ideology, at least to the extent that they are relevant to the evaluation of a statutory factor (which is all the notice contemplates that the Chairperson will do). The statute plainly does not preclude such consideration. As noted, the statute specifies that the Chairperson must ensure that applications are judged by "artistic excellence and artistic merit, . . . taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). The basic statutory criteria of "artistic excellence and artistic merit" call for aesthetic judgments regarding the government's assessment of the value of the project or work that cannot be divorced from consideration of the expressive content of competing applicants' productions or the messages contained therein.

Indeed, in *Finley*, the Supreme Court recognized that the "very assumption" of the NEA grant program is that the NEA will award grants based on "esthetic judgments" about the content of a proposed project and its likely public reception. 524 U.S. at 585-86. And it would be "inconceivable" that the NEA could render subjective value judgments about the "artistic worth" of a project while maintaining "absolute neutrality." *Id.* at 585 (quoting *Advocates for the Arts v. Thompson*, 532 F.2d 792, 795-96 (1st Cir. 1976); *see also id.* at 597 (Scalia, J., concurring in the judgment) (opining that the NEA is "required by law to discriminate" in favor of certain types of expression).

Congress's decision to expand and clarify the statutory standard through the 1990 amendments only reinforces the point that the agency's funding decisions need not be content or viewpoint agnostic. Those amendments state that the NEA Chairperson may "consider[] general standards of decency and respect for the diverse beliefs and values of the American public," *id.* § 954(d)(1), and may select winning projects relative to her judgment about which best further Congress's stated purposes in creating the grant program, *id.* § 954(d)(2). Given that Congress added this language to make the NEA *more* responsive to taxpayers and promote public accountability for the type of work that the agency chooses to sponsor, *see id.* § 951(5), it is implausible to believe that Congress intended for the NEA Chairperson to ignore the views of the President—a democratically accountable official to whom she answers directly—when making these subjective judgments.

3. The district court also took issue with the fact that the final notice permits the NEA Chairperson to override the judgment of the Council and deny an application that the Council has recommended that she approve. ADD.34-38. But once again, that is exactly what the statute contemplates.

The statute expressly vests in the NEA Chairperson "final authority" to approve (or deny) any applications recommended by the Council. 20 U.S.C. § 955(f). The only restriction on this authority is that the Chairperson may "only provide to an applicant the amount of financial assistance recommended by the Council and may not approve an application with respect to which the Council makes a negative

recommendation." *Id.* § 955(f). The statute provides no equivalent constraint on the Chairperson's ability to *deny* an application.

Tracking this statutory scheme, the final notice states that the NEA Chairperson may deny an application that has been recommended by the Council if, in her independent judgment, she concludes that the proposed project does not warrant funding under the applicable statutory standards. The district court's contrary conclusion that the NEA Chairperson's role is "more formal than substantive" cannot be reconciled with the statutory text. ADD.38.

## B. The Final Notice is Reasonable and Reasonably Explained

The district court also improperly determined that the final notice was arbitrary and capricious. That standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has considered the relevant issues and reasonably explained the decision." *Id.* That explanation need not be extensive, so long as it is clear that the agency "examine[d] the relevant data" and articulated a "satisfactory explanation" for the specific action it took. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action may therefore be arbitrary and capricious if the agency "relie[d] on improper factors, fail[ed] to consider pertinent aspects of the problem, offer[ed] a rationale

contradicting the evidence before it, or reach[ed] a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023) (quotation marks omitted). But under this "highly deferential standard of review," a court must "uphold an agency determination if it is supported by any rational view of the record." *Id.* (quotation marks omitted).

As noted above, the main steps taken by the final notice were to declare that the agency did not intend to create any categorical bar to funding or certification requirement, as it had previously announced, and instead to retreat to the statutory standard. ADD.46 ("Applicants will not be required to certify that no federal funds are used to promote gender ideology. . . . The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced."). Plaintiffs have no problem with that. The only part of the notice to which plaintiffs object is the part that explains that the NEA Chairperson will consider, in her discretion, the President's views on promoting gender ideology to the extent it is relevant to the statutory criteria she is directed to evaluate. ADD.46, ADD.51. Such a policy should not require much explanation, and in any event the reasons for it are quite clear. The President has made clear that he does not believe that promoting gender ideology is beneficial; steering clear of projects that do so in favor of other worthy projects, at least where doing so is consistent with the governing statute, makes eminent sense. *See National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

545 U.S. 967, 981 (2005) (explaining agencies must reconsider policies "in response to . . . a change in administrations").

The district court held that the final notice is arbitrary and capricious because, in the court's view, the NEA failed to adequately explain its justifications for announcing a policy that categorically disfavors applications that promote gender ideology. ADD.38-40. But as discussed, the policy does nothing more than account for the President's critical views on promoting gender ideology and explain how they may be considered consistent with the statutory scheme. *See* ADD.46, ADD.51. The district court's description of such a policy as "categorical" cannot make it a more significant policy than it actually is. It is unclear that any explanation at all would be needed for applying the statutory factors on a case-by-case basis (as the agency always has). For example, the district court faulted the Final Notice for failing to explain "what it means for a project to 'promote gender ideology,'" ADD.39, but the reason that the final notice does not dwell on that terminology is because it is what matters, ultimately, to the Chairperson's funding decision is not whether the project promotes gender ideology, but whether the "specific elements of that project align with" the same statutory criteria she uses to evaluate all projects, ADD.51. Moreover, the final notice expressly references Executive Order 14168, which itself defines "gender ideology." ADD.46; 90 Fed. Reg. at 8615-8616. The notice also explains that it is permitted to consider the content of a particular project when evaluating an application against the statutory criteria. ADD.50. And it methodically explained

27

how the President's policy views of promoting gender ideology (which has itself been explained in numerous settings) might be relevant to specific statutory criteria that the Chairperson is entitled to consider and the limited, though important, role that they would play in the agency's considerations. ADD.51. That explanation was more than sufficient.

## II. The Final Notice Does Not Violate The First Amendment

The district court also erred in holding that the final notice violates the First Amendment. The court mistakenly analyzed the NEA's funding decisions as though they were a restriction on private speech, replicating the error that the Supreme Court corrected in *Finley* in the context of this very program. The only government actions here are not restrictions on private speech but government determinations about how to spend the government's own money, coupled with the government's expressing its own opinions about which projects are worthy of public funding.

**A.** In *National Endowment of the Arts v. Finley*, the Supreme Court upheld the constitutionality of the 1990 amendments to the NEA's enabling statute, 524 U.S. at 590, which permit the NEA to consider "general standards of decency and respect for the diverse beliefs and values of the American public" when making funding decisions, 20 U.S.C. § 954(d)(1). The plaintiffs in *Finley* claimed that these amendments were facially unconstitutional either because the statute "constrains the agency's ability to fund certain categories of artistic expression" or because the agency's consideration of subjective principles of "decency and respect" would be

used "as a tool for invidious viewpoint discrimination." *Finley*, 524 U.S. at 581-82. In rejecting this argument, the Supreme Court held that the statutory standard "imposes not categorical requirement" barring funding for certain types of expression, *id.* at 581, and that the agency's consideration of "decency and respect" in its funding decisions was constitutionally permissible because the government may permissibly "allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake," *id.* at 587-88.

The government may thus choose to selectively fund an art project it believes "contribute[s] to public support and confidence in the use of taxpayer funds," while at the same time declining to subsidize another artistically significant project that espouses a conflicting message that the government does not believe advances these purposes. *Finley*, 524 U.S. at 588 (citing 20 U.S.C. § 951(5)). "In doing so, 'the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.'" *Id.* (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)); *see also id.* at 597-98 (Scalia, J., concurring in the judgment) ("[T]he NEA itself is nothing less than an institutionalized discrimination. . . . Nonetheless, it is constitutional, as is the congressional determination to favor decency and respect for beliefs and values over the opposite because such favoritism does not 'abridge' anyone's freedom of speech.").

The district court's conclusion that the final notice engages in "presumptively invalid" viewpoint discrimination does not engage with this aspect of *Finley*. ADD.29.

Viewpoint discrimination is presumptively invalid when the government is regulating private speech. But the government is permitted to control its own message, as *Finley* recognized. The government "'is entitled to say what it wishes' and to select the views that it wants to express" free from "First Amendment scrutiny." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). Indeed, it is often "the very business of government to favor and disfavor points of view." *Finley*, 524 U.S. at 598 (Scalia J., concurring in the judgment); *cf. People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("[The government] spoke when it determined which elephant and donkey models to include in the exhibition and which not to include.").

In particular, the government can choose which speech to fund, so long as it leaves private entities to engage in whichever speech they would like on their own time and dime. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013). Similarly, the government can engage in its own speech—here, by conveying the message, both implicitly and explicitly, that certain projects are worthy of public funding. Although the district court correctly noted that the art projects that the NEA may or may not fund is private speech and not government speech, ADD.15, the relevant point is that the private speech is not being regulated.

This case thus bears no resemblance to the cases on which the district court and plaintiffs rely in which the government directly regulates private speech. *See* ADD.15, 29 (citing *Matal v. Tam*, 582 U.S. 2183 (2017); *Shurtleff v. City of Boston*, 596 U.S. 243 (2022); *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004)).

Unlike those cases, the NEA funding program does not directly regulate or restrict speech; it simply decides which projects it would like to subsidize. *Cf. Tam*, 582 U.S. at 240 (acknowledging that the "government is not required to subsidize activities that it does not wish to promote," and explaining that the program at issue in that case was "nothing like" the subsidy program at issue in *Finley*).[2] Instead, the only speech directly controlled or regulated (as opposed to merely subsidized) by the NEA is the NEA's own speech: when the NEA approves a project for funding, it communicates the message that the agency believes the project to meet the highest standards of artistic excellence and merit and that it is worthy of both public and private support.

Indeed, Congress has expressly recognized that the NEA's selective funding decisions are a form of government speech and that the public associates that message with the agency. The NEA's enabling statute expressly provides that the NEA Chairperson must ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). As discussed, those standards are inherently subjective and thus the award of funding necessarily reflects the agency's own views on those questions. The

---

[2] Those cases are inapposite for the additional reason that they addressed a situation in which the government has restricted access to a forum that it intentionally opened for private expression. As discussed further below, (at pp. 36-39), *Finley* held that the availability of NEA subsidies does not create such a forum. 524 U.S. at 586-87.

statute also provides that "obscenity is without artistic merit," and that the Chairperson's approval of an application "shall not be construed to mean, and shall not be considered as evidence that the project . . . is or is not obscene." *Id.* § 954(d)(2). NEA funding must also be "sensitive to the nature of public sponsorship," and "subject to the conditions that traditionally govern the use of public money," including that "funding should contribute to public support and confidence in the use of taxpayer funds." *Id.* § 951(5). And if a grant awardee "substantially fails to satisfy the purposes for which such financial assistance is provided," the Chairperson may prohibit the recipient from "in any way associat[ing]" the project with the NEA and may require that any published project contain a disclaimer that the "opinions, findings, conclusions, and recommendations expressed herein do not reflect the views of the National Endowment for the Arts." *Id.* § 959(f)(3)(B), (C). Each of these provisions presupposes that the public may view the grant or denial of funding as conveying a government message of endorsement.

In addition, since at least 1999, the NEA has required grant recipients to display across a winning project's promotion and materials the NEA's logo and a statement that the NEA has selected the project for funding, JA438; JA444-45; JA172-173, which contributes to public's perception that the government has endorsed the artistic excellence and merit of the project and has determined that sponsoring the project is an appropriate use of taxpayer resources. *But see* 20 U.S.C. § 959(f)(3). And as the district court recognized, the record here demonstrates that

many artists apply for NEA grants-in-aid because the "prestige of receiving a grant" often translates into other funding opportunities. ADD.23-24. These examples demonstrate that both Congress and the public as a whole perceive the NEA's funding decisions as a governmental message communicating to the public an endorsement of the artistic merit and excellence of the project. The government is entitled to control the message it sends through that communicative act and need not be viewpoint neutral in expressing its own views. *See, e.g.*, *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1336 (11th Cir. 2023); *Gittens*, 414 F.3d at 28.

In a parenthetical citation, the district court noted that the Supreme Court in *Finley* left open the question of whether it would violate the constitution if the NEA "were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." ADD.29 (quoting *Finley*, 524 U.S. at 587). But here, as in *Finley*, the final notice contemplates a process for the NEA Chairperson's evaluation of a project promoting gender ideology that "stops well short of an absolute restriction" on funding such projects, 524 U.S. at 580—it simply directs that the Chairperson will evaluate any such applications to ensure that they truly do meet the statutory framework for artistic excellence and merit, *see* ADD.46, ADD.50-51. Moreover, the Supreme Court's obviously did not mean by that comment to negate the core holding of *Finley*—that the government may selectively choose to fund art projects that it believes "contribute to public support and confidence in the use of taxpayer funds" without running afoul of the First Amendment. *Finley*, 524 U.S. at

588 (citing 20 U.S.C. § 951(5)).  So if nothing else, it should be plain that the NEA

Chairperson's determination not to fund a particular art project that she deems

unworthy of public funding under the statutory criteria does not amount to an

impermissible "penalty on disfavored viewpoints."  *Id.* at 587.

That observation is sufficient to resolve this case, but in any event *Finley* itself

explained the distinction between "allocat[ing] competitive funding according to

criteria that would be impermissible were direct regulation of speech or a criminal

penalty at stake"—which is permissible—and imposing an unconstitutional condition

or "penalty" on viewpoint.  524 U.S. at 587-88.  As *Finley* explained, while the

government may generally "selectively fund a program to encourage certain activities

it believes to be in the public interest" to the exclusion of others, *id.* at 588 (quoting

*Rust*, 500 U.S. at 193), funding decisions are subject to a constitutional constraint

insofar as the government cannot leverage its funding power in a "coercive" manner

that actively "suppress[es]" private speech, *id.* at 587.  But those concerns are not

implicated by selective funding that leaves private entities free to express themselves

as they wish using their own resources.  On the contrary, *Finley* affirmed that

"cho[osing] to fund one activity to the exclusion" of another with a conflicting

message is permissible.  *Id.* at 588 (quotation marks omitted); *see also id.* at 590 (Scalia,

J., concurring in the judgment) (evaluating NEA grant applications on "content- and

viewpoint-based criteria" is "perfectly constitutional"); *see also Rust*, 500 U.S. at 193

("'A refusal to fund protected activity, without more, cannot be equated with the

34

imposition of a 'penalty' on that activity.'" (quoting *Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980)); *cf. Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers of America*, 485 U.S. 360, 371 (1988) (acknowledging that a constitutionally permissible spending statute "works at least some discrimination" against the otherwise protected activity).

Instead, that constitutional concern arises only when the government is using the funding to affect speech outside of the program, such as conditioning grants on refraining from expressive conduct "that [is] separate and independent from the project that receives . . . funds." *Rust*, 500 U.S. at 196; *see also id.* at 197 ("'[O]ur 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."). The Supreme Court explained this distinction in *Finley*, and later Supreme Court cases what sorts of actions constitute an impermissible penalty. For example, while limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—are constitutionally permissible, *Agency for Int'l Dev.*, 570 U.S. at 217-18 (2013) (quotation marks omitted), conditioning federal funds on a pledge to adopt a policy "explicitly opposing prostitution and sex trafficking" is not, *id.* at 210 (quotation marks omitted). The

35

latter is a form of coercion that actively suppresses a protected private activity rather than just refraining from publicly funding it.

Nothing remotely like that is present here. The final notice focuses only on what the government is actually funding, not on what funding recipients do on their own time and dime. It does not impose any conditions implicating the constitutional rules that apply when the government "seek[s] to leverage funding" to limit or penalize "speech outside the contours of the program itself." *Agency for Int'l Dev.*, 570 US. at 214-15. The notice "does not 'penalize'" applicants who promote gender ideology "or deny them the right" to create art that expresses those views; it merely reflects a constitutionally permissible "decision not to subsidize their doing so." *United States v. American Libr. Ass'n*, 539 U.S. 194, 212 (2003). Put simply, this case is indistinguishable from *Finley*; the final notice does not restrict private speech and therefore does not violate the Constitution.

**B.** The district court rested its contrary conclusion almost entirely on cases that stand for the proposition that when the government intentionally opens a forum for private speech, "'viewpoint discrimination' is forbidden." ADD.27 (quoting *Tam*, 582 U.S. at 243). But that framework has no application here. Those cases draw on the principle that when the government creates a "limited public forum" open to discussion of a particular "subject matter"—such as an in-person space for discussion or a bulletin board—the government must be "viewpoint neutral," *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 389, 393 (1993), unless the

36

government is the speaker or the government is "disburs[ing] public funds to private entities to convey a governmental message," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).

As already discussed, *Finley* expressly recognized that this framework is inapplicable where, as here, the government has not created a forum for private expression but has instead decided to "'selectively fund a program.'" 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193). In such case, the government may choose grants that advance its policy goals and reject grants that do not, and it may do so "according to criteria that would be impermissible were direct regulation of speech at stake." *Id.* at 587-88; *accord id.* at 590 (Scalia, J., concurring in the judgment) (evaluating "grant applications" on "content- and viewpoint-based criteria" is "perfectly constitutional").

In reaching the contrary result, the district court improperly relied upon the Supreme Court's decision in *Rosenberger v. Rector & Visitors of the University of Virginia*, ADD.27, in which the Supreme Court extended the limited-public-forum doctrine to certain government "funding decisions," even though funding programs are "a forum more in a metaphysical than in a spatial or geographic sense," 515 U.S. at 830, 833. That case involved a public university's funding of a variety of student groups in order to provide "a wide range of opportunities" for students. *Id.* at 824 (quotation omitted). The Court emphasized that it addressed a situation where "the University . . . expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

*Finley* makes clear that *Rosenberger*'s standard has no application to the grant-in-aid program at issue here. Indeed, *Finley* was a direct response to a divided panel of the Ninth Circuit that applied *Rosenberger*'s viewpoint-neutrality requirement to the NEA's grant program. *Finley v. National Endowment for the Arts*, 100 F.3d 671, 683 (9th Cir. 1996) ("Although NEA awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint."), *rev'd*, 524 U.S. 569 (1998). The dissenting Ninth Circuit judge would have held that "[w]hether government can consider content and viewpoint depends on whether the money it gives out is generally available to all who meet some basic standard, or whether it is a prize given to a select few." *Id.* at 684 (Kleinfeld, J., dissenting).

The Supreme Court held that the Ninth Circuit majority's "reliance on . . . *Rosenberger* . . . [was] misplaced" for the reason stated in the Ninth Circuit dissent, notably that the NEA's grant program was different from the program in *Rosenberger* because of "the competitive process according to which the grants are allocated." *Finley*, 524 U.S. at 586. The Court explained that, unlike *Rosenberger*, "in the context of arts funding, . . . the Government does not indiscriminately 'encourage a diversity of views from private speakers.'" *Id.* Likewise, unlike *Rosenberger*, the NEA's "mandate is to make esthetic judgments" based upon an "inherently content-based 'excellence' threshold for NEA support." *Id.* These considerations set the NEA's grant program "apart from the subsidy at issue in *Rosenberger*—which was available to all student organizations that were 'related to the educational purpose of the University,'" as well

38

as "from comparably objective decisions on allocating public benefits, such as access to a school auditorium or a municipal theater." *Id.* (quoting *Rosenberger*, 515 U.S. at 824).

*Finley* thus recognizes that, unlike *Rosenberger*, the NEA grants-in-art program lacks the essential characteristics of a forum. Congress did not design the program to "indiscriminately 'encourage a diversity of views from private speakers.'" *Finley*, 524 U.S. at 586 (quoting *Rosenberger*, 524 U.S. at 586). Instead, Congress directed the NEA to provide public sponsorship of discrete projects based on rigorous selection criteria rooted in artistic excellence and merit, which results in the NEA's ability to provide funding to only a small fraction of applicants. The availability of this type of highly competitive funding does not create a limited public forum, and the *Rosenberger* viewpoint neutrality standard does not apply. *Finley*, 524 U.S. at 586; *accord id.* at 598-99 (Scalia, J., concurring in the judgment) ("*Rosenberger*, as the Court explains, found the viewpoint discrimination unconstitutional, not because funding of 'private' speech was involved, but because the government had established a limited public forum—to which the NEA's granting of highly selective (if not highly discriminating) awards bears no resemblance."); *see also Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022) (noting that the Supreme Court has cautioned that courts should not "extend[] the public forum doctrine 'in a mechanical way' to contexts that meaningfully differ from those in which the doctrine has traditionally been applied"") (quoting *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-73 (1998))).

Strangely, the district court acknowledged in a parenthetical citation that *Finley* "suggest[ed]" that the NEA grant program "is not a limited public forum." ADD.27. But the district court did not take this point to its logical conclusion—if the NEA grant program does not create a forum for private expression, then the viewpoint-neutrality standard that govern such forums does not apply.[3] Instead, under *Finley* and subsequent subsidy cases, so long as the NEA is not leveraging funding to suppress speech outside of the NEA program, it may make subjective decisions, which need not be viewpoint neutral, regarding what art to subsidize.

In their district court briefing, plaintiffs acknowledged that *Finley* held that the government may "pick and choose funding winners and losers" and that NEA funding is not a limited public forum. Dkt. No. 28, at 4. Relying upon *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 541-42 (2001), plaintiffs nevertheless urged that the NEA must maintain viewpoint neutrality when making funding decisions. Dkt. No. 28 at 7. But that case is likewise inapposite.

*Velasquez* considered the legality of a provision that prohibited attorneys who received funds from the government-funded Legal Services Corporation from making arguments on behalf of clients—whether with government funds or other funds— that challenged existing welfare laws. 531 U.S. at 538. The Court held that the

---

[3] In the same parenthetical, the district court stated that if the NEA is not a limited public forum, "by implication" it must be a "nonpublic forum." ADD.27. That is incorrect; the NEA is not a forum at all, but rather just a funding program.

restriction impermissibly "distorts the legal system by altering the traditional role of the attorneys," "sifts out cases presenting constitutional challenges in order to insulate the Government's laws from judicial inquiry," and that this attempt to restrict speech in order to "insulate [the government's] own laws from legitimate judicial challenge" violated the First Amendment. 531 U.S. at 544, 546, 548.

It is plain this holding has no application here. As other courts have observed, *Velazquez* turned on the Supreme Court's conclusion that the funding program at issue resembled the program in *Rosenberger* and thus effectively created a limited public forum. *Legal Aid Servs. Of Or. v. Legal Servs. Corp.*, 608 F.3d 1084 (9th Cir. 2010) ("The [*Velazquez*] Court analyzed the grantee plaintiffs' unconstitutional conditions claim through the lens of the Court's limited public forum cases."); *see also Mezibov v. Allen*, 411 F.3d 712, 720 (6th Cir. 2005) (stating that "Velazquez involved . . . a government funding program that the Court deemed a limited public forum for First Amendment purposes"); *Marijuana Policy Project v. United States*, 304 F.3d 82, 87 (D.C. Cir. 2002) (stating that Velazquez "rests on limited public forum doctrine"). Indeed, *Velasquez* emphasized that "like the program in *Rosenberger*, the [Legal Services Corporation] program was designed to facilitate private speech"—specifically, to ensure communication between attorneys and clients who would not otherwise afford legal assistance. 531 U.S. at 542, 546-47. As discussed, *Finley* rejected this exact analogy.

Moreover, *Velazquez* emphasized the Court's unique concern with a subsidy condition that effected a "serious and fundamental restriction on the advocacy of

41

attorneys and the functioning of the judiciary." 531 U.S. at 534. And the Court

stressed that, due to the very nature of the program, "[t]here often will be no

alternative source for the client to receive vital information" that the program restricts

attorneys from giving, and thus there "is no alternative channel for expression of the

advocacy Congress seeks to restrict." *Id.* at 546-47. No such restrictions exist here;

any applicant for NEA funding who does not receive it remains free to create

whatever art they desire, whether on their own dime or with the support of other

sponsors. *See Finley*, 524 U.S. at 597 (Scalia, J., concurring in the judgment) ("The

NEA is far from the sole source of funding for art . . . .").

## III.   At the Very Least, the Remedy Is Overbroad

Even if the district court did not err in concluding that the final notice is

unlawful, the relief it ordered was overbroad. Per the "familiar rule," "once a . . .

violation is found, a federal court is required to tailor the scope of the remedy to fit

the . . . violation." *Buchanan v. Evans*, 439 U.S. 1360, 1362 (1978) (Brennan, J., in

chambers) (alterations and quotation marks omitted). And it is well established that a

court sitting in equity must tailor relief to be "'no more burdensome to the defendant

than necessary to provide complete relief to the plaintiffs.'" *Trump v. CASA, Inc.*, 606

U.S. 831, 852 (2025) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). That

principle also "ensures that federal courts respect the limits of their Article III

authority," *United States v. Texas*, 599 U.S. 670, 693-94 (2023) (Gorsuch, J., concurring

in the judgment), which likewise requires that "a plaintiff's remedy" "be limited to the

inadequacy that produced his injury," *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alterations and quotation marks omitted).

Plaintiffs brought this case as a facial challenge to the final notice, and their standing to sue was thus predicated on a theory that they were likely to be injured as a result of the process outlined in that document.[4]  The district court held that the notice was unlawful and violated plaintiffs' First Amendment rights, and that this constitutional injury constituted irreparable harm that warranted injunctive relief. ADD.44.  The appropriate remedy from these findings would thus be to enjoin the notice's application to plaintiffs, which would afford "complete relief" to the irreparable injury identified by the district court.  The district court nevertheless reached further and imposed additional remedies.  It vacated the final notice on a universal basis, and separately, permanently enjoined the government from (1) applying to plaintiffs any viewpoint-based standard of review "that disfavors applications deemed 'to promote gender ideology,'" and (2) requiring plaintiffs "to comply with the [Executive Order] when using NEA funds."  ADD.43.  This remedy was broader than necessary to provide complete relief to plaintiffs in two respects.

---

[4] Plaintiffs also alleged that they were injured by the NEA's requirements that applicants for funding certify compliance with the Executive Order, which they construed as an "eligibility bar" on funding projects that promoted gender ideology. As discussed, the NEA retracted those requirements before issuing the final notice, and the final notice itself does not impose any such certification requirement or eligibility bar.  The district court did not conclude otherwise, finding only that the matter was "dispute[d]."  ADD.43 n.10.

*First*, the district court vacated the final notice on a universal basis without any serious consideration of whether traditional equitable principles supported that remedy. As discussed, a party-limited injunction prohibiting the government from applying the final notice to plaintiffs plainly provides relief for the only injury that gave rise to the case or controversy before the court. It thus stands to reason that district court's injunction—which prohibits the government from applying to plaintiffs any viewpoint-based standard of review that disfavors applications based on gender ideology—provides plaintiffs with complete relief. Having determined that such an injunction was appropriate, the district court should not have gone on to separately vacate the final notice without considering whether that remedy was duplicative of the injunction the court had already ordered.

In any event, this Court has referenced vacatur as a traditional equitable remedy. *See American Pub. Health Ass'n v. National Inst. of Health*, 145 F.4th 39, 50 (1st Cir. 2025) (affirmatively citing *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994) for the proposition that "vacatur" is an "equitable remedy"—"a type of declaratory relief that will guide an agency as it decides upon its future course of conduct"). It thus stands to reason that, like all equitable remedies, vacatur is discretionary, not automatic or compelled. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006). Indeed, the APA explicitly states that its provisions do not affect the "power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702.

The district court thus erred when it failed to consider whether universal vacatur was appropriate under the circumstances. That is particularly so given that vacatur provides relief to nonparties. The Supreme Court recently emphasized that longstanding equitable principles preclude relief to nonparties. *CASA*, 606 U.S. at 843-44. The district court recognized that this limitation prohibited it from issuing an injunction that extended beyond the plaintiffs to this suit. *See* ADD.43-44. Nevertheless, the district court stated, without analysis, that it was appropriate to vacate the final notice even as to nonparties because "vacatur" under 5 U.S.C. § 706(2) has a "broad scope." ADD.45. This demonstrates the district court's failure to properly consider whether vacatur was necessary to provide plaintiffs with complete relief under the circumstances of this case.

*Second*, the district court's injunction prohibiting the government from "requiring Plaintiffs . . . to comply with the [Executive Order] when using NEA funds" is plainly broadly than necessary to provide plaintiffs complete relief from the injury that gave rise to the case or controversy addressed by the court. ADD.43. Indeed, the court made no attempt to justify its decision to impose this burden on the government. It simply stated, without making any attendant findings to support this conclusion, that this injunction was necessary to provide plaintiffs "complete relief." ADD.43.

Notably, although the NEA's initial steps to implement the Executive Order required applicants to certify compliance with the Executive Order, JA96, the NEA

withdrew that requirement before issuing the final notice at issue here, JA146-47, JA217-18, and the notice itself expressly stated that no such certification is required, ADD.51 ("The process does not include an eligibility bar, nor does it include a certification requirement."); ADD.53 ("The NEA's implementation of EO 14168 . . . does not include a certification requirement . . . ."). As a result, any concerns about that prior certification requirement had become moot at the time of final judgment; plaintiffs could not possibly have demonstrated that any such requirement caused an ongoing, irreparable injury that warranted separate, injunctive relief.

The district court made no findings to the contrary. Indeed, its brief discussion of plaintiffs' irreparable harm did not address the certification requirement at all; the only time the court's opinion mentions a hypothetical certification requirement is a footnote that states that the parties "dispute" whether the NEA has reinstated that requirement. ADD.43 n.10. The court did not purport to resolve that factual dispute. The absence of any findings about how plaintiffs suffer an ongoing injury from such a requirement demonstrates that the injunction is clearly more burdensome on the government than necessary to afford complete relief to plaintiffs. At a minimum, the district court's failure to make any factual findings in support of this permanent injunction warrants a remand. *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544-45 (1st Cir. 1996) ("Though the district court enjoys considerable discretion . . . its decision to grant or deny a[n] . . . injunction must be supported by adequate findings of fact and conclusions of law."); *Knapp Shoes, Inc. v. Sylvania Shoe*

46

*Mfg. Corp.*, 15 F.3d 1222, 1228 (1st Cir. 1994) ("conclusory findings are not enough" to support an injunction (quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES CALENDA
  *United States Attorney*

DANIEL TENNY

 *s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*
  *Jennifer.l.utrecht@usdoj.gov*

April 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,469 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Jennifer L. Utrecht*

Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

*s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

ADDENDUM

# TABLE OF CONTENTS

Memorandum and Order Granting Plaintiffs' Motion for Summary Judgment
in Part and Denying in Part; Granting Defendants' Motion for Summary
Judgment in Part and Denying in Part, ECF No. 34 (Sept. 19, 2025) ...... ADD.1

National Endowment for the Arts, Final Notice (April 30, 2025), .................... ADD.46

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                      )
RHODE ISLAND LATINO ARTS, et al.,     )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )     C.A. No. 25-79 WES
                                      )
NATIONAL ENDOWMENT FOR THE ARTS,      )
et al.,                               )
                                      )
          Defendants.                 )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Senior District Judge.

Before the Court are Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion"), Dkt. No. 22, and Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Summary Judgment Motion ("Defendants' Motion"), Dkt. No. 24. Plaintiffs are three arts groups that applied for grants from the National Endowment for the Arts ("NEA") and a membership organization that represents such groups. Defendants are the NEA and its Acting Chairperson. Pursuant to an Executive Order, the NEA intends to disfavor grant applications that "promote gender ideology." Plaintiffs allege this practice would violate the First Amendment, the Administrative Procedure Act ("APA"), and the Fifth Amendment. Because the Court agrees with Plaintiffs regarding their First Amendment and APA claims, but not their Fifth Amendment claim,

**ADD.1**

Plaintiffs' Motion is granted in part and denied in part, and Defendants' Motion is denied in part and granted in part.

Defendants are therefore enjoined from applying a viewpoint-based standard of review to Plaintiffs that disfavors applications deemed "to promote gender ideology," and the Court vacates and sets aside Defendants' current plan to implement the Executive Order.

## I.   BACKGROUND

### A. The NEA's Authorizing Statute

The National Foundation on the Arts and the Humanities Act of 1965 ("NFAHA") declares, as amended, that "[t]he arts . . . belong to all the people of the United States."  20 U.S.C. § 951(1).  The NFAHA further provides that "it is necessary . . . for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent."  Id. § 951(7).  In accordance with these principles, the NFAHA established the NEA, which provides financial assistance to groups and certain individuals "of exceptional talent engaged in or concerned with the arts."  Id. § 954(c).  Among the priorities identified in the funding program at issue in this case are "projects and productions which have substantial . . . artistic and cultural significance, giving emphasis to American creativity

2

**ADD.2**

and cultural diversity," and those with similar significance "that reach, or reflect the culture of, a minority, inner city, rural, or tribal community."  Id. § 954(c)(1), (4).

Because the drafters and subsequent amenders of the NFAHA were concerned about the NEA being leveraged as an instrument of "political control of culture," they took several steps to ensure that grants are awarded based on talent alone, irrespective of the artists' viewpoints or the messages conveyed in their works.  See Am. Compl. ¶ 18, Dkt. No. 15 (quoting H.R. Rep. No. 89-618, at 21 (1965)); see also id. ¶ 22 ("Congress's intent was to have 'Government assistance, but not intervention[;] . . . support but not control[;] . . . stimulation but not participation.'" (omissions in original) (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. John S. Monagan))).

One safeguard against political interference is a prohibition against federal supervision or control over the policies, personnel, or operations of grant recipients.  20 U.S.C. § 953(c). Another safeguard is the nested, multilayer review process that underlies each individual grant decision.  Working outward from the innermost layer, this process begins with an advisory panel's review of a grant application; the panel is required to "recommend applications . . . solely on the basis of artistic excellence and artistic merit."  Id. § 959(c).  Notably, the NEA must "ensure

3

**ADD.3**

that all panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." Id. § 959(c)(1).

From there, the NEA's National Council on the Arts (the "Council") is required to make recommendations concerning whether to approve applications determined by the advisory panels to have artistic excellence and artistic merit. Id. § 955(f)(1). Just as the composition of the advisory panels ensures a diversity of viewpoints and backgrounds, so too does that of the Council. In selecting a voting member of the Council, the President must "give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the arts and shall make such appointments so as to represent equitably all geographical areas in the United States." Id. § 955(b)(1), (1)(C). Each of the Council's eighteen voting members "shall hold office for a term of six years, and the terms of office shall be staggered." Id. § 955(c).

At the outermost layer of review is the Chairperson, who may not approve or disapprove any application until it is recommended for approval by the Council, and who may not approve an application for which the Council has made a negative recommendation. Id. § 955(f)(2); see also id. § 955(b)(1) (requiring the President to

4

**ADD.4**

consider equitable representation in appointment of Chairperson). In establishing regulations and procedures for the NEA's funding program, the Chairperson must ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." Id. § 954(d)(1). The NFAHA further provides that "[i]n selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under [the program at issue here], the Chairperson shall give particular regard to artists and artistic groups that have traditionally been underrepresented." Id. § 954(c). The Chairperson and voting members of the Council are appointed by the President and confirmed by the Senate, id. §§ 954(b)(1), 955(b)(1)(C); and members of the advisory panels are appointed by the Chairperson, id. § 959(c)(6). The Chairperson serves a four-year term and is eligible for reappointment. Id. § 954(b)(2).

This complex statutory framework demonstrates Congress's intent to insulate the NEA from political control and to encourage the freedom of expression. As a Senate committee report on the original version of the NFAHA explained:

> It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. One of the artist's and humanist's great

**ADD.5**

> values to society is the mirror of self-examination
> which they raise so that society can become aware of its
> shortcomings as well as its strengths . . . . Countless
> times in history artists and humanists who were vilified
> by their contemporaries because of their innovations in
> style or mode of expression have become prophets to a
> later age.  Therefore, the committee affirms that the
> intent of this act should be the encouragement of free
> inquiry and expression. . . .  [C]onformity for its own
> sake is not to be encouraged, and . . . no undue
> preference should be given to any particular style or
> school of thought or expression.

Am. Compl. ¶ 22 (omissions in original) (quoting S. Rep. No. 89-300, at 3-4 (1965)); see also id. (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. Henry Helstoki) ("The Federal Government will supply the money, but the artists and their organizations will suggest the proposals, select the performances which are to be produced and do all the planning.  The Federal Government will be the means, but the end product will be the sole responsibility of the performing artists.")).

**B. The Instant Litigation**

**1. The Executive Order (the "EO")**

On January 20, 2025, President Trump signed Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  Id. ¶ 48. According to Section 2(f) of the EO:

> "Gender ideology" replaces the biological category of
> sex with an ever-shifting concept of self-assessed
> gender identity, permitting the false claim that males
> can identify as and thus become women and vice versa,
> and requiring all institutions of society to regard this

**ADD.6**

false claim as true.  Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.  Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

Exec. Order No. 14168, § 2(f), 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025).  The EO has multiple substantive provisions, but relevant to this case is Section 3(g), which declares that "[f]ederal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."  Id. § 3(g), 90 Fed. Reg. at 8616.

### 2. Initial EO Implementation and Lawsuit

The President signed the EO about three weeks ahead of the application deadline for the semiannual Grants for Arts Project ("GAP"), the NEA's premier grant program.  Am. Compl. ¶¶ 35, 38.  The submission deadline for the current funding cycle was initially set for February 13, 2025.  Id. ¶ 38.  On February 6, however, the NEA updated its application procedure and pushed the final deadline to March 24, with an intermediate deadline set for March 11.  Id. ¶¶ 38, 41.  The updated procedure required applicants to confirm that, if selected, they (1) would "comply with all applicable Executive Orders while the award [was] being administered" and (2) "underst[ood] that federal funds shall not be used to promote

7

**ADD.7**

gender ideology, pursuant to Executive Order No. 14168." Statement of Undisputed Facts ("PSUF") ¶ 28, Dkt. No. 23.

Plaintiffs are three individual arts groups — Rhode Island Latino Arts ("RILA"), National Queer Theater ("NQT"), and The Theater Offensive ("TTO") — and one member organization, Theatre Communications Group ("TCG"). Id. ¶¶ 45, 76, 102, 119. On March 6, Plaintiffs filed a Complaint alleging the NEA's implementation of the EO violated the First Amendment, APA, and Fifth Amendment; they also moved for a preliminary injunction. Am. Compl. ¶ 6; see Compl. ¶¶ 96-123, Dkt. No. 1.

### 3. Rescission of EO Implementation and Denial of Preliminary Injunction

After Plaintiffs filed their lawsuit, the NEA rescinded its implementation of the EO, pushed back the application deadline a second time, now to April 7, and announced it would re-implement the EO following a "new evaluation . . . in accordance with the [APA]." PSUF ¶¶ 31-33; Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 70-71, Dkt. No. 11-1. According to the NEA, "[t]his new consideration and evaluation process [would be] complete[d] by April 16, 2025" — nine days after the revised deadline — and the NEA would "implement and make public the final decision resulting from that process by April 30, 2025." Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 71.

Because the NEA had rescinded its implementation of the EO,

**ADD.8**

Defendants argued that Plaintiffs' claims were nonjusticiable, and they urged the Court to deny Plaintiffs' motion for a preliminary injunction.  In a Memorandum and Order entered April 3, the Court found that Plaintiffs' claims were justiciable under the voluntary cessation exception to the mootness doctrine.  Mem. & Order 20-23, Dkt. No. 13.  Applying this exception, the Court found that if a prohibition on the use of NEA funds to "promote gender ideology" were reinstated, it would likely violate the First Amendment and the APA.  Id. at 24-41.  The Court nevertheless denied Plaintiffs' motion for a preliminary junction.  Id. at 46.  Although Plaintiffs demonstrated a likelihood of success on the merits of their claims and showed irreparable harm, the Court found that the balance of the equities and public interest weighed heavily in Defendants' favor, in large part because an injunction would "short circuit" the NEA's then-pending administrative review process.  Id. at 42-46.

   **4. Re-Implementation of EO and Motions for Summary Judgment**

   As promised, the NEA published its final decision regarding the implementation of the EO (the "Final Notice") on April 30.[1] See Admin. R. ("AR") 207, 215, Dkt. No. 19.  The Final Notice

_____

   [1] The Court uses the term "Final Notice" because that is the name given to the corresponding file in the Administrative Record. See the drop-down Table of Contents for Admin. R. ("AR"), Dkt. No. 21.

**ADD.9**

states that the "existing multi-tiered application review process will remain unchanged," and that the Chairperson will implement the EO "by evaluating projects that promote gender ideology based on the existing statutory criteria at the final stage of application review."[2]  Id. at 207.  In other words, neither when advisory panels determine that certain applications "have artistic excellence and artistic merit," 20 U.S.C. § 955(f)(1), nor when the Council "make[s] recommendations to the Chairperson concerning . . . whether to approve [those] applications," id. § 954(f), (f)(1), will the NEA implement the EO.  Rather, the Chairperson will independently assess those applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology," on a "case-by-case" basis.  AR 208.  If the Chairperson "concludes that a proposed project 'promotes gender ideology," it will not be "denied solely" for that reason, but it "could weigh against the project's final approval."  Defs.' Objs. & Resp. Pls.' 1st Set Reqs. Admis. ("Defs.' Admiss.") 2, Dkt. No. 21; see Text Order (June 4, 2025).  In no circumstance, however, could it "weigh in favor of the project's final approval."

---

[2] "The Chair[person's] review of proposed projects follows shortly after the Council has made its recommendations," which traditionally does not happen "until the end of the third week of October." Defs.' Resps. Pls.' Statement Facts & Separate Statement Undisputed Facts ("DSUF") ¶ 4, Dkt. No. 25.

Defs.' Resps. Pls.' Statement Facts & Separate Statement Undisputed Facts ("DSUF") ¶ 40, Dkt. No. 25 (emphasis added).

In their Amended Complaint, Plaintiffs allege that the Final Notice violates the First Amendment, APA, and Fifth Amendment; and they move for summary judgment on all claims.  Am. Compl. ¶¶ 112-141; Pls.' Mem. L. Supp. Mot. Summ. J. (Pls.' Mem.") 1-2, Dkt. No. 22-1.  Defendants move for summary judgment on all claims as well. Defs.' Mot. 1-3.

## II.  LEGAL STANDARD

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Viscito v. Nat'l Plan. Corp., 34 F.4th 78, 83 (1st Cir. 2022) (quoting Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017)).  "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." Scottsdale Ins. v. United Rentals (N. Am.), Inc., 977 F.3d 69, 72 (1st Cir. 2020).

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA.  Bos.

11

**ADD.11**

Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016).

## III. DISCUSSION

On the First Amendment claim and all three APA claims, the Court grants summary judgment to Plaintiffs; on the Fifth Amendment claim, however, the Court grants summary judgment to Defendants.

### A. First Amendment Claim

The Court finds that the NEA's Final Notice violates the First Amendment because it is a viewpoint-based restriction on private speech.  A threshold issue is whether NEA-funded art is government speech or private speech.  If NEA-funded art is government speech, then restrictions on that speech do not implicate the Free Speech Clause of the First Amendment.  Because the Court determines that NEA-funded art is private speech, it next considers whether the Final Notice amounts to a restriction on that speech and, if so, what type of restriction.

With the Final Notice in effect, projects deemed to promote gender ideology are less likely to be approved for NEA funding. The Final Notice is thus a restriction on artists' speech, and one that is viewpoint based, because it assigns negative weight to the expression of certain ideas on the issue of gender identity.  The Final Notice is thus presumptively unconstitutional.  Because the restriction cannot withstand judicial scrutiny, the Court

12

**ADD.12**

concludes that the Final Notice violates the First Amendment.

**1. Government or Private Speech**

The Court must first determine whether the Free Speech Clause of the First Amendment applies to the NEA's funding program. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009). The line between private speech and government speech "can blur," however, when "the government invites the people to participate in a program." Shurtleff v. City of Boston, 596 U.S. 243, 252 (2022). That is what Congress did when it decided to fund the arts through the NEA. In these situations, a court must assess whether the program is designed to "transmit the government's message" or facilitate private expression. Id.; see id. at 271 (Alito, J., concurring). If the former, then participation in the program is government speech, and the government can restrict the viewpoints expressed in the program without implicating the Free Speech Clause. If the latter, then participation in the program is private speech, and the Free Speech Clause applies.

To determine whether participants in a program are engaged in government speech or private speech, a court considers "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the

13

**ADD.13**

extent to which the government has actively shaped or controlled the expression."[3]  Id.  These considerations have led the Supreme Court to hold that "the messages of permanent monuments in a public park constituted government speech, even when the monuments were privately funded and donated."  Id.  (citing Summum, 555 U.S. at 470-73).  Similarly, the Supreme Court held that Texas's specialty license plate designs are government speech, even when the designs are proposed by private parties, because license plates "long have communicated messages from the States," the designs "are often closely identified in the public mind with the State," and "Texas maintains direct control over the messages conveyed" on the plates. Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 210-13 (2015) (brackets omitted).

On the other hand, the Supreme Court held that "trademarking words or symbols generated by private registrants" were private speech because even though the government "had to approve each proposed mark, it did not exercise sufficient control over the

---

[3] As the Supreme Court has emphasized, these considerations do not amount to "rigid factors."  See Shurtleff v. City of Boston, 596 U.S. 243, 252 (2022); see id. at 261-76 (Alito, J., concurring) (criticizing the majority's "factorized approach" and advocating a method of review in which "government speech occurs if — but only if — a government purposefully expresses a message of its own through persons authorized to speak on its behalf, and in doing so, does not rely on a means that abridges speech").

**ADD.14**

nature and content of those marks to convey a governmental message in so doing." Shurtleff, 596 U.S. at 252-53 (citing Matal v. Tam, 582 U.S. 218 (2017)). And it also held that Boston's flag-raising program, in which the city occasionally let private groups hoist their own flags in place of the Boston flag on one of three flagpoles in front of city hall — the flags of the United States and Massachusetts flew from the other poles — was also private speech. Shurtleff, 596 U.S. at 248. For despite "the historical practice of flag flying at government buildings," the city had no "meaningful involvement in the selection of flags or the crafting of their messages." Id. at 258.

These precedents lead the Court to conclude that NEA-funded art is private speech, not government speech.[4] Indeed, all three considerations discussed above — history, public perception, and

---

[4] Defendants contend the relevant inquiry is not whether NEA-funded art is government speech, but whether the NEA's decision to fund that art is government speech. Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply") 4-5, Dkt. No. 32. That cannot be right. When the NEA decides to fund certain art, that is an example of "the government invit[ing] the people to participate in a program." Shurtleff, 596 U.S. 243, 252 (2022). The Court must therefore determine whether speakers participating in the program are "exercising a power to speak for [the] government" or speaking for themselves. See id. at 268 (Alito, J., concurring). In this case, the relevant act of participation is the production of art that is funded by the NEA. It is therefore the art — not the NEA's decision to fund the art — that is the proper focus of the Court's government speech inquiry.

**ADD.15**

control — weigh in favor of Plaintiffs.[5]

### a. History

The Court first considers the "history of the expression at issue." Shurtleff, 596 U.S. at 252. The objective here is to determine whether the relevant speech has traditionally been used to "communicate[] messages from the [government]." Walker, 576 U.S. at 210-11.

There is no question that, historically, art has been used as a medium to communicate the government's messages and that often the government has relied on the work of private artists to achieve that goal. Were the Court "to consider only that general history," it would find that the first factor of the government-speech test favors Defendants. Shurtleff, 596 U.S. at 253. But the Court is wary of painting with too broad a brush. Notwithstanding the general history of government involvement in the arts, the history of the specific arts-funding program at issue here suggests that its participants are engaged in private speech.[6]

---

[5] The Court takes heed of Justice Alito's warning that, because the government-speech doctrine "is susceptible to dangerous misuse," the Supreme Court "must exercise great caution before extending [its] government-speech precedents." Matal v. Tam, 582 U.S. 218, 235 (2017).

[6] Supreme Court precedent suggests that the general history of the expression involved and the specific history of the program at issue are both relevant to government-speech analysis. See

**ADD.16**

At its inception, the NEA was designed not as an instrument of political communication but as a vehicle for private expression. That much is clear from the text of the NFAHA, which declares that "[t]he arts . . . belong to all the people of the United States," 20 U.S.C. § 951(1), and moreover directs "the Federal Government to help create and sustain not only a climate encouraging freedom of thought . . . but also the material conditions facilitating the release of this creative talent," id. § 951(7); see also supra Part I.A (discussing structure and legislative history of NFAHA).

Despite this origin story, Defendants suggest that subsequent controversies surrounding the NEA — and amendments to the NFAHA that were passed in response — complicate the historical analysis. See Defs.' Mot. 8-11, 21.  In 1990, Congress amended the NFAHA following public controversy over two "provocative works," neither of which received funding directly from the NEA but rather from "organization[s] that received NEA support."  Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 574-75 (1998).  The first was a "retrospective of photographer Robert Mapplethorpe's work," which "included homoerotic photographs that several Members of Congress

─────────────

Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 210-12 (2015) (considering both histories); see also id. at 218-29 (citing Cornelius v. NAACP Leg. Def. & Educ. Fund, 473 U.S. 788, 804-06 (1985) (discussing history of specific fundraising program involved in that case).

**ADD.17**

condemned as pornographic," and the second was "Andres Serrano's work Piss Christ, a photograph of a crucifix immersed in urine." Id. at 574.  With the help of an independent commission, Congress amended the NFAHA with the provisions now codified at § 954(d), which require the Chairperson to ensure (1) that "general standards of decency and respect for the diverse beliefs and values of the American public" are considered in the distribution of NEA funds, and (2) that projects "determined to be obscene are prohibited from receiving" NEA support.  See Pub. L. No. 101-512, § 103, 104 Stat. 1915, 1963 (1990).  Defendants also highlight language that was added to the NFAHA's findings and purpose section:

> [T]he Government must be sensitive to the nature of public sponsorship.  Public funding of the arts . . . is subject to the conditions that traditionally govern the use of public money.  Such funding should contribute to public support and confidence in the use of taxpayer funds.  Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines.
>
> . . . .
>
> The arts . . . reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups.

Defs.' Mot. 11 (quoting Pub. L. No. 101-512, § 101, 104 Stat. at 1961 (codified at 20 U.S.C. § 951(5), (6))) (second omission in original).

In the Court's view, none of these additions transformed the

18

**ADD.18**

NEA into a means for communicating the government's messages.  If anything, the 1990 amendments demonstrate that Congress intended to preserve the NEA as a vehicle for private speech, despite the potential for public controversy.  See Finley, 524 U.S. at 582 (quoting 136 Cong. Rec. 28674 (1990) ("If [Congress has] done one important thing in this amendment, it is this.  We have maintained the integrity of freedom of expression in the United States.")).  As noted in Finley, the independent commission "cautioned Congress against the adoption of distinct viewpoint-based standards for funding" and, consistent with that recommendation, "Congress declined to disallow any particular viewpoints."  524 U.S. at 581-82.  Instead, Congress emphasized the importance of respecting the "diverse beliefs" of all Americans while accounting for "general standards of decency"[7] and ensuring that obscenity, which is not

---

[7] In the Court's view, the "decency" component of 20 U.S.C. § 954(d)(1) is akin to requirements that school libraries take "educational suitability" into account when selecting the books on their shelves.  See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 584 (1998) (citing Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 871 (1981)).  Such requirements may be permissible.  Id.  But even if the NEA has some degree of content-based discretion over its funding choices, "that discretion may not be exercised in a narrowly partisan or political manner," because "[o]ur Constitution does not permit the official suppression of ideas."  Pico, 457 U.S. at 870-71; see also Matal, 582 U.S. at 243 (noting "some content- and speaker-based restrictions may be allowed" depending on the nature of the forum, but "'viewpoint discrimination' is forbidden." (quoting

**ADD.19**

protected by the First Amendment, is ineligible for NEA funding. 20 U.S.C. § 954(d)(1), (2); see also United States v. Williams, 553 U.S. 285, 288 (2008) (noting obscenity is unprotected speech). None of these changes suggest that Congress reformed the NEA into a medium for communicating government messages at the expense of other views.  Rather, this chapter of the NEA's history reinforces the notion that it was designed to support free expression through the use of public funds, despite the resulting challenges.

As a final note on the history front, Defendants contend that "government patronage of the arts reflects a historical tradition of government speech." Defs.' Mot. 19.  Although the Court agrees as a general matter, the cases Defendants cite in support of their argument demonstrate the risks of employing an overly broad reading of history in this context. See id. at 19 n.16.  One case involved a public art exhibit organized around specific themes in which the host city not only funded, but also took ownership of, the winning installations and provided the venue for their display. McGriff v. City of Miami Beach, 84 F.4th 1330, 1332-35 (11th Cir. 2023). Another involved the Smithsonian Institution's decisions over which art it chooses to exhibit in the National Portrait Gallery. Raven v. Sajet, 334 F. Supp. 3d 22, 25-26 (D.D.C. 2018).  And a

---

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 831 (1995))).

20

**ADD.20**

third involved a congressional art competition in which the works were selected to represent a particular House district, sponsored by the House member for that district, and displayed on the Capitol grounds.  Pulphus v. Ayers, 249 F. Supp. 3d 238, 240-41 (D.D.C. 2017).[8]

None of these examples capture the unique history and purpose of the NEA, let alone the NEA's relationship with the art that it funds.  To be sure, these considerations are better addressed under the rubrics of public perception and control.  But the NEA stands in contrast to the government-funded arts programs discussed in these cases, which in turn undermines Defendants' argument about history.  In conclusion, the "history of the expression at issue," defined narrowly as NEA-funded art, supports a finding that such art is private speech.  See Shurtleff, 596 U.S. at 252.

### b. Public Perception

The Court next considers "whether the public would tend to view the speech at issue as the government's."  Id. at 255.  Another way of framing the inquiry is whether, in transmitting a message through art using NEA funds, an artist "likely intends to convey

---

[8] For a discussion of the fourth case that Defendants cite, People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23 (D.C. Cir. 2005), see Mem. & Order 35, Dkt. No. 13.  See Defs.' Cross-Mot. Summ. J. & Opp'n Pls.' Summ. J. Mot. ("Defs.' Mot.") 19 n.16, Dkt. No. 24.

**ADD.21**

to the public that the [government] has endorsed that message." Walker, 576 U.S. at 212. As with the history factor, the public-perception factor supports Plaintiffs' contention that NEA-funded art is private speech.

Unlike the programs involved in the cases Defendants cite above, the NEA does not take ownership of or designate a venue for the works that it funds. Instead, NEA-funded art "is billed as the work of the artists and funded organization[s], not the NEA," DSUF ¶ 21, and must be "supported by other sources of funding" in addition to the NEA, id. ¶ 24; see 20 U.S.C. § 954(e). Moreover, NEA-funded art "is typically performed or exhibited in private venues and galleries, or in public parks and streets not owned by the NEA, but rather other government actors who require separate, distinct approvals." DSUF ¶ 25; contra Raven, 334 F. Supp. 3d at 25-26; Pulphus, 249 F. Supp. 3d at 240-41. And "NEA-funded organizations retain the intellectual property rights in their NEA-funded works." DSUF ¶ 26; contra McGriff, 84 F.4th at 1332-35.

Based on these facts about NEA-funded art, the Court finds it unlikely that members of the public would think that NEA-funded artists speak for anyone but themselves, and certainly not for the government. That is especially true given the diversity of views reflected in the projects that the NEA — even when accounting for

22

**ADD.22**

changes in presidential administrations — has decided to fund. See, e.g., Pls.' Mem. 15 n.3 (citing examples in which the NEA has funded projects with conflicting themes and that appear to clash with the relevant administration's policy views).  Indeed, if the government is speaking through recipients of NEA funding, then it is "babbling prodigiously and incoherently, saying many unseemly things, and expressing contradictory views."  Matal, 582 U.S. at 236 (citation modified).

Notwithstanding the above, Defendants argue that "the public perceives the NEA's seal of approval as the government speaking." Defs.' Mot. 25.  True, recipients of NEA funding must acknowledge, "in a prominent manner," that their projects are supported in part by an award from the NEA and display the NEA's logo in materials related to their projects.  Id.; see DSUF ¶ 23.  But "if private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints."  Matal, 582 U.S. at 235. Furthermore, many artists likely seek NEA support in part because the prestige of receiving a grant could translate to other funding opportunities.  See Defs.' Mot. 7 n.5 (citing, inter alia, Decl. Giselle Byrd ¶ 19, Dkt. No. 2-5).  In this respect, the NEA's seal of approval functions as an endorsement, and one that signals to prospective funders the artistic merits of a given project.  But

23

**ADD.23**

the government can endorse a project as good art without further endorsing all the messages or viewpoints it conveys.  In short, the government may speak for itself when it approves an artist's work, but that does not mean the artist speaks for the government when it produces that work.

The Court therefore concludes that when it comes to NEA-funded art, "the public's likely perception" is that a private person, not the government, "is speaking."  Shurtleff, 596 U.S. at 252.

### c. Control

The final consideration is the extent to which the government has "actively controlled" the production of NEA-funded art and "shaped the messages" that the art conveys.  Id. at 256.  In this context, it matters less that the NEA has final approval authority over each project, see id. at 252-53 (citing Matal, 582 U.S. 218), and that it contributes — by providing partial funding — to the means of production, see id. at 256 (discussing Boston's provision of hand crank for raising flags).  Rather, what matters most is the NEA's control over the art's "content and meaning" because "that type of control would indicate that [it] meant to convey the [art's] messages."  Id.

This factor weighs decisively in favor of a conclusion that NEA-funded art is private speech.  As with the trademarks at issue

24

**ADD.24**

in Matal, the NEA "does not dream up" the art that it funds, "and it does not edit [the projects] submitted for [approval]." Matal, 582 U.S. at 235.  In fact, when Plaintiffs received NEA funding in the past, the NEA neither "suggested to applicants that they should make substantive changes to their projects" nor "otherwise offered feedback on the substance of a project." DSUF ¶¶ 17-18.  Moreover, "[w]hen the NEA has given feedback on proposals, it has been about how to better frame an applicant's pitch to make it a more competitive application, not about changing the project itself." Id. ¶ 19 (emphasis added).  And NQT, which hosts an annual theater festival, has received approval for NEA funding in previous cycles before even deciding which plays to include in the relevant year's festival.  See Suppl. Decl. Adam Odsess-Rubin ¶ 14, Dkt. No. 22-4.  In scenarios like this, the NEA cannot be said to control, or even be aware of, the content or viewpoints of the works that it funds.  See Pls.' Opp'n Defs.' Cross-Mot. & Reply Supp. Pls.' Mot. ("Pls.' Reply") 12-13, Dkt. No. 31.

Defendants discredit Plaintiffs' declarations to the extent that Plaintiffs' experiences do not "establish any fact relative" to the NEA in general.  See, e.g., DSUF ¶ 18.  But Defendants mount no evidence that would allow the Court to look beyond Plaintiffs' experiences and make general findings about the NEA's control over the content and meaning of the art that it funds.  Relatedly, the

25

**ADD.25**

Final Notice proclaims that "the NEA has historically expressed a preference for certain projects, which often reflect administration priorities." AR 211. But there is no evidence in the record that, prior to this funding cycle, the NEA has solicited applications through its GAP program for projects that espouse specific themes, much less advance the administration's policy preferences. Id. (discussing current funding cycle's "America250" program); see generally DSUF (providing no examples from previous cycles). Contra McGriff, 84 F.4th at 1332-35. Instead, Defendants' control argument rests on the NEA's final approval authority. See Defs.' Mot. 28-30. But for all the reasons above, that is insufficient.

The Court concludes that the history, public perception, and government's control of the expression at issue — NEA-funded art — all demonstrate that such art is not government speech, but private speech.

### 2. Nature of Speech Restriction

Because NEA-funded art is private speech, the Free Speech Clause of the First Amendment applies to any restrictions that are placed on that speech. The Court must therefore review the Final Notice to determine whether it restricts artist's speech and, if it does, the type of restriction at issue. The latter question is important to the extent this case implicates the Supreme Court's

**ADD.26**

forum precedents.  See Finley, 524 U.S. at 586 (suggesting NEA is not a limited public forum and, by implication, is thus a nonpublic forum); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 830 (1995) (describing university's student activities fund as a "metaphysical" limited public forum).  Depending on the nature of the forum involved, "some content- and speaker-based restrictions may be allowed."  Matal, 582 U.S. at 243.  But in all cases, "'viewpoint discrimination' is forbidden."  Id. (quoting Rosenberger, 515 U.S. at 831); see also Shurtleff, 596 U.S. at 275-76 (Alito, J., concurring) (noting that if Boston had created a nonpublic forum, it could have restricted use of its flagpole to certain subject matters, but "it could not have employed viewpoint-discriminatory criteria to bar otherwise-eligible speakers from expressing their views on those subjects").

The Court concludes that the Final Notice restricts artists' speech, and that it does so on the basis of viewpoint.  As defined in the EO, "gender ideology" "permit[s] the false claim that males can identify as and thus become women and vice versa," and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."  EO § 2(f), 90 Fed. Reg. at 8615-16.  The EO further provides that "[f]ederal funds shall not be used to promote gender ideology," and that "[e]ach agency shall assess grant conditions and grantee preferences [to] ensure grant

27

**ADD.27**

funds do not promote gender ideology." Id. § 3(g), 90 Fed. Reg. at 8616.

The Final Notice states that the Chairperson will assess NEA funding applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology," on a "case-by-case" basis. AR 208. It does not further define what it means to "promote gender ideology." But it notes that "[t]he EO requires executive agencies to take all necessary steps, as permitted by law, to ensure that agency funds are not used to promote gender ideology." Id. at 207 (emphasis added).

Defendants concede that if the Chairperson "concludes that a proposed project 'promotes gender ideology,' that factor could weigh against the project's final approval." Defs.' Admiss. 2. To be sure, the Chairperson "will not disqualify a project from consideration solely on [the Chairperson's] conclusion that a proposed project 'promotes gender ideology.'" Id. But in no circumstance could that conclusion "weigh in favor of the project's final approval." DSUF ¶ 40.

From the Court's perspective, these concessions demonstrate that projects deemed to "promote gender ideology" are less likely to receive NEA funding. In other words, the NEA intends to disfavor applications that promote gender ideology precisely because they promote gender ideology. The Final Notice therefore

28

**ADD.28**

promises to penalize artists based on their speech.  If the NEA restricted all applications that touched on the subject of "gender ideology," or on the relationship between sex and gender more broadly, that would amount to a content-based restriction on artists' speech.  See Rosenberger, 515 U.S. at 828-29.  Because the Final Notice targets the promotion of specific ideas about these topics, however, the NEA is engaged in viewpoint discrimination, which is "an egregious form of content discrimination."  Id. at 829; see also Finley, 524 U.S. at 587 (upholding 20 U.S.C. § 954(d)(1) but noting it "would confront a different case" "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints").  Therefore, regardless of whether forum analysis applies to the NEA, the Final Notice is presumptively invalid because it is viewpoint discriminatory.  See Cornelius, 473 U.S. at 806; Shurtleff, 596 U.S. at 275-76 (Alito, J., concurring); see also Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004).

### 3. Application of Judicial Scrutiny

Viewpoint discrimination is traditionally subject to strict scrutiny, which requires the government to prove the restriction is "narrowly tailored to serve compelling state interests."  Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).  Defendants make no

29

**ADD.29**

effort to argue the Final Notice satisfies any type of judicial scrutiny, let alone strict scrutiny; indeed, Defendants have not even asserted the state interest behind the NEA's new policy, aside from complying with the EO.  See generally Defs.' Mot.  Therefore, the Court finds that the Final Notice fails judicial scrutiny and thus violates the First Amendment.

## B. APA Claims

The Court also finds that the Final Notice violates the APA. The APA requires courts to "hold unlawful and set aside agency action" that, inter alia, is in excess of statutory authority, arbitrary and capricious; or contrary to a constitutional right. 5 U.S.C. § 706(2)(A)-(C).  Although the APA "embodies a 'basic presumption of judicial review,'" agency action is not reviewable unless it is "final."  Dep't of Com. v. New York, 588 U.S. 752, 771 (2019) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 140 (1967)); see 5 U.S.C. § 704.  To satisfy this requirement, the action must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation modified).

## 1. Final Agency Action and Ripeness

The Court finds that the Final Notice is reviewable as final

**ADD.30**

agency action because it marked the consummation of the NEA's "consideration and evaluation process" about how to implement the EO and determined that the Chairperson has the right, if not the obligation, to assess NEA grant applications based on viewpoint-discriminatory criteria. See Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 71. And it also stated that the Chairperson would exercise this right when reviewing applications submitted during the current funding cycle. Defendants argue there is no final agency action because Plaintiffs' applications might not advance to the final stage of review, when the Chairperson will exercise this purported right. Defs.' Mot. 33. In any event, Defendants contend, "Plaintiffs undisputedly lack any right" to receive NEA grants, which are competitive. Id. at 34.

Defendants' arguments are unavailing. No application will be approved without first being assessed according to the criteria. The assessment is thus a prerequisite to acceptance and, therefore, all applications are subject to it. By way of an analogy, imagine that an elite college announces that it will assess student applications based on applicants' race, but only during the final stage of review when most applicants are no longer in contention. Just because the admissions policy will be enforced against only some applicants does not change the fact that it applies to all applicants. So too here. Nor do Plaintiffs claim a right to

31

**ADD.31**

receive NEA grants.  Rather, they claim a right to have their applications assessed according to criteria that are not viewpoint discriminatory, and that the Final Notice violates that right. See Pls.' Reply 18.  The Court thus finds that the Final Notice is reviewable under the APA.

Relatedly, the Court finds that Plaintiffs' APA claims are ripe because the issues are fit for judicial review and Plaintiffs will face hardship if the Court withholds consideration.  See Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). Relevant to this inquiry is whether the issues are "purely legal" and whether "further factual development" is necessary.  Id. at 812.  The issues are fit for judicial review because whether the Chairperson has power to assess applications based on viewpoint-discriminatory criteria is a purely legal question.  Furthermore, Plaintiffs will face hardship if the Court withholds consideration of this question, because if it turns out the Chairperson lacks the power asserted, then Plaintiffs' applications will have been assessed according to unlawful criteria.

In summary, the Final Notice is reviewable, and Plaintiffs' APA claims are ripe.  The Court therefore considers the merits of Plaintiffs' APA claims.

## 2. In Excess of Statutory Authority

The Court finds that the Final Notice violates the APA because

**ADD.32**

the NEA's authorizing statute does not empower the Chairperson to categorically disfavor applications for promoting certain views. See 5 U.S.C. § 706(2)(C).  The "command of the APA" is "that 'the reviewing court' — not the agency whose action it reviews — is to 'decide <u>all</u> relevant questions of law' and 'interpret . . . statutory provisions.'"  <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369, 398 (2024) (omission in original) (quoting 5 U.S.C. § 706).  Therefore, "in deciding whether an agency has acted within its statutory authority," courts "must exercise their independent judgment" and, in doing so, provide no deference to the agency's interpretation.  <u>Id.</u> at 392, 412.  Here, the relevant question is whether the Final Notice is inconsistent with the NEA's authorizing statute, the NFAHA.

In attempting to reconcile the Final Notice with the NFAHA, the Court can only conclude that "the NEA [has tried] to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints."  <u>Finley</u>, 524 U.S. at 587.  According to the Final Notice, the Chairperson will conduct a "case-by-case review . . . of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology."  AR 208.  This independent assessment will occur during the final stage of the application process — after the advisory panels have determined whether certain

33

**ADD.33**

applications "have artistic excellence and artistic merit," and after the Council has "ma[d]e recommendations to the Chairperson concerning . . . whether to approve" those applications. 20 U.S.C. § 955(f), (f)(1); see AR 210-12. During these earlier stages, neither the advisory panels nor the Council will consider whether proposed projects promote gender ideology; only the Chairperson will do that. See Defs.' Mot. 33; AR 207-09, 212-14. If the Chairperson concludes that a proposed project promotes gender ideology, the effect can only be negative. See supra Part III.A.2.

As to what empowers the Chairperson to categorically disfavor projects that promote certain viewpoints, Defendants offer two theories. First, the Final Notice posits that the Chairperson has statutory authority to make an independent assessment of artistic excellence and artistic merit, and that whether a project promotes gender ideology is relevant to that assessment. See AR 210-11. Second, Defendants contend that the NFAHA empowers the Chairperson to consider whether a project aligns with "general standards of decency and respect for the diverse beliefs and values of the American public," with the implication being that a project that promotes gender ideology does not. Defs.' Mot. 35-36 (discussing 20 U.S.C. § 954(d)(1)).

Both theories conflict with the NFAHA. To be sure, the NFAHA affords the Chairperson some discretion over whether to approve

34

**ADD.34**

applications that have made it past the first two rounds of review. When exercising that discretion, the Chairperson will be assessing content. See Finley, 524 U.S. at 585-86. Even so, neither the statute's instruction to employ the "subjective criteria" of excellence and merit nor its "vague exhortation" to consider decency and respect for diverse beliefs — i.e., viewpoint diversity — empowers the Chairperson to adopt an explicit policy of viewpoint discrimination. See id. at 583-84, 587.

Although the Chairperson has final approval authority over whether the NEA should fund certain projects, the NFAHA vests most of the substantive power to review those projects in the advisory panels and the Council. And the statute constrains the discretion of those entities as well. The Chairperson must "utilize advisory panels," which are required to recommend applications "solely on the basis of artistic excellence and artistic merit." 20 U.S.C. § 959(c). Those recommendations go to the Council, which in turn "make[s] recommendations to the Chairperson concerning" whether to approve those application and how much funding to provide for each. Id. § 955(f)(1)-(2). The Council cannot recommend applications to the Chairperson that have not been determined by the panels to have artistic excellence and artistic merit. Id. § 955(f)(1). And the Chairperson "may not approve an application with respect to which the Council makes a negative recommendation." Id.

35

**ADD.35**

§ 955(f)(2).  Therefore, the panels' discretion constrains the Council's discretion, which in turn constrains the Chairperson's.[9]

This multistep review process reflects the NFAHA's stated purpose of "encouraging freedom of thought," id. § 951(7), as well as a broader effort to minimize the influence of politics over the NEA's funding decisions.  See supra Part I.A (discussing NFAHA's legislative history).  Other features of the statute speak to those intentions as well.  The Chairperson is directed to "ensure that all advisory panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view."  20 U.S.C. § 959(c)(1).  Furthermore, the panels must include "lay individuals who are knowledgeable about the arts but who are not engaged in the arts as a profession and do not belong to arts organizations or artists' organizations.  Id. § 959(c)(2).  Panel members are appointed by the Chairperson.  Id. § 959(c)(6).

As for the Council, its eighteen voting members must be "private citizens" who are widely recognized for their involvement in the arts and include "practicing artists, civic cultural

---

[9] The statute contains one exception not relevant here, which allows the Council to delegate its authority to the Chairperson for certain applications and with significant limitations.  See 20 U.S.C. § 955(f).

**ADD.36**

leaders, members of the museum profession, and others who are professionally engaged in the arts." Id. § 955(b)(1)(C). Although appointed by the President, the Council's voting members serve staggered, six-year terms and cannot be reappointed for two years after their terms expire. Id. § 955(c). The NFAHA instructs the President to "give due regard" to different types of diversity in making the appointments. Id. § 955(b)(1)(C).

In contrast, the Chairperson has no statutorily prescribed qualifications and serves a four-year term. Id. § 954(b). This lopsidedness in the statutory scheme confirms that the NFAHA is designed to shield the NEA's review process from politics. For one, unlike the final stage of review, which is entrusted to a single person, the first two stages of review are entrusted to multimember deliberative bodies that represent cross sections of the American public. Furthermore, unlike the decision to give the Chairperson a four-year term, the fact that Congress gave the Council's voting members a staggered, six-year term with a two-year bar on reappointment suggests that it meant for them to be insulated from political influence. See Beck v. Tex. Bd. of Dental Exam'rs, 204 F.3d 629, 636 (5th Cir. 2000). And as noted above, when it comes to experience or expertise in the arts, the NFAHA contemplates a marked asymmetry between the Council and advisory panels on one side and the Chairperson on the other. This in turn

37

**ADD.37**

suggests that the Chairperson's role in the application review process is designed to be more formal than substantive.

Given these considerations, the Court finds it impossible to square the Final Notice with the NEA's authorizing statute. Although the NFAHA gives the Chairperson the final word over whether to approve applications for NEA grants, the Chairperson cannot use that power to downgrade applications simply because they promote disfavored views. The Court therefore finds that the Final Notice violates the APA because it exceeds the Chairperson's statutory authority under the NFAHA.

## 3. Arbitrary and Capricious

The Final Notice also violates the APA because it is arbitrary and capricious. See 5 U.S.C. § 706(2)(A). In determining whether final agency action is arbitrary and capricious under the APA, a reviewing court must consider "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" Dep't of Com., 588 U.S. at 773 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). The scope of review is narrow, and a court "may not substitute [its] judgment for that of the [agency]." Id. That said, final agency action may be arbitrary and capricious "if the agency has relied on factors which

38

**ADD.38**

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

The NEA's only explanation for its decision to categorically disfavor applications that promote gender ideology is that it will "serve the public by . . . furthering the current administration's priorities as provided in the [EO]," AR 214, which states that "[f]ederal funds shall not be used to promote gender ideology." EO § 3(g), 90 Fed. Reg. at 8616. The administrative record — which consists of the NFAHA, "a smattering of cases," the EO, the NEA's grant application guidelines, and the Final Notice — is devoid of reasoned policy analysis and is devoted instead to defending the NEA's decision on legal grounds. Pls.' Mem. 22; see generally AR. There is no examination of relevant data, there are no findings of fact, and there is zero explanation of what it means for a project to "promote gender ideology," let alone how that concept relates to artistic merit, artistic excellence, general standards of decency, or respect for the diverse beliefs and values of the American public. In short, the NEA has made no effort to justify its policy on any grounds aside from complying with the EO.

39

**ADD.39**

Defendants' basic argument is that the NEA is accountable to the public and the President executes the public's will; therefore, the Final Notice cannot be arbitrary and capricious because it "reflects a policy directive that the President issued."  Defs.' Mot. 37.  To be sure, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."  Dep't of Com., 588 U.S. at 781.  But a "decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order."  Louisiana v. Biden, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), vacated and remanded on other grounds, 45 F.4th 841 (5th Cir. 2022).  Because the NEA has failed to explain its action outside of complying with the EO, the Court concludes that the Final Notice is arbitrary and capricious in violation of the APA.

### 4. Contrary to Constitutional Right

Finally, for the reasons discussed in Part III.A, the Final Notice is unlawful under the APA because it violates Plaintiffs' constitutional rights to free speech.

### C. Fifth Amendment Claim

The Court finds that Defendants are entitled to summary judgment on Plaintiffs' Fifth Amendment claim.  The Fifth Amendment to the U.S. Constitution prohibits deprivations of "life, liberty,

**ADD.40**

or property, without due process of law." U.S. Const. amend. V. Under the void-for-vagueness doctrine, a law may violate the Fifth Amendment if it (1) does not "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) "may authorize and even encourage arbitrary and discriminatory enforcement." City of Chicago v. Morales, 527 U.S. 41, 56 (1999).

"The degree of vagueness that the Constitution tolerates — as well as the relative importance of fair notice and fair enforcement — depends in part on the nature of the enactment," including the subject matter involved and the penalties at stake. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498-99 (1982). "In particular, the [Supreme] Court has 'expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.'" Sessions v. Dimaya, 584 U.S. 148, 156 (2018) (quoting Hoffman Ests., 455 U.S. at 498-99). But "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." Hoffman Ests., 455 U.S. at 499.

Plaintiffs contend that the Final Notice is void for vagueness

**ADD.41**

on both notice and enforcement grounds.   Regarding notice, they argue that the NEA's failure to explain what it means to "promote gender ideology" has left Plaintiffs uncertain of what exactly the Chairperson intends to disfavor.  Pls.' Mem. 25-27.  As a result, Plaintiffs have submitted applications that "steer 'far clear' of anything that might be deemed to [promote gender ideology]."  <u>Id.</u> at 27 (quoting <u>Finley</u>, 524 U.S. at 588).  Regarding enforcement, Plaintiffs argue that the Final Notice "significantly broadens the discretion of one person, the NEA Chair, exacerbating the potential for arbitrary or discriminatory enforcement."  Pls.' Reply 26; <u>see</u> Pls.' Mem. 29.

Notwithstanding the substantive merits of Plaintiffs' notice argument, the Court finds it unavailing because the NEA adopted the Final Notice after Plaintiffs had already submitted their grant applications.   See <u>supra</u> Part I.B.3-4.  Plaintiffs' enforcement argument also fails because the Final Notice does not broaden the Chairperson's discretion; rather, it specifies how the Chairperson intends to use that discretion.  To be sure, this use of discretion violates the First Amendment and the APA for the reasons discussed above, <u>see</u> <u>supra</u> Part III.A-B, and the Final Notice promises both arbitrary and discriminatory enforcement.  But that does not make the Final Notice unconstitutionally vague.  Defendants are thus entitled to summary judgment on Plaintiffs' Fifth Amendment claim.

**ADD.42**

## D. Remedy

The Court declares that the Final Notice is unconstitutional and unlawful; vacates and sets aside the Final Notice, 5 U.S.C. § 706(2); and instructs Plaintiffs to submit an application for fees and other expenses, 28 U.S.C. § 2412(d).

In addition to vacatur of the Final Notice, Plaintiffs seek permanent injunctive relief. Am. Compl. 36-37. The Supreme Court has recently cautioned federal courts to ensure that "injunctions are [no] broader than necessary to provide complete relief to each plaintiff with standing to sue." Trump v. CASA, Inc., 606 U.S. 831, 861 (2025). The Court finds that here, complete relief requires at least that Defendants be permanently enjoined from (1) applying to Plaintiffs — including members of TCG — a viewpoint-based standard of review that disfavors applications deemed "to promote gender ideology," and (2) requiring Plaintiffs — including members of TCG — to comply with the EO when using NEA funds.[10]

---

[10] The parties dispute whether the NEA has reinstated the "certification requirement" in its "Assurance of Compliance." See Pls.' Opp'n Defs.' Cross-Mot. & Reply Supp. Mot. Summ. J. (Pls.' Reply") 17 n.15; Defs.' Reply 2-3; see also Mem. & Order 17-20. In any event, it follows that if Defendants are enjoined from disfavoring applications for federal funds that "promote gender ideology," they should be enjoined from requiring applicants to comply with an executive order stating that "[f]ederal funds shall not be used to promote gender ideology" should they receive those funds. See Exec. Order No. 14168, § 3(g), 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025).

43

**ADD.43**

Accordingly, the Court orders (1) and (2).  If Plaintiffs believe the injunction as stated falls short of complete relief, the Court instructs them to provide briefing on this issue within fourteen (14) days of the date of this order; Defendants will have seven (7) days to respond; and Plaintiffs will have seven (7) days to reply.

Plaintiffs are entitled to injunctive relief because they have shown "actual success on the merits" of their First Amendment claim, irreparable harm would occur absent such relief, and "the public interest would not be adversely affected by an injunction." Doe v. R.I. Interscholastic League, 137 F.4th 34, 40 (1st Cir. 2025); see Nken v. Holder, 556 U.S. 418, 435 (2009) (noting the third and fourth injunction factors "merge when the Government is the opposing party"); Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). As for the public interest factor, the Court denied Plaintiffs' earlier request for preliminary injunctive relief largely because an injunction at that time would have impeded the NEA's then-pending administrative review process.  See Mem. & Order 42-44.  Because that process has since concluded, this consideration no longer applies.  And the public interest is not on the government's side when it uses a program designed to promote free expression to

**ADD.44**

squash it instead.

Finally, the scope of the injunction does not affect the broad scope of vacatur under 5 U.S.C. § 706(2).  See CASA, 806 U.S. at 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action.").

**IV.  CONCLUSION**

For the reasons above, Plaintiffs' Motion for Summary Judgment, Dkt. No. 22, is GRANTED IN PART and DENIED IN PART; and Defendants' Cross-Motion for Summary Judgment, Dkt. No. 24, is DENIED IN PART and GRANTED IN PART.


IT IS SO ORDERED.

_____
William E. Smith
Senior District Judge
Date: September 19, 2025

45

**ADD.45**

**AGENCY:**

National Endowment for the Arts.

**ACTION:**

Notice.

**SUMMARY:**

In order to implement the President's Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* ("EO 14168" or "the EO"), the Chair[1] of the National Endowment for the Arts (NEA) has determined that appropriate action is needed to incorporate the EO in the NEA's grant application review process. Per the NEA Chair's authority under 20 U.S.C. § 959, the NEA publishes this explanation of its intended action to implement EO 14168.

The EO requires executive agencies to take all necessary steps, as permitted by law, to ensure that agency funds are not used to promote gender ideology. As set forth below, the NEA will implement EO 14168 on a grant-by-grant basis, in a manner that is consistent with the U.S. Constitution, the Administrative Procedure Act (APA), the NEA enabling statute 20 U.S.C. § 954, *et seq.* and its established policies and procedures regarding application review.

The statute 20 U.S.C. § 954(d)(1) confers upon the NEA Chair the discretionary authority to award a grant, or to decline to award a grant, and empowers the Chair as the final step in ensuring that each application represents "artistic excellence" and "artistic merit".[2] The NEA will adhere to Congress' direction for the Chair to judge applications on the basis of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.[3]

The Chair will continue to review grant applications based on the statutory requirements. The existing multi-tiered application review process will remain unchanged. The Chair will implement EO 14168 by evaluating projects that promote gender ideology based on the existing statutory criteria at the final stage of application review.

Applicants will not be required to certify that no federal funds are used to promote gender ideology. Thus, there is no eligibility bar to submitting an application related to promoting gender ideology. The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced. Under these criteria, there is no room for viewpoint discrimination. This implementation process is consistent with the First and Fifth Amendments as well as the APA. No applicant should suffer harm under this process, which essentially utilizes the existing statutory review scheme that the agency currently follows.

---

[1] If the position of Chair is vacant, then "Chair" will refer to such official performing the functions and duties of the Chair, in the absence of a Chair being officially appointed and confirmed.

[2] See also 20 U.S.C. § 955(f)(2).

[3] 20 U.S.C. § 954(d)(1).

**ADD.46**

The case-by-case review by the Chair of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology, will in general provide a significant public benefit by (1) furthering the current administration's priorities as provided in EO 14168; (2) providing more clarity to applicants on how EO 14168 is being implemented by the NEA; and (3) better informing applicants on whether and how to apply for NEA funding opportunities.

**DATES:**

The grant application review process set out in this Notice will be effective upon publication and will be applicable to all pending applications.

**FOR FURTHER INFORMATION, CONTACT:**

Ann Eilers, Deputy Chair for Management and Budget, National Endowment for the Arts, at (202) 682-5534, or by email at eilersa@arts.gov; Jennifer Lindow Eskin, Senior Advisor for Strategy, Programs, & Engagement, National Endowment for the Arts, at (202) 682-5781, or by email at eskinj@arts.gov.

**SUPPLEMENTARY INFORMATION:**

**I.    Background**

On January 20, 2025, the President issued EO 14168, "*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*." [4]  The order addressed a broad series of priorities related to the President's concerns about gender ideology and included among other things the following provisions:

>Sec. 2(g) Federal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

>Sec . 3(e) Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

>Sec. 8(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

On February 6, 2025, the NEA decided to implement EO 14168 by requiring applicants to certify that "the applicant . . . understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168[. . .]." [5] On March 17, 2025, the NEA rescinded that

---

[4] Exec. Order No. 14,168, 2025 WL 327882 (Pres.): *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 FR 8615.

[5] Memorandum and Order, ECF 13, 7:2.

**ADD.47**

requirement and is issuing this memorandum to clarify its process for implementing the EO, to the extent permitted by law.[6]

This Notice outlines the NEA's grant application review standards and processes, and how it will implement EO 14168 in that review process.

## II.    Grant Application Review

### A. Project-based Reviews

Applicants are judged based on their application materials for their proposed projects, and not any other activities they may conduct that exist beyond the four corners of their application. There are additional factors that must be considered by the NEA. For instance, an organization that has been suspended or debarred may not receive federal funds. There are also project types that are ineligible because the NEA has chosen not to fund them – for instance, construction projects or projects with significant entertainment or social activities.  Also, there are projects for which the NEA has stated a preference, such as projects supporting the work of artists and arts organizations in contributing to the health and well-being of individuals and communities.

### B. Review Standards -- Artistic Excellence and Artistic Merit

The NEA's enabling statute provides two specific criteria in reviewing grant applications: Artistic Excellence and Artistic Merit.[7] Additionally, there is a secondary factor that is required to be considered: general standards of decency and respect for the diverse beliefs and values of the American public."[8]  The Grants for Arts Projects guidelines describe the Artistic Excellence and Artistic Merit as follows:

### i.    Artistic Excellence.

The artistic excellence of the project includes:
- The quality of the artists and other key individuals, works of art, organizations, arts education providers, artistic partners, and/or services involved in the project.

### ii.    Artistic Merit.

The artistic merit of the project includes:
- The value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency.
- The ability to carry out the project based on such factors as the appropriateness of the budget, clarity of the project activities, resources involved, and the qualifications of the project's personnel and/or partnerships.

---

[6] *Id.*, at 10:3-11:11.
[7] 20 U.S.C. § 954(d)(1).
[8] *Id.*

**ADD.48**

- Clearly defined goals and/or proposed outcomes and an appropriate plan to determine if those goals and/or outcomes are met. This includes, where relevant, measures to assess student and/or teacher learning in arts education.
- Evidence of direct compensation to artists, makers, art collectives, and/or art workers.
- As applicable: Engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

### C. Review Process

The above Artistic Excellence and Artistic Merit standard of review is implied in every phase of the review process, which is outlined below.

1. Once the application submission deadline is closed, NEA staff reviews each of the applications submitted by the deadline for completeness and other eligibility issues.
2. If NEA staff determines that an application is complete and meets all eligibility requirements, each application is reviewed by a panel of arts experts (and a layperson) under the Artistic Excellence and Artistic Merit.
3. Each application receives a score between 1 and 10 on each artistic excellence and merit criteria. The panels provide their recommendations.
4. The panel recommendations are submitted to the National Council on the Arts, which deliberates, votes on the applications before them, and proposes funding levels for the applications recommended for Chair's approval.
5. Chair reviews the Council's recommendations and has the "final authority" to approve or deny an application.[9]

### D. Chair's Discretion

The NEA's authorizing legislation, 20 U.S.C. § 954, *et seq*., authorizes the Chair, and the Chair alone, to create the terms by which a program of grants in aid may be disbursed to organizations and individuals. Particularly, Artistic Excellence and Artistic Merit, taken together, give the Chair the discretion to award a grant, or to decline to award a grant, and situates the Chair as the final step in ensuring that each application represents "artistic excellence" and "artistic merit". Her final approval authority granted by the enabling statute is more than a mere perfunctory role. The Congress compels the Chair to either affirm or reject the Council's assessment of a project's excellence and/or merit. In exercising this authority, the Chair does so based on the particulars of each application as they relate to artistic excellence and merit. As the Court wrote in Finley, "the NEA's mandate is to make aesthetic judgments" which are "inherently content-based", and "[a]ny content-based considerations that may be taken into account are a consequence of the nature of arts funding; the NEA has limited resources to allocate among many "artistically excellent" projects, and it does so on the basis of a wide variety of subjective criteria."[10]

---

[9] 20 U.S.C. § 955(f)(2).
[10] *Natal Endowment for the Arts v. Finley*, 524 U.S. 569, 571 (1998).

**ADD.49**

### E.  Final Decision by the Chair

#### i.        Artistic Excellence and Artistic Merit

In assessing the artistic excellence and artistic merit of applications, the Chair considers among other things: the quality of the artists, works of art, organizations, arts education providers, artistic partners; the value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency; budget, project's clarity, resources, and project staff and partners' qualifications; clearly defined goals and/or proposed outcomes and an appropriate plan; evidence of compensation to artists; as applicable, engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

#### ii.       Content-based considerations recognized in *Finley*

In doing so, the Chair may make content-based judgments. The Court in *Finley* wrote that "Any content-based considerations that may be taken into account are a consequence of the nature of arts funding; the NEA has limited resources to allocate among many "artistically excellent" projects, and it does so on the basis of a wide variety of subjective criteria."[11]  The *Finley* Court also noted that "[t]he agency may decide to fund particular projects for a wide variety of reasons, 'such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form.'"[12]  For example, the Chair may find that despite the Council's recommendation, the contemporary relevance of a particular application or its suitability to a special audience, or that its educational value leaves something to be desired.

#### iii.      Agency priorities

The NEA has historically expressed a preference for certain projects, which often reflect administration priorities. For example, the current NEA Grants for Arts Projects program guidelines encourage arts projects including activities that:

(1) Celebrate the nation's rich artistic heritage and creativity by honoring the semiquincentennial of the United States of America (America250);
(2) Originate from or are in collaboration with HBCUs, tribal colleges and universities, American Indian and Alaska Native tribes, Hispanic serving institutions, Asian American and Pacific Islander communities, and organizations that support the independence of people with disabilities;
(3) Support health and well-being of people and communities through the arts; and,
(4) Support existing and new technology-centered creatives practices across all artistic disciplines and forms.

---

[11] *Finley*, at 571.
[12] *Finley*, at 585.

**ADD.50**

### III.    Implementing EO 14168

The Chair's evaluation of projects promoting gender ideology will be to the extent practicable by law and in a manner consistent with the U.S. Constitution and federal laws and regulations, including the NEA statute, and agency policies and procedures.

To implement EO 14168, the Chair may evaluate projects promoting gender ideology in a manner consistent with the NEA's statutory framework of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public. In doing so, the Chair may consider factors including program priorities. As noted in *Finley*, assessments of Artistic Excellence and Artistic Merit may include (but are not limited to) considering "the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form."[13]

In reviewing applications, the Chair will make the decision on a grant-by-grant basis, relying on the criteria outlined in Section II above.  For example, in reviewing an application that promotes gender ideology, the Chair could consider whether or not the specific elements of that project align with general standards of decency and respect for the diverse beliefs and values of the American public, or whether those elements indicate a sufficient level of anticipated public interest in or appreciation of the project, or are likely to be suitable for or appeal to intended audiences.[14] The process does not include an eligibility bar, nor does it include a certification requirement.

### IV.    This Implementation Procedure Complies with Constitutional and APA Requirements.

#### A. This Implementation Process Complies with the First Amendment.

##### i.  NEA Grantmaking Constitutes Government Speech.

The NEA's grantmaking decisions constitute a form of government speech and therefore are not subject to scrutiny under the Free Speech Clause of the First Amendment.[15]  NEA grantmaking constitutes government speech in accordance with the three-factor test outlined in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), following the decision in *Pleasant Grove City v. Summum*.[16]

First, the history of the expression indicates that the NEA is communicating a message: namely that the project receiving federal support meets the highest standards of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse

---

[13] *Finley*, at 585.
[14] Id.
[15] *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209 (2015).
[16] *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 129 S. Ct. 1125 (2009).

beliefs and values of the American public.[17]  In creating the NEA, Congress did not intend for the Government to fund "art for art's sake", but rather art that serves a public purpose, including "to achieve a better understanding of the past, a better analysis of the present, and a better view of the future", to enable and support projects "which have substantial national or international artistic and cultural significance", and to "[foster] mutual respect for the diverse beliefs and values of all persons and groups".[18]  Congress recognized in the NEA's enabling legislation that "[p]ublic funding of the arts and humanities is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines."[19]

Second, NEA-funded projects "are often closely identified in the public mind with the [Government]."[20]  NEA-funded projects are required to credit the NEA and to include the NEA logo on project websites and promotional materials, making it likely to convey that the Government endorses the Artistic Excellence and Artistic Merit of the project.[21]  It is reasonable for the public to conclude that taxpayer-funded projects are closely identified with the Government, and that the Government is conveying a message that these projects exemplify artistic excellence and merit and respect for the diverse values of Americans, and are an appropriate use of taxpayer resources.

Third, the NEA maintains control, including through exercising final approval authority over the projects NEA funds, through a highly selective process.[22]  NEA's project selection is therefore a form of Government speech.

### ii.  This Implementation Process Does Not Include Viewpoint Discrimination.

Even if NEA-funded projects constitute private speech, the NEA will not impose an eligibility bar and will not engage in viewpoint discrimination. Per the NEA's statutory criteria, applications will be judged based upon Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.[23]

As noted in *Finley*, the NEA has limited resources and "must deny the majority of the grant applications that it receives, including many that propose "artistically excellent projects.  The agency may decide to fund particular projects for a wide variety of reasons, 'such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form.'"[24]

---

[17] 20 U.S.C. § 954 (d)(1).
[18] 20 U.S.C. § 951 (3) and (6); 20 U.S.C. § 954 (c)(1).
[19] 20 U.S.C. § 951 (5).
[20] *Walker*, at 211.
[21] *Walker*, at 211; *Summum*, at 472.
[22] *Walker*, at 210; *Summum*, at 473.
[23] 20 U.S.C. § 951(d)(1).
[24] *Finley*, at 585.

**ADD.52**

In the context of these decisions, "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake."  NEA legislation mandates that "[p]ublic funds … must ultimately serve a public purpose the Congress defines", and the Court held in *Finley* that "Congress may 'selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.'  In doing so, 'the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.'"[25]

### B.  This Implementation Process Complies with the Fifth Amendment.

The NEA's implementation of EO 14168 does not include the enactment of any rules or requirements that are unconstitutionally vague under the Fifth Amendment.  It does not include a certification requirement and therefore does not subject applicants to potential criminal penalties for making false statements.[26]  This process does not include a bar to eligibility.  Instead, the NEA will consider projects promoting gender ideology in a manner consistent with the NEA's statutory framework of Artistic Excellence and Artistic Merit.  The Court in *Finley* established that this framework is not constitutionally vague, writing that "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."[27]

### C.  This Implementation Process Complies with the Administrative Procedure Act.

The NEA's implementation of EO 14168 does not include any agency actions that would violate the Administrative Procedure Act for exceeding the NEA's statutory authority, being arbitrary and capricious, or being contrary to a constitutional right.  The NEA is not instituting an eligibility bar, nor is it mandating a certification requirement.  Instead, the NEA will consider projects promoting gender ideology in a manner consistent with the NEA's existing statutory framework of Artistic Excellence and Artistic Merit.

### V.  Other Considerations in the Review Process

The case-by-case review by the Chair of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology, seeks to serve the public by (1) furthering the current administration's priorities as provided in EO 14168; (2) providing more clarity to applicants on how EO 14168 is being implemented by the NEA; and (3) better informing applicants on whether and how to apply for NEA funding opportunities. Alternatively, a decision to not establish an implementation process would adversely affect the ability of the NEA to comply with the President's mandates and Administration priorities.  A decision to establish a different implementation process, such as subjecting applications with proposed projects promoting gender ideology to a different review standard and process, or establishing an eligibility bar, would adversely affect applicants and the NEA's ability to implement the EO in a manner consistent with its enabling statute, the Constitution, and the APA.

---

[25] *Finley*, at 587-8.
[26] *Bella Lewitzky Dance Found. v. Frohnmayer,* 754 F. Supp. 774, 781 (C.D. Cal. 1991), in which the finding of unconstitutional vagueness was the result of a certification requirement.
[27] *Finley*, at 589.

**ADD.53**

## VI.    Regulatory Requirements: Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation. The NEA is merely adopting a general statement of policy, i.e., a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[28] As section 20 U.S.C. § 951 provides, final application review decisions are made by the Chairman of the NEA "in their discretion." This Notice clarifies the NEA's process for implementing EO 14168 to the extent permitted by law.  In clarifying that applications for projects that promote gender ideology will be considered within the NEA's existing statutory framework, the NEA is not instituting a legislative rule that would be subject to requirements for notice-and-comment rulemaking and a delayed effective date.

## VII.    Termination and No Private Rights

The Chair retains the sole discretion to terminate this grant application review process at any point. This process is being implemented as a matter of the Chair's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

Mary Anne Carter
Senior Advisor
National Endowment for the Arts

April 16, 2025

Amended April 30, 2025 to correct contact information.

---

[28] *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979).

**ADD.54**