# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

RHODE ISLAND LATINO ARTS; NATIONAL QUEER THEATER; THE THEATER OFFENSIVE; THEATRE COMMUNICATIONS GROUP,

Plaintiffs-Appellees,

v.

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in the official capacity as Acting Chair of the National Endowment for the Arts,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Rhode Island

## APPENDIX

Daniel Tenny
Jennifer L. Utrecht
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, APPELLATE STAFF
950 Pennsylvania Avenue NW,
   Room 7710
Washington, DC 20530
(202) 353-9039

TABLE OF CONTENTS

Docket Sheet, Case No. 1:25-cv-00079 (D.R.I.)..................................................JA1

Complaint, ECF No. 1 (Mar. 6, 2025) ..............................................................JA10

Exhibits to Motion for Preliminary Injunction, ECF No. 2 (Mar. 6, 2025)

   Declaration of Vera Eidelman and Attached Exhibits, ECF No. 2-2 ................. JA42

   Declaration of Marta V. Martinez, ECF No. 2-3 .................................... JA115

   Declaration of Adam Odsess-Rubin, ECF No. 2-4 ........................................... JA122

   Declaration of Giselle Byrd, ECF No. 2-5 ......................................................... JA131

   Declaration of Emilya Cachapero, ECF No. 2-6.............................................. JA138

Declaration of Ann Eilers, ECF No. 10 (Mar. 10, 2025) ......................................JA146

Exhibits to Opposition to Motion for Preliminary Injunction, ECF No. 11-1 (Mar. 21, 2025) ..........................................................................JA149

   Exhibit A: National Endowment for the Arts, Legal Requirements and Assurance of Compliance (Mar. 11, 2025) ....................................... JA151

   Exhibit B: National Endowment for the Arts, General Terms and Conditions for Federal Financial Assistance Awars to Organizations (Apr. 22, 2024).................................................................................................... JA166

   Exhibit C: Memorandum from Mary Anne Carter, NEA Senior Advisor, to NEA Grantmaking Staff (Mar. 17, 2025)....................................... JA216

Exhibits to Motion for Preliminary Injunction Reply, ECF No. 12 (Mar. 25, 2025)

   Supplemental Declaration of Marta V. Martinez, ECF No. 12-1 ...................... JA219

   Supplemental Declaration of Emilya Cachapero, ECF No. 12-2 ...................... JA225

Memorandum and Order Denying Motion for Preliminary Injunction, ECF No. 13 (Apr. 3, 2025)......................................................................................JA229

Amended Complaint, ECF No. 15 (May 12, 2025) ..................................................JA276

Administrative Record (Excerpts), ECF No. 19 (May 27, 2025)

   Certification ................................................................................................. JA314

   Executive Order 14168 ............................................................................... JA317

   National Endowment for the Arts, Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP) Program ......................................... JA322

   National Endowment for the Arts, Notice (April 16 & 30, 20205) ................. JA362

i

Notice by Mary Anne Carter in Response to Plaintiffs' Requests for Admission, ECF No. 21 (June 11, 2025)..................................................JA372

Exhibits to Plaintiffs' Motion for Summary Judgment, ECF No. 22 (June 30, 2025)

    Supplemental Declaration of Vera Eidelman and Attached Exhibits, ECF No. 22-2 ........................................................................... JA375

    Second Supplemental Declaration of Emilya Cachapero, ECF No. 22-3 ........................................................................................ JA414

    Supplemental Declaration of Adam Odsess-Rubin, ECF No. 22-4.................. JA421

    Supplemental Declaration of Giselle Byrd, ECF No. 22-5................................ JA427

    Second Supplemental Declaration of Marta V. Martinez, ECF No. 22-6 ........................................................................................ JA432

Declaration of Daniel Beattie and Attached Exhibits, ECF No. 25-1 (July 16, 2025) ................................................................................ JA437

Second Supplemental Declaration of Vera Eidelman and Attached Exhibits, ECF No. 30-1 (Aug. 30, 2025) ................................................. JA486

Supplemental Declaration of Daniel Beattie and Attached Exhibits, ECF No. 33-1 (August 8, 2025) ................................................................. JA519

Memorandum and Order Granting Plaintiffs' Motion for Summary Judgment in Part and Denying in Part; Granting Defendant's Cross-Motion for Summary Judgment in Part and Denying in Part, ECF No. 34 (Sept. 19, 2025) ......................................................................... JA533

Judgment, ECF No. 35 (Sept. 19, 2025) .................................................... JA587

Notice of Appeal, ECF No. 36 (Nov. 17, 2025) ....................................... JA588

APPEAL

# U.S. District Court
## District of Rhode Island (Providence)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00079-WES-PAS

| | |
|---|---|
| Rhode Island Latino Arts et al v. National Endowment for the Arts et al | Date Filed: 03/06/2025 |
| | Date Terminated: 09/19/2025 |
| Assigned to: Senior District Judg William E Smith | Jury Demand: None |
| Referred to: Magistrate Judge Patricia A. Sullivan | Nature of Suit: 440 Civil Rights: Other |
| Case in other court: First Circuit, 25-02113 | Jurisdiction: U.S. Government Defendant |
| Cause: 05:551 Administrative Procedure Act | |

**Plaintiff**

**Rhode Island Latino Arts**                represented by    **Brian Hauss**
American Civil Liberties Union Foundation
125 Broad Street
Floor 18
New York, NY 10004
212-549-2500
Email: bhauss@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Cole**
600 New Jersey Ave. NW
Washington, DC 20001
202-662-9078
Email: cole@georgetown.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren Yu**
American Civil Liberties Union Foundation
125 Broad Street
Floor 18
New York, NY 10004
212-549-2500
Email: lyu@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
American Civil Liberties Union Foundation
125 Broad Street
Floor 18
New York, NY 10004
212-549-2500
Email: scarletk@aclu.org

JA1

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vera Eidelman**
American Civil Liberties Union Foundation
125 Broad St.
Ste 18th Floor
New York, NY 10004
212-519-2556
Email: veidelman@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lynette J. Labinger**
Lynette Labinger, Attorney at Law
128 Dorrance Street, Box 710
Providence, RI 02903
401-465-9565
Email: LL@labingerlaw.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **National Queer Theater** | represented by | **Brian Hauss**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**David Cole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren Yu**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vera Eidelman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lynette J. Labinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **The Theater Offensive** | represented by | **Brian Hauss**<br>(See above for address) |

JA2

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Cole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren Yu**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vera Eidelman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lynette J. Labinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Theatre Communications Group**            represented by **Brian Hauss**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Cole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren Yu**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vera Eidelman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lynette J. Labinger**

**JA3**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **National Endowment for the Arts** | represented by | **Kevin Bolan** |

DOJ-USAO
U.S. Attorney's Office for the District of
Rhode Island
One Financial Plaza
Ste 17th Floor
Providence, RI 02903
401-709-5000
Email: kevin.bolan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Mary Anne Carter** | represented by | **Kevin Bolan** |
| *in her official capacity as Acting Chair of the National Endowment for the Arts* | | (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2025 | 1 | COMPLAINT ( filing fee paid $ 405.00, receipt number ARIDC-2106349 ), filed by Theatre Communications Group, Rhode Island Latino Arts, The Theater Offensive, National Queer Theater. (Attachments: # 1 Civil Cover Sheet)(Labinger, Lynette) (Entered: 03/06/2025) |
| 03/06/2025 | 2 | MOTION for Preliminary Injunction ( **Responses due by 3/20/2025.**), MOTION to Expedite ( **Responses due by 3/20/2025.**), MOTION for Temporary Restraining Order filed by All Plaintiffs. (Attachments: # 1 Supporting Memorandum memorandum of law, # 2 Affidavit Declaration of Vera Eidelman with exhibits, # 3 Affidavit Declaration of Marta V. Martinez, # 4 Affidavit Declaration of Adam Odsess-Rubin with exhibit, # 5 Affidavit Declaration of Giselle Byrd, # 6 Affidavit Declaration of Emilya Cachapero)(Labinger, Lynette) (Entered: 03/06/2025) |
| 03/06/2025 | | Case assigned to Senior District Judge William E Smith and Magistrate Judge Patricia A. Sullivan. (Hill, Cherelle) (Entered: 03/06/2025) |
| 03/06/2025 | 3 | CASE OPENING NOTICE ISSUED (Hill, Cherelle) (Entered: 03/06/2025) |
| 03/06/2025 | 4 | Corporate Disclosure Statement by Rhode Island Latino Arts, National Queer Theater, The Theater Offensive, Theatre Communications Group. (Labinger, Lynette) (Entered: 03/06/2025) |
| 03/06/2025 | 5 | MOTION for Vera Eidelman to Appear Pro Hac Vice *for all plaintiffs* ( filing fee paid $ 100.00, receipt number ARIDC-2106480 ) filed by All Plaintiffs. (Labinger, Lynette) (Entered: 03/06/2025) |
| 03/06/2025 | 6 | MOTION for Lauren Yu to Appear Pro Hac Vice *for all plaintiffs* ( filing fee paid $ 100.00, receipt number ARIDC-2106482 ) filed by All Plaintiffs. (Labinger, Lynette) (Entered: 03/06/2025) |

JA4

| 03/06/2025 | 7 | MOTION for Scarlet Kim to Appear Pro Hac Vice *for all plaintiffs* ( filing fee paid $ 100.00, receipt number ARIDC-2106484 ) filed by All Plaintiffs. (Labinger, Lynette) (Entered: 03/06/2025) |
|---|---|---|
| 03/06/2025 | 8 | MOTION for David Cole to Appear Pro Hac Vice *for all plaintiffs* ( filing fee paid $ 100.00, receipt number ARIDC-2106486 ) filed by All Plaintiffs. (Labinger, Lynette) (Entered: 03/06/2025) |
| 03/06/2025 | | TEXT ORDER granting 5 Motion to Appear Pro Hac Vice of Vera Eidelman. So Ordered by Senior District Judge William E Smith on 3/6/2025. (Hill, Cherelle) (Entered: 03/06/2025) |
| 03/06/2025 | | TEXT ORDER granting 6 Motion to Appear Pro Hac Vice of Lauren Yu. So Ordered by Senior District Judge William E Smith on 3/6/2025. (Hill, Cherelle) (Entered: 03/06/2025) |
| 03/06/2025 | | TEXT ORDER granting 7 Motion to Appear Pro Hac Vice of Scarlet Kim. So Ordered by Senior District Judge William E Smith on 3/6/2025. (Hill, Cherelle) (Entered: 03/06/2025) |
| 03/06/2025 | | TEXT ORDER granting 8 Motion to Appear Pro Hac Vice of David Cole. So Ordered by Senior District Judge William E Smith on 3/6/2025. (Hill, Cherelle) (Entered: 03/06/2025) |
| 03/06/2025 | 9 | MOTION for Brian Hauss to Appear Pro Hac Vice *for all plaintiffs* ( filing fee paid $ 100.00, receipt number ARIDC-2106609 ) filed by All Plaintiffs. (Labinger, Lynette) (Entered: 03/06/2025) |
| 03/06/2025 | | TEXT ORDER granting 9 Motion to Appear Pro Hac Vice of Brian Hauss. So Ordered by Senior District Judge William E Smith on 3/6/2025. (Hill, Cherelle) (Entered: 03/06/2025) |
| 03/07/2025 | | NOTICE of Hearing: Zoom Video Conference set for 3/7/2025 at 04:30 PM before Senior District Judge William E Smith. This is an attorneys only conference. (Simoncelli, Michael) (Entered: 03/07/2025) |
| 03/07/2025 | | Minute Entry for proceedings held before Senior District Judge William E Smith: Zoom Chambers Conference held on 3/7/2025. Participants: V. Eidelman, B. Hauss, D. Cole, L. Yu, S. Kim, and L. Labinger for the Plaintiffs; B. Wong for the Defendants. (Simoncelli, Michael) (Entered: 03/07/2025) |
| 03/07/2025 | | TEXT ORDER re 2 MOTION for Preliminary Injunction, MOTION to Expedite, MOTION for Temporary Restraining Order. Defendants shall file their response by 3/14/2025, and Plaintiffs shall file their reply by 3/17/25. So Ordered by Senior District Judge William E Smith on 3/7/2025. (Simoncelli, Michael) (Entered: 03/07/2025) |
| 03/07/2025 | | NOTICE of Hearing on 2 MOTION for Preliminary Injunction: Motion Hearing set for 3/18/2025 at 09:30 AM in Courtroom 3 before Senior District Judge William E Smith. (Simoncelli, Michael) (Entered: 03/07/2025) |
| 03/10/2025 | 10 | DECLARATION *of Ann Eilers* by All Defendants. (Bolan, Kevin) (Entered: 03/10/2025) |
| 03/11/2025 | | TEXT ORDER re 2 MOTION for Preliminary Injunction, MOTION to Expedite, MOTION for Temporary Restraining Order. Defendants shall file their response by 2:00 PM on 3/21/2025, and Plaintiffs shall file their reply by 3/25/25. So Ordered by Senior District Judge William E Smith on 3/11/2025. (Simoncelli, Michael) (Entered: 03/11/2025) |
| 03/11/2025 | | NOTICE of Hearing on Motion 2 MOTION for Preliminary Injunction: Motion Hearing reset for 3/27/2025 at 10:00 AM in Courtroom 3 before Senior District Judge William E Smith. (Simoncelli, Michael) (Entered: 03/11/2025) |

**JA5**

| 03/17/2025 | | NOTICE of Hearing: Video Chambers Conference set for 3/18/2025 at 11:00 AM before Senior District Judge William E. Smith. (Zoom Meeting ID/Passcode provided to counsel of record by email.) (Simoncelli, Michael) (Entered: 03/17/2025) |
|---|---|---|
| 03/18/2025 | | Minute Entry for proceedings held before Senior District Judge William E Smith: Zoom Chambers Conference held on 3/18/2025. Participants: V. Eidelman, S. Kim, and L. Yu for Plaintiffs; K. Bolan for the Defendants. (Zoom Video Conference at 11:05 AM.) (Simoncelli, Michael) (Entered: 03/18/2025) |
| 03/21/2025 | 11 | RESPONSE In Opposition to 2 MOTION for Preliminary Injunction MOTION to Expedite MOTION for Temporary Restraining Order filed by All Defendants. **Replies due by 3/28/2025.** (Attachments: # 1 Exhibit Bolan Decl. (and Exs. A-C))(Bolan, Kevin) (Entered: 03/21/2025) |
| 03/25/2025 | 12 | REPLY to Response re 11 Response to Motion, *in Support of Plaintiffs' Motion for Preliminary Injunction* filed by All Plaintiffs. (Attachments: # 1 Affidavit SUPPLEMENTAL DECLARATION OF MARTA V. MARTNEZ, # 2 Affidavit SUPPLEMENTAL DECLARATION OF EMILYA CACHAPERO)(Labinger, Lynette) (Entered: 03/25/2025) |
| 03/27/2025 | | Minute Entry for proceedings held before Senior District Judge William E Smith: Motion Hearing held on 3/27/2025 re 2 MOTION for Preliminary Injunction. Counsel present: V. Eidelman, S. Kim, L. Yu, and L. Labinger for Plaintiffs; K. Bolan for Defendants. V. Eidelman and S. Kim argue their Motion for Preliminary Injunction; Court questions counsel throughout; K. Bolan argues objection to Motion; Court questions counsel throughout; V. Eidelman and S. Kim present rebuttal; Court questions counsel throughout. Court takes motion under advisement. Recess. (Court Reporter D. Veitch in Courtroom 3 at 10:05 AM.) (Simoncelli, Michael) (Entered: 03/27/2025) |
| 04/03/2025 | 13 | MEMORANDUM and ORDER denying 2 Motion for Preliminary Injunction; denying 2 Motion to Expedite; denying 2 Motion for TRO. So Ordered by Senior District Judge William E Smith on 4/3/2025. (Entered: 04/03/2025) |
| 04/08/2025 | | NOTICE of Hearing: Zoom Chambers Conference set for 4/17/2025 before Senior District Judge William E Smith. Zoom meeting ID/passcode provided to counsel of record by email. (Simoncelli, Michael) (Entered: 04/08/2025) |
| 04/09/2025 | 14 | STIPULATION *Accepting Service of the Summons and Complaint* filed by All Plaintiffs. (Eidelman, Vera) (Entered: 04/09/2025) |
| 04/09/2025 | | NOTICE of Hearing: Zoom Chambers Conference rescheduled to 4/23/2025 at 02:00 PM before Senior District Judge William E Smith. Zoom Meeting ID/Passcode provided to counsel of record by email. (Simoncelli, Michael) (Entered: 04/09/2025) |
| 04/23/2025 | | Minute Entry for proceedings held before Senior Judge William E Smith: Zoom Status Conference held on 4/23/2025. Participants: S. Kim, L. Yu, D. Cole, and L. Labinger for Plaintiffs; K. Bolan for Defendants. (Zoom Video Conference at 2:00 PM.) (Simoncelli, Michael) (Entered: 04/23/2025) |
| 04/23/2025 | | NOTICE of Hearing:Zoom Status Conference set for 5/5/2025 at 02:00 PM before Senior Judge William E Smith. This is an attorneys-only conference, and Zoom ID/Passcode provided to counsel of record by email. (Simoncelli, Michael) (Entered: 04/23/2025) |
| 05/05/2025 | | Minute Entry for proceedings held before Senior Judge William E. Smith: Status Conference held on 5/5/2025. Participants: V. Eidelman, S. Kim, L. Yu, and L. Labinger for Plaintiffs; K. Bolan for Defendants. Court to issue schedule re: filing of amended complaint and answer, discovery requests, and cross-motions for summary judgment. (Zoom Video Conference at 2:00 PM) (Simoncelli, Michael) (Entered: 05/05/2025) |

JA6

| 05/05/2025 | | TEXT ORDER: Plaintiffs to file an amended complaint by May 12, 2025, and Defendants to file their answer, along with the complete administrative record, by May 27, 2025. Plaintiffs to issue discovery requests to the Defendants by May 12, 2025; Defendants to file their objections to the discovery requests by May 19, 2025; and Plaintiffs to respond to Defendants' objections by May 27, 2025. The objections and responses shall be no longer than 5 pages.<br><br>Plaintiffs to file their cross-motion for summary judgment by June 30, 2025; Defendants to file their cross-motion for summary judgment and their response to Plaintiffs' cross-motion for summary judgment by July 18, 2025; Plaintiffs to file their reply in support of their cross-motion for summary judgment and response to Defendants' cross-motion for summary judgment by August 1, 2025; and Defendants to file their reply in support of their cross-motion for summary judgment by August 8, 2025. So Ordered by Senior Judge William E. Smith on 5/5/2025. (Simoncelli, Michael) (Entered: 05/05/2025) |
| 05/12/2025 | 15 | AMENDED COMPLAINT against All Defendants, filed by Theatre Communications Group, Rhode Island Latino Arts, The Theater Offensive, National Queer Theater. (Attachments: # 1 Amended Complaint in Redline)(Eidelman, Vera) (Entered: 05/12/2025) |
| 05/12/2025 | 16 | NOTICE by National Queer Theater, Rhode Island Latino Arts, The Theater Offensive, Theatre Communications Group *of Discovery Request* (Eidelman, Vera) (Entered: 05/12/2025) |
| 05/19/2025 | 17 | MOTION for Protective Order *to Preclude Extra-Record Discovery* filed by All Defendants. **Responses due by 6/2/2025.** (Attachments: # 1 Exhibit)(Bolan, Kevin) (Entered: 05/19/2025) |
| 05/27/2025 | 18 | RESPONSE In Opposition to 17 MOTION for Protective Order *to Preclude Extra-Record Discovery* filed by All Plaintiffs. **Replies due by 6/3/2025.** (Eidelman, Vera) (Entered: 05/27/2025) |
| 05/27/2025 | 19 | ADMINISTRATIVE RECORD filed by Mary Anne Carter, National Endowment for the Arts. (Bolan, Kevin) *Clerk's Office removed case participant restriction on the document and swapped out Main Document 19 on 12/29/2025; document is now electronically accessible.* (Gonzalez Gomez, Viviana) (Entered: 05/27/2025) |
| 05/27/2025 | 20 | ANSWER to 15 Amended Complaint by Mary Anne Carter, National Endowment for the Arts.(Bolan, Kevin) (Entered: 05/27/2025) |
| 06/04/2025 | | TEXT ORDER denying in part and granting in part Defendants' Motion for Protective Order, Dkt. No. 17. The NEA's "explanation of its intended action to implement EO 14168," see generally, id. Ex. 1, Dkt. No. 17-1, suggests the Chair will treat a grant application's perceived promotion of "gender ideology," as defined by the EO, as either a disqualifying factor or a factor weighing against approval during the final stage of the application review process. That conclusion is not free from doubt, however, given some (potentially intentional) ambiguity. To address this, the Court will permit the limited discovery reflected in Plaintiffs' three requests for admission, and thus Defendants' Motion for Protective Order is denied in that respect.<br><br>Although the Court recognizes there is a presumption against discovery in Administrative Procedure Act ("APA") cases, "supplementation of the record may be permissible where there is a 'failure to explain administrative action as to frustrate effective judicial review.'" Olsen v. United States, 414 F.3d 144, 155-56 (1st Cir. 2005) (quoting Camp v. Pitts, 411 U.S. 138, 142-43 (1973)). Answers to the three simple questions posed by Plaintiffs in their requests for admission will facilitate effective judicial review. Answers to Plaintiffs' interrogatories, on the other hand, are not necessary for effective judicial review at this time. Defendants' Motion for Protective Order is therefore granted as to the interrogatories; |

JA7

however, if Defendants' answers to Plaintiffs' requests for admission fail to clarify matters, the Court may revisit this issue.

Accordingly, Defendants' Motion for Protective Order, Dkt. No. 17, is DENIED as to Plaintiffs' requests for admission and GRANTED as to Plaintiffs' interrogatories. Answers to the requests for admission must be filed by June 11, 2025, at 5:00 pm. So Ordered by Senior Judge William E. Smith on 6/4/2025. (Simoncelli, Michael) (Entered: 06/04/2025)

| 06/11/2025 | 21 | NOTICE by Mary Anne Carter, National Endowment for the Arts -- *Resps. to Pls.' RFAs* (Bolan, Kevin) (Entered: 06/11/2025) |
| 06/30/2025 | 22 | MOTION for Summary Judgment filed by All Plaintiffs. **Responses due by 7/14/2025.** (Attachments: # 1 Supporting Memorandum Memorandum of Law in Support of Motion for Summary Judgement, # 2 Affidavit Supplemental Declaration of Vera Eidelman, # 3 Affidavit Second Supplemental Declaration of TCG, # 4 Affidavit Supplemental Declaration of NQT, # 5 Affidavit Supplemental Declaration of TTO, # 6 Affidavit Second Supplemental Declaration of RILA)(Eidelman, Vera) (Entered: 06/30/2025) |
| 06/30/2025 | 23 | STATEMENT OF UNDISPUTED FACTS by All Plaintiffs re 22 MOTION for Summary Judgment . (Eidelman, Vera) (Entered: 06/30/2025) |
| 07/16/2025 | 24 | Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Summary-Judgment Motion* filed by All Defendants. **Responses due by 7/30/2025.** (Attachments: # 1 Exhibit Bolan Decl. and Exs. A to D)(Bolan, Kevin) (Entered: 07/16/2025) |
| 07/16/2025 | 25 | STATEMENT OF UNDISPUTED FACTS *and Response to Plaintiffs' Statement of Facts* by All Defendants re 24 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Summary-Judgment Motion*. (Attachments: # 1 Exhibit Beattie Decl. and Exs. A & B)(Bolan, Kevin) (Entered: 07/16/2025) |
| 07/16/2025 | 26 | RESPONSE In Opposition to 22 MOTION for Summary Judgment filed by All Defendants. **Replies due by 7/23/2025.** (Hill, Cherelle) (Entered: 07/18/2025) |
| 07/18/2025 | 27 | RESPONSE In Opposition to 22 MOTION for Summary Judgment *Statement of Facts and Their Separate Statement of Undisputed Facts* filed by All Defendants. **Replies due by 7/25/2025.** (Attachments: # 1 Exhibit Beattie Decl. with Exs. A and B)(Bolan, Kevin) (Entered: 07/18/2025) |
| 08/01/2025 | 28 | RESPONSE In Opposition to 24 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Summary-Judgment Motion* filed by All Plaintiffs. **Replies due by 8/8/2025.** (Eidelman, Vera) (Entered: 08/01/2025) |
| 08/01/2025 | 29 | RESPONSE IN OPPOSITION by National Queer Theater, Rhode Island Latino Arts, The Theater Offensive, Theatre Communications Group re 25 Statement of Undisputed Facts, . (Eidelman, Vera) (Entered: 08/01/2025) |
| 08/01/2025 | 30 | STATEMENT OF UNDISPUTED FACTS *(Additional)* by All Plaintiffs re 28 Response to Motion. (Attachments: # 1 Affidavit Second Supplemental Declaration of Vera Eidelman with Exs. 1, 2, 3, 4, 5)(Eidelman, Vera) (Entered: 08/01/2025) |
| 08/01/2025 | 31 | REPLY to Response re 26 Response to Motion *for Summary Judgement* filed by All Plaintiffs. (Eidelman, Vera) (Entered: 08/01/2025) |
| 08/08/2025 | 32 | REPLY to Response re 28 Response to Motion *for Summary Judgment* filed by All Defendants. (Bolan, Kevin) (Entered: 08/08/2025) |
| 08/08/2025 | 33 | STATEMENT OF DISPUTED FACTS by All Defendants re 29 Response in Opposition, 30 Statement of Undisputed Facts. (Attachments: # 1 Exhibit Suppl. Decl. of Daniel Beattie with Exs. A & B)(Bolan, Kevin) (Entered: 08/08/2025) |

JA8

| 09/19/2025 | 34 | MEMORANDUM AND ORDER: Plaintiffs' 22 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART; and Defendants' 24 Cross-Motion for Summary Judgment is DENIED IN PART and GRANTED IN PART. So Ordered by Senior Judge William E. Smith on 9/19/2025. (Simoncelli, Michael) (Entered: 09/19/2025) |
| 09/19/2025 | 35 | JUDGMENT. So Ordered by Clerk of Court on 9/19/2025. (Simoncelli, Michael) (Entered: 09/19/2025) |
| 11/17/2025 | 36 | NOTICE OF APPEAL by Mary Anne Carter, National Endowment for the Arts (No fee paid, USA, Waived by Statute, or IFP.)<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 11/24/2025. (Bolan, Kevin) (Entered: 11/17/2025) |
| 11/17/2025 | 37 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated record on appeal consisting of notice of appeal, order(s) being appealed, and a certified copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b). 36 Notice of Appeal,,. (Attachments: # 1 Record on Appeal)(Hill, Cherelle) (Entered: 11/17/2025) |
| 11/17/2025 |  | USCA Case Number 25-2113 for 36 Notice of Appeal,, filed by Mary Anne Carter, National Endowment for the Arts. (Hill, Cherelle) (Entered: 11/17/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/16/2026 14:58:30 | | | |
| **PACER Login:** | jenn.utrecht | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00079-WES-PAS |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

JA9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, <br><br> *Defendants*. | Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     This lawsuit seeks to enjoin an unlawful and unconstitutional exercise of executive power that has sowed chaos in the funding of arts projects across the United States, causing grievous irreparable harm to Plaintiffs and other organizations.

2.     Plaintiffs are four arts nonprofit corporations that have received funding from the National Endowment for the Arts ("NEA") in the past and that seek to apply for NEA funding in the future, including in the current March 2025 application cycle. They are each committed to creating, producing, and promoting art that, among other things, affirms the equal dignity of all people—regardless of race, sex, religion, sexuality, or gender identity. In particular, they have created and promoted art in the past that promotes and affirms the lived experiences of transgender and nonbinary people, by casting transgender and nonbinary actors, and by promoting and producing art that features transgender and nonbinary themes.

**JA10**

3.      As directed by federal statute, the NEA administers tens of millions of dollars appropriated by Congress each year to funding for the arts. Congress established the NEA to "help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." 20 U.S.C. § 951(7). Congress made clear that, when choosing which projects to fund, "artistic excellence and artistic merit" are the only criteria for judging applications. *Id*. at § 954(d)(1).

4.      But on the day he took office, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO"), directing that "federal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615 (Jan. 30, 2025) at §2(f). The EO defines "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* at §2(g).

5.      Shortly thereafter, the NEA implemented the Gender Ideology EO by requiring all grant applicants to certify their understanding that "federal funds shall not be used to promote gender ideology," pursuant to the EO. It also makes applications for projects that appear to "promote" what the government deems "gender ideology" ineligible for funding.

6.      Because they seek to affirm transgender and nonbinary identities and experiences in the projects for which they seek funding, Plaintiffs are effectively barred by the "gender ideology" certification and prohibition (together, "gender ideology prohibition") from receiving NEA grants on artistic merit and excellence grounds. Some of their proposed work appears to be ineligible for NEA funding under the new "gender ideology" prohibition, even though similar work has been funded in the past. Moreover, the vagueness of the prohibition requires them to

guess as to what if anything they can create, produce, or promote that addresses themes of gender, or that affirms the identities of all people regardless of their gender identity.

7.    The NEA's "gender ideology" prohibition is contrary to the agency's governing statute, arbitrary and capricious, and violates the First and Fifth Amendments by imposing a vague and viewpoint-based restriction on artists' speech. Plaintiffs request that the Court declare the "gender ideology" prohibition unlawful, set it aside, and enjoin its application facially and as to Plaintiffs.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705-06.

9.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency acting in her official capacity and Plaintiff Rhode Island Latino Arts resides in this district.

## PARTIES

**A.    Plaintiffs**

10.    Rhode Island Latino Arts ("RILA") is a 501(c)(3) nonprofit corporation based in Rhode Island. Its mission is to promote, encourage, and preserve the art, history, heritage, and cultures of Latinos in Rhode Island. It is committed to supporting the equal dignity of all artists, including transgender and nonbinary artists, and its work often features such artists and themes. RILA offers programming of every genre of art, including visual art, dance, and music. It puts on

JA12

theatrical and musical performances, Latin percussion sessions, dancing events, script readings, and storytelling events. It also has a gallery to showcase artwork, and operates literacy programs. RILA has previously received NEA funding in 2019, 2020, and 2022.

11.    National Queer Theater, Inc. ("NQT") is a 501(c)(3) nonprofit corporation based in New York. It is a theater collective dedicated to celebrating the brilliance of generations of LGBTQ+ artists and providing a home for unheard storytellers and activists. Its work regularly features transgender and nonbinary individuals and themes. NQT was awarded NEA grants in 2023 and 2024 for its Criminal Queerness Festiva ("CQF"). In addition, NQT was offered an NEA grant in 2025 for CQF, and that award is pending processing.

12.    The Theater Offensive, Inc. ("TTO") is a 501(c)(3) nonprofit corporation based in Massachusetts. It is a theatrical organization whose mission is to present liberating art by, for, and about queer and trans people of color that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Although TTO is open to all without regard to race, sex, or other identifying characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people, including people of color, who are often the most underserved in the theatrical community both on and offstage. Its work regularly features transgender and nonbinary artists and themes. TTO has previously received six grants from the NEA, in 2016, 2017, twice in 2022, 2023, and 2025.

13.    Theatre Communications Group ("TCG") is a 501(c)(3) nonprofit corporation based in New York. It is a national theater organization with over 600 member theaters and affiliates and over 3,500 individual members. TCG offers networking and knowledge-building opportunities through research, communications, and events, and it publishes the nation's only general-circulation magazine related to theater, *American Theatre*. TCG supports theater

JA13

professionals through annual convenings, industry reports, workshops, webinars, and the publication of *American Theatre* magazine and TCG Books, while also awarding $43 million in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking.

**B.    Defendants**

14.    Defendant National Endowment for the Arts ("NEA") is an independent agency of the United States Government headquartered in Washington, D.C. It is responsible for processing and overseeing arts grants to individuals and organizations across the country.

15.    Defendant Mary Anne Carter is the Acting Chair of the NEA. She is sued in her official capacity only.

**ALLEGATIONS**

**A.    Congress Establishes the NEA**

16.    In 1965, Congress enacted the National Endowment for the Arts and Humanities Act (the "Act"), which established the NEA. 79 Stat. 845 (codified as amended at 20 U.S.C. § 951 *et seq.*). The Act sets forth "a broadly conceived national policy of support for the humanities and the arts in the United States," 20 U.S.C. § 953(b), and commits federal funding "to help create and sustain . . . the material conditions facilitating the release of this creative talent," *id*. at § 951(7).

17.    In response to concerns that government support for the arts might lead to "attempts at political control of culture," H.R. Rep. No. 89-618, at 21, *reprinted in* 1965 U.S.C.C.A.N. 3186, 3205 ("H.R. Rep. No. 618"), Congress took several steps to insulate the agency from political pressures, and to insulate private grantees' speech from government control.

18.    First, Congress articulated that funding criteria must be based on artistic excellence and merit. 79 Stat. 846–47, § 5(c)(1). The Act originally reflected this standard in the description

of the productions to receive NEA funding, *e.g.* "productions which have substantial artistic and cultural significance" and "productions, meeting professional standards of or standards of authenticity, irrespective of origin which are of significant merit." *Id*. at § 5(c)(1)–(2). As the Senate Report explained, the standard for grants would be "artistic and humanistic excellence." S. Rep. No. 300, 89th Cong., 1st Sess. at 4 (1965); *see also Hearing on the Grant Making Process of the National Endowment for the Arts,* Before the Subcomm. on Postsecondary Educ. of the House Comm. on Educ. and Labor, 98th Cong., 2d Sess. 4-5 (June 28, 1984) (hereinafter "*1984 Grant Making Hearing*") ("The only criterion was to be artistic excellence, and that is the criterion used today.") (statement of former NEA chair Frank Hodsoll). The Act also now explicitly provides that "artistic excellence and artistic merit are the criteria by which applications are judged." 20 U.S.C. § 954(d)(1).

19.    Second, Congress enacted a provision that forbade the NEA from "exercis[ing] any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any school or other non-federal agency, institution, organization, or association." 20 U.S.C. § 953(c). The House Report described this provision as an "assurance against federal interference in the arts." H.R. Rep. No. 618, 1965 U.S.C.C.A.N. at 3200.

20.    Third, Congress made the NEA an agency of arts professionals guided by artistic merit rather than of politicians who might be driven by political concerns. It required that the NEA's decisionmakers—the Chair and the National Council on the Arts—be experts in the arts. *See* 78 Stat. 905, § 5(a) (requiring National Council on the Arts members to be selected "for their broad knowledge of or experience in, or for their profound interest in the arts," include those "professionally engaged in the arts," and from "the major art fields"); 79 Stat. at 849, § 6(a) (transferring the National Council on the Arts to the NEA); *see also* 135 Cong. Rec. 16284 (1989)

**JA15**

(statement of Senator Pell) ("When we structured the Endowment, we were careful to put the artistic decisionmaking in the hands of outside experts and away from the influence of government . . . ."); *1984 Grant Making Hearing* (statement of former NEA chair Hodsoll) ("[T]here would be no federal agencies to fund the arts and the humanities without statutory guarantees that Washington bureaucrats would not make the artistic content decisions involved in federally funded projects. Rather, these decisions were to be left to the individual artists and their organizations."). The Act continues to reflect Congress's desire that the NEA's decisionmakers be arts professionals, providing that 18 members of the National Council on the Arts be appointed according to similar criteria. *See* 20 U.S.C. § 955(b).

21.    Fourth, the Senate Report devoted an entire section to "Freedom of Expression":

> It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. One of the artist's and humanist's great values to society is the mirror of self-examination which they raise so that society can become aware of its shortcomings as well as its strengths . . . . Countless times in history artists and humanists who were vilified by their contemporaries because of their innovations in style or mode of expression have become prophets to a later age. Therefore, the committee affirms that the intent of this act should be the encouragement of free inquiry and expression. . . . [C]onformity for its own sake is not to be encouraged, and . . . no undue preference should be given to any particular style or school of thought or expression.

S. Rep. No. 300, 89th Cong., 1st Sess. at 3–4 (1965). As one member stated, Congress's intent was to have "Government assistance, but not intervention . . . support but not control . . . stimulation but not participation." 111 Cong. Rec. 23963 (1965) (statement of Cong. Monagan); *see also* 111 Cong. Rec. 23969 (1965) (statement of Cong. Helstoski) ("The Federal Government will supply the money, but the artists and their organizations will suggest the proposals, select the performances which are to be produced and do all the planning. The Federal Government will be the means, but the end product will be the sole responsibility of the performing artists.").

JA16

22.    Since its founding, the NEA has awarded more than $5.5 billion in funding to individuals and organizations working to bring the arts to communities throughout the nation.[1] It has regularly supported art that features transgender and nonbinary artists and themes, including by the Plaintiffs in this case. On January 14, 2025, the NEA announced its latest tranche of awards, numbering "1,474 awards totaling $36,790,500 to support the arts in communities in all 50 states, Puerto Rico, and Washington, DC."[2]

**B.    The Structure and Grantmaking Authority of the NEA**

23.    The Act "authorize[s]" the NEA's Chair "to establish and carry out a program of contracts with, or grants-in-aid or loans to, groups or, in appropriate cases, individuals of exceptional talent engaged in or concerned with the arts." 20 U.S.C. § 954(c). The broadly defined funding priorities identified by the Act include, *inter alia*, "projects and productions which have substantial national or international artistic and cultural significance"; "projects and productions which have substantial artistic and cultural significance and that reach, or reflect the culture of, a minority, inner city, rural, or tribal community"; and "projects and productions that will encourage public knowledge, education, understanding, and appreciation of the arts." *Id*. §§ 954(c)(1)–(10).

24.    The Act directs the Chair to "utilize advisory panels to review applications, and to make recommendations to the National Council on the Arts." *Id*. § 959(c). These advisory panels must be "composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." *Id*. § 959(c)(1). They must also "include representation of lay individuals who are

---

[1] *Impact*, Nat'l Endowment for the Arts, https://www.arts.gov/impact

[2] *National Endowment for the Arts Supports the Arts with Nearly $36.8 Million in Funding Nationwide*, Nat'l Endowment for the Arts (Jan. 14, 2025), https://www.arts.gov/news/press-releases/2025/national-endowment-arts-supports-arts-nearly-368-million-funding-nationwide

knowledgeable about the arts but who are not engaged in the arts as a profession and are not members of either artists' organizations or arts organizations." *Id*. § 959(c)(2).

25. The National Council on the Arts reviews the recommendations made by the advisory panels and advises the Chair on whether to approve or deny funding. *Id*. § 955(f). The Chair has "final authority to approve each application, except that the Chairperson may only provide to an applicant the amount of financial assistance recommended by the Council and may not approve an application with respect to which the Council makes a negative recommendation." *Id*. § 955(f)(2).

**C.      The "Decency and Respect" Clause and *NEA v. Finley*, 524 U.S. 569 (1998)**

26. Prior to 1989, "only a handful of the agency's . . . awards ha[d] generated formal complaints about misapplied funds or abuse of the public's trust." *NEA v. Finley*, 524 U.S. 569, 574 (1998). That year, however, controversy arose concerning the funding of a Robert Mapplethorpe retrospective that included homoerotic photographs, and an Andres Serrano piece entitled Piss Christ, which featured a photograph of a crucifix covered in urine. *Id.*

27. Congress initially responded by stipulating in the 1990 appropriations bill that no NEA funds "may be used to promote, disseminate, or produce materials which in the judgment of [the NEA] may be considered obscene, including but not limited to, depictions of sadomasochism, homoeroticism, the sexual exploitation of children, or individuals engaged in sex acts and which, when taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 575 (alteration in original) (quoting Department of the Interior and Related Agencies Appropriations Act, 1990, 103 Stat. 738-742). The NEA instituted "a requirement that all grantees certify in writing that they would not utilize federal funding to engage in projects inconsistent with the criteria in the 1990 appropriations bill." *Id.* A federal district court subsequently struck the

certification down as unconstitutionally vague and unduly chilling of speech. *See id*. (citing *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F.Supp. 774 (C.D. Cal. 1991)).

28.     The 1990 appropriations bill also created "an Independent Commission of constitutional law scholars to review the NEA's grant-making procedures and assess the possibility of more focused standards for public arts funding." *Id*. The Commission recommended in its report "that the NEA rescind the certification requirement and cautioned against legislation setting forth any content restrictions." *Id*. Instead, it proposed "procedural changes to enhance the role of advisory panels and a statutory reaffirmation of 'the high place the nation accords to the fostering of mutual respect for the disparate beliefs and values among us.'" *Id*. at 575–76 (quoting Independent Commission, Report to Congress on the National Endowment for the Arts 83–91 (Sept. 1990)).

29.     Congress subsequently "debated" and "rejected" several proposed reforms when "it considered the agency's reauthorization in the fall of 1990." *Id*. at 576. Among those proposals was an amendment that would have prohibited "awarding any grants that could be used to 'promote, distribute, disseminate, or produce matter that has the purpose or effect of denigrating the beliefs, tenets, or objects of a particular religion' or 'of denigrating an individual, or group of individuals, on the basis of race, sex, handicap, or national origin.'" *Id.* (quoting 136 Cong. Rec. 28657–64).

30.     Instead, Congress adopted the Williams/Coleman Amendment, codified at 20 U.S.C. § 954(d)(1), which directs the Chair, in establishing regulations and procedures for funding projects and productions, to "ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *See also Finley*, 524 U.S. at 576. The

Amendment also directs that the regulations and procedures must "clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded." 20 U.S.C. § 954(d)(2).

31.    Shortly after the enactment of the Williams/Coleman Amendment, four performance artists and the National Association of Arts Organizations challenged the constitutionality of the "decency and respect" clause on the ground that, among other things, it violated the First Amendment because it constituted viewpoint discrimination. *Finley*, 524 U.S. at 577–78.

32.    In *NEA v. Finley*, the Supreme Court held that § 954(d)(1) does not violate the First Amendment, because the "decency and respect" clause "imposes no categorical requirement" on the viewpoint of artistic works eligible for NEA funding. *Id*. at 581. The Court noted that "[t]he Independent Commission had cautioned Congress against the adoption of distinct viewpoint-based standards for funding," and that Congress had heeded this warning by "declin[ing] to disallow any particular viewpoints." *Id*. at 581–82. The Court specifically highlighted that the sponsors of § 954(d)(1) had stated: "[I]f we start down that road of prohibiting categories of expression, categories which are indeed constitutionally protected speech, where do we end? Where one Member's aversions end, others with different sensibilities and with different values begin.'" *Id*. at 582 (alteration in original) (quoting 136 Cong. Rec. 28624 (statement of Rep. Coleman)). In light of these considerations, the Court agreed with the NEA that the "decency and respect" clause is "merely hortatory," and that § 954(d)(1) "does not preclude awards to projects that might be deemed 'indecent' or 'disrespectful,' nor place conditions on grants, or even specify that those factors must be given any particular weight in reviewing an application." *Id*. at 580–81.

33.    In upholding the "decency and respect" clause, the Court was careful to note that it "would confront a different case" if the NEA were to deny grants to projects or productions

expressing disfavored viewpoints. *Id*. at 587. The Court reaffirmed "that, even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas,'" *id.* at 587 (alteration in original) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U. S. 540, 550 (1983)), especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace,'" *id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991)).

### D.        The NEA Grants for Arts Projects

34.        The Grants for Arts Projects ("GAP") is the NEA's "principal grants category." GAP makes grants "available for arts projects of all sizes in a wide variety of artistic disciplines."[3]

35.        GAP applicants may request an amount between $10,000–$100,000.[4]

36.        The NEA accepts GAP applications during two funding cycles each year. For fiscal year 2026, the NEA is accepting applications in the March Cycle and July Cycle.[5]

37.        For the March Cycle, the submission deadline is March 24, 2025, and the notification for acceptance or rejection is December 2025. Though the deadline had initially been set for February 13, 2025, the NEA extended it to March 24, 2025 when it amended the GAP application guidelines, including by newly requiring applicants to certify that they would not "promote gender ideology." For the March Cycle, the earliest project start date is January 1, 2026.[6]

38.        For the July Cycle, the submission deadline is July 22, 2025, and the notification for acceptance or rejection is April 2026. The earliest project start date is June 1, 2026.[7]

---

[3] *Grants*, Nat'l Endowment for the Arts, https://www.arts.gov/grants.

[4] *Grants for Arts Projects*, Nat'l Endowment for the Arts, https://www.arts.gov/grants/grants-for-arts-projects.

[5] *Id*.

[6] *Id*.

[7] *Id*.

39.     The NEA anticipates awarding $62,245,000 for fiscal year 2026. It anticipates 4,500 applications and anticipates 2,075 awards. [8]

**E.     The GAP Application Process**

40.     The GAP application process has two parts. In Part 1, applicants must complete the Application for Federal Domestic Assistance/Short Organization Form, a brief form that collects basic information about the applicant organization, and submit it on Grants.gov. For the March Cycle, Part 1 is due March 11, 2025.

41.     In Part 2, an applicant must complete the Grant Application Form, which constitutes the majority of the application material, including information about the organization, like history and budget; the project description, timeline, and budget information; and work samples, and submit it on the NEA's applicant portal. For the March Cycle, Part 2 is due March 24, 2025.

42.     Both Parts 1 and 2 require an applicant to agree to the following certification:

> By signing this certification, I certify (1) to the statements contained in the list of certifications* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001).

43.     In order to submit Parts 1 and 2 of the GAP application, an applicant must agree to the certification by checking a box labeled "I agree."

---

[8] *Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP) Grant Program Details* 4, Nat'l Endowment for the Arts, February 2025, https://www.arts.gov/sites/default/files/FY26-GAP-Grant-Program-Details-FebRevFinal4.pdf.

**JA22**

44.    Below the certification text is the following explanatory asterisk: "The list of certifications and assurances, or an Internet site where you may obtain this list, is contained in the announcement or agency specific instructions."

45.    The agency specific instructions for the GAP application are available in the GAP Grant Program Details for fiscal year 2026, which includes a detailed description of the grant program and eligibility information.[9] The GAP Grant Program Details states that "[b]y signing and submitting the application form . . . , the Applicant certifies that it is in compliance with the statutes outlined in the Assurance of Compliance and all related National Endowment for the Arts regulations as well as all applicable executive orders . . . ." It also provides a hyperlink to the Assurance of Compliance, which is available on the NEA website.

46.    Accordingly, by agreeing to the certification when submitting the GAP application, an applicant certifies their agreement with the Assurance of Compliance.

F.    **Executive Order 14168 and the NEA's Implementation of the Order through the Assurance of Compliance**

47.    On January 20, 2025, President Donald J. Trump signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO").

48.    The Gender Ideology EO claims that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." 90 Fed. Reg. 8615 (Jan. 30, 2025) at § 1. The Order asserts that "[e]fforts to eradicate the biological reality of sex" and "attack

---

[9] *Id.*

JA23

. . . the ordinary and longstanding use and understanding of biological and scientific terms . . . unmoored from biological facts" amounts to an "attack" on "women" and "on the validity of the entire American system." *Id*. It accordingly states that "my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id*.

49. In order to pursue this objective, the Gender Ideology EO directs: "Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. at § 3(g).

50. Section 2(f) of the Gender Ideology EO defines "gender ideology" as follows:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

51. The NEA subsequently implemented the President's Gender Ideology EO. On February 6, 2025, the agency announced updates to its grants for fiscal year 2026, including GAP grants. On or about the same day, the NEA amended its Assurance of Compliance to include the language:

> [T]he applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:
>
> - The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions.
>   . . .
> - The applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.

**JA24**

52.    The Assurance of Compliance states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these . . . executive orders" and that "[i]f the NEA determines that a recipient has failed to comply . . . , it may suspend or terminate the award, and/or recover the funds." It further states that the "[t]he applicant's assurance of compliance is subject to judicial enforcement." It later reiterates that "[t]he United States has the right to seek judicial or administrative enforcement of this assurance."

G.    *National Association of Diversity Officers in Higher Education v. Trump*

53.    On February 21, 2025, the U.S. District Court for the District of Maryland enjoined a different certification requirement that appeared in the NEA's new Assurance of Compliance, when it also added the "gender ideology" prohibition. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (hereinafter "*NADOHE*"), No. 25-cv-333, 2025 WL 573764 (D. Md. Feb. 21, 2025). That certification requirement read: "The applicant will not operate any programs promoting 'diversity, equity, and inclusion' (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173" ("DEI certification").

54.    President Trump signed Executive Order No. 14173 ("DEI EO"), entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," on January 21, 2025. 90 Fed. Reg. 8633 (Jan. 31, 2025). In relevant part, the DEI EO directs all agencies to "include in every contract or grant award," a certification, enforceable through the False Claims Act, that the contractor or grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

55.    On February 3, 2025, the National Association of Diversity Officers in Higher Education, the American Association of University Professors, Restaurant Opportunities Centers United, and the Mayor and City Council of Baltimore challenged, *inter alia*, the certification

JA25

requirement in the DEI EO, on the grounds that it violates the First Amendment and the separation of powers. Compl., *NADOHE*, ECF No. 1, at ¶¶ 193–210 (Feb. 3, 2025). On February 13, 2025, the plaintiffs moved for a temporary restraining order and/or preliminary injunction, including on these claims. Mot. for TRO, *NADOHE*, ECF No. 27 (Feb. 13, 2025).

56.    On February 21, 2025, the district court held that the plaintiffs had shown a likelihood of success that the certification requirement in the DEI EO violates the First Amendment because it is a "content-based prior restraint on their speech" and "operates as a facially viewpoint-discriminatory order as well." *NADOHE*, 2025 WL 573764, at *22. It also held that the plaintiffs had demonstrated irreparable injury and that the balance of the equities and public interest tip in their favor. *Id*. at *27–28. On that basis, the court ordered that the defendants "shall not: . . . require any grantee or contractor to make any 'certification' or other representation pursuant to the Certification Provision." Prelim. Inj., *NADOHE*, ECF No. 45, at 3.

57.    Following the Court's issuance of its preliminary injunction order, the NEA updated its Assurance of Compliance to include the following language after the DEI certification:

> *PLEASE NOTE: Due to the preliminary injunction issued on February 21, 2025, by the United States District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, the NEA is not currently requiring any grantee or contractor to make any "certification" or other representation pursuant to Executive Order No. 14173. This term will not apply to your award as long as this preliminary injunction remains in effect.*

**H.    Harm to Plaintiffs**

***Rhode Island Latino Arts***

58.    RILA is in the process of applying for NEA funding in the March 2025 GAP cycle to support programming in 2026.

59.    RILA originally planned to seek support for a production of "Faust," in which the lead character is gay and queer. RILA was considering casting a nonbinary actor who uses

**JA26**

they/them pronouns for that role. In the past, this actor has chosen to dress as a man during one performance and dress as a woman in the next performance, while performing the same role.

60. Because the NEA's Assurance of Compliance now requires certifying that federal funds will "not be used to promote gender ideology," RILA decided not to apply for a grant to support "Faust."

61. RILA also considered applying to support its storytelling program. In its storytelling program, RILA allows performing artists to tell their stories without restrictions, based on the principle that artistic freedom should allow them to say what they want. The program is open to all performers, including nonbinary and transgender performers, and it allows them to speak about or interpret their art based on their personal lives. RILA will not tell performers to stay away from topics that could be interpreted as "promoting" what the government deems to be "gender ideology."

62. RILA decided not to apply for a grant to support the storytelling program because of the NEA's new Assurance of Compliance and "gender ideology" prohibition.

63. Though it is not the project for which RILA wanted to apply, in the absence of judicial relief, RILA will apply for an NEA grant to support performance tours and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. Without the "gender ideology" requirement, the scope would be different; RILA would apply for a grant that would affirmatively include celebrating transgender, queer, and nonbinary identity and featuring artists and characters with those identities.

64. Though RILA objects to the "gender ideology" prohibition, RILA submitted Part 1 of its application on February 14, 2025, and agreed to the Assurance of Compliance, with the intention of proceeding with a more restricted project that would comply with the "gender

**JA27**

ideology" prohibition. If there were no "gender ideology" prohibition, RILA would expand the scope of the project in Part 2 of its application to reflect its intention to support transgender, queer, and nonbinary artists, characters, and themes within the scope of its NEA-funded programming.

65.    Because what it means to "promote" what the government deems to be "gender ideology" is not clear, RILA is forced to guess as to the parameters, including whether it prohibits allowing a transgender, queer, or nonbinary individual to participate in NEA-funded programming, including any mention of these identities in RILA's work, or including any fictional characters who are transgender, nonbinary, or queer. Given the lack of clarity, RILA fears that even describing itself as an organization that supports transgender, nonbinary, and queer artists might run afoul of the "gender ideology" prohibition. The lack of clarity also denies RILA the ability to provide artists the creative freedom to which RILA is committed as an organization, and it precludes RILA from expressing viewpoints affirming all identities, including those of transgender, nonbinary, and queer individuals, even though RILA is committed to those views as an artistic organization.

66.    RILA believes that it has the right, as an artistic organization, to apply for NEA funding to promote art that meets the artistic merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." RILA seeks to affirm all gender identities, including transgender, nonbinary, and queer identities. Yet any work that might be seen as "promoting" these identities risks violating the NEA's "gender ideology" prohibition.

67.    RILA also intends to apply for NEA grants in future grant cycles to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through that art. But as long as the "gender ideology" prohibition is in place, RILA is barred from seeking such support.

**JA28**

*National Queer Theater*

68.     NQT intends to apply for NEA funding in the March 2025 GAP cycle to support its Criminal Queerness Festival ("CQF"), as it has successfully in the past. The NEA funds would be used for artist and production expenses.

69.     The 2026 CQF will be NQT's eighth annual one. In January 2025, NQT received an Obie Award for the Festival in the "Theatre Grants" category. The prestigious Obie Awards, established in 1955, honor the highest caliber of off-Broadway and off-off Broadway theater to recognize brave work, champion new material, and advance careers in theater.

70.     CQF is devoted to freedom of expression and to fighting censorship and criminalization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes. CQF has featured works from emerging artists from countries that criminalize homosexuality. The plays are accompanied by talkback discussions facilitated by the playwrights, human rights advocates, and other subject matter experts.

71.     The plays featured in the festival are chosen by a curatorial committee of prior CQF playwrights. Supporting transgender, nonbinary, and gender queer writers and themes has always been a part of the festival, including in the years that it has received NEA funding. In 2023, the festival featured one play about intersex identity. In 2024, two plays were written by transgender writers and about trans identity. For 2025, all three playwrights identify as nonbinary or gender queer, and one play has nonbinary characters.

72.     Because the "gender ideology" prohibition is unclear, it has forced NQT to guess as to what, if anything, it could do that would avoid the open-ended prohibition. For example, it is

**JA29**

not clear whether "promoting" what the government deems to be "gender ideology" includes merely working with actors, playwrights, and other artists who identify as transgender, nonbinary, or queer, regardless of the content of the art they produce. It is also unclear whether the mere existence of a transgender, nonbinary, or queer character in a piece violates the prohibition. NQT fears that its very mission as an organization dedicated to celebrating LGBTQ+ artists might also run afoul of the "gender ideology" prohibition.

73.     NQT believes that it has the right, as an organization of artists, to apply for NEA funding to promote art that meets the merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." NQT seeks to affirm all gender identities, including transgender, nonbinary, and queer identities. Yet any work that promotes these identities risks violating the NEA's "gender ideology" prohibition.

74.     Only because one cannot register to apply for NEA funding without checking the box agreeing to the certification in the application, NQT intends to check that box. But it will simultaneously make clear in writing on the application that it is not agreeing to the "gender ideology" prohibition because it believes it is legally invalid.

75.     NQT intends to apply for the March 2025 cycle and not the July 2025 cycle so that it can receive the grant notification in December, which is also when NQT passes its budget. Because NQT operates on a calendar year, receiving the grant notification in December would give it six months to plan, budget, and fundraise for CQF 2026. If NQT were to wait until the July 2025 cycle, that would force it to wait until April 2026 for the grant notification, leaving NQT with only two months before CQF 2026, which is not enough time for the necessary planning.

76.     NQT also intends to apply for NEA funding in the future, as it has consistently done in the past, to support its work affirming transgender, queer, and nonbinary identities. But as long

**JA30**

as the NEA requires that no funds can be used to "promote" what the government deems to be "gender ideology," NQT is barred from seeking such support.

### The Theater Offensive

77.    TTO intends to apply for NEA funding in the March 2025 GAP cycle to support the production of a new play titled "Smoke," written by a transgender playwright. Set in 1960's D.C., "Smoke" explores love, found family, motherhood, and healing, and reveals the complexities of transgender life. The production will feature two transgender actors in the leading roles. The NEA funds would be used to support the artists in the play, which would begin rehearsals in May 2026.

78.    The certification requirement poses an obstacle for TTO, because it wants to apply for funding, but believes it has a right to be considered without regard to whether the views its project expresses "promote" what the government deems to be "gender ideology."

79.    Accordingly, TTO intends to check the box agreeing to the certification in the application only because doing so is necessary to submit an application, but it will simultaneously make clear in writing on the application that it is not agreeing to the "gender ideology" prohibition because it believes it is legally invalid.

80.    TTO finds the certification requirement unclear as to what constitutes "promoting" what the government deems to be "gender ideology"; the requirement thereby forces TTO to guess as to what it can and cannot do with an NEA grant. For example, it does not make clear whether "promoting" what the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as transgender and/or nonbinary, without more, or whether it prohibits only certain messages, themes, or views. The requirement is also unclear as to whether the existence of a transgender and/or nonbinary character in a piece constitutes

**JA31**

"promoting" what the government deems to be "gender ideology." Nor is it clear what views are proscribed. TTO fears that its very mission as an organization dedicated to queer and trans people might run afoul of the "gender ideology" prohibition.

81.    TTO would like to apply for the March 2025 cycle and not the July 2025 cycle in order to have enough planning time for "Smoke." Every production requires significant lead time in order to ensure that proper funding is in place, and the production process requires time to secure a venue, actors, creative and production team members, security, and more. Having a year to adequately plan and secure the necessary funding is best practice for organizations like TTO.

82.    It is also important for TTO to apply in the March 2025 cycle because March applicants will not know if their application was recommended or rejected for funding until December 2025, and the earliest start date for any funded project is January 2026. If TTO were to apply in the second cycle of funding, it would not allow the project to start until June 1, 2026, which would be too late for Smoke's production timeline.

83.    TTO also intends to apply for NEA grants in future grant cycles to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender and/or nonbinary identities through its artistic expression. But as long as the NEA requires that no funds can be used to "promote" what the government deems "gender ideology," TTO is barred from seeking such support.

***Theatre Communications Group***

84.    Many of TCG's members apply for and receive funding from the NEA to support their artistic endeavors. Many of them want to apply for NEA funding in the March 2025 GAP cycle.

**JA32**

85.    Because the NEA's Assurance of Compliance now requires certifying that federal funds will "not be used to promote gender ideology," many of TCG's members have been deterred from applying for funding in the March 2025 cycle, though they had otherwise planned to and would like to. These members object to having to make such a certification, and fear the penalties that could flow to them if they are deemed to have made a false certification. If the "gender ideology" prohibition were lifted, these members would apply for NEA funding in the March 2025 cycle.

86.    Many of TCG's members also fear that the ban on "promot[ing]" what the government deems to be "gender ideology" would bar them from even being considered for NEA funding because they work with, or are, transgender, nonbinary, or queer artists, and are committed to treating all artists with equal dignity.

87.    For example, one member theater, which has received several NEA grants and whose mission includes presenting "diverse" stories of the American identity, had planned to apply in the March 2025 cycle. However, it cannot and will not agree to the Assurance of Compliance because it fundamentally disagrees with the "gender ideology" prohibition. Transgender people are part of the theater's workforce, audience, and arts education programs, and the theater recognizes all gender identities. It believes that not acknowledging transgender people or identity is discriminatory. As a result, the theater is unable to apply for an NEA grant that would otherwise cover 25 percent of their production cost.

88.    The "gender ideology" prohibition also bars many of TCG's members from being considered for an NEA grant without regard to whether their projects express views that "promote" what the government deems to be "gender ideology." TTO is one such member.

**JA33**

89.     Many of TCG's members, including TTO, find the "gender ideology" prohibition unclear, and it thereby forces them to guess as to what is and is not permitted with an NEA grant.

90.     TCG has heard from members that they are uncertain about how to proceed, unsure of whether to apply knowing they will be barred from eligibility because their project may express views that "promote" what the government deems to be "gender ideology," to apply with a different project, or forego applying for NEA funding altogether. These members feel that they require legal advice to understand how to handle the uncertainty that has been imposed on them, and many are unable to access it in time. In addition, many members, especially smaller theaters do not have existing relationships with lawyers or the money to support access to legal counsel, particularly on such a quick timeline.

91.     Many TCG members have expressed dismay at being forced to compromise on their commitment to free artistic expression and their ideals in order to seek NEA funding. These organizations seek to affirm all gender identities, including transgender, nonbinary, and queer identities.

92.     Some TCG members have also told TCG about the financial impact of losing NEA funding. For example, for one small theater, an NEA grant would cover their entire design team's wages, pension, and health. These members would like to apply for NEA funding but for the ban on "promoting" what the government deems to be "gender ideology," and would do so in the March 2025 cycle if this Court provides relief invalidating that restriction while this case is pending.

93.     The "gender ideology" prohibition has also caused TCG to divert a great deal of its time and resources. For example, TCG has diverted some of its research into polling members about how the requirement has affected their plans to apply, or not apply, for NEA funding. In

JA34

addition, TCG's programming team has had to quickly pivot to provide its members and the larger field with informational webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices with respect to applying for NEA funding.

94.    Many of TCG's members, including TTO, intend to apply for NEA grants in future grant cycles as well to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through their artistic expression. But as long as the NEA requires that no funds can be used to "promote" "gender ideology," they are barred from seeking such support. This is true for TCG as well.

95.    If the Court invalidates the "gender ideology" prohibition, TCG intends to apply for an NEA grant during the July 2025 cycle to support fieldwide convenings and research. Last year, TCG's national conference, supported in part by the NEA, included a panel on gender identity and a presentation by a trans woman. TCG is in preliminary planning stages for the next conference in 2026, and TCG is committed to including in the conference discussion about gender identity, affirming trans, nonbinary, and queer members of the community.

## CLAIMS

### FIRST CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act—Exceeds Statutory Authority
(Against All Defendants)**

96.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

97.     A reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

98.     Defendants' amendments to the Assurance of Compliance to implement Executive Order 14168 are a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

99.     Defendants' action exceeds the NEA's statutory authority under its enabling statute, the National Endowment for the Arts and Humanities Act of 1965, codified at 20 U.S.C. § 951 *et seq*. The Act authorizes the NEA to "ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id*. § 954(d)(1). The Act explicitly identifies one category of speech ineligible for funding—obscenity. *Id*. § 954(d)(2). The Act therefore does not authorize the NEA to render any other categories—or viewpoints—of speech ineligible for funding.

100.    Defendants' actions exceed their statutory authority under the Act, and the Court must hold them unlawful and set them aside.

### SECOND CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act—Arbitrary and Capricious
(Against All Defendants)**

101.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

**JA36**

102.   A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

103.   Defendants' amendments to the Assurance of Compliance to implement Executive Order 14168 are a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

104.   Defendants' action is arbitrary and capricious. Defendants have failed to adequately justify their action; have relied on factors Congress did not authorize them to consider; have failed to consider important aspects of the problem; and have failed to acknowledge or justify their change of position. The Court must hold them unlawful and set them aside.

### THIRD CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act—Contrary to Constitutional Right**
**(Against All Defendants)**

105.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

106.   A reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

107.   Defendants' amendments to the Assurance of Compliance to implement Executive Order 14168 are a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

108.   For the reasons described in the Fourth and Fifth Claims for Relief, and incorporated here, Defendants' actions are contrary to constitutional right, and the Court must hold them unlawful and set them aside.

### FOURTH CLAIM FOR RELIEF
**Violation of the First Amendment**
**(Against All Defendants)**

109.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

JA37

110.    The Assurance of Compliance, as amended by Defendants to implement Executive Order 14168, violates the First Amendment by imposing a viewpoint-based bar on federal arts funding. In particular, the amendment requires GAP applicants to certify that NEA funds will "not be used to promote gender ideology," which is defined to include the "false claim" "that there is a vast spectrum of genders that are disconnected from one's sex."

111.    When it comes to "what is good art," "[o]ur system of government" intentionally "accommodat[es] . . . the widest varieties of tastes and ideas," for it is a judgment that "varies with individuals as it does from one generation to another." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 157 (1946).

112.    In the arts, as in other contexts, the First Amendment rests on "[t]he bedrock principle of viewpoint neutrality," which "demands that the state not suppress speech" due to "disagreement with the underlying ideology or perspective that the speech expresses." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004).

113.    As the Supreme Court recognized in *Finley*, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587 (quoting *Regan*, 461 U.S. at 550) (alteration in original).

114.    The Supreme Court's decisions regarding other government benefits echo this rule. *See, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679, 682 (2010) (recognizing that official recognition of a student group is "effectively a state subsidy" and cannot be withheld based on viewpoint).

115.    The prohibition on viewpoint discrimination also applies where the government provides support to speech through any kind of forum, even, as here, a nonpublic forum.

116.    Yet the NEA's "gender ideology" prohibition is a textbook example of viewpoint discrimination. It singles out messages and perspectives that the government does not like for worse treatment.

117.    The Assurance of Compliance and funding prohibition violate the First Amendment facially and as applied to Plaintiffs.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment**
**(Against All Defendants)**

118.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

119.    The Due Process Clause of the Fifth Amendment prohibits laws that are unconstitutionally vague, and applies with particular force where government regulations affect speech, out of concern that vague regulations will chill protected speech by causing individuals to steer clear of the prohibited zone.

120.    The requirement is also heightened where, as here, criminal penalties are at stake. *See* 18 U.S.C. § 1001(a) (knowingly and willfully making "any materially false, fictitious, or fraudulent statement or representation" can result in fines and/or imprisonment up to five years).

121.    The Assurance of Compliance is unconstitutionally vague on its face and as applied to Plaintiffs. It fails to adequately define what speech is prohibited and, in particular, what it means "to promote gender ideology." Although Executive Order 14168 defines gender ideology to "includ[e] the idea that there is a vast spectrum of genders that are disconnected from one's sex," it neither limits the definition to that idea nor provides any indication of which ideas might fall within the term's ambit. 90 Fed. Reg. 8615 (Jan. 30, 2025) at § 2(f). Even if the amended Assurance of Compliance adequately defined what constitutes "gender ideology," it provides no criteria for determining whether a work of art "promote[s]" these ideas.

**JA39**

122. The vagueness of the "gender ideology" prohibition both fails to provide adequate notice about what speech is prohibited and invites arbitrary or selective enforcement by the NEA.

123. Because Defendants' amendments to the Assurance of Compliance to implement the Executive Order fail to provide fair notice to enable ordinary people to understand what speech the statute prohibits, it is unconstitutionally vague and violates the Fifth Amendment to the U.S. Constitution.

<div align="center">

**PRAYER FOR RELIEF**

</div>

Plaintiffs respectfully request that this Court:

a. Declare that Defendants' amendments to the Assurance of Compliance, Defendants' prohibition on funding any projects that "promote gender ideology," and Defendants' other actions to implement Executive Order 14168 are unconstitutional and unlawful;

b. Vacate and set aside Defendants' amendments to the Assurance of Compliance, Defendants' prohibition on funding any projects that "promote gender ideology," and Defendants' other actions to implement Executive Order 14168;

c. Temporarily restrain and/or preliminarily and permanently enjoin Defendants from implementing or giving effect to Executive Order 14168, Defendants' amendments to the Assurance of Compliance to implement Executive Order 14168, Defendants' prohibition on funding any projects that "promote gender ideology," and any other actions by Defendants to implement Executive Order 14168;

d. Temporarily restrain and/or preliminarily and permanently enjoin Defendants from taking any other action that prevents Defendants from fulfilling their statutory duty

<div align="center">

**JA40**

</div>

to judge grant applications using the criteria set forth in the Act of "artistic excellence and artistic merit";

e.    Award Plaintiffs reasonable attorneys' fees and costs; and

f.    Grant such other and further relief as the Court may deem appropriate.


Dated: March 6, 2025                    Respectfully submitted,

/s/ Lynette Labinger

Lynette Labinger, Esq., (Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
401.465.9565
LL@labingerlaw.com
Cooperating counsel
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF RHODE ISLAND

Vera Eidelman*
Scarlet Kim*
Lauren Yu*
Brian Hauss*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
veidelman@aclu.org
scarletk@aclu.org
lyu@aclu.org
bhauss@aclu.org

David D. Cole*
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

*Attorneys for Plaintiffs*

*Pro Hac Vice Application Forthcoming

JA41

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, | Case No. |
| *Plaintiffs*, | |
| *v.* | |
| NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, | |
| *Defendants*. | |

## DECLARATION OF VERA EIDELMAN

I, Vera Eidelman, declare as follows:

1. I am a Senior Staff Attorney with the American Civil Liberties Union Foundation and counsel for Plaintiffs in the above-captioned action. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2. Attached as Exhibit 1 is a true and correct copy of a document issued by the National Endowment for the Arts ("NEA") with the title "Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP), Grant Program Details," dated February 2025, available at https://www.arts.gov/sites/default/files/FY26-GAP-Grant-Program-Details-FebRevFinal4.pdf.

3. Attached as Exhibit 2 is a true and correct copy of a webpage published by the NEA with the title "Legal Requirements and Assurance of Compliance," available at https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance.

4.      Attached as Exhibit 3 is a true and correct copy of a press release published by the NEA with the title, "National Endowment for the Arts Supports the Arts with Nearly $36.8 Million in Funding Nationwide," dated January 14, 2025, available at https://www.arts.gov/news/press-releases/2025/national-endowment-arts-supports-arts-nearly-368-million-funding-nationwide.

5.      Attached as Exhibit 4 is a true and correct copy of a press release published by the NEA with the title, "Updates on National Endowment for the Arts FY 2026 Grant Opportunities," dated February 6, 2025, available at https://www.arts.gov/news/press-releases/2025/updates-national-endowment-arts-fy-2026-grant-opportunities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 5, 2025.

_____
Vera Eidelman

2

JA43

# EXHIBIT 1

Published February 2025

# National Endowment for the Arts

## Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP)

## Grant Program Details

## Table of Contents

*Click a heading below to jump directly to that section*

Grants for Arts Projects ....................................................................................................... 4

Basic Information ........................................................................................................... 4

Executive Summary............................................................................................... 4

Grants for Arts Projects Program Description ....................................................... 6

Program Goals and Objectives............................................................................... 6

Projects ................................................................................................................ 6

We Encourage .................................................................................................. 6

Period of Performance........................................................................................... 7

Legal Requirements and Assurance of Compliance............................................... 8

Nondiscrimination Policies ............................................................................... 8

Accessibility...................................................................................................... 8

National Historic Preservation Act and National Environmental Policy Act Review.......... 8

Subject Matter ................................................................................................. 9

Authorizing Statute .......................................................................................... 9

Program Description: Artistic Disciplines....................................................... 10

Choosing the Right Discipline for Educational Projects........................................ 11

Program Description: Unallowable Activities/Costs....................................... 13

Unallowable Activities ......................................................................................... 13

Certain Unallowable Costs ................................................................................... 14

Eligibility............................................................................................................... 15

"Friends of" and Other Affiliated Fundraising Organizations............................... 16

Elementary and Secondary Schools...................................................................... 16

Fiscal Sponsorship ............................................................................................... 16

Cost Sharing/Matching Requirement ................................................................... 17

Eligibility: Application Limits ............................................................................ 18

Applications to other NEA funding categories: .................................................... 18

---

JA45

Published February 2025

Exception: Parent Organizations with Independent Components (IC) .............................. 18

Independent Component (IC) Eligibility.............................................................. 18

**Award Amounts & Cost Share/Matching** ............................................................ **20**

Award Amounts .......................................................................................... 20

Cost Share and Matching Funds ....................................................................... 20

**Application Contents & Format** ......................................................................... **21**

Application Instructions ................................................................................. 21

Applications Recommended for Funding .............................................................. 21

**Submission Requirements & Deadlines** .............................................................. **22**

Pre-Application Required Registrations................................................................. 22

Submission Methods..................................................................................... 22

Contact Information...................................................................................... 22

Application Submission Dates & Times ................................................................ 23

Exceptions to the Submission Deadlines .............................................................. 23

Intergovernmental Review ............................................................................. 24

**Application Review** ....................................................................................... **25**

Review Criteria........................................................................................... 25

Review & Selection Process ............................................................................ 25

Risk Review .............................................................................................. 26

**Award Notices** ............................................................................................ **27**

Final Reports for Previous Awards..................................................................... 27

**Post-Award Requirements and Administration**...................................................... **28**

General Terms & Conditions............................................................................ 28

Implementation of Title 2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards................................................ 28

Crediting Requirement.................................................................................. 28

Changes in Projects..................................................................................... 28

Accessibility.............................................................................................. 29

National Historic Preservation Act and/or the National Environmental Policy Act Review 30

Project Reporting and Evaluation ..................................................................... 30

Responsible Conduct of Program Evaluation and Research.......................................... 31

Legal Requirements and Assurance of Compliance.................................................. 31

Civil Rights............................................................................................... 32

JA46

Published February 2025

Regulations Relating to Lobbying ........................................................................................ 32

Freedom of Information Act (FOIA) Notice ....................................................................... 33

Standards for Service ......................................................................................................... 33

Paperwork Reduction Act Statement ............................................................................... 33

**Frequently Asked Questions .......................................................................................... 34**

## Access for individuals with disabilities:

Contact the Office of Accessibility at 202-682-5532 / accessibility@arts.gov or the Office of Civil Rights at civilrights@arts.gov to request an accommodation or an alternate format of the guidelines at least 2 weeks prior to the application deadline.

JA47

| GAP FY26 Grant Program Details | Basic Information |
|---|---|

# Grants for Arts Projects

## Basic Information

| | |
|---|---|
| **Federal Agency Name** | National Endowment for the Arts |
| **Funding Opportunity Title** | Grants for Arts Projects |
| **Announcement Type** | Modification of previous announcement |
| **Funding Opportunity Number(s)** | March: 2025NEA01GAP1MARCH<br>July: 2025NEA01GAP2 |
| **Assistance Listing Number(s)** | 45.024 |
| **Agency Contact Information** | GAP Contacts Page |

Details in the chart below are estimates. Actual figures may vary.

| FUNDING DETAILS | AMOUNT *(Contingent upon availability of funds)* |
|---|---|
| **Total amount of funding expected to award** | $62,245,000 |
| **Anticipated number of applications** | 4,500 |
| **Anticipated number of awards** | 2,075 |
| **Expected dollar value of awards (range)** | All Applicants: $10,000-$100,000<br>Local Arts Agencies Subgranting Projects: $30,000-$150,000 |

## Executive Summary

Grants for Arts Projects (GAP) provides project-based funding for organizations in the areas of Artist Communities, Arts Education, Dance, Design, Film & Media Arts, Folk & Traditional Arts, Literary Arts, Local Arts Agencies, Museums, Music, Musical Theater, Opera, Presenting & Multidisciplinary Works, Theater, and Visual Arts. Funded activities may include public engagement with the arts and arts education, the integration of the arts with strategies promoting the health and well-being of people and communities, and the improvement of overall capacity and capabilities within the arts sector. Awards require a 1:1 cost share/match.

Eligible applicants include: nonprofit, tax-exempt 501(c)(3), U.S. organizations; units of state or local government; and Federally recognized tribal communities or tribes. Funding in this category is *not available* for individuals, fiscally sponsored entities, commercial/for-profit enterprises, State Arts Agencies (SAA), or Regional Arts Organizations (RAO).

Applications are evaluated based on the published Review Criteria.

JA48

| **GAP FY26 Grant Program Details** | Basic Information |
| --- | --- |

**COMPONENTS OF THIS NOTICE OF FUNDING OPPORTUNITY (NOFO):**

- *GAP GRANT PROGRAM DETAILS (this document)*: Essential information about GAP, including a grant program description, unallowable activities and costs, eligibility, review criteria, award amount and cost sharing, and post-award requirements and administration, among others.
- *APPLICATION INSTRUCTIONS DOCUMENT*: Navigate to the Application Instructions section on the GAP webpage for complete information on application requirements and instructions on how to apply. Select the discipline that is most relevant to your project activities. Each instructions document also includes a detailed description for the discipline area, accepted project types, and characteristics of competitive proposals.

**KEY DATES:**

Applying for and managing a federal grant is a significant undertaking and the process is competitive. We estimate that after completing the required registrations, which can take several weeks to finalize, the process to draft and submit an application will take approximately 26 hours.

| Step | March Cycle (GAP1) | July Cycle (GAP2) |
| --- | --- | --- |
| Grant Program Details and Application Instructions Published | February 2025 | February 2025 |
| Part 1 Application Package Available on Grants.gov | February 2025 | Mid-May 2025 |
| **Part 1 Grants.gov** *Submission deadline* | **March 11, 2025** **11:59 pm ET** | **July 10, 2025** **11:59 pm ET** |
| **Part 2 NEA Applicant Portal** *Opens to applicants* | **March 14, 2025** **9:00 am ET** | **July 15, 2025** **9:00 am ET** |
| **Part 2 NEA Applicant Portal** *Submission deadline* | **March 24, 2025** **11:59 pm ET** | **July 22, 2025** **11:59 pm ET** |
| Notification of recommended funding or rejection | December 2025 | Early to mid April 2026 |
| Earliest project start date | January 1, 2026 | June 1, 2026 |

JA49

| GAP FY26 Grant Program Details | Program Description |
|---|---|

# Grants for Arts Projects Program Description

## Program Goals and Objectives

The National Endowment for the Arts is committed to supporting excellent arts projects for the benefit of all Americans. Through project-based funding, Grants for Arts Projects (GAP) supports an expansive range of arts activities. These activities may include opportunities for public engagement with the arts and arts education, for the integration of the arts with strategies promoting the health and well-being of people and communities, and for the improvement of overall capacity and capabilities within the arts sector.

## Projects

We fund arts projects with specific, definable activities in the following disciplines: Artist Communities, Arts Education, Dance, Design, Film & Media Arts, Folk & Traditional Arts, Literary Arts, Local Arts Agencies, Museums, Music, Musical Theater, Opera, Presenting & Multidisciplinary Works, Theater, and Visual Arts. **Go to Artistic Disciplines on page 10 for additional information.**

Projects may be small, medium, or large, and may take place in any part of the nation's 50 states, the District of Columbia, and U.S. jurisdictions. A project may consist of one or more specific events or activities; it may be a new initiative or part of your organization's regular season or activities. Organizations that undertake a single short-term program in a year may apply for that event, or may choose to identify certain components of that program as their project. Organizations may apply for any or all phases of a project, from planning through implementation. A project should not encompass all an organization's activities or costs in a given year. The NEA does not fund general operating support or a full season of programming.

We welcome applications from first-time and returning applicants; from organizations serving rural, urban, suburban, and tribal communities of all sizes; and from organizations with small, medium, or large operating budgets.

Projects are evaluated according to the Review Criteria on page 25. Applicants should keep these in mind while developing their application materials.

## We Encourage

We encourage arts projects in any of the following areas, including activities that:

- **Celebrate the nation's rich artistic heritage and creativity by honoring the semiquincentennial of the United States of America (America250).** Project activities may focus exclusively on celebrating the anniversary, or they may incorporate a special America250-related component or focus within a larger project. For example, projects could examine the work of American artists, present or create art recognizing this

JA50

| GAP FY26 Grant Program Details | Program Description |
|---|---|

important milestone, or undertake educational activities or related programming. See the FAQ section for more information.

- **Originate from or are in collaboration with the following**:
  - Historically Black Colleges and Universities
  - Tribal Colleges and Universities
  - American Indian and Alaska Native tribes
  - Hispanic Serving Institutions
  - Asian American and Pacific Islander communities, and
  - Organizations that support the independence of people with disabilities.
- **Support the health and well-being of people and communities through the arts.**
- **Support existing and new technology-centered creative practices across all artistic disciplines and forms,** including work that explores or reflects on the impacts of artificial intelligence (AI) in ways that are consistent with valuing human artistry and improve the public's awareness and understanding of the use of AI.

## Period of Performance

NEA support of a project (i.e., "Earliest Start Date") can begin no sooner than:
- January 1, 2026 (for applicants to the March cycle, "GAP1"), or
- June 1, 2026 (for applicants to the July cycle "GAP2").

Grants awarded in this program generally may cover a period of performance of up to two years. **The two-year period is intended to allow an applicant time to plan, execute, and close out its project, not to repeat a one-year project for a second year**.

No pre-award costs are allowable in the Project Budget. A recipient may not receive more than one NEA award or other federal funding for the same activities/costs during the same period of performance.

JA51

| GAP FY26 Grant Program Details | Program Description |
|---|---|

## Legal Requirements and Assurance of Compliance

The **Legal Requirements** section on our website provides information about key legal requirements that may apply to an applicant or recipient. It is not an exhaustive list, more details may be found in Appendix A of the General Terms and Conditions.

By signing and submitting the application form on Grants.gov, the Applicant certifies that it is in compliance with the statutes outlined in the **Assurance of Compliance** and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance.

**It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

### Nondiscrimination Policies

Projects may reach a particular group or demographic (such as sex, disability, economic status, race, color, or national origin, including limited English proficiency), however, projects may not be exclusionary under Federal civil rights laws and policies prohibiting discrimination. This nondiscrimination requirement extends to hiring practices, artist selection processes, and audience engagement. Your application should make it clear that project activities are not exclusionary. Please review the Assurance of Compliance, which outlines the relevant federal statutes, NEA regulations, and executive orders.

### Accessibility

Federal regulations require that all NEA-funded projects be accessible to people with disabilities. Individuals with disabilities may be artists, performers, audiences, visitors, teaching artists, students, staff, and volunteers. Funded activities should be held in a physically accessible venue, and program access and effective communication should be provided for participants and audience members with disabilities. If your project is recommended for funding, you will be asked to provide detailed information describing how you will make your project physically and programmatically accessible to people with disabilities.

### National Historic Preservation Act and National Environmental Policy Act Review

Recommended projects are subject to the National Historic Preservation Act (NHPA) and/or the National Environmental Policy Act (NEPA) compliance review.

Some of the common project types requiring a review are:
- Projects involving a building over 50 years old. This also includes structures such as bridges; or objects such as sculptures; or a landscape that is historically significant.
- The commissioning and installation of temporary or permanent outdoor artworks or structures, such as: sculptures, statues, murals, or permanent signs.

JA52

| GAP FY26 Grant Program Details | Program Description |
|---|---|

- Outdoor arts/music festivals or activities requiring ground disturbance.
- Maintenance or rehabilitation of landscapes and gardens.
- Design services and planning for projects that may affect historic properties.

See more information about NHPA/NEPA review under Post-Award Requirements and Administration.

## Subject Matter

Per the NEA's legislation, projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 USC 952(j)-(l); 20 USC 954(d),(l).

## Authorizing Statute

The NEA offers this funding opportunity under the authority of 20 U.S.C. § 954.

JA53

| GAP FY26 Grant Program Details | Program Description: Artistic Disciplines |
|---|---|

# Program Description: Artistic Disciplines

We fund arts projects through 15 different subcategories, based on artistic discipline or field, which we broadly refer to as "disciplines." Applicants apply to a specific discipline area. In the Instructions documents found on the GAP webpage, each discipline has outlined the types of projects they encourage, and guidance on characteristics of competitive proposals.

Select the discipline that most closely aligns with your project activities. The short descriptions on this page offer an overview; however, applicants should review the full discipline description before applying. Contact us if you have any questions about which discipline is most appropriate for your project.

| Discipline | Summary |
|---|---|
| **Artist Communities** | Artist residencies that provide dedicated space, time, and resources to artists for the creation or development of new work. |
| **Arts Education** | Projects for pre-K-12 students, the educators and artists who support them, and the schools and communities that serve them **(see below for more guidance on selecting the right discipline for educational projects)**. |
| **Dance** | Projects in all genres of dance, including creation of work, presentation and touring, residencies, archive/preservation of dance, services to the field, and education projects. |
| **Design** | Projects including architecture, communications and graphic design, fashion design, historic preservation, industrial and product design, interior design, accessible design, landscape architecture, rural design, social impact design, and urban design. |
| **Film & Media Arts** | Artist support programs, public engagement activities, and services to the field focused on film, cinema, audio, broadcast, creative code and computation, interactive media, and emergent practices at the intersection of arts and digital technology. |
| **Folk & Traditional Arts** | Project activities in folk and traditional arts, including culturally- or community-centered artistic traditions, represented by a wide range of genres including, but not limited to, music, dance, crafts, foodways, dress/adornment, occupation, ceremony, and oral expression, such as stories, poetry, and language. |
| **Literary Arts** | Projects supporting publishing, distribution, and/or promotion of literary content, as well as literary arts programming and services to the field. |

JA54

| GAP FY26 Grant Program Details | Program Description: Artistic Disciplines |

| Discipline | Summary |
|---|---|
| **Local Arts Agencies** | Projects by arts commissions, arts councils, or departments of cultural affairs; national or statewide service organizations partnering with local arts agencies; and arts projects by local government and special districts. |
| **Museums** | Museums projects including exhibitions, care of collections, conservation, commissions, public art works, community engagement, and education activities. |
| **Music** | Music and music presentation projects in all genres including classical, contemporary, and jazz. |
| **Musical Theater** | Musical theater and musical theater presentation projects. |
| **Opera** | Opera and opera presentation projects. |
| **Presenting & Multidisciplinary Works** | Projects presenting works from across disciplines, multidisciplinary works, and/or interdisciplinary artists. |
| **Theater** | Theater and theater presentation projects. |
| **Visual Arts** | Projects supporting visual artists and projects in all visual arts mediums. |

In limited cases, and in consultation with the applicant, NEA staff may transfer an application to a discipline other than the one selected by the applicant to ensure appropriate panel review. However, we cannot guarantee that an application will be transferred in all cases where this might be desirable.

## Choosing the Right Discipline for Educational Projects

All GAP disciplines welcome educational projects. The Arts Education discipline is specifically geared toward pre-K-12 students (Direct Learning), the educators and artists who support them (Professional Development), and the schools and communities that serve them (Collective Impact). Projects submitted to Arts Education must incorporate robust measures to assess student and/or teacher learning in arts education. Assessment of student learning should align with state or national arts standards.

Projects for short-term arts enrichment or exposure to the arts for youth, adults, and intergenerational audiences are welcome in the other disciplines. Applicants should select the discipline that most closely matches their project activities.

Arts events in all disciplines may be accompanied by ancillary learning activities (e.g., study guides for teachers and students, artists' visits prior to or following the event, workshops,

JA55

| GAP FY26 Grant Program Details | Program Description: Artistic Disciplines |

lecture-demonstrations, or master classes).

Select the **Arts Education** discipline for:
- Pre-K through 12th grade Direct Learning or Professional Development projects that **align with either national or state arts education standards, and include robust student and/or teacher assessment.**
- Collective Impact projects intended to transform schools and communities by providing access and engagement in the arts to students through collective, systemic approaches.
- Projects from Local Arts Agencies proposing a Collective Impact project.

Select one of the **other disciplines** for:
- Youth programs with a focus on exposure to or appreciation of the arts—including activities that take place in school, after school, during the summer, or in community settings. Such projects may include the work of professional artists and/or teaching artists.
- Youth programs that do not include robust student assessment.
- Programs serving adults and intergenerational groups.

Be sure to review the discipline description and project types found in the Instructions document (found under the Application Instructions section of the GAP webpage) to confirm that your educational project is an appropriate fit.

JA56

| GAP FY26 Grant Program Details | Unallowable Activities/Costs |
|---|---|

# Program Description: Unallowable Activities/Costs

The activities and costs listed below are **not** allowable and must not be included as part of your project activities or budget. This includes activities/costs covered by cost share/matching funds. Applicants should carefully review the General Terms and Conditions (GTC) for additional information about allowable and unallowable costs.

## Unallowable Activities

- General operating support, or support for a full season of programming.
- Direct grants to individuals.
- Direct grants to individual elementary or secondary schools - charter, private, or public, or booster clubs and similar organizations dedicated to supporting individual elementary or secondary schools. See Eligibility on page 16 for more information.
- Projects that replace or supplant arts instruction provided by an arts specialist.
- Generally, courses/coursework in degree-granting institutions.
- Literary publishing that does not focus on contemporary literature and/or writers.
- Generally, publication of books, exhibition of works, or other projects by the applicant organization's board members, faculty, or trustees.
- Generally, exhibitions of, and other projects that primarily involve, single, individually-owned, private collections.
- Projects for which no curatorial, juried, or editorial judgment has been applied to the selection of artists or art works.
- Costs of entertainment, including amusement, diversion, and social activities such as receptions, parties, galas, community dinners, picnics, and potlucks. Generally, this also includes activities at venues such as bars, wineries, and breweries where the consumption of alcohol/social activity is the primary purpose of the venue.
- Awards to individuals or organizations to honor or recognize achievement.
- Commercial (for-profit) enterprises or activities, including arts markets, concessions, food, T-shirts, artwork, or other items for resale. This includes online or virtual sales/shops.
- Lobbying, including activities intended to influence the outcome of elections or influence government officials regarding pending legislation, either directly or through specific lobbying appeals to the public.
- Voter registration drives and related activities.
- Construction, purchase, or renovation of facilities or the purchase of land. Design fees, preparing space for an exhibit, installation or de-installation of art, and community planning are allowable.
- Subgranting or regranting, except for local arts agencies that meet the NEA's eligibility criteria for subgranting. Local arts agencies may not subgrant to individuals.

JA57

| GAP FY26 Grant Program Details | Unallowable Activities/Costs |

## Certain Unallowable Costs

- Cash reserves and endowments.

- Costs for the creation of new organizations.

- Costs to bring a project into compliance with federal grant requirements. This includes environmental or historical assessments or reviews and the hiring of individuals to write assessments or reviews or to otherwise comply with the National Environmental Policy Act and/or the National Historic Preservation Act.

- Expenditures related to compensation to foreign nationals and/or travel to or from foreign countries when those expenditures are not in compliance with regulations issued by the U.S. Treasury Department Office of Foreign Assets Control. For further information, contact our Office of Grants Management at grants@arts.gov.

- Project costs supported by any other federal funding. This includes federal funding received either directly from a federal agency (e.g., National Endowment for the Humanities, Housing and Urban Development, National Science Foundation, or an entity that receives federal appropriations such as the Corporation for Public Broadcasting or Amtrak); or indirectly from a pass-through organization such as a state arts agency, regional arts organization, or a grant made to another entity.

- Alcoholic beverages.

- Purchase and/or use of gift cards, gift certificates, or other cash equivalents to support project costs.

- Gifts and prizes, including cash prizes as well as other items (e.g., electronic devices, gift certificates) with monetary value.

- Stipends/fees to individuals who are incarcerated.

- Contributions and donations to other entities, including donation drives.

- General miscellaneous or contingency costs.

- Fines and penalties, bad debt costs, deficit reduction.

- Marketing expenses that are not directly related to the project.

- Audit costs that are not directly related to a single audit (formerly known as an A-133 audit).

- Rental costs for home office workspace owned by individuals or entities affiliated with the applicant organization.

- The purchase of vehicles.

- Visa costs paid to the U.S. government.

- Costs incurred outside of the approved period of performance.

JA58

| GAP FY26 Grant Program Details | Eligibility |
|---|---|

# Eligibility

Applicants may be arts organizations, local arts agencies, arts service organizations, local education agencies (school districts), and other organizations that can help advance the NEA's mission.

| **ELIGIBLE** |
|---|
| The following **are eligible** to apply:<br>• Nonprofit, tax-exempt 501(c)(3), U.S. organizations;<br>• Units of state or local government; and<br>• Federally recognized tribal communities or tribes.<br><br>To be eligible, **the applicant organization must**:<br>• Meet the NEA's Legal Requirements including non-profit, tax-exempt status at the time of application.<br>• Have an active registration with the System for Award Management (SAM), and have a Unique Entity Identifier (UEI), at the time of application. Applicants must maintain an active SAM registration until the application process is complete and throughout the life of an award.<br>• Have completed a five-year history of arts programming prior to the application deadline.<br>   o Applicants will provide examples of previous arts programming in the application:<br>      ▪ Arts programming may have taken place prior to when the organization incorporated or received non-profit, tax-exempt status.<br>      ▪ If arts programming was suspended due to the pandemic, you may include examples that occurred in 2018 or 2019 to meet the five-year requirement. Do not include examples prior to 2018. Virtual programming is acceptable.<br>      ▪ Organizations that previously operated as a program of another institution may include arts programming it carried out while part of that institution.<br>   o For applicants to the March 2025 GAP1 cycle, programming must have started in or before March 2020.<br>   o For applicants to the July 2025 GAP2 cycle, programming must have started in or before July 2020. |
| **NOT ELIGIBLE** |
| The following are **not eligible** to apply:<br>• Individuals;<br>• Commercial and for-profit enterprises;<br>• Applications using a fiscal sponsor/agent (organizations must apply directly on their own behalf); and<br>• State and jurisdictional arts agencies (SAAs), and Regional Arts Organizations (RAOs). SAAs and RAOs may serve as partners in projects; however, they may not receive NEA funds through GAP. |

JA59

| GAP FY26 Grant Program Details | Eligibility |
|---|---|

## "Friends of" and Other Affiliated Fundraising Organizations

An organization whose primary purpose is to channel resources (financial, human, or other) to an affiliated organization may only apply if the affiliated organization does not submit its own application. This prohibition applies even if each organization has its own 501(c)(3) status. For example, the "Friends of ABC Museum" may not apply if the ABC Museum applies. Fiscally sponsored organizations and projects are not eligible for NEA funding, see more information about Fiscal Sponsors below.

## Elementary and Secondary Schools

Individual elementary or secondary schools - charter, private, or public, **are not eligible** to apply. Booster clubs and similar organizations dedicated to supporting individual elementary or secondary schools **are not eligible** to apply. Schools may participate as partners in an eligible organization's project.

Local education agencies (LEAs), school districts, and state and regional education agencies **are eligible to apply**. If a single school also is a local education agency, as is the case with some charter schools, the school may submit documentation that supports its status as a local education agency.

## Fiscal Sponsorship

Fiscally sponsored organizations and projects are not eligible for NEA funding. An organization or individual **may not** use a fiscal sponsor/agent for the purpose of applying. The NEA does not fund unincorporated or for-profit entities or individuals that use non-profit, tax-exempt 501(c)(3) U.S. organizations; units of state or local government; or federally recognized tribal communities or tribes to apply for grants on their behalf.

If your organization does not have its own non-profit status, you may still participate in a project submitted by another eligible organization, but you may not submit your own application.

An organization that provides fiscal sponsor/agent services that otherwise meets the eligibility criteria above may apply for its own programs and projects. In this case, the organization must clearly demonstrate that it is applying only for its own programmatic activities.

### What is a fiscal sponsor/agent?
A fiscal sponsor/agent is an entity that oversees the fiscal activities of another organization, company, or group of independent artists or projects. These activities may include bookkeeping, filing of W2s or 1099s, daily banking, or grant preparation.

An application must demonstrate the active involvement of the applicant organization in the proposed project activities. This might include:

JA60

| **GAP FY26 Grant Program Details** | Eligibility |
|---|---|

- Producing or co-producing.
- Partnering on creative direction or development.
- Organizing workshops, public showings, or distribution of work.
- Providing social networking strategies or web implementation.

The NEA may review your website and other materials in addition to your application to determine the eligibility of the application.

## Cost Sharing/Matching Requirement

Applications that do not include a project budget meeting the *minimum* requirements of at least a $10,000 NEA funding request, a $10,000 cost share/match, and $20,000 in total project expenses will be deemed ineligible and not be reviewed. See Award Amounts and Cost Share Matching on page 20 for more information related to cost share/matching requirements.

JA61

| GAP FY26 Grant Program Details | Eligibility: Application Limits |
|---|---|

# Eligibility: Application Limits

An organization may submit only one application to the FY 2026 Grants for Arts Projects program (i.e., one application per calendar year), with limited exceptions.

## Applications to other NEA funding categories:

- **An organization *may not* apply to both the Grants for Arts Projects category and the Our Town category in the same calendar year.**
- An organization *may* apply to the NEA's Research Awards program in addition to Grants for Arts Projects. If you submit applications to other opportunities, each request must be for a **distinctly different project (with different activities and costs), or a distinctly different phase of the same project**, with a different period of performance and costs.

If you have other NEA awards with activities and/or periods of performance that will overlap with your proposed Grants for Arts project, please contact NEA staff for guidance to ensure that the projects are different or for a distinctly different phase of a project.

Project participants such as individuals (project staff or artists) or partner organizations may participate in more than one application if there is no overlap in proposed costs or activities.

## Exception: Parent Organizations with Independent Components (IC)

Exceptions to the one-application rule are made only for parent organizations that have separately identifiable and independent components (e.g., a university campus that has a presenting organization and a radio station).

A parent organization may apply for each eligible component. In addition, a parent organization also may submit one application on its own behalf for a **project that is different from any project submitted in an application by its independent component(s)**.

The application for the independent component must be for a project of the component. For example, if a university campus applies for its art museum as an independent component, the project must be for the art museum. The art museum cannot be used as a passthrough entity for projects from other areas of the university, nor can the university's own application be a submission to support a second art museum project.

### Independent Component (IC) Eligibility

An eligible IC must be a unit that is both programmatically and administratively distinct from the parent organization. To qualify it should be equivalent to a stand-alone institution. The independent status is demonstrated by the component's:

- Unique mission, separate and distinct from the parent entity;
- Separate, dedicated staff, with duties specific to the mission of the component;

JA62

| **GAP FY26 Grant Program Details** | Eligibility: Application Limits |

- Independent board, mostly consisting of members not associated with the parent entity (the board should generally function with substantial oversight and management of the component);
- Separate budget, maintained by the component; and
- Five-year history of arts programming undertaken by the component.

**A parent organization should consult with NEA staff to verify the eligibility of the component before preparing an application.** If an application is submitted by a parent organization on behalf of a component that the NEA determines does not to meet the eligibility criteria for an IC, that application may be marked ineligible, unless the parent applicant has not submitted any other applications in the same calendar year.

The following **do not qualify** as eligible ICs:
- Academic departments of colleges and universities.
- Programs, initiatives, and projects of organizations.
- Collaboratives or consortiums of multiple organizations.

For example:
- **Eligible IC**: An art museum on a university campus serves the general public and does not grant degrees. The museum board, not the university trustees, manages the museum's budget, staff, and programming. In this example, the art museum essentially is a stand-alone organization and qualifies as an independent component.
- **Ineligible IC**: A symphony association sponsors a youth orchestra in addition to its professional orchestra. Some symphony musicians serve as faculty for the youth orchestra; there is some overlap of membership between the symphony trustees and the youth orchestra's advisory board; and the executive director for the symphony association serves as CEO for both the professional and youth orchestras. In this case the youth orchestra is not equivalent to a separate institution and therefore does not qualify as an independent component.

The parent organization must meet the eligibility requirements for all applicants. An affiliated organization that performs grant administration duties for a parent organization (e.g., a college foundation that administers grants awarded to a college and its components) may submit applications for components and the parent organization in lieu of such applications being submitted by the parent. The affiliated organization must meet the eligibility requirements for all applicants.

JA63

| GAP FY26 Grant Program Details | Award Amounts & Cost Share/Matching |

# Award Amounts & Cost Share/Matching

All funded projects must adhere to federal rules and regulations. Familiarize yourself with the requirements of managing a federal grant by reviewing the Post-Award Requirements and Administration section of this document, as well as the General Terms and Conditions and reporting requirements found in Manage Your Award.

## Award Amounts

Awards range from $10,000 to $100,000.

Designated local arts agencies eligible to subgrant may request from $30,000 to $150,000 for subgranting in the Local Arts Agencies discipline. Additional eligibility, documentation, and reporting requirements for subgranting applications are detailed in the Local Arts Agencies Instructions document (found under the *Application Instructions* section of the GAP webpage).

In developing an application, we urge all applicants to consider the funding level of recent awards and to request a realistic award amount.

The NEA reserves the right to limit support of a project to a particular portion(s) or cost(s).

Applicants whose recommended funding amount is less than the amount requested in the application will have the opportunity to revise the project's budget and/or scope to reflect any necessary changes to the project's activities.

## Cost Share and Matching Funds

All awards require a nonfederal cost share/match of at least 1 to 1. For example, if an organization receives a $10,000 award, the total project costs must be at least $20,000, and the organization must provide at least $10,000 toward the project costs from nonfederal sources. NEA funding cannot exceed 50% of the total cost of the project.

Cost share/matching funds cannot include other federal funds from the NEA or other federal entities; including federal funds subgranted through State Arts Agencies, Regional Arts Organizations, or Local Arts Agencies.

Cost share/matching funds do not need to be committed at the time of application, but applicants will be asked to provide potential sources of funding in the project budget section of the application.

JA64

| GAP FY26 Grant Program Details | Application Contents & Formatting |

# Application Contents & Format

Applying is a multi-step process. We estimate that after registering, the process to draft and submit an application takes approximately 26 hours.

## Application Instructions

**A detailed instructions document outlining how to complete and submit both parts of the application, including *all application questions and requirements*, can be found on the GAP webpage, under the Application Instructions section**.

### Registration

Before applying, applicants must finalize required registrations detailed on the next page. **All three required registrations must be active to submit Part 1 of the application through Grants.gov.**

### Application Part 1, Grants.gov

Part 1 of the application is submitted through Grants.gov. All applicants must submit the "Application for Federal Domestic Assistance/Short Organization Form." This is a brief form that will collect basic information about your organization.

**A direct link to the Part 1 Grants.gov Opportunity Package where you will complete this form, is included on the GAP webpage under How to Apply.** You must successfully submit Part 1 to continue to Part 2.

### Application Part 2, NEA Applicant Portal

Part 2 of the application is submitted via the NEA's Applicant Portal. This is a separate website from Grants.gov.

All applicants must complete the "Grant Application Form (GAF)" and upload items through the portal. Information is submitted via a web form where you will enter the majority of your application material, including information about your organization's history and budget, and project details including a project description, timeline, budget information, and work samples.

## Applications Recommended for Funding

Applicants whose projects are recommended for funding must submit additional information, which may include: a project activity update, a revised project budget, an accessibility form, and if required by your project activities, information about compliance with the National Historic Preservation Act and/or the National Environmental Policy Act.

See Post-Award Requirements and Administration for more information on Accessibility and NEPA/NHPA compliance, as well as other information about award management.

JA65

| GAP FY26 Grant Program Details | Submission Requirements & Deadlines |

# Submission Requirements & Deadlines

## Pre-Application Required Registrations

**Before applying, all applicants must register with Login.gov, Grants.gov, and the System for Award Management (SAM) at SAM.gov**. Applicants must provide a valid unique entity identifier (UEI) in their application; and continue to maintain an active SAM.gov registration with current entity information at all times during which it has an active Federal award or an application or plan under consideration by a Federal agency. **All three required registrations must be active to submit Part 1 of the application through Grants.gov.**

Returning applicants must renew or verify that their registrations are up to date prior to the application deadline.

**Registering and maintaining accounts with Login.gov, SAM, and Grants.gov is always FREE.**

The **Registration Guidance document** available on the GAP webpage provides detailed information about the registration process, including links to each registration site, and support resources.

## Submission Methods

Application materials must be submitted electronically. See Application Instructions on the previous page.

## Contact Information

For assistance with application requirements, contact NEA staff .

**Login.gov, SAM, and Grants.gov Help**
The NEA does not have access to your Login.gov, SAM, or Grants.gov accounts. If you have any questions about or need assistance with these sites, including questions regarding electronic accessibility, you must contact them directly:

- **Login.gov Help**: Call 1-844-875-6446, consult the information posted in their Help Center, or use their online form to submit a question.

- **SAM Federal Service Desk**: Call 1-866-606-8220 or see the information posted on the SAM website at SAM Help.

- **Grants.gov Contact Center**: Call 1-800-518-4726, email support@grants.gov, or consult the information posted on the Grants.gov website at Support. The Grants.gov Contact Center is available 24 hours a day, 7 days a week.

JA66

| **GAP FY26 Grant Program Details** | Submission Requirements & Deadlines |

## Application Submission Dates & Times

| Step | March Cycle (GAP1) * | July Cycle (GAP2) |
|---|---|---|
| Grant Program Details and Application Instructions Published | February 2025 | February 2025 |
| Part 1 Application Package Available on Grants.gov | February 2025 | Mid-May 2025 |
| **Part 1 Grants.gov** *Submission deadline* | **March 11, 2025** **11:59 pm ET** | **July 10, 2025** **11:59 pm ET** |
| **Part 2 NEA Applicant Portal** *Opens to applicants* | **March 14, 2025** **9:00 am ET** | **July 15, 2025** **9:00 am ET** |
| **Part 2 NEA Applicant Portal** *Submission deadline* | **March 24, 2025** **11:59 pm ET** | **July 22, 2025** **11:59 pm ET** |
| Notification of recommended funding or rejection | December 2025 | Early to mid April 2026 |
| Earliest project start date | January 1, 2026 | June 1, 2026 |

*All Artist Communities and Design applicants must apply at the March 11, 2025, deadline.

Literary Arts accepts particular project types at each deadline; applicants should refer to the Literary Arts instructions to determine which deadline is appropriate for their proposal.

Please do not request the status of your application before the notification date that is listed above.

**Late, ineligible, and incomplete applications will not be reviewed**.

## Exceptions to the Submission Deadlines

Exceptions to the submission deadlines will be considered **only** for registration or renewal issues, or technical malfunctions that are the result of failures on the part of Login.gov, SAM, Grants.gov, or NEA systems, as determined by the NEA. To be considered for this exception, you must provide documentation of a Login.gov, SAM, Grants.gov, or NEA systems failure that prevented your submission by the deadline.

In the event of a major emergency (e.g., a hurricane or a Login.gov, SAM, Grants.gov, or NEA systems technological failure), the NEA Chair may adjust application deadlines for affected applicants. If a deadline is extended for any reason, an announcement will be posted on our website.

JA67

**GAP FY26 Grant Program Details**     Submission Requirements & Deadlines

Exceptions to the deadline **will not be considered** for reasons such as:
- User error, including but not limited to, failing to register or apply on time, or failure to verify that your application was successfully submitted to Grants.gov and/or the Applicant Portal.

- Problems with computer systems or Internet access at the applicant organization.

Please note:
- Permission for late application submission cannot be granted in advance. If you feel you have a case for an exception, contact staff as soon as possible **after** the deadline with documentation of the issues you encountered.

- Applications submitted late or outside the Grants.gov system (e.g., an emailed SF-424) will not be processed, reviewed, or considered for funding.

## Intergovernmental Review

This funding opportunity is not subject to Intergovernmental Review of Federal Programs Executive Order 12372.

JA68

| GAP FY26 Grant Program Details | Application Review |
|---|---|

# Application Review

## Review Criteria

Applications will be reviewed based on the criteria below, with equal weight assigned to artistic excellence and artistic merit. While proposals need not address each criterion marked "as applicable," applicants may consider all the criteria when developing their proposals.

**Proposals must be for arts projects with specific, definable activities.** The application may be rejected if it does not sufficiently describe the project activities.

For more information about how these criteria relate to a specific discipline, review the discipline-specific instructions and/or contact staff.

### Artistic Excellence

The **artistic excellence** of the project includes:
- The quality of the artists and other key individuals, works of art, organizations, arts education providers, artistic partners, and/or services involved in the project.

### Artistic Merit

The **artistic merit** of the project includes:
- The value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency.
- The ability to carry out the project based on such factors as the appropriateness of the budget, clarity of the project activities, resources involved, and the qualifications of the project's personnel and/or partnerships.
- Clearly defined goals and/or proposed outcomes and an appropriate plan to determine if those goals and/or outcomes are met. This includes, where relevant, measures to assess student and/or teacher learning in arts education.
- Evidence of direct compensation to artists, makers, art collectives, and/or art workers.
- As applicable:
  - Engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

## Review & Selection Process

Applications are checked for completeness and eligibility by NEA staff. Eligible applications are evaluated according to the Review Criteria above, in closed session, by advisory panelists. Each panel comprises a group of arts experts and other individuals, including at least one knowledgeable layperson, with broad knowledge in the areas under review. Panels are convened virtually by discipline. Panel membership changes regularly. The panel recommends the projects to be supported, and the staff reconciles panel recommendations with the funds

JA69

that are available. These recommendations are forwarded to the National Council on the Arts, where they are voted on in an open public session.

The National Council on the Arts makes recommendations to the NEA Chair.

The NEA Chair reviews the recommendations for grants in all funding categories and makes the final decision on all grant awards. Applicants are then notified of funding decisions.

## Risk Review

All recommended applications undergo a review to evaluate risk posed by the applicant prior to making a federal award. This may include past performance on grants, meeting reporting deadlines, compliance with terms and conditions, audit findings, etc.

JA70

**GAP FY26 Grant Program Details**                                   Award Notices

# Award Notices

The notification date for your category on the Application Calendar tells you when we expect to announce award decisions.

Notifications are sent via email. Applicants recommended for funding will receive a preliminary congratulatory message, with a request for project and budget updates. Applicants not recommended for funding will receive a rejection notice via email.

The official award notification (i.e., a notice of action authorized by the NEA Office of Grants Management) is the only legal and valid confirmation of award. Receipt of your official award notification may take several months depending on a number of factors such as changes to your project, the number of awards to be processed, whether the NEA has its funding appropriation from Congress, etc. **All NEA awards are contingent on active SAM registration. The NEA will not be able to issue an award if you have an expired SAM.gov registration on September 1 of the fiscal year listed on this funding opportunity.**

## Final Reports for Previous Awards

Before the NEA issues any award, organizations must have submitted acceptable Final Report packages by the due date(s) for all previous NEA award(s).

JA71

| GAP FY26 Grant Program Details | Post Award Requirements and Administration |

# Post-Award Requirements and Administration

## General Terms & Conditions

Federal government-wide and agency-specific requirements that relate to NEA awards are highlighted in our General Terms & Conditions (GTCs). The GTCs incorporate the adoption of 2 CFR Part 200 by reference. The document also explicitly identifies where the NEA has selected options offered in the regulation, such as budget waivers and requirements for use of program income. It also includes requirements for cost share funds, reporting requirements, amendment processes, and termination actions. **Recipients must review, understand, and comply with these requirements.** Failure to comply with the GTCs for an award may result in termination of an award, and/or returning funds to the NEA, among other consequences.

## Implementation of Title 2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards

The guidance under 2 CFR Part 200 from the federal government's Office of Management and Budget (OMB) establishes clarity and consistency of the pre- and post-award requirements applicable to federal award recipients. The NEA has adopted the OMB Guidance in 2 CFR part 200 under §3255.1 Adoption of 2 CFR Part 200. The NEA's adoption of 2 CFR Part 200 gives regulatory effect to the OMB guidance, including any updates to it.

## Crediting Requirement

Recipients must clearly acknowledge NEA support of the project in their programs and related promotional material, including publications and websites. Additional acknowledgment requirements may be provided later. The NEA does not fund general operating support, so you must ensure that the NEA is only credited with funding the specific project, and not your entire organization or its operations.

## Changes in Projects

Pre-Award: Applicants must notify the NEA of any significant changes in their project that occur after applying. If the project or the organization's capacity to carry out the project changes significantly before an award is made, the NEA may revise or withdraw the funding recommendation.

Post-Award: Recipients are expected to carry out a project consistent with the project approved for funding by the NEA. If changes to the project are required, the recipient must request written approval from the Office of Grants Management, **which is the only office authorized to amend or change an NEA award. Written and/or verbal approval of proposed project changes from any other NEA office does not constitute an approved change to an award.** Detailed information is included in the NEA's General Terms & Conditions for Grants to Organizations.

JA72

| GAP FY26 Grant Program Details | Post Award Requirements and Administration |
|---|---|

## Accessibility

As outlined in the Assurance of Compliance, Section 504 of the Rehabilitation Act of 1973, and the NEA's implementing regulation, all NEA-funded projects are required to be accessible to people with disabilities. Individuals with disabilities may be artists, performers, audiences, visitors, teaching artists, students, staff, and volunteers. Funded activities must be held in a physically-accessible venue, and program access and effective communication must be provided for participants and audience members with disabilities.

If your project is recommended for funding, you will be asked to provide detailed information describing how you will make your project physically and programmatically accessible to people with disabilities:

- Buildings and facilities (including projects held in historic facilities) must be physically accessible. The following are some examples, but are not an exhaustive list:
  - Ground-level/no-step entry, ramped access, and/or elevators to project facilities and outdoor spaces;
  - Wheelchair-accessible box office, stage/backstage, meeting, and dressing rooms;
  - Wheelchair-accessible restrooms and water fountains;
  - Directional signage for accessible entrances, restrooms, and other facilities; and
  - Accessible workspaces for employees.
- The programmatic activities must be accessible either as part of the funded activity or upon request, where relevant. The following are some examples, but they are not an exhaustive list:
  - Accommodations for performances, tours, virtually streamed events, conferences, and lectures, such as sign language interpretation, real-time captioning, and audio description;
  - Print materials in alternative formats, such as large-print brochures/labels/programs, braille, and electronic/digital formats;
  - Accessible and screen reader-compatible electronic materials, documents, websites, and virtual platforms, and alternative text for images;
  - Closed/open captioning and audio/visual description for video, film, television broadcasts, and virtual events;
  - Auxiliary aids and devices, such as assistive listening devices.

Costs associated with project-related programmatic accommodations, such as those listed above, may be included in an NEA grant budget. However, costs associated with physical construction or renovation expenses may not be included in the grant budget.

In accordance with the General Terms & Conditions, a Section 504 self-evaluation must be on file at your organization, and you must have a designated 504/accessibility coordinator on staff.

For technical assistance on how to make your project accessible, contact the Accessibility Office at accessibility@arts.gov, 202-682-5532; or the Civil Rights Office at civilrights@arts.gov, 202-682-5454; or see our online Accessibility Resources.

JA73

## National Historic Preservation Act and/or the National Environmental Policy Act Review

All awards are subject to review and compliance with the National Historic Preservation Act (NHPA) and the National Environmental Policy Act (NEPA). The NEA will conduct a review of your project to ensure that it is in compliance with NHPA/NEPA and other Federal environmental laws.

**If you are recommended for an award which may have historic preservation or environmental concerns (NHPA/NEPA), you will be notified and asked to provide additional information.** This review and approval process takes time to complete and may delay your project's start date, and/or our ability to release award funds, the NEA cannot release award funds until the NHPA/NEPA review is complete.

Once notified that additional NHPA/NEPA review is needed, be sure to include thorough and complete information for all project activities and locations, which will help expedite the review. If project activities and locations are not yet finalized, you must provide the timeline for determining project activities and locations as these details are required to complete the NHPA/NEPA review.

For projects requiring ground disturbance or impacting buildings over 50 years old, you may be instructed to continue the NHPA review with the appropriate State Historic Preservation Office (SHPO).

Some of the project types that may require additional information or SHPO review include:

- Projects involving a building over 50 years old. This also includes structures such as bridges; or objects such as sculptures; or a landscape that is historically significant.
- The commissioning and installation of temporary or permanent outdoor artworks or structures, such as: sculptures, statues, murals, or permanent signs.
- Outdoor arts/music festivals or activities requiring ground disturbance.
- Maintenance or rehabilitation of landscapes and gardens.
- Design services and planning for projects that may affect historic properties.

## Project Reporting and Evaluation

Before applying, carefully review the reporting requirements for the NEA's Final Reports. If you have any questions about the NEA's objectives or the required final reports, contact NEA staff.

All recipients are required at minimum to submit a Final Descriptive Report (FDR), a Federal Financial Report (FFR), and a Geographic Location of Project Activity Report (GEO) within 120 days of the end of the award's period of performance. The estimated time burden for completing final reports is 5 hours. Local Arts Agencies with awards for Subgranting projects are also required to submit a Subgrants report, with an additional time burden of 4.5 hours.

JA74

| **GAP FY26 Grant Program Details** | Post Award Requirements and Administration |

Recipients of Arts Education Direct Learning awards will be required to describe the methods used to assess student learning.

You are required to maintain project source documentation, including financial records, for three years following submission of your final reports.

Beyond the required final reports for all recipients, some recipients may be asked to assist in the collection of additional information to help the NEA determine the degree to which agency objectives were achieved. You may be asked to share project accomplishments such as work samples, community action plans, cultural asset studies, programs, reviews, relevant news clippings, and playbills.

## Responsible Conduct of Program Evaluation and Research

NEA recipients should comply with all applicable laws and regulations governing the responsible conduct of research in the United States.

*NEA PROGRAM EVALUATION ETHICS REVIEW*: In limited cases, the NEA may conduct a review of your project prior to making an award if your project activities include *formal program evaluation, research that involves directly collecting personal information from program participants,* and/or *activities involving vulnerable populations*. Examples include activities that require program participants to provide sensitive and/or confidential information about themselves, and/or that involve systematic studies to assess a program's benefits for participants.

*INFORMAL PROGRAM EVALUATION AND DATA COLLECTION FOR FINAL REPORTING:* Many NEA-funded projects include informal evaluation, such as conducting *anonymized surveys* of program participants about their satisfaction with a program, or *basic field observations* of program participants such as counting the number of audience members or tickets sold. **These types of activities are typically exempt from a program evaluation ethics review.** Data collection activities related to completion of the Final Descriptive Report (FDR) are exempt from a program evaluation ethics review.

**Questions:** Contact our Office of Research and Analysis (ORA) at research@arts.gov. ORA has compiled Resources on Program Evaluation and Performance Measurement to help applicants and awardees document the effectiveness and impact of their arts programs.

## Legal Requirements and Assurance of Compliance

The **Legal Requirements** section on our website provides information about key legal requirements that may apply to an applicant or recipient. It is not an exhaustive list; more details may be found in Appendix A of the General Terms & Conditions.

JA75

| **GAP FY26 Grant Program Details** | Post Award Requirements and Administration |

By signing and submitting the application form on Grants.gov, the Applicant certifies that it is in compliance with the statutes outlined in the **Assurance of Compliance**  and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance.

**It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

## Civil Rights

Projects may reach a particular group or demographic (such as sex, disability, economic status, race, color, or national origin, including limited English proficiency); however, projects may not be exclusionary under Federal civil rights laws and policies prohibiting discrimination. This nondiscrimination requirement extends to hiring practices, artist selection processes, and audience engagement. Your application should make it clear that project activities are not exclusionary. Please review the Assurance of Compliance which outlines the relevant federal statutes, NEA regulations, and executive orders.

The NEA's Office of Civil Rights investigates complaints about compliance with accessibility standards as well as other federal civil rights statutes. For further information and copies of the nondiscrimination regulations identified above, contact the Office of Civil Rights at 202-682-5454 or civilrights@arts.gov. For inquiries about limited English proficiency, go to http://www.lep.gov, or contact the Office of Civil Rights at 202-682-5454 or civilrights@arts.gov.

## Regulations Relating to Lobbying

For organizations applying for more than $100,000 (31 U.S.C. 1352).

The applicant certifies that:

a) It has not and will not use federal appropriated funds or cost share/matching funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a member of a National Endowment for the Arts advisory panel or the National Council on the Arts, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of or modification to any federal grant or contract.

b) If it has used or will use any funds other than federal appropriated funds to pay any person for influencing or attempting to influence any of the individuals specified above, the applicant:

   i) Is not required to disclose that activity if that person is regularly employed by the applicant. (Regularly employed means working for at least 130 days within the year immediately preceding the submission of this application.)

   ii) Will complete and submit Standard Form-LLL, "Disclosure of Lobbying Activities," if that person is not regularly employed by the applicant.

JA76

**GAP FY26 Grant Program Details**    Post Award Requirements and Administration

iii) Will require that the language of this certification be included in the award documents for all subawards of more than $100,000 and that all subrecipients shall certify and disclose accordingly.

## Freedom of Information Act (FOIA) Notice

***Disclosure Notice:*** The National Endowment for the Arts (NEA) may share a copy of awarded applications and/or related materials submitted to the NEA by the applicants, with the public or other third parties, where required or permitted by law.

## Standards for Service

The NEA has set the following standards for serving applicants. We pledge to:

- Treat you with courtesy and efficiency.

- Respond to inquiries and correspondence promptly.

- Provide clear and accurate information about our policies and procedures.

- Provide timely information about funding opportunities and make guidelines available promptly.

- Ensure that all eligible applications are reviewed thoughtfully and fairly.

We welcome your comments on how we are meeting these standards. Email: webmgr@arts.gov, attention: Standards for Service. For questions about these guidelines or your application, see Agency Contacts. In addition, applicants may receive an invitation to participate in a voluntary survey to provide feedback on the grant application guidelines on our website and any experiences consulting with our staff.

## Paperwork Reduction Act Statement

The public reporting burden for this collection of information is estimated at an average of 26 hours per response. This includes the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. We welcome any suggestions that you might have on improving the guidelines and making them as easy to use as possible. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: webmgr@arts.gov, attention: Reporting Burden. Note: Applicants are not required to respond to the collection of information unless it displays a currently valid U.S. Office of Management and Budget (OMB) control number.

ALN 45.024
OMB No. 3135-0112 Expires 10/31/25

JA77

| GAP FY26 Grant Program Details | FAQs |
|---|---|

# Frequently Asked Questions

America250-Related Projects| Late or Incomplete Applications | Eligibility and Allowable Activities/Costs |Subgranting | Competitive Projects | Period of Performance | Other federal funding

## America250-Related Projects

**Does my grant application have to include an America250-related project in order to receive funding this year?**

No. We are encouraging, but not requiring, applicants to consider celebrating and honoring America250 as part of their project activities. We will certainly continue to fund projects that do not include an America250 focus or related programming.

**What is an America250-related project?**

For applicants that choose to focus on this milestone, we are interested in projects that celebrate and honor the nation's rich artistic and cultural heritage as part of America250. For example, projects could examine the work of American artists, present or create art recognizing this important milestone, or undertake educational activities or related programming. We aim to fund a wide range of projects—large and small, in all artistic disciplines, and in communities of all sizes across the country—that celebrate and honor this important milestone.

**Does my project have to focus entirely on celebrating America250?**

No. If you decide to submit an application for America250-related activities, your project may focus exclusively on celebrating and honoring the anniversary, or it may incorporate a special America250-related component or focus within a larger project that you are planning to undertake. For example, an organization applying for a broader musical series might devote a performance or educational activity to celebrating America250.

**Do all America250-related activities have to take place only in 2026?**

No. We recognize that project schedules vary based on your organization's unique needs. As such, America250-related activities can take place anytime during your award's period of performance in 2026-2027.

## Late or Incomplete Applications

**We missed the application deadline. Can I submit a late application?**

Late, ineligible, and incomplete applications will not be reviewed. Please review the information under Exceptions to the Submission Deadlines.

**Will you contact me if my application is missing anything?**

No. Because of the volume of applications, the NEA has a strict approach to incomplete applications. For your application to be considered complete, every required item MUST be

| GAP FY26 Grant Program Details | FAQs |
|---|---|

included in your application, which must be submitted no later than the application deadline date. **NEA staff will not contact applicants to request missing material**. Do not wait until the day of the deadline to submit! The NEA suggests setting an internal application deadline for your organization that is 24-48 hours before the actual application deadline.

**If my application is determined to be incomplete, may I add the missing item(s) and resubmit the application?**

No. An organization cannot add missing items and resubmit the application after the application deadline.

## Eligibility and Allowable Activities/Costs

**Can federally recognized tribes apply?**

Yes. In keeping with federal policies of Tribal Self Governance and Self-Determination, we may provide support for a project with a primary audience restricted to enrolled members of a federally recognized tribe. Applicants (federally recognized tribal governments, non-profits situated on federally recognized tribal lands, or other non-profits whose mission primarily serves federally recognized tribal enrollees) should consult with NEA staff to verify their eligibility before preparing an application.

**Can non-federally recognized tribes apply?**

Yes, if the applicant is a non-profit, tax-exempt 501(c)(3), U.S. organization. Projects for non-federally recognized tribes and indigenous groups may be supported, but project participation can't be restricted to only tribal members.

**Can Native Hawaiian groups apply?**

Yes, if the applicant is a non-profit, tax-exempt 501(c)(3), U.S. organization. Projects for Native Hawaiians may be supported, but project participation can't be restricted to only Native Hawaiians.

**Our project may need updated technology to support quality virtual programming. To what extent can these costs be included in the project budget, and do we need to differentiate between supplies or equipment costs?**

You can apply for costs related to updated technology if they support the proposed project activities. Costs could include:
- Equipment, purchase or rental
- Hardware
- Software, e.g., timed ticketing software
- Increased bandwidth
- Streaming subscriptions
- Specialized audio-visual equipment for performers

JA79

| **GAP FY26 Grant Program Details** | FAQs |
|---|---|

The distinction between supplies and equipment is determined by cost and useful life. A justification for the cost is required in some cases.

If you intend to purchase equipment that costs $10,000 or more per item with an estimated useful life of more than one year, clearly identify the equipment and you will need to provide a justification for this expenditure either in the Project Budget form or in your narrative.

Digital devices or other technologies are considered supplies if they are less than $10,000 per item, regardless of the length of useful life, and no additional justification is required.

**Can my project budget include the cost of open or closed captions or sign language interpretation for virtual events?**

Yes.

**How can I make sure that my project is in compliance with Federal civil rights laws?**

Projects may reach a particular group or demographic (such as sex, disability, economic status, race, color, or national origin, including limited English proficiency), however, projects may not be exclusionary under Federal civil rights laws and policies prohibiting discrimination. This nondiscrimination requirement extends to hiring practices, artist selection processes, and audience engagement. Your application should make it clear that project activities are not exclusionary. Please review the Assurance of Compliance which outlines the relevant federal statutes, NEA regulations, and executive orders.

**Can my partner organizations also apply for NEA funds to support our collaborative work?**

A partnering organization may apply for funds to support a joint effort but there can be no overlapping project costs or activities between the applications. For example, if you are a dance company, and you are applying for the development of a new work and a presenting organization/theater is also applying for a residency/performance project that includes your company and the presentation of the new work, you must ensure that the costs are kept separate. You cannot include as cost share/match any income derived from a federal grant made to another entity (e.g., if a presenter includes your artist fees as an expense in their budget, you cannot use that as income in your own budget). You should communicate closely with your partners to be sure that you are each clear on the division of costs and activity between the applications.

**Can my organization submit an additional application in the GAP category through the Film & Media Arts discipline for the July deadline?**

No. Organizations may submit only one application to the FY 2026 Grants for Arts Projects program (i.e., one application per calendar year) with limited exceptions made only for Parent (and Related) Organizations. The NEA limits the number of applications an organization may submit to ensure that our award funds extend to a variety of organizations, including first-time applicants and organizations serving communities of all sizes.

JA80

| **GAP FY26 Grant Program Details** | FAQs |
|---|---|

Although there is no longer the opportunity to submit an additional application through the Film & Media Arts discipline for the July deadline, the NEA remains committed to supporting existing and new technology-centered creative practices across all artistic disciplines and forms.

The NEA will continue to accept applications for projects that support this work in any relevant artistic discipline within the GAP category.

**In the past my organization submitted an additional application to Film & Media Arts, what should we do for FY26?**

The NEA recommends that you either focus your application on activities appropriate for the Film & Media Arts program, *or* apply to one of the other disciplines for a project that suits their accepted project types. Many of the other disciplines accept projects that utilize technology-centered creative practices, as well as build arts organization's capacity to serve a broad public by providing access, training, and other resources to engage with digital technologies. You can read more about what kinds of projects are accepted by reviewing the individual discipline instructions documents. If you have questions, we encourage you to contact NEA staff.

### Subgranting

**The "Unallowable Activities/Costs" section says that subgranting is not allowed. What is subgranting?**

Subgranting is defined as regranting funds to an organization for activities that are conducted independently of your organization and for the benefit of the subrecipients' own program objectives. A subrecipient is not directly affiliated with your organization. Examples of subgranting include:

- Payment to an organization to obtain training or technical assistance for their own benefit with little or no involvement from your organization.
- Production funds awarded to an organization through a competitive review process with little or no subsequent involvement from your organization.
- Emergency relief funding for housing or food.

Congress prohibits the NEA from making awards for subgranting activity, with exceptions only for state arts agencies, regional arts organizations, and local arts agencies designated to operate on behalf of local governments.

Designated local arts agencies are eligible to apply for subgranting through the Local Arts Agencies discipline of the Grants for Arts Projects category. Designated local arts agencies must meet additional eligibility requirements, provide additional documentation in the application, and follow additional reporting and compliance requirements. Designated local arts agencies are encouraged to contact Local Arts Agencies staff to discuss eligibility and application requirements when preparing a subgranting application.

JA81

| GAP FY26 Grant Program Details | FAQs |
|---|---|

**My organization wants to apply for support of its apprenticeship program. How can I clarify in my application that my project does not include awarding subgrants even though my budget may include fees to individual artists?**

The key to avoiding the appearance of subgranting is the involvement of your organization in carrying out the project activities. For example, an apprenticeship program might include fees paid to artists. These fees are not considered subgranting if your organization provides substantive supervision of and involvement in the mentor-apprentice relationship. This might include:

- Planning a detailed description of the individual master-apprentice course of study.
- Monitoring and evaluating the progress of the activity including conducting site visits.
- Documenting apprenticeship activities including reports from masters and apprentices.
- Arranging public exhibition or performance opportunities for masters and apprentices.
- Archiving material related to the apprenticeships and publicly distributing information about the apprenticeship program and its activities.

Note that simply "checking in" on the activity, including obtaining progress and final reports, does not qualify as substantive involvement in the project.

You can provide evidence of your organization's substantive involvement in the project through project-related information on your website, announcements and evaluations of public events, and archival documentation.

### Competitive Projects

**Does my project have to be new? Does it have to be big?**

No. Projects do not have to be new. Existing projects can be just as competitive as new activities. Projects do not need to be big either; the NEA welcomes small and medium-sized projects that can make a difference in their community or field.

**Does my project have to be outside the scope of my regular programming?**

No. A project can be a part of an applicant's regular season or activity.

**Can I apply for more NEA funding for a project supported by an earlier grant?**

Yes. If you have previously received a grant to support an earlier phase of a project, you *may* re-apply to the NEA for additional funding to support a later phase. However, each application must clearly describe the specific phase of work to be supported, and there can be NO overlapping project costs or activity between the awards.

### Period of Performance (Support)

**How soon after the "Earliest Start Date" for my deadline does my project have to begin?**

The NEA's support can start any time on or after that date.

JA82

| GAP FY26 Grant Program Details | FAQs |
|---|---|

**Can my project start before this date?**

No. Proposed project activities for which you're requesting support cannot take place before this date. You may only request that the NEA fund the portion of your project that will take place after the "Earliest Start Date."

**How long can my project last? May I apply for another project during this period?**

The NEA generally allows a period of performance of up to two years. Many applicants request a period of performance somewhere between 12 and 24 months. The two-year period is intended to allow an applicant sufficient time to plan, execute, and close out its project, not to repeat a one-year project for a second year.

Generally, an organization may apply to the NEA for another project (with totally different project costs) the following year even if a previous NEA-supported project is still underway. You are responsible for ensuring that there are no overlapping costs or activities between the projects. Note that this may affect when you can start your new proposed project.

## Other federal funding

**Can our organization use funds we received from other federal agencies as cost share/match for an NEA grant?**

No. Federal funds may not be used as cost share/match for other federal grants. This may include funding from the Paycheck Protection Program and Shuttered Venues Operators Grants (SVOG) from the Small Business Administration (SBA), as well as other federal funding, from:

- AmeriCorps
- Institute of Museum and Library Services
- National Endowment for the Humanities
- National Park Service
- National Science Foundation
- U.S. Department of Agriculture
- U.S. Department of Education (e.g., 21st Century Community Learning Centers)
- U.S. Department of Housing and Urban Development
- Or an entity that receives federal appropriations such as the Corporation for Public Broadcasting or Amtrak

**Can my organization use funds we have received from a Regional Arts Organization (RAO), State Arts Agency (SAA), or Local Arts Agency (LAA) as part of the cost-share/match for an NEA grant?**

Yes, if those funds *did not* originate at the federal level from the NEA or another federal agency (such the ones listed above). Your program officer at the RAO, SAA, or LAA will be able to tell you if the award you received from them includes any federal funds. It is up to you to ascertain the source of funding. When completing your project budget, be sure to indicate that these funds are non-federal.

# EXHIBIT 2

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 44 of 73 PageID #: 125



Menu

# Legal Requirements and Assurance of Compliance

## Legal Requirements

**NOTE: This list highlights some of the significant legal requirements that may apply to an applicant or recipient; however, it is not exhaustive. More information regarding these and other legal requirements may be found at Appendix A of the** General Terms & Conditions `</node/45296>`**, which set forth the National Policy and Other Legal Requirements, Statutes, Regulations, and Executive Orders that Govern Your Award. There may be other applicable legal requirements that are not listed in this document. It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

JA85

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 45 of 73 PageID #: 126

1. By law, the National Endowment for the Arts may support only those organizations:

- **That are tax-exempt**. Organizations qualifying for this status must meet the following criteria:

  1. No part of net earnings may benefit a private stockholder or individual.
  2. Donations to the organization must be allowable as a charitable contribution under Section 170(c) of the Internal Revenue Code of 1954, as amended.

  For further information, go to the Internal Revenue Service's (IRS) website <http://www.irs.gov>.

- Who have not had their IRS status revoked. It is your responsibility to ensure that your status is current at the time of the application and throughout the life of your award.

- **That compensate all professional performers and related or supporting professional personnel on National Endowment for the Arts-supported projects at no less than the prevailing minimum compensation**. (This requirement is in accordance with regulations that have been issued by the Secretary of Labor in 29 CFR Part 505 <http://www.gpo.gov/fdsys/pkg/cfr-1998-title29-vol3/pdf/cfr-1998-title29-vol3-chap-id2.pdf>. This part does not provide information on specific compensation levels.)

<div align="center">JA86</div>

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 46 of 73 PageID
#: 127

- **That ensure that no part of any National Endowment for the Arts-supported project will be performed under or engaged in working conditions which are unsanitary, hazardous, or dangerous to the health and safety of the employees involved.**

JA87

Case 1:25-cv-00079-WES-PAS Document 2-2 Filed 03/06/25 Page 47 of 73 PageID #: 128

## 2. **Some legal requirements apply to every applicant. For example:**

- **Compliance with the federal requirements** that are outlined in the Assurance of Compliance below

- **Debarment and Suspension procedures**. The applicant must comply with requirements set forth in Subpart C of 2 CFR 180, as adopted by the National Endowment for the Arts in 2 CFR Part 3254. Failure to comply may result in the debarment or suspension of the recipient, and the National Endowment for the Arts suspending, terminating, and/or recovering the funds. More information on Debarment and Suspension procedures can be found in the GTCs.

- **Federal Debt Status** (OMB Circular A-129

  <https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/a129/a-129.pdf>). Processing of applications will be suspended when applicants are delinquent on federal tax or non-tax debts, including judgment liens against property for a debt to the federal government. An organization's debt status is displayed in the System for Award Management (SAM). New awards will not be made if an applicant is still in debt status as of September 1 of the fiscal year listed on this funding opportunity.

JA88

Case 1:25-cv-00079-WES-PAS     Document 2-2     Filed 03/06/25     Page 48 of 73 PageID
#: 129

- **Labor Standards** (29 CFR Part 505

  <https://www.govinfo.gov/app/details/cfr-2023-title29-vol3/cfr-2023-title29-vol3-part505>). Recipients must comply with the standards set out in Labor Standards on Projects or Productions Assisted by Grants from the National Endowments for the Arts.

- The Drug-Free Workplace Act of 1988

  <https://www.govinfo.gov/content/pkg/uscode-2020-title41/html/uscode-2020-title41-subtitleiv-chap81-sec8103.htm> (41 U.S.C. 8101 et seq. and 2 CFR Part 3256). The recipient is required to publish a statement regarding its drug-free workplace program as well as to comply with other requirements.

JA89

3. **Some legal requirements apply depending upon what activity the award is funding. For example:**

- If your project activities have the potential to impact any structure that is eligible for or on the National Register of Historic Places, adjacent to a structure that is eligible for or on the National Register of Historic Places, or located in an historic district, you will be asked to provide additional information about your project or take additional action so that the agency can review and comply with the National Historic Preservation Act <https://www.achp.gov/protecting-historic-properties> (NHPA). NHPA also applies to any planning activities that may affect historic properties or districts. The additional agency review must be completed prior to any agency funds being released.

- If your project activities have the potential to impact the environment or environmentally sensitive resources, you will be required to provide information in accordance with the National Environmental Policy Act <https://www.epa.gov/laws-regulations/summary-national-environmental-policy-act> (NEPA). The additional agency review must be completed prior to any agency funds being released.

**JA90**

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 50 of 73 PageID #: 131

- If your project activities include any contract over $2,000 involving the construction, alteration, or repair of public buildings or public works, the contract must contain a clause setting forth the minimum wages to be paid to laborers and mechanics employed under the contract in accordance with The Davis-Bacon and Related Acts (DBRA). More information on DBRA can be found in the GTCs `</node/45296>` under the "Other National Policies" heading.

- Projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 USC 952(j)-(l); 20 USC 954(d),(l).

4. **Some legal requirements apply depending upon who the applicant is. For example:**

- The Native American Graves Protection and Repatriation Act of 1990 (25 U.S.C. 3001 et seq.) applies to any organization that controls or possesses Native American cultural items, such as human remains or associated funerary objects and receives Federal funding, even for a purpose unrelated to the Act.

JA91

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 51 of 73 PageID #: 132

5. **In addition, State Arts Agencies must meet the requirements in Section 954(g)(2) of the National Endowment for the Arts' authorizing legislation, which state:**

"In order to receive assistance under this subsection in any fiscal year, a State shall submit an application for such grants at such time as shall be specified by the Chairperson and accompany such applications with a plan which the Chairperson finds—

(A) designates or provides for the establishment of a State agency (hereinafter in this section referred to as the "State agency") as the sole agency for the administration of the State plan;

(B) provides that funds paid to the State under this subsection will be expended solely on projects and productions approved by the State agency which carry out one or more of the objectives of subsection (c);

(C) provides that the State agency will make such reports, in such form and containing such information, as the Chairperson may from time to time require, including a description of the progress made toward achieving the goals of the State plan;

(D) provides—

i. assurances that the State agency has held, after reasonable notice, public meetings in the State to allow all groups of artists, interested organizations, and the public to present views and make recommendations regarding the State plan; and

JA92

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 52 of 73 PageID
#: 133

ii. a summary of such recommendations and the State agency's response to such recommendations; and

(E) contains--

i. a description of the level of participation during the most recent preceding year for which information is available by artists, artists' organizations, and arts organizations in projects and productions for which financial assistance is provided under this subsection;

ii. for the most recent preceding year for which information is available, a description of the extent projects and productions receiving financial assistance from the State arts agency are available to all people and communities in the State; and

iii. a description of projects and productions receiving financial assistance under this subsection that exist or are being developed to secure wider participation of artists, artists' organizations, and arts organizations identified under clause (i) of this subparagraph or that address the availability of the arts to all people or communities identified under clause (ii) of this subparagraph.

No application may be approved unless the accompanying plan satisfies the requirements specified in this subsection."

JA93

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 53 of 73 PageID #: 134

# Assurance of Compliance

**By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance**.

We may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement.

The applicant certifies that it does not discriminate:

- On the grounds of race, color, or national origin, in accordance with **Title VI of the Civil Rights Act of 1964**, as amended (42 U.S.C. 2000d et seq.), implemented by the National Endowment for the Arts at 45 CFR 1110.

- Solely on the grounds of disability, in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. 794), as amended, implemented by the National Endowment for the Arts at 45 CFR 1151, and the **Americans with Disabilities Act of 1990** ("ADA"), as amended, (42 U.S.C. 12101 et seq.).

JA94

- On the basis of age, in accordance with the **Age Discrimination Act of 1975,** as amended (42 U.S.C. 6101 et seq.), implemented by the National Endowment for the Arts at 45 CFR 1156.

- On the basis of sex, in any education program or activity, in accordance with **Title IX of the Education Amendments of 1972,** as amended (20 U.S.C. 1681 et seq.).

In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:

- The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions.

- The applicant's compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code, pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025. *PLEASE NOTE: Due to the preliminary injunction issued on February 21, 2025, by the United State District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, the NEA is not currently requiring any grantee or contractor to make any "certification" or other representation pursuant to Executive Order No. 14173. This term will not apply to your award as long as this preliminary injunction remains in effect.*

JA95

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 55 of 73 PageID #: 136

- The applicant will not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173. *PLEASE NOTE: Due to the preliminary injunction issued on February 21, 2025, by the United State District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, the NEA is not currently requiring any grantee or contractor to make any "certification" or other representation pursuant to Executive Order No. 14173. This term will not apply to your award as long as this preliminary injunction remains in effect.*

- The applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.

The applicant will inform the public that persons who believe they have been discriminated against on the basis of race, color, national origin, disability, sex, or age may file a complaint with the Director of Civil Rights at the National Endowment for the Arts.

The applicant will forward all complaints for investigation and any finding issued by a Federal or state court or by a Federal or state administrative agency to:

Director, NEA Office of Civil Rights

Email: civilrights@arts.gov

The applicant shall maintain records of its compliance and submission for three (3) years. The applicant will compile, maintain and permit access to records as required by applicable regulations, guidelines or other directives.

The applicant must also certify that it will obtain assurances of compliance from all subrecipients and will require all subrecipients of National Endowment for the Arts funds to comply with these requirements.

The United States has the right to seek judicial or administrative enforcement of this assurance.

## Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

JA97

# EXHIBIT 3

Case 1:25-cv-00039-WES-PAS   Document 22   Filed 03/06/25   Page 58 of 73 PageID #: 139



Menu

# National Endowment for the Arts Supports the Arts with Nearly $36.8 Million in Funding Nationwide

Jan 14, 2025



Case 1:25-cv-00039-WES-PAS   Document 2-2   Filed 03/06/25   Page 59 of 73 PageID #: 140

NEA Grants for Arts Projects awardee photos (clockwise beginning in upper left): Students participate in Northern Arizona University's Indigenous Youth Media Workshop, Summer 2024. Photo courtesy of Northern Arizona University; Iris Musicians perform during the finale of the Weinberg Manor's 2024 Music Festival. Weinberg Manors is an affordable housing community for low-income older adults in Baltimore City. Photo by Lori Raphael; Territory design team members and community partners at the ribbon cutting for Creating Space, a public space created by youth to explore design as a tool for community healing. Photo courtesy of Territory NFP; A group of Arts Institute for Creative Advancement apprentices hard at work as captured by their instructor during Capitol Hill Arts Workshop's weekly scenic shop training. Photo by Reuben Rosenthal c/o Arts Institute for Creative Advancement.

En Español </sites/default/files/fy25-january-grant-announcement-spanish.pdf>

*Washington, DC*—The National Endowment for the Arts (NEA) is pleased to announce 1,474 awards totaling $36,790,500 to support the arts in communities in all 50 states, Puerto Rico, and Washington, DC. Funding for organizations is recommended in the categories of Grants for Arts Projects, Challenge America, Research Grants in the Arts, and Research Labs, and for individuals through Literature Fellowships in creative writing and for translation projects.

"The NEA is proud to continue our nearly 60 years of supporting the efforts of organizations and artists that help to shape our country's vibrant arts sector and communities of all types across our nation," said NEA Chair Maria Rosario Jackson, PhD. "It is inspiring to see the wide range of creative projects taking place—those that address our past and help us consider our future, integrate arts and culture in new ways into our lives and communities, and provide powerful opportunities for people throughout our nation to come together through a shared arts experience."

JA100

3/5/25, 4:47 PM
National Endowment for the Arts Supports the Arts with Nearly $36.8 Million in Funding Nationwide | National Endowment for the Arts

Case 1:25-cv-00070-WES-PAS   Document 22   Filed 03/06/25   Page 60 of 73 PageID
#: 141

- View a state-by-state listings
  <https://www.arts.gov/sites/default/files/fall2024_statelistreport_updated_jan14.pdf> of
  the grants announced in this release.

- View a listing of awards by discipline / grant category
  <https://www.arts.gov/sites/default/files/fall2024_disciplinelistreport.pdf>

- All current grants and additional project details can be viewed
  through the recent grant search <https://apps.nea.gov/grantsearch/>

Each year, the NEA assembles panels of experts and knowledgeable
laypeople with relevant expertise and experience to review NEA
applications and rate them in accordance with published review
criteria. More than 340 panelists <https://www.arts.gov/grants/recent-
grants/panelists> reviewed the eligible applications for this round of
funding. Recommendations were then presented to the National
Council on the Arts <https://www.arts.gov/about/leadership-staff/national-council-
arts>. The council made its recommendations to the NEA Chair, who
made the final decision on all grant awards. Learn more about the
grant review process <https://www.arts.gov/grants/grant-review-process> or
volunteer to be a panelist <https://www.arts.gov/form/volunteer-to-be-a-national-
endowment-for-the-arts-panelist>.

## Grants for Arts Projects

Grants for Arts Projects (GAP) provides expansive funding
opportunities to strengthen the nation's arts and cultural ecosystem,
including opportunities for public engagement with the arts and arts
education, for the integration of the arts with strategies promoting

JA101

Case 1:25-cv-00039-WES-PAS    Document 22    Filed 03/06/25    Page 61 of 73 PageID #: 142

the health and well-being of people and communities, and for the improvement of overall capacity and capabilities within the arts sector.

The National Endowment for the Arts received 2,195 eligible Grants for Arts Projects applications this round, which were submitted in February 2024. The NEA will award **1,127 grants for a total of $31,825,500** to support arts projects in 15 artistic disciplines and fields. All grants require a nonfederal cost share/match of at least 1 to 1. Examples include:

- A local arts agencies subgranting award to **Arrowhead Regional Arts Council** in **Duluth, Minnesota**, of $60,000 to support the expansion of competitive grant programs for arts organizations and individual artists. The Art Project Grant program will support arts activities presented by small organizations with a focus on applicants from rural areas. The Individual Artist Project Grant program will provide a stipend for artists to create, perform, or exhibit work.

- An award to **Artist Communities Alliance** in **Providence, Rhode Island**, of $80,000 to support a professional development program for the artist residency field focused on emergency preparedness and disaster response. The program will include workshops, training sessions, and the development of resources to share with the broader field.

JA102

Case 1:25-cv-00070-WES-PAS    Document 2-2    Filed 03/06/25    Page 68 of 73 PageID #: 143

- An award to **Arts Alive!** in **Keene, New Hampshire**, of $25,000 to support the conceptual design of a new community arts center. The design process will engage artists, designers, and individuals from Keene and across the rural Monadnock Region, to share ideas and desires for a community arts center that will include studios, music practice rooms, residences, workshop/classroom space, gallery space, office spaces, and more.

- An award to **Great Plains Theatre Commons** in **Omaha, Nebraska**, of $35,000 to support the annual New Play Conference. Playwrights, actors, directors, dramaturgs, and designers from across the United States will gather for learning, collaboration, rehearsals, readings, and performances.

- An award to the **Iris Music Project Inc** in **Columbia, Maryland**, of $20,000 to support chamber ensemble performances in underserved healthcare communities. Weekly music programs will be developed in collaboration with musicians and residents at senior living facilities. As part of America 250, a culminating event focusing on the question, "What does it mean to be American?" will provide an opportunity for individuals to share—through stories, songs, and art—their diverse and unique perspectives on their personal and collective histories.

JA103

Case 1:25-cv-00070-WES-PAS   Document 22   Filed 03/06/25   Page 63 of 73 PageID #: 144

- An award to **Miami Lighthouse for the Blind and Visually Impaired, Inc** in **Miami, Florida**, of $30,000 to support a year-round arts education program for underserved groups, including individuals with vision disabilities. Tactile and visual arts activities in various mediums aim to enhance sensory perception, fine motor skills, spatial awareness, and overall well-being. Art instruction will be tailored to participants' unique visual needs, empowering them to create art in an inclusive setting with access accommodations and adaptive equipment.

- An award to **Northern Arizona University** in **Flagstaff, Arizona**, of $25,000 to support the Indigenous Youth Media Workshop. Through mentorship by accomplished filmmakers, journalists, and photographers, high school students will participate in a comprehensive hands-on media arts production program focused on telling stories important to their communities.

This year's Grants for Arts Projects application deadlines are **Thursday, February 13, 2025**, and **Thursday, July 10, 2025**. Each discipline has outlined their broader arts ecosystem, the types of projects they encourage, and guidance on characteristics of competitive proposals. Visit arts.gov <https://www.arts.gov/grants/grants-for-arts-projects> for guidelines and application resources <https://www.arts.gov/grants/grants-for-arts-projects/applicant-resources>, including an on demand video of the FY 2026 Grants for Arts Projects guidelines webinar.

3/5/25, 4:47 PM
Case 1:25-cv-00039-WES-PAS    Document 22    Filed 03/06/25    Page 64 of 73 PageID
#: 145
National Endowment for the Arts Supports the Arts with Nearly $36.8 Million in Funding Nationwide | National Endowment for the Arts

# Challenge America

Challenge America grants are awarded in all artistic disciplines and offer support primarily to small organizations for a wide variety of arts projects that extend the reach of the arts underserved groups and communities that may have limited access to the arts relative to geography, ethnicity, economic status, and/or disability. This includes communities that have limited grant funding opportunities and/or have been underserved by national arts funding; small organizations that may face barriers to accessing grant funding; and organizations that may benefit from enhanced technical assistance resources. This program is often an entry point for organizations that are new to applying for federal funding.

The National Endowment for the Arts reviewed 563 eligible applications for Challenge America funding this year, which were submitted in April 2024, and will award **272 grants for a total of $2,720,000**. Each grant is for $10,000 and requires a minimum $10,000 cost share/match. Examples include:

- An award to **Maryland Youth Ballet** in **Silver Spring, Maryland**, to support dance classes for children with physical and developmental disabilities. Weekly classes are led by specially trained ballet instructors and a pediatric physical therapist. Together, they work with children who are able to walk without assistance as well as those who are supported by wheelchairs, walkers, or other mobility aids.

JA105

Case 1:25-cv-00070-WES-PAS    Document 2-2    Filed 03/06/25    Page 65 of 73 PageID #: 146

- An award to **Prison Performing Arts** in **Saint Louis, Missouri**, to support the development and presentation of a new play adaptation of "Little Women" by Louisa May Alcott created in collaboration with incarcerated artists. Playwright Courtney Bailey will work with the artists to develop this new play during their weekly spoken word class for inmates.

- An award to **Three Rivers Arts Council** in **Wahpeton, North Dakota**, to support a Native artists residency program that will engage students and the public through Native arts, music, and storytelling. NEA National Heritage Fellow Bryan Akipa and other artists will give performances, visit classrooms, and participate in other activities in the community.

The next Challenge America application deadline is **Thursday, April 24, 2025**. Visit arts.gov <https://www.arts.gov/grants/challenge-america> for guidelines and application resources and register for the FY26 Challenge America guidelines webinar <https://www.arts.gov/news/events/fy26-challenge-america-guidelines-webinar> on Wednesday, February 27, 2024, from 3:00–4:00 p.m. ET.

## Research Awards

The NEA has two research grant opportunities for projects that engage with the NEA's five-year research agenda <https://www.arts.gov/sites/default/files/nea-research-agenda-12.21_revdec2024.pdf>.

**Research Grants in the Arts** supports research studies that investigate the value and/or impact of the arts, either as individual components of the U.S. arts ecosystem or as they interact with each

other and/or with other domains of American life. In total, the NEA will award **18 organizations grants totaling $1,045,000**. Recent examples include:

- An award to **American Symphony Orchestra League (aka League of American Orchestras)** in **New York** of $45,000 to support a mixed-methods study examining business practices and financial strategies implemented by nonprofit orchestras after the COVID-19 pandemic.

- An award to **Carnegie Mellon University** in **Pittsburgh, Pennsylvania**, of $80,000 for a study examining university students' creative practices with artificial intelligence (AI), for the purpose of informing arts-integrative secondary education.

- An award to **Robert W. Woodruff Arts Center, Inc. (aka High Museum of Art)** in **Atlanta, Georgia**, of $80,000 to support a mixed-methods study of the relationship between visiting an art museum and individual well-being across various adult populations.

In addition, the NEA also supports **NEA Research Labs**—these are grounded in the social and behavioral sciences and support transdisciplinary research teams investigating the value and impact of the arts for the benefit of both the arts and non-arts sectors. There are currently 29 active Research Labs <https://www.arts.gov/initiatives/nea-research-labs>.

Case 1:25-cv-00079-WES-PAS    Document 22    Filed 03/06/25    Page 67 of 73 PageID
#: 148

This year's Research Labs and Research Grants in the Arts application deadline is **Monday March 24, 2025**. Visit arts.gov for guidelines and application resources and register for a Research Grants in the Arts webinar on Tuesday, February 4, 2025, from 2:00–3:00 p.m. ET.

## Literature Fellowships

Fellowships help writers and translators to create new work and thus expand the portfolio of literary art available to American audiences. These fellowships allow recipients to set aside time for writing, research, travel, and general career advancement.

This year's Creative Writing Fellowships are in poetry. These fellowships are highly competitive, with more than 2,000 eligible applications received for FY 2025. The NEA will award **35 Creative Writing Fellowships** of $25,000 each, **totaling $875,000**. You can read more about the recipients in the Creative Writing Fellowships <https://www.arts.gov/impact/literary-arts/creative-writing-fellows> section of arts.gov. The next deadline for Creative Writing Fellowships <https://www.arts.gov/grants/creative-writing-fellowships> is **Wednesday, March 12, 2025**, and will be for prose (fiction and creative nonfiction).

The NEA will award **Translation Fellowships to 22 translators** ranging from $10,000 to $20,000 totaling $325,000 to translate works from 17 languages and 21 countries into English, including books from Guinea, Mali, and the Philippines, countries not previously represented through an NEA fellowship. You can read

Case 1:25-cv-00070-WES-PAS    Document 22    Filed 03/06/25    Page 68 of 73 PageID #: 149

more about these translators and their projects in the Translation Fellowships <https://www.arts.gov/impact/literary-arts/translation-fellows> section of arts.gov.

Please note, there may be a delay in the distribution of awards as the NEA and all of the federal government are operating under a continuing budget resolution. For more information on all NEA's grant opportunities, including 2025 deadlines, and resources for applicants and awardees, including a guide for first-time applicants, visit the Grants section <https://www.arts.gov/grants> of arts.gov.

# About the National Endowment for the Arts

**About the National Endowment for the Arts**

Established by Congress in 1965, the National Endowment for the Arts is an independent federal agency that is the largest funder of the arts and arts education in communities nationwide and a catalyst of public and private support for the arts. By advancing opportunities for arts participation and practice, the NEA fosters and sustains an environment in which the arts benefit everyone in the United States. To learn more, visit arts.gov <https://www.arts.gov/> or follow us on Facebook <https://www.facebook.com/nationalendowmentforthearts>, Instagram

Case 1:25-cv-00039-WES-PAS    Document 2-2    Filed 03/06/25    Page 69 of 73 PageID #: 150

<https://www.instagram.com/neaarts/>, X <https://x.com/neaarts>, LinkedIn <https://www.linkedin.com/company/national-endowment-for-the-arts>and YouTube <https://www.youtube.com/user/neaarts>.

# Contact

Allison Hill

hilla@arts.gov

202-682-5037

---

# Recent News

All News </news/press-releases>



Mar 04, 2025



Feb 06, 2025

# EXHIBIT 4

3/5/25, 4:48 PM Updates on National Endowment for the Arts FY 2026 Grant Opportunities | National Endowment for the Arts

Case 1:25-cv-00079-WES-PAS Document 2-2 Filed 03/06/25 Page 71 of 73 PageID #: 152



Menu

# Updates on National Endowment for the Arts FY 2026 Grant Opportunities

Feb 06, 2025

**The updated FY 2026 Grants for Arts Projects guidelines** <https://www.arts.gov/grants/grants-for-arts-projects>**, as well as accompanying Frequently Asked Questions** <https://www.arts.gov/grants/grants-for-arts-projects/frequently-asked-questions-0>**, are now available on arts.gov.**

The National Endowment for the Arts is updating its FY 2026 grant guidelines, with deadlines in March and July 2025. These changes impact organizations applying in the Grants for Arts Projects or

JA112

3/5/25, 4:48 PM
Updates on National Endowment for the Arts FY 2026 Grant Opportunities | National Endowment for the Arts

Case 1:25-cv-00079-WES-PAS    Document 2-2    Filed 03/06/25    Page 72 of 73 PageID #: 153

Challenge America categories; please see below for pertinent details.

## Challenge America

The Challenge America opportunity is canceled for FY 2026. Organizations that have applied or were planning to apply to the FY 2026 Challenge America grant opportunity are encouraged to apply to the Grants for Arts Projects category at the March or July deadlines instead.

This change is to focus NEA staff resources on the Grants for Arts Projects category.

## Grants for Arts Projects

The National Endowment for the Arts is revising the FY 2026 Grants for Arts Projects guidelines and they will be available on arts.gov/grants </node/44866> no later than Monday, February 10, 2025.

As part of these changes, the February 13, 2025, Grants for Arts Projects deadline has been canceled. The FY 2026 deadlines are now March 11, 2025, for GAP 1 and July 10, 2025, for GAP 2. Organizations that have already submitted an application must submit a new application under one of these deadlines.

Under the updated guidelines, the NEA continues to encourage projects that celebrate the nation's rich artistic heritage and creativity by honoring the semiquincentennial of the United States of

JA113

Case 1:25-cv-00079-WES-PAS   Document 2-2   Filed 03/06/25   Page 73 of 73 PageID #: 154

America (America250). This can include incorporating an America250-related component or focus within a larger project.

Additional changes to the Grants for Arts Projects guidelines include a requirement for applicants to have completed a five-year history of arts programming prior to the application deadline. If arts programming was suspended due to the pandemic, applicants may include examples that occurred in 2018 or 2019 to meet the five-year requirement. Do not include examples prior to 2018. Virtual programming is acceptable. Organizations may no longer submit applications in the same fiscal year for both Grants for Arts Projects and Our Town funding categories (a separate application in the Research Awards category is allowable).

A **webinar** covering the updated guidelines will take on Tuesday, February 18, 2025, at 2:00 p.m. (Free to attend <https://www.arts.gov/news/events/webinar-fy26-grants-arts-projects-application-guidelines>. A recording will be posted shortly after the presentation in the Applicant Resources section of the Grants for Arts Projects webpage.) In addition, frequently asked questions will be available in the Applicant Resources section.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, | Case No. |
| *Plaintiffs*, | |
| *v.* | |
| NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, | |
| *Defendants*. | |

## DECLARATION OF MARTA V. MARTÍNEZ

I, Marta V. Martínez, declare as follows:

1.      My name is Marta V. Martínez. I am the Executive Director and Founder of Rhode Island Latino Arts ("RILA"). The facts set forth in this declaration are based on my personal knowledge.

2.      Founded in 1988 as the Hispanic Heritage Committee, RILA is the leading Latino arts nonprofit organization in Rhode Island. Its mission is to promote, encourage, and preserve the art, history, heritage, and cultures of Latinos in Rhode Island.

3.      RILA offers programming of every genre of art, including visual art, dance, and music. It puts on theatrical and musical performances, Latin percussion/drumming sessions, dancing events, script readings, and storytelling events. RILA also has a gallery to showcase artwork, and operates literacy programs.

4.    RILA has previously received funding from the National Endowment for the Arts ("NEA").

5.    In 2019, RILA received an NEA grant to support a youth bilingual performing arts program. Guest artists taught theater, dance, and Latin percussion/drumming workshops, and the program culminated in a public performance.

6.    In 2020, RILA received an NEA grant to support operational costs in response to the COVID-19 pandemic.

7.    In 2022, RILA received an NEA grant to support a performance tour through Latino neighborhoods.

8.    RILA is in the process of applying for funding from the NEA's Grants for Arts Projects in the March 2025 cycle to support programming in 2026.

9.    The NEA's Grants for Arts Projects application has two parts. Part 1 is submitted through Grants.gov and collects basic information about an organization. For the upcoming application cycle, Part 1 is due March 11, 2025. Part 2 of the application is submitted through the NEA's applicant portal, and requires information about the organization, its history and budget, and information about the project. Part 2 is due March 24, 2025. We can submit only one application per calendar year.

10.    In order to submit Parts 1 and 2 of the application, we must submit a certification that we agree to an Assurance of Compliance. For the March 2025 cycle, NEA amended the Assurance of Compliance to include a new requirement, which states that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

JA116

11.     The new Assurance of Compliance also states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement."

12.     RILA originally planned to apply for funding in the March 2025 cycle to support a production of "Faust," in which the lead character is gay and queer. One actor who we were considering to cast for that role is nonbinary and uses they/them pronouns. RILA is committed to affording them the artistic freedom to interpret the role as they choose. In the past, this actor has chosen to dress as a man during one performance and dress as a woman in the next performance, while performing the same role.

13.     RILA also considered applying for an NEA grant in the March 2025 cycle to support its storytelling program. The storytelling program allows performing artists to tell their stories without restrictions, and they feel comfortable working with us because we give them the artistic freedom to say what they want. In the past, a storyteller told a story about their son coming out as queer. We intend to continue to keep this program open to all performers and allow others to speak about or interpret their art based on their personal lives on stage, including nonbinary and transgender performers, and we want them to feel free to affirm their identities in their performances as part of their expressive work. We will not tell our artists to stay away from topics that could be interpreted as "promoting" what the government deems as "gender ideology."

14.     RILA decided not to apply for a grant to support "Faust" or the storytelling program because of NEA's new Assurance of Compliance, specifically the requirement that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive

3

Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." In the absence of judicial relief invalidating the "gender ideology" requirement, RILA is concerned that applying for funding to support "Faust" or its storytelling program might run afoul of this requirement and the certification we are required to make to apply for funding.

15.    In the absence of judicial relief, RILA will apply for an NEA grant to support performance tours and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. But were the "gender ideology" requirement invalidated, we would apply for a grant that would affirmatively include celebrating transgender, queer, and nonbinary identity and featuring artists with those identities.

16.    The prohibition on "promoting" what the government deems to be "gender ideology" requires us to guess as to what we can apply for and what we can feature in any NEA-funded programming. The requirement forces us to guess as to the parameters of what constitutes "gender ideology," and what constitutes the "promotion" of "gender ideology." Is it prohibited to allow a transgender, queer, or nonbinary individual to participate in NEA-funded programming? To include any mention of these identities? To include any fictional characters who are trans, nonbinary, or queer? Indeed, I fear that even describing RILA as an organization that supports transgender, nonbinary, and queer artists might run afoul of the "gender ideology" restriction.

17.    The "gender ideology" requirement's vagueness also forces us to guess as to what constraints we must place on our arts programming. As a result, it denies us the ability to provide our artists the creative freedom to which we are committed as an organization, and it precludes us from expressing viewpoints affirming all identities, including those of trans, nonbinary, and queer individuals, even though we are committed to those views as an artistic organization.

**JA118**

18.     If it were not for the "gender ideology" requirement, the scope of the project for which we would apply for NEA funding would be different. As we have done in the past, we would like to support artists who are transgender, queer, or nonbinary, and art that features trans, queer and nonbinary characters and themes. If we obtain judicial relief before March 24, 2025, the date when the substantive portion of the application is due, we will make clear that our project will do just that. Absent such relief, however, we will be compelled to apply for a more restricted program in order to avoid any programming that might violate the vague "gender ideology" prohibition.

19.     We submitted Part 1 of our application on February 14, 2025, with the intention of proceeding not with our ideal project, but with a more restricted project to avoid violating the "gender ideology" requirement. But we would like to apply for a broader project, affirming transgender, nonbinary, and queer identities, and believe it is our right to do so. If the court were to enjoin the "gender ideology" requirement, we will expand the scope of the project in Part 2 of our application to reflect our intention to support trans, queer, and nonbinary artists, characters, and themes within the scope of the NEA-funded programming.

20.     We believe that we have the right, as artists, to apply for NEA funding to promote art that meets the artistic merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." We seek to affirm all gender identities, including transgender, nonbinary, and queer identities. Yet any work that might be seen as promoting these identities risks violating the NEA restriction on using federal funding to "promote" what the government deems to be "gender ideology." We therefore seek judicial relief declaring this requirement invalid, and freeing us to submit an application that is not restricted by the need to comply with the "gender ideology" requirement.

21.     Being denied NEA funding will undermine our ability to fulfill our mission to promote Latino arts and cultural history.

22.     As we have in the past, we also intend to apply for NEA grants in future grant cycles to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through that art. But as long as the NEA requires that no funds can be used to support what the government deems to be "gender ideology," we are barred from seeking such support.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March __5__, 2025.


_Marta V. Martínez_
Marta V. Martínez

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, <br><br> *Defendants*. | Case No. |

**DECLARATION OF ADAM ODSESS-RUBIN**

I, Adam Odsess-Rubin, declare as follows:

1.      My name is Adam Odsess-Rubin. I am the Founding Artistic Director of National Queer Theater ("NQT"). The facts set forth in this declaration are based on my personal knowledge.

2.      NQT is a theater collective dedicated to celebrating the brilliance of generations of LGBTQ+ artists and providing a home for unheard storytellers and activists. Through our art and free community programs, we create and organize together, working towards a more equitable vision of the world and celebrating the diversity of the American public, and in particular the most marginalized people in the queer community, including trans people, immigrants, and people of color.

JA122

3. NQT was awarded NEA grants in 2023 and 2024 for its Criminal Queerness Festival ("CQF"). In addition, NQT was offered an NEA grant in 2025 for CQF, and that award is pending processing. CQF has also received support from the New York City Department of Cultural Affairs in partnership with the City Council, the JKW Foundation, NYC Pride, and the Terrence McNally Foundation.

4. In January 2025, NQT received an Obie Award for CQF in the "Theatre Grants" category. The prestigious Obie Awards, established in 1955, honor the highest caliber of off-Broadway and off-off Broadway theater to recognize brave work, champion new material, and advance careers in theater.[1]

5. NQT first produced the CQF festival in 2019. CQF has featured works from emerging artists from countries that criminalize homosexuality, such as Syria, Venezuela, Uganda, Kenya, Iraq, China, Pakistan, Tanzania, Egypt, Mexico, India, Lebanon, and Poland. The plays are accompanied by talkback discussions facilitated by the playwrights, human rights advocates, and other subject matter experts.

6. CQF is devoted to freedom of expression and to fighting censorship and criminalization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes.

7. The plays featured in the festival are chosen by a curatorial committee of prior CQF playwrights. Supporting trans writers and trans themes has always been a part of the festival, including in the years that it received NEA funding. In 2023, the festival featured one play about intersex identity. In 2024, two plays were written by transgender writers and about trans identity.

---

[1] https://www.obieawards.com/about.

For 2025, all three playwrights identify as nonbinary or gender queer, and one play has nonbinary characters.

8. NQT intends to apply for funding from the NEA's Grants for Arts Projects in the March 2025 cycle to support CQF 2026, the eighth annual CQF. The NEA funds would be used for artist and production expenses.

9. We intend to apply for the March 2025 cycle and not the July 2025 cycle so that we can receive the grant notification in December, which is also when we pass NQT's budget. Because we operate on a calendar year, receiving the grant notification in December gives us six months to plan, budget, and fundraise for CQF 2026. If we were to wait until the July 2025 cycle, that would force us to wait until April 2026 for the grant notification, leaving us with only two months before CQF 2026, which is not enough time for the necessary planning.

10. The NEA's Grants for Arts Projects application has two parts. Part 1 is submitted through Grants.gov and collects basic information about an organization. For the upcoming application cycle, Part 1 is due March 11, 2025. Part 2 of the application is submitted through the NEA's applicant portal, and requires information about the organization, its history and budget, and information about the project. Part 2 is due March 24, 2025. Both parts must be submitted online.

11. In order to submit Parts 1 and 2 of the application, we must submit a certification that we agree to an Assurance of Compliance. For the March 2025 cycle, NEA amended the Assurance of Compliance to include a new requirement, which states that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

JA124

12.     An applicant agrees to the certification by checking a box labeled "I agree." There is no other option for the certification. Parts 1 and 2 of the application cannot be submitted without this box checked. A screenshot of this portion of Part 1 is attached as Exhibit A to this declaration.

13.     The new Assurance of Compliance also states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement."

14.     While it is clear that the new restriction is aimed at suppressing speech that affirms transgender, queer and nonbinary identity, the restriction remains unclear in substantial respects, forcing us to guess as to what if anything we could do that would avoid its open-ended prohibition. For example, it is not clear whether "promoting" what the government deems to be "gender ideology" includes merely working with actors, playwrights, and other artists who identify as trans, nonbinary, or queer, regardless of the content of the art they produce. It is also unclear whether the mere existence of a trans, nonbinary, or queer character in a piece constitutes "promoting" what the government deems to be "gender ideology." We fear that NQT's very mission as an organization dedicated to celebrating LGBTQ+ artists might also run afoul of the "gender ideology" restriction.

15.     We believe that we have the right, as artists, to apply for NEA funding to promote art that meets the merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." And we believe that restriction is invalid as contrary to statute, the Constitution, and the Administrative Procedures Act. The NEA certification and restriction, however, forbid the use of any NEA funding to "promote" what the government deems

**JA125**

to be "gender ideology." And the Executive Order No. 14168 defines "gender ideology" as any effort to affirm that gender is not determined biologically by anatomy at birth. We seek to affirm all gender identities, including transgender, nonbinary, and queer identities. Yet any work that promotes these identities risks violating the NEA restriction on using federal funding to "promote" what the government deems to be "gender ideology." We have to agree to this requirement in order to submit an application. But we believe that condition is invalid and that it is our right, under the First Amendment, not to be so restricted.

16.    In the absence of this funding restriction, we would seek NEA funding, as we have received in the past, to support CQF 2026, which is expressly intended to support and celebrate artists who explore LGBTQ+ stories, including work that expressly affirms the equal dignity and genuine experience of trans artists and explores and celebrates stories of and about transgender people that affirm their identity, and rejects the notion that people's identities are determined by their biological anatomy at birth. Affirming LGBTQ+ rights is at the heart of everything we do and our mission; it is the reason for existing as an organization. We stand by our values.

17.    Only because one cannot register to apply for NEA funding without checking the box agreeing to the certification in the application, we intend to check that box. But we will simultaneously make clear in writing on the application that we are not agreeing to the "gender ideology" restriction because we believe it is legally invalid, and we are seeking judicial relief to declare it invalid, enjoin its application, and allow our application to be considered on equal terms with all other applications in the March 2025 cycle.

18.    We seek injunctive relief invalidating the "gender ideology" restriction so that we are not rendered ineligible from competing for NEA funding because of the viewpoints our NEA-funded work will express.

**JA126**

19.     We also intend to apply for NEA funding in the future, as we have consistently done in the past, to support our work affirming transgender, queer, and nonbinary identities. We therefore seek a permanent injunction against enforcement of the provision and a declaration that it shall be set aside as contrary to law and arbitrary and capricious under the APA. Without this relief, our right to compete equally for funding for work of artistic merit will be denied.

JA127

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March **5**, 2025.

Adam Odsess-Rubin

# EXHIBIT A



**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,<br><br>*Defendants*. | Case No. |

**DECLARATION OF GISELLE BYRD**

I, Giselle Byrd, declare as follows:

1. My name is Giselle Byrd. I am the Executive Director of The Theater Offensive ("TTO"). The facts set forth in this declaration are based on my personal knowledge.

2. TTO is a theatrical organization, founded in 1989, that presents liberating art by, for, and about queer and trans people of color, that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Although TTO is open to all without regard to race, sex, or other identifying characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people, including people of color, who are often the most underserved in the theatrical community both on and offstage. I joined TTO as its Executive Director in December 2023.

3. TTO has previously received six grants from the NEA.

1

4.      In 2016, TTO received an NEA grant to support its youth theater program, True Colors, which is the longest running LGBTQIA2S+ youth theater program in the country. That year, TTO was also awarded the National Arts and Humanities Youth Programs Award.

5.      In 2017, TTO received an NEA grant to support the development and production of an original production titled "They, Them, Theirs: Showcasing Trans Lives."

6.      In 2022, TTO received an NEA grant to support the production of "Amm(i)gone," an original piece that explored the intersections of Islamophobia, sexism, ageism, racism, immigration, and queerness.

7.      In 2022, TTO received an NEA grant to support operational costs in response to the COVID-19 pandemic.

8.      In 2023, TTO received an NEA grant to support the development of "Fly," an original work that featured a transmasculine narrative and trans actors.

9.      In 2025, TTO received an NEA grant to support artist and personnel costs for its Queer Republic Festival. The festival is focused on supporting and producing multidisciplinary works by queer and trans artists that promote wellbeing and resilience and affirm the equal dignity and lived experiences of trans, queer, and nonbinary people.

10.     TTO intends to apply for funding from the NEA's Grants for Arts Projects in the March 2025 cycle to support the production of a new play titled "Smoke," written by a trans playwright. A play which is set against the backdrop of 1960's D.C., "Smoke" explores love, found family, motherhood, and healing and reveals the complexities of trans life in a time where trans people were at the turning point in the fight for their human rights. The production will feature two trans actors in the leading roles. The NEA funds would be used to support the artists in the play, which would begin rehearsals in May 2026.

11.    We intend to apply for the March 2025 cycle and not the July 2025 cycle in order to have enough planning time for "Smoke." Every production requires significant lead time in order to ensure that proper funding is in place as we begin the production process. This process includes securing a venue, actors, creative and production team members, security, and more. This is instrumental in order to successfully execute productions that continue to grow our audience and donor bases simultaneously. Having a year to adequately plan and secure the necessary funding is best practice for organizations such as ours, where we often face the ever-present threat of limited capacity. This is due to the ongoing discrimination towards the livelihood of queer and trans people, requiring them to find multiple methods of employment that, in turn, do not allow them the abilities to create artistic work.

12.    The importance of applying in the March cycle for "Smoke" is also due to the NEA's timeline, pursuant to which applicants do not know if their application was recommended or rejected for funding until December 2025 for the March cycle, making the earliest start date for any funded project January 2026. If we were to apply in the second cycle of funding, it would not allow the project to start until June 1, 2026, which would be too late for our production timeline.

13.    The NEA's Grants for Arts Projects application has two parts. Part 1 is submitted through Grants.gov and collects basic information about an organization. For the upcoming application cycle, Part 1 is due March 11, 2025. Part 2 of the application is submitted through the NEA's applicant portal, and requires information about the organization, its history and budget, and information about the project. Part 2 is due March 24, 2025.

14.    In order to submit Parts 1 and 2 of the application, we must submit a certification that we agree to an Assurance of Compliance. An applicant agrees to the certification by checking

3

**JA133**

a box labeled "I agree." There is no other option for the certification. Parts 1 and 2 of the application cannot be submitted without this box checked.

15. For the March 2025 cycle, NEA amended the Assurance of Compliance to include a new requirement, which states that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

16. The new Assurance of Compliance also states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement."

17. The certification requirement poses an obstacle for us, because we want to apply for funding, but believe we have a right to be considered without regard to whether the views our project expresses "promote" what the government deems to be "gender ideology." Accordingly, we intend to check the box agreeing to the certification in the application only because doing so is necessary to submit an application, but we will simultaneously include a statement in the application making clear that we are not agreeing to abide by the "gender ideology" provision because we believe it is unconstitutional and otherwise invalid, and will seek judicial relief invalidating that provision to ensure that our application can be considered fairly without regard to the invalid "gender ideology" provision.

18. The certification requirement is unclear as to what constitutes "promoting" what the government deems to be "gender ideology" and thereby forces us to guess as to what we can and cannot do with an NEA grant. For example, it does not make clear whether "promoting" what

the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as trans and/or nonbinary, without more, or whether they prohibit only certain messages, themes, or views. The requirement is also unclear as to whether the existence of a trans and/or nonbinary character in a piece constitutes "promoting" what the government deems to be "gender ideology." Nor is it clear what views are proscribed. Is any discussion of trans and/or nonbinary identity prohibited, or only expression that might be seen to "promote" those identities? What messages fall within the prohibited "ideology"? We fear that TTO's very mission as an organization dedicated to queer and trans people might run afoul of the "gender ideology" requirement. Our work aims to provide this country's trans and nonbinary community with narratives that reflect their lives, when their very existence is facing erasure due to the principles of the "gender ideology" executive order.

19.    The "gender ideology" prohibition does not only affect stories with trans and/or nonbinary discussion, but censors the artistic freedoms that our donor base expects and requires from TTO, which has the potential to lead to a loss of financial support. This is further compounded by the prestige of receiving an NEA grant, which can provide opportunities for new funding possibilities. With this lack of support, many theater companies will cease their productivity as they will no longer have access to these opportunities.

20.    TTO seeks injunctive relief invalidating the "gender ideology" restriction so that TTO is not rendered ineligible from competing for NEA funding because of the viewpoints our NEA-funded work will express.

21.    We also intend to apply for NEA grants in future grant cycles to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender and/or

nonbinary identities through their artistic expression. But as long as the NEA requires that no funds

can be used to support "gender ideology," we are barred from seeking such support.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March __5__, 2025.

_Giselle Byrd_
_____
Giselle Byrd

**JA137**

**UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,<br><br>*Defendants*. | Case No. |

**<u>DECLARATION OF EMILYA CACHAPERO</u>**

I, Emilya Cachapero, declare as follows:

1.    My name is Emilya Cachapero. I am the Co-Executive Director: National and Global Programming of Theatre Communications Group ("TCG"). I reviewed this with LaTeshia Ellerson, who is the Co-Executive Director: National Engagement of TCG, and Alisha Tonsic, who is the Co-Executive Director: National Operations and Business Development of TCG. The facts set forth in this declaration are based on our personal knowledge and reflect our collective views.

2.    TCG is a national theatre organization with over 600 member theatres and affiliates and over 3,500 individual members. TCG offers networking and knowledge-building opportunities for theatre professionals through annual convenings, industry reports, workshops, webinars, and the publication of *American Theatre* magazine and TCG Books, while also awarding $43 million

1

**JA138**

in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking. TCG also engages in federal and regional advocacy. In addition, TCG conducts research about the fiscal health of the field by surveying its members, both organizational and individual; this data includes demographic information such as gender identities of individual artists.

3.      TCG's mission is to lead for a just and thriving theatre ecology. It is committed to modeling and advocating for the structural, cultural, and equitable environments that a just and thriving theatre ecology requires. TCG believes that a better world for the theatre requires greater equity, visibility, and funding. We envision a thriving theatre ecology that has the investments, commitments, and participants it needs to create, produce, and present diverse stories; encourage, engage, and financially sustain theatre makers and practitioners; abundantly serve multifaceted communities; advance values and practices of equity and justice; and sustain theatre as a viable industry. At the core of our work is ensuring equitable participation in all areas of practice and that all populations in our community have access to our services, including those of Black, Indigenous and all People of Color (BIPOC), LGBTQ+, transgender/gender-nonconforming (TGNC), and disability identities.

4.      Though the NEA is a defendant in this lawsuit, the NEA is not TCG's adversary. We stand in full support of the NEA's mission to create art that sustains, strengthens, and nurtures the diverse fabric of our country. However, we fundamentally object to the Trump administration's imposition of an ideological viewpoint-based screen on NEA funding, by barring grants that in any way "promote" what the administration deems to be "gender ideology." We believe the "gender ideology" restriction unlawfully suppresses the speech of all artists, including transgender, nonbinary, and queer artists.

2

JA139

5.      TCG has received 42 NEA grants since 1998 to support fieldwide convenings, research, and other programming.

6.      Many of our members apply for and receive funding from the NEA to support their artistic endeavors. Many of them want to apply for funding from the NEA's Grants for Arts Projects in the March 2025 cycle.

7.      For the March 2025 cycle, the NEA amended the Assurance of Compliance that applicants must agree to in order to seek NEA funding to include a new requirement, which states that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

8.      The new Assurance of Compliance also states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement."

9.      Because of the new certification requirement, many of our members have been deterred from applying for funding in the March 2025 cycle, though they had otherwise planned to and would like to. These members object to having to make such a certification, and fear the penalties that could flow to them if they are deemed to have falsely certified. If the certification requirement and funding restriction were lifted, these members would apply for NEA funding in the March 2025 cycle. And many of our members fear that the ban on "promot[ing]" what the government deems to be "gender ideology" would bar them even from being considered for

funding because they work with, or are, transgender, nonbinary, or queer artists, and are committed to treating all their artists with equal dignity.

10.     For example, one member theatre, which has received several NEA grants and whose mission includes presenting "diverse" stories of the American identity, had planned to apply in March, but cannot and will not sign the Assurance of Compliance because the theatre fundamentally disagrees with the "gender ideology" requirement. Transgender people are part of this member theatre's workforce, audience, and arts education programs, and the theatre recognizes all gender identities. It believes that not acknowledging those under the transgender umbrella is discriminatory. As a result, the theatre is unable to apply for an NEA grant that would otherwise cover 25 percent of their production cost.

11.     The "gender ideology" requirement also bars many of our members from being considered without regard to whether their projects express views that "promote" what the government deems to be "gender ideology." The Theater Offensive ("TTO") is one such member of TCG. TTO intends to apply for funding from the NEA's Grants for Arts Projects in the March 2025 cycle to support a new play written by a trans playwright. The certification requirement on the NEA application poses an obstacle for TTO because of the "gender ideology" requirement. TTO intends to check the box agreeing to the certification while simultaneously including a statement in the application making clear that it is not agreeing to abide by the "gender ideology" requirement because it believes the requirement is unconstitutional and otherwise invalid.

12.     Many of our members, including TTO, find the certification requirement unclear as to what constitutes "promoting gender ideology" and thereby forces them to guess as to what is and is not permitted with an NEA grant. For example, it does not make clear whether "promoting gender ideology" includes merely working with actors, playwrights, and other artists who identify

as trans, nonbinary, or queer, or whether it prohibits only certain messages, themes, or views. The requirement is also unclear as to whether the existence of a trans, nonbinary, or queer character in a piece constitutes "promoting gender ideology." Nor is it clear what views are proscribed. Is any discussion of trans, nonbinary, or queer identity prohibited, or only expression that might be seen to "promote" those identities? What messages fall within the prohibited "ideology"?

13.     We have heard from members that they are uncertain about how to proceed, unsure of whether to apply knowing they will be barred from eligibility because their project may express views that "promote" what the government deems to be "gender ideology," apply with a different project, or forego applying for NEA funding altogether. These members feel that they require legal advice to understand how to handle the uncertainty that has been imposed on them, and many are unable to access it in time. In addition, many members, especially smaller theatres do not have existing relationships with lawyers or the money to support access to legal counsel, particularly on such a quick timeline.

14.     We seek judicial relief so that our members can apply and compete for NEA funding without regard to whether their programs in some ways "promote" what the government deems to be "gender ideology."  Because many members would like to apply in the March cycle of funding, we seek preliminary injunctive relief that would allow them to do so.

15.     Many members have expressed dismay at being forced to compromise on their commitment to free artistic expression and their ideals in order to seek NEA funding. These organizations seek to affirm all gender identities, including transgender, nonbinary, and queer identities. Some members have also told us about the financial impact of losing NEA funding. For example, for one small theatre, an NEA grant would cover their entire design team's wages, pension, and health. These members would like to apply for NEA funding but for the ban on

5

JA142

"promoting" what the government deems to be "gender ideology," and would do so in the March 2025 cycle if this Court provides relief invalidating that restriction while this case is pending.

16.     The ban on "promoting" what the government deems to be "gender ideology" requirement has also caused us to divert a great deal of our time and resources. For example, we have diverted some of our research into polling members about how the requirement has affected their plans to apply, or not apply, for NEA funding. In addition, our programming team has had to quickly pivot to provide our members and the larger field with informational webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices.

17.     We seek judicial relief invalidating the "gender ideology" prohibition so that our members can apply and be considered for NEA funding fairly without regard to whether their work or organization or projects "promote" what the government deems to be "gender ideology." This is core to our mission to lead for a just and thriving theatre ecology that celebrates free artistic expression. A just and thriving theatre ecology is one that financially sustains all theatre makers and practitioners and serves multifaceted communities, including trans, nonbinary, and queer theatre communities, and that produces works of artistic merit and excellence, without being disadvantaged because a work is deemed to promote a viewpoint the administration opposes.

18.     Many of our members, including TTO, intend to apply for NEA grants in future grant cycles as well to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through their artistic expression. But as long as the NEA requires that no funds can be used to support "gender ideology," they are barred from seeking such support. This is true for TCG as well.

19.    If the Court invalidates the "gender ideology" prohibition, TCG intends to apply for an NEA grant during the July 2025 cycle to support fieldwide convenings and research. Last year, TCG's national conference, supported in part by the NEA, included a panel on gender identity and a presentation by a trans woman. TCG is in preliminary planning stages for the next conference in 2026, and TCG is committed to including in the conference discussion about gender identity, affirming trans, nonbinary, and queer members of the community.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 5   , 2025.

_____
Emilya Cachapero

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP,<br><br>       *Plaintiffs*,<br><br>v.<br><br>NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in her official capacity as Senior Advisor National Endowment for the Arts,<br><br>       *Defendants*. | Case No. **1:25-cv-00079** |

### DECLARATION OF ANN EILERS, DEPUTY CHAIR FOR MANAGEMENT AND BUDGET, NATIONAL ENDOWMENT FOR THE ARTS

Pursuant to 28 U.S.C. § 1746, I, Ann Eilers, declare, under penalty of perjury, the following to be true and correct:

1. I am over the age of 18 and competent to make this Declaration.

2. The facts stated in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge.

3. I am the Deputy Chair for Management and Budget for the National Endowment for the Arts ("NEA"). In this capacity, I supervise the NEA Office of Grants Management, which has the primary responsibility for issuing and processing the NEA's financial assistance awards approved by the NEA Chair in conformance with Agency legislation, policies and procedures, and applicable federal laws, executive orders, rules, and regulations. The Office of Grants Management does not draft or issue funding program guidelines, oversee solicitations, review, or recommend for funding any applications/nominations/proposals submitted to the agency under any funding opportunity.

**JA146**

4.  The NEA is an independent federal agency.  The NEA's primary activities include grantmaking to nonprofit arts organizations, public arts agencies and organizations at the state, regional, local level, nonprofit colleges and universities, federally recognized tribes, and individual writers and translators.

5.  Applicants for NEA financial assistance awards are required to comply with federal anti-discrimination laws, and applicable regulations and executive orders. To ensure compliance, applicants are required to certify their compliance with relevant federal laws, regulations, and executive orders by reviewing the Assurance of Compliance language provided by the NEA in the relevant funding program guidelines and checking the certification box on the Application for Federal Domestic Assistance (SF-424), which is submitted through Grants.gov.

6.  On January 20, 2025, President Trump issued Executive Order 14168, Defending Women from Gender ideology Extremism and Restoring Biological Truth to the Federal Government (hereinafter, "E.O. 14168"). I am aware that on February 6, 2025, the NEA updated the Assurance of Compliance to ensure applicants' compliance with E.O. 14168. I do not manage the office that identifies updated language or processes these changes.

7.  On March 6, 2025, the American Civil Liberties Union Foundation filed a Complaint for Declaratory and Injunctive Relief and a Memorandum in Support on behalf of several Plaintiffs. The Complaint alleges harm to Plaintiffs due to the new compliance requirement with E.O. 14168.

8.  No later than March 11, 2025, senior leadership at the NEA will approve the removal of the new language requiring compliance with E.O. 14168 in its Assurance of Compliance until the conclusion of this litigation. The NEA intends to no longer require applicants to certify their compliance with E.O. 14168 while the outcome of this litigation is pending.

9.  No later than March 11, 2025, senior leadership at the NEA will approve a change to one of the submission deadlines for the NEA's Grants for Arts Projects ("GAP") funding opportunity. The March 24, 2025 submission deadline for GAP will be changed to April 7, 2025.

Executed on March 10, 2025.

ANN EILERS

_____

Signature

**JA147**

Deputy Chair Management and Budget
Title

March 10, 2024
Date

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

RHODE ISLAND LATINO ARTS,
NATIONAL QUEER THEATER, THE
THEATER OFFENSIVE, and THEATRE
COMMUNICATIONS GROUP,

      Plaintiffs,

   *v.*

NATIONAL ENDOWMENT FOR THE
ARTS; MARY ANNE CARTER, in her of-
ficial capacity as Acting Chair of the Na-
tional Endowment for the Arts,

      Defendants.

Civil Action
No. 24-cv-79-WES-PAS

**DECLARATION OF KEVIN BOLAN**

    I, Kevin Bolan, declare as follows:

    1.     I am an Assistant United States Attorney in the U.S. District of Rhode Island and am counsel for the Defendants in this action.

    2.     I submit this declaration in support of the Defendants' response to the Plaintiffs' motion for preliminary injunction.

    3.     The attached exhibits are true and accurate copies of documents issued by the National Endowment for the Arts. The outline lettering of the documents below matches their exhibit letter:

        a.     NEA, Legal Requirements and Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance.

        b.     NEA, General Terms and Conditions for Federal Financial Assistance Awards to Organizations (Apr. 22, 2024), https://www.arts.gov/sites/default/files/FY25-GTC-ORGs-11.5.2024.pdf.

        c.     Mem. from Mary Anne Carter, NEA Senior Advisor, to NEA Grantmaking Staff (Mar. 17, 2025).

**JA149**

I declare under penalty of perjury that the foregoing is true and correct.

March 21, 2025

/s/ Kevin Bolan
Assistant United States Attorney

# Ex. A

Case 1:25-cv-00079-WES-PAS Document 1-1 Filed 03/21/25 Page 5 of 71 PageID #: 241



Menu

# Legal Requirements and Assurance of Compliance

## Legal Requirements

**NOTE: This list highlights some of the significant legal requirements that may apply to an applicant or recipient; however, it is not exhaustive. More information regarding these and other legal requirements may be found at Appendix A of the** General Terms & Conditions </grants/manage-your-award>**, which set forth the National Policy and Other Legal Requirements, Statutes, Regulations, and Executive Orders that Govern Your Award. There may be other applicable legal requirements that are not listed in this document. It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

JA152

Case 1:25-cv-00079-WES-PAS    Document 11-1    Filed 03/21/25    Page 6 of 71    PageID
#: 242

1. By law, the National Endowment for the Arts may support only those organizations:

- **That are tax-exempt**. Organizations qualifying for this status must meet the following criteria:

  1. No part of net earnings may benefit a private stockholder or individual.
  2. Donations to the organization must be allowable as a charitable contribution under Section 170(c) of the Internal Revenue Code of 1954, as amended.

  For further information, go to the Internal Revenue Service's (IRS) website <http://www.irs.gov>.

- Who have not had their IRS status revoked. It is your responsibility to ensure that your status is current at the time of the application and throughout the life of your award.

JA153

Case 1:25-cv-00079-WES-PAS    Document 1-1    Filed 03/21/25    Page 7 of 71    PageID #: 243

- **That compensate all professional performers and related or supporting professional personnel on National Endowment for the Arts-supported projects at no less than the prevailing minimum compensation**. (This requirement is in accordance with regulations that have been issued by the Secretary of Labor in 29 CFR Part 505 <http://www.gpo.gov/fdsys/pkg/cfr-1998-title29-vol3/pdf/cfr-1998-title29-vol3-chap-id2.pdf>. This part does not provide information on specific compensation levels.)

- **That ensure that no part of any National Endowment for the Arts-supported project will be performed under or engaged in working conditions which are unsanitary, hazardous, or dangerous to the health and safety of the employees involved**.

JA154

Case 1:25-cv-00079-WES-PAS    Document 11-1    Filed 03/21/25    Page 8 of 71    PageID
#: 244

## 2. **Some legal requirements apply to every applicant. For example:**

- **Compliance with the federal requirements** that are outlined in the Assurance of Compliance below

- **Debarment and Suspension procedures**. The applicant must comply with requirements set forth in Subpart C of 2 CFR 180, as adopted by the National Endowment for the Arts in 2 CFR Part 3254. Failure to comply may result in the debarment or suspension of the recipient, and the National Endowment for the Arts suspending, terminating, and/or recovering the funds. More information on Debarment and Suspension procedures can be found in the GTCs.

- **Federal Debt Status** (OMB Circular A-129

  <https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/a129/a-129.pdf>). Processing of applications will be suspended when applicants are delinquent on federal tax or non-tax debts, including judgment liens against property for a debt to the federal government. An organization's debt status is displayed in the System for Award Management (SAM). New awards will not be made if an applicant is still in debt status as of September 1 of the fiscal year listed on this funding opportunity.

JA155

Case 1:25-cv-00079-WES-PAS   Document 11-1   Filed 03/21/25   Page 9 of 71   PageID #: 245

- **Labor Standards** (29 CFR Part 505

  <https://www.govinfo.gov/app/details/cfr-2023-title29-vol3/cfr-2023-title29-vol3-part505>). Recipients must comply with the standards set out in Labor Standards on Projects or Productions Assisted by Grants from the National Endowments for the Arts.

- The Drug-Free Workplace Act of 1988

  <https://www.govinfo.gov/content/pkg/uscode-2020-title41/html/uscode-2020-title41-subtitleiv-chap81-sec8103.htm> (41 U.S.C. 8101 et seq. and 2 CFR Part 3256). The recipient is required to publish a statement regarding its drug-free workplace program as well as to comply with other requirements.

JA156

Case 1:25-cv-00079-WES-PAS    Document 11-1    Filed 03/21/25    Page 10 of 71    PageID #: 246

### 3. **Some legal requirements apply depending upon what activity the award is funding. For example:**

- If your project activities have the potential to impact any structure that is eligible for or on the National Register of Historic Places, adjacent to a structure that is eligible for or on the National Register of Historic Places, or located in an historic district, you will be asked to provide additional information about your project or take additional action so that the agency can review and comply with the National Historic Preservation Act <https://www.achp.gov/protecting-historic-properties> (NHPA). NHPA also applies to any planning activities that may affect historic properties or districts. The additional agency review must be completed prior to any agency funds being released.

- If your project activities have the potential to impact the environment or environmentally sensitive resources, you will be required to provide information in accordance with the National Environmental Policy Act <https://www.epa.gov/laws-regulations/summary-national-environmental-policy-act> (NEPA). The additional agency review must be completed prior to any agency funds being released.

JA157

- If your project activities include any contract over $2,000 involving the construction, alteration, or repair of public buildings or public works, the contract must contain a clause setting forth the minimum wages to be paid to laborers and mechanics employed under the contract in accordance with The Davis-Bacon and Related Acts (DBRA). More information on DBRA can be found in the GTCs </grants/manage-your-award> under the "Other National Policies" heading.

- Projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 USC 952(j)-(l); 20 USC 954(d),(l).

4. **Some legal requirements apply depending upon who the applicant is. For example:**

- The Native American Graves Protection and Repatriation Act of 1990 (25 U.S.C. 3001 et seq.) applies to any organization that controls or possesses Native American cultural items, such as human remains or associated funerary objects and receives Federal funding, even for a purpose unrelated to the Act.

JA158

Case 1:25-cv-00079-WES-PAS  Document 11-1  Filed 03/21/25  Page 12 of 71  PageID #: 248

5. **In addition, State Arts Agencies must meet the requirements in Section 954(g)(2) of the National Endowment for the Arts' authorizing legislation, which state:**

"In order to receive assistance under this subsection in any fiscal year, a State shall submit an application for such grants at such time as shall be specified by the Chairperson and accompany such applications with a plan which the Chairperson finds—

(A) designates or provides for the establishment of a State agency (hereinafter in this section referred to as the "State agency") as the sole agency for the administration of the State plan;

(B) provides that funds paid to the State under this subsection will be expended solely on projects and productions approved by the State agency which carry out one or more of the objectives of subsection (c);

(C) provides that the State agency will make such reports, in such form and containing such information, as the Chairperson may from time to time require, including a description of the progress made toward achieving the goals of the State plan;

(D) provides—

  i. assurances that the State agency has held, after reasonable notice, public meetings in the State to allow all groups of artists, interested organizations, and the public to present views and make recommendations regarding the State plan; and

JA159

Case 1:25-cv-00079-WES-PAS Document 11-1 Filed 03/21/25 Page 13 of 71 PageID #: 249

ii. a summary of such recommendations and the State agency's response to such recommendations; and

(E) contains--

i. a description of the level of participation during the most recent preceding year for which information is available by artists, artists' organizations, and arts organizations in projects and productions for which financial assistance is provided under this subsection;

ii. for the most recent preceding year for which information is available, a description of the extent projects and productions receiving financial assistance from the State arts agency are available to all people and communities in the State; and

iii. a description of projects and productions receiving financial assistance under this subsection that exist or are being developed to secure wider participation of artists, artists' organizations, and arts organizations identified under clause (i) of this subparagraph or that address the availability of the arts to all people or communities identified under clause (ii) of this subparagraph.

No application may be approved unless the accompanying plan satisfies the requirements specified in this subsection."

JA160

Case 1:25-cv-00079-WES-PAS    Document 11-1    Filed 03/21/25    Page 14 of 71    PageID
#: 250

# Assurance of Compliance

**By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance**.

We may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement.

The applicant certifies that it does not discriminate:

- On the grounds of race, color, or national origin, in accordance with **Title VI of the Civil Rights Act of 1964**, as amended (42 U.S.C. 2000d et seq.), implemented by the National Endowment for the Arts at 45 CFR 1110.

- Solely on the grounds of disability, in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. 794), as amended, implemented by the National Endowment for the Arts at 45 CFR 1151, and the **Americans with Disabilities Act of 1990** ("ADA"), as amended, (42 U.S.C. 12101 et seq.).

JA161

- On the basis of age, in accordance with the **Age Discrimination Act of 1975,** as amended (42 U.S.C. 6101 et seq.), implemented by the National Endowment for the Arts at 45 CFR 1156.

- On the basis of sex, in any education program or activity, in accordance with **Title IX of the Education Amendments of 1972,** as amended (20 U.S.C. 1681 et seq.).

In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:

- The applicant will comply with all applicable Executive Orders while the award is being administered.  Executive orders are posted at whitehouse.gov/presidential-actions.

- The applicant's compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code, pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025. *PLEASE NOTE: Due to the preliminary injunction issued on February 21, 2025, by the United State District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, the NEA is not currently requiring any grantee or contractor to make any "certification" or other representation pursuant to Executive Order No. 14173. This term will not apply to your award as long as this preliminary injunction remains in effect.*

JA162

- The applicant will not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173. *PLEASE NOTE: Due to the preliminary injunction issued on February 21, 2025, by the United State District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, the NEA is not currently requiring any grantee or contractor to make any "certification" or other representation pursuant to Executive Order No. 14173. This term will not apply to your award as long as this preliminary injunction remains in effect.*

- The applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. *PLEASE NOTE: Pending the outcome of litigation in the United States District Court of Rhode Island, Case No.1:25-cv-00079-WES-PAS, the NEA is not currently requiring any grantee to make any "certification" or other representation pursuant to Executive Order 14168.*

The applicant will inform the public that persons who believe they have been discriminated against on the basis of race, color, national origin, disability, sex, or age may file a complaint with the Director of Civil Rights at the National Endowment for the Arts.

The applicant will forward all complaints for investigation and any finding issued by a Federal or state court or by a Federal or state administrative agency to:

JA163

Case 1:25-cv-00079-WES-PAS    Document 11-1    Filed 03/21/25    Page 17 of 71    PageID
#: 253

Director, NEA Office of Civil Rights

Email: civilrights@arts.gov

The applicant shall maintain records of its compliance and submission for three (3) years. The applicant will compile, maintain and permit access to records as required by applicable regulations, guidelines or other directives.

The applicant must also certify that it will obtain assurances of compliance from all subrecipients and will require all subrecipients of National Endowment for the Arts funds to comply with these requirements.

The United States has the right to seek judicial or administrative enforcement of this assurance.

# Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

JA164

About </about>

Contact Us

</about/leadership-

staff/all-staff>

Civil Rights

</about/civil-rights-office>

No Fear Act

</about/civil-rights-

office/applicants-for-

employment-and-

employees/no-fear-act>

FOIA </about/freedom-of-

information-act-foia-guide>

Inspector General

</about/inspector-general>

Accessibility

</impact/accessibility>

Privacy Policy

</privacy>

Disclaimers

</about/website-

disclaimers>

Open Government

</about/open-government>

USA.gov

<http://www.usa.gov/>

Section 508

Accessibility </section-

508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-

grant-scam>

400 7th Street, SW, Washington, DC
20506
202.682.5400

# Ex. B

November 2024



# General Terms and Conditions

## for Federal Financial Assistance Awards to Organizations

Incorporating revisions to Title 2 of the Code of Federal Regulations (2 CFR)
for all Federal Financial Assistance Awards issued on or after October 1, 2024
(89 FR 30046 April 22, 2024)

**Office of Grants Management**

National Endowment for the Arts

400 7th Street, SW

Washington, DC 20506

Telephone (202) 682-5403

grants@arts.gov

finalreports@arts.gov

www.arts.gov/grants/manage-your-award

**Accessibility Accommodations**

Individuals who are deaf or hard-of-hearing may e-mail the Office of Grants Management at
grants@arts.gov for assistance.

Individuals who do not use conventional print or electronic media may access the information in this
document by contacting the Office of Accessibility at accessibility@arts.gov or by phone at (202) 682-
5532.

JA168

1. Applicability ...........................................................................................................4

2. Your Responsibilities as a Recipient of a Federal Financial Assistance Award........................................5

3. Acknowledgment of National Endowment for the Arts Support and Disclaimer ...............................6

4. Selected Definitions (§ 200.1) .............................................................................7

5. SAM.gov Required Registration (2 CFR 25) ..................................................................12

6.  Mandatory Disclosures (§ 200.113)........................................................................13

7.  Conflicts of Interest (§ 200.112 and .318(c)) and Related Mandatory Disclosures (§ 200.113)..........13

8. Whistleblower Protection (§ 200.217) ......................................................................14

9. Statutory and National Policy Requirements (§ 200.300 and .209)......................................15

10. Financial Management (§ 200.302) and Internal Controls (§ 200.303) ...............................16

11. Cash Management Standards / Federal Payment (§ 200.305) ..........................................17

12. Cost Sharing (20 U.S.C. 954(e) and § 200.306) and Program Income (§ 200.307)...........................17

13. General Procurement Standards (§ 200.317-.327).........................................................20

14. Cost Principles (Part 200 – Subpart E) .......................................................................22

15. Travel (§ 200.475 and 41 CFR 301-10)......................................................................27

16. Changes in Your Project: Amendments (§ 200.308)......................................................28

17. Performance and Financial Reporting (§ 200.328 through 344) .......................................31

18. Property Standards: Use and Disposition (§ 200.310 through 316) ..................................33

19. Record Retention (§ 200.334) and Access....................................................................35

20. Remedies for Noncompliance and Termination (§ 200.339 and .340).............................36

21. Closeout, Adjustments, and Continuing Responsibilities (§ 200.344 and .345)..................38

22. Single Audit Requirements (§ 200.501).......................................................................39

APPENDIX A NATIONAL POLICY AND OTHER LEGAL REQUIREMENTS, STATUTES,  AND REGULATIONS THAT GOVERN YOUR AWARD ...........................................................................40

APPENDIX B PART 25 AWARD TERM - SAM.GOV AND UEI REQUIREMENTS ........................................46

APPENDIX C PART 175 AWARD TERM - TRAFFICKING IN PERSONS.....................................................47

**JA169**

**Important Information Regarding Your National Endowment for the Arts Award**

## 1. Applicability

The *General Terms and Conditions for Federal Financial Assistance Awards to Organizations* (GTCs) apply to grants and cooperative agreements (awards) the National Endowment for the Arts (NEA or the agency) issues to 501(c)(3) nonprofit organizations, institutions of higher education (IHEs), units of state and local government, and federally recognized tribal entities.

- Awards issued under the Partnership Agreement funding opportunity to State Arts Agencies (SAAs) and Regional Arts Organizations (RAOs) are subject to the *General Terms and Conditions for Partnership Agreements*.
- Awards issued under all other NEA funding opportunities for subaward projects to pass-through entities[1] are subject to the *General Terms and Conditions for Pass-Through Entities*.

Contact the NEA Office of Grants Management at grants@arts.gov if you are unsure which *General Terms and Conditions* apply to your award.

**Implementation.** These GTCs implement Title 2 of the Code of Federal Regulations (2 CFR) including Subtitle A-Office of Management and Budget Guidance for Federal Financial Assistance and Part 200-Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Part 200 or § 200), last amended on October 2, 2024. You may access the full text of 2 CFR 200 at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-I.

**Adoption.** The NEA has adopted 2 CFR 200 through regulation at 2 CFR 3255.1.

**Additional Statutes and Policies.** The GTCs are also based on the NEA's legislation 20 U.S.C. § 954 and 955, along with other federal statutes, regulations, and executive orders that apply to federal financial assistance awards and established NEA policies. All NEA award recipients must be familiar with and comply with applicable requirements.

The NEA endeavors to include pertinent statutes and regulations within the GTCs. In general, more expansive information can be found by reviewing the enumerated citations.

When applicable, your award may also require specific terms and conditions (§ 200.308). Should there be inconsistency between requirements, specific terms and conditions supersede the GTCs. You can

---

[1] Only State Arts Agencies, Regional Arts Organizations, and designated Local Arts Agencies are eligible to subgrant NEA funds.

find specific terms and conditions for your award (if applicable) in the Documents tab in your award record in REACH, the NEA's electronic grants management system.

## 2. Your Responsibilities as a Recipient of a Federal Financial Assistance Award

When you accept an NEA award, your organization assumes legal, financial, administrative, and programmatic responsibilities for administering the award in accordance with any provisions included in the award; the statutes, regulations, executive orders and established NEA policies governing federal financial assistance awards; and these GTCs, all of which are hereby incorporated into your award by reference. While the NEA may provide you with reminders regarding award requirements, the absence of receiving such notice does not relieve you of your responsibilities. If you fail to comply with these requirements, the NEA may suspend or terminate your award and recover NEA funding. In addition, the United States has the right to seek judicial enforcement of these obligations.

**Acceptance of an NEA Award.** Submission of a Payment Request constitutes your agreement to comply with all the terms and conditions of the award.

All NEA award recipients must:

1. Comply with the terms and conditions of your award, including the GTCs, 2 CFR 200, and any specific terms and conditions that apply to the award (§ 200.100.)

2. Maintain an active registration in the System for Award Management (SAM.gov) with current information about your entity at all times during which your entity has an active award or application under consideration (§ 200.25).

3. Ensure the efficient and effective administration of the federal award through sound management practices (§ 200.400(a)).

4. Administer federal funds in a manner consistent with the U.S. Constitution, federal statutes, regulations, and the terms and conditions of your federal award (§ 200.303 (b) and .400).

5. Maintain accounting practices consistent with the cost principles in 2 CFR 200 and that support the accumulation of costs as required by these cost principles, including maintaining adequate documentation to support costs charged to the federal award.

6. Maintain a sound financial management system that records separately within its general accounting system the receipt and disbursement of grant funds and cost sharing contributions and that monitors the expenditure of these funds against the approved award budget (§ 200.302).

7. Have in place written procedures for determining the allowability of costs, the disbursement of federal funds, procurement, conflict of interests, compensation for personal services, leave policies, classification of participant costs, relocation policies, and travel reimbursement for staff on official business. (§ 200.430(g)(7); .112; .318(c); .302, .317-.327; .475)

8. Document the time and effort spent by all employees/staff/personnel on approved project activities (§ 200.430 (g)).

9. Conduct all procurement transactions in an open and free competition and ensure that procurement contracts for more than the simplified acquisition threshold that are not awarded by competitive bids or offers are justified and documented (§ 200.317 through .327).

10. Carry out your project activities as approved by the NEA at the time of award and, if amended, as acknowledged in writing by the Office of Grants Management (§ 200.308).

11. Request written approval from the NEA Office of Grants Management for any changes to your project prior to implementing the changes.

12. Acknowledge the NEA's support in all materials publicizing or resulting from project activities.

13. Submit all financial and performance reports by the due dates as required by the terms and conditions of the award (§ 200.328(d)).

14. Comply with requirements concerning record retention and the federal government's rights of access to records and personnel (§ 200.334 through .338).

15. Have an audit performed that meets the requirements of 2 CFR 200 Subpart F - Audit Requirements whenever you expend $1,000,000 or more in federal funds during a fiscal year (§ 200.501).

## 3. Acknowledgment of National Endowment for the Arts Support and Disclaimer

You must prominently acknowledge NEA support in all materials and announcements for your funded project. You can find NEA logos for your use on the Manage Your Award section of the NEA's website at www.arts.gov/grants/manage-your-award.

Most NEA awards support specific projects, therefore, you can only use the NEA's name and logo in relation to your NEA-supported project. Do not advertise the NEA as a general donor to your organization. Do not include the NEA in a list of donors not specific to the supported project or suggest that NEA provides continued support to your organization after the NEA closes out your award.

JA172

The NEA reserves the right to change the language of the required acknowledgment of NEA support, as well as the right to disallow the use of the NEA logo and acknowledgment of NEA support.

**Language for print and online project materials.** A basic requirement is a phrase acknowledging NEA support using the following language: "*This project is supported in part by the National Endowment for the Arts.*" The NEA encourages you to also include "*To find out more about how National Endowment for the Arts grants impact individuals and communities, visit www.arts.gov.*"

In addition, the NEA encourages you to use NEA's current logo whenever possible to accurately indicate that the NEA is currently supporting your project. You may not alter the NEA logo without written permission from the NEA's Office of Public Affairs.

You may use social media to indicate NEA support of your project using the following language, "*This project is supported in part by the National Endowment for the Arts.*" You may also include the NEA in a list of project supporters. On certain social media platforms, you may use **@NEAarts** instead of spelling out the full name of the agency.

**Language for radio, television, and streaming audio and/or video broadcast.** The NEA requires the following voice-over language: "*This project is supported in part by the National Endowment for the Arts. On the web at arts dot gov.*" For television or streaming video broadcast, you must display the current NEA logo and the www.arts.gov web address (URL).

## 4. Selected Definitions (§ 200.1)

Frequently used terms are summarized below; refer to § 200.1 for additional definitions and detail.

| Term | Definition |
|---|---|
| Assistance Listing | The publicly available listing of federal assistance programs managed and administered by the General Services Administration (GSA) at SAM.gov. |
| Assistance Listing Number | A unique number assigned to identify an Assistance Listing. |
| Authorizing Official | The person at the recipient organization who has the authority to bind the organization legally and financially. For recipient organizations (parent organizations) responsible for an approved independent |

| Term | Definition |
|------|------------|
| | component (child organization), the Authorizing Official must have the authority to bind the parent organization. |
| Closeout | The process by which the federal agency or pass-through entity determines that all applicable administrative actions and all required work of the federal award have been completed and takes actions as described in § 200.344. |
| Cognizant Agency for Audit | The federal agency designated to carry out the responsibilities described in § 200.513(a). The cognizant agency for audit is not necessarily the same as the cognizant agency for indirect costs. |
| Cognizant Agency for Indirect Costs | The federal agency responsible for reviewing, negotiating, and approving cost allocation plans or indirect cost proposals on behalf of all federal agencies. The cognizant agency for indirect costs is not necessarily the same as the cognizant agency for audit. |
| Contract | For the purpose of federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a federal award. For additional information on subrecipient and contractor determinations, see § 200.331. |
| Cooperative Agreement | A legal instrument of financial assistance between a federal agency and a recipient that, consistent with 31 U.S.C. 6302-6305: (1) Is used to enter into a relationship the principal purpose of which is to transfer anything of value to carry out a public purpose authorized by a law of the United States (see 31 U.S.C. 6101(3)); and not to acquire property or services for the federal Government's direct benefit or use; (2) Is distinguished from a grant in that it provides for substantial involvement of the federal agency in carrying out the activity contemplated by the federal award. |
| Cost Share | The portion of project costs not paid by federal funds. This term includes matching, which refers to required levels of cost share that you must provide to the project. |
| De Minimis Indirect Cost Rate | Recipients that do not have a current federal negotiated indirect cost rate may elect to charge a de minimis rate of up to 15 percent (15%) of modified total direct costs (MTDC). The recipient is authorized to determine the appropriate rate up to this limit. See § 200.414. |
| Disallowed Cost | Charges to a federal award that the federal agency or pass-through entity determines to be unallowable in accordance with applicable federal statutes, regulations, the provisions of 2 CFR 200, or the terms and conditions of the federal award. |

**JA174**

| Term | Definition |
|---|---|
| Equipment | Tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost that equals or exceeds the lesser of the capitalization level established by the recipient for financial statement purposes, or $10,000. |
| Expenditure | Expenditures means charges made by a recipient to a project or program for which a federal award is received. The charges may be reported on a cash or accrual basis as long as the methodology is disclosed and consistently applied. |
| Federal Funding Accountability and Transparency Act (P.L. 109-282, 9/26/2006) | The Federal Funding Accountability and Transparency Act (FFATA) requires information about federal awards to be posted on a single, searchable website (www.USASpending.gov) that is open for public access. |
| Federal Share | The portion of the approved project costs paid using federal (NEA) funds. |
| Grant or Grant Agreement | A legal instrument of financial assistance between a federal agency and a recipient or between a pass-through entity and a subrecipient, consistent with 31 U.S.C. 6302, 6304. A grant is distinguished from a cooperative agreement in that it does not provide for substantial involvement of the federal agency in carrying out the activity contemplated by the federal award. |
| Indian Tribe | Indian Tribe means any Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. Chapter 33), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. See 25 U.S.C. 5304(e). This includes any Indian Tribe identified in the annually published Bureau of Indian Affairs list of "Indian Entities Recognized and Eligible to Receive Services" and other entities that qualify as an Alaska Native village or regional village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act. |
| Indirect Costs | Those costs incurred for a common or joint purpose benefiting more than one cost objective and not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved. Institutes of higher education (IHE) often use the term facilities and administrative (F&A) cost to refer to indirect costs. |

JA175

| Term | Definition |
|---|---|
| Modified Total Direct Cost (MTDC) | Indirect cost rate base that consists of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each subaward (regardless of the period of performance of the subawards under the award).<br><br>MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs, and the portion of each subaward in excess of $50,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs and with the approval of the cognizant agency for indirect costs. |
| Non-federal Entity | Either a State, local government, Indian Tribe, Institution of Higher Education (IHE), or nonprofit organization that carries out a federal award as a recipient or subrecipient. |
| Participant | Generally, an individual participating in or attending program activities under a federal award, such as trainings or conferences, but who is not responsible for implementation of the federal award. Individuals committing effort to the development or delivery of program activities under a federal award such as consultants, project personnel, or staff members of a recipient or subrecipient are not program participants.<br><br>Examples may include community members attending a community outreach program, members of the public whose perspectives or input are sought as part of a program, students, or conference attendees. |
| Participant Support Costs | Direct costs that support participants and their involvement in a federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants. |
| Period of Performance (POP) | The time interval between the start and end date of a federal award. It is the time during which the recipient must perform and complete the work authorized under the federal award. Only costs associated with approved activities incurred during this period and approved administrative closeout costs can be charged to the award. |
| Personally Identifiable Information (PII) | Information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual. The definition of PII is not attached to any single category of information |

JA176

| Term | Definition |
|------|-----------|
|  | or technology. Instead, it requires a case-by-case assessment of the specific risk that an individual can be identified.<br><br>Examples of PII include but are not limited to social security numbers; passport numbers; credit card numbers; clearances; bank numbers; biometrics; date and place of birth; mother's maiden name; criminal, medical and financial records; and educational transcripts. |
| Project Cost | Total allowable costs incurred under a federal award and all cost sharing, including third-party contributions. |
| Recipient | An entity that receives a federal award directly from a federal agency to carry out an activity under a federal program. The term recipient does not include subrecipients or individuals that are program participants and beneficiaries of the award. |
| Source Documentation (Financial Management) | Documentation that provides evidence that expenditures allocable to an award were incurred and paid during the approved period of performance. Source Documentation includes receipts, invoices, contracts, copies of cancelled checks, transaction reports, bank statements, charge/debit card statements, and in-kind contribution reports. All source documentation must specifically identify the expenditures. |
| Supply | All tangible personal property other than those described in the equipment definition. A computing device is a supply if the acquisition cost is below the lesser of the capitalization level established by the recipient or subrecipient for financial statement purposes or $10,000, regardless of the length of its useful life. |
| System for Award Management (SAM.gov) | Federal repository into which a recipient must provide the information required for the conduct of business as a recipient. |
| Termination | An action a federal agency takes to discontinue a federal award, in whole or in part, at any time before the planned end date of the period of performance. Termination does not include discontinuing a federal award due to a lack of available funds. |
| Third-party In-Kind Contributions | The value of services and property donated to the recipient and used to meet cost sharing requirements. Volunteer services furnished by third-party professional and technical personnel, consultants, and other labor may be counted as cost sharing if the service is necessary for the program. Donated property from third parties may include items such as |

JA177

| Term | Definition |
|---|---|
| | equipment, venue space, office supplies, or workshop and classroom supplies necessary to carry out the NEA-supported project. |
| Unique Entity Identifier (UEI) | The universal identifier assigned by SAM.gov to uniquely identify an entity. |
| Unrecovered Indirect Costs | The difference between the amount of indirect costs charged to the federal award and the amount which could have been charged to the federal award under the recipient's Negotiated Indirect Cost Rate Agreement. |

## 5. SAM.gov Required Registration (2 CFR 25)

2 CFR 25 provides guidance on requirements for applicants, recipients, and subrecipients to obtain a unique entity identifier (UEI), as required by the Federal Funding Accountability and Transparency Act (P.L. 109-282, 9/26/2006), and for entities to register in the System for Award Management (SAM.gov) repository for standard information about applicants and recipients. See **APPENDIX B: PART 25 AWARD TERM - SAM.GOV AND UEI REQUIREMENTS** for more information about this term of your award.

**NOTICE: You must maintain a current and active registration in SAM.gov until you submit all final reports required under this federal award or receive the final payment, whichever is later.**

1. The NEA may not issue a federal award or amend an existing federal award to provide additional federal funds if the entity is not in compliance with the requirements to maintain an active registration with SAM.gov. **The NEA will withdraw any funding offers and reject the application(s) of any applicant that has an inactive SAM.gov registration as of September 1 of the current federal fiscal year** (2 CFR 25.205).

2. The NEA may not issue a federal award or amend an existing federal award to provide additional federal funds when SAM.gov shows that the entity has delinquent federal debt. **The NEA will withdraw any funding offers and will reject the application(s) of any applicant that has a YES in the Delinquent Federal Debt Indicator in their SAM.gov registration as of September 1 of the current federal fiscal year** (OMB Circular A-129).

3. The NEA will not release award funds if the entity is not in compliance with the requirement to maintain an active registration with SAM.gov or has delinquent federal debt. **Failure to resolve the delinquent federal debt or obtain an active SAM registration within 150 days after the end date of the period of performance for the award will result in de-obligation of any funds**

**remaining on the award (**2 CFR 25.205)**. See Closeout, Adjustments, and Continuing
Responsibilities** for more information.

## 6.  Mandatory Disclosures (§ 200.113)

Applicants and recipients of a federal award must promptly disclose whenever, in connection with the
federal award, it has credible evidence of the commission of a violation of federal criminal law
involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States
Code or a violation of the civil False Claims Act (31 U.S.C. 3729-3733).

Recipients are required to report matters related to recipient integrity and performance in accordance
with Appendix XII to Part 200. You are also required to provide this as a written disclosure to the NEA
Office of Grants Management at grants@arts.gov and the NEA Office of Inspector General at
oig@arts.gov.

Failure to make required disclosures can result in any of the remedies described in **Section 20.
Remedies for Noncompliance and Termination**. (See also § 200.339, 2 CFR Part 180, 31 U.S.C. 3321,
and 41 U.S.C. 2313.)

## 7.  Conflicts of Interest (§ 200.112 and .318(c)) and Related Mandatory Disclosures (§ 200.113)

You must have written conflict of interest policies that ensure all employees, board members, officers,
or agents engaged in the administration of federal grants and cooperative agreements, avoid conflicts
of interest. Your standards of conduct must provide for disciplinary actions to be applied for violations
by employees, officers, agents, or board members.

You must maintain written standards of conduct covering conflicts of interest and governing the
actions of your employees engaged in the selection, award, and administration of contracts supported
by the federal award. No employee, officer, agent, or board member with a real or apparent conflict of
interest may participate in the selection, award, or administration of a contract supported by the NEA
award. A conflict of interest includes when the employee, officer, agent, or board member, any
member of their immediate family, their partner, or an organization that employs or is about to
employ any of the parties indicated herein, has a financial or other interest in or a tangible personal
benefit from an entity considered for a contract. An employee, officer, agent, and board member of

the recipient may neither solicit nor accept gratuities, favors, or anything of monetary value from contractors.

If your organization has a parent, affiliate, or subsidiary organization that is not a State, local government, or Indian Tribe, you must also maintain written standards of conduct covering organizational conflicts of interest. Organizational conflicts of interest mean that because of relationships with a parent company, affiliate, or subsidiary organization, the recipient is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization.

Recipients are required to disclose to us any actual or potential conflicts, including but not limited to the following:

- **NEA Panelist.** Any individuals who serve as NEA panelists cannot review an application from an organization with which they are affiliated as an employee, board member, officer, or agent. If a panelist later becomes associated with an award project that they reviewed, then that individual cannot act as an Authorizing Official for that award. This prohibition is in effect throughout the entire period of performance for the award. Recipients must disclose any affiliations with an NEA panelist to the as soon as they become aware of the affiliation.
- **National Council on the Arts member**. Recipients must disclose whether any of their personnel are National Council on the Arts Members. Once an Authorizing Official, Project Director, or Grants Administrator for an applicant or recipient organization is nominated to the National Council on the Arts, that individual must recuse themselves from deliberating or voting on that organization's application and award actions, and from submitting payment requests on that organization's behalf. Recipients must disclose any affiliations with National Council on the Arts member to the NEA as soon as they become aware of the affiliation.

## 8. Whistleblower Protection (§ 200.217)

An employee of a recipient must not be discharged, demoted, or otherwise discriminated against as reprisal for disclosing information that the employee reasonably believes is evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal contract or grant.

Recipients must inform their employees in writing of employee whistleblower rights and protections under 41 U.S.C. 4712.

## 9. Statutory and National Policy Requirements (§ 200.300 and .209)

Recipients are responsible for complying with all requirements of the federal award, including those based on the following:

**Statutory Policy Requirements** (§ 200.300(a)). Recipients are required to ensure that federal funding is expended, and programs are in full accordance with the U.S. Constitution, applicable federal statutes, and regulations—including provisions protecting free speech, religious liberty, public welfare, and the environment, and those prohibiting discrimination, including those in general appropriations provisions.

**NEA's Enabling Legislation.** Recipients are required to execute their projects in accordance with the NEA's enabling legislation that requires "artistic excellence and artistic merit." Projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 U.S.C. 952(j)-(l); 20 U.S.C. 954(d) and (l).

**Financial Assistance General Certifications and Representations** (§ 200.209 and .415). Applicants for and recipients of federal financial assistance are required to complete and agree to the Financial Assistance Certifications in SAM.gov when registering or renewing a registration. The Representations and Certifications (Reps and Certs) are a common set of certifications and representations required by federal statutes or regulations in accordance with the guidance under 2 CFR 200. Applicants and recipients must keep these certifications and representations current, accurate, and complete as part of their SAM.gov entity registration.

**Final Financial Report and other Financial Reports Certifications** (§ 200.415). Only an official at the recipient organization who is authorized to legally bind the organization may submit financial reports, including the Final Financial Report. Electronic submission of a financial report through the REACH system constitutes signing the certification. The official must agree to the following certification:

> *By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729-3730 and 3801-3812).*

See **Appendix A** for more details regarding these statutory and national policy requirements. See **17: Performance and Financial Reporting** for additional information.

JA181

## 10. Financial Management (§ 200.302) and Internal Controls (§ 200.303)

### *Financial Management*

The recipient's financial management system, including records documenting compliance with federal statutes, regulations, and the terms and conditions of your NEA award must be sufficient to allow for the preparation of reports and to track project expenditures to verify that the award funds and required cost share funds were used in accordance with the NEA's legislation, federal statutes, regulations, and the terms and conditions of the award.  Required reports include payment requests, annual financial reports (if applicable), the Final Financial Report, and any other report indicated in the terms and conditions of your award.

Financial management systems must meet standards described in **§ 200.302,** including:

- Identification of all federal awards received and expended and the federal programs under which they were received. Federal program and federal award identification must include, as applicable, the Assistance Listings title and number, federal award identification number, year the federal award was issued, and name of the federal agency.
  - You can find these award details on the **Official Notice of Action** document in the Documents tab for the award in REACH.
- Accurate, current, and complete identification of federal award data, financial results, and the ability to provide source documentation upon request.
- All records must be supported by source documentation.
- Written procedures for determining the allowability of costs and for managing payments.

In addition, recipients that are units of State governments must expend and account for the federal award in accordance with State laws and procedures for expending and accounting for the State's funds.

### *Internal Controls*

Recipients must establish, document, and maintain effective internal controls over the federal award and provide reasonable assurance that the recipient is managing the award in compliance with federal statutes, regulations, and the terms and conditions of the federal award. See recommended compliance guidance regarding documenting internal controls at **§ 200.303.** Recipients must take prompt action when instances of noncompliance are identified.

**Cybersecurity.** Recipients must take reasonable cybersecurity and other measures to safeguard information including protected personally identifiable information (PII) and other types of information. This also includes information the federal agency designates as sensitive or other

**JA182**

information the recipient considers sensitive and is consistent with applicable federal, State, local, and tribal laws regarding privacy and responsibility over confidentiality.

## 11. Cash Management Standards / Federal Payment (§ 200.305)

Recipients must have written procedures to minimize the time elapsing between the receipt of federal award funds and the disbursement of federal award funds to avoid having excessive federal funds on hand. The recipient must make timely payments to contractors in accordance with the contract provisions.

The NEA will withhold payments if:

- The recipient has failed to comply with the terms and conditions of the federal award,
- The recipient is delinquent in a debt to the United States, or
- The recipient notifies the NEA that it is withholding payments from contractors to assure satisfactory completion of work on the award.

**Payment Requests.** Requests for advance payment are limited to a recipient's immediate cash requirements in carrying out the purpose of your approved project and are not to exceed anticipated expenditures for a 30-day period (§ 200.305(b)(1)). This 30-day period starts with the date you submit the payment request in REACH. Any funds requested from the NEA and not liquidated within 30 days must be returned to us. See the *How to Manage Your NEA Award Handbook* for instructions on returning funds.

**Payments to States.** For recipients that are units of State government, payments are governed by Treasury-State Cash Management Improvement Act (CMIA) agreements and default procedures codified at 31 CFR 205 and Treasury Financial Manual (TFM) 4A-2000, "Overall Disbursing Rules for All Federal Agencies."

## 12. Cost Sharing (20 U.S.C. 954(e) and § 200.306) and Program Income (§ 200.307)

Unless otherwise stated in your award documents, NEA funds cannot exceed 50 percent of the total cost of the NEA-supported project (20 U.S.C. 954(e)). NEA funding requires a one-to-one or "dollar for dollar" cost share. This required cost share refers to the portion of project costs not paid by federal funds, and may include your own funds, donations, non-federal grants, and other revenue.

The NEA notifies you of the required cost share for your award in the Cost Share section of the Terms and Conditions document on the Documents Tab for the award in REACH.

Important:

- All costs in your project budget, whether supported by NEA funds or the cost share, must conform to all the requirements of the federal award and must be verifiable in your records. This includes costs covered by voluntary committed cost share.
- You cannot include costs from your NEA-funded project budget in other federal awards, including other NEA awards.
- All costs included in your NEA-funded project budget must be necessary and reasonable for achieving the objectives of your NEA award and allowable per the NEA's legislation, relevant NEA program guidelines, and the §200 Cost Principles.

**Use of Unrecovered Indirect Costs as Cost Share** (§ 200.306(c)). Unrecovered indirect costs may only be included as cost share for an award if the recipient has a current Negotiated Indirect Cost Rate Agreement (NICRA) with a federal agency. See **Section 4: Selected Definitions** for more information.

**Use of Program Income** (§ 200.307). Income earned during the period of performance that results from activities supported through a NEA award is program income. These earnings can include, but are not limited to, income from fees for services, admission fees, or the use or rental of property.

The NEA allows program income to be used as part of the cost share for allowable expenses of the NEA-supported project, or for other eligible projects in the arts conducted by your organization (§ 200.307(b) and (b)(3).

## *IN-KIND COST SHARE*

A recipient may use in-kind third-party (i.e., not your own) contributions of services and property to meet the required cost share for the award. While you may use in-kind contributions to meet the required cost share for an award, the NEA cannot reimburse you for goods or services provided to you as an in-kind contribution (§ 200.306(d)-(j).

All third-party in-kind contributions must also be included as direct costs in the project budget so the NEA can determine their allowability and necessity to the project. All third-party in-kind contributions of services, goods, property, or space must be documented in your financial management system, be supported by source documentation, and have their fair market value determined as described below.

JA184

**Donated property.** The value of donated space must not exceed the fair rental value of comparable space as established by an independent appraisal of comparable space and facilities in a privately-owned building in the same locality. Donated property from third parties may include items such as equipment, office supplies, or workshop and classroom supplies. The assessed value of donated property included as cost sharing must not exceed the property's fair market value at the time of the donation.

**Volunteer services furnished by third-party professional and technical personnel, consultants, and other labor.** These services may be counted as cost sharing if the service is necessary for the NEA project. Rates for third-party volunteer services must be consistent with those paid for similar work by the recipient. When the required skills are not found in the recipient's workforce, rates must be consistent with those paid for similar work in the labor market where the recipient competes for the services involved. Fringe benefits that are allowable, allocable, and reasonable may be included in the valuation.

**Volunteer services furnished by employees of a third-party organization.** When a third-party organization furnishes the services of an employee, these services must be valued at no greater than the employee's regular rate of pay plus an amount of fringe benefits that is reasonable, necessary, allocable, and otherwise allowable, and indirect costs at either the third-party organization's approved federally-negotiated indirect cost rate or, a rate in accordance with § 200.414(d) provided these services employ the same skill(s) for which the employee is normally paid. Where donated services are treated as indirect costs, indirect cost rates will separate the value of the donated services so that reimbursement for the donated services will not be made.

**Ineligible Cost Share Sources** (§ 200.306 and .403). Recipients may not use these sources to meet the cost share requirement for an award:

- **Other federal funds.** This includes other NEA funds (§ 200.306(b)(5)). This also includes federal funds that have been sub-awarded or disbursed to you from a State Arts Agency, Regional Arts Organization, or another organization. Consult your other funders to determine if their funding to you includes federal funds.
- Cash funding and/or third-party **in-kind contributions used as cost share for another NEA award** or another federal program/award (§ 200.306(b)(2) and .403(f)).
- Contributions or gifts to your organization that are **restricted** and cannot be used to support the project. This includes gifts (bequeathed or otherwise) which are not available to your organization for use during the award's period of performance.

JA185

## 13. General Procurement Standards (§ 200.317-.327)

**States and Tribal Entity Recipients.** A State or Indian Tribe must follow the same policies and procedures that you use for procurements with non-federal funds. If such policies and procedures do not exist, then you must follow the procurement standards in § 200.318 through .327. In addition to your own policies and procedures, States or Indian Tribes must also comply with the procurement standards in § 200.321 through .323, and .327.

**All Other Recipients.** All other recipients and subrecipients must follow the procurement standards in § 200.318 through .327.

Documented procurement procedures. You must maintain and use documented procedures for procurement transactions under a federal award, including for acquisition of property or services. These documented procurement procedures must be consistent with State, local, and tribal laws and regulations and the standards identified in § 200.317 through .327**.** The NEA may ask to review your procurement policy, plans, and other documents such as requests for proposals and independent cost estimates.

**Oversight of contractors.** Recipients must maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts or purchase orders. See § 200.501(h) for more information.

**Avoidance of unnecessary or duplicative items.** Your procedures must avoid the acquisition of unnecessary or duplicative items. You should consider consolidating or breaking out procurements to obtain a more economical purchase. When appropriate, you should conduct an analysis comparing leasing and purchasing equipment to determine the most economical approach.

**Responsible contractors.** You must award contracts only to responsible contractors that possess the ability to perform successfully under the terms and conditions of a proposed contract. You must consider contractor integrity, public policy compliance, proper classification of employees (see the Fair Labor Standards Act, 29 U.S.C. 201, chapter 8), past performance record, and financial and technical resources when conducting a procurement transaction. See also § 200.214.

**Procurement records.** You must maintain records sufficient to detail the history of each procurement transaction. These records must include the rationale for the procurement method, contract type selection, contractor selection or rejection, and the basis for the contract price.

**Settlement of contractual and administrative issues.** You are responsible for the settlement of all contractual and administrative issues arising out of your procurement transactions. These issues include, but are not limited to, source evaluation, protests, disputes, and claims.

**Competition** (§ 200.319). You must conduct all procurement transactions under an NEA award in a manner that provides full and open competition and is consistent with the standards of § 200.319 and .320. You are encouraged to consider small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms for procurement contracts under a federal award. (§ 200.321(a))

**Procurement methods** (§ 200.320). There are three types of procurement methods:

1. Informal procurement methods for micro-purchases and simplified acquisitions,
2. Formal procurement methods through sealed bids or proposals, and
3. Noncompetitive procurement methods.

For any of these methods, you must maintain and use documented procurement procedures, consistent with the standards of § 200.317 through .320.

You can access the Federal Acquisition Regulation (FAR) at https://www.acquisition.gov/browse/index/far for more information and for procurement thresholds. **Note that the thresholds are subject to change, so you should use the thresholds in place at the time of your procurement action.**

**Informal Procurement Methods.** You may use informal procurement methods when the value of the procurement transaction under the federal award does not exceed the simplified acquisition threshold. Recipients may also establish a lower threshold. You may be able to take advantage of the flexibilities found by using informal procurement methods such as:

- **Micro-purchases.** (§ 200.320(a)(1)) and the Federal Acquisition Regulation (FAR) at 48 CFR Part 2, subpart 2.1). For the micro-purchase threshold, you may self-certify a threshold up to $50,000 on an annual basis and must maintain and make documentation available to the NEA and auditors in accordance with § 200.334. The self-certification must include a justification, clear identification of the threshold, and supporting documentation.

  You may award micro-purchases without soliciting competitive price or rate quotations if you consider the price reasonable based on research, experience, purchase history, or other information; and maintain documents to support this conclusion.

JA187

- **Simplified acquisitions** (§ 200.320(a)(2)) and the FAR at 48 CFR part 2, subpart 2.1.)  You may use this method when the aggregate dollar amount of your procurement transaction is higher than the micro-purchase threshold but does not exceed the simplified acquisition threshold in the FAR. You are responsible for determining an appropriate simplified acquisition threshold based on internal controls, an evaluation of risk, and your documented procurement procedures, which may be lower than, but must not exceed, the threshold established in the FAR.

**Formal procurement methods.** You are required to use formal procurement methods when the value of the procurement transaction under an NEA award exceeds the simplified acquisition threshold of your organization. Formal procurement methods are competitive and require public notice. Refer to § 200.320 (b) for formal procurement methods.

**Noncompetitive procurement.** You may only use the noncompetitive procurement method if one of the following circumstances applies:

- The aggregate amount of the procurement transaction does not exceed the micro-purchase threshold.
- The procurement transaction can only be fulfilled by a single source.
- The public exigency or emergency for the requirement will not permit a delay resulting from providing public notice of a competitive solicitation.
- You request in writing to use a noncompetitive procurement method, and the NEA provides written approval. The NEA may request further information in support of any such request.
- After soliciting several sources, competition is determined inadequate.

**Buy American Act (41 U.S.C. 8301-8305) and Domestic Preference for Procurement** (§ 200.322) You are strongly encouraged to purchase American-made equipment in accordance with the Buy American Act. Furthermore, you should, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. (§ 200.322(a))

## 14. Cost Principles (Part 200 – Subpart E)

The allowability of costs under your NEA award is determined in accordance with the NEA's legislation and appropriate NEA program guidelines or program solicitation, and the cost principles. All costs

JA188

included in your approved project budget and on payment requests and financial reports for the
award, whether supported with NEA funds or cost share funds, must be:

- Necessary and reasonable for the performance of the federal award (§ 200.403(a)).
- Allocable and in conformance with these cost principles and as set forth in the award (§ 200.403(b)).
- Consistent with written policies and procedures that apply uniformly to both federally financed and other activities of the recipient (§ 200.403(c)).
- Accorded consistent treatment as either a direct or indirect cost (§ 200.403(d)).
- Determined in accordance with generally accepted accounting principles (GAAP) (§ 200.403(e)).
- Not included as a cost or used to meet cost sharing requirements of any other federally financed program (§ 200.403(f)).
- Adequately documented for reporting and audit purposes (§ 200.403(g)).
- Incurred during the approved period of performance and budget period (§ 200.403(h)).

Where the determination of cost allowability differs, the NEA program guidelines, GTCs, and any
specific terms and conditions, as appropriate, take precedence over § 200.

## *UNALLOWABLE COSTS*

You should refer to the program guidelines applicable to your award for the full list of unallowable
costs and activities. The following is a selection of common costs that are unallowable based on NEA
legislation and policy:

- Awards to individuals or organizations to honor or recognize achievement (P.L. 111–88, October 30, 2009, Sec. 438 (2)).
  - Stipends and fees for individuals or organizations who provide services or goods to you under the federal award are allowable.
- Cash reserves and endowments (NEA guidelines).
- Construction, purchase, or renovation costs of facilities or land (NEA guidelines).
  - Costs associated with design fees, preparing space for an exhibit, installation or de-installation of art, and community planning are allowable.
- Costs to bring a project into compliance with federal award requirements (NEA guidelines).
- Compensation to foreign nationals, including travel to or from foreign countries, when those expenditures are not in compliance with regulations issued by the U.S. Treasury Department Office of Foreign Assets Control (OFAC Sanctions/NEA guidelines).
- Subgranting or re-granting (P.L. 111–88, October 30, 2009, Sec. 438 (2)).
- Gifts and prizes, including cash prizes as well as other items with monetary value (e.g., electronic devices, gift certificates). (NEA guidelines)

**JA189**

- The purchase of vehicles such as cars, vans, buses, trucks, and sport utility vehicles. (NEA guidelines).
- Visa costs paid to the U.S. Government (P.L. 109-54, Title III General Provisions, Sec. 406).
  - Costs associated with preparing material for submission for a visa is allowable.

### ALLOWABILITY OF COMMON COSTS (§ 200.420 through 476)

**Pre-Award Costs.** The NEA does not approve costs incurred prior to the start date of the period of performance. Do not include these costs in your project budget or subsequent financial reports for your award (§ 200.308(g)(1)).

**Administrative Closeout Costs.** Administrative closeout costs may be included in your project budget. and incurred until the due date of the final report(s). You must liquidate these costs prior to the due date of the final report(s) (§ 200.472). Allowable costs include salaries of personnel preparing final reports, costs associated with the disposition of equipment and property, and related indirect costs.

**Participant support costs** (§200.456). Participant support costs must be documented in your policies and procedures and treated consistently. Allowable costs include stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care and per diem paid directly to or on behalf of program participants participating in or attending program activities under a federal award such as trainings or conferences, but who are not committing effort to the development or delivery of program activities under the award.

- Consultants, project personnel, and staff members of a recipient organization are not program participants.
- Direct costs that support participants' temporary dependent care needs (dependent is defined in 26 U.S.C. 152) to participate in or attend a program activity under an NEA award are allowable, as long as the classification of items as participant support costs are documented in the recipient's written policies and procedures and treated consistently across all federal awards.

**Conferences** (§ 200.432). A conference is an event whose primary purpose is dissemination of technical information beyond the recipient. Conference hosts/sponsors must exercise discretion and judgment in ensuring that conference costs are appropriate, necessary, and managed to minimize costs to the award. Allowable costs include the rental of facilities, speakers' fees, attendance fees, costs of meals and non-alcoholic refreshments, local transportation, and other items incidental to such conferences unless further restricted by the terms and conditions of the federal award. This includes the costs of identifying and providing locally available dependent-care resources for program participants as needed. Refer to **Section 15: Travel** for more information.

- Costs associated with social activities and entertainment activities at a conference such as closing dinners or receptions are unallowable. Entertainment, gifts, and prizes are also unallowable.

**Contingency provisions** (§ 200.433). Contingency provisions are estimates of future costs associated with events/conditions that may occur and which are indeterminable at the time a project budget is submitted. You may include contingency amounts for specific items of cost if the amount is estimated using broadly accepted cost estimating methodologies and specified in award budget (e.g., production contingency). To be allowable, these amounts must comply with the cost principles, be necessary and reasonable for the accomplishment of project objectives and be verifiable from your records.

- Contingency amounts for major project scope changes, unforeseen risks, or extraordinary events are unallowable and cannot be included in the project budget.

**Entertainment** (§ 200.438). Costs associated with amusement, diversion, and social activities are unallowable. Activities such as receptions, parties, galas, dinners, and other community social gatherings are unallowable. This includes costs such as catering, gifts, and gift cards, as well as costs for the planning, staffing, and supplies for the activities. Generally, this also includes activities at venues such as bars, wineries, and breweries where the consumption of alcohol/social activity is the primary purpose of the venue (NEA guidelines).

- Alcoholic beverages are unallowable.

**Fundraising** (§ 200.442). A percentage of salaries and fringe benefits for development or fundraising staff, or fees to contractors, to raise funds used as cost share for the NEA project during the period of performance are allowable. Costs related to development/fundraising staff time and effort spent managing the NEA award are also allowable.

- Costs of fundraising to benefit the general operations of the recipient are unallowable. This may include costs related to financial campaigns, endowment drives, solicitation of gifts and bequests, or similar expenses incurred to raise capital or obtain contributions.
- Costs for events or other activities that are only open to donors are also unallowable.

**Rental costs of real property for home office workspace** (§ 200.465(f)). Rental of any property owned by any individuals or entities affiliated with the recipient, including commercial or residential real estate, for purposes such as a home office is unallowable.

**JA191**

**Publication and printing costs** (§ 200.461)   Costs related to the development and production of items as part of the approved NEA project activity (e.g., publishing books or exhibition catalogues, or making recordings or films for distribution) and incurred during the period of performance are allowable. (§ 200.461)

**Selling and marketing costs (**NEA guidelines, § 200.467, § 200.421(e)(3)).
Costs of selling and marketing any products or services of the recipient are unallowable. This includes costs of goods for resale such as the sale of concessions, promotional merchandise, food and/or beverages, T-shirts or other clothing, artwork, or other items for resale. This includes items sold via online or virtual sales/shops and at art markets. It also includes any staffing, technology, or facilities costs related to retail activities.

**Prohibited telecommunications and video surveillance services and equipment** (§ 200.216 and .471; P. L. 115-232, section 889). You may not buy or obtain, nor extend or renew a contract for, covered telecommunications and video surveillance services and equipment that is prohibited by P. L. 115-232, section 889.

## INDIRECT COSTS (§ 200.414)

Recipients may claim indirect costs based on the following:

- **Negotiated Indirect Cost Rate Agreement (NICRA).** A current and appropriate NICRA negotiated with your federal cognizant agency; or,
- **De Minimis Rate.** A recipient that does not have a current NICRA (including provisional rate) may elect to charge a de minimis rate of up to 15% of modified total direct costs (MTDC) in their project budget.
  - When applying the de minimis rate, costs must be consistently charged as either direct or indirect costs and may not be double charged or inconsistently charged as both.
  - The de minimis rate does not require documentation to justify its use and may be used indefinitely. Once elected, you must use the de minimis rate for all federal awards for which you elect to charge indirect costs until you request and receive a negotiated rate (§ 200.414(f)).

**Research Indirect Cost Rates.** If you are claiming indirect costs under a NICRA, indirect cost rates applicable to research generally can only be used in project budgets for the NEA's Office of Research & Analysis (ORA) awards. You must use rates applicable to other activities for most NEA awards. Refer to the NEA guidelines applicable to your program, taking into account your own institutional guidance.

You cannot claim both direct overhead/administrative costs and indirect costs in your NEA project budget.

**Resources.** More information about indirect costs for a NEA award can be found in the *How to Manage Your NEA Award Handbook* and the *Indirect Cost Guide* on the NEA's website.

## 15. Travel (§ 200.475 and 41 CFR 301-10)

Travel costs include transportation, lodging, subsistence, and related items incurred by the recipient's employees who are in travel status on official business attributable to work under a federal award. You may charge these costs on an actual cost basis, on a per diem or mileage basis, or on a combination of the two, provided the method used is applied to an entire trip and not to selected days of the trip. The method used must be consistent with those normally allowed in like circumstances in the recipient's other activities and in accordance with your established written policies.

For travel costs you charge to the NEA award, source documentation must justify that participation of the individual is necessary for the federal award, and that the costs are reasonable and consistent with your established written policy.

**Commercial Air Travel** (§ 200.475(e)). Airfare costs, whether domestic or foreign, in excess of the basic least expensive unrestricted accommodations class offered by commercial airlines are unallowable, except when such accommodations would:

- Require circuitous routing.
- Require travel during unreasonable hours.
- Excessively prolonged travel.
- Result in additional costs that would offset the transportation savings; or
- Offer accommodations not reasonably adequate for the traveler's medical needs.

You must justify and document these conditions on a case-by-case basis for the use of first-class or business-class airfare to be allowable in such cases.

**Fly America Act** (41 CFR 301-10.131 through .143). You are required to follow the provisions of the Fly America Act (49 U.S.C. 40118). All air travel and cargo transport services funded by NEA funds or cost share funds must use a U.S. flag air carrier or a foreign airline under an air transport agreement (codeshare agreement) with the United States when these services are available. To comply with Fly

America regulations, you must purchase the flight via the U.S. airline's designator and flight number if the flight is shared between a U.S. and a foreign airline.

There are some exceptions to the Fly America Act, see 41 CFR 301-10.135 through .138. If you do use a foreign airline, you must provide the NEA with a certification, including a justification as to why your travel met one of the exceptions. Ticket cost, convenience, or traveler preference are not exceptions to the Fly America Act. Additional information may be requested, if necessary.

**Foreign Travel.** Foreign travel is any travel outside the United States, its territories, and possessions. For foreign travel not originally identified and approved in your award budget, you must request prior written approval from the Office of Grants Management before travel is undertaken.

## 16. Changes in Your Project: Amendments (§ 200.308)

You are required to conduct your project consistent with the application and proposal that the NEA approved for funding. The approved budget for your NEA award summarizes the financial aspects of the project or program as approved during the federal award process. It includes the federal share of project costs and non-federal cost share.

### *NOTICE*
The NEA Office of Grants Management is the only office with the authority to issue or amend an NEA award. Written and/or verbal approval of proposed changes to an award from any other NEA office does not constitute an approved change to the award.

The NEA considers all amendment/change requests on a case-by-case basis, and approval is not guaranteed. Until you receive written approval from the Office of Grants Management, you may only incur costs consistent with the terms and conditions of the award in effect at the time of your request. You can find detailed information about how to request changes to your award in the *How to Manage Your NEA Award Handbook* on the NEA website*.*

The NEA has the right to request additional information, such as updates on specific project activities, including a revised budget or an itemized list of actual expenditures, as needed. If your organization is undergoing an audit by the NEA Inspector General's office, the NEA Office of Grants Management will review any amendment requests to the award(s) in question in conjunction with the audit resolution process.

### *CHANGES THAT REQUIRE PRIOR WRITTEN APPROVAL*

You must request prior written approval from the Office of Grants Management for the following changes to your approved award:

**Project scope changes (§ 200.308(f)(1)).** These include changes to the approved project activities, focus of the project's content, significant changes in targeted participants, and changes in the breadth or impact of projects. Scope changes also include:

- Changes in artists or key partners, if you identified them as confirmed artists or partners in your application or approved project budget.
    - You must submit a short biography for each new proposed artist along with your change request.
    - Festival artist substitutions do not require a scope change unless you are making a change to the festival's headline artists.

- Changes to your project activities, including outdoor activities and activities that cause a ground disturbance, that may impact historic properties or the environment.
    - You must complete and submit the NHPA/NEPA Questionnaire along with your change request.
- Changes in the primary partner for Our Town awards or other NEA funding opportunities which require primary partners.
- Changes in key personnel identified by name or position in Research Grants in the Arts, Research Labs, or other awards managed by the NEA Office of Research & Analysis (ORA). For these awards, you must also notify the NEA if there is a disengagement from the project for more than three months, or a 25% reduction in time and effort devoted to the award over the course of the period of performance, by the approved project director or principal investigator.

**Budget revisions** (§ 200.308(b)(c)(f) and § 200.407). These include:

- Budget changes due to a significant change in the scope of the NEA-supported project.
- Adding permanent equipment.
- Adding foreign travel.
- Adding indirect costs allowable under a Negotiated Indirect Cost Rate Agreement (NICRA) or the de minimis rate.

**Pre-Award Costs.** The NEA does not approve costs incurred prior to the start date of the period of performance. Do not include these costs in your project budget or subsequent financial reports for your award. (§ 200.308(g)(1))

**JA195**

**Period of performance changes/time extensions.** If additional time is needed to complete your approved project activities, you may request a change to the period of performance, including a new start date (this date can be no earlier than the earliest allowable start date per the NEA's guidelines) and/or an extension to the end date.  All requests for no-cost time extensions should be submitted as soon as you are aware of the need for additional time (§ 200.308(f)(10)).

**Final report extensions.** If you completed all project activities and incurred all approved costs within your period of performance, but need more time to prepare your final reports, you may request an extension to the due date for your required reports. (§ 200.344 (b))

- You must request a final report extension if you are submitting a payment request with your final reports and your entity's SAM registration is expired or if your SAM registration shows you have delinquent federal debt subject to offset. See the *How to Manage Your NEA Award Handbook* for additional information.

## *CHANGES THAT DO NOT REQUIRE PRIOR WRITTEN APPROVAL*
**Project scope changes, including:**

- Changes in your organizational management/project administration, unless specified in your award document.
    - This does not apply to Research awards.
    - If there are significant changes to the leadership or senior staff of your organization and/or the project director, you must submit a personnel update. Refer to the How to Manage your NEA Award Handbook for details.
- Changes in artists, participants, or project partners not identified as committed/confirmed in the approved project.
- Addition or removal of auxiliary programming provided the activity is allowable and it does not impact the overall project scope.

**Budget revisions, including:**

- Transfers among previously approved direct cost line items.
    - This does not include transferring funds for foreign travel.
- Elimination of an allowable project cost that does not affect the scope of the award.
- Replacement of in-kind cost share with cash cost share if the source of the new cash cost share is allowable.

**JA196**

**Terminating/Declining an Award.** You may decide to terminate or withdraw from the award. Please see the *How to Manage Your NEA Award Handbook* for instructions and contact us at grants@arts.gov.

## 17. Performance and Financial Reporting (§ 200.328 through 344)

Refer to the *How to Manage Your NEA Award Handbook* and the Manage Your Award section of the NEA website for more information on preparing and submitting your required payment progress report, annual financial and performance reports (if applicable), and final reports specific to your award.

**Payment Progress Report** (20 U.S.C. 954(j)). A progress report is required with your payment request once the cumulative amount of NEA funds requested exceeds two-thirds of the NEA award amount. This information is reported on the payment request form and must be approved before the NEA can release any funds exceeding two-thirds of the NEA award amount. The progress report must include a description of award-supported activities completed since the award's period of performance start date and those activities scheduled for the remainder of the period of performance.

**Annual Financial Report** (§ 200.328(b)). You must submit a financial report no less than annually. The required reporting dates will be indicated on the Forms & Reports tab in REACH.

- For awards with a period of performance of **12 months or less**, the Final Federal Financial Report submitted with your final reports will meet this requirement.
- For awards with a period of performance **longer than 12 months**, you must submit an Annual Financial Report no later than 90 days after each 12-month reporting period.
  - Example: An award with a period of performance from January 1, 2025, to December 31, 2026, will have an Annual Financial Report due by March 31, 2026.
- The NEA may waive this requirement upon receipt of an acceptable payment request showing actual expenditures, including cost share funds, during the reporting period.

**Annual Performance Progress Report** (§ 200.328(c)). You must submit a performance progress report no less than annually. The required reporting dates will be indicated on the Forms & Reports tab in REACH.

- For awards with a period of performance of **12 months or less**, the Final Descriptive Report submitted with your final reports will meet this requirement.
- For awards with a period of performance **longer than 12 months**, you must submit the Annual Performance Progress Report no later than 90 days after each 12-month reporting period.

JA197

Example: An award with a period of performance from January 1, 2025, to December 31, 2026, will have an Annual Performance Progress Report due by March 31, 2026.

- The NEA may waive this requirement upon receipt of an acceptable Payment Progress Report during the reporting period.

**Specific Reporting Requirements** (§ 200.208). The NEA may require you to submit certain information before award funds are released. This information may include but is not limited to verification of compliance with NEPA/NHPA requirements, a signed contract, in-kind documentation, an itemized list of actual expenditures to date, receipts and invoices, or quarterly reports. In general, there will be a specific term and condition indicating these additional award requirements in your award documents, when applicable.

**Final Reports** (§ 200.328, .339 and .344). To close out your award you must submit the following reports no later than 120 days after the period of performance end date:

- **Final Descriptive Report** (FDR) that provides us with information on the performance of your award activities and associated data,
- **Final Financial Report** (FFR),
- **Geographic Location of Project Activities** R**eport** and,
- Product, if identified on the Report Schedule document and tab in REACH.

**Monitoring and Reporting Program Performance** (§ 200.329 (b- c)). You are responsible for oversight of your NEA award. The approved project is expected to be completed by the end date of the period of performance. The goals and performance of the project will be measured and evaluated against the approved project activities as well as the requirements described in the NEA guidelines for your award.

You must monitor your project activities under the NEA award to ensure you are compliant with all requirements and meeting performance expectations. (§ 200.329(a))

**Significant Developments** (§ 200.329(e)). When a significant development that could impact your award occurs during the period of performance, you must immediately notify the NEA via REACH Message in the award record or at grants@arts.gov.  Significant developments include problems, delays, or adverse conditions which will impact your ability to complete the project and meet the objectives of the award. When reporting significant developments, you must include plans to correct the issues or request a change to the scope, time, or budget of your award.

**JA198**

**Failure to Submit Required Reports** (§ 200.344(h) and (i)). You are required to submit all final reports within 120 days from the end date of the period of performance, or by the extended due date as approved in writing by the Office of Grants Management.

There are severe consequences if you do not submit your final reports by the deadline, including:

- Failure to submit acceptable final reports for any award(s) renders you ineligible to receive NEA funding for five (5) years following the final report due date of the award(s) or until the delinquent final reports are submitted and accepted, whichever occurs first.
- Failure to submit acceptable final reports will also affect the NEA's ability to release payments on any of your other open awards.
- The NEA may also pursue other enforcement actions per § 200.339 and .344(i).

**Administrative Closeout and De-obligation.** If final reports are still overdue 150 days after the end of your award's period of performance, any funds remaining on the award will be de-obligated by the NEA and no longer available to you. This means you will not be able to submit payment requests to draw down these funds. This 150-day deadline is known as the Delinquency Deadline date. The NEA will also close out your award.

- If a final report extension was approved prior to the Delinquency Deadline date, you must submit acceptable final reports by the extended due date, or any remaining award funds will be de-obligated.

**Material Failure to Comply.** If you do not submit all required final reports within one year of the approved period of performance end date, the NEA must report your material failure to comply with the terms and conditions of the award to SAM.gov. (§ 200.340(a)(c)).

## 18. Property Standards: Use and Disposition (§ 200.310 through 316)

**Artwork.** Property may include commissioned, purchased, or fabricated artwork(s) approved under the NEA award. It is your responsibility for maintaining and updating property records when there is a change in the status of the property (§ 200.313 (d)).

**Equipment** (§ 200.1) includes tangible, nonexpendable, personal property having a useful life of more than one (1) year and a per unit cost that equals or exceeds the lesser of the capitalization level established by your organization, or $10,000. The NEA must approve equipment costs in your NEA project budget.

**JA199**

**Disposition of Artwork and Equipment** (§ 200.313(e) and (e)(1)). Unless otherwise specified, you will have title to artwork and equipment commissioned, purchased, or fabricated under the award, without further obligation to the federal government, if it will be used for activities similar to those approved by the NEA. One example of similar activity is selling the artwork to another museum or visual art center with the intention that it will be available to the public. It may not be de-accessioned to a private collector where it would no longer be on view to the public.

Equipment with a current fair market value of $10,000 or less (per unit) may be retained, sold, or otherwise disposed of with no further obligation to the NEA.

**Supplies** (§ 200.314). If there is a residual inventory of unused supplies exceeding $10,000 in total aggregate value, including computing devices purchased for $10,000 or less per unit, you may retain them without further obligation to the federal government, provided that they will be used for activities similar to those approved by the NEA. (See Supply under **Definitions** for more information.)

**Intangible Property** (§ 200.315). You may copyright any material that is subject to copyright and was developed, or for which ownership was acquired, under the NEA award during the period of performance. For procedural information, visit the U.S. Copyright Office at <u>www.copyright.gov</u>.

The NEA reserves a royalty-free, non-exclusive, and irrevocable right to reproduce, publish, or otherwise use work, as well as data, produced under a federal award for federal government purposes. The NEA also has the right to authorize others to do the same (§ 200.315 (b), (d), and (e)).

The NEA strongly recommends that any publication that results from an NEA award be catalogued by the Cataloging in Publication Program of the Library of Congress before final printing. This method of cataloging enables libraries to acquire and process books quickly. Publishers that are ineligible for this program may be eligible for the Library's Preassigned Control Number Program. Entering these titles in a national bibliographic database leads to greater dissemination of publications. For procedural information, visit the Library of Congress at http://www.loc.gov/publish/cip/.

JA200

## 19. Record Retention (§ 200.334) and Access

You must retain financial records, supporting documents, statistical records, and all other recipient records pertinent to a federal award for a period of three (3) years from the date of submission of the Final Financial Report (FFR). Exceptions to this three-year period include if litigation, claim, or audit is started before the expiration of the three-year period, or if the NEA notifies you in writing to extend the retention period.

**Methods for collection, transmission, and storage of information** (§ 200.336). When practicable, the NEA and the recipient must collect, transmit, and store federal award information in open and machine-readable formats. A machine-readable format is a format in a standard computer language (not English text) that can be read automatically by a computer system.

You do not need to create and retain paper copies when original records are electronic and cannot be altered. In addition, you may substitute electronic versions of original paper records through duplication or other forms of electronic conversion, provided that the procedures are subject to periodic quality control reviews. Quality control reviews must ensure that electronic conversion procedures provide safeguards against the alteration of records and assurance that records remain in a format that is readable by a computer system.

**Standards for Documentation of Personnel Expenses** (§ 200.430(g)). Charges to federal awards for salaries and wages must be based on records that accurately reflect the work performed. The records must comply with your organization's internal controls and established accounting policies. Records must support these costs for both the federal funds and cost share requirements. Personnel activity reports or equivalent documentation may be requested if your records do not meet the standards in § 200.430(g)(8).

**Equipment.** You must retain records for equipment for three (3) years after final disposition (§ 200.334(c)).

### *ACCESS TO FEDERAL AWARD INFORMATION (§ 200.337 and .338)*

**Recipient records.** The NEA, Inspectors General, the Comptroller General of the United States, or any of their authorized representatives must have the right of access to any records of the recipient pertinent to the federal award to perform audits, execute site visits, or for any other official use. This right also includes timely and reasonable access to the recipient's personnel for the purpose of interview and discussion related to such documents or the federal award in general.

**Restrictions on public access to records.** The NEA may not place restrictions on the recipient that limit public access to the records of the recipient or subrecipient pertinent to an NEA award, except for protected personally identifiable information (PII) or other sensitive information when NEA can demonstrate that such records will be kept confidential and would have been exempted from disclosure pursuant to the Freedom of Information Act (5 U.S.C. 552) or controlled unclassified information pursuant to Executive Order 13556 if the records had belonged to the NEA.

**Freedom of Information Act (FOIA).** The Freedom of Information Act (5 U.S.C. 552) does not apply to records that remain under the recipient's control except as required by § 200.315 (Intangible Property). Unless required by federal, State, local, or tribal law, recipients are not required to permit public access to their records. The recipient's records provided to the NEA generally will be subject to FOIA and applicable exemptions**.**

**Disclosure Notice**. The NEA may share a copy of award applications and/or related materials submitted to the NEA by applicants, with the public or other third parties where required or permitted by law. (§ 200.339 through .343)

## 20. Remedies for Noncompliance and Termination (§ 200.339 and .340)

**Remedies** (§ 200.339). If you fail to comply with the US Constitution, federal statutes, regulations, or the terms and conditions of your award, the NEA may impose additional specific conditions as described in § 200.208. If the NEA determines that noncompliance cannot be remedied by imposing additional conditions, the agency may take one or more of the following actions, as appropriate in the circumstances:

- Temporarily withhold cash payments pending correction of the deficiency, or more severe enforcement action (§ 200.339(a)).
- Disallow costs for all or part of the activity associated with your noncompliance (§ 200.339(b)).
- Suspend or terminate the NEA award in part or in its entirety (§ 200.339(c)).
- Initiate suspension or debarment proceedings as authorized under 2 CFR 180 and our regulations at 2 CFR 32.3254 (§ 200.339(d)).
- Withhold further new NEA awards or award renewals (§ 200.339(e)).
- Take other legally available remedies (§ 200.339(f)).

**Termination** (§ 200.340 (a)). A termination occurs during the award's period of performance. The NEA award may be terminated in part or in its entirety as follows:

JA202

1.  By the NEA, if you fail to comply with the terms and conditions of the federal award.
2.  By the NEA, with the consent of the recipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated.
3.  By the recipient, upon sending the NEA a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the NEA determines that the remaining portion of the federal award will not accomplish the purposes for which the award was made, the NEA may terminate the award in its entirety.
4.  By the NEA, pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer meets the program goals or agency priorities.
5.  By the NEA, when the recipient is determined to be in violation of the requirement in paragraph (g) of Section 106 of the Trafficking Victims Protection Act of 2000 (TVPA) as amended (22 U.S.C. § 7104(g)). Termination may occur as described in **Appendix C: 2 CFR Part 175, Award Term for Trafficking in Persons**.

If the NEA terminates the award prior to the end of the period of performance for your material failure to comply with the terms and conditions, the agency will report the termination in SAM.gov and USASpending (§ 200.340(c) and .341(c)). The information will be available in these systems for 5 years from the date of termination (§ 200.341(b)(2)). You can object or challenge the decision. (§ 200.340(c)(1) and .342)

Government-wide suspension and debarment will follow a process in conjunction with the NEA Office of Inspector General. (2 CFR Part 180 - OMB Guidelines to Agencies on Government-Wide Debarment and Suspension (Nonprocurement – Subpart F)

**Notification of termination requirement** (§ 200.341). The NEA must provide written notice of termination to the recipient. The written notice of termination should include the reasons for termination, the effective date, and the portion of the NEA award to be terminated, if applicable.

**Termination provisions** (§ 200.211 and .208). Termination provisions may be included in the specific terms and conditions for an award; a notification of intent by the NEA to terminate, or other options. (§ 200.211(c)(v) and .208) The NEA reserves the right to take additional actions (§ 200.339 and .208) such as:

- Requiring you to return a portion or all the award funds.
- Requesting that you remove acknowledgement of NEA support.
- Recommending government-wide suspension.

JA203

- Taking other legally available remedies.

The NEA will notify you of such actions and give you an opportunity to provide information and come into compliance. (§ 200.342)

## 21. Closeout, Adjustments, and Continuing Responsibilities (§ 200.344 and .345)

The NEA must close out the federal award when it determines that all administrative actions and required work of the award have been completed. If you fail to complete the necessary administrative actions or the required work for an award by the Delinquency Deadline, the NEA must proceed with closeout based on the information available.

During the closeout process, the NEA reviews submitted final reports and other items to determine if all applicable administrative actions and all required work of the award have been completed in an acceptable manner and in accordance with the terms and conditions of the award.

You must liquidate all financial obligations incurred under the NEA award no later than 120 calendar days after the conclusion of the period of performance. You must also promptly refund any unobligated funds that the NEA paid and that are not authorized to be retained. See OMB Circular A-129 and § 200.346.  To return NEA funds, follow the instructions in the *How to Manage Your NEA Award Handbook*.

The closeout of a federal award does not affect any of the following:

- The NEA's right to disallow costs and recover funds on the basis of a later audit or review.
  - However, the NEA must determine whether to disallow costs and notify you within the record retention period.
- Your requirement to return funds or your right to receive any remaining and available funds as a result of review or corrections.
- The NEA's ability to make financial adjustments to a previously closed award.
- Audit requirements if you must have a Single or Program-Specific Audit (§ 200 Subpart F).
- Property management and disposition requirements in § 200.310 through .316.
- Records retention as required in § 200.334 through .337.

**JA204**

## 22. Single Audit Requirements (§ 200.501)

A non-federal entity that expends $1,000,000 or more in federal awards during the non-federal entity's fiscal year must have a single or program-specific audit conducted for that year. The $1,000,000 threshold is the aggregate of funds from all federal sources.

If your non-federal entity meets or exceeds this threshold, a percentage of Single Audits costs may be included in your NEA award budget. Otherwise, audit costs are unallowable (§ 200.425).

A non-Federal entity that expends less than $1,000,000 in federal awards during its fiscal year is exempt from federal audit requirements for that year. However, in all instances, the records of the non-Federal entity must be available for review or audit by appropriate officials of the NEA and the Government Accountability Office (GAO).

If you have questions about Single Audit requirements, contact the NEA Office of Inspector General at (202) 682-5402 or oig@arts.gov.

## APPENDIX A
## NATIONAL POLICY AND OTHER LEGAL REQUIREMENTS, STATUTES,
## AND REGULATIONS THAT GOVERN YOUR AWARD

You must ensure that you implement the funded project in full accordance with the US Constitution, federal law, and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, and the environment, and those prohibiting discrimination (§ 200.300).

As a registrant with SAM.gov, in most cases, you have already self-certified to your compliance with these policies and legal requirements through the *Financial Assistance General Certifications and Representations*, including attesting to the accuracy of the certification and acknowledging that you may be subjected to criminal prosecution under Section 1001, Title 18 U.S.C, or civil liability under the False Claims Act if you have misrepresented the information.  A copy of this Financial Assistance Certifications Report is available in your SAM.gov entity registration record.

**1. Nondiscrimination Policies**
As a condition of receipt of federal financial assistance, you acknowledge and agree to execute your project, and require any contractors, successors, transferees, and assignees to comply with applicable provisions of national laws and policies prohibiting discrimination, including but not limited to:

**Title VI of the Civil Rights Act of 1964, as amended**, and implemented by the National Endowment for the Arts at 45 CFR 1110, provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance. Title VI also extends protection to persons with limited English proficiency (42 U.S.C. 2000d et seq.).

As clarified by **Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency**, national origin discrimination includes discrimination on the basis of limited English proficiency (LEP). To ensure compliance with Title VI, you must take reasonable steps to ensure that LEP persons have meaningful access to your programs. Meaningful access may entail providing language assistance services, including oral and written translation, where necessary. You are encouraged to consider the need for language services for LEP persons in conducting your programs and activities. For assistance and information go to www.arts.gov/about/foia/library.

**Title IX of the Education Amendments of 1972, as amended**, provides that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subject to discrimination under any education program or activity receiving federal financial assistance (20 U.S.C 1681 et seq.).

**JA206**

Your NEA-approved project cannot unlawfully discriminate based on sexual orientation or gender identity, consistent with the Supreme Court's reasoning in Bostock v. Clayton County, 140 S. Ct. 1731 (2020).

**The Age Discrimination Act of 1975, as amended**, provides that no person in the United States shall, on the basis of age, be excluded from participation in, be denied benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance (42 U.S.C 6101 et seq.).

**The Americans with Disabilities Act of 1990 (ADA), as amended**, prohibits discrimination on the basis of disability in employment (Title I); State and local government services (Title II); and places of public accommodation and commercial facilities (Title III) (42 U.S.C 12101-12213).

**Section 504 of the Rehabilitation Act of 1973, as amended**, provides that no otherwise qualified individual with a disability in the United States shall, solely by reason of his/her disability, be excluded from participation in, be denied benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance (29 U.S.C 794).

Access should be integrated into all facets and activities of an organization, from day-to-day operations to long range goals and objectives. Access accommodations and services should be given a high priority, and funds should be available for these services. All organizations are legally required to provide reasonable and necessary accommodations for staff and visitors with disabilities.

You must designate a staff member to serve as a 504 Coordinator and a Section 504 self-evaluation must be on file at your organization. To help your organization evaluate its programs, activities, and facilities to ensure full compliance with Section 504 accessibility requirements, the NEA's Office of Civil Rights has a *Section 504 Self Evaluation Workbook* available on the www.arts.gov website. The completed Section 504 self-evaluation workbook or similar compliance and supporting documentation must be kept on file for a period of three (3) years from the date the final Federal Financial Report (FFR) is filed and be made available to the public and the NEA upon request. The NEA may request the 504 workbook or your compliance documents in various instances including an Inspector General audit and/or civil rights investigation.

*Design for Accessibility: A Cultural Administrator's Handbook* provides guidance on making access an integral part of an organization's staffing, mission, budget, and programs. You may download this handbook and other resources from the NEA website at www.arts.gov. If you have questions, contact the Office of Accessibility at accessibility@arts.gov or (202) 682-5532.

JA207

## 2. Environmental and Historic Preservation Policies

**The National Environmental Policy Act of 1969, as amended (NEPA)**, applies to any federal funds that would support an activity that may have environmental implications. The NEA may ask you to respond to specific questions or provide additional information in accordance with NEPA. If there are environmental implications, the NEA will determine whether a categorical exclusion may apply; to undertake an environmental assessment; or to issue a "finding of no significant impact," pursuant to applicable regulations and 42 U.S.C. Sec. 4332.

**The National Historic Preservation Act of 1966, as amended (NHPA)**, applies to any federal funds that support activities that have the potential to impact any structure eligible for or on the National Register of Historic Places, adjacent to a structure that is eligible for or on the National Register of Historic Places, or located in a historic district, in accordance with Section 106. This also applies to planning activities that may affect historic properties or districts. The NEA will conduct a review of your project activities, as appropriate, to determine the impact of your project activities on the structure or any affected properties. NEA review must be completed prior to any award funds being released. You may be asked to provide additional information on your project to ensure compliance with NHPA at any time during your award's period of performance (16 U.S.C. 470).

## 3. Other National Policies

**Debarment and Suspension**. You must comply with requirements regarding debarment and suspension in Subpart C of 2 CFR 180, as adopted by the NEA in 2 CFR 32.3254. There are circumstances under which the NEA may receive information concerning your fitness to carry out a project and administer federal funds, such as:

- Conviction of, or a civil judgment for, the commission of fraud, embezzlement, theft, forgery, or making false statements.
- Any other offense indicating a lack of business integrity or business honesty that seriously and directly affects your present responsibility.
- Any other cause of so serious or compelling a nature that it affects an organization's present responsibility.

In these circumstances, the NEA may need to act quickly to protect the interest of the government by suspending your funding while investigating the specific facts. The NEA's suspension actions may be coordinated with other federal agencies that have an interest in the NEA's findings. A suspension may result in your debarment from receiving federal funding government-wide for up to three (3) years.

JA208

**The Drug Free Workplace Act** requires you to publish a statement about your drug-free workplace program. You must give a copy of this statement to each employee (including consultants and temporary personnel) who will be involved in award-supported activities at any site where these activities will be carried out.

You must maintain a record of the sites where work is performed under this award including the full street address, city, state, and zip code. You must notify the National Endowment for the Arts Office of Grants Management of any employee convicted of a violation of a criminal drug statute that occurs in the workplace (41 U.S.C 701 et seq. and 45 CFR 1155).

**Lobbying**. You must not conduct political lobbying, as defined in the statutes and regulations listed below, within your NEA-supported project. In addition, you must not use federal funds for lobbying specifically to obtain awards. For definitions and other information on these restrictions, refer to the following:

No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy, or appropriation, whether before or after the introduction of any bill, measure, or resolution proposing such legislation, law, ratification, policy, or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for any legislation, law, ratification, policy, or appropriations which they deem necessary for the efficient conduct of the public business, or from making any communication whose prohibition by this section might, in the opinion of the Attorney General, violate the Constitution or interfere with the conduct of foreign policy, counter-intelligence, intelligence, or national security activities (18 U.S.C 1913).

Lobbying (§ 200.450) describes the cost of certain influencing activities associated with obtaining grants, contracts, cooperative agreements, or loans as an unallowable project cost. The regulation generally defines lobbying as conduct intended to influence the outcome of elections or to influence elected officials regarding pending legislation, either directly or through specific lobbying appeals to the public.

**Certification Regarding Lobbying to Obtain Awards.** Section 319 of Public Law 101-121, codified at 31 U.S.C. 1352, prohibits the use of federal funds in lobbying members and employees of Congress, as

JA209

well as employees of Federal agencies, with respect to the award or amendment of any federal grant, cooperative agreement, contract, or loan. While non-federal funds may be used for such activities, they must not be included in your project budget, and their use must be disclosed to the awarding federal agency. Disclosure of lobbying activities by long-term employees (employed or expected to be employed for more than 130 days by a recipient of federal funds) is, however, not required. In addition, the law exempts from definition of lobbying certain professional and technical services by applicants and awardees.

**Davis-Bacon and Related Acts (DBRA), as amended**, requires that each contract over $2,000 to which the United States is a party for the construction, alteration, or repair of public buildings or public works (these activities include, but are not limited to, painting, decorating, altering, remodeling, installing pieces fabricated off-site, and furnishing supplies or equipment for a work-site) must contain a clause setting forth the minimum wages to be paid to laborers and mechanics employed under the contract. Under the provisions of DBRA, contractors or their subcontractors must pay workers who qualify under DBRA no less than the locally prevailing wages and fringe benefits paid on projects of a similar character.

You can find information about the laborers and projects that fall under DBRA on the U.S Department of Labor's website at www.dol.gov. DBRA wage determinations are to be used in accordance with the provisions of Regulations, 29 CFR Part 1, Part 3, and Part 5, and with DOL's Compliance Guide. The provisions of DBRA apply within the 50 states, territories, protectorates, and Native American nations (if the labor is completed by non-tribal laborers).

**The Native American Graves Protection and Repatriation Act of 1990** applies to any organization that controls or possesses Native American human remains and associated funerary objects and receives Federal funding, even for a purpose unrelated to this Act (25 U.S.C. 3001 et seq.). For more information see 43 CFR 10 - Native American Graves Protection and Repatriation Regulations at https://www.ecfr.gov/.

If your project includes Native American human remains, funerary objects, sacred objects, and/or objects of cultural patrimony, per the Native American Graves Protection and Repatriation Act (NAGPRA) of November 16, 1990, you are required to:

- Consult with lineal descendants, Indian Tribes, or Native Hawaiian organizations on the appropriate storage, treatment, or handling of human remains or cultural items,
- Make a reasonable and good-faith effort to incorporate and accommodate the Native American traditional knowledge of lineal descendants, Indian Tribes, or Native Hawaiian organizations in the storage, treatment, or handling of human remains or cultural items, and

JA210

- Obtain free, prior, and informed consent from lineal descendants, Indian Tribes, or Native Hawaiian organizations prior to allowing any exhibition of, access to, or research on human remains or cultural items. Research includes, but is not limited to, any study, analysis, examination, or other means of acquiring or preserving information about human remains or cultural items.

**U.S. Constitution Education Program**. Educational institutions (including but not limited to "local educational agencies'' and "institutions of higher education") receiving federal funds from any agency are required to provide an educational program on the U.S. Constitution on September 17 (P.L. 108-447, Division J, Sec. 111(b)). For more information, go to the U.S. Department of Education's website at www.ed.gov and the Library of Congress website at www.loc.gov.

**Prohibition on use of funds to ACORN or its subsidiaries**. No NEA funds or cost share funds expended for your NEA project may be distributed to the Association of Community Organizations for Reform Now (ACORN) or its subsidiaries (P.L. 111-88 Sec. 427).

JA211

**APPENDIX B**
**PART 25 AWARD TERM - SAM.GOV AND UEI REQUIREMENTS**

**Definitions.** For the purposes of this award term:

- **System for Award Management (SAM)** means the federal repository into which a recipient must provide the information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM website (www.SAM.gov).
- **Unique Entity Identifier** (UEI) means the universal identifier assigned by SAM to uniquely identify an entity.
- **Entity** is defined at 2 CFR 25.400 and includes all of the following types as defined in § 200.1:
  - Non-federal entity;
  - Foreign organization;
  - Foreign public entity;
  - Domestic for-profit organization; and
  - Federal agency.
- **Subaward** has the meaning given in § 200.1.
- **Subrecipient** has the meaning given in § 200.1.

**Requirement for SAM Registration.** Unless exempt from this requirement under 2 CFR 25.110, the recipient must maintain a current and active registration in SAM. The recipient's registration must always be current and active until the recipient submits all final reports required under this federal award or receives the final payment, whichever is later. The recipient must review and update its information in SAM at least annually from the date of its initial registration or any subsequent updates to ensure it is current, accurate, and complete. If applicable, this includes identifying the recipient's immediate and highest-level owner and subsidiaries and providing information about the recipient's predecessors that have received a federal award or contract within the last three years.

**Requirement for Unique Entity Identifier (UEI).** If the recipient is authorized to make subawards under this federal award, the recipient must notify potential subrecipients that no entity may receive a subaward until the entity has provided its UEI to the recipient; and the recipient must not make a subaward to an entity unless the entity has provided its UEI to the recipient. Subrecipients are not required to complete full registration in SAM to obtain a UEI.

**JA212**

## APPENDIX C
## PART 175 AWARD TERM - TRAFFICKING IN PERSONS

**Note:** *The language of this award term is included in, and mandated by, 2 CFR 200. "Severe forms of trafficking in persons" is a term defined by law at* 22 U.S.C. 7102(11) as : *"(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or (B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery*."

**I.      Trafficking in Persons**

**(a)** *Provisions applicable to a recipient that is a private entity.*

(1) Under this award, the recipient, its employees, subrecipients under this award, and subrecipient's employees must not engage in:

(i) Severe forms of trafficking in persons;

(ii) The procurement of a commercial sex act during the period of time that this award or any subaward is in effect;

(iii) The use of forced labor in the performance of this award or any subaward; or

(iv) Acts that directly support or advance trafficking in persons, including the following acts:

(A) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;

(B) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:

(*1*) Exempted from the requirement to provide or pay for such return transportation by the federal department or agency providing or entering into the grant or cooperative agreement; or

(*2*) The employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;

(C) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;

(D) Charging recruited employees a placement or recruitment fee; or

**JA213**

(E) Providing or arranging housing that fails to meet the host country's housing and safety standards.

(2) The federal agency may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if any private entity under this award:

(i) Is determined to have violated a prohibition in paragraph (a)(1) of this appendix; or

(ii) Has an employee that is determined to have violated a prohibition in paragraph (a)(1) of this this appendix through conduct that is either:

(A) Associated with the performance under this award; or

(B) Imputed to the recipient or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement)," as implemented by the NEA at 2 CFR 32.3254

**(b)** *Provision applicable to a recipient other than a private entity.*

(1) The federal agency may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if a subrecipient that is a private entity under this award:

(i) Is determined to have violated a prohibition in paragraph (a)(1) of this appendix; or

(ii) Has an employee that is determined to have violated a prohibition in paragraph (a)(1) of this appendix through conduct that is either:

(A) Associated with the performance under this award; or

(B) Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement)," as implemented by the NEA at 2 CFR 32.3254.

**(c)** *Provisions applicable to any recipient.*

(1) The recipient must inform the NEA and the NEA Inspector General immediately of any information you receive from any source alleging a violation of a prohibition in paragraph (a)(1) of this appendix.

(2) The federal agency's right to unilaterally terminate this award as described in paragraphs (a)(2) or (b)(1) of this appendix:

(i) Implements the requirements of 22 U.S.C. 78, and

(ii) Is in addition to all other remedies for noncompliance that are available to the federal agency under this award.

JA214

(3) The recipient must include the requirements of paragraph (a)(1) of this award term in any subaward it makes to a private entity.

(4) If applicable, the recipient must also comply with the compliance plan and certification requirements in 2 CFR 175.105(b).

**(d)** *Definitions.* For purposes of this award term:

*Employee* means either:

(1) An individual employed by the recipient or a subrecipient who is engaged in the performance of the project or program under this award; or

(2) Another person engaged in the performance of the project or program under this award and not compensated by the recipient including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing requirements.

*Private Entity* means any entity, including for-profit organizations, nonprofit organizations, institutions of higher education, and hospitals. The term does not include foreign public entities, Indian Tribes, local governments, or states as defined in § 200.1.

The terms "severe forms of trafficking in persons," "commercial sex act," "sex trafficking," "Abuse or threatened abuse of law or legal process," "coercion," "debt bondage," and "involuntary servitude" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

JA215

# Ex. C

**MEMORANDUM**

| | |
|---|---|
| From: | Mary Anne Carter, Senior Advisor |
| To: | NEA Grantmaking Staff |
| RE: | EO 14168: *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* |
| Date: | March 17, 2025 |

---

Dear NEA Grantmaking Staff:

This memorandum concerns EO 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* ("the EO") as that EO applies to the NEA's grantmaking activities.

I am writing to inform all staff that the NEA has rescinded all implementation of the EO, as it applies to the NEA's grantmaking activities. Any prior statements the NEA has made concerning any provisions of the EO that apply to its grantmaking are null and void.

To the extent that the NEA has evaluated any part of any grant applications on or since February 6, 2025 based on the EO, we are rescinding those evaluations and will reconsider those applications at the appropriate time, once the administrative process described below is complete.

The NEA is initiating a new evaluation of the EO in accordance with the Administrative Procedure Act, sec. 5 U.S.C. § 551 *et seq*. We intend to address:

1. How, in particular, recent judicial activity, including but not limited to court orders that do not apply to the NEA but that have preliminarily enjoined certain EO provisions concerning other federal government entities, *e.g.*, *Washington v. Trump*, No. 2:25-cv-00244-LK, 2025 WL 659057, at *27-*28 (W.D. Wash. Feb. 28, 2025) (enjoining defendants' application of EO 14,168 §§ 3(e), (g) to plaintiff States); Mem. Op. (ECF 115) & Order (ECF 116), *PFLAG, Inc. v. Trump*, No. 25-cv-337-BAH (D. Md. Mar. 4, 2025) (enjoining defendants' application of EO 14,168 § 3(g) nationwide) affect our implementation of this order, if at all.

2. The potential implementation of the EO as to the NEA's grantmaking activities subject to §§ 8(a)(i) and (b) of the EO—that is, subject to "the authority granted by law to an executive department or agency, or the head thereof" and "consistent with applicable law"—including 20 U.S.C. § 951 *et seq*.

The NEA will not implement the EO at any grant evaluation stage during the current pending grant cycles, and any grants cycles in the future, unless and until such a time that the agency's process of deliberating and considering this EO has completed.

The NEA will not require any applicant for any agency funds to certify their compliance with the EO during this time.

This direction should not be understood to impair the authority of the NEA to award, fund, terminate, or cancel grants at any stage in the grant lifecycle for reasons unrelated to the EO, consistent with applicable law.

This new consideration and evaluation process will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025.

As a result of this reconsideration, the March Council meeting will be rescheduled to a time this process concludes. We will announce that date shortly.


Sincerely,

Mary Anne Carter

Mary Anne Carter
Senior Advisor

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS,
NATIONAL QUEER THEATER,
THE THEATER OFFENSIVE, and
THEATRE COMMUNICATIONS GROUP,

          *Plaintiffs*,

          *v.*

NATIONAL ENDOWMENT FOR THE
ARTS, and MARY ANNE CARTER, in her
official capacity as Acting Secretary of the
National Endowment for the Arts,

          *Defendants*.

Case No. 1:25-cv-00079-WES-PAS

## <u>SUPPLEMENTAL DECLARATION OF MARTA V. MARTÍNEZ</u>

I, Marta V. Martínez, declare as follows:

1.      My name is Marta V. Martínez. I am the Executive Director and Founder of Rhode Island Latino Arts ("RILA"). The facts set forth in this declaration are based on my personal knowledge.

2.      RILA is planning to submit an application to the NEA's Grants for Arts Projects ("GAP") during the March 2025 cycle. RILA is a small organization and the money we have received in the past from the NEA has made a significant difference to our programming. The money we could receive from the NEA this cycle would similarly make a significant difference to our programming. It would make it possible to fund a project we could not otherwise put on. Because of that possibility, we made the decision to submit to GAP in the March cycle whether or not the NEA's prohibition on "promoting gender ideology" is in place. However, the scope of the

**JA219**

project that we apply for depends entirely on whether or not that prohibition is part of the NEA's grantmaking process.

3.      The NEA permits us to submit only one application per calendar year. Because we have submitted Part 1 of our application for this grant cycle, we must submit Part 2 by April 7 or forego any NEA grant applications this year.

4.      We chose to apply during the March 2025 cycle because we need the funding for programming in the first half of 2026. It would not have been feasible for us to apply during the July 2025 cycle because funds awarded during that cycle are not available until June 2026. If we had waited until July to apply for a grant, that would have left a gap in our programming for 2026.

5.      RILA would like to seek funding for a project that reflects our intention to support artistic expression by and about trans, queer, and nonbinary artists, characters, and themes within the scope of the NEA-funded programming. In particular, this project would include a storytelling component. When we run storytelling programs, we allow performing artists to tell their stories without restrictions, and they feel comfortable working with us because we give them the artistic freedom to say what they want. In the past, a storyteller told a story about their son coming out as queer. We intend to continue to keep this program open to all performers and allow others to speak about or interpret their art based on their personal lives on stage, including nonbinary and transgender performers. These performers are members of the RILA community, and we want them to feel free to affirm their identities in their performances as part of their expressive work. We will not tell our artists to stay away from topics that could be interpreted as "promoting" what the government deems as "gender ideology."

6.      Unless it is clear that the NEA will not refuse to fund any projects that appear to "promote" what the government deems to be "gender ideology" in the March 2025 grant cycle,

JA220

however, RILA will instead submit a more limited project that focuses on performance tours and an oral history highlighting the contributions of Latinos to American history and Rhode Island history, which would steer clear of any support for artistic expression by and about trans, queer, and nonbinary artists, characters, and themes, including through a storytelling component. This is not the full scope of the project we want to submit, but a more restricted project because we believe we need to censor ourselves and change the scope of our planned project to avoid violating any "gender ideology" prohibition. Absent relief, we will steer far clear of any project that could be deemed to "promote gender ideology" because the possibility of NEA funding is so significant for RILA.

7.     If it were clear that no "gender ideology" prohibition would factor into the consideration of our grant application, we would expand the scope of our project in Part 2 of our grant application due April 7. As we have done in the past, we would like to support artists who are transgender, queer, or nonbinary, and art that features trans, queer and nonbinary artists, characters and themes, including through a storytelling component.

8.     The declaration from Ann Eilers dated March 7, 2025, did not provide us with the relief we need to proceed with our desired project in this application cycle. Although the declaration stated that we would no longer need to certify compliance with EO 14168 while the outcome of this litigation is pending, it did not remove the prohibition on any project that appears to "promote gender ideology" from receiving funding. Even without the certification, we fear that an application for RILA's desired project would still be barred from eligibility due to the "gender ideology" prohibition. Absent the relief we seek, we would still be forced to submit Part 2 of our application with our more restricted, self-censored project rather than our desired project.

**JA221**

9.      Similarly, the memo from Mary Anne Carter dated March 17, 2025, does not provide us with the relief we need to proceed with our intended project in this application cycle. The memo states that the NEA will not implement EO 14168 "unless and until such a time that the agency's process of deliberating and considering this EO has completed," and that the "new consideration and evaluation process will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025." It is therefore clear that any implementation of EO 14168 will be imposed on the March 2025 round of applications, even though the governing rules will not be made clear to applicants like RILA before the application is due.

10.     Because the EO that the NEA is deliberating over states that "[f]ederal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," RILA continues to fear that the NEA will reimpose the same "gender ideology" prohibition that the NEA had put in place when RILA filed suit. Because of that, RILA is forced to censor itself with regard to the project that we submit in Part 2, due on April 7. While the prohibition may not technically be in place when RILA submits, the NEA has reserved the ability—and in no way disclaimed its intention to—reimpose the "gender ideology" prohibition on April 30, thereby making any proposal submitted by April 7 that could be deemed to cross the "gender ideology" line ineligible for funding in the current cycle. Absent the relief we seek, therefore, we cannot seek funding for the project we actually want to submit, given the likelihood that it will be ineligible starting on April 30, once it is too late for us to change our submission.

11.     Moreover, because the NEA has said that it will impose any new rules and prohibitions it comes up with on April 30 on applications that are submitted on April 7, it is very

**JA222**

unclear to RILA what standards, prohibitions, and preferences will govern our April 7 application. This lack of clarity makes it difficult for us to determine what to include, and not include, in our application. And we will have no opportunity after any new rules, policies, or standards are announced on April 30 to adapt our application.

12.    Putting together an application for an NEA grant takes a great deal of effort, especially for a small organization like RILA that does not have a dedicated development office for writing grant applications. The process of writing this grant requires extensive planning, coordination, and research. It involves gathering detailed information, developing a compelling narrative, preparing budgets, timelines, and work plans, and often coordinating with multiple partners. For a small team juggling multiple programs and responsibilities, completing a federal grant application can take several weeks of focused work and staff time that might otherwise be used for direct programming. I started working on Part 2 of our application as soon as the NEA applicant portal opened on March 14, 2025, because of how much time I would need to work on the application, and intend to submit Part 2 as soon as practicable after this Court issues a ruling on the pending motion for preliminary relief. Despite these challenges, RILA remains committed to applying for federal support because of the transformative impact such funding can have on our community-based arts and cultural initiatives.

**JA223**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March __21__, 2025.

Marta V. Martínez

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Secretary of the National Endowment for the Arts, <br><br> *Defendants*. | Case No. 25-cv-79-WES-PAS |

<u>**DECLARATION OF EMILYA CACHAPERO**</u>

I, Emilya Cachapero, declare as follows:

1.       My name is Emilya Cachapero. I am the Co-Executive Director: National and Global Programming of Theatre Communications Group ("TCG"). I reviewed this with LaTeshia Ellerson, who is the Co-Executive Director: National Engagement of TCG, and Alisha Tonsic, who is the Co-Executive Director: National Operations and Business Development of TCG. The facts set forth in this declaration are based on our personal knowledge and reflect our collective views.

2.       TCG has a nationwide membership, with members located in 48 states across the country. Rhode Island Latino Arts ("RILA"), National Queer Theater, and The Theatre Offensive are all members of TCG.

**JA225**

3.      We continue to hear from members that are applying to the NEA's Grants for Arts Projects ("GAP") during the March 2025 cycle with projects that support artistic expression by and about transgender, queer, and nonbinary artists. Some of these members, including RILA, will change their applications depending on whether it is clear that the NEA will not refuse to fund any projects that appear to "promote" what the government deems to be "gender ideology" in the March 2025 grant cycle.

4.      Other TCG members have submitted Part 1 of their GAP applications but will either change the scope of their project or not submit Part 2 on April 7 because of the "gender ideology" prohibition, based on whether this Court enjoins the "gender ideology" prohibition as being part of the selection criteria for funding grant awards before the April 7 deadline.

5.      The declaration from Ann Eilers dated March 7, 2025, did not provide relief for these members. Although the declaration removed the certification requirement from the grant application, it did not remove the prohibition on any project that appears to "promote gender ideology" from receiving funding. Absent relief, some TCG members will still not submit applications for their desired projects.

6.      The memo from Mary Anne Carter dated March 17, 2025, also did not provide relief for these members. The Carter memo states that the NEA will not implement EO 14168 "unless and until such a time that the agency's process of deliberating and considering this EO has been completed," and that the "new consideration and evaluation process will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025." It is therefore clear that any implementation of EO 14168 will be imposed on the March 2025 round of applications, even though the governing rules will not be made clear to applicants before the application is due.

JA226

7.      Because the EO that the NEA is deliberating over states that "[f]ederal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," our members continue to fear that the NEA will reimpose the same "gender ideology" prohibition that the NEA had put in place when TCG filed suit. In addition, some of our members fear that submitting an application that would later be subject to a "gender ideology" prohibition could invite further scrutiny. Because of that, absent the relief we seek, some of our members are forced to censor themselves with regard to their applications due on April 7. Although the "gender ideology" prohibition may not technically be in place when they submit their applications, the NEA has reserved the ability—and in no way disclaimed its intention to—reimpose the prohibition by April 30, once it is too late for submissions to be changed.

8.      Moreover, because the NEA has said that it will impose any new rules and prohibitions it comes up with on April 30 on applications that are submitted on April 7, it is very unclear to our members what standards, prohibitions, and preferences will govern applications in this funding cycle. And there will be no opportunity after any new rules, policies, or standards are announced on April 30 for members to adapt their submitted applications.

9.      Putting together an application for an NEA grant takes a great deal of effort, especially for our smaller members that do not have dedicated development offices for writing grant applications. For example, one of our members had to recently lay off its development department, and now it finds itself with limited resources to craft applications for grant funding.

10.     We continue to gather feedback from members (such as during our Theatre Advocacy Week) to understand how the ongoing changes from the NEA have affected their plans to apply, or no longer apply, for NEA funding. We plan to hold more webinars, once we have more clarity on the situation, to help our members navigate the application process.

**JA227**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March  25  , 2025.

_____
Emilya Cachapero

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                        )
RHODE ISLAND LATINO ARTS, et al.,       )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )      C.A. No. 25-79 WES
                                        )
NATIONAL ENDOWMENT FOR THE ARTS,        )
et al.,                                 )
                                        )
          Defendants.                   )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Senior District Judge.

Before the Court is Plaintiffs' Motion for a Preliminary Injunction, Expedited Hearing, and/or a Temporary Restraining Order ("PI Motion"), ECF No. 2. Plaintiffs are hopeful recipients of federal arts funding whose intended projects would feature transgender and nonbinary performers, characters, stories, and themes. They seek to preliminarily enjoin the National Endowment for the Arts ("NEA") and its leadership from prohibiting recipients of NEA grants from using the grants to promote "gender ideology," as defined in recent Executive Order 14168 (the "EO"). According to the Complaint, such a prohibition would violate the Administrative Procedure Act ("APA"), the First Amendment, and the Fifth Amendment. The Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of their APA and First

**JA229**

Amendment claims and that they would suffer irreparable harm if the prohibition were imposed.  Critical to the outcome here, however, is that after Plaintiffs filed their Complaint and PI Motion, the NEA rescinded its implementation of the EO pending further administrative review, which will conclude in a matter of weeks.  Notwithstanding the NEA's pivot, under the voluntary cessation doctrine, Plaintiffs' claims are not moot.  But due to the posture of the case, the Court finds that the balance of equities tips in Defendants' favor and that an injunction is not in the public interest at this time.  Therefore, the PI Motion is denied.[1]

I.    **BACKGROUND**

  **A. The NEA's Authorizing Statute**

The National Foundation on the Arts and the Humanities Act of 1965 ("NFAHA") declares, as amended, that "[t]he arts . . . belong to all the people of the United States."  20 U.S.C. § 951(1).  The NFAHA further provides that "it is necessary . . . for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent."  Id. § 951(7).  In accordance with these principles, the

---

[1] The Court will schedule a conference within the next several weeks to set a schedule for the case.

JA230

NFAHA established the NEA, which provides financial assistance to groups and certain individuals "of exceptional talent engaged in or concerned with the arts." Id. § 954(c). Among the priorities identified in the funding program at issue in this case are "projects and productions which have substantial . . . artistic and cultural significance, giving emphasis to American creativity and cultural diversity," and those with similar significance "that reach, or reflect the culture of, a minority, inner city, rural, or tribal community." Id. § 954(c)(1), (4).

Because the drafters and subsequent amenders of the NFAHA were concerned about the NEA being leveraged as an instrument of "political control of culture," they took several steps to ensure that grants are awarded based on talent alone, irrespective of the artists' identities, backgrounds, viewpoints, or perspectives. See Compl. ¶ 17, ECF No. 1 (quoting H.R. Rep. No. 89-618, at 21 (1965)); see also id. ¶ 21 ("Congress's intent was to have 'Government assistance, but not intervention[;] . . . support but not control[;] . . . stimulation but not participation.'" (omissions in original) (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. John S. Monagan))).

One safeguard against political interference is a prohibition against federal supervision or control over the policies, personnel, or operations of grant recipients. 20 U.S.C. § 953(c).

3

**JA231**

Another safeguard is the nested, multilayer review process that underlies each individual grant decision.  Working outward from the innermost layer, this process begins with an advisory panel's review of a grant application; the panel is required to "recommend applications . . . solely on the basis of artistic excellence and artistic merit."  Id. § 959(c).  Notably, the NEA must "ensure that all panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view."  Id. § 959(c)(1).

From there, the NEA's National Council on the Arts (the "Council") is required to make recommendations concerning whether to approve applications determined by the advisory panels to have artistic excellence and artistic merit.  Id. § 955(f)(1).  Just as the composition of the advisory panels ensures a diversity of viewpoints and backgrounds, so too does that of the Council.  In selecting the Council's eighteen voting members, the President must "give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the arts and shall make such appointments so as to represent equitably all geographical areas in the United States."  Id. § 955(b)(1), (1)(C).

At the outermost layer of review is the Chairperson, who may

4

**JA232**

not approve or disapprove any application until it is recommended for approval by the Council, and who may not approve an application for which the Council has made a negative recommendation.  Id. § 955(f)(2); see also id. § 955(b)(1) (requiring the President to consider equitable representation in selection of the Chairperson).  Moreover, the Chairperson must ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public."  Id. § 954(d)(1).  Finally, the NFAHA provides that "[i]n selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under [the program at issue here], the Chairperson shall give particular regard to artists and artistic groups that have traditionally been underrepresented."  Id. § 954(c).

In short, this complex statutory framework demonstrates Congress's intent to insulate the NEA from political control and to encourage the freedom of expression.  As a Senate committee report on the original version of the NFAHA explained:

> It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression.  One of the artist's and humanist's great values to society is the mirror of self-examination which they raise so that society can become aware of its shortcomings as well as its strengths . . . . Countless times in history artists and humanists who were vilified

by their contemporaries because of their innovations in style or mode of expression have become prophets to a later age.  Therefore, the committee affirms that the intent of this act should be the encouragement of free inquiry and expression. . . . [C]onformity for its own sake is not to be encouraged, and . . . no undue preference should be given to any particular style or school of thought or expression.

Compl. ¶ 21 (omissions in original) (quoting S. Rep. No. 89-300, at 3-4 (1965)).

**B. Executive Order 14168**

On January 20, 2025, President Trump signed Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Id. ¶ 47. According to Section 2(f) of the EO:

"Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.  Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.   Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

Exec. Order No. 14168, § 2(f), 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025).   The EO has multiple substantive provisions, but relevant to the present case is Section 3(g), which declares that "[f]ederal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences

6

**JA234**

and ensure grant funds do not promote gender ideology." Id. § 3(g), 90 Fed. Reg. at 8616.

The President signed the EO about three weeks ahead of the initial application deadline for the semiannual Grants for Arts Project ("GAP"), the NEA's premier grant program. Compl. ¶¶ 34-37. The submission deadline for the current funding cycle was initially set for February 13, 2025. Id. ¶ 37. On February 6, however, the NEA updated its application procedure and pushed the final deadline to March 24, with an intermediate deadline set for March 11. Id. ¶¶ 37, 40-41, 51. The NEA's updated procedure required each applicant to certify, at both stages of the application and subject to potential criminal, civil, or administrative penalties for making false statements, that if selected as a grant recipient, the applicant (1) "will comply with all applicable Executive Orders while the award is being administered" and (2) "understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168." Id. ¶ 51; see id. ¶¶ 40-43. In response to this litigation, the final deadline was again pushed back to April 7 and other changes were made, discussed below.

### C. The Plaintiffs

Plaintiffs are three prospective applicants for the current funding cycle and a membership organization that represents a host

7

**JA235**

of prospective applicants. Id. ¶¶ 2, 10-13. All four are concerned about the NEA's implementation of the EO. Id. ¶ 6. Rhode Island Latino Arts ("RILA") would prefer to submit a project "that would affirmatively include celebrating transgender, queer, and nonbinary identity and featur[e] artists and characters with those identities." Id. ¶ 63. Since February 6, however, when the NEA implemented the EO, RILA has considered whether to censor itself and submit a different project for the current funding cycle. Id. ¶¶ 63-67.

National Queer Theater ("NQT") intends to seek funding for its Criminal Queerness Festival, which has received GAP awards in previous years and

> is devoted to freedom of expression and to fighting censorship and criminalization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes.

Id. ¶ 70; see id. ¶¶ 68-69, 71-72. NQT will seek GAP funding this cycle regardless of the NEA's implementation of the EO, "[b]ut it will simultaneously make clear in writing on the application that it is not agreeing to the 'gender ideology' prohibition because it believes it is legally invalid." Id. ¶ 74.

The Theater Offensive ("TTO") intends to apply for a grant in the current funding cycle to support the production of a new play,

8

**JA236**

written by a transgender playwright, that features two transgender actors in the leading roles and explores "the complexities of transgender life." Id. ¶ 77.  "TTO fears that its very mission as an organization dedicated to queer and trans people might run afoul of the 'gender ideology' prohibition." Id. ¶ 80.  Despite those concerns, TTO intends to seek funding and, like NQT, express its disagreement with the prohibition in writing on the application. Id. ¶ 79.

Finally, the Theatre Communications Group ("TCG"), which is a national membership organization, has many members who find themselves in the same situation as the Plaintiffs above — indeed, TTO is a member of TCG. Id. ¶¶ 13, 94.  TCG also intends to apply for a grant during the next funding cycle, in July 2025, to support a conference that would include a panel discussion "about gender identity, affirming trans, nonbinary, and queer members of the community." Id. ¶ 95.

### D. The Instant Litigation

Due to these concerns, Plaintiffs filed a Complaint on March 6 seeking declaratory and injunctive relief against the NEA and Mary Anne Carter, in her official capacity as the NEA's Acting Chairperson. Id. at 1.  The Complaint alleges that Defendants, by requiring applicants to certify their compliance with the EO and prohibiting applications that promote "gender ideology," as

defined in the EO, have violated the APA, the First Amendment, and the Fifth Amendment.  Id.  ¶¶ 5-7.  Because the application deadlines were fast approaching, Plaintiffs filed their PI Motion, also on March 6, seeking to preliminarily enjoin Defendants from imposing the certification requirement and from prohibiting applications that promote gender ideology.  Pls.' Mem. L. Supp. PI Mot. ("PI Mem.") 1, ECF No. 2-1.

The Court scheduled a hearing on the PI Motion for March 18. Notice Hr'g PI Mot. (Mar. 7, 2025).  But then, on March 10, the NEA submitted a declaration providing that: no later than the following day, the NEA would remove "the new language requiring compliance with E.O. 14168 . . . until the conclusion of this litigation.  The NEA intends to no longer require applicants to certify their compliance with E.O. 14168 while the outcome of this litigation is pending."  Decl. Ann Eilers, Deputy Chair Mgmt. & Budget, NEA ("Eilers Decl.") ¶ 8, ECF No. 10.  The Eilers Declaration further provided that the March 24 deadline would be changed to April 7.  Id. ¶ 9.  The Court thereafter rescheduled the hearing on the PI Motion for March 27.  Notice Hr'g PI Mot. (Mar. 11, 2025).

In yet another pivot, the NEA then issued a memorandum from Mary Anne Carter, on March 17, that abandoned the NEA's prior statement concerning the certification requirement.  Memorandum

10

**JA238**

from Mary Anne Carter, Sr. Advisor, NEA, to NEA Grantmaking Staff ("Carter Memo") 1 (Mar. 17, 2025).  The Carter Memo provides that "the NEA has rescinded all implementation of the EO, as it applies to the NEA's grantmaking activities."  Id.  Furthermore, it states:

> The NEA will not implement the EO at any grant evaluation stage during the current pending grant cycles, and any grants cycles in the future, unless and until such a time that the agency's process of deliberating and considering this EO has completed.
>
> The NEA will not require any applicant for any agency funds to certify their compliance with the EO during this time.
>
> . . .
>
> This new consideration and evaluation process will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025.

Id. at 2.  The Carter Memo did not change the April 7 deadline. See generally id.  In its Response to the PI Motion, filed on March 21, Defendants argue that because the NEA has rescinded the implementation of the EO pending further administrative review, Plaintiffs' claims are nonjusticiable on standing and ripeness grounds (they do not argue mootness).  Defs.' Resp. PI Mot. ("Defs.' Resp.") 1, ECF No. 11.  Despite their argument that Plaintiffs' claims are nonjusticiable, Defendants have not moved to dismiss the action, but they discourage the Court from "short-circuit[ing] an ongoing administrative proceeding that might, or might not, obviate the sole ground for the Plaintiffs' case."  Id.

**JA239**

at 2.

In their Reply, Plaintiffs assert that their claims are still justiciable and accuse Defendants of "manufactur[ing] standing and ripeness problems [by trying to] erroneously muddle distinct justiciability inquiries."  Pls.' Reply Mem. L. Supp. PI Mot. ("Pls.' Reply") 2, ECF No. 12.  According to Plaintiffs, it is mootness — not standing or ripeness — that is at issue here; and despite the NEA rescinding its implementation of the EO, Plaintiffs contend that because the voluntary cessation doctrine applies, their claims are not moot.  Id.

The Court heard argument on Thursday, March 27, and promised a decision on the PI Motion before April 7, the application deadline for the current funding cycle.  Minute Entry (Mar. 27, 2025).

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  Id. (quoting Amoco Prod. Co. v. Village of Gamble, 480 U.S. 531, 542 (1987)).  To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is

12

**JA240**

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. "[W]hen the Government is the opposing party," as in this case, the third and fourth factors merge. Nken v. Holder, 556 U.S. 418, 426 (2009).

## III. DISCUSSION

The Court begins with the parties' conflicting justiciability arguments and finds that mootness, not standing or ripeness, is the relevant inquiry. From there, the Court considers whether the voluntary cessation exception to mootness applies and finds that, while it does not apply to the certification requirement, it does apply to the NEA's categorical prohibition of applications that promote gender ideology. Finally, the Court considers whether this categorical prohibition, which the Court refers to in this case as an "eligibility bar," should be preliminarily enjoined. In the end, the Court finds that Plaintiffs clearly satisfy the first two elements of the preliminary-injunction test: likelihood of success on the merits and irreparable harm absent an injunction. But at this juncture, the balance of the equities and public interest counsel against preliminary relief. This is an unusual but not unheard-of outcome in a preliminary injunction motion. Typically, likelihood of success and irreparable harm rule the day on these motions. But there are four factors for a reason, and

13

**JA241**

this is the rare case where the balance of the harms and equities plus the public interest caution against the extraordinary relief requested.

**A. Justiciability**

According to Defendants, because the NEA has rescinded its implementation of the EO, Plaintiffs no longer have standing; and because the NEA will not re-implement the EO until after the application deadline, Plaintiffs' claims are not ripe. Defs.' Resp. 7-13. Defendants' Response does not argue mootness. At bottom, however, they assert that there "is no case or controversy for this Court to adjudicate." Id. at 1.

Whether Plaintiffs' claims are justiciable despite the NEA's rescission of the EO is clearly a question of mootness, not standing or ripeness, regardless of the labels Defendants use. Standing is a fixed question, "to be assessed under the facts existing when the complaint is filed." Lujan v. Defs. of Wildlife, 504 U.S. 555, 569 n.4 (1992); see also Becker v. FEC, 230 F.3d 381, 386 n.3 (1st Cir. 2000). Defendants do not suggest that Plaintiffs lacked standing — or that their claims were not ripe — when the Complaint was filed. If anything, arguing that Plaintiffs lack standing because of the rescission implies that they had standing before the rescission.

Standing relates both to "questions of ripeness — whether the

14

**JA242**

harm asserted has matured sufficiently to warrant judicial intervention — and of mootness — whether the occasion for judicial intervention persists." Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975). But under circumstances where, as here, the plaintiffs had standing at the outset (and their claims were ripe), but the defendants' intervening conduct raises the question whether a case or controversy remains, mootness is the relevant inquiry. See Becker, 230 F.3d at 386 n.3 ("[A] plaintiff must have a personal interest at stake throughout the litigation of a case, [but] such an interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."); Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980))).

In short, Plaintiffs had standing before the NEA rescinded its implementation of the EO and, at the time, their claims were fit for judicial review. See Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568, 581 (1985) ("One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." (quoting

15

**JA243**

Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 142 (1974))).
What the Court must now decide is whether, because of the
rescission, Plaintiffs' claims are moot.  See West Virginia v.
EPA, 597 U.S. 697, 719 (2022) ("It is the doctrine of mootness,
not standing, that addresses whether 'an intervening circumstance
[has] deprive[d] the plaintiff of a personal stake in the outcome
of the lawsuit.'" (emphasis and alterations in original) (quoting
Genesis HealthCare Corp. v. Symczyk, 569 U.S. 66, 72 (2013))).

## B. Voluntary Cessation

Plaintiffs argue their claims are not moot under the voluntary
cessation doctrine, which stands for the principle that "a
defendant cannot automatically moot a case simply by ending its
unlawful conduct once sued."  Already, LLC v. Nike, Inc., 568 U.S.
85, 91 (2013).  The doctrine is thus designed to prevent defendants
from manipulating a court's jurisdiction to evade judicial review
of a challenged practice.  See FBI v. Fikre, 601 U.S. 234, 241
(2024) ("A live case or controversy cannot be so easily disguised,
and a federal court's constitutional authority cannot be so readily
manipulated.").

To prevent this kind of gamesmanship, the voluntary cessation
doctrine imposes on defendants a "formidable burden."  Id. (quoting
Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,
528 U.S. 167, 190 (2000)).  For a case to be mooted by the halting

16

**JA244**

of a defendant's conduct, the "defendant must prove 'no reasonable expectation' remains that it will 'return to [its] old ways.'" Id. (quoting United States v. W. T. Grant Co., 345 U.S. 629, 632-33 (1953)).  Put differently, "a defendant's 'voluntary cessation of a challenged practice' will moot a case only if the defendant can show that the practice cannot 'reasonably be expected to recur.'"  Id. (quoting Friends of the Earth, 528 U.S. at 189).

Importantly, two challenged practices are at issue here: the certification requirement and the eligibility bar.  Each must be examined independently.  At least in the context of this grant cycle, Defendants have met their burden with respect to the certification requirement.  But because it is reasonable to expect that once the NEA completes its upcoming "evaluation process" it may reimpose an eligibility bar during this cycle — and after proposals have been submitted — Defendants cannot meet their formidable burden to demonstrate that the case is moot.

### 1. Certification Requirement

Before the NEA rescinded its implementation of the EO, it was requiring each grant applicant to certify that, if selected, it "will comply with all applicable Executive Orders while the award is being administered." Compl. ¶ 51.  The application specifically alerted applicants to the EO, and it required them to acknowledge that — pursuant to the EO — "federal funds shall not be used to

17

**JA245**

promote gender ideology." Id. These two provisions, working together, made up the certification requirement.

The certification requirement operated as a precondition to submission of an application for NEA funding. But on March 10, the NEA pushed back the application deadline — from March 24 to April 7 — and declared that it would not impose a certification requirement on applicants until the conclusion of this litigation. Eilers Decl. ¶¶ 8-9. Because the litigation had only just begun and the deadline was mere weeks away, the Eilers Declaration all but foreclosed the possibility that applicants would have to sign the certification requirement to submit applications for the current grant cycle. But that possibility increased, however slightly, with the publication of the Carter Memo on March 17.

According to the Carter Memo, the NEA has initiated a new "consideration and evaluation process" regarding whether, and how, to implement the EO in its grantmaking activities. Carter Memo 2. It further provides that the process "will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025." Id. In the meantime, the Carter Memo says that the NEA will not implement the EO during any grant cycles until that process is complete, nor will it require "any applicant for any agency funds to certify

18

**JA246**

their compliance with the EO during this time." Id.

Reading between the lines, the Carter Memo leaves open the remote possibility — indeed, it arguably suggests — that the NEA could reimpose a certification requirement on applications for the current grant cycle after it concludes the evaluation process. But based on the timeline delineated in the Carter Memo, it appears practically impossible for this to occur.

For one, the April 7 application deadline is days away. And three to four weeks is not much time for the NEA to conduct its process — while considering the effect of this and other judicial decisions cited in the Carter Memo — in deciding whether and how to implement the EO. See id. at 1 (noting that the NEA intends to address how "recent judicial activity" affects its implementation of the EO, if at all). To be sure, it is theoretically possible that following the evaluation process, the NEA will retroactively require applicants who have already submitted their projects for approval to confirm that those projects comply with the EO. But such an approach is highly unlikely given the broad assurances of the Carter Memo and the practical infeasibility of such a requirement, so the Court cannot reasonably expect the NEA to do that.

Because the NEA cannot reasonably be expected to reimpose a certification requirement on applications submitted for the

19

**JA247**

current grant cycle, Defendants have met their burden under the voluntary cessation doctrine.  The NEA does not disclaim reimposing the requirement, but for the reasons discussed above, if it did, the requirement would apply to future grant cycles and not to the current one.  Although TCG and likely some of its members intend to apply for NEA funding during the next grant cycle,[2] it is the current cycle that is the subject of the PI Motion.  Therefore, Plaintiffs' request for injunctive relief regarding the certification requirement is moot.

## 2. Eligibility Bar

As noted above, the NEA initially sought to implement the EO by adding two provisions to its grant application form.  The first provision requires each applicant to certify its compliance with all applicable Executive Orders if selected as a grant recipient; and the second provision asks each applicant to acknowledge "that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168."  Compl. ¶ 51.  When combined, these provisions operate to form the certification requirement considered above.  But the second provision also has a freestanding effect: it notifies applicants that the NEA will not consider applications deemed to promote gender ideology.  In

---

[2] The NEA currently permits only one application per year. Pls.' Reply 18.

20

**JA248**

Plaintiffs' words, it serves as a "new, extra-statutory eligibility criterion." PI Mem. 17.[3]

Although Defendants cannot reasonably be expected to retroactively impose the certification requirement on applications submitted during the current funding cycle, the same cannot be said with respect to the prospective application of the eligibility bar. Therefore, the voluntary cessation exception to the mootness doctrine applies to Plaintiffs' claims regarding the NEA's categorical prohibition of projects deemed to promote gender ideology.

The Court reaches this conclusion for three reasons. First, the NEA has not disclaimed implementation of the EO. Pls.' Reply 4. And the timeline delineated in the Carter Memo suggests a probability that it will implement the EO during the current grant cycle.

Second, agency action is imminent. The question is not an

---

[3] The "Legal Requirements and Assurance of Compliance" section of the grant application, where the certification requirement and eligibility bar appear, includes a provision that "[p]rojects or programs that are determined to be obscene are without artistic merit and shall not be funded." Decl. Vera Eidelman Ex. 2, at 7, ECF No. 2-2. The obscenity bar is not extra-statutory like the eligibility bar on the promotion of gender ideology here, see 20 U.S.C. § 954(d)(1)-(2), but the bars' resemblance suggests the NEA meant to categorically proscribe the promotion of gender ideology just as Congress did for obscenity.

21

**JA249**

abstract one of whether a defendant will resume a challenged practice at an unspecified future date. Here, the date is specified and, unless the NEA foregoes implementation of the EO, the practice will likely resume in some form. The only question is how much that practice will resemble the challenged one.

Third, the text of the EO appears to require the NEA to impose an eligibility bar. The EO provides that "[f]ederal funds shall not be used to promote gender ideology." Exec. Order No. 14168, § 3(g), 90 Fed. Reg. at 8616. To be sure, Section 8(b) of the EO requires it to be "implemented consistent with applicable law." Id. § 8(b), 90 Fed. Reg. at 8618. So it is certainly possible that the NEA will moderate its approach to implementing the EO in light of the statutory language of the NFAHA and the input of this Court and others. But given the text of the EO, it is just as reasonable to expect that the NEA will conclude that the promotion of "gender ideology" will be considered as a significant factor weighing against a project's approval.

For these reasons, although the NEA has rescinded its prior implementation of the EO, the NEA can reasonably be expected to reimpose the eligibility bar during the current grant cycle. Therefore, the voluntary cessation exception applies with respect to the eligibility bar, the case is not moot in that respect, and the Court must consider Plaintiffs' request for preliminary

**JA250**

relief.

## C. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right," Winter, 555 U.S. at 24, and courts "should pay particular regard for the public consequences" of granting one, id. (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).   Moreover, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."   Lackey v. Stinnie, 145 S. Ct. 659, 667 (2025) (quoting Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017) (per curiam)).

The NEA has rescinded its implementation of the EO pending further administrative review.  But under the voluntary cessation doctrine, the rescission has not mooted the case, and Plaintiffs' claims about the eligibility bar are live.  Therefore, the Court must consider Plaintiffs' request for preliminary relief.  That entails reviewing the merits of Plaintiffs' legal claims.  On that note, two qualifications are in order.  First, one should resist "improperly equat[ing] 'likelihood of success' with 'success'" and treating the Court's preliminary review of Plaintiffs' claims "as 'tantamount to decisions on the underlying merits.'"   Id. (alteration in original) (quoting Univ. of Tex. v. Camenisch, 451

23

**JA251**

U.S. 390, 394 (1981)).  Second, requests for preliminary injunctive relief — especially when the window for review is small and the questions are big, as in this case — often require courts "to assess the merits of important cases earlier and more quickly than is ordinarily preferable, and to do so without the benefit of full merits briefing and oral argument."  Labrador v. Poe by & through Poe, 144 S. Ct. 921, 928 (2024) (mem.) (Kavanaugh, J., concurring).  With those qualifications noted, the Court proceeds to the preliminary-injunction analysis.

**1. Likelihood of Success on the Merits**

Plaintiffs can demonstrate a likelihood of success on the merits of their APA and First Amendment claims, but not their Fifth Amendment claim.

**a. APA Claims**

The Court finds that the eligibility bar likely violates the APA.  Plaintiffs bring three APA claims: that the eligibility bar (1) exceeds statutory authority, (2) is arbitrary and capricious, and (3) is contrary to a constitutional right.  Compl. ¶¶ 96-108.  The Court only addresses the first APA claim under this subsection and, given the preliminary nature of its review, simply folds the third APA claim into its analysis of Plaintiffs' constitutional claims in the following subsections.  The Court does not address

24

**JA252**

Plaintiffs' arbitrary-and-capricious claim.

The APA requires a court to "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  As the Supreme Court has recently explained, "the command of the APA" is "that 'the reviewing court' — not the agency whose action it reviews — is to 'decide <u>all</u> relevant questions of law' and 'interpret . . . statutory provisions.'"  <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369, 398 (2024) (quoting 5 U.S.C. § 706).  Therefore, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."  <u>Id.</u> at 412.  Indeed, even where an agency's authorizing statute is ambiguous with respect to the question at issue, the agency's interpretation of that statute is "<u>not</u> entitled to deference."  <u>Id.</u> at 392.  Here, the question is whether the eligibility bar, as it was originally imposed, is inconsistent with the NEA's authorizing statute, the NFAHA.

In response to Plaintiffs' claims that the eligibility bar violates the APA, Defendants argue only that because the NEA has rescinded the eligibility bar (in response to this litigation) pending further administrative review, no final agency action has occurred and, therefore, the APA does not apply.  Defs.' Resp. 14.

25

**JA253**

But as explained above, the voluntary cessation doctrine applies to Plaintiffs' challenge against the eligibility bar despite the rescission.  See supra Part III(B)(2).  Accordingly, the Court must review the eligibility bar under the APA to determine whether Plaintiffs have met their burden in their request for preliminary relief.

Before deciding whether the eligibility bar can be reconciled with the NEA's authorizing statute, the Court looks to the statute itself.  The NFAHA creates a multistep process to guide the NEA's review of each grant application.  First, the statute requires the Chairperson to "utilize advisory panels to review applications" and provides that "such panels shall recommend applications" to the Council "solely on the basis of artistic excellence and artistic merit."  20 U.S.C. § 959(c).  From there, the Council's eighteen voting members, all of whom must be private citizens with strong connections to the arts, id. § 955(b)(1)(C), "shall make recommendations to the Chairperson concerning . . . whether to approve particular applications . . . that are determined by panels . . . to have artistic excellence and artistic merit," id. § 955(f), (f)(1).  At the final step, the Chairperson must decide whether to approve or disapprove each application recommended by the Council.  Id. § 955(f)(2).  The Chairperson "may not approve an application with respect to which the Council makes a negative

26

**JA254**

recommendation."  Id.

The Court reads the decision-making structure outlined in the NFAHA to significantly constrain the Chairperson's discretion over whether to approve a given application.  With respect to each step of the decision-making process, the statute underscores that "artistic excellence and artistic merit are the criteria by which applications are judged."  Id. § 954(d)(1); see id. §§ 955(f)(1), 959(c).  To be sure, § 954(d)(1) instructs the Chairperson to ensure that applications are assessed by these criteria while "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." Id. § 954(d)(1).  This reasonably provides the NEA with at least some discretion over which applications to select, but that discretion must be exercised within the contours of the broader assessment of artistic excellence and artistic merit.  In other words, the Court does not read the decency and respect clause to empower the NEA to reject an application based on a sole criterion, regardless of its artistic qualities.  Cf. Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 582 (1998) (explaining "[t]hat § 954(d)(1) admonishes the NEA merely to take 'decency and respect' into consideration and that [it] was aimed at reforming procedures rather than precluding speech").

Furthermore, the NFAHA makes clear that each application is

27

**JA255**

to be reviewed on an individual basis, and that none should be presumed ineligible based on its content or viewpoint, with one exception. That exception is § 954(d)(2), which instructs the NEA to establish regulations and procedures that "clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded," and prohibits the NEA from supporting projects that are "determined to be obscene." 20 U.S.C. § 954(d)(2). According to the NFAHA, "[t]he term 'determined to be obscene' means determined, in a final judgment of a court of record and of competent jurisdiction in the United States, to be obscene." Id. § 952(j).

The relevance of § 954(d)(2) is threefold. First, as the Supreme Court has noted, "[w]hen Congress has in fact intended" the NEA to prohibit the funding of certain classes of speech, "it has done so in no uncertain terms." Finley, 524 U.S. at 581. Against the categorical language of a provision like § 954(d)(2), it is difficult to envision how a provision like § 954(d)(1), with its "vague exhortation" to consider decency and respect when making selections, could reasonably be used to proscribe a whole class of speech. Id. at 583. Second, § 954(d)(2)'s prohibition against funding obscenity is content based, not viewpoint based, and obscenity is not protected under the First Amendment. See United States v. Williams, 553 U.S. 285, 288 (2008) ("We have long held

**JA256**

that obscene speech . . . is not protected by the First Amendment." (citing Roth v. United States, 354 U.S. 476, 484-85 (1957))); see also Miller v. California, 413 U.S. 15, 23 (1973). Therefore, if the NEA used § 954(d)(1) to impose a viewpoint-based disqualification of protected speech, it would be going well beyond what Congress did in § 954(d)(2). Third, based on the statutory definition of "determined to be obscene," it appears that the NEA does not have power to decide which projects cannot be funded because they are obscene; rather, that determination requires the final judgment of a court. 20 U.S.C. § 952(j).

In light of the text and structure of the NFAHA, the Court is unable to reconcile the eligibility bar with the NEA's authorizing statute. The NFAHA sets forth a multistep review process to guide the NEA's selection of grant applications; and at each step of the process, the statute reiterates that artistic excellence and artistic merit — and nothing more — are the criteria by which applications are to be judged. Congress has instructed the NEA to ensure that "general standards of decency and respect for the diverse beliefs and values of the American public" are "tak[en] into consideration" during the review process. Id. § 954(d)(1). But the Court does not read this "vague exhortation" to empower the NEA to disqualify an entire class of projects based on the viewpoints they express and without regard to their artistic

29

**JA257**

qualities.  <u>Finley</u>, 524 U.S. at 583.  Because the eligibility bar does just that, and because the Court cannot find any provision of the NFAHA that would seem to justify it, the Court finds that the NEA's EO-based eligibility bar would likely exceed the NEA's statutory authority.

Because the Court finds that Plaintiffs have shown that the eligibility bar likely exceeds the NEA's authority under the NFAHA, the Court need not consider their second APA claim — that the eligibility bar is arbitrary and capricious — at this juncture. As for Plaintiffs' third APA claim — that the eligibility bar violates the APA because it is contrary to a constitutional right — the Court finds that Plaintiffs can demonstrate a likelihood of success on this claim for the reasons described immediately below.

### b. First Amendment Claim

In addition to likely violating the APA, the eligibility bar likely runs afoul of the First Amendment.  As mentioned above, the Supreme Court considered a First Amendment challenge related to the NEA's grantmaking process in its seminal <u>Finley</u> decision.  <u>See</u> <u>id.</u> at 572-73.  There, grant applicants brought a facial challenge to § 954(d)(1), arguing that its "decency and respect" clause was a viewpoint-based restriction on protected speech, in violation of the First Amendment, and was void for vagueness under both the

30

**JA258**

First and Fifth Amendments. Id. at 577-79.

The Court rejected both challenges and upheld § 954(d)(1), reasoning that its "vague exhortation" for decency and respect to be taken into consideration does not "silence speakers by expressly 'threaten[ing] censorship of ideas.'" Id. at 583-84 (alteration in original) (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 393 (1992)). As for the plaintiffs' void-for-vagueness challenge, although the Court described the terms of § 954(d)(1) as "undeniably opaque," it found it "unlikely . . . that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature." Id. at 588. When applying for competitive grants based on subjective criteria like artistic excellence and artistic merit, the Court reasoned that it was to be expected that artists "conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding." Id. at 589. And "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." Id.

On the First Amendment challenge, the Court observed that "the text of § 954(d)(1) imposes no categorical requirement" and "stands in sharp contrast to congressional efforts to prohibit the funding of certain classes of speech." Id. at 581. The Court further explained that "[i]n cases where we have struck down

31

**JA259**

legislation as facially unconstitutional, the dangers were both more evident and more substantial," such as where a criminal provision "set forth a clear penalty, proscribed views on particular 'disfavored subjects,' and suppressed 'distinctive idea[s], conveyed by a distinctive message.'" Id. at 582 (second alteration in original) (citations omitted) (quoting R.A.V., 505 U.S. at 391, 393).

Notwithstanding the deferential approach articulated above, the Court did not rule out the possibility of a successful First Amendment challenge to the implementation of § 954(d)(1):

> [W]e have no occasion here to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination. If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. We have stated that, even in the provision of subsidies, the Government may not "ai[m] at the suppression of dangerous ideas," and if a subsidy were "manipulated" to have a "coercive effect," then relief could be appropriate. In addition, as the NEA itself concedes, a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive "certain ideas or viewpoints from the marketplace." Unless § 954(d)(1) is applied in a manner that raises concern about the suppression of disfavored viewpoints, however, we uphold the constitutionality of the provision.

Id. at 587 (alteration in original) (emphasis added) (citations omitted) (first quoting Regan v. Tax'n With Representation of Wash., 461 U.S. 540, 550 (1983); then quoting Ark. Writers'

Project, Inc. v. Ragland, 481 U.S. 221, 237 (1987) (Scalia, J., dissenting); and then quoting Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 116 (1991)).

That "different case" is quite nearly the one now before this Court. Id. To be sure, this is not an as-applied challenge to a particular funding decision, nor is it a challenge to the statute. But the categorical nature and breadth of the eligibility bar seem to all but guarantee that a whole class of projects will be rejected based on viewpoint alone: with the eligibility bar in place, federal funding is being used to impose a "disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" Id. (quoting Simon & Schuster, 502 U.S. at 116). Defendants seem to acknowledge this, because their response is not to deny the obvious reality, but to claim that the First Amendment does not apply. They argue that NEA-funded art is not private speech at all — which is protected by the First Amendment — but government speech, which has no First Amendment protection:

> The NEA's selective, grantmaking decisions do not create any fora for any private citizens' exercise of free speech. Instead, the NEA's decisions about which art projects it selects for awards — and which it does not — constitute a form of government speech, and are therefore not subject to the First Amendment.

Defs.' Resp. 9. The Court must therefore decide whether the NEA's grant program is "designed to facilitate private speech" or instead to "promote a governmental message." Legal Servs. Corp. v.

33

**JA261**

Velazquez, 531 U.S. 533, 542 (2001).

We begin with the premise that the Free Speech Clause of the First Amendment "restricts government regulation of private speech; it does not regulate government speech." Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009). But "[t]he boundary between government speech and private expression can blur where, as here, a government invites the people to participate in a program." Shurtleff v. City of Boston, 596 U.S. 243, 252 (2022). To help determine whether, in these situations, "the government intends to speak for itself or to [facilitate] private expression," the Supreme Court has developed a "holistic" multifactor test. Id. A court should consider "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." Id. (citing Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 209-14 (2015)).

Applying these factors "without the benefit of full merits briefing" or a factual record, Labrador, 144 S. Ct. at 928 (Kavanaugh, J., concurring), the Court finds that the NEA's grantmaking program was designed to facilitate private speech. First, the history of the expression at issue, defined narrowly as NEA-funded art, favors Plaintiffs' argument that such art is

34

**JA262**

private speech.  In this case, defining the expression at issue is an awkward task.  In Shurtleff, the expression at issue was "flag flying, particularly at the seat of government."  596 U.S. at 253. In Walker, it was license plates.  576 U.S. at 210-11.  And in Summum, it was monuments built with the support of private funds but "display[ed] to the public on government land."  555 U.S. at 471.  Here, the expression at issue could be defined as artwork by private actors that is performed or displayed in nongovernment-owned spaces, but this would not capture the public-funding element.

Alternatively, it could be described simply as publicly funded art, but that would lump it together with situations in which the government exercises far more creative control over the production than is contemplated by the NFAHA, such as in cases involving public art exhibits, Smithsonian-commissioned portraits, or public monuments.  See People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23, 25, 29-31 (D.C. Cir. 2005) (holding that District of Columbia, by inviting artists to submit designs for decorating sculptures of donkeys and elephants — symbols of the main political parties — "installed at prominent city, federal and private locations," was engaged in government speech); Raven v. Sajet, 334 F. Supp. 3d 22, 28 (D.D.C. 2018) (holding National Portrait Gallery's art selections are government

speech); Matal v. Tam, 582 U.S. 218, 238 (2017) ("Governments have used monuments to speak to the public since ancient times; . . . '[p]ublic parks are often closely identified in the public mind with the government unit that owns the land' . . . ." (alteration in original) (quoting Summum, 555 U.S. at 472)).  The text and structure of the NFAHA make clear that the purpose of the NEA is to fund art for art's sake, not to advance specific views.  See supra Part III(C)(1)(a).  And, as noted at the outset, the drafters and subsequent amenders of the NFAHA went lengths to ensure that NEA funds were not leveraged to promote a particular political or governmental message.  See supra Part I(A).  In that respect, the NEA is distinct from programs like those cited above where the government speaks through its selection, display, and maintenance of art.

The second factor — "the public's likely perception as to who (the government or a private person) is speaking" — also supports the argument that NEA-funded art is private speech.  Shurtleff, 596 U.S. at 252.  To borrow Plaintiffs' words, "no one thinks an NEA artist speaks for the government."  Pls.' Reply 25.  Indeed, not even the Supreme Court thinks so: If artists have no First Amendment interest in what they produce using NEA funds, then the Finley Court would not have engaged in its lengthy analysis of the plaintiffs' claims or suggested that violations of the First

36

**JA264**

Amendment could occur in the grantmaking context.  See Finley, 524 U.S. at 587.

Finally, the third factor also favors this conclusion.  "[T]he extent to which the government has actively shaped or controlled the expression" is minimal here.  Shurtleff, 596 U.S. at 252.  Of course, the NEA "maintain[s] control over the selection" of proposals, Walker, 576 U.S. at 210, but for the reasons described in the Court's discussion of Plaintiffs' APA claims, this control does not extend to the content or viewpoint of the message conveyed, see supra Part III(C)(1)(a).  As this Court has repeatedly observed, artistic excellence and artistic merit are the only criteria by which proposals are to be judged; and further, the intent of the NFAHA is to "encourage[] . . . free inquiry and expression."  Compl. ¶ 21 (quoting S. Rep. No. 89-300, at 3-4).

Because the Court finds that NEA-funded art is likely private speech and not government speech, the eligibility bar amounts to impermissible viewpoint discrimination in violation of the First Amendment.  "At its most basic, the test for viewpoint discrimination is whether — within the relevant subject category — the government has singled out a subset of messages for disfavor based on the views expressed."  Matal, 582 U.S. at 248 (Kennedy, J., concurring).  That is exactly what the NEA has done by imposing

37

**JA265**

the eligibility bar.

This conclusion is also consistent with the related line of Supreme Court cases that address the power of government to impose speech-related conditions on the receipt of public funds. In these cases, the Court has outlined several considerations that distinguish permissible restrictions from impermissible ones. First, the government can extend a benefit that requires recipients to refrain from certain First Amendment activities, such as lobbying, without violating the First Amendment. See Regan, 461 U.S. at 545-46. But the Court has made clear that the permissibility of such activity-based restrictions does not mean the government can use subsidies to suppress "dangerous ideas." Id. at 548 (quoting Cammarano v. United States, 358 U.S. 498, 513 (1959)); see also FCC v. League of Women Voters of Cal., 468 U.S. 364, 380-81, 398-99 (1984) (holding grant condition preventing broadcasters from sharing their own partisan opinions was unconstitutional viewpoint discrimination). In this set of cases, the government is not communicating through its funding decisions, but rather is deciding whether to subsidize certain activities. And here the line between a content-based restriction and a

viewpoint-based restriction is significant.[4]

A second set of cases involves the government controlling the speech of funding recipients in order to "promote a governmental message." Velazquez, 531 U.S. at 542.  In these government speech cases, the line drawn is not between content and viewpoint, but rather between speech-related conditions that "define the limits of the government spending program" and those that "seek to leverage funding to regulate speech outside the contours of the program itself."  Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214-15 (2013).  A speech-based restriction in this context is permissible if the recipient is free to participate in activities that conflict with the government's message "on its own time and dime."  Id. at 218; see, e.g., Rust v. Sullivan, 500 U.S. 173, 196-200 (1991).  But if the condition "goes beyond defining the limits of the federally funded program to defining the recipient," constitutional problems arise. All. for Open Soc'y, 570 U.S. at 218.

Finally, the Supreme Court has held that where a funding program is designed not to promote a governmental message, but to facilitate private speech, any content- or viewpoint-based

---

[4] The Court notes that "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task."  Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994).

condition on the receipt of funding raises constitutional concerns. See Velazquez, 531 U.S. at 542, 548 (noting legal services program "was designed to facilitate private speech, not to promote a governmental message," and that Congress could not define the program's scope "to exclude certain vital theories and ideas"); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 834 (1995) ("It does not follow . . . that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers. A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles.").

To be sure, there is some overlap between the first two sets of cases, and the Supreme Court's line drawing is not always clear. Furthermore, although the eligibility bar is a precondition on the receipt of federal funds, the cases discussed above involve challenges to funding conditions that were enacted as an intrinsic part of a specific government program. In contrast, here we have an effort to impose an extrinsic, extra-statutory condition on top of an existing program. In the Court's preliminary view, and for all the reasons discussed above, it seems clear that the NEA's

40

**JA268**

grantmaking process was designed to facilitate private speech, and not to promote a governmental message. NEA-funded art is therefore protected under the First Amendment; and where, as here, the government has imposed a viewpoint-based condition on the receipt of those funds, there is a clear First Amendment violation.

### c. Fifth Amendment Claim

The Court finds that given the current posture of the case, where the certification requirement is mooted by the rescission but the eligibility bar is not, Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that the eligibility bar is unconstitutionally vague in violation of the Fifth Amendment. The primary thrust of Plaintiffs' vagueness argument is that the application instructed them to sign the certification requirement subject to potential criminal penalties for making false statements. Compl. ¶¶ 120-123; see also PI Mem. 28-29. But as discussed above, the NEA rescinded the certification requirement and cannot reasonably be expected to reimpose one as a precondition to applying for a grant in this cycle. See supra Part III(B)(1). Therefore, Plaintiffs' certification-requirement claim is moot, and the risk of penalties for any statements made in relation to the EO within the context of the grant application is no longer an issue.

As to the eligibility bar in particular, Plaintiffs argue

**JA269**

that even if there is no threat of criminal penalties, the bar nevertheless violates the Fifth Amendment because it affords the NEA excessive discretion over the grantmaking process. Pls.' Reply 26-27 (citing Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 94 (1st Cir. 2004)). But as the Supreme Court noted in Finley, the NFAHA "vests the NEA with substantial discretion to award grants," and "identifies only the broadest funding priorities." Finley, 524 U.S. at 573. If anything, the eligibility bar severely narrows the discretion of NEA personnel in deciding which projects to approve, and that is precisely why it likely violates both the APA and the First Amendment.

## 2. Irreparable Harm

Because Plaintiffs can demonstrate a likelihood of success on the merits of their First Amendment claim, the Court does not need to perform a separate irreparable-harm analysis. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Irreparable harm is thus "presumed upon a determination that [Plaintiffs] are likely to prevail on their First Amendment claim." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 11 (1st Cir. 2012).

## 3. Balance of the Equities and Public Interest

As noted above, the NEA's rescission of the eligibility bar

**JA270**

has not mooted Plaintiffs' claims.  This is because the Court can reasonably expect the NEA to reimpose the eligibility bar in some form, and on applications submitted during the current grant cycle, when it completes its review process regarding implementation of the EO later this month.  And because the eligibility bar (as initially imposed) likely violates the APA and the First Amendment, Plaintiffs can satisfy the first two elements of the preliminary injunction test.

But "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." Winter, 555 U.S. at 32 (citing Romero-Barcelo, 456 U.S. at 313 ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.") (alteration in original))).  And here, the balance of the equities tips against granting an injunction, at least for the present time.

Granting a preliminary injunction in these circumstances would impose significant hardship on the NEA with little practical benefit to Plaintiffs.  If the Court enjoins the NEA from imposing an eligibility bar at this juncture, it will in effect short circuit the ongoing administrative review process set to conclude in a matter of days.  This would rob the NEA of the opportunity to make its own considered decision about whether to implement the EO at all, given the obvious tension between the EO and the explicit

43

**JA271**

language of the NFAHA.  It is possible that the NEA will conclude that the two are irreconcilable, the statute governs, and the EO cannot be lawfully implemented absent congressional action.  For the Court to intercede and mandate this outcome would raise obvious separation-of-powers concerns.

It is also possible that the NEA might forge a middle position by attempting to harmonize the EO with Congress's statutory mandate.  This could, for example, take the form of expressing a preference for proposals that promote certain themes and shy away from others (including "gender ideology").  Plaintiffs' counsel, when asked about this possibility at oral argument, acknowledged that this would present a more difficult case.  The Court is in no position to anticipate this action or comment upon its legality.  Again, to do so would raise serious separation-of-powers concerns.

On the other side of the ledger, the benefits to Plaintiffs of granting an injunction are minimal.  NQT and TTO have already stated they intend to submit their preferred applications despite the eligibility bar because they have concluded it is unlawful. Compl. ¶¶ 74, 79.  Only RILA — and presumably some of TCG's members — are considering submitting an alternative proposal in lieu of one that might run up against the eligibility bar.  Id. ¶¶ 63-67, 84-92.

While an injunction might provide RILA and other applicants

with the assurance they desire that their preferred applications will not be rejected outright based on their content or the viewpoints they express, such an order provides less help than it may appear.  First, Plaintiffs now not only have their own legal opinions regarding the unlawfulness of an eligibility bar but have this Court's preliminary review of the merits as well.  RILA and the TCG members who are on the fence may now follow the example of the other Plaintiffs who already intend to submit their preferred applications.  If they do so, they are not harmed by the lack of injunctive relief.[5]

Furthermore, Plaintiffs must recognize that preliminary relief is inevitably fleeting: only the Court's final judgment can either vindicate or invalidate their claims.  And of course, nothing in life is certain.  Notwithstanding its initial view of the merits, this Court (or the Court of Appeals) might ultimately uphold whatever the NEA comes up with after its review.  Plaintiffs must make choices that hopeful grant applicants make all the time about what to propose in their application, to enhance their chances of success.  The Court cannot make the process free of

---

[5] Plaintiffs formerly faced a potential harm of civil, criminal, or administrative penalties for making false statements, tied to compliance with the EO, in submitting their applications. Compl. ¶¶ 42-46.  However, the removal of the certification requirement has eliminated that potential harm.  Eilers Decl. ¶ 8.

difficult choices.

Plaintiffs who have yet to submit an application must decide whether to play it safe and submit a backup proposal or possibly take a calculated risk and submit their preferred application. As Defendants suggest in their Response, when it comes to selective grant competitions such as this one, each applicant must consider a range of factors in deciding what kind of application to submit, and there is no guarantee of success. Defs.' Resp. 11. The Court's preliminary analysis of the merits just adds another factor to this calculation.

The bottom line is this: Although Plaintiffs can show a substantial likelihood of success on the merits of their (not moot) eligibility-bar claim, the balance of the equities and public interest weigh heavily against preliminary injunctive relief, at this time, for all the reasons discussed above. Once the NEA completes its process, Plaintiffs may well return to the Court for relief — or, if the NEA declines to adopt the EO in any way, they may drop the curtain on this action altogether. But for now, the PI Motion is denied.

## IV.  CONCLUSION

For the reasons above, Plaintiffs' Motion for a Preliminary Injunction, Expedited Hearing, and/or a Temporary Restraining Order ("PI Motion"), ECF No. 2, is DENIED.

IT IS SO ORDERED.

_____
William E. Smith
Senior District Judge
Date: April 3, 2025

47

**JA275**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, <br><br> *Defendants*. | Case No. 25-79 WES |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This lawsuit seeks to enjoin an unlawful and unconstitutional exercise of executive power that has sowed chaos in the funding of arts projects across the United States, causing grievous irreparable harm to Plaintiffs and other organizations.

2.      Plaintiffs are four arts nonprofit corporations that have received funding from the National Endowment for the Arts ("NEA") in the past and that seek to apply for NEA funding in the future, including in the current March 2025 application cycle. They are each committed to creating, producing, and promoting art that, among other things, affirms the equal dignity of all people—regardless of race, sex, religion, sexuality, or gender identity. In particular, they have created and promoted art in the past that promotes and affirms the lived experiences of transgender and nonbinary people, by casting transgender and nonbinary actors, and by promoting and producing art that features transgender and nonbinary themes.

**JA276**

3.      As directed by federal statute, the NEA administers tens of millions of dollars appropriated by Congress each year to funding for the arts. Congress established the NEA to "help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." 20 U.S.C. § 951(7). Congress made clear that, when choosing which projects to fund, "artistic excellence and artistic merit" are the only criteria for judging applications. *Id*. at § 954(d)(1).

4.      But on the day he took office, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO" or "EO"), directing that "federal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615 (Jan. 30, 2025) at §2(f). The EO defines "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* at §2(g).

5.      Shortly thereafter, the NEA implemented the Gender Ideology EO by requiring all grant applicants to certify their understanding that "federal funds shall not be used to promote gender ideology," pursuant to the EO. It also made applications for projects that appear to "promote" what the government deems "gender ideology" ineligible for funding.

6.      Because Plaintiffs seek to affirm transgender and nonbinary identities and experiences in the projects for which they seek funding, and were effectively barred by the "gender ideology" certification and prohibition (together, "gender ideology prohibition") from receiving NEA grants on artistic merit and excellence grounds, they filed this lawsuit challenging the prohibition on March 6, 2025, accompanied by a motion for preliminary relief.

7.      Following that filing, the NEA took several actions:

**JA277**

a.  First, on March 10, 2025, it declared that it would remove the certification requirement and that it would not reimpose the requirement "while the outcome of this litigation is pending." The NEA removed the certification requirement on March 11, 2025.

b.  Second, on March 17, 2025, the NEA issued a memorandum stating that "the NEA has rescinded all implementation of the EO, as it applies to the NEA's grantmaking activities" and would undergo "a new evaluation of the EO," which would be "complete[d] by April 16, 2025" and be "implement[ed] and ma[d]e public . . . by April 30, 2025."

c.  Finally, on April 30, 2025, the NEA announced the resulting policy ("Final EO Implementation"), which stated that "appropriate action is needed to incorporate the EO in the NEA's grant application review process" and that the NEA "intend[s] action to implement [the EO]." In particular, it announced that the Chair will review grant applications on a case-by-case basis "for artistic excellence and merit, including whether the proposed project promotes gender ideology."

8.    The "gender ideology" prohibition, comprising both the certification requirement and the eligibility bar; any other action to disqualify any project that promotes what the government deems to be "gender ideology" from NEA funding; and any other action to make any such project less likely to receive NEA funding is contrary to the agency's governing statute, arbitrary and capricious, and violates the First and Fifth Amendments by imposing a vague and viewpoint-based restriction on artists' speech. Plaintiffs request that the Court declare the "gender ideology" prohibition, the Final EO Implementation, and any other viewpoint-based effort by the

NEA to implement the EO unlawful, set them aside, and enjoin their application facially and as to Plaintiffs.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705-06.

10.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency acting in her official capacity and Plaintiff Rhode Island Latino Arts resides in this district.

## PARTIES

### A.     Plaintiffs

11.     Rhode Island Latino Arts ("RILA") is a 501(c)(3) nonprofit corporation based in Rhode Island. Its mission is to promote, encourage, and preserve the art, history, heritage, and cultures of Latinos in Rhode Island. It is committed to supporting the equal dignity of all artists, including transgender and nonbinary artists, and its work often features such artists and themes. RILA offers programming of every genre of art, including visual art, dance, and music. It puts on theatrical and musical performances, Latin percussion sessions, dancing events, script readings, and storytelling events. It also has a gallery to showcase artwork, and operates literacy programs. RILA has previously received NEA funding in 2019, 2020, and 2022.

12.     National Queer Theater, Inc. ("NQT") is a 501(c)(3) nonprofit corporation based in New York. It is a theater collective dedicated to celebrating the brilliance of generations of LGBTQ+ artists and providing a home for unheard storytellers and activists. Its work regularly

JA279

features transgender and nonbinary individuals and themes. NQT was awarded NEA grants in 2023 and 2024 for its Criminal Queerness Festiva ("CQF"). In addition, NQT was offered an NEA grant in 2025 for CQF.

13.     The Theater Offensive, Inc. ("TTO") is a 501(c)(3) nonprofit corporation based in Massachusetts. It is a theatrical organization whose mission is to present liberating art by, for, and about queer and trans people of color that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Although TTO is open to all without regard to race, sex, or other identifying characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people, including people of color, who are often the most underserved in the theatrical community both on and offstage. Its work regularly features transgender and nonbinary artists and themes. TTO has previously received six grants from the NEA, in 2016, 2017, twice in 2022, 2023, and 2025.

14.     Theatre Communications Group ("TCG") is a 501(c)(3) nonprofit corporation based in New York. It is a national theater organization with over 600 member theaters and affiliates and over 3,500 individual members. TCG offers networking and knowledge-building opportunities through research, communications, and events, and it publishes the nation's only general-circulation magazine related to theater, *American Theatre*. TCG supports theater professionals through annual convenings, industry reports, workshops, webinars, and the publication of *American Theatre* magazine and TCG Books, while also awarding $43 million in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking.

JA280

**B.      Defendants**

15.      Defendant National Endowment for the Arts ("NEA") is an independent agency of the United States Government headquartered in Washington, D.C. It is responsible for processing and overseeing arts grants to individuals and organizations across the country.

16.      Defendant Mary Anne Carter is the Acting Chair of the NEA. She is sued in her official capacity only.

<div align="center">

**ALLEGATIONS**

</div>

**A.      Congress Establishes the NEA**

17.      In 1965, Congress enacted the National Endowment for the Arts and Humanities Act (the "Act"), which established the NEA. 79 Stat. 845 (codified as amended at 20 U.S.C. § 951 *et seq.*). The Act sets forth "a broadly conceived national policy of support for the humanities and the arts in the United States," 20 U.S.C. § 953(b), and commits federal funding "to help create and sustain . . . the material conditions facilitating the release of this creative talent," *id*. at § 951(7).

18.      In response to concerns that government support for the arts might lead to "attempts at political control of culture," H.R. Rep. No. 89-618, at 21, *reprinted in* 1965 U.S.C.C.A.N. 3186, 3205 ("H.R. Rep. No. 618"), Congress took several steps to insulate the agency from political pressures, and to insulate private grantees' speech from government control.

19.      First, Congress articulated that funding criteria must be based on artistic excellence and merit. 79 Stat. 846–47, § 5(c)(1). The Act originally reflected this standard in the description of the productions to receive NEA funding, *e.g.* "productions which have substantial artistic and cultural significance" and "productions, meeting professional standards of or standards of authenticity, irrespective of origin which are of significant merit." *Id*. at § 5(c)(1)–(2). As the Senate Report explained, the standard for grants would be "artistic and humanistic excellence." S.

<div align="center">

**JA281**

</div>

Rep. No. 300, 89th Cong., 1st Sess. at 4 (1965); *see also Hearing on the Grant Making Process of the National Endowment for the Arts,* Before the Subcomm. on Postsecondary Educ. of the House Comm. on Educ. and Labor, 98th Cong., 2d Sess. 4-5 (June 28, 1984) (hereinafter "*1984 Grant Making Hearing*") ("The only criterion was to be artistic excellence, and that is the criterion used today.") (statement of former NEA chair Frank Hodsoll). The Act also now explicitly provides that "artistic excellence and artistic merit are the criteria by which applications are judged." 20 U.S.C. § 954(d)(1).

20.    Second, Congress enacted a provision that forbade the NEA from "exercis[ing] any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any school or other non-federal agency, institution, organization, or association." 20 U.S.C. § 953(c). The House Report described this provision as an "assurance against federal interference in the arts." H.R. Rep. No. 618, 1965 U.S.C.C.A.N. at 3200.

21.    Third, Congress made the NEA an agency of arts professionals guided by artistic merit rather than of politicians who might be driven by political concerns. It required that the NEA's decisionmakers—the Chair and the National Council on the Arts—be experts in the arts. *See* 78 Stat. 905, § 5(a) (requiring National Council on the Arts members to be selected "for their broad knowledge of or experience in, or for their profound interest in the arts," include those "professionally engaged in the arts," and from "the major art fields"); 79 Stat. at 849, § 6(a) (transferring the National Council on the Arts to the NEA); *see also* 135 Cong. Rec. 16284 (1989) (statement of Senator Pell) ("When we structured the Endowment, we were careful to put the artistic decisionmaking in the hands of outside experts and away from the influence of government . . . ."); *1984 Grant Making Hearing* (statement of former NEA chair Hodsoll) ("[T]here would be no federal agencies to fund the arts and the humanities without statutory guarantees that

JA282

Washington bureaucrats would not make the artistic content decisions involved in federally funded projects. Rather, these decisions were to be left to the individual artists and their organizations."). The Act continues to reflect Congress's desire that the NEA's decisionmakers be arts professionals, providing that 18 members of the National Council on the Arts be appointed according to similar criteria. *See* 20 U.S.C. § 955(b).

22.    Fourth, the Senate Report devoted an entire section to "Freedom of Expression":

> It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. One of the artist's and humanist's great values to society is the mirror of self-examination which they raise so that society can become aware of its shortcomings as well as its strengths . . . . Countless times in history artists and humanists who were vilified by their contemporaries because of their innovations in style or mode of expression have become prophets to a later age. Therefore, the committee affirms that the intent of this act should be the encouragement of free inquiry and expression. . . . [C]onformity for its own sake is not to be encouraged, and . . . no undue preference should be given to any particular style or school of thought or expression.

S. Rep. No. 300, 89th Cong., 1st Sess. at 3–4 (1965). As one member stated, Congress's intent was to have "Government assistance, but not intervention . . . support but not control . . . stimulation but not participation." 111 Cong. Rec. 23963 (1965) (statement of Cong. Monagan); *see also* 111 Cong. Rec. 23969 (1965) (statement of Cong. Helstoski) ("The Federal Government will supply the money, but the artists and their organizations will suggest the proposals, select the performances which are to be produced and do all the planning. The Federal Government will be the means, but the end product will be the sole responsibility of the performing artists.").

23.    Since its founding, the NEA has awarded more than $5.5 billion in funding to individuals and organizations working to bring the arts to communities throughout the nation.[1] It

---

[1] *Impact*, Nat'l Endowment for the Arts, https://www.arts.gov/impact

has regularly supported art that features transgender and nonbinary artists and themes, including by the Plaintiffs in this case. On January 14, 2025, the NEA announced its latest tranche of awards, numbering "1,474 awards totaling $36,790,500 to support the arts in communities in all 50 states, Puerto Rico, and Washington, DC."[2]

**B.      The Structure and Grantmaking Authority of the NEA**

24.      The Act "authorize[s]" the NEA's Chair "to establish and carry out a program of contracts with, or grants-in-aid or loans to, groups or, in appropriate cases, individuals of exceptional talent engaged in or concerned with the arts." 20 U.S.C. § 954(c). The broadly defined funding priorities identified by the Act include, *inter alia*, "projects and productions which have substantial national or international artistic and cultural significance"; "projects and productions which have substantial artistic and cultural significance and that reach, or reflect the culture of, a minority, inner city, rural, or tribal community"; and "projects and productions that will encourage public knowledge, education, understanding, and appreciation of the arts." *Id*. §§ 954(c)(1)–(10).

25.      The Act directs the Chair to "utilize advisory panels to review applications, and to make recommendations to the National Council on the Arts." *Id*. § 959(c). These advisory panels must be "composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." *Id*. § 959(c)(1). They must also "include representation of lay individuals who are knowledgeable about the arts but who are not engaged in the arts as a profession and are not members of either artists' organizations or arts organizations." *Id*. § 959(c)(2).

---

[2] *National Endowment for the Arts Supports the Arts with Nearly $36.8 Million in Funding Nationwide*, Nat'l Endowment for the Arts (Jan. 14, 2025), https://www.arts.gov/news/press-releases/2025/national-endowment-arts-supports-arts-nearly-368-million-funding-nationwide

26.    The National Council on the Arts reviews the recommendations made by the advisory panels and advises the Chair on whether to approve or deny funding. *Id*. § 955(f). The Chair has "final authority to approve each application, except that the Chairperson may only provide to an applicant the amount of financial assistance recommended by the Council and may not approve an application with respect to which the Council makes a negative recommendation." *Id*. § 955(f)(2).

###    C.    The "Decency and Respect" Clause and *NEA v. Finley*, 524 U.S. 569 (1998)

27.    Prior to 1989, "only a handful of the agency's . . . awards ha[d] generated formal complaints about misapplied funds or abuse of the public's trust." *NEA v. Finley*, 524 U.S. 569, 574 (1998). That year, however, controversy arose concerning the funding of a Robert Mapplethorpe retrospective that included homoerotic photographs, and an Andres Serrano piece entitled Piss Christ, which featured a photograph of a crucifix covered in urine. *Id.*

28.    Congress initially responded by stipulating in the 1990 appropriations bill that no NEA funds "may be used to promote, disseminate, or produce materials which in the judgment of [the NEA] may be considered obscene, including but not limited to, depictions of sadomasochism, homoeroticism, the sexual exploitation of children, or individuals engaged in sex acts and which, when taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 575 (alteration in original) (quoting Department of the Interior and Related Agencies Appropriations Act, 1990, 103 Stat. 738-742). The NEA instituted "a requirement that all grantees certify in writing that they would not utilize federal funding to engage in projects inconsistent with the criteria in the 1990 appropriations bill." *Id.* A federal district court subsequently struck the certification down as unconstitutionally vague and unduly chilling of speech. *See id.* (citing *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F.Supp. 774 (C.D. Cal. 1991)).

29.     The 1990 appropriations bill also created "an Independent Commission of constitutional law scholars to review the NEA's grant-making procedures and assess the possibility of more focused standards for public arts funding." *Id*. The Commission recommended in its report "that the NEA rescind the certification requirement and cautioned against legislation setting forth any content restrictions." *Id*. Instead, it proposed "procedural changes to enhance the role of advisory panels and a statutory reaffirmation of 'the high place the nation accords to the fostering of mutual respect for the disparate beliefs and values among us.'" *Id*. at 575–76 (quoting Independent Commission, Report to Congress on the National Endowment for the Arts 83–91 (Sept. 1990)).

30.     Congress subsequently "debated" and "rejected" several proposed reforms when "it considered the agency's reauthorization in the fall of 1990." *Id*. at 576. Among those proposals was an amendment that would have prohibited "awarding any grants that could be used to 'promote, distribute, disseminate, or produce matter that has the purpose or effect of denigrating the beliefs, tenets, or objects of a particular religion' or 'of denigrating an individual, or group of individuals, on the basis of race, sex, handicap, or national origin.'" *Id.* (quoting 136 Cong. Rec. 28657–64).

31.     Instead, Congress adopted the Williams/Coleman Amendment, codified at 20 U.S.C. § 954(d)(1), which directs the Chair, in establishing regulations and procedures for funding projects and productions, to "ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *See also Finley*, 524 U.S. at 576. The Amendment also directs that the regulations and procedures must "clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded." 20 U.S.C. § 954(d)(2).

32.     Shortly after the enactment of the Williams/Coleman Amendment, four performance artists and the National Association of Arts Organizations challenged the constitutionality of the "decency and respect" clause on the ground that, among other things, it violated the First Amendment because it constituted viewpoint discrimination. *Finley*, 524 U.S. at 577–78.

33.     In *NEA v. Finley*, the Supreme Court held that § 954(d)(1) does not violate the First Amendment, because the "decency and respect" clause "imposes no categorical requirement" on the viewpoint of artistic works eligible for NEA funding. *Id*. at 581. The Court noted that "[t]he Independent Commission had cautioned Congress against the adoption of distinct viewpoint-based standards for funding," and that Congress had heeded this warning by "declin[ing] to disallow any particular viewpoints." *Id*. at 581–82. The Court specifically highlighted that the sponsors of § 954(d)(1) had stated: "[I]f we start down that road of prohibiting categories of expression, categories which are indeed constitutionally protected speech, where do we end? Where one Member's aversions end, others with different sensibilities and with different values begin.'" *Id.* at 582 (alteration in original) (quoting 136 Cong. Rec. 28624 (statement of Rep. Coleman)). In light of these considerations, the Court agreed with the NEA that the "decency and respect" clause is "merely hortatory," and that § 954(d)(1) "does not preclude awards to projects that might be deemed 'indecent' or 'disrespectful,' nor place conditions on grants, or even specify that those factors must be given any particular weight in reviewing an application." *Id*. at 580–81.

34.     In upholding the "decency and respect" clause, the Court was careful to note that it "would confront a different case" if the NEA were to deny, or disfavor, grants to projects or productions expressing disfavored viewpoints. *Id*. at 587. The Court reaffirmed "that, even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas,'"

**JA287**

*id.* at 587 (alteration in original) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U. S. 540, 550 (1983)), especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace,'" *id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991)).

**D.      The NEA Grants for Arts Projects**

35.      The Grants for Arts Projects ("GAP") is the NEA's "principal grants category." GAP makes grants "available for arts projects of all sizes in a wide variety of artistic disciplines."[3]

36.      GAP applicants may request an amount between $10,000–$100,000.[4]

37.      The NEA accepts GAP applications during two funding cycles each year. For fiscal year 2026, the NEA is accepting applications in the March Cycle and July Cycle.[5]

38.      For the March Cycle, the submission deadline was March 24, 2025 when this case was filed, and the notification for acceptance or rejection is December 2025. Though the deadline had initially been set for February 13, 2025, the NEA extended it to March 24, 2025 when it amended the GAP application guidelines in early February, including by newly requiring applicants to certify that they would not "promote gender ideology." Following the filing of this suit, the NEA extended the deadline again, to April 7, 2025. For the March Cycle, the earliest project start date is January 1, 2026.[6]

39.      For the July Cycle, the submission deadline is July 22, 2025, and the notification for acceptance or rejection is April 2026. The earliest project start date is June 1, 2026.[7]

---

[3] *Grants*, Nat'l Endowment for the Arts, https://www.arts.gov/grants.

[4] *Grants for Arts Projects*, Nat'l Endowment for the Arts, https://www.arts.gov/grants/grants-for-arts-projects.

[5] *Id.*

[6] *Id.*

[7] *Id.*

40.    The NEA anticipates awarding $62,245,000 for fiscal year 2026. It anticipates 4,500 applications and anticipates 2,075 awards.[8]

**E.    The GAP Application Process**

41.    The GAP application process has two parts. In Part 1, applicants must complete the Application for Federal Domestic Assistance/Short Organization Form, a brief form that collects basic information about the applicant organization, and submit it on Grants.gov. For the March Cycle, Part 1 was due March 11, 2025.

42.    In Part 2, an applicant must complete the Grant Application Form, which constitutes the majority of the application material, including information about the organization, like history and budget; the project description, timeline, and budget information; and work samples, and submit it on the NEA's applicant portal. For the March Cycle, Part 2 was due on March 24, 2025 when this case was filed; that deadline was later extended to April 7, 2025.

43.    When this suit was filed, both Parts 1 and 2 required an applicant to agree to the following certification:

> By signing this certification, I certify (1) to the statements contained in the list of certifications* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001).

44.    In order to submit Parts 1 and 2 of the GAP application, an applicant must agree to the certification by checking a box labeled "I agree."

---

[8] *Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP) Grant Program Details* 4, Nat'l Endowment for the Arts, February 2025, https://www.arts.gov/sites/default/files/FY26-GAP-Grant-Program-Details-FebRevFinal4.pdf.

45. Below the certification text is the following explanatory asterisk: "The list of certifications and assurances, or an Internet site where you may obtain this list, is contained in the announcement or agency specific instructions."

46. The agency specific instructions for the GAP application are available in the GAP Grant Program Details for fiscal year 2026, which includes a detailed description of the grant program and eligibility information.[9] The GAP Grant Program Details states that "[b]y signing and submitting the application form . . . , the Applicant certifies that it is in compliance with the statutes outlined in the Assurance of Compliance and all related National Endowment for the Arts regulations as well as all applicable executive orders . . . ." It also provides a hyperlink to the Assurance of Compliance, which is available on the NEA website.

47. Accordingly, by agreeing to the certification when submitting the GAP application, an applicant certifies their agreement with the Assurance of Compliance.

**F.    Executive Order 14168 and the NEA's Implementation of the Order through the Assurance of Compliance**

48. On January 20, 2025, President Donald J. Trump signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO" or "EO").

49. The Gender Ideology EO claims that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." 90 Fed. Reg. 8615 (Jan. 30, 2025) at § 1. The Order asserts that "[e]fforts to eradicate the biological reality of sex" and "attack

---

[9] *Id.*

. . . the ordinary and longstanding use and understanding of biological and scientific terms . . . unmoored from biological facts" amounts to an "attack" on "women" and "on the validity of the entire American system." *Id*. It accordingly states that "my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id*.

50.    In order to pursue this objective, the Gender Ideology EO directs: "Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. at § 3(g).

51.    Section 2(f) of the Gender Ideology EO defines "gender ideology" as follows:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

52.    The NEA subsequently implemented the President's Gender Ideology EO. On February 6, 2025, the agency announced updates to its grants for fiscal year 2026, including GAP grants. On or about the same day, the NEA amended its Assurance of Compliance to include the language:

> [T]he applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:
>
> - The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions.
>    . . .
> - The applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.

53.    The Assurance of Compliance states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these . . . executive orders" and that "[i]f the NEA determines that a recipient has failed to comply . . . , it may suspend or terminate the award, and/or recover the funds." It further states that the "[t]he applicant's assurance of compliance is subject to judicial enforcement." It later reiterates that "[t]he United States has the right to seek judicial or administrative enforcement of this assurance."

G.    *National Association of Diversity Officers in Higher Education v. Trump*

54.    On February 21, 2025, the U.S. District Court for the District of Maryland enjoined a different certification requirement that appeared in the NEA's new Assurance of Compliance, when it also added the "gender ideology" prohibition. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (hereinafter "*NADOHE*"), No. 25-cv-333, 2025 WL 573764 (D. Md. Feb. 21, 2025). That certification requirement read: "The applicant will not operate any programs promoting 'diversity, equity, and inclusion' (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173" ("DEI certification").

55.    President Trump signed Executive Order No. 14173 ("DEI EO"), entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," on January 21, 2025. 90 Fed. Reg. 8633 (Jan. 31, 2025). In relevant part, the DEI EO directs all agencies to "include in every contract or grant award," a certification, enforceable through the False Claims Act, that the contractor or grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

56.    On February 3, 2025, the National Association of Diversity Officers in Higher Education, the American Association of University Professors, Restaurant Opportunities Centers United, and the Mayor and City Council of Baltimore challenged, *inter alia*, the certification

**JA292**

requirement in the DEI EO, on the grounds that it violates the First Amendment and the separation of powers. Compl., *NADOHE*, ECF No. 1, at ¶¶ 193–210 (Feb. 3, 2025). On February 13, 2025, the plaintiffs moved for a temporary restraining order and/or preliminary injunction, including on these claims. Mot. for TRO, *NADOHE*, ECF No. 27 (Feb. 13, 2025).

57.    On February 21, 2025, the district court held that the plaintiffs had shown a likelihood of success that the certification requirement in the DEI EO violates the First Amendment because it is a "content-based prior restraint on their speech" and "operates as a facially viewpoint-discriminatory order as well." *NADOHE*, 2025 WL 573764, at *22. It also held that the plaintiffs had demonstrated irreparable injury and that the balance of the equities and public interest tip in their favor. *Id*. at *27–28. On that basis, the court ordered that the defendants "shall not: . . . require any grantee or contractor to make any 'certification' or other representation pursuant to the Certification Provision." Prelim. Inj., *NADOHE*, ECF No. 45, at 3.

58.    Following the Court's issuance of its preliminary injunction order, the NEA updated its Assurance of Compliance to include the following language after the DEI certification:

> *PLEASE NOTE: Due to the preliminary injunction issued on February 21, 2025, by the United States District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, the NEA is not currently requiring any grantee or contractor to make any "certification" or other representation pursuant to Executive Order No. 14173. This term will not apply to your award as long as this preliminary injunction remains in effect.*

59.    On March 14, 2025, the Fourth Circuit stayed the preliminary injunction pending appeal.

60.    As of May 12, 2025, the language regarding the NEA not currently requiring any grantee to make "any 'certification' or other representation pursuant to Executive Order No. 14173" continues to appear on the Assurance of Compliance.

**H.    Changes to NEA Policy Following the Filing of this Lawsuit**

JA293

61.    On March 6, 2025, Plaintiffs filed suit, seeking to enjoin the gender ideology prohibition, accompanied by a motion for preliminary relief, in light of the upcoming deadlines: March 11 for Part 1, and March 24 for Part 2.

62.    On March 10, 2025, the NEA submitted a declaration to this Court stating that the NEA would remove the certification requirement before Part 1 was due, and that the March 24, 2025 deadline would be extended to April 7, 2025.

63.    On March 11, 2025, the NEA removed the certification requirement from the Assurance of Compliance. The Assurance now states that the NEA will "no longer require applicants to certify their compliance with [the EO] while the outcome of this litigation is pending."

64.    On March 17, 2025, Defendant Carter issued a memorandum ("March 17 Memorandum") to NEA grantmaking staff, stating that "the NEA has rescinded all implementation of the EO, as it applies to the NEA's grantmaking activities" and announcing that the NEA "is initiating a new evaluation of the EO in accordance with the Administrative Procedure Act." The Memorandum explained that the NEA would not implement the EO in any grant evaluations "until . . . the agency's process of deliberating and considering this EO has completed," which would occur "by April 16, 2025" and be "implement[ed] and ma[d]e public . . . by April 30, 2025." The NEA also specified that it "will not require any applicant for any agency funds to certify their compliance with the EO during this time."

65.    On April 3, 2025, this Court issued a Memorandum and Order denying Plaintiffs' request for preliminary relief. The Court found that "Plaintiffs have demonstrated a likelihood of success on the merits of their APA and First Amendment claims and that they would suffer irreparable harm if the prohibition were imposed." In particular, the Court concluded that the

JA294

eligibility bar is not reconcilable with the NEA's authorizing statute, and that it likely runs afoul of the First Amendment because "the NEA's grantmaking program was designed to facilitate private speech," not government speech, and the eligibility bar "all but guarantee[s] that a whole class of projects will be rejected based on viewpoint alone." At the same time, because the NEA had "rescinded its implementation of the EO pending further administrative review," the Court concluded that "the balance of equities tips in Defendants' favor and . . . an injunction is not in the public interest at this time." The Court noted that "[o]nce the NEA completes its process, Plaintiffs may well return to this Court for relief[.]"

66.    The NEA completed its process on April 16, 2025, and announced the resulting policy ("Final EO Implementation") on April 30. The Final EO Implementation states that "appropriate action is needed to incorporate the EO in the NEA's grant application review process," that the NEA "intend[s] action to implement [the EO]," and that the Chair will review grant applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology."

67.    At the same time, the Final EO Implementation asserts that the new process "essentially utilizes the existing statutory review scheme that the agency currently follows." "[T]he Chair will implement [the EO] by evaluating projects that promote gender ideology based on the existing statutory criteria"; "the only criteria all applications are subject to are those set forth in the enabling statute"; and "[u]nder these criteria, there is no room for viewpoint discrimination." "For example, in reviewing an application that promotes gender ideology," the NEA explains, "the Chair could consider whether or not the specific elements of that project align with general standards of decency and respect for the diverse beliefs and values of the American public, or whether those elements indicate a sufficient level of anticipated public interest in or appreciation

JA295

of the project, or are likely to be suitable for or appeal to intended audiences," but "[t]he process does not include an eligibility bar[.]"

68.    The Final EO Implementation also states that "[a]pplicants will not be required to certify that no federal funds are used to promote gender ideology." However, the Assurance of Compliance continues to state that no such certification will be required only "while the outcome of this litigation is pending."

I.    **Harm to Plaintiffs**

*Rhode Island Latino Arts*

69.    When Plaintiffs filed this suit, RILA was in the process of applying for NEA funding in the March 2025 GAP cycle to support programming in 2026.

70.    RILA originally planned to seek support for a production of "Faust," in which the lead character is gay and queer. RILA was considering casting a nonbinary actor who uses they/them pronouns for that role. In the past, this actor has chosen to dress as a man during one performance and dress as a woman in the next performance, while performing the same role.

71.    Because, at the time that RILA was preparing its application and choosing which proposal to put forth, the NEA's Assurance of Compliance required certifying that federal funds will "not be used to promote gender ideology," RILA decided not to apply for a grant to support "Faust."

72.    RILA also considered applying to support its storytelling program. In its storytelling program, RILA allows performing artists to tell their stories without restrictions, based on the principle that artistic freedom should allow them to say what they want. The program is open to all performers, including nonbinary and transgender performers, and it allows them to speak about or interpret their art based on their personal lives. RILA will not tell performers to

stay away from topics that could be interpreted as "promoting" what the government deems to be "gender ideology."

73.     RILA decided not to apply for a grant to support the storytelling program because of the gender ideology prohibition in place when the lawsuit was filed.

74.     Though it is not the project for which RILA wanted to apply, RILA has applied for an NEA grant to support performance tours and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. Without the "gender ideology" prohibition in place when the suit was filed, the scope would have been different; RILA would have applied for a grant that affirmatively included celebrating transgender, queer, and nonbinary identity and featuring artists and characters with those identities.

75.     Though RILA objected to the "gender ideology" prohibition, RILA submitted Part 1 of its application on February 14, 2025, and agreed to the Assurance of Compliance, with the intention of proceeding with a more restricted project that would comply with the "gender ideology" prohibition. After the certification requirement had been removed, RILA withdrew and then resubmitted Part 1.

76.     Similarly, because RILA had to submit Part 2 of its application by April 7, before the NEA issued its Final EO Implementation, and there was no assurance that the NEA would not reimpose the "gender ideology" prohibition, RILA did not expand the scope of the project in Part 2 of its application to reflect its desire to support transgender, queer, and nonbinary artists, characters, and themes within the scope of its NEA-funded programming.

77.     Because what it means to "promote" what the government deems to be "gender ideology" is not clear, RILA is forced to guess as to the parameters, including whether it prohibits allowing a transgender, queer, or nonbinary individual to participate in NEA-funded programming,

**JA297**

including any mention of these identities in RILA's work, or including any fictional characters who are transgender, nonbinary, or queer. Given the lack of clarity, RILA fears that even describing itself as an organization that supports transgender, nonbinary, and queer artists might run afoul of the "gender ideology" prohibition. The lack of clarity also denies RILA the ability to provide artists the creative freedom to which RILA is committed as an organization, and it precludes RILA from expressing viewpoints affirming all identities, including those of transgender, nonbinary, and queer individuals, even though RILA is committed to those views as an artistic organization.

78.    In addition, because the NEA's Final EO Implementation is not clear with regard to what role the NEA's perception that a project "promotes gender ideology" will play in its grantmaking determinations, RILA is forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make it ineligible for, or less likely to receive, an NEA grant in this or future funding cycles.

79.    RILA believes that it has the right, as an artistic organization, to apply for NEA funding to promote art that meets the artistic merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." RILA seeks to affirm all gender identities, including transgender, nonbinary, and queer identities. Yet any work that might be seen as "promoting" these identities risks violating the NEA's "gender ideology" prohibition.

80.    RILA also intends to apply for NEA grants in future grant cycles to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through that art. But as long as the promotion of what the government deems to be "gender ideology" affects eligibility for, or likelihood of, receiving an NEA grant, RILA will be forced to censor the projects it submits for NEA support.

*National Queer Theater*

81.     When this lawsuit was filed, NQT intended to apply for NEA funding in the March 2025 GAP cycle to support its Criminal Queerness Festival ("CQF"), as it has successfully in the past. Since the suit was filed, NQT submitted a proposal for CQF 2026 in the March funding cycle. The NEA funds would be used for artist and production expenses.

82.     The 2026 CQF will be NQT's eighth annual one. In January 2025, NQT received an Obie Award for the Festival in the "Theatre Grants" category. The prestigious Obie Awards, established in 1955, honor the highest caliber of off-Broadway and off-off Broadway theater to recognize brave work, champion new material, and advance careers in theater.

83.     CQF is devoted to freedom of expression and to fighting censorship and criminalization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes. CQF has featured works from emerging artists from countries that criminalize homosexuality. The plays are accompanied by talkback discussions facilitated by the playwrights, human rights advocates, and other subject matter experts.

84.     The plays featured in the festival are chosen by a curatorial committee of prior CQF playwrights. Supporting transgender, nonbinary, and gender queer writers and themes has always been a part of the festival, including in the years that it has received NEA funding. In 2023, the festival featured one play about intersex identity. In 2024, two plays were written by transgender writers and about trans identity. For 2025, all three playwrights identify as nonbinary or gender queer, and one play has nonbinary characters.

**JA299**

85.    Because the "gender ideology" prohibition in place when the lawsuit was filed was unclear, it forced NQT to guess as to what, if anything, it could do that would avoid the open-ended prohibition. For example, it is not clear whether "promoting" what the government deems to be "gender ideology" includes merely working with actors, playwrights, and other artists who identify as transgender, nonbinary, or queer, regardless of the content of the art they produce. It is also unclear whether the mere existence of a transgender, nonbinary, or queer character in a piece violates the prohibition. NQT fears that its very mission as an organization dedicated to celebrating LGBTQ+ artists might also run afoul of the "gender ideology" prohibition.

86.    In addition, because the NEA's Final EO Implementation is not clear with regard to what role, if any, the NEA's perception that a project "promotes gender ideology" will play in its grantmaking determinations, NQT is forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make it ineligible for, or less likely to, receive an NEA grant in this or future funding cycles.

87.    NQT believes that it has the right, as an organization of artists, to apply for NEA funding to promote art that meets the merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." NQT seeks to affirm all gender identities, including transgender, nonbinary, and queer identities. Yet any work that promotes these identities risks violating the NEA's "gender ideology" prohibition, or its Final EO Implementation.

88.    Only because one could not register to apply for NEA funding without checking the box agreeing to the certification in the application, NQT intended to check that box when this lawsuit was filed, while simultaneously making clear in writing on the application that it was not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Because the

**JA300**

NEA revoked the certification requirement while this litigation is pending, NQT did not have to agree to the "gender ideology" certification in this funding cycle.

89. NQT applied for the March 2025 cycle and not the July 2025 cycle so that it can receive the grant notification in December, which is also when NQT passes its budget. Because NQT operates on a calendar year, receiving the grant notification in December would give it six months to plan, budget, and fundraise for CQF 2026. If NQT were to wait until the July 2025 cycle, that would force it to wait until April 2026 for the grant notification, leaving NQT with only two months before CQF 2026, which is not enough time for the necessary planning.

90. NQT also intends to apply for NEA funding in the future, as it has consistently done in the past, to support its work affirming transgender, queer, and nonbinary identities. But as long as the promotion of what the government deems to be "gender ideology" affects eligibility for, or likelihood of receiving, an NEA grant, NQT will be effectively barred from seeking such support.

### *The Theater Offensive*

91. When this lawsuit was filed, TTO intended to apply for NEA funding in the March 2025 GAP cycle to support the production of a new play titled "Smoke," written by a transgender playwright. Since the suit was filed, TTO has applied for these funds. Set in 1960's D.C., "Smoke" explores love, found family, motherhood, and healing, and reveals the complexities of transgender life. The production will feature two transgender actors in the leading roles. The NEA funds would be used to support the artists in the play, which would begin rehearsals in May 2026.

92. When this lawsuit was filed, the certification requirement posed an obstacle for TTO, because it wanted to apply for funding, but believes it has a right to be considered without regard to whether the views its project expresses "promote" what the government deems to be "gender ideology."

**JA301**

93.    Accordingly, when the suit was filed, TTO intended to check the box agreeing to the certification in the application only because doing so was necessary to submit an application, but planned to simultaneously make clear in writing on the application that it is not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Because the NEA revoked the certification requirement while this litigation is pending, TTO did not have to agree to the "gender ideology" certification in this funding cycle.

94.    TTO found the certification requirement and eligibility bar unclear as to what constitutes "promoting" what the government deems to be "gender ideology"; they thereby forced TTO to guess as to what it can and cannot do with an NEA grant. For example, it does not make clear whether "promoting" what the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as transgender and/or nonbinary, without more, or whether it prohibits only certain messages, themes, or views. The requirement was also unclear as to whether the existence of a transgender and/or nonbinary character in a piece constitutes "promoting" what the government deems to be "gender ideology." Nor is it clear what views are proscribed. TTO fears that its very mission as an organization dedicated to queer and trans people might run afoul of the "gender ideology" prohibition.

95.    In addition, because the NEA's Final EO Implementation is not clear with regard to what role, if any, the NEA's perception that a project "promotes gender ideology" will play in its grantmaking determinations, TTO is forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make it ineligible for, or less likely to, receive an NEA grant in this or future funding cycles.

96.    TTO applied for the March 2025 cycle and not the July 2025 cycle in order to have enough planning time for "Smoke." Every production requires significant lead time in order to

**JA302**

ensure that proper funding is in place, and the production process requires time to secure a venue, actors, creative and production team members, security, and more. Having a year to adequately plan and secure the necessary funding is best practice for organizations like TTO.

97.    It was also important for TTO to apply in the March 2025 cycle because March applicants will not know if their application was recommended or rejected for funding until December 2025, and the earliest start date for any funded project is January 2026. If TTO were to apply in the second cycle of funding, it would not allow the project to start until June 1, 2026, which would be too late for Smoke's production timeline.

98.    TTO also intends to apply for NEA grants in future grant cycles to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender and/or nonbinary identities through its artistic expression. But as long as the promotion of what the government deems to be "gender ideology" affects eligibility for, or likelihood of receiving, an NEA grant, TTO will be effectively barred from seeking such support.

### Theatre Communications Group

99.    Many of TCG's members apply for and receive funding from the NEA to support their artistic endeavors. When this lawsuit was filed, many of them intended to apply for NEA funding in the March 2025 GAP cycle, and many have applied in the weeks since.

100.    Because, at the time that the suit was filed, the NEA's Assurance of Compliance required certifying that federal funds will "not be used to promote gender ideology," many of TCG's members were deterred from applying for funding in the March 2025 cycle, though they had otherwise planned to and would have liked to. These members objected to having to make such a certification, and feared the penalties that could flow to them if they are deemed to have made a false certification.

**JA303**

101. Many of TCG's members also fear that if the promotion of what the government deems to be "gender ideology" affects eligibility for, or likelihood of receiving, an NEA grant, they will be effectively barred them from even being considered for NEA funding because they work with, or are, transgender, nonbinary, or queer artists, and are committed to treating all artists with equal dignity.

102. For example, one member theater, which has received several NEA grants and whose mission includes presenting "diverse" stories of the American identity, had planned to apply in the March 2025 cycle. However, when this lawsuit was filed, it had decided not to apply because it cannot and will not agree to the Assurance of Compliance because it fundamentally disagrees with the "gender ideology" prohibition. Transgender people are part of the theater's workforce, audience, and arts education programs, and the theater recognizes all gender identities. It believes that not acknowledging transgender people or identity is discriminatory. As a result, the theater did not apply for an NEA grant that would otherwise cover 25 percent of their production cost.

103. If the promotion of what the government deems to be "gender ideology" affects eligibility for, or likelihood of receiving, an NEA grant, many of TCG's members will also be effectively barred from being considered for an NEA grant without regard to whether their projects express views that "promote" what the government deems to be "gender ideology." TTO, RILA, and NQT are all such members.

104. Many of TCG's members, including TTO, RILA, and NQT, find the "gender ideology" prohibition unclear, and it thereby forces them to guess as to what is and is not permitted with an NEA grant.

105. In addition, because the NEA's Final EO Implementation is not clear with regard to what role, if any, the NEA's perception that a project "promotes gender ideology" will play in

JA304

its grantmaking determinations, many of TCG's members, including TTO, RILA, and NQT, are forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make them ineligible for, or less likely to receive, an NEA grant in this or future funding cycles.

106. When this lawsuit was filed, TCG had heard from members that they were uncertain about how to proceed, unsure of whether to apply knowing they would be barred from eligibility because their project may express views that "promote" what the government deems to be "gender ideology," to apply with a different project, or forego applying for NEA funding altogether. These members felt that they required legal advice to understand how to handle the uncertainty that has been imposed on them, and many were unable to access it in time. In addition, many members, especially smaller theaters do not have existing relationships with lawyers or the money to support access to legal counsel, particularly on such a quick timeline.

107. When this lawsuit was filed, many TCG members expressed dismay at being forced to compromise on their commitment to free artistic expression and their ideals in order to seek NEA funding. These organizations seek to affirm all gender identities, including transgender, nonbinary, and queer identities.

108. Some TCG members have also told TCG about the financial impact of losing NEA funding. For example, for one small theater, an NEA grant would cover their entire design team's wages, pension, and health. These members would like to apply for NEA funding but for the ban on, or disfavoring of, "promoting" what the government deems to be "gender ideology." They would have liked to apply for the March 2025 cycle, and intend to apply in future cycles.

109. The "gender ideology" prohibition also caused TCG to divert a great deal of its time and resources. For example, TCG has diverted some of its research into polling members

JA305

about how the requirement has affected their plans to apply, or not apply, for NEA funding. In addition, TCG's programming team has had to quickly pivot to provide its members and the larger field with informational webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices with respect to applying for NEA funding. Similarly, after the NEA issued its Final EO Implementation, TCG had to divert resources to poll members to understand how they have been impacted and to alter programming to offer related guidance.

110.    Many of TCG's members, including TTO, RILA, and NQT, intend to apply for NEA grants in future grant cycles as well to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through their artistic expression. But as long as the promotion of what the government deems to be "gender ideology" affects eligibility for, or makes an applicant less likely to receive, an NEA grant, they will be forced to self-censor or be effectively barred from seeking such support. This is true for TCG as well.

111.    If the Court invalidates the "gender ideology" prohibition—and any related policy where the NEA considers the promotion of "gender ideology" in determining eligibility for or likelihood of receiving an NEA grant—TCG intends to apply for an NEA grant during the July 2025 cycle to support fieldwide convenings and research. Last year, TCG's national conference, supported in part by the NEA, included a panel on gender identity and a presentation by a trans woman. TCG is in preliminary planning stages for the next conference in 2026, and TCG is committed to including in the conference discussion about gender identity, affirming trans, nonbinary, and queer members of the community.

**JA306**

## CLAIMS

### FIRST CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act—Exceeds Statutory Authority
### (Against All Defendants)

112.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

113.    A reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

114.    Defendants' "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation are all final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

115.    Defendants' actions exceed the NEA's statutory authority under its enabling statute, the National Endowment for the Arts and Humanities Act of 1965, codified at 20 U.S.C. § 951 *et seq*. The Act authorizes the NEA to "ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id*. § 954(d)(1). The Act explicitly identifies one category of speech ineligible for funding—obscenity. *Id*. § 954(d)(2). The Act therefore does not authorize the NEA to render any other categories—or viewpoints—of speech ineligible for, or less likely to receive, funding.

116.    Defendants' actions exceed their statutory authority under the Act, and the Court must hold them unlawful and set them aside.

### SECOND CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act—Arbitrary and Capricious
### (Against All Defendants)

117.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

118.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

119.    Defendants' "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation are all final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

120.    Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their action; have relied on factors Congress did not authorize them to consider; have failed to consider important aspects of the problem; and have failed to acknowledge or justify their change of position. The Court must hold them unlawful and set them aside.

### THIRD CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act—Contrary to Constitutional Right
### (Against All Defendants)

121.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

122.    A reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

123.    Defendants' "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation are all final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

124.    For the reasons described in the Fourth and Fifth Claims for Relief, and incorporated here, Defendants' actions are contrary to constitutional right, and the Court must hold them unlawful and set them aside.

### FOURTH CLAIM FOR RELIEF
### Violation of the First Amendment
### (Against All Defendants)

125.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

126.    Defendants' "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation all violate the First Amendment by imposing a viewpoint-based bar on

federal arts funding, or by necessarily requiring the NEA to disfavor projects that "promote" what the government deems to be "gender ideology," which is defined to include the "false claim" "that there is a vast spectrum of genders that are disconnected from one's sex."

127.    When it comes to "what is good art," "[o]ur system of government" intentionally "accommodat[es] . . . the widest varieties of tastes and ideas," for it is a judgment that "varies with individuals as it does from one generation to another." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 157 (1946).

128.    In the arts, as in other contexts, the First Amendment rests on "[t]he bedrock principle of viewpoint neutrality," which "demands that the state not suppress speech" due to "disagreement with the underlying ideology or perspective that the speech expresses." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004).

129.    As the Supreme Court recognized in *Finley*, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587 (quoting *Regan*, 461 U.S. at 550) (alteration in original).

130.    The Supreme Court's decisions regarding other government benefits echo this rule. *See, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679, 682 (2010) (recognizing that official recognition of a student group is "effectively a state subsidy" and cannot be withheld based on viewpoint).

131.    The prohibition on viewpoint discrimination also applies where the government provides support to speech through any kind of forum, even, as here, a nonpublic forum. And it applies not only to eligibility bars, but also to policies that disfavor particular viewpoints.

132.    Yet the NEA's "gender ideology" prohibition, or any policy enacted through the Final EO Implementation requiring the NEA to disfavor projects that "promote" what the

JA309

government deems to be "gender ideology," is a textbook example of viewpoint discrimination. It singles out messages and perspectives that the government does not like for worse treatment.

133. The "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation violate the First Amendment facially and as applied to Plaintiffs.

### FIFTH CLAIM FOR RELIEF
#### Violation of the Fifth Amendment
#### (Against All Defendants)

134. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

135. The Due Process Clause of the Fifth Amendment prohibits laws that are unconstitutionally vague, and applies with particular force where government regulations affect speech, out of concern that vague regulations will chill protected speech by causing individuals to steer clear of the prohibited zone.

136. The requirement is also heightened where, as here, criminal penalties are at stake. *See* 18 U.S.C. § 1001(a) (knowingly and willfully making "any materially false, fictitious, or fraudulent statement or representation" can result in fines and/or imprisonment up to five years).

137. The "gender ideology" certification is unconstitutionally vague on its face and as applied to Plaintiffs. It fails to adequately define what speech is prohibited and, in particular, what it means "to promote gender ideology." Although Executive Order 14168 defines gender ideology to "includ[e] the idea that there is a vast spectrum of genders that are disconnected from one's sex," it neither limits the definition to that idea nor provides any indication of which ideas might fall within the term's ambit. 90 Fed. Reg. 8615 (Jan. 30, 2025) at § 2(f). Even if the amended Assurance of Compliance adequately defined what constitutes "gender ideology," it provides no criteria for determining whether a work of art "promote[s]" these ideas.

**JA310**

138.    Though the NEA has updated its Assurance of Compliance to no longer require a certification that grantees will not "promote" what the government deems to be "gender ideology," the Assurance currently states that the requirement is only suspended until this litigation concludes, and pending its outcome.

139.    The vagueness of the "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation fail to provide adequate notice about what speech is prohibited and also invite arbitrary or selective enforcement by the NEA.

140.    In the alternative, if the Final EO Implementation is determined not to disfavor any project that promotes what the government deems to be "gender ideology," the vagueness of the Final EO Implementation, including whether or not it requires the NEA to disfavor specific viewpoints, also fails to provide adequate notice about what speech is prohibited and grants the NEA unfettered discretion, thereby inviting arbitrary or selective enforcement.

141.    Because Defendants' "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation fail to provide fair notice to enable ordinary people to understand what speech the statute prohibits, they are unconstitutionally vague and violate the Fifth Amendment to the U.S. Constitution.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Declare that Defendants' "gender ideology" certification; "gender ideology" eligibility bar; Final EO Implementation, including any requirement that any

**JA311**

projects that "promote gender ideology" are disfavored; and Defendants' other actions to implement Executive Order 14168 are unconstitutional and unlawful;

b.  Vacate and set aside Defendants' Defendants' "gender ideology" certification; "gender ideology" eligibility bar; Final EO Implementation, including any requirement that any projects that "promote gender ideology" are disfavored; and Defendants' other actions to implement Executive Order 14168;

c.  Temporarily restrain and/or preliminarily and permanently enjoin Defendants from implementing or giving effect to Executive Order 14168; Defendants' "gender ideology" certification; "gender ideology" eligibility bar; Final EO Implementation, including any requirement that any projects that "promote gender ideology" are disfavored; and Defendants' other actions to implement Executive Order 14168;

d.  Temporarily restrain and/or preliminarily and permanently enjoin Defendants from taking any other action that prevents Defendants from fulfilling their statutory duty to judge grant applications using the criteria set forth in the Act of "artistic excellence and artistic merit";

e.  Award Plaintiffs reasonable attorneys' fees and costs; and

f.  Grant such other and further relief as the Court may deem appropriate.

Dated: May 12, 2025                         Respectfully submitted,

                                            /s/Vera Eidelman
                                            Vera Eidelman*
                                            Scarlet Kim*
                                            Lauren Yu*
                                            Brian Hauss*

**JA312**

AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
veidelman@aclu.org
scarletk@aclu.org
lyu@aclu.org
bhauss@aclu.org

/s/Lynette Labinger
Lynette Labinger, Esq., (Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
401.465.9565
LL@labingerlaw.com
Cooperating counsel
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF RHODE ISLAND

David D. Cole*
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

*Attorneys for Plaintiffs*

* Admitted *pro hac vice*

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS,
NATIONAL QUEER THEATER, THE
THEATER OFFENSIVE, and THEATRE
COMMUNICATIONS GROUP,

Plaintiffs,

*v.*

NATIONAL ENDOWMENT FOR THE
ARTS; MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,

Defendants.

Civil Action
No. 25-cv-79-WES-PAS

**DEFENDANTS' FILING AND CERTIFICATION
OF ADMINISTRATIVE RECORD**

The Defendants file the attached certification of the Administrative Record regarding the agency's predecisional guidance dated April 16, 2025, and first published and revised April 30, 2025 (only to correct contact information), concerning the agency's anticipated implementation of Executive Order 14168. The Defendants also attach that Record.

Dated: May 27, 2025

Respectfully submitted,

NATIONAL ENDOWMENT FOR THE ARTS;
MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,

By their Attorneys

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
kevin.bolan@usdoj.gov

**CERTIFICATION**

I certify that on May 27, 2025, I filed this document and its attachments through the Court's ECF system, thereby electronically serving all parties of record in this action.

/s/ Kevin Bolan
KEVIN BOLAN
Assistant United States Attorney

CERTIFICATION OF ADMINISTRATIVE RECORD

I, Mary Anne Carter, Senior Advisor of the National Endowment for the Arts, hereby certify, to the best of my knowledge, that the material described in the index below (and attached) comprises the administrative record regarding the agency's predecisional guidance dated April 16, 2025, and first published and revised April 30, 2025 (only to correct contact information), concerning the agency's anticipated implementation of Executive Order 14168. The record contains non-privileged materials that were directly or indirectly considered or relied upon by the me in preparing that guidance.

Dated: May 23, 2025

_____

Mary Anne Carter
Senior Advisor
National Endowment for the Arts

1.    20 U.S.C. §§ 951-960.

2.    *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979).

3.    *Bella Lewitzsky Dance Found. v. Fronhmayer*, 754 F. Supp. 774 (C.D. Cal. 1991).

4.    *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998).

5.    *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009).

6.    *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).

7.    Executive Order 14168 (Jan. 20, 2025), 90 Fed. Reg. 8615.

8.    Nat'l Endowment for the Arts, Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP) Program Details (Feb. 2025), https://www.arts.gov/sites/default/files/FY26-GAP-Grant-Program-Details-FebRevFinal4.pdf.

9.    Nat'l Endowment for the Arts, Notice (April 16 & 30, 2025), https://www.arts.gov/sites/default/files/Final.Notice.Implementation.EO14168.pdf.

**JA316**

7

 KeyCite Yellow Flag

Enjoined by   Orr v. Trump,   D.Mass.,   April 18, 2025

Exec. Order No. 14168, 90 FR 8615, 2025 WL 327882(Pres.)

Executive Order 14168

Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

January 20, 2025

**\*8615**  By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

Section 1. Purpose. Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

Sec. 2. Policy and Definitions. It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.  **\*8616**  Gender ideology includes the idea that there is a vast spectrum of genders that

are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

Sec. 3. Recognizing Women Are Biologically Distinct From Men. (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in Bostock v. Clayton County (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in Bostock v. Clayton County (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Sec. 4. Privacy in Intimate Spaces. (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.  **\*8617**
(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

JA319

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

Sec. 5. Protecting Rights. The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

Sec. 6. Bill Text. Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

Sec. 7. Agency Implementation and Reporting. (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.
(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Nondiscriminatory School Environments for LGBTQI+ Students";

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educaci ̄oacute»n de EE.UU. Apoyar a los j ̄oacute»venes y familias LGBTQI+ en la escuela" (June 21, 2023);

JA320

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021); **\*8618**

(G) "Letter to Educators on Title IX's 49th Anniversary" (June 23, 2021);

(H) "Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families" (June 2021);

(I) "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County" (June 22, 2021);

(J) "Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students" (June 9, 2021); and

(K) "Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS" (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled "Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972"; and

(iv) the Equal Employment Opportunity Commission's "Enforcement Guidance on Harassment in the Workplace" (April 29, 2024).

Sec. 8. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.
(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

 THE WHITE HOUSE,January 20, 2025.
Billing code 3395-F4-P


Exec. Order No. 1416890 FR 86152025 WL 327882(Pres.)

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.    JA321

8

# National Endowment for the Arts

## Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP) Grant Program Details

## Table of Contents

*Click a heading below to jump directly to that section*

**Grants for Arts Projects** ............................................................................................ **4**

  **Basic Information** ................................................................................................... **4**

    Executive Summary............................................................................................ 4

  **Grants for Arts Projects Program Description** ....................................................... **6**

    Program Goals and Objectives........................................................................... 6

    Projects .............................................................................................................. 6

      We Encourage ............................................................................................. 6

    Period of Performance....................................................................................... 7

    Legal Requirements and Assurance of Compliance........................................... 8

      Nondiscrimination Policies ......................................................................... 8

      Accessibility............................................................................................... 8

      National Historic Preservation Act and National Environmental Policy Act Review.......... 8

      Subject Matter ........................................................................................... 9

      Authorizing Statute ................................................................................... 9

  **Program Description: Artistic Disciplines** ........................................................... **10**

    Choosing the Right Discipline for Educational Projects.................................... 11

  **Program Description: Unallowable Activities/Costs** ........................................... **13**

    Unallowable Activities ..................................................................................... 13

    Certain Unallowable Costs .............................................................................. 14

  **Eligibility**............................................................................................................ **15**

    "Friends of" and Other Affiliated Fundraising Organizations........................... 16

    Elementary and Secondary Schools................................................................ 16

    Fiscal Sponsorship .......................................................................................... 16

    Cost Sharing/Matching Requirement .............................................................. 17

  **Eligibility: Application Limits** ............................................................................. **18**

    Applications to other NEA funding categories: ............................................... 18

JA323

Exception: Parent Organizations with Independent Components (IC) ............................... 18

    Independent Component (IC) Eligibility................................................................... 18

**Award Amounts & Cost Share/Matching** ........................................................... **20**

    Award Amounts ........................................................................................................ 20

    Cost Share and Matching Funds ............................................................................. 20

**Application Contents & Format** .......................................................................... **21**

    Application Instructions .......................................................................................... 21

    Applications Recommended for Funding ................................................................ 21

**Submission Requirements & Deadlines** .............................................................. **22**

    Pre-Application Required Registrations.................................................................. 22

    Submission Methods ............................................................................................... 22

    Contact Information................................................................................................. 22

    Application Submission Dates & Times .................................................................. 23

    Exceptions to the Submission Deadlines ................................................................ 23

    Intergovernmental Review ..................................................................................... 24

**Application Review** ............................................................................................ **25**

    Review Criteria........................................................................................................ 25

    Review & Selection Process .................................................................................... 25

    Risk Review ............................................................................................................. 26

**Award Notices** .................................................................................................. **27**

    Final Reports for Previous Awards.......................................................................... 27

**Post-Award Requirements and Administration**................................................... **28**

    General Terms & Conditions................................................................................... 28

        Implementation of Title 2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards.................................... 28

        Crediting Requirement...................................................................................... 28

    Changes in Projects................................................................................................. 28

    Accessibility............................................................................................................. 29

    National Historic Preservation Act and/or the National Environmental Policy Act Review  30

    Project Reporting and Evaluation .......................................................................... 30

    Responsible Conduct of Program Evaluation and Research.................................... 31

    Legal Requirements and Assurance of Compliance............................................... 31

    Civil Rights............................................................................................................... 32

Regulations Relating to Lobbying ........................................................................... 32

Freedom of Information Act (FOIA) Notice ........................................................... 33

Standards for Service ............................................................................................. 33

Paperwork Reduction Act Statement .................................................................... 33

**Frequently Asked Questions** .................................................................................. **34**

## Access for individuals with disabilities:

Contact the Office of Accessibility at 202-682-5532 / accessibility@arts.gov or the Office of Civil Rights at civilrights@arts.gov to request an accommodation or an alternate format of the guidelines at least 2 weeks prior to the application deadline.

# Grants for Arts Projects

## Basic Information

| | |
|---|---|
| **Federal Agency Name** | National Endowment for the Arts |
| **Funding Opportunity Title** | Grants for Arts Projects |
| **Announcement Type** | Modification of previous announcement |
| **Funding Opportunity Number(s)** | March: 2025NEA01GAP1MARCH<br>July: 2025NEA01GAP2 |
| **Assistance Listing Number(s)** | 45.024 |
| **Agency Contact Information** | GAP Contacts Page |

Details in the chart below are estimates. Actual figures may vary.

| FUNDING DETAILS | AMOUNT *(Contingent upon availability of funds)* |
|---|---|
| **Total amount of funding expected to award** | $62,245,000 |
| **Anticipated number of applications** | 4,500 |
| **Anticipated number of awards** | 2,075 |
| **Expected dollar value of awards (range)** | All Applicants: $10,000-$100,000<br>Local Arts Agencies Subgranting Projects: $30,000-$150,000 |

## Executive Summary

Grants for Arts Projects (GAP) provides project-based funding for organizations in the areas of Artist Communities, Arts Education, Dance, Design, Film & Media Arts, Folk & Traditional Arts, Literary Arts, Local Arts Agencies, Museums, Music, Musical Theater, Opera, Presenting & Multidisciplinary Works, Theater, and Visual Arts. Funded activities may include public engagement with the arts and arts education, the integration of the arts with strategies promoting the health and well-being of people and communities, and the improvement of overall capacity and capabilities within the arts sector. Awards require a 1:1 cost share/match.

Eligible applicants include: nonprofit, tax-exempt 501(c)(3), U.S. organizations; units of state or local government; and Federally recognized tribal communities or tribes. Funding in this category is *not available* for individuals, fiscally sponsored entities, commercial/for-profit enterprises, State Arts Agencies (SAA), or Regional Arts Organizations (RAO).

Applications are evaluated based on the published Review Criteria.

JA326

**COMPONENTS OF THIS NOTICE OF FUNDING OPPORTUNITY (NOFO):**
- *GAP GRANT PROGRAM DETAILS (this document)*: Essential information about GAP, including a grant program description, unallowable activities and costs, eligibility, review criteria, award amount and cost sharing, and post-award requirements and administration, among others.
- *APPLICATION INSTRUCTIONS DOCUMENT*: Navigate to the Application Instructions section on the GAP webpage for complete information on application requirements and instructions on how to apply. Select the discipline that is most relevant to your project activities. Each instructions document also includes a detailed description for the discipline area, accepted project types, and characteristics of competitive proposals.

**KEY DATES:**

Applying for and managing a federal grant is a significant undertaking and the process is competitive. We estimate that after completing the required registrations, which can take several weeks to finalize, the process to draft and submit an application will take approximately 26 hours.

| Step | March Cycle (GAP1) | July Cycle (GAP2) |
|---|---|---|
| Grant Program Details and Application Instructions Published | February 2025 | February 2025 |
| Part 1 Application Package Available on Grants.gov | February 2025 | Mid-May 2025 |
| **Part 1 Grants.gov** *Submission deadline* | **March 11, 2025** **11:59 pm ET** | **July 10, 2025** **11:59 pm ET** |
| **Part 2 NEA Applicant Portal** *Opens to applicants* | **March 14, 2025** **9:00 am ET** | **July 15, 2025** **9:00 am ET** |
| **Part 2 NEA Applicant Portal** *Submission deadline* | **March 24, 2025** **11:59 pm ET** | **July 22, 2025** **11:59 pm ET** |
| Notification of recommended funding or rejection | December 2025 | Early to mid April 2026 |
| Earliest project start date | January 1, 2026 | June 1, 2026 |

JA327

# Grants for Arts Projects Program Description

## Program Goals and Objectives

The National Endowment for the Arts is committed to supporting excellent arts projects for the benefit of all Americans. Through project-based funding, Grants for Arts Projects (GAP) supports an expansive range of arts activities. These activities may include opportunities for public engagement with the arts and arts education, for the integration of the arts with strategies promoting the health and well-being of people and communities, and for the improvement of overall capacity and capabilities within the arts sector.

## Projects

We fund arts projects with specific, definable activities in the following disciplines: Artist Communities, Arts Education, Dance, Design, Film & Media Arts, Folk & Traditional Arts, Literary Arts, Local Arts Agencies, Museums, Music, Musical Theater, Opera, Presenting & Multidisciplinary Works, Theater, and Visual Arts. **Go to Artistic Disciplines on page 10 for additional information.**

Projects may be small, medium, or large, and may take place in any part of the nation's 50 states, the District of Columbia, and U.S. jurisdictions. A project may consist of one or more specific events or activities; it may be a new initiative or part of your organization's regular season or activities. Organizations that undertake a single short-term program in a year may apply for that event, or may choose to identify certain components of that program as their project. Organizations may apply for any or all phases of a project, from planning through implementation. A project should not encompass all an organization's activities or costs in a given year. The NEA does not fund general operating support or a full season of programming.

We welcome applications from first-time and returning applicants; from organizations serving rural, urban, suburban, and tribal communities of all sizes; and from organizations with small, medium, or large operating budgets.

Projects are evaluated according to the Review Criteria on page 25. Applicants should keep these in mind while developing their application materials.

## We Encourage

We encourage arts projects in any of the following areas, including activities that:

- **Celebrate the nation's rich artistic heritage and creativity by honoring the semiquincentennial of the United States of America (America250).** Project activities may focus exclusively on celebrating the anniversary, or they may incorporate a special America250-related component or focus within a larger project. For example, projects could examine the work of American artists, present or create art recognizing this

JA328

important milestone, or undertake educational activities or related programming. See the FAQ section for more information.

- **Originate from or are in collaboration with the following**:
  - Historically Black Colleges and Universities
  - Tribal Colleges and Universities
  - American Indian and Alaska Native tribes
  - Hispanic Serving Institutions
  - Asian American and Pacific Islander communities, and
  - Organizations that support the independence of people with disabilities.
- **Support the health and well-being of people and communities through the arts.**
- **Support existing and new technology-centered creative practices across all artistic disciplines and forms,** including work that explores or reflects on the impacts of artificial intelligence (AI) in ways that are consistent with valuing human artistry and improve the public's awareness and understanding of the use of AI.

## Period of Performance

NEA support of a project (i.e., "Earliest Start Date") can begin no sooner than:
- January 1, 2026 (for applicants to the March cycle, "GAP1"), or
- June 1, 2026 (for applicants to the July cycle "GAP2").

Grants awarded in this program generally may cover a period of performance of up to two years. **The two-year period is intended to allow an applicant time to plan, execute, and close out its project, not to repeat a one-year project for a second year.**

No pre-award costs are allowable in the Project Budget. A recipient may not receive more than one NEA award or other federal funding for the same activities/costs during the same period of performance.

JA329

## Legal Requirements and Assurance of Compliance

The **Legal Requirements** section on our website provides information about key legal requirements that may apply to an applicant or recipient. It is not an exhaustive list, more details may be found in Appendix A of the General Terms and Conditions.

By signing and submitting the application form on Grants.gov, the Applicant certifies that it is in compliance with the statutes outlined in the **Assurance of Compliance** and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance.

**It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

### Nondiscrimination Policies

Projects may reach a particular group or demographic (such as sex, disability, economic status, race, color, or national origin, including limited English proficiency), however, projects may not be exclusionary under Federal civil rights laws and policies prohibiting discrimination. This nondiscrimination requirement extends to hiring practices, artist selection processes, and audience engagement. Your application should make it clear that project activities are not exclusionary. Please review the Assurance of Compliance, which outlines the relevant federal statutes, NEA regulations, and executive orders.

### Accessibility

Federal regulations require that all NEA-funded projects be accessible to people with disabilities. Individuals with disabilities may be artists, performers, audiences, visitors, teaching artists, students, staff, and volunteers. Funded activities should be held in a physically accessible venue, and program access and effective communication should be provided for participants and audience members with disabilities. If your project is recommended for funding, you will be asked to provide detailed information describing how you will make your project physically and programmatically accessible to people with disabilities.

### National Historic Preservation Act and National Environmental Policy Act Review

Recommended projects are subject to the National Historic Preservation Act (NHPA) and/or the National Environmental Policy Act (NEPA) compliance review.

Some of the common project types requiring a review are:
- Projects involving a building over 50 years old. This also includes structures such as bridges; or objects such as sculptures; or a landscape that is historically significant.
- The commissioning and installation of temporary or permanent outdoor artworks or structures, such as: sculptures, statues, murals, or permanent signs.

JA330

- Outdoor arts/music festivals or activities requiring ground disturbance.
- Maintenance or rehabilitation of landscapes and gardens.
- Design services and planning for projects that may affect historic properties.

See more information about NHPA/NEPA review under Post-Award Requirements and Administration.

## Subject Matter

Per the NEA's legislation, projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 USC 952(j)-(l); 20 USC 954(d),(l).

## Authorizing Statute

The NEA offers this funding opportunity under the authority of 20 U.S.C. § 954.

# Program Description: Artistic Disciplines

We fund arts projects through 15 different subcategories, based on artistic discipline or field, which we broadly refer to as "disciplines." Applicants apply to a specific discipline area. In the Instructions documents found on the GAP webpage, each discipline has outlined  the types of projects they encourage, and guidance on characteristics of competitive proposals.

Select the discipline that most closely aligns with your project activities. The short descriptions on this page offer an overview; however, applicants should review the full discipline description before applying. Contact us if you have any questions about which discipline is most appropriate for your project.

| Discipline | Summary |
| --- | --- |
| Artist Communities | Artist residencies that provide dedicated space, time, and resources to artists for the creation or development of new work. |
| Arts Education | Projects for pre-K-12 students, the educators and artists who support them, and the schools and communities that serve them **(see below for more guidance on selecting the right discipline for educational projects)**. |
| Dance | Projects in all genres of dance, including creation of work, presentation and touring, residencies, archive/preservation of dance, services to the field, and education projects. |
| Design | Projects including architecture, communications and graphic design, fashion design, historic preservation, industrial and product design, interior design, accessible design, landscape architecture, rural design, social impact design, and urban design. |
| Film & Media Arts | Artist support programs, public engagement activities, and services to the field focused on film, cinema, audio, broadcast, creative code and computation, interactive media, and emergent practices at the intersection of arts and digital technology. |
| Folk & Traditional Arts | Project activities in folk and traditional arts, including culturally- or community-centered artistic traditions, represented by a wide range of genres including, but not limited to, music, dance, crafts, foodways, dress/adornment, occupation, ceremony, and oral expression, such as stories, poetry, and language. |
| Literary Arts | Projects supporting publishing, distribution, and/or promotion of literary content, as well as literary arts programming and services to the field. |

JA332

| Discipline | Summary |
|---|---|
| Local Arts Agencies | Projects by arts commissions, arts councils, or departments of cultural affairs; national or statewide service organizations partnering with local arts agencies; and arts projects by local government and special districts. |
| Museums | Museums projects including exhibitions, care of collections, conservation, commissions, public art works, community engagement, and education activities. |
| Music | Music and music presentation projects in all genres including classical, contemporary, and jazz. |
| Musical Theater | Musical theater and musical theater presentation projects. |
| Opera | Opera and opera presentation projects. |
| Presenting & Multidisciplinary Works | Projects presenting works from across disciplines, multidisciplinary works, and/or interdisciplinary artists. |
| Theater | Theater and theater presentation projects. |
| Visual Arts | Projects supporting visual artists and projects in all visual arts mediums. |

In limited cases, and in consultation with the applicant, NEA staff may transfer an application to a discipline other than the one selected by the applicant to ensure appropriate panel review. However, we cannot guarantee that an application will be transferred in all cases where this might be desirable.

## Choosing the Right Discipline for Educational Projects

All GAP disciplines welcome educational projects. The Arts Education discipline is specifically geared toward pre-K-12 students (Direct Learning), the educators and artists who support them (Professional Development), and the schools and communities that serve them (Collective Impact). Projects submitted to Arts Education must incorporate robust measures to assess student and/or teacher learning in arts education. Assessment of student learning should align with state or national arts standards.

Projects for short-term arts enrichment or exposure to the arts for youth, adults, and intergenerational audiences are welcome in the other disciplines. Applicants should select the discipline that most closely matches their project activities.

Arts events in all disciplines may be accompanied by ancillary learning activities (e.g., study guides for teachers and students, artists' visits prior to or following the event, workshops,

JA333

lecture-demonstrations, or master classes).

Select the **Arts Education** discipline for:

- Pre-K through 12th grade Direct Learning or Professional Development projects that **align with either national or state arts education standards, and include robust student and/or teacher assessment.**
- Collective Impact projects intended to transform schools and communities by providing access and engagement in the arts to students through collective, systemic approaches.
- Projects from Local Arts Agencies proposing a Collective Impact project.

Select one of the **other disciplines** for:

- Youth programs with a focus on exposure to or appreciation of the arts—including activities that take place in school, after school, during the summer, or in community settings. Such projects may include the work of professional artists and/or teaching artists.
- Youth programs that do not include robust student assessment.
- Programs serving adults and intergenerational groups.

Be sure to review the discipline description and project types found in the Instructions document (found under the Application Instructions section of the GAP webpage) to confirm that your educational project is an appropriate fit.

JA334

# Program Description: Unallowable Activities/Costs

The activities and costs listed below are **not** allowable and must not be included as part of your project activities or budget. This includes activities/costs covered by cost share/matching funds. Applicants should carefully review the General Terms and Conditions (GTC) for additional information about allowable and unallowable costs.

## Unallowable Activities

- General operating support, or support for a full season of programming.

- Direct grants to individuals.

- Direct grants to individual elementary or secondary schools - charter, private, or public, or booster clubs and similar organizations dedicated to supporting individual elementary or secondary schools. See Eligibility on page 16 for more information.

- Projects that replace or supplant arts instruction provided by an arts specialist.

- Generally, courses/coursework in degree-granting institutions.

- Literary publishing that does not focus on contemporary literature and/or writers.

- Generally, publication of books, exhibition of works, or other projects by the applicant organization's board members, faculty, or trustees.

- Generally, exhibitions of, and other projects that primarily involve, single, individually-owned, private collections.

- Projects for which no curatorial, juried, or editorial judgment has been applied to the selection of artists or art works.

- Costs of entertainment, including amusement, diversion, and social activities such as receptions, parties, galas, community dinners, picnics, and potlucks. Generally, this also includes activities at venues such as bars, wineries, and breweries where the consumption of alcohol/social activity is the primary purpose of the venue.

- Awards to individuals or organizations to honor or recognize achievement.

- Commercial (for-profit) enterprises or activities, including arts markets, concessions, food, T-shirts, artwork, or other items for resale. This includes online or virtual sales/shops.

- Lobbying, including activities intended to influence the outcome of elections or influence government officials regarding pending legislation, either directly or through specific lobbying appeals to the public.

- Voter registration drives and related activities.

- Construction, purchase, or renovation of facilities or the purchase of land. Design fees, preparing space for an exhibit, installation or de-installation of art, and community planning are allowable.

- Subgranting or regranting, except for local arts agencies that meet the NEA's eligibility criteria for subgranting. Local arts agencies may not subgrant to individuals.

JA335

## Certain Unallowable Costs

- Cash reserves and endowments.

- Costs for the creation of new organizations.

- Costs to bring a project into compliance with federal grant requirements. This includes environmental or historical assessments or reviews and the hiring of individuals to write assessments or reviews or to otherwise comply with the National Environmental Policy Act and/or the National Historic Preservation Act.

- Expenditures related to compensation to foreign nationals and/or travel to or from foreign countries when those expenditures are not in compliance with regulations issued by the U.S. Treasury Department Office of Foreign Assets Control. For further information, contact our Office of Grants Management at grants@arts.gov.

- Project costs supported by any other federal funding. This includes federal funding received either directly from a federal agency (e.g., National Endowment for the Humanities, Housing and Urban Development, National Science Foundation, or an entity that receives federal appropriations such as the Corporation for Public Broadcasting or Amtrak); or indirectly from a pass-through organization such as a state arts agency, regional arts organization, or a grant made to another entity.

- Alcoholic beverages.

- Purchase and/or use of gift cards, gift certificates, or other cash equivalents to support project costs.

- Gifts and prizes, including cash prizes as well as other items (e.g., electronic devices, gift certificates) with monetary value.

- Stipends/fees to individuals who are incarcerated.

- Contributions and donations to other entities, including donation drives.

- General miscellaneous or contingency costs.

- Fines and penalties, bad debt costs, deficit reduction.

- Marketing expenses that are not directly related to the project.

- Audit costs that are not directly related to a single audit (formerly known as an A-133 audit).

- Rental costs for home office workspace owned by individuals or entities affiliated with the applicant organization.

- The purchase of vehicles.

- Visa costs paid to the U.S. government.

- Costs incurred outside of the approved period of performance.

JA336

# Eligibility

Applicants may be arts organizations, local arts agencies, arts service organizations, local education agencies (school districts), and other organizations that can help advance the NEA's mission.

| ELIGIBLE |
|---|
| The following **are eligible** to apply:<br>• Nonprofit, tax-exempt 501(c)(3), U.S. organizations;<br>• Units of state or local government; and<br>• Federally recognized tribal communities or tribes.<br><br>To be eligible, **the applicant organization must**:<br>• Meet the NEA's Legal Requirements including non-profit, tax-exempt status at the time of application.<br>• Have an active registration with the System for Award Management (SAM), and have a Unique Entity Identifier (UEI), at the time of application. Applicants must maintain an active SAM registration until the application process is complete and throughout the life of an award.<br>• Have completed a five-year history of arts programming prior to the application deadline.<br>    ○ Applicants will provide examples of previous arts programming in the application:<br>        ▪ Arts programming may have taken place prior to when the organization incorporated or received non-profit, tax-exempt status.<br>        ▪ If arts programming was suspended due to the pandemic, you may include examples that occurred in 2018 or 2019 to meet the five-year requirement. Do not include examples prior to 2018. Virtual programming is acceptable.<br>        ▪ Organizations that previously operated as a program of another institution may include arts programming it carried out while part of that institution.<br>    ○ For applicants to the March 2025 GAP1 cycle, programming must have started in or before March 2020.<br>    ○ For applicants to the July 2025 GAP2 cycle, programming must have started in or before July 2020. |
| NOT ELIGIBLE |
| The following are **not eligible** to apply:<br>• Individuals;<br>• Commercial and for-profit enterprises;<br>• Applications using a fiscal sponsor/agent (organizations must apply directly on their own behalf); and<br>• State and jurisdictional arts agencies (SAAs), and Regional Arts Organizations (RAOs). SAAs and RAOs may serve as partners in projects; however, they may not receive NEA funds through GAP. |

## "Friends of" and Other Affiliated Fundraising Organizations

An organization whose primary purpose is to channel resources (financial, human, or other) to an affiliated organization may only apply if the affiliated organization does not submit its own application. This prohibition applies even if each organization has its own 501(c)(3) status. For example, the "Friends of ABC Museum" may not apply if the ABC Museum applies. Fiscally sponsored organizations and projects are not eligible for NEA funding, see more information about Fiscal Sponsors below.

## Elementary and Secondary Schools

Individual elementary or secondary schools - charter, private, or public, **are not eligible** to apply. Booster clubs and similar organizations dedicated to supporting individual elementary or secondary schools **are not eligible** to apply. Schools may participate as partners in an eligible organization's project.

Local education agencies (LEAs), school districts, and state and regional education agencies **are eligible to apply**. If a single school also is a local education agency, as is the case with some charter schools, the school may submit documentation that supports its status as a local education agency.

## Fiscal Sponsorship

Fiscally sponsored organizations and projects are not eligible for NEA funding. An organization or individual **may not** use a fiscal sponsor/agent for the purpose of applying. The NEA does not fund unincorporated or for-profit entities or individuals that use non-profit, tax-exempt 501(c)(3) U.S. organizations; units of state or local government; or federally recognized tribal communities or tribes to apply for grants on their behalf.

If your organization does not have its own non-profit status, you may still participate in a project submitted by another eligible organization, but you may not submit your own application.

An organization that provides fiscal sponsor/agent services that otherwise meets the eligibility criteria above may apply for its own programs and projects. In this case, the organization must clearly demonstrate that it is applying only for its own programmatic activities.

### What is a fiscal sponsor/agent?
A fiscal sponsor/agent is an entity that oversees the fiscal activities of another organization, company, or group of independent artists or projects. These activities may include bookkeeping, filing of W2s or 1099s, daily banking, or grant preparation.

An application must demonstrate the active involvement of the applicant organization in the proposed project activities. This might include:

JA338

- Producing or co-producing.
- Partnering on creative direction or development.
- Organizing workshops, public showings, or distribution of work.
- Providing social networking strategies or web implementation.

The NEA may review your website and other materials in addition to your application to determine the eligibility of the application.

## Cost Sharing/Matching Requirement

Applications that do not include a project budget meeting the *minimum* requirements of at least a $10,000 NEA funding request, a $10,000 cost share/match, and $20,000 in total project expenses will be deemed ineligible and not be reviewed. See Award Amounts and Cost Share Matching on page 20 for more information related to cost share/matching requirements.

# Eligibility: Application Limits

An organization may submit only one application to the FY 2026 Grants for Arts Projects program (i.e., one application per calendar year), with limited exceptions.

## Applications to other NEA funding categories:

- **An organization *may not* apply to both the Grants for Arts Projects category and the Our Town category in the same calendar year.**
- An organization *may* apply to the NEA's Research Awards program in addition to Grants for Arts Projects. If you submit applications to other opportunities, each request must be for a **distinctly different project (with different activities and costs), or a distinctly different phase of the same project**, with a different period of performance and costs.

If you have other NEA awards with activities and/or periods of performance that will overlap with your proposed Grants for Arts project, please contact NEA staff for guidance to ensure that the projects are different or for a distinctly different phase of a project.

Project participants such as individuals (project staff or artists) or partner organizations may participate in more than one application if there is no overlap in proposed costs or activities.

## Exception: Parent Organizations with Independent Components (IC)

Exceptions to the one-application rule are made only for parent organizations that have separately identifiable and independent components (e.g., a university campus that has a presenting organization and a radio station).

A parent organization may apply for each eligible component. In addition, a parent organization also may submit one application on its own behalf for a **project that is different from any project submitted in an application by its independent component(s)**.

The application for the independent component must be for a project of the component. For example, if a university campus applies for its art museum as an independent component, the project must be for the art museum. The art museum cannot be used as a passthrough entity for projects from other areas of the university, nor can the university's own application be a submission to support a second art museum project.

### Independent Component (IC) Eligibility

An eligible IC must be a unit that is both programmatically and administratively distinct from the parent organization. To qualify it should be equivalent to a stand-alone institution. The independent status is demonstrated by the component's:

- Unique mission, separate and distinct from the parent entity;
- Separate, dedicated staff, with duties specific to the mission of the component;

JA340

- Independent board, mostly consisting of members not associated with the parent entity (the board should generally function with substantial oversight and management of the component);
- Separate budget, maintained by the component; and
- Five-year history of arts programming undertaken by the component.

**A parent organization should consult with NEA staff to verify the eligibility of the component before preparing an application.** If an application is submitted by a parent organization on behalf of a component that the NEA determines does not to meet the eligibility criteria for an IC, that application may be marked ineligible, unless the parent applicant has not submitted any other applications in the same calendar year.

The following **do not qualify** as eligible ICs:
- Academic departments of colleges and universities.
- Programs, initiatives, and projects of organizations.
- Collaboratives or consortiums of multiple organizations.

For example:
- **Eligible IC**: An art museum on a university campus serves the general public and does not grant degrees. The museum board, not the university trustees, manages the museum's budget, staff, and programming. In this example, the art museum essentially is a stand-alone organization and qualifies as an independent component.
- **Ineligible IC**: A symphony association sponsors a youth orchestra in addition to its professional orchestra. Some symphony musicians serve as faculty for the youth orchestra; there is some overlap of membership between the symphony trustees and the youth orchestra's advisory board; and the executive director for the symphony association serves as CEO for both the professional and youth orchestras. In this case the youth orchestra is not equivalent to a separate institution and therefore does not qualify as an independent component.

The parent organization must meet the eligibility requirements for all applicants. An affiliated organization that performs grant administration duties for a parent organization (e.g., a college foundation that administers grants awarded to a college and its components) may submit applications for components and the parent organization in lieu of such applications being submitted by the parent. The affiliated organization must meet the eligibility requirements for all applicants.

**JA341**

# Award Amounts & Cost Share/Matching

All funded projects must adhere to federal rules and regulations. Familiarize yourself with the requirements of managing a federal grant by reviewing the Post-Award Requirements and Administration section of this document, as well as the General Terms and Conditions and reporting requirements found in Manage Your Award.

## Award Amounts

Awards range from $10,000 to $100,000.

Designated local arts agencies eligible to subgrant may request from $30,000 to $150,000 for subgranting in the Local Arts Agencies discipline. Additional eligibility, documentation, and reporting requirements for subgranting applications are detailed in the Local Arts Agencies Instructions document (found under the *Application Instructions* section of the GAP webpage).

In developing an application, we urge all applicants to consider the funding level of recent awards and to request a realistic award amount.

The NEA reserves the right to limit support of a project to a particular portion(s) or cost(s).

Applicants whose recommended funding amount is less than the amount requested in the application will have the opportunity to revise the project's budget and/or scope to reflect any necessary changes to the project's activities.

## Cost Share and Matching Funds

All awards require a nonfederal cost share/match of at least 1 to 1. For example, if an organization receives a $10,000 award, the total project costs must be at least $20,000, and the organization must provide at least $10,000 toward the project costs from nonfederal sources. NEA funding cannot exceed 50% of the total cost of the project.

Cost share/matching funds cannot include other federal funds from the NEA or other federal entities; including federal funds subgranted through State Arts Agencies, Regional Arts Organizations, or Local Arts Agencies.

Cost share/matching funds do not need to be committed at the time of application, but applicants will be asked to provide potential sources of funding in the project budget section of the application.

JA342

# Application Contents & Format

Applying is a multi-step process. We estimate that after registering, the process to draft and submit an application takes approximately 26 hours.

## Application Instructions

**A detailed instructions document outlining how to complete and submit both parts of the application, including *all application questions and requirements*, can be found on the GAP webpage, under the Application Instructions section**.

### Registration

Before applying, applicants must finalize required registrations detailed on the next page. **All three required registrations must be active to submit Part 1 of the application through Grants.gov.**

### Application Part 1, Grants.gov

Part 1 of the application is submitted through Grants.gov. All applicants must submit the "Application for Federal Domestic Assistance/Short Organization Form." This is a brief form that will collect basic information about your organization.

**A direct link to the Part 1 Grants.gov Opportunity Package where you will complete this form, is included on the GAP webpage under How to Apply.** You must successfully submit Part 1 to continue to Part 2.

### Application Part 2, NEA Applicant Portal

Part 2 of the application is submitted via the NEA's Applicant Portal. This is a separate website from Grants.gov.

All applicants must complete the "Grant Application Form (GAF)" and upload items through the portal. Information is submitted via a web form where you will enter the majority of your application material, including information about your organization's history and budget, and project details including a project description, timeline, budget information, and work samples.

## Applications Recommended for Funding

Applicants whose projects are recommended for funding must submit additional information, which may include: a project activity update, a revised project budget, an accessibility form, and if required by your project activities, information about compliance with the National Historic Preservation Act and/or the National Environmental Policy Act.

See Post-Award Requirements and Administration for more information on Accessibility and NEPA/NHPA compliance, as well as other information about award management.

JA343

# Submission Requirements & Deadlines

## Pre-Application Required Registrations

**Before applying, all applicants must register with Login.gov, Grants.gov, and the System for Award Management (SAM) at SAM.gov**. Applicants must provide a valid unique entity identifier (UEI) in their application; and continue to maintain an active SAM.gov registration with current entity information at all times during which it has an active Federal award or an application or plan under consideration by a Federal agency. **All three required registrations must be active to submit Part 1 of the application through Grants.gov.**

Returning applicants must renew or verify that their registrations are up to date prior to the application deadline.

**Registering and maintaining accounts with Login.gov, SAM, and Grants.gov is always FREE.**

The **Registration Guidance document** available on the GAP webpage provides detailed information about the registration process, including links to each registration site, and support resources.

## Submission Methods

Application materials must be submitted electronically. See Application Instructions on the previous page.

## Contact Information

For assistance with application requirements, contact NEA staff .

**Login.gov, SAM, and Grants.gov Help**
The NEA does not have access to your Login.gov, SAM, or Grants.gov accounts. If you have any questions about or need assistance with these sites, including questions regarding electronic accessibility, you must contact them directly:

- **Login.gov Help**: Call 1-844-875-6446, consult the information posted in their Help Center, or use their online form to submit a question.

- **SAM Federal Service Desk**: Call 1-866-606-8220 or see the information posted on the SAM website at SAM Help.

- **Grants.gov Contact Center**: Call 1-800-518-4726, email support@grants.gov, or consult the information posted on the Grants.gov website at Support. The Grants.gov Contact Center is available 24 hours a day, 7 days a week.

JA344

## Application Submission Dates & Times

| Step | March Cycle (GAP1) * | July Cycle (GAP2) |
|---|---|---|
| Grant Program Details and Application Instructions Published | February 2025 | February 2025 |
| Part 1 Application Package Available on Grants.gov | February 2025 | Mid-May 2025 |
| **Part 1 Grants.gov** *Submission deadline* | **March 11, 2025** **11:59 pm ET** | **July 10, 2025** **11:59 pm ET** |
| **Part 2 NEA Applicant Portal** *Opens to applicants* | **March 14, 2025** **9:00 am ET** | **July 15, 2025** **9:00 am ET** |
| **Part 2 NEA Applicant Portal** *Submission deadline* | **March 24, 2025** **11:59 pm ET** | **July 22, 2025** **11:59 pm ET** |
| Notification of recommended funding or rejection | December 2025 | Early to mid April 2026 |
| Earliest project start date | January 1, 2026 | June 1, 2026 |

*All Artist Communities and Design applicants must apply at the March 11, 2025, deadline.

Literary Arts accepts particular project types at each deadline; applicants should refer to the Literary Arts instructions to determine which deadline is appropriate for their proposal.

Please do not request the status of your application before the notification date that is listed above.

**Late, ineligible, and incomplete applications will not be reviewed**.

## Exceptions to the Submission Deadlines

Exceptions to the submission deadlines will be considered **only** for registration or renewal issues, or technical malfunctions that are the result of failures on the part of Login.gov, SAM, Grants.gov, or NEA systems, as determined by the NEA. To be considered for this exception, you must provide documentation of a Login.gov, SAM, Grants.gov, or NEA systems failure that prevented your submission by the deadline.

In the event of a major emergency (e.g., a hurricane or a Login.gov, SAM, Grants.gov, or NEA systems technological failure), the NEA Chair may adjust application deadlines for affected applicants. If a deadline is extended for any reason, an announcement will be posted on our website.

JA345

Exceptions to the deadline **will not be considered** for reasons such as:
- User error, including but not limited to, failing to register or apply on time, or failure to verify that your application was successfully submitted to Grants.gov and/or the Applicant Portal.
- Problems with computer systems or Internet access at the applicant organization.

Please note:
- Permission for late application submission cannot be granted in advance. If you feel you have a case for an exception, contact staff as soon as possible **after** the deadline with documentation of the issues you encountered.
- Applications submitted late or outside the Grants.gov system (e.g., an emailed SF-424) will not be processed, reviewed, or considered for funding.

## Intergovernmental Review

This funding opportunity is not subject to Intergovernmental Review of Federal Programs Executive Order 12372.

# Application Review

## Review Criteria

Applications will be reviewed based on the criteria below, with equal weight assigned to artistic excellence and artistic merit. While proposals need not address each criterion marked "as applicable," applicants may consider all the criteria when developing their proposals.

**Proposals must be for arts projects with specific, definable activities.** The application may be rejected if it does not sufficiently describe the project activities.

For more information about how these criteria relate to a specific discipline, review the discipline-specific instructions and/or contact staff.

### Artistic Excellence

The **artistic excellence** of the project includes:

- The quality of the artists and other key individuals, works of art, organizations, arts education providers, artistic partners, and/or services involved in the project.

### Artistic Merit

The **artistic merit** of the project includes:

- The value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency.
- The ability to carry out the project based on such factors as the appropriateness of the budget, clarity of the project activities, resources involved, and the qualifications of the project's personnel and/or partnerships.
- Clearly defined goals and/or proposed outcomes and an appropriate plan to determine if those goals and/or outcomes are met. This includes, where relevant, measures to assess student and/or teacher learning in arts education.
- Evidence of direct compensation to artists, makers, art collectives, and/or art workers.
- As applicable:
  - Engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

## Review & Selection Process

Applications are checked for completeness and eligibility by NEA staff. Eligible applications are evaluated according to the Review Criteria above, in closed session, by advisory panelists. Each panel comprises a group of arts experts and other individuals, including at least one knowledgeable layperson, with broad knowledge in the areas under review. Panels are convened virtually by discipline. Panel membership changes regularly. The panel recommends the projects to be supported, and the staff reconciles panel recommendations with the funds

JA347

that are available. These recommendations are forwarded to the National Council on the Arts, where they are voted on in an open public session.

The National Council on the Arts makes recommendations to the NEA Chair.

The NEA Chair reviews the recommendations for grants in all funding categories and makes the final decision on all grant awards. Applicants are then notified of funding decisions.

## Risk Review

All recommended applications undergo a review to evaluate risk posed by the applicant prior to making a federal award. This may include past performance on grants, meeting reporting deadlines, compliance with terms and conditions, audit findings, etc.

# Award Notices

The notification date for your category on the Application Calendar tells you when we expect to announce award decisions.

Notifications are sent via email. Applicants recommended for funding will receive a preliminary congratulatory message, with a request for project and budget updates. Applicants not recommended for funding will receive a rejection notice via email.

The official award notification (i.e., a notice of action authorized by the NEA Office of Grants Management) is the only legal and valid confirmation of award. Receipt of your official award notification may take several months depending on a number of factors such as changes to your project, the number of awards to be processed, whether the NEA has its funding appropriation from Congress, etc. **All NEA awards are contingent on active SAM registration. The NEA will not be able to issue an award if you have an expired SAM.gov registration on September 1 of the fiscal year listed on this funding opportunity.**

## Final Reports for Previous Awards

Before the NEA issues any award, organizations must have submitted acceptable Final Report packages by the due date(s) for all previous NEA award(s).

# Post-Award Requirements and Administration

## General Terms & Conditions

Federal government-wide and agency-specific requirements that relate to NEA awards are highlighted in our General Terms & Conditions (GTCs). The GTCs incorporate the adoption of 2 CFR Part 200 by reference. The document also explicitly identifies where the NEA has selected options offered in the regulation, such as budget waivers and requirements for use of program income. It also includes requirements for cost share funds, reporting requirements, amendment processes, and termination actions. **Recipients must review, understand, and comply with these requirements.** Failure to comply with the GTCs for an award may result in termination of an award, and/or returning funds to the NEA, among other consequences.

### Implementation of Title 2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards

The guidance under 2 CFR Part 200 from the federal government's Office of Management and Budget (OMB) establishes clarity and consistency of the pre- and post-award requirements applicable to federal award recipients. The NEA has adopted the OMB Guidance in 2 CFR part 200 under §3255.1 Adoption of 2 CFR Part 200. The NEA's adoption of 2 CFR Part 200 gives regulatory effect to the OMB guidance, including any updates to it.

### Crediting Requirement

Recipients must clearly acknowledge NEA support of the project in their programs and related promotional material, including publications and websites. Additional acknowledgment requirements may be provided later. The NEA does not fund general operating support, so you must ensure that the NEA is only credited with funding the specific project, and not your entire organization or its operations.

## Changes in Projects

Pre-Award: Applicants must notify the NEA of any significant changes in their project that occur after applying. If the project or the organization's capacity to carry out the project changes significantly before an award is made, the NEA may revise or withdraw the funding recommendation.

Post-Award: Recipients are expected to carry out a project consistent with the project approved for funding by the NEA. If changes to the project are required, the recipient must request written approval from the Office of Grants Management, **which is the only office authorized to amend or change an NEA award. Written and/or verbal approval of proposed project changes from any other NEA office does not constitute an approved change to an award.** Detailed information is included in the NEA's General Terms & Conditions for Grants to Organizations.

JA350

## Accessibility

As outlined in the Assurance of Compliance, Section 504 of the Rehabilitation Act of 1973, and the NEA's implementing regulation, all NEA-funded projects are required to be accessible to people with disabilities. Individuals with disabilities may be artists, performers, audiences, visitors, teaching artists, students, staff, and volunteers. Funded activities must be held in a physically-accessible venue, and program access and effective communication must be provided for participants and audience members with disabilities.

If your project is recommended for funding, you will be asked to provide detailed information describing how you will make your project physically and programmatically accessible to people with disabilities:
- Buildings and facilities (including projects held in historic facilities) must be physically accessible. The following are some examples, but are not an exhaustive list:
  - Ground-level/no-step entry, ramped access, and/or elevators to project facilities and outdoor spaces;
  - Wheelchair-accessible box office, stage/backstage, meeting, and dressing rooms;
  - Wheelchair-accessible restrooms and water fountains;
  - Directional signage for accessible entrances, restrooms, and other facilities; and
  - Accessible workspaces for employees.
- The programmatic activities must be accessible either as part of the funded activity or upon request, where relevant. The following are some examples, but they are not an exhaustive list:
  - Accommodations for performances, tours, virtually streamed events, conferences, and lectures, such as sign language interpretation, real-time captioning, and audio description;
  - Print materials in alternative formats, such as large-print brochures/labels/programs, braille, and electronic/digital formats;
  - Accessible and screen reader-compatible electronic materials, documents, websites, and virtual platforms, and alternative text for images;
  - Closed/open captioning and audio/visual description for video, film, television broadcasts, and virtual events;
  - Auxiliary aids and devices, such as assistive listening devices.

Costs associated with project-related programmatic accommodations, such as those listed above, may be included in an NEA grant budget. However, costs associated with physical construction or renovation expenses may not be included in the grant budget.

In accordance with the General Terms & Conditions, a Section 504 self-evaluation must be on file at your organization, and you must have a designated 504/accessibility coordinator on staff.

For technical assistance on how to make your project accessible, contact the Accessibility Office at accessibility@arts.gov, 202-682-5532; or the Civil Rights Office at civilrights@arts.gov, 202-682-5454; or see our online Accessibility Resources.

**JA351**

## National Historic Preservation Act and/or the National Environmental Policy Act Review

All awards are subject to review and compliance with the National Historic Preservation Act (NHPA) and the National Environmental Policy Act (NEPA). The NEA will conduct a review of your project to ensure that it is in compliance with NHPA/NEPA and other Federal environmental laws.

**If you are recommended for an award which may have historic preservation or environmental concerns (NHPA/NEPA), you will be notified and asked to provide additional information.** This review and approval process takes time to complete and may delay your project's start date, and/or our ability to release award funds, the NEA cannot release award funds until the NHPA/NEPA review is complete.

Once notified that additional NHPA/NEPA review is needed, be sure to include thorough and complete information for all project activities and locations, which will help expedite the review. If project activities and locations are not yet finalized, you must provide the timeline for determining project activities and locations as these details are required to complete the NHPA/NEPA review.

For projects requiring ground disturbance or impacting buildings over 50 years old, you may be instructed to continue the NHPA review with the appropriate State Historic Preservation Office (SHPO).

Some of the project types that may require additional information or SHPO review include:
- Projects involving a building over 50 years old. This also includes structures such as bridges; or objects such as sculptures; or a landscape that is historically significant.
- The commissioning and installation of temporary or permanent outdoor artworks or structures, such as: sculptures, statues, murals, or permanent signs.
- Outdoor arts/music festivals or activities requiring ground disturbance.
- Maintenance or rehabilitation of landscapes and gardens.
- Design services and planning for projects that may affect historic properties.

## Project Reporting and Evaluation

Before applying, carefully review the reporting requirements for the NEA's Final Reports. If you have any questions about the NEA's objectives or the required final reports, contact NEA staff.

All recipients are required at minimum to submit a Final Descriptive Report (FDR), a Federal Financial Report (FFR), and a Geographic Location of Project Activity Report (GEO) within 120 days of the end of the award's period of performance. The estimated time burden for completing final reports is 5 hours. Local Arts Agencies with awards for Subgranting projects are also required to submit a Subgrants report, with an additional time burden of 4.5 hours.

JA352

Recipients of Arts Education Direct Learning awards will be required to describe the methods used to assess student learning.

You are required to maintain project source documentation, including financial records, for three years following submission of your final reports.

Beyond the required final reports for all recipients, some recipients may be asked to assist in the collection of additional information to help the NEA determine the degree to which agency objectives were achieved. You may be asked to share project accomplishments such as work samples, community action plans, cultural asset studies, programs, reviews, relevant news clippings, and playbills.

## Responsible Conduct of Program Evaluation and Research

NEA recipients should comply with all applicable laws and regulations governing the responsible conduct of research in the United States.

***NEA PROGRAM EVALUATION ETHICS REVIEW***: In limited cases, the NEA may conduct a review of your project prior to making an award if your project activities include *formal program evaluation, research that involves directly collecting personal information from program participants,* and/or *activities involving vulnerable populations*. Examples include activities that require program participants to provide sensitive and/or confidential information about themselves, and/or that involve systematic studies to assess a program's benefits for participants.

***INFORMAL PROGRAM EVALUATION AND DATA COLLECTION FOR FINAL REPORTING:*** Many NEA-funded projects include informal evaluation, such as conducting *anonymized surveys* of program participants about their satisfaction with a program, or *basic field observations* of program participants such as counting the number of audience members or tickets sold. **These types of activities are typically exempt from a program evaluation ethics review.** Data collection activities related to completion of the Final Descriptive Report (FDR) are exempt from a program evaluation ethics review.

**Questions:** Contact our Office of Research and Analysis (ORA) at research@arts.gov. ORA has compiled Resources on Program Evaluation and Performance Measurement to help applicants and awardees document the effectiveness and impact of their arts programs.

## Legal Requirements and Assurance of Compliance

The **Legal Requirements** section on our website provides information about key legal requirements that may apply to an applicant or recipient. It is not an exhaustive list; more details may be found in Appendix A of the General Terms & Conditions.

By signing and submitting the application form on Grants.gov, the Applicant certifies that it is in compliance with the statutes outlined in the **Assurance of Compliance**  and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance.

**It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

## Civil Rights

Projects may reach a particular group or demographic (such as sex, disability, economic status, race, color, or national origin, including limited English proficiency); however, projects may not be exclusionary under Federal civil rights laws and policies prohibiting discrimination. This nondiscrimination requirement extends to hiring practices, artist selection processes, and audience engagement. Your application should make it clear that project activities are not exclusionary. Please review the Assurance of Compliance which outlines the relevant federal statutes, NEA regulations, and executive orders.

The NEA's Office of Civil Rights investigates complaints about compliance with accessibility standards as well as other federal civil rights statutes. For further information and copies of the nondiscrimination regulations identified above, contact the Office of Civil Rights at 202-682-5454 or civilrights@arts.gov. For inquiries about limited English proficiency, go to http://www.lep.gov, or contact the Office of Civil Rights at 202-682-5454 or civilrights@arts.gov.

## Regulations Relating to Lobbying

For organizations applying for more than $100,000 (31 U.S.C. 1352).

The applicant certifies that:

a) It has not and will not use federal appropriated funds or cost share/matching funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a member of a National Endowment for the Arts advisory panel or the National Council on the Arts, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of or modification to any federal grant or contract.

b) If it has used or will use any funds other than federal appropriated funds to pay any person for influencing or attempting to influence any of the individuals specified above, the applicant:

  i) Is not required to disclose that activity if that person is regularly employed by the applicant. (Regularly employed means working for at least 130 days within the year immediately preceding the submission of this application.)

  ii) Will complete and submit Standard Form-LLL, "Disclosure of Lobbying Activities," if that person is not regularly employed by the applicant.

JA354

iii) Will require that the language of this certification be included in the award documents for all subawards of more than $100,000 and that all subrecipients shall certify and disclose accordingly.

## Freedom of Information Act (FOIA) Notice

*Disclosure Notice:* The National Endowment for the Arts (NEA) may share a copy of awarded applications and/or related materials submitted to the NEA by the applicants, with the public or other third parties, where required or permitted by law.

## Standards for Service

The NEA has set the following standards for serving applicants. We pledge to:
- Treat you with courtesy and efficiency.
- Respond to inquiries and correspondence promptly.
- Provide clear and accurate information about our policies and procedures.
- Provide timely information about funding opportunities and make guidelines available promptly.
- Ensure that all eligible applications are reviewed thoughtfully and fairly.

We welcome your comments on how we are meeting these standards. Email: webmgr@arts.gov, attention: Standards for Service. For questions about these guidelines or your application, see Agency Contacts. In addition, applicants may receive an invitation to participate in a voluntary survey to provide feedback on the grant application guidelines on our website and any experiences consulting with our staff.

## Paperwork Reduction Act Statement

The public reporting burden for this collection of information is estimated at an average of 26 hours per response. This includes the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. We welcome any suggestions that you might have on improving the guidelines and making them as easy to use as possible. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: webmgr@arts.gov, attention: Reporting Burden. Note: Applicants are not required to respond to the collection of information unless it displays a currently valid U.S. Office of Management and Budget (OMB) control number.

ALN 45.024
OMB No. 3135-0112 Expires 10/31/25

JA355

# Frequently Asked Questions

America250-Related Projects| Late or Incomplete Applications | Eligibility and Allowable Activities/Costs |Subgranting | Competitive Projects | Period of Performance | Other federal funding

## America250-Related Projects

**Does my grant application have to include an America250-related project in order to receive funding this year?**

No. We are encouraging, but not requiring, applicants to consider celebrating and honoring America250 as part of their project activities. We will certainly continue to fund projects that do not include an America250 focus or related programming.

**What is an America250-related project?**

For applicants that choose to focus on this milestone, we are interested in projects that celebrate and honor the nation's rich artistic and cultural heritage as part of America250. For example, projects could examine the work of American artists, present or create art recognizing this important milestone, or undertake educational activities or related programming. We aim to fund a wide range of projects—large and small, in all artistic disciplines, and in communities of all sizes across the country—that celebrate and honor this important milestone.

**Does my project have to focus entirely on celebrating America250?**

No. If you decide to submit an application for America250-related activities, your project may focus exclusively on celebrating and honoring the anniversary, or it may incorporate a special America250-related component or focus within a larger project that you are planning to undertake. For example, an organization applying for a broader musical series might devote a performance or educational activity to celebrating America250.

**Do all America250-related activities have to take place only in 2026?**

No. We recognize that project schedules vary based on your organization's unique needs. As such, America250-related activities can take place anytime during your award's period of performance in 2026-2027.

## Late or Incomplete Applications

**We missed the application deadline. Can I submit a late application?**

Late, ineligible, and incomplete applications will not be reviewed. Please review the information under Exceptions to the Submission Deadlines.

**Will you contact me if my application is missing anything?**

No. Because of the volume of applications, the NEA has a strict approach to incomplete applications. For your application to be considered complete, every required item MUST be

JA356

included in your application, which must be submitted no later than the application deadline date. **NEA staff will not contact applicants to request missing material**. Do not wait until the day of the deadline to submit! The NEA suggests setting an internal application deadline for your organization that is 24-48 hours before the actual application deadline.

**If my application is determined to be incomplete, may I add the missing item(s) and resubmit the application?**

No. An organization cannot add missing items and resubmit the application after the application deadline.

## Eligibility and Allowable Activities/Costs

**Can federally recognized tribes apply?**

Yes. In keeping with federal policies of Tribal Self Governance and Self-Determination, we may provide support for a project with a primary audience restricted to enrolled members of a federally recognized tribe. Applicants (federally recognized tribal governments, non-profits situated on federally recognized tribal lands, or other non-profits whose mission primarily serves federally recognized tribal enrollees) should consult with NEA staff to verify their eligibility before preparing an application.

**Can non-federally recognized tribes apply?**

Yes, if the applicant is a non-profit, tax-exempt 501(c)(3), U.S. organization. Projects for non-federally recognized tribes and indigenous groups may be supported, but project participation can't be restricted to only tribal members.

**Can Native Hawaiian groups apply?**

Yes, if the applicant is a non-profit, tax-exempt 501(c)(3), U.S. organization. Projects for Native Hawaiians may be supported, but project participation can't be restricted to only Native Hawaiians.

**Our project may need updated technology to support quality virtual programming. To what extent can these costs be included in the project budget, and do we need to differentiate between supplies or equipment costs?**

You can apply for costs related to updated technology if they support the proposed project activities. Costs could include:
- Equipment, purchase or rental
- Hardware
- Software, e.g., timed ticketing software
- Increased bandwidth
- Streaming subscriptions
- Specialized audio-visual equipment for performers

JA357

The distinction between supplies and equipment is determined by cost and useful life. A justification for the cost is required in some cases.

If you intend to purchase equipment that costs $10,000 or more per item with an estimated useful life of more than one year, clearly identify the equipment and you will need to provide a justification for this expenditure either in the Project Budget form or in your narrative.

Digital devices or other technologies are considered supplies if they are less than $10,000 per item, regardless of the length of useful life, and no additional justification is required.

**Can my project budget include the cost of open or closed captions or sign language interpretation for virtual events?**

Yes.

**How can I make sure that my project is in compliance with Federal civil rights laws?**

Projects may reach a particular group or demographic (such as sex, disability, economic status, race, color, or national origin, including limited English proficiency), however, projects may not be exclusionary under Federal civil rights laws and policies prohibiting discrimination. This nondiscrimination requirement extends to hiring practices, artist selection processes, and audience engagement. Your application should make it clear that project activities are not exclusionary. Please review the Assurance of Compliance which outlines the relevant federal statutes, NEA regulations, and executive orders.

**Can my partner organizations also apply for NEA funds to support our collaborative work?**

A partnering organization may apply for funds to support a joint effort but there can be no overlapping project costs or activities between the applications. For example, if you are a dance company, and you are applying for the development of a new work and a presenting organization/theater is also applying for a residency/performance project that includes your company and the presentation of the new work, you must ensure that the costs are kept separate. You cannot include as cost share/match any income derived from a federal grant made to another entity (e.g., if a presenter includes your artist fees as an expense in their budget, you cannot use that as income in your own budget). You should communicate closely with your partners to be sure that you are each clear on the division of costs and activity between the applications.

**Can my organization submit an additional application in the GAP category through the Film & Media Arts discipline for the July deadline?**

No. Organizations may submit only one application to the FY 2026 Grants for Arts Projects program (i.e., one application per calendar year) with limited exceptions made only for Parent (and Related) Organizations. The NEA limits the number of applications an organization may submit to ensure that our award funds extend to a variety of organizations, including first-time applicants and organizations serving communities of all sizes.

JA358

Although there is no longer the opportunity to submit an additional application through the Film & Media Arts discipline for the July deadline, the NEA remains committed to supporting existing and new technology-centered creative practices across all artistic disciplines and forms.

The NEA will continue to accept applications for projects that support this work in any relevant artistic discipline within the GAP category.

**In the past my organization submitted an additional application to Film & Media Arts, what should we do for FY26?**

The NEA recommends that you either focus your application on activities appropriate for the Film & Media Arts program, *or* apply to one of the other disciplines for a project that suits their accepted project types. Many of the other disciplines accept projects that utilize technology-centered creative practices, as well as build arts organization's capacity to serve a broad public by providing access, training, and other resources to engage with digital technologies. You can read more about what kinds of projects are accepted by reviewing the individual discipline instructions documents. If you have questions, we encourage you to contact NEA staff.

### Subgranting

**The "Unallowable Activities/Costs" section says that subgranting is not allowed. What is subgranting?**

Subgranting is defined as regranting funds to an organization for activities that are conducted independently of your organization and for the benefit of the subrecipients' own program objectives. A subrecipient is not directly affiliated with your organization. Examples of subgranting include:

- Payment to an organization to obtain training or technical assistance for their own benefit with little or no involvement from your organization.
- Production funds awarded to an organization through a competitive review process with little or no subsequent involvement from your organization.
- Emergency relief funding for housing or food.

Congress prohibits the NEA from making awards for subgranting activity, with exceptions only for state arts agencies, regional arts organizations, and local arts agencies designated to operate on behalf of local governments.

Designated local arts agencies are eligible to apply for subgranting through the Local Arts Agencies discipline of the Grants for Arts Projects category. Designated local arts agencies must meet additional eligibility requirements, provide additional documentation in the application, and follow additional reporting and compliance requirements. Designated local arts agencies are encouraged to contact Local Arts Agencies staff to discuss eligibility and application requirements when preparing a subgranting application.

JA359

**My organization wants to apply for support of its apprenticeship program. How can I clarify in my application that my project does not include awarding subgrants even though my budget may include fees to individual artists?**

The key to avoiding the appearance of subgranting is the involvement of your organization in carrying out the project activities. For example, an apprenticeship program might include fees paid to artists. These fees are not considered subgranting if your organization provides substantive supervision of and involvement in the mentor-apprentice relationship. This might include:

- Planning a detailed description of the individual master-apprentice course of study.
- Monitoring and evaluating the progress of the activity including conducting site visits.
- Documenting apprenticeship activities including reports from masters and apprentices.
- Arranging public exhibition or performance opportunities for masters and apprentices.
- Archiving material related to the apprenticeships and publicly distributing information about the apprenticeship program and its activities.

Note that simply "checking in" on the activity, including obtaining progress and final reports, does not qualify as substantive involvement in the project.

You can provide evidence of your organization's substantive involvement in the project through project-related information on your website, announcements and evaluations of public events, and archival documentation.

## Competitive Projects

**Does my project have to be new? Does it have to be big?**

No. Projects do not have to be new. Existing projects can be just as competitive as new activities. Projects do not need to be big either; the NEA welcomes small and medium-sized projects that can make a difference in their community or field.

**Does my project have to be outside the scope of my regular programming?**

No. A project can be a part of an applicant's regular season or activity.

**Can I apply for more NEA funding for a project supported by an earlier grant?**

Yes. If you have previously received a grant to support an earlier phase of a project, you *may* re-apply to the NEA for additional funding to support a later phase. However, each application must clearly describe the specific phase of work to be supported, and there can be NO overlapping project costs or activity between the awards.

## Period of Performance (Support)

**How soon after the "Earliest Start Date" for my deadline does my project have to begin?**

The NEA's support can start any time on or after that date.

**Can my project start before this date?**

No. Proposed project activities for which you're requesting support cannot take place before this date. You may only request that the NEA fund the portion of your project that will take place after the "Earliest Start Date."

**How long can my project last? May I apply for another project during this period?**

The NEA generally allows a period of performance of up to two years. Many applicants request a period of performance somewhere between 12 and 24 months. The two-year period is intended to allow an applicant sufficient time to plan, execute, and close out its project, not to repeat a one-year project for a second year.

Generally, an organization may apply to the NEA for another project (with totally different project costs) the following year even if a previous NEA-supported project is still underway. You are responsible for ensuring that there are no overlapping costs or activities between the projects. Note that this may affect when you can start your new proposed project.

## Other federal funding

**Can our organization use funds we received from other federal agencies as cost share/match for an NEA grant?**

No. Federal funds may not be used as cost share/match for other federal grants. This may include funding from the Paycheck Protection Program and Shuttered Venues Operators Grants (SVOG) from the Small Business Administration (SBA), as well as other federal funding, from:

- AmeriCorps
- Institute of Museum and Library Services
- National Endowment for the Humanities
- National Park Service
- National Science Foundation
- U.S. Department of Agriculture
- U.S. Department of Education (e.g., 21st Century Community Learning Centers)
- U.S. Department of Housing and Urban Development
- Or an entity that receives federal appropriations such as the Corporation for Public Broadcasting or Amtrak

**Can my organization use funds we have received from a Regional Arts Organization (RAO), State Arts Agency (SAA), or Local Arts Agency (LAA) as part of the cost-share/match for an NEA grant?**

Yes, if those funds *did not* originate at the federal level from the NEA or another federal agency (such the ones listed above). Your program officer at the RAO, SAA, or LAA will be able to tell you if the award you received from them includes any federal funds. It is up to you to ascertain the source of funding. When completing your project budget, be sure to indicate that these funds are non-federal.

JA361

9

**AGENCY:**

National Endowment for the Arts.

**ACTION:**

Notice.

**SUMMARY:**

In order to implement the President's Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* ("EO 14168" or "the EO"), the Chair[1] of the National Endowment for the Arts (NEA) has determined that appropriate action is needed to incorporate the EO in the NEA's grant application review process. Per the NEA Chair's authority under 20 U.S.C. § 959, the NEA publishes this explanation of its intended action to implement EO 14168.

The EO requires executive agencies to take all necessary steps, as permitted by law, to ensure that agency funds are not used to promote gender ideology. As set forth below, the NEA will implement EO 14168 on a grant-by-grant basis, in a manner that is consistent with the U.S. Constitution, the Administrative Procedure Act (APA), the NEA enabling statute 20 U.S.C. § 954, *et seq*. and its established policies and procedures regarding application review.

The statute 20 U.S.C. § 954(d)(1) confers upon the NEA Chair the discretionary authority to award a grant, or to decline to award a grant, and empowers the Chair as the final step in ensuring that each application represents "artistic excellence" and "artistic merit".[2] The NEA will adhere to Congress' direction for the Chair to judge applications on the basis of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.[3]

The Chair will continue to review grant applications based on the statutory requirements. The existing multi-tiered application review process will remain unchanged. The Chair will implement EO 14168 by evaluating projects that promote gender ideology based on the existing statutory criteria at the final stage of application review.

Applicants will not be required to certify that no federal funds are used to promote gender ideology. Thus, there is no eligibility bar to submitting an application related to promoting gender ideology. The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced. Under these criteria, there is no room for viewpoint discrimination. This implementation process is consistent with the First and Fifth Amendments as well as the APA. No applicant should suffer harm under this process, which essentially utilizes the existing statutory review scheme that the agency currently follows.

---

[1] If the position of Chair is vacant, then "Chair" will refer to such official performing the functions and duties of the Chair, in the absence of a Chair being officially appointed and confirmed.
[2] See also 20 U.S.C. § 955(f)(2).
[3] 20 U.S.C. § 954(d)(1).

**JA363**

The case-by-case review by the Chair of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology, will in general provide a significant public benefit by (1) furthering the current administration's priorities as provided in EO 14168; (2) providing more clarity to applicants on how EO 14168 is being implemented by the NEA; and (3) better informing applicants on whether and how to apply for NEA funding opportunities.

**DATES:**

The grant application review process set out in this Notice will be effective upon publication and will be applicable to all pending applications.

**FOR FURTHER INFORMATION, CONTACT:**

Ann Eilers, Deputy Chair for Management and Budget, National Endowment for the Arts, at (202) 682-5534, or by email at eilersa@arts.gov; Jennifer Lindow Eskin, Senior Advisor for Strategy, Programs, & Engagement, National Endowment for the Arts, at (202) 682-5781, or by email at eskinj@arts.gov.

**SUPPLEMENTARY INFORMATION:**

**I.      Background**

On January 20, 2025, the President issued EO 14168, "*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.*"[4]  The order addressed a broad series of priorities related to the President's concerns about gender ideology and included among other things the following provisions:

> Sec. 2(g) Federal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

> Sec . 3(e) Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

> Sec. 8(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

On February 6, 2025, the NEA decided to implement EO 14168 by requiring applicants to certify that "the applicant . . . understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168[. . .]."[5] On March 17, 2025, the NEA rescinded that

---

[4] Exec. Order No. 14,168, 2025 WL 327882 (Pres.): *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 FR 8615.

[5] Memorandum and Order, ECF 13, 7:2.

requirement and is issuing this memorandum to clarify its process for implementing the EO, to the extent permitted by law.[6]

This Notice outlines the NEA's grant application review standards and processes, and how it will implement EO 14168 in that review process.

## II.    Grant Application Review

### A.  Project-based Reviews

Applicants are judged based on their application materials for their proposed projects, and not any other activities they may conduct that exist beyond the four corners of their application. There are additional factors that must be considered by the NEA. For instance, an organization that has been suspended or debarred may not receive federal funds. There are also project types that are ineligible because the NEA has chosen not to fund them – for instance, construction projects or projects with significant entertainment or social activities.  Also, there are projects for which the NEA has stated a preference, such as projects supporting the work of artists and arts organizations in contributing to the health and well-being of individuals and communities.

### B.  Review Standards -- Artistic Excellence and Artistic Merit

The NEA's enabling statute provides two specific criteria in reviewing grant applications: Artistic Excellence and Artistic Merit.[7] Additionally, there is a secondary factor that is required to be considered: general standards of decency and respect for the diverse beliefs and values of the American public."[8]  The Grants for Arts Projects guidelines describe the Artistic Excellence and Artistic Merit as follows:

### i.    Artistic Excellence.

The artistic excellence of the project includes:
- The quality of the artists and other key individuals, works of art, organizations, arts education providers, artistic partners, and/or services involved in the project.

### ii.    Artistic Merit.

The artistic merit of the project includes:
- The value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency.
- The ability to carry out the project based on such factors as the appropriateness of the budget, clarity of the project activities, resources involved, and the qualifications of the project's personnel and/or partnerships.

---

[6] *Id.*, at 10:3-11:11.
[7] 20 U.S.C. § 954(d)(1).
[8] *Id.*

- Clearly defined goals and/or proposed outcomes and an appropriate plan to determine if those goals and/or outcomes are met. This includes, where relevant, measures to assess student and/or teacher learning in arts education.
- Evidence of direct compensation to artists, makers, art collectives, and/or art workers.
- As applicable: Engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

## C. Review Process

The above Artistic Excellence and Artistic Merit standard of review is implied in every phase of the review process, which is outlined below.

1. Once the application submission deadline is closed, NEA staff reviews each of the applications submitted by the deadline for completeness and other eligibility issues.
2. If NEA staff determines that an application is complete and meets all eligibility requirements, each application is reviewed by a panel of arts experts (and a layperson) under the Artistic Excellence and Artistic Merit.
3. Each application receives a score between 1 and 10 on each artistic excellence and merit criteria. The panels provide their recommendations.
4. The panel recommendations are submitted to the National Council on the Arts, which deliberates, votes on the applications before them, and proposes funding levels for the applications recommended for Chair's approval.
5. Chair reviews the Council's recommendations and has the "final authority" to approve or deny an application.[9]

## D. Chair's Discretion

The NEA's authorizing legislation, 20 U.S.C. § 954, *et seq.*, authorizes the Chair, and the Chair alone, to create the terms by which a program of grants in aid may be disbursed to organizations and individuals. Particularly, Artistic Excellence and Artistic Merit, taken together, give the Chair the discretion to award a grant, or to decline to award a grant, and situates the Chair as the final step in ensuring that each application represents "artistic excellence" and "artistic merit". Her final approval authority granted by the enabling statute is more than a mere perfunctory role. The Congress compels the Chair to either affirm or reject the Council's assessment of a project's excellence and/or merit. In exercising this authority, the Chair does so based on the particulars of each application as they relate to artistic excellence and merit. As the Court wrote in Finley, "the NEA's mandate is to make aesthetic judgments" which are "inherently content-based", and "[a]ny content-based considerations that may be taken into account are a consequence of the nature of arts funding; the NEA has limited resources to allocate among many "artistically excellent" projects, and it does so on the basis of a wide variety of subjective criteria."[10]

---

[9] 20 U.S.C. § 955(f)(2).
[10] *Natal Endowment for the Arts v. Finley*, 524 U.S. 569, 571 (1998).

### E. Final Decision by the Chair

#### i.    Artistic Excellence and Artistic Merit

In assessing the artistic excellence and artistic merit of applications, the Chair considers among other things: the quality of the artists, works of art, organizations, arts education providers, artistic partners; the value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency; budget, project's clarity, resources, and project staff and partners' qualifications; clearly defined goals and/or proposed outcomes and an appropriate plan; evidence of compensation to artists; as applicable, engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

#### ii.    Content-based considerations recognized in *Finley*

In doing so, the Chair may make content-based judgments. The Court in *Finley* wrote that "Any content-based considerations that may be taken into account are a consequence of the nature of arts funding; the NEA has limited resources to allocate among many "artistically excellent" projects, and it does so on the basis of a wide variety of subjective criteria."[11] The *Finley* Court also noted that "[t]he agency may decide to fund particular projects for a wide variety of reasons, 'such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form.'"[12] For example, the Chair may find that despite the Council's recommendation, the contemporary relevance of a particular application or its suitability to a special audience, or that its educational value leaves something to be desired.

#### iii.    Agency priorities

The NEA has historically expressed a preference for certain projects, which often reflect administration priorities. For example, the current NEA Grants for Arts Projects program guidelines encourage arts projects including activities that:

(1) Celebrate the nation's rich artistic heritage and creativity by honoring the semiquincentennial of the United States of America (America250);
(2) Originate from or are in collaboration with HBCUs, tribal colleges and universities, American Indian and Alaska Native tribes, Hispanic serving institutions, Asian American and Pacific Islander communities, and organizations that support the independence of people with disabilities;
(3) Support health and well-being of people and communities through the arts; and,
(4) Support existing and new technology-centered creatives practices across all artistic disciplines and forms.

---

[11] *Finley*, at 571.
[12] *Finley*, at 585.

JA367

### III.    Implementing EO 14168

The Chair's evaluation of projects promoting gender ideology will be to the extent practicable by law and in a manner consistent with the U.S. Constitution and federal laws and regulations, including the NEA statute, and agency policies and procedures.

To implement EO 14168, the Chair may evaluate projects promoting gender ideology in a manner consistent with the NEA's statutory framework of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public. In doing so, the Chair may consider factors including program priorities. As noted in *Finley*, assessments of Artistic Excellence and Artistic Merit may include (but are not limited to) considering "the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form."[13]

In reviewing applications, the Chair will make the decision on a grant-by-grant basis, relying on the criteria outlined in Section II above.  For example, in reviewing an application that promotes gender ideology, the Chair could consider whether or not the specific elements of that project align with general standards of decency and respect for the diverse beliefs and values of the American public, or whether those elements indicate a sufficient level of anticipated public interest in or appreciation of the project, or are likely to be suitable for or appeal to intended audiences.[14] The process does not include an eligibility bar, nor does it include a certification requirement.

### IV.    This Implementation Procedure Complies with Constitutional and APA Requirements.

#### A. This Implementation Process Complies with the First Amendment.

##### i.    NEA Grantmaking Constitutes Government Speech.

The NEA's grantmaking decisions constitute a form of government speech and therefore are not subject to scrutiny under the Free Speech Clause of the First Amendment.[15]  NEA grantmaking constitutes government speech in accordance with the three-factor test outlined in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), following the decision in *Pleasant Grove City v. Summum*.[16]

First, the history of the expression indicates that the NEA is communicating a message: namely that the project receiving federal support meets the highest standards of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse

---

[13] *Finley*, at 585.

[14] Id.

[15] *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209 (2015).

[16] *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 129 S. Ct. 1125 (2009).

**JA368**

beliefs and values of the American public.[17]  In creating the NEA, Congress did not intend for the Government to fund "art for art's sake", but rather art that serves a public purpose, including "to achieve a better understanding of the past, a better analysis of the present, and a better view of the future", to enable and support projects "which have substantial national or international artistic and cultural significance", and to "[foster] mutual respect for the diverse beliefs and values of all persons and groups".[18]  Congress recognized in the NEA's enabling legislation that "[p]ublic funding of the arts and humanities is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines."[19]

Second, NEA-funded projects "are often closely identified in the public mind with the [Government]."[20]  NEA-funded projects are required to credit the NEA and to include the NEA logo on project websites and promotional materials, making it likely to convey that the Government endorses the Artistic Excellence and Artistic Merit of the project.[21]  It is reasonable for the public to conclude that taxpayer-funded projects are closely identified with the Government, and that the Government is conveying a message that these projects exemplify artistic excellence and merit and respect for the diverse values of Americans, and are an appropriate use of taxpayer resources.

Third, the NEA maintains control, including through exercising final approval authority over the projects NEA funds, through a highly selective process.[22]  NEA's project selection is therefore a form of Government speech.

### ii.   This Implementation Process Does Not Include Viewpoint Discrimination.

Even if NEA-funded projects constitute private speech, the NEA will not impose an eligibility bar and will not engage in viewpoint discrimination. Per the NEA's statutory criteria, applications will be judged based upon Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.[23]

As noted in *Finley*, the NEA has limited resources and "must deny the majority of the grant applications that it receives, including many that propose "artistically excellent projects.  The agency may decide to fund particular projects for a wide variety of reasons, 'such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form.'"[24]

---

[17] 20 U.S.C. § 954 (d)(1).
[18] 20 U.S.C. § 951 (3) and (6); 20 U.S.C. § 954 (c)(1).
[19] 20 U.S.C. § 951 (5).
[20] *Walker*, at 211.
[21] *Walker*, at 211; *Summum*, at 472.
[22] *Walker*, at 210; *Summum*, at 473.
[23] 20 U.S.C. § 951(d)(1).
[24] *Finley*, at 585.

In the context of these decisions, "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." NEA legislation mandates that "[p]ublic funds … must ultimately serve a public purpose the Congress defines", and the Court held in *Finley* that "Congress may 'selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.' In doing so, 'the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.'"[25]

### B. This Implementation Process Complies with the Fifth Amendment.

The NEA's implementation of EO 14168 does not include the enactment of any rules or requirements that are unconstitutionally vague under the Fifth Amendment. It does not include a certification requirement and therefore does not subject applicants to potential criminal penalties for making false statements.[26] This process does not include a bar to eligibility. Instead, the NEA will consider projects promoting gender ideology in a manner consistent with the NEA's statutory framework of Artistic Excellence and Artistic Merit. The Court in *Finley* established that this framework is not constitutionally vague, writing that "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."[27]

### C. This Implementation Process Complies with the Administrative Procedure Act.

The NEA's implementation of EO 14168 does not include any agency actions that would violate the Administrative Procedure Act for exceeding the NEA's statutory authority, being arbitrary and capricious, or being contrary to a constitutional right. The NEA is not instituting an eligibility bar, nor is it mandating a certification requirement. Instead, the NEA will consider projects promoting gender ideology in a manner consistent with the NEA's existing statutory framework of Artistic Excellence and Artistic Merit.

### V.    Other Considerations in the Review Process

The case-by-case review by the Chair of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology, seeks to serve the public by (1) furthering the current administration's priorities as provided in EO 14168; (2) providing more clarity to applicants on how EO 14168 is being implemented by the NEA; and (3) better informing applicants on whether and how to apply for NEA funding opportunities. Alternatively, a decision to not establish an implementation process would adversely affect the ability of the NEA to comply with the President's mandates and Administration priorities. A decision to establish a different implementation process, such as subjecting applications with proposed projects promoting gender ideology to a different review standard and process, or establishing an eligibility bar, would adversely affect applicants and the NEA's ability to implement the EO in a manner consistent with its enabling statute, the Constitution, and the APA.

---

[25] *Finley*, at 587-8.
[26] *Bella Lewitzky Dance Found. v. Frohnmayer,* 754 F. Supp. 774, 781 (C.D. Cal. 1991), in which the finding of unconstitutional vagueness was the result of a certification requirement.
[27] *Finley*, at 589.

**VI.      Regulatory Requirements: Administrative Procedure Act (APA)**

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation. The NEA is merely adopting a general statement of policy, i.e., a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[28] As section 20 U.S.C. § 951 provides, final application review decisions are made by the Chairman of the NEA "in their discretion." This Notice clarifies the NEA's process for implementing EO 14168 to the extent permitted by law.  In clarifying that applications for projects that promote gender ideology will be considered within the NEA's existing statutory framework, the NEA is not instituting a legislative rule that would be subject to requirements for notice-and-comment rulemaking and a delayed effective date.

**VII.     Termination and No Private Rights**

The Chair retains the sole discretion to terminate this grant application review process at any point. This process is being implemented as a matter of the Chair's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

Mary Anne Carter
Senior Advisor
National Endowment for the Arts

April 16, 2025

Amended April 30, 2025 to correct contact information.

---

[28] *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979).

JA371

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS, *et al.*,

       Plaintiffs,

  *v.*

NATIONAL ENDOWMENT FOR THE
ARTS, *et al.*,

       Defendants.

Civil Action
No. 24-cv-79-WES-PAS

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS'
FIRST SET OF REQUESTS FOR ADMISSION**

Under Federal Rules of Civil Procedure 26 and 36 and to comply with the Court's June 4, 2025, text order, Defendants National Endowment for the Arts and its Senior Advisor Mary Anne Carter (collectively, the "NEA," unless otherwise specified herein) hereby object and respond to Plaintiffs' First Set of Requests for Admission.

**Objections**

The NEA provides its responses subject to three objections. First, the NEA incorporates and preserves its objections to Plaintiffs' requests on the grounds cited in its motion for a protective order (ECF 17), but responds in full to the requests as the Court ordered on June 4, 2025. Second, the NEA construes Plaintiffs' requests as seeking admissions only concerning its Grants for Arts Projects, the sole NEA program at issue in this case. Third, the NEA objects to the Plaintiffs' Definitions, Instructions, and requests to the extent that they seek disclosures exceeding the NEA's obligations under the Federal Rules of Civil Procedure.

**Responses**

**REQUEST FOR ADMISSION No. 1:** Admit that the NEA's or Chair's conclusion that a proposed project "promotes gender ideology" will disqualify the project from receiving an NEA grant.

**Response:** Denied. As stated in the NEA's Final Notice of Implementation of Executive Order 14168, dated April 16, 2025, the NEA will not consider a project's potential promotion of gender

**JA372**

ideology in evaluating whether the project is eligible for grant funding. The Chair will consider all applicable factors in evaluating a proposed project, and will not disqualify a project from consideration solely on her conclusion that a proposed project "promotes gender ideology."

**REQUEST FOR ADMISSION No. 2:** If your answer to Request for Admission No. 1 is anything other than an unqualified admission, admit that the NEA's or Chair's conclusion that a proposed project "promotes gender ideology" will make it less likely that the project will receive an NEA grant.

**Response**: Admitted only as follows. In evaluating a proposed project, the NEA will consider all applicable factors set forth under the NEA's enabling statute (including, in particular, 20 USC §§ 954(c) & (d)), other governing law, and according to agency practices. If the NEA Chair concludes that a proposed project "promotes gender ideology," that factor could weigh against the project's final approval. The fact that a proposed project "promotes gender ideology," standing alone, will not mean that project will not receive approval. No proposed project will be denied solely on the basis that it "promotes gender ideology."

**REQUEST FOR ADMISSION No. 3:** If your answer to Request for Admission No. 2 is anything other than an unqualified admission, admit that the NEA's or Chair's conclusion that a proposed project "promotes gender ideology" will make no difference as to whether the project will receive an NEA grant.

**Response**: Denied, only as follows. The Chair will consider all applicable factors in evaluating a proposed project, and whether a proposed project "promotes gender ideology" may be a factor as described in the NEA's Final Notice of Implementation of Executive Order 14168, dated April 16, 2025, at 6, § III.

I declare that the foregoing responses are true to the best of my knowledge and belief.     As to the objections,

/s/ _MA Carter_                          /s/ _Kevin Bolan_
MARY ANNE CARTER                         KEVIN BOLAN
Senior Advisor                           Assistant U.S. Attorney
National Endowment for the Arts

Dated: June 11, 2025

Respectfully submitted,

NATIONAL ENDOWMENT FOR THE ARTS;
MARY ANNE CARTER, in her official capac-
ity as Senior Advisor of the National Endow-
ment for the Arts,

By their Attorneys

SARA MIRON BLOOM
Acting United States Attorney

/s/ Kevin Bolan
KEVIN BOLAN
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
kevin.bolan@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on June 11, 2025, I filed this document and its attachments through the Court's ECF system, thereby electronically serving all parties of record in this action.

/s/ Kevin Bolan
KEVIN BOLAN
Assistant United States Attorney

JA374

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, et al., | |
| *Plaintiffs*, | Case No. 1:25-cv-00079-WES-PAS |
| *v.* | |
| NATIONAL ENDOWMENT FOR THE ARTS, et al., | |
| *Defendants*. | |

## SUPPLEMENTAL DECLARATION OF VERA EIDELMAN

I, Vera Eidelman, declare as follows:

1.      I am a Senior Staff Attorney with the American Civil Liberties Union Foundation and counsel for Plaintiffs in the above-captioned action. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment.

2.      Attached as Exhibit 1 is a true and correct copy of a webpage published by the National Endowment for the Arts ("NEA") with the title "Grants," available at https://www.arts.gov/grants.

3.      Attached as Exhibit 2 is a true and correct copy of a webpage published by the National Endowment for the Arts ("NEA") with the title "Grants for Arts Projects," available at https://www.arts.gov/grants/grants-for-arts-projects.

4.      Attached as Exhibit 3 is a true and correct copy of a webpage published by the National Endowment for the Arts ("NEA") with the title "Legal Requirements and Assurance of Compliance," available at https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance and current as of June 30, 2025.

**JA375**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 30, 2025.

_____
Vera Eidelman

# EXHIBIT 1

**NATIONAL ENDOWMENT for the ARTS**

Menu



Grants

# "The Arts . . . belong to all the people of the United States."

*1965 Enabling Legislation for the National Foundation on the Arts and the Humanities Act of 1965

Welcome!

The National Endowment for the Arts is the only arts funder in the United States—public or private—that provides access to the arts in all 50 states, the District of Columbia, and U.S. jurisdictions. Our work extends into communities of all sizes across America through a vast network that includes artists, arts workers, audiences,

JA378

Case 1:25-cv-00079-WES-PAS     Document 22-2     Filed 06/30/25     Page 5 of 39 PageID #: 798

learners, and organizations at the local, state-wide, regional, and national levels.

Whether you are a first-time or returning applicant, we welcome the opportunity to connect with you. Our staff strives to ensure that all applicants receive the support they need to understand every step of the process. Here are some resources to help orient you to our grantmaking process:

- First Time Applicant Guide for Organizations </grants/first-time-applicant-guide-for-organizations>

- How are applications reviewed? Grant Review Process </grants/grant-review-process>

- Want to serve as an application reviewer? Volunteer to be a Panelist </form/volunteer-to-be-a-national-endowment-for-the-arts-panelist>

- See the wide variety of projects and grant recipients we have funded </grants/recent-grants>

- **NOTE**: SAM Validation Is Returning to Grants.gov </grants/sam-validation%3dreturning-to-grants.gov>

Please carefully read the guidelines located below to better understand each program's intent, as well as the types of projects we are particularly interested in funding.

Find out more about funding opportunities available through your state arts agency and regional arts organization <https://www.arts.gov/state-and-regional-arts-organizations>.



**JA379**



Performance of *Twelfth Night* at Yale Repertory Theatre. Photo by Joan Marcus

# Grants for Organizations

## NEA "Celebrating America250: Arts Projects Honoring the National Garden of American Heroes"

$25,000 grants for arts projects in any discipline that celebrate the contributions to American history of one or more of the national heroes listed in Executive Order 13978. No match required. Deadline: July 14, 2025

</grants/national-garden-of-heroes>

## GRANTS FOR ARTS PROJECTS

Grants for Arts Projects is our principal grants category. Grants are available for arts projects of all sizes in a wide variety of artistic disciplines. Deadlines: March 11 and July 17, 2025

</grants/grants-for-arts-projects>

## OUR TOWN

In previous years, Our Town had its own application deadline. To simplify the application intake and review process, Our Town applicants will now apply within the Grants for Arts Projects (GAP) program and choose the "Our Town" discipline. GAP: Our Town requirements and application questions have been simplified for the benefit of all applicants.

</grants/our-town>

## CHALLENGE AMERICA

The Challenge America grant program has been canceled for FY 2026. We encourage applicants who may have planned to apply to Challenge America this year to review the Grants for Arts Projects guidelines to learn more about funding opportunities.

</grants/challenge-america>

JA381

Case 1:25-cv-00079-WES-PAS    Document 22-2    Filed 06/30/25    Page 8 of 39 PageID #: 801

## PARTNERSHIP AGREEMENT GRANTS

Grants are awarded to the nation's 56 state and jurisdictional arts agencies (SAAs), and the six regional arts organizations (RAOs) whose members comprise SAAs. Partnership support is also available to the national service organization for the state arts agencies. * Deadline has passed. New guidelines anticipated in July 2025.

</grants/partnership-agreement-grants>

## RESEARCH AWARDS

The National Endowment for the Arts invites applicants to engage with its five-year research agenda (as part of the NEA FY2022-2026 Strategic Plan, Objective 3.2) through the agency's Research Grants in the Arts program.
* Deadline has passed.

</grants/research-awards>

# Fellowships

JA382

# CREATIVE WRITING FELLOWSHIPS

The Literature Fellowships program awards grants in prose (fiction and creative nonfiction) and poetry to published creative writers.
*Deadline has passed.

</grants/creative-writing-fellowships>

---

# TRANSLATION PROJECT FELLOWSHIPS

Through fellowships to published translators, the NEA supports projects for the translation of specific works of prose, poetry, or drama from other languages into English.
* Deadline has passed.

</grants/translation-project-fellowships>

---

# Manage Your Award

JA383

Case 1:25-cv-00079-WES-PAS     Document 22-2     Filed 06/30/25     Page 10 of 39 PageID #: 803

## Manage Your Award

Manage Your Award is for recipients of offers and awards from the National Endowment for the Arts.  Here you will find the guidance necessary to understand and comply with the rules, regulations, and policies that govern your federal award, as well as all forms and instructions you will need to manage the award from offer to closeout.

</grants/manage-your-award>

---

# Recent Grants

Information about NEA grants awarded since 1998.

**Go** </grants/recent-grants>

## Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

JA384

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

About </about>

Contact Us </about/leadership-staff/all-staff>

Civil Rights </about/civil-rights-office>

No Fear Act </about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

FOIA </about/freedom-of-information-act-foia-guide>

Inspector General </about/inspector-general>

Accessibility </impact/accessibility>

Privacy Policy </privacy>

Disclaimers </about/website-disclaimers>

Open Government </about/open-government>

USA.gov <http://www.usa.gov/>

Section 508 Accessibility </section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-grant-scam>

JA385

400 7th Street, SW, Washington, DC
20506
202.682.5400

**JA386**

# EXHIBIT 2



Menu

# GRANTS FOR ARTS PROJECTS

## Grant Program Summary

Update: Please review this notice <https://www.arts.gov/sites/default/files/final.notice.implementation.eo14168.pdf>concerning the agency's implementation of EO 14168.

GAP 2 Deadline Update: The deadline dates for the FY26 GAP 2 funding opportunity have changed. See the calendar below for the new dates.

The NEA is committed to supporting excellent arts projects for the benefit of all Americans. Grants for Arts Projects (GAP) provides funding for public engagement with the arts and arts education, for the integration of the arts with strategies promoting the health and

JA388

well-being of people and communities, and for the improvement of overall capacity and capabilities within the arts sector. We welcome applications from first-time and returning applicants; from organizations serving rural, urban, suburban, and tribal communities of all sizes; and from organizations with small, medium, or large operating budgets. **We strongly encourage applications for arts projects that incorporate one or more agency funding priorities** </grants/priorities>**.**

We fund arts projects in the following disciplines: Artist Communities, Arts Education, Dance, Design, Film & Media Arts, Folk & Traditional Arts, Literary Arts, Local Arts Agencies, Museums, Music, Musical Theater, Opera, Our Town, Presenting & Multidisciplinary Works, Theater, and Visual Arts.

A full grant program description can be found under **Grant Program Details** below. For detailed instructions on how to apply, see **Application Instructions** below.

**Access for individuals with disabilities:**
Contact the Office of Civil Rights at civilrights@arts.gov to request an accommodation or an alternate format of the guidelines at least 2 weeks prior to the application deadline.

# Eligibility

Review *GAP Grant Program Details* document below for full details. Organizations eligible to apply include:

**JA389**

- Nonprofit, tax-exempt 501(c)(3), U.S. organizations;

- Units of state or local government; or

- Federally recognized tribal communities or tribes.

Applicant organizations must have completed at least 5 years of arts programming prior to the application deadline. Generally, an applicant may submit one application per calendar year.

Funding is **not** available in this category for individuals, applications submitted by a fiscal sponsor, or commercial/for-profit enterprises.

# Funding level

Applicants may request an amount between $10,000-$100,000.

Local Arts Agencies *only*: Designated local arts agencies that are eligible to subgrant may request $30,000 to $150,000 for subgranting programs. See the Local Arts Agencies Application Instructions below for more information on subgranting eligibility.

1:1 Cost-share/match required. Sources may include both cash and in-kind.

Review the *GAP Program Details* document below for full details.

# Important Dates

Applications are accepted during two funding cycles each year.

**JA390**

|  | March Cycle (GAP 1) | July Cycle (GAP 2) |
|---|---|---|
| Grant Program Details and Application Instructions Published | February 2025 | February 2025 |
| Part 1 Application Package Available on Grants.gov | February 2025 | Mid-June 2025 |
| **Part 1 Grants.gov** *Submission deadline* | **March 11, 2025 11:59 pm ET** | **July 17, 2025 11:59 pm ET** |
| **Part 2 NEA Applicant Portal** *Opens to applicants* | **March 14, 2025 9:00 am ET** | **July 22, 2025 9:00 am ET** |
| **Part 2 NEA Applicant Portal** *Submission deadline* | **Updated Deadline: April 7, 2025 11:59 pm ET** | **July 29, 2025 11:59 pm ET** |
| Notification of recommended funding or rejection | December 2025 | Early to mid April 2026 |

**JA391**

| Earliest project start date | January 1, 2026 | June 1, 2026 |
|---|---|---|

# Grant Program Details & Instructions

**GAP Grant Program Details (all disciplines):** PDF </sites/default/files/fy26-gap-grant-program-details-july-v2.pdf>

This document includes a detailed description of the grant program, eligibility information, award information, an application calendar, a list of unallowable activities/costs, application review details, FAQs, and federal award administration information. Review this information before you decide to apply.

**Application Instructions**:

Each document includes **full instructions on how to complete and submit both parts of the application** and a detailed description of the discipline, types of accepted projects, and characteristics of competitive proposals. From the list below, select the discipline that most closely corresponds with your proposed project activities.

- Artist Communities: PDF </sites/default/files/fy26-gap-ac-instructions-febrevfinal2.pdf>

- Arts Education: PDF </sites/default/files/fy26-gap-arts-ed-instructions-july.pdf>

- Dance: PDF </sites/default/files/fy26-gap-dance-instructions-july.pdf>

- Design: PDF </sites/default/files/fy26-gap-design-instructions-febrevfinal2.pdf>

**JA392**

- Film & Media Arts: PDF </sites/default/files/fy26-gap-film-media-arts-instructions-july.pdf>

- Folk & Traditional Arts: PDF </sites/default/files/fy26-gap-folk-arts-instructions-july.pdf>

- Literary Arts: PDF </sites/default/files/fy26-gap-literary-arts-instructions-july.pdf>

- Local Arts Agencies: PDF </sites/default/files/fy26-gap-local-arts-agencies-instructions-july.pdf>

- Museums: PDF </sites/default/files/fy26-gap-museums-instructions-july.pdf>

- Music: PDF </sites/default/files/fy26-gap-music-instructions-july.pdf>

- Musical Theater: PDF </sites/default/files/fy26-gap-musical-theater-instructions-july.pdf>

- Our Town: PDF </sites/default/files/fy26-gap-our-town-instructions-july.pdf>

- Opera: PDF </sites/default/files/fy26-gap-opera-instructions-july.pdf>

- Presenting & Multidisciplinary Works: PDF </sites/default/files/fy26-gap-pmw-instructions-july.pdf>

- Theater: PDF </sites/default/files/fy26-gap-theater-instructions-july.pdf>

- Visual Arts: PDF </sites/default/files/fy26-gap-visual_arts-instructions-july.pdf>

# How to Apply

Submitting an application is a multi-step process. **Detailed instructions on how to complete and submit the both parts of the application package can be found in the Application Instructions documents above.** Applying for a federal grant can be time

JA393

Case 1:25-cv-00079-WES-PAS    Document 22-2    Filed 06/30/25    Page 20 of 39 PageID #: 813

consuming, we estimate that after registering, the process to draft and submit an application takes approximately 26 hours.

## REGISTRATION

**Registration Guidance** PDF </sites/default/files/organization-registration-3.pdf>
Before you can submit an application, you must register with Login.gov <https://login.gov/>, the System for Award Management (SAM) at SAM.gov <https://sam.gov/content/home>, and Grants.gov <https://www.grants.gov/> or renew/verify these registrations. Registration can take several weeks.

## SUBMIT YOUR APPLICATION

### Application Part 1, Grants.gov

Submit the *Application for Federal Domestic Assistance/Short Organization Form*. Clicking the link below will take you **directly** to the pre-populated application package in Grants.gov.

## PART 1 GRANTS.GOV APPLICATION PACKAGE

**July Cycle: Funding opportunity number 2025NEA01GAP2** <https://www.grants.gov/search-results-detail/359688>

**After clicking the link above:**

JA394

- **The Grants.gov "View Grant Opportunity" screen will open, click the red "Apply" button**. To create the Workspace application, you must be logged into Grants.gov with a participant role <https://www.grants.gov/applicants/workspace-overview/workspace-roles> of either **Workspace Manager** or **Authorized Organization Representative (AOR).**

  - **If the Apply button is grey or you receive a "bad request" error, please see** further instructions on how to troubleshoot <https://www.arts.gov/grants/grants-gov-issues>.

- **Create a Workspace application**:

  - Fill in the Application Filing Name field with your organization name, then

  - Click the **Create Workspace** button.

- **Go to the Manage Workspace page**, where you can begin working on the application.

**Application Part 2, NEA Applicant Portal** <https://applicantportal.arts.gov/> Complete the *Grant Application Form (GAF)*. Login instructions and step-by-step directions for filling out the GAF are available via the *Application Instructions* documents above. The Applicant Portal (AP) is a separate website from grants.gov, click the link above to access the portal.

Applicants may receive a courtesy email at the beginning of the Part 2 submission window as a reminder that the AP is open – you do not need to wait for this email to access the AP, it will open promptly at 9:00 am Eastern Time on the date indicated on the calendar. Emails

JA395

can occasionally get caught in spam filters, for this reason non-receipt of the courtesy email *does not* provide grounds for an extension, nor should it be interpreted to mean that Part 1 of your application was not received.

# Webinars and Resources

See the Applicant Resources on the sidebar for information on webinars and other resources.

# Manage Your Award

Before applying, we recommend that you review reporting requirements and other information related to managing a federal award, including the General Terms and Conditions, on our Manage Your Award </grants/manage-your-award/>page.

**JA396**

# Stories

Learn about grantees, artists, arts organizations, and arts events around the country through our blog, podcasts, interviews, videos, and magazine.

**Go** </stories>

## Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

**About** </about>

**Contact Us** </about/leadership-staff/all-staff>

**Civil Rights** </about/civil-rights-office>

JA397

No Fear Act </about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

FOIA </about/freedom-of-information-act-foia-guide>

Inspector General </about/inspector-general>

Accessibility </impact/accessibility>

Privacy Policy </privacy>

Disclaimers </about/website-disclaimers>

Open Government </about/open-government>

USA.gov <http://www.usa.gov/>

Section 508 Accessibility </section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-grant-scam>

400 7th Street, SW, Washington, DC 20506
202.682.5400

**JA398**

# EXHIBIT 3



Menu

# Legal Requirements and Assurance of Compliance

## Legal Requirements

**NOTE: This list highlights some of the significant legal requirements that may apply to an applicant or recipient; however, it is not exhaustive. More information regarding these and other legal requirements may be found at Appendix A of the** General Terms & Conditions </grants/manage-your-award>**, which set forth the National Policy and Other Legal Requirements, Statutes, Regulations, and Executive Orders that Govern Your Award. There may be other applicable legal requirements that are not listed in this document. It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

JA400

1. By law, the National Endowment for the Arts may support only those organizations:

- **That are tax-exempt**. Organizations qualifying for this status must meet the following criteria:

  1. No part of net earnings may benefit a private stockholder or individual.
  2. Donations to the organization must be allowable as a charitable contribution under Section 170(c) of the Internal Revenue Code of 1954, as amended.

  For further information, go to the Internal Revenue Service's (IRS) website <http://www.irs.gov>.

- Who have not had their IRS status revoked. It is your responsibility to ensure that your status is current at the time of the application and throughout the life of your award.

- **That compensate all professional performers and related or supporting professional personnel on National Endowment for the Arts-supported projects at no less than the prevailing minimum compensation**. (This requirement is in accordance with regulations that have been issued by the Secretary of Labor in 29 CFR Part 505 <http://www.gpo.gov/fdsys/pkg/cfr-1998-title29-vol3/pdf/cfr-1998-title29-vol3-chap-id2.pdf>. This part does not provide information on specific compensation levels.)

**JA401**

- **That ensure that no part of any National Endowment for the Arts-supported project will be performed under or engaged in working conditions which are unsanitary, hazardous, or dangerous to the health and safety of the employees involved**.

- JA402

## 2. Some legal requirements apply to every applicant. For example:

- **Compliance with the federal requirements** that are outlined in the Assurance of Compliance below

- **Debarment and Suspension procedures**. The applicant must comply with requirements set forth in Subpart C of 2 CFR 180, as adopted by the National Endowment for the Arts in 2 CFR Part 3254. Failure to comply may result in the debarment or suspension of the recipient, and the National Endowment for the Arts suspending, terminating, and/or recovering the funds. More information on Debarment and Suspension procedures can be found in the GTCs.

- **Federal Debt Status** (OMB Circular A-129 <https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/a129/a-129.pdf>). Processing of applications will be suspended when applicants are delinquent on federal tax or non-tax debts, including judgment liens against property for a debt to the federal government. An organization's debt status is displayed in the System for Award Management (SAM). New awards will not be made if an applicant is still in debt status as of September 1 of the fiscal year listed on this funding opportunity.

**JA403**

- **Labor Standards** (29 CFR Part 505 <https://www.govinfo.gov/app/details/cfr-2023-title29-vol3/cfr-2023-title29-vol3-part505>). Recipients must comply with the standards set out in Labor Standards on Projects or Productions Assisted by Grants from the National Endowments for the Arts.

- The Drug-Free Workplace Act of 1988 <https://www.govinfo.gov/content/pkg/uscode-2020-title41/html/uscode-2020-title41-subtitleiv-chap81-sec8103.htm> (41 U.S.C. 8101 et seq. and 2 CFR Part 3256). The recipient is required to publish a statement regarding its drug-free workplace program as well as to comply with other requirements.

**JA404**

3. **Some legal requirements apply depending upon what activity the award is funding. For example:**

- If your project activities have the potential to impact any structure that is eligible for or on the National Register of Historic Places, adjacent to a structure that is eligible for or on the National Register of Historic Places, or located in an historic district, you will be asked to provide additional information about your project or take additional action so that the agency can review and comply with the National Historic Preservation Act <https://www.achp.gov/protecting-historic-properties> (NHPA). NHPA also applies to any planning activities that may affect historic properties or districts. The additional agency review must be completed prior to any agency funds being released.

- If your project activities have the potential to impact the environment or environmentally sensitive resources, you will be required to provide information in accordance with the National Environmental Policy Act <https://www.epa.gov/laws-regulations/summary-national-environmental-policy-act> (NEPA). The additional agency review must be completed prior to any agency funds being released.

JA405

- If your project activities include any contract over $2,000 involving the construction, alteration, or repair of public buildings or public works, the contract must contain a clause setting forth the minimum wages to be paid to laborers and mechanics employed under the contract in accordance with The Davis-Bacon and Related Acts (DBRA). More information on DBRA can be found in the GTCs </grants/manage-your-award> under the "Other National Policies" heading.

- Projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 USC 952(j)-(l); 20 USC 954(d),(l).

4. **Some legal requirements apply depending upon who the applicant is. For example:**

- The Native American Graves Protection and Repatriation Act of 1990 (25 U.S.C. 3001 et seq.) applies to any organization that controls or possesses Native American cultural items, such as human remains or associated funerary objects and receives Federal funding, even for a purpose unrelated to the Act.

**JA406**

5. **In addition, State Arts Agencies must meet the requirements in Section 954(g)(2) of the National Endowment for the Arts' authorizing legislation, which state:**

"In order to receive assistance under this subsection in any fiscal year, a State shall submit an application for such grants at such time as shall be specified by the Chairperson and accompany such applications with a plan which the Chairperson finds—

(A) designates or provides for the establishment of a State agency (hereinafter in this section referred to as the "State agency") as the sole agency for the administration of the State plan;

(B) provides that funds paid to the State under this subsection will be expended solely on projects and productions approved by the State agency which carry out one or more of the objectives of subsection (c);

(C) provides that the State agency will make such reports, in such form and containing such information, as the Chairperson may from time to time require, including a description of the progress made toward achieving the goals of the State plan;

(D) provides—

i. assurances that the State agency has held, after reasonable notice, public meetings in the State to allow all groups of artists, interested organizations, and the public to present views and make recommendations regarding the State plan; and

JA407

ii. a summary of such recommendations and the State agency's response to such recommendations; and

(E) contains--

i. a description of the level of participation during the most recent preceding year for which information is available by artists, artists' organizations, and arts organizations in projects and productions for which financial assistance is provided under this subsection;

ii. for the most recent preceding year for which information is available, a description of the extent projects and productions receiving financial assistance from the State arts agency are available to all people and communities in the State; and

iii. a description of projects and productions receiving financial assistance under this subsection that exist or are being developed to secure wider participation of artists, artists' organizations, and arts organizations identified under clause (i) of this subparagraph or that address the availability of the arts to all people or communities identified under clause (ii) of this subparagraph.

No application may be approved unless the accompanying plan satisfies the requirements specified in this subsection."

# Assurance of Compliance

**By signing and submitting its application form on Grants.gov, the**

JA408

**applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance**.

We may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement.

The applicant certifies that it does not discriminate:

- On the grounds of race, color, or national origin, in accordance with **Title VI of the Civil Rights Act of 1964**, as amended (42 U.S.C. 2000d et seq.), implemented by the National Endowment for the Arts at 45 CFR 1110.

- Solely on the grounds of disability, in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. 794), as amended, implemented by the National Endowment for the Arts at 45 CFR 1151, and the **Americans with Disabilities Act of 1990** ("ADA"), as amended, (42 U.S.C. 12101 et seq.).

- On the basis of age, in accordance with the **Age Discrimination Act of 1975,** as amended (42 U.S.C. 6101 et seq.), implemented by the National Endowment for the Arts at 45 CFR 1156.

JA409

- On the basis of sex, in any education program or activity, in accordance with **Title IX of the Education Amendments of 1972,** as amended (20 U.S.C. 1681 et seq.).

In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:

- The applicant will comply with all applicable Executive Orders while the award is being administered.  Executive orders are posted at whitehouse.gov/presidential-actions.

- The applicant's compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of the False Claims Act, 31 U.S.C. § 3729(b)(4), pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025.

  The applicant does not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173.

  See FAQ on these certification requirements </grants/legal-requirements-and-assurance-of-compliance/frequently-asked-questions>

The applicant will inform the public that persons who believe they have been discriminated against on the basis of race, color, national origin, disability, sex, or age may file a complaint with the Director of Civil Rights at the National Endowment for the Arts.

The applicant will forward all complaints for investigation and any

**JA410**

Case 1:25-cv-00079-WES-PAS     Document 22-2     Filed 06/30/25     Page 37 of 39 PageID
#: 830

finding issued by a Federal or state court or by a Federal or state administrative agency to:

Director, NEA Office of Civil Rights
Email: civilrights@arts.gov

The applicant shall maintain records of its compliance and submission for three (3) years. The applicant will compile, maintain and permit access to records as required by applicable regulations, guidelines or other directives.

The applicant must also certify that it will obtain assurances of compliance from all subrecipients and will require all subrecipients of National Endowment for the Arts funds to comply with these requirements.

The United States has the right to seek judicial or administrative enforcement of this assurance.

JA411

# Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

**About** </about>

**Contact Us** </about/leadership-staff/all-staff>

**Civil Rights** </about/civil-rights-office>

**FOIA** </about/freedom-of-information-act-foia-guide>

**No Fear Act** </about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

**Inspector General** </about/inspector-general>

**Accessibility** </impact/accessibility>

**Privacy Policy** </privacy>

**Disclaimers** </about/website-disclaimers>

**Open Government** </about/open-government>

**USA.gov** <http://www.usa.gov/>

**Section 508 Accessibility** </section-508-accessibility>

**JA412**

**Scam Regarding NEA Grants** </about/national-endowment-arts-warns-public-about-

grant-scam>

---

400 7th Street, SW, Washington, DC

20506

202.682.5400

**JA413**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, et al., | |
| *Plaintiffs*, | Case No. 1:25-cv-00079-WES-PAS |
| *v.* | |
| NATIONAL ENDOWMENT FOR THE ARTS, et al., | |
| *Defendants*. | |

### SECOND SUPPLEMENTAL DECLARATION OF EMILYA CACHAPERO

I, Emilya Cachapero, declare as follows:

1.      My name is Emilya Cachapero. I am the Co-Executive Director: National and Global Programming of Theatre Communications Group ("TCG"). I reviewed this with LaTeshia Ellerson, who is the Co-Executive Director: National Engagement of TCG, and Alisha Tonsic, who is the Co-Executive Director: National Operations and Business Development of TCG. The facts set forth in this declaration are based on our personal knowledge and reflect our collective views.

2.      TCG is a national theatre organization with over 600 member theatres and affiliates and over 3,500 individual members. TCG offers networking and knowledge-building opportunities for theatre professionals through annual convenings, industry reports, workshops, webinars, and the publication of American Theatre magazine and TCG Books, while also awarding $43 million in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking. TCG also engages in federal and regional advocacy. In addition, TCG conducts research about the fiscal health of the field by surveying its members,

**JA414**

both organizational and individual; this data includes demographic information such as gender identities of individual artists.

3.    Many of our members apply for and receive funding from the NEA to support their artistic endeavors. TCG itself has received 42 NEA grants since 1998.

4.    Our understanding of the NEA's current implementation of the "Gender Ideology" EO, as reflected in the Final EO Implementation that the NEA made public on April 30, 2025, is that, for every application, the Chair will consider whether or not the proposed project "promotes" what the government deems to be "gender ideology" and that the inclusion of such a message or perspective can only lower the chances of that project receiving funding.

5.    The intent of the Final EO Implementation appears to be to keep the policy as unclear as possible, while clearly continuing to disfavor projects that "promote" what the government deems to be "gender ideology." The NEA has refused to make a definitive statement that a project's views on gender will not be a concern at any stage of the application evaluation process.

6.    The Final EO Implementation's emphasis on the Chair's discretion moves away from the NEA's history of primarily moving applications forward based on peer review, which incorporates a diversity of backgrounds and perspectives by definition. The Final EO Implementation, in contrast, leaves the ultimate decision to the Chair—a single person who will be the arbiter for all applications. Our members are concerned that the current Chair will heavily disfavor projects that she views as "promoting gender ideology" in part because she approved all of the policies and restrictions the NEA had previously put in place in response to the Gender Ideology EO, including the certification requirement and the eligibility bar.

**JA415**

7.      In response to the Final EO Implementation, our members now ask us to help assess the risk that their projects will not get funded and the risks that funding could be rescinded; they ask us questions about the legality of the NEA's new policy; and they reach out for our advice on what they can say in their applications and even what language about gender identity and inclusivity it is still safe to have on their websites, in their missions, and the name of their organizations. The answers to these questions are not clear to us, and there is a lot of uncertainty among members. It remains unclear whether the existence of a trans, nonbinary, or queer character or actor in a piece constitutes "promoting gender ideology." Nor is it clear what views are proscribed. Is any discussion of trans, nonbinary, or queer identity prohibited, or only expression that might be seen to "promote" those identities? What messages fall within the prohibited "ideology"?

8.      In addition, the Assurance of Compliance that applicants must agree to if they are selected and become an NEA grant recipient states, "The applicant will comply with all applicable Executive Orders while the award is being administered." As we understand it, this includes the Gender Ideology EO's requirement that "[f]ederal funds shall not be used to promote gender ideology"—a restriction that we and our members worry will run to grant applicants if they receive NEA funding. This language in the Assurance of Compliance only increases our and our members' uncertainty around what messages can be expressed with NEA funding, and bolsters our and our members' concerns that support for and even simply discussion of transgender people in projects seeking NEA funding means that the Chair will disfavor such applications.

9.      The Assurance of Compliance also states, "The United States has the right to seek judicial or administrative enforcement of this assurance." The possibility of such enforcement only

adds to our and our members' concerns about the ambiguity of the NEA's prohibition on projects that "promote gender ideology," since it could open applicants to legal penalties.

10. If TCG or TCG members were to apply for future NEA funding, they would also have to certify in Part 1 of the application that "I certify . . . to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties." The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes us and TCG members fearful of seeking NEA funds in the future, and only adds to our and our members' concerns about understanding what "promoting gender ideology" does and does not cover.

11. Fewer of our members are planning to apply for NEA funding in the July 2025 cycle and future cycles, even compared to when the NEA had initially imposed the certification requirement and eligibility bar on February 6, 2025. They worry about the likelihood that they will make it through the first two phases of review—the panels and the Council—only to be denied a grant by the Chair because of the negative thumb that she will place on the scale for any project she deems to "promote gender ideology." Because of the resources necessary to complete an NEA application, our members worry that the application for NEA funding is not worth the risk of having grants denied because of the Chair's disapproval of their views. They also have concerns about legal penalties stemming from the Assurance of Compliance.

12. We had previously intended to apply in the July 2025 funding cycle for funding for our 2026 national conference, which will include discussions about gender identity and will affirm transgender, nonbinary, and queer members of the theatre community. In light of the Final EO Implementation, and the content and messages of our conference, however, we fear we would be

unlikely to receive a grant. We are also worried about the ambiguity and legal risks introduced by the Assurance of Compliance even if we were to receive NEA funding. We no longer intend to apply in the July 2025 cycle, and do not anticipate applying while the Final EO Implementation is in effect. But for the Final EO Implementation and the Assurance of Compliance, we would apply for NEA funding in future cycles.

13.     The NEA has been a longstanding funder for TCG, including grants in substantial amounts. No longer being competitive for NEA funding because of our desire to affirm and celebrate all gender identities would have a great impact on TCG.

14.     We have had to expend substantial resources to help our members respond to the Final EO Implementation, including efforts to answer the many questions and individual inquiries from our members. We have had to create more communications to our members and to the public since January 2025 than in the last three years prior to January combined. In addition to a huge volume of email requests, we are also called upon to speak more publicly about the NEA's policies, including the Final EO Implementation, and we must keep abreast of any changes by closely tracking federal policy and communications, as well as the work of our sister and partner organizations, who our members are also hearing from and therefore asking questions about. This impacts staff time, the amount of money we expend on sources of news to keep up-to-date, and the substance of the work of our executive leadership, programming, membership, communications, marketing, and magazine teams, among others.

15.     NEA funding is not seen by us or our members as government speech. The NEA's mission is to support artistic and cultural expression across the country by giving grants to artists, arts organizations, and schools. Because of that, the work it funds is generally understood as private

speech—not the government speaking through art. Even though the NEA is a federal agency, its role is to support creativity, not to control or define its content.

16.     When the public attends performances or exhibitions supported by NEA grants, they typically view that funding as a sign of the organization's artistic value—not as the government's endorsement of a specific message or theme. Most people aren't familiar with the specific criteria the NEA uses to award grants, beyond understanding that it funds excellent work.

**JA419**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June  26 , 2025

_Emilya Cachapero_
Emilya Cachapero

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS, et al.,

                     *Plaintiffs*,

          *v.*

NATIONAL ENDOWMENT
FOR THE ARTS, et al.,

                     *Defendants*.

Case No. 1:25-cv-00079-WES-PAS

**SUPPLEMENTAL DECLARATION OF ADAM ODSESS-RUBIN**

I, Adam Odsess-Rubin, declare as follows:

1.      My name is Adam Odsess-Rubin. I am the Founding Artistic Director of National Queer Theater ("NQT"). The facts set forth in this declaration are based on my personal knowledge.

2.      NQT is a theater collective dedicated to celebrating the brilliance of generations of LGBTQ+ artists and providing a home for unheard storytellers and activists. Through our art and free community programs, we create and organize together, working towards a more equitable vision of the world and celebrating the diversity of the American public, and in particular the most marginalized people in the queer community, including trans people, immigrants, and people of color. We seek to affirm all gender identities, including transgender, nonbinary, and queer identities. Affirming LGBTQ+ rights is at the heart of everything we do and our mission; it is our reason for existing as an organization.

3.      Since 2019, NQT has annually put on a Criminal Queerness Festival ("CQF" or the "Festival"). The Festival is devoted to freedom of expression and to fighting censorship and

**JA421**

criminalization of LGBTQ+ people in other countries. It features original works from emerging artists from countries that criminalize homosexuality, and often casts transgender actors and employs transgender staff. It is intended to support and celebrate artists who explore LGBTQ+ stories, including work that expressly affirms the equal dignity and genuine experience of transgender artists and explores and celebrates stories of and about transgender people, and rejects the notion that people's identities are determined by their biological anatomy at birth.

4.      NQT received NEA grants in 2023 and 2024 for the Festival. Though the NEA offered NQT funding for CQF 2025, that grant was revoked months before the Festival began, forcing NQT to find funding to fill the hole in our budget.

5.      NQT submitted a proposal seeking NEA funding for CQF 2026 in the March 2025 cycle. To my knowledge, that application remains pending.

6.      My understanding of the NEA's current implementation of the "Gender Ideology" EO, as reflected in the Final EO Implementation that the NEA made public on April 30, 2025, is that, for every application, the Chair will consider whether or not the proposed project "promotes" what the government deems to be "gender ideology" and that the inclusion of such a message or perspective can only lower the chances of that project receiving funding.

7.      What I also understand from the Final EO Implementation is that we will not be disqualified from funding if our project is understood to "promote" what the government deems to be "gender ideology," but our application may be demoted—possibly to the point where we will no longer be competitive for NEA funding. Given that NEA grants are already highly competitive, anything that makes us less competitive is highly concerning, and could in effect mean that we do not stand a chance.

JA422

8.      If the Final EO Implementation remains in place, I do not think that we will continue to apply for NEA grants. With the new policy, it feels like the NEA is trying to assess our values in some way. Given NQT's name, NQT's mission, the fact that we work with transgender actors, and the fact that the vast majority of our projects lie at the intersection of queer—including transgender—identities, it is hard for me to imagine a project that we could pitch that would not be at a disadvantage in the review process. Given the time and effort involved in applying for an NEA grant, I worry it is no longer worth the significant effort required to submit an application.

9.      What exactly it means to "promote gender ideology" also remains unclear in substantial respects. For example, it is not clear whether it includes merely working with actors, playwrights, and other artists who identify as transgender, nonbinary, or queer, regardless of the content of the art they produce. It is also unclear whether the mere presence of a transgender, nonbinary, or queer character in a piece constitutes "promoting" what the government deems to be "gender ideology." We fear that NQT's very mission as an organization dedicated to celebrating LGBTQ+ artists might trigger the "gender ideology" penalty, adding to our disincentives to apply for funding in the future.

10.      In addition, the Assurance of Compliance that we must agree to if NQT is selected and becomes an NEA grant recipient states, "The applicant will comply with all applicable Executive Orders while the award is being administered." As we understand it, this includes the Gender Ideology EO's requirement that "[f]ederal funds shall not be used to promote gender ideology"—a restriction that we worry will run to NQT if it receives NEA funding. This language in the Assurance of Compliance only increases our uncertainty around what messages we can express with NEA funding, and bolsters our concerns that our support for

**JA423**

and discussion of transgender people in CQF plays means that the Chair will disfavor our applications.

11.     The Assurance of Compliance also states, "The United States has the right to seek judicial or administrative enforcement of this assurance." The possibility of such enforcement only adds to our concerns about the ambiguity of the NEA's prohibition on projects that "promote gender ideology," since it could open us to legal penalties.

12.     If NQT were to apply for future NEA funding, I would also have to certify in Part 1 of the application that I "certify . . . to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties." The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes me fearful of seeking NEA funds in the future, and only adds to my concerns about understanding what "promoting gender ideology" does and does not cover.

13.     Were it not for the Final EO Implementation, and the ambiguity introduced by the Assurance of Compliance, we would seek NEA funding, as we have received in the past, for future CQFs. We believe that we have the right, as artists, to apply for NEA funding to promote art that meets the merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology."

14.     In NQT's experience as a recipient of NEA grants for CQF, the NEA has never suggested that we make substantive changes to the Festival, or otherwise given us feedback on the substance of our project proposal. When we apply for NEA funding, we typically do not know what plays we will include in the relevant year's Festival, so the NEA cannot give us

**JA424**

feedback on the specific plays we ultimately include. Instead, we are pitching, and the NEA is evaluating, our concept of the Festival.

15. When we publicize the Festival, we are very intentional in how we frame and market our central role. In all of our contracts, we make clear that it is very important that NQT gets credit for the Festival, including in the exact wording of the billing ("National Queer Theater's Criminal Queerness Festival"), and the size and placement of our name.

16. The NEA is not centered in any way in our framing of the Festival. We do not have any parameters in our contracts with other partners regarding where and how we recognize the NEA, though we do list them as a funder in our program, along with our other funders, which have included the New York City Department of Cultural Affairs in partnership with the City Council, the JKW Foundation, NYC Pride, and the Terrence McNally Foundation.

17. Many other entities also help to make the Festival happen, from the other funders; to the theaters that host the plays, including Lincoln Center and PAC NYC; to NYC Pride, which centers CQF as its official theater event.

**JA425**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2025.

_____

Adam Odsess-Rubin

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS, et al.,

*Plaintiffs*,

v.

NATIONAL ENDOWMENT FOR THE
ARTS, et al.,

*Defendants*.

Case No. 1:25-cv-00079-WES-PAS

**SUPPLEMENTAL DECLARATION OF GISELLE BYRD**

I, Giselle Byrd, declare as follows:

1.      My name is Giselle Byrd. I am the Executive Director of The Theater Offensive

("TTO"). The facts set forth in this declaration are based on my personal knowledge.

2.      TTO is a theatrical organization that presents liberating art by, for, and about queer

and trans people of color, that transcends artistic boundaries, celebrates cultural abundance, and

dismantles oppression. Although TTO is open to all without regard to race, sex, or other identifying

characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people,

including people of color, who are often the most underserved in the theatrical community both on

and offstage.

3.      TTO has previously received NEA grants in 2016, 2017, 2021, and 2022. In 2024,

the NEA offered a grant for TTO's Queer [Re]public Festival in 2025, but the NEA revoked the

grant months before the festival began, forcing TTO to find other sources of funding on short

notice.

1
**JA427**

4.      TTO applied for funding in the March 2025 cycle of the NEA's Grants for Arts Projects to support the production of a new play titled "Smoke," set during the Washington race riots of the 1960s, reflecting a significant and historical moment in our nation's history. The play is written by a trans playwright, and it is set to feature two trans actors in the leading roles and presents the complexities of trans life in a positive light. To my knowledge, that application remains pending.

5.      My understanding of the NEA's current implementation of the "Gender Ideology" EO, as reflected in the Final EO Implementation that the NEA made public on April 30, 2025, is that, for every application, the Chair will consider whether or not the proposed project "promotes" what the government deems to be "gender ideology" and that the inclusion of such a message or perspective can only lower the chances of that project receiving funding.

6.      What exactly it means to "promote gender ideology" remains unclear in substantial respects, especially given the fact that "gender ideology" is not a scientifically proven concept with defined boundaries. For example, it does not make clear whether "promoting" what the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as trans and/or nonbinary, without more, or whether they prohibit only certain messages, themes, or views. The requirement is also unclear as to whether the existence of a trans and/or nonbinary character in a piece constitutes "promoting gender ideology." Nor is it clear what views are proscribed. Is any discussion of trans and/or nonbinary identity prohibited, or only expression that might be seen to "promote" those identities? What about classic American works that feature drag? We fear that TTO's very mission as an organization dedicated to queer and trans people might trigger the "gender ideology" penalty.

7.      When thinking about future grant applications, we also worry that the "gender ideology" penalty could be replicated to penalize other speech disfavored by the government, impacting additional communities. If the NEA is allowed to discriminate against this particular viewpoint, it is not clear why it wouldn't discriminate against others in the future.

8.      In addition, the Assurance of Compliance that we must agree to if TTO is selected and becomes an NEA grant recipient states, "The applicant will comply with all applicable Executive Orders while the award is being administered." As we understand it, this includes the Gender Ideology EO's requirement that "[f]ederal funds shall not be used to promote gender ideology"—a restriction that we worry will run to TTO if it receives NEA funding. This language in the Assurance of Compliance only increases our uncertainty around what messages we can express with NEA funding, and bolsters our concerns that our support for and discussion of transgender and/or nonbinary people in our work means that the Chair will disfavor our applications.

9.      The Assurance of Compliance also states, "The United States has the right to seek judicial or administrative enforcement of this assurance." The possibility of such enforcement only adds to our concerns about the ambiguity of the NEA's prohibition on projects that "promote gender ideology," since it could open us to legal penalties.

10.     If TTO were to apply for future NEA funding, I would also have to certify in Part 1 of the application that I "certify . . . to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties." The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded

works makes me fearful of seeking NEA funds in the future, and only adds to my concerns about understanding what "promoting gender ideology" does and does not cover.

11.     Despite the Final EO Implementation, TTO will continue to apply for NEA grants because we believe it is important to showcase narratives that reflect the American people. The NEA's new policy does not change our mission and our work. If anything, it has emphasized the importance of uplifting narratives that recognize the lived experiences of transgender and/or nonbinary individuals. There are studies and articles discussing how people find the arts beneficial for their emotional well-being, including seeing themselves reflected in works of art, and it is detrimental to penalize art that affirms the transgender and nonbinary community.

12.     In TTO's experience as a recipient of NEA grants, the NEA has never suggested that we make substantive changes to our proposals or otherwise given us feedback on the substance of our project proposal. When the NEA has given feedback, it has been about how to better frame TTO's proposal to make it a more competitive application, but not about changing the project itself. The NEA has never suggested removing themes, actors, or other aspects of a proposal because of the substance.

13.     When publicizing its work, TTO makes clear that the work belongs to TTO and its artists. Our thoughts are our own, and we have never censored who we are and what we do. TTO retains the intellectual property rights to its work.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on June 30, 2025.

_____
Giselle Byrd

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS, et al.,

*Plaintiffs*,

v.

NATIONAL ENDOWMENT FOR THE
ARTS, et al.,

*Defendants*.

Case No. 1:25-cv-00079-WES-PAS

## SECOND SUPPLEMENTAL DECLARATION OF MARTA V. MARTÍNEZ

I, Marta V. Martínez, declare as follows:

1.     My name is Marta V. Martínez. I am the Executive Director and Founder of Rhode Island Latino Arts ("RILA"). The facts set forth in this declaration are based on my personal knowledge.

2.     Founded in 1988 as the Hispanic Heritage Committee, RILA is the leading Latino arts nonprofit organization in Rhode Island. Its mission is to promote, encourage, and preserve the art, history, heritage, and cultures of Latinos in Rhode Island. RILA offers programming of every genre of art, including visual art, dance, and music. It puts on theatrical and musical performances, Latin percussion/drumming sessions, dancing events, script readings, and storytelling events. RILA also has a gallery to showcase artwork, and operates literacy programs.

3.     RILA has previously received NEA grants in 2019, 2020, and 2022.

4.     RILA applied for funding in the March 2025 cycle of the NEA's Grants for Arts Projects. RILA initially submitted Part 1 of the application on February 14, 2025, when the Assurance of Compliance stated that applicants would not use federal funds to "promote gender

**JA432**

ideology." After that certification requirement had been removed, RILA withdrew and resubmitted Part 1.

5. In the current (March 2025) cycle, RILA is seeking NEA funding to support performance tours, visual art, and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. Because, at the time that the application was due, the NEA had not yet issued its Final EO Implementation—and so it remained possible that but unclear whether the NEA would prohibit or penalize projects perceived to be "promoting" what the government deems to be "gender ideology"—RILA chose not to expand the scope of its project in Part 2 of its application to reflect its desire to support transgender, queer, and nonbinary artists, characters, and themes within the scope of its NEA-funded programming. Instead, I made sure to steer clear of anything that could be perceived as "promoting gender ideology" in RILA's application materials. I found myself having to be more deliberate even in how I described RILA as an organization, including our commitments to inclusivity, compared to how I have written previous applications for NEA funding. To my knowledge, RILA's application remains pending.

6. My understanding of the NEA's current implementation of the "Gender Ideology" EO, as reflected in the Final EO Implementation that the NEA made public on April 30, 2025, is that, for every application, the Chair will consider whether or not the proposed project "promotes" what the government deems to be "gender ideology" and that the inclusion of such a message or perspective can only lower the chances of that project receiving funding.

7. In light of the Final EO Implementation, it is very unclear how applications will be reviewed and how, if at all, the NEA plans to monitor projects after a grant has been awarded. There are many unresolved questions, such as what constitutes the "promotion" of "gender ideology." Is it prohibited to allow a transgender, queer, or nonbinary individual to participate in

NEA-funded programming? To include any mention of these identities? To include any fictional characters who are trans, nonbinary, or queer? Indeed, I fear that even describing RILA as an organization that supports transgender, nonbinary, and queer artists might run afoul of the "gender ideology" restriction.

8.    In addition, the Assurance of Compliance that I must agree to if RILA is selected and becomes an NEA grant recipient states, "The applicant will comply with all applicable Executive Orders while the award is being administered." As I understand it, this includes the Gender Ideology EO's requirement that "[f]ederal funds shall not be used to promote gender ideology"—a restriction that I worry will run to RILA if it receives NEA funding. This language in the Assurance of Compliance only increases my uncertainty around what messages RILA can express with NEA funding and how the Final EO Implementation will be enforced.

9.    The Assurance of Compliance also states, "The United States has the right to seek judicial or administrative enforcement of this assurance." The possibility of such enforcement only adds to my concerns about the ambiguity of the NEA's prohibition on projects that "promote gender ideology," since it could open us to legal penalties. It also increases my fears and uncertainty regarding monitoring of RILA's programming for what viewpoints RILA expresses should RILA receive funding.

10.    If RILA were to apply for future NEA funding, I would also have to certify in Part 1 of the application that I "certify . . . to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties." The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded

works makes me fearful of seeking NEA funds in the future, and only adds to my concerns about understanding what "promoting gender ideology" does and does not cover.

11.     Because of the Final EO Implementation, and the ambiguity introduced by the Assurance of Compliance, I would strongly hesitate to apply for NEA funding again. Putting together an application for an NEA grant takes a great deal of effort, especially for a small organization like RILA that does not have a dedicated development office for writing grant applications. The process of writing a grant for NEA funding requires extensive planning, coordination, and research. It involves gathering detailed information, developing a compelling narrative, preparing budgets, timelines, and work plans, and often coordinating with multiple partners. For a small team juggling multiple programs and responsibilities, completing a federal grant application can take several weeks of focused work and staff time that might otherwise be used for direct programming. It would be very frustrating to go through all of that effort but not receive funding because the proposed project is deemed to express a view disfavored by the NEA Chair.

12.     Absent the Final EO Implementation, and the ambiguity introduced by the Assurance of Compliance, RILA would seek NEA funding in the future without hesitation.

13.     In RILA's experience as a recipient of NEA grants, the NEA has never suggested that we make substantive changes to our proposals or otherwise given us feedback on the substance of our project. When the NEA has given feedback, it has been about how to better frame RILA's proposal to make it a more competitive application, but not about changing the project itself. The NEA has never suggested removing themes, actors, or other aspects of a proposal because of the substance.

14.    RILA puts on projects that receive NEA funding either it its own space, or in public parks or streets that require permission from other, non-NEA government bodies.

15.    Those who attend and see RILA's art, performances, and other events recognize that this is RILA's work. People know our work—it is unique and it is very consistent. It reflects our audience and our mission. That is how we get people coming back again and again.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 27, 2025.

Marta V. Martínez

Ex. 1

JA437

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS, *et al.*

        Plaintiffs,

   *v.*

NATIONAL ENDOWMENT FOR THE
ARTS, *et al.*,

        Defendants.

Civil Action
No. 25-cv-79-WES-PAS

## DECLARATION OF DANIEL BEATTIE

I, Daniel Beattie, declare as follows:

1.     I am the Director of Guidelines and Panel Operations at the National Endowment for the Arts ("NEA"). I have held that position since October 2020. As Director of Guidelines and Panel Operations, I am responsible for the modification of agency-wide funding opportunity guidelines and instructions for competitive grant programs, as well as oversight of the agency's advisory panel review process.

2.     I have worked at the National Endowment for the Arts since 1999. Prior to my current position, I was a program analyst in the Office of Guidelines and Panel Operations from 2012 to 2020, during which time I updated agency funding guidelines. I have also held the following roles during my tenure with the agency: acting director of arts education (2011-2012), grant program coordinator/officer (2008-2011), grant program specialist (2001-2008), and research assistant in the Office of the Chair (1999-2001).

**The NEA's branding requirement for projects receiving NEA funding**

3.     Since at least 1999, the NEA has required the recipients of all grants to display prominently and across a winning project's promotion and materials the NEA's logo and a statement that the NEA had selected that project for funding.

4.     I attach as **Ex. A** to this declaration a true and accurate copy of the NEA's General Terms & Conditions for Grants and Cooperative Agreements to Organizations, which issued

in 1999 and include the preceding requirement. A true and accurate copy of the most recent version of the NEA's terms and conditions for grant recipients is on file with the Court in ECF 11-1.

**NEA appropriates for FY 2026**

5. Congress has not appropriated money to the NEA for FY 2026.

**NEA Assurance of Compliance**

6. The NEA's Assurance of Compliance language concerning executive orders does not apply to EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)).

7. On July 14, 2025, the NEA revised the language on its Assurance of Compliance webpage to re-affirm the preceding point. I attach as **Ex. B** to this declaration a true and accurate copy of the NEA's Assurance of Compliance web page that includes that re-affirmation on page 11. NEA, Legal Requirements and Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance/

**The status of the NEA's ongoing GAP 1 multilayer application review**

8. Traditionally, concerning the NEA's first of two GAP funding cycles, the Council does not review and make recommendations on project applications until the end of the third week of October. The Chair's review of proposed projects follows shortly after the Council has made its recommendations.

I, Daniel Beattie, declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2024

Daniel Beattie
Director of Guidelines and Panel Operations
National Endowment for the Arts

# Ex. A

# INTRODUCTION

All grants and cooperative agreements (hereinafter referred to as "award") made by the National Endowment for the Arts (Endowment) to institutions of higher education, nonprofit organizations, units of state and local governments, and Federally recognized Indian Tribal governments are subject to these *General Terms & Conditions for Grants and Cooperative Agreements to Organizations* (General Terms)[1].  These General Terms are based on the administrative requirements of the *Office of Management and Budget Circular A-110 ("Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals and Other Nonprofit Organizations"),* the *Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments (the Common Rule),* and the various Federal laws, rules, regulations, and Executive Orders that apply to grants and cooperative agreements.  They are also based on the Endowment's legislation, rules, regulations, and policies.  **It is therefore important that funding recipients be familiar with and comply with these General Terms**.

*Please note*:   There have been changes that we wish to highlight in these General Terms since they were last revised in November 1998:

- Links are provided through the Endowment's website to various OMB circulars.

- Copies of materials provided in the grant award package are available online through the Endowment s website.

- The National Historic Preservation Act of 1966, as amended, and the National Environmental Policy Act of 1969 have been added to the *Office of Management & Budget (OMB) Circulars, Statutes, & Regulations that Govern Your Award* section.

---

[1]*These terms and conditions also apply to commercial organizations when they are awarded cooperative agreements.*

JA441

# TABLE OF CONTENTS

*Item*                         *Subject*                                                                    *Page*

***Acceptance of an Endowment Award***
1.    Recipient Responsibilities                                                 4
2.    Compliance with Terms and Conditions                          4
3.    Original Signature                                                          4
4.    Acknowledgment of Endowment Support and Disclaimer    4

***Office of Management & Budget (OMB) Circulars, Statutes, & Regulations that Govern Your Award***
5.    Uniform Administrative Requirements                            6
6.    Cost Principles                                                             6
7.    Nondiscrimination and Other Assurances                      7
8.    Lobbying                                                                      9
9.    Drug-Free Workplace Act Requirements                      11
10.   Suspension, Termination and Debarment                     11
11.   The Native American Graves Protection and
          Repatriation Act of 1990                                          12
12.   National Historic Preservation Act of 1966, as amended   12
13.   National Environmental Policy Act of 1969                    12

***Authorizing Official***
14.   Authorizing Official                                                    13

***How to Obtain Your Award Funds***
15.   Requesting Payment                                                   15

***If There Are Changes in Your Project***
16.   Award Amendments
          16
17.   Change in Key Person(s)                                            18
18.   Foreign Travel Requests                                            18

***Reporting & Recordkeeping***
19.   Grantee Reporting Requirements
                                                                                          20
20.   Matching Requirements                                             21
21.   Indirect Costs                                                          22
22.   Subgranting                                                             22
23.   Record Retention                                                     24
24.   Financial Management Standards                              24
25.   Program Income                                                      24

JA442

26.    In-Kind (Third Party) Contributions                                   24
27.    Equipment                                                             25
28.    Personnel Activity ("Time & Effort") Reports                          26


***Audit Matters***
29.    A-133 Audit Requirements
                                                                            27
30.    Award Confirmation for Audit Purposes                                 27
31.    Catalog of Federal Domestic Assistance (CFDA) Numbers                 27

***Copyright and Cataloging Information***
32.    Copyright                                                             29
33.    Library of Congress Cataloging in Publication Data                    29

***Questions?***
34.    Endowment Staff                                                       30

***Attachments***
        Sample Personnel Activity (Time & Effort) Report                     31
        Signature Authorization Form                                         32

JA443

## *Acceptance of an Endowment Award*

1.   **Recipient Responsibilities**

In accepting an Endowment award, recipients assume legal, financial, administrative, and programmatic responsibility for administering the award in accordance with the aforementioned laws, rules, regulations, Executive Orders, and these General Terms, including responsibility for complying with any provisions included in the award.  **While the Endowment may periodically provide recipients with reminder notices regarding award requirements such as final reports, failure on the part of the recipient to receive such notice does not relieve the recipient of its responsibility to comply with all applicable award requirements.**  Failure to comply with these requirements may result in suspension or termination of the award and Endowment recovery of funds.  (See Item 10, Suspension, Termination and Debarment.)

*Sponsors , Fiscal Agents, or lead members of consortiums*.  If this award is made to you as the sponsor or fiscal agent for an organization, or the lead member of a consortium, your organization is legally, financially, administratively, and programmatically responsible for all aspects of the award including submission of payment requests; reports (e.g., special, progress, final); and any amendment request that would affect the terms and conditions of this award.

2.   **Compliance with Terms and Conditions**

Submission of a Request for Advance or Reimbursement constitutes agreement to comply with and expend funds consistent with all the terms and conditions of the award.

3.   **Original Signature**

Recipients may submit a request for payment or other post-award forms to the Endowment by facsimile; however, the Endowment reserves the right to request a "hard copy" signature (i.e., ink on paper) of an organization's authorizing official if it is deemed necessary.  (See Item 12, Authorizing Official.)

4.   **Acknowledgment of Endowment Support and Disclaimer**

Recipients must acknowledge, in a prominent manner, the Endowment's support in all materials and announcements, both audio and visual, regarding this award. (e.g., "This project is supported in part by an award from the National Endowment for the Arts.")  Recipients must also display, in a prominent

## *Acceptance of an Endowment Award*

manner, the National Endowment for the Arts' logo in association with the acknowledgment (copies of the Endowment's Logo are enclosed). The Endowment reserves the right to disallow the use of its logo and acknowledgment of Endowment support, as well as the right to require a specified acknowledgment.

JA445

## *Office of Management & Budget (OMB) Circulars, Statutes, and Regulations that Govern Your Award*

5.      **Uniform Administrative Requirements**

Nonprofit organizations, and colleges and universities, are subject to the provisions of OMB Circular A-110 ("Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals and Other Nonprofit Organizations"),[2] as amended.  Units of state and local governments and Federally recognized Indian Tribal governments are subject to the administrative requirements codified by the Endowment at "45 Code of Federal Regulations (CFR) Part 1157 - Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments" ("Common Rule").  As applicable, these documents, by reference, are hereby incorporated into this award.

A copy of OMB Circular A-110 may be obtained through a link on the Endowment's website: **http://www.arts.gov**

   ☝      Click on "Applications & Grant Forms," then
   ☝      Click on "Request Funds or Report On Your Project**"**

The Common Rule, as well as A-110, are also available by writing the Grants & Contracts Office, National Endowment for the Arts, 1100 Pennsylvania Avenue, N.W., Washington, DC 20506 or by faxing to (202) 682-5610.

6.      **Cost Principles**

The allowability of costs for work performed under an Endowment award shall be determined in accordance with the applicable Federal cost principles and the terms and conditions of the award.  The following OMB Circulars set forth the Federal cost principles that, in general, apply to Endowment recipients.  These cost principles, as applicable, are hereby incorporated into this award:

a.      **OMB Circular A-122, "Cost Principles for Nonprofit Organizations,"** as amended:  nonprofit organizations, exclusive of institutions of higher education;

b.      **OMB Circular A-21, "Cost Principles for Educational Institutions,"** as amended:  public and private institutions of higher education;

---

[2]*These uniform administrative requirements also apply to commercial organizations when they are awarded cooperative agreements.*

## *Office of Management & Budget (OMB) Circulars, Statutes, and Regulations that Govern Your Award*

    c.      **OMB Circular A-87, "Cost Principles for State and Local Governments,"** as amended:  state, local and Federally recognized Indian tribal governments; and

    d.      *Federal Acquisition Regulation (FAR) at 48 CFR Part 31 for commercial organizations, individuals, and those nonprofit organizations listed in Attachment C to OMB Circular A-122.  (**This applies only to recipients of cooperative agreements, i.e., cooperators**.)*

Copies of the OMB Circulars may be obtained from the Endowment's website or by writing or faxing to the Grants & Contracts Office, as described in Item 5 above.

The FAR is available on line at ***http://www.arnet.gov/far/***.

7.    **Nondiscrimination and Other Assurances**

    a.      **Nondiscrimination and Other Statutes**.  Recipients are required to execute projects, productions, workshops and programs in accordance with the requirements of Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the Age Discrimination Act of 1975; and Title IX of the Education Amendments of 1972, where applicable.

        (1)    **Title VI of the Civil Rights Act of 1964**, as amended, provides that no person in the United States shall, *on the grounds of race, color, or national origin,* be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.  (42 U.S.C. 2000d et seq.)

        (2)    **Section 504 of the Rehabilitation Act of 1973** provides that no otherwise qualified individual with a disability in the United States, as defined in Section 7(6), shall, *solely by reason of his/her disability,* be excluded from participation in, be denied benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.  (29 U.S.C. 794)

## *Office of Management & Budget (OMB) Circulars, Statutes, and Regulations that Govern Your Award*

(3)    **The Americans with Disabilities Act of 1990** ("ADA") prohibits discrimination *on the basis of disability* in employment (Title I), state and local government services (Title II), and places of public accommodation and commercial facilities (Title III).  (42 U.S.C. 1210I-12213)

(4)    **The Age Discrimination Act of 1975** provides that no person in the United States shall, *on the basis of age*, be excluded from participation in, be denied benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.  (42 U.S.C. 6101 et seq. and 45 CFR Part 1156)

(5)    **Title IX of the Education Amendments of 1972** provides that no person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance.  (20 U.S.C. 1681 et seq.)

The Endowment has developed several publications to assist arts groups in making their facilities and activities accessible to people with disabilities.  The Arts and 504 is a how-to handbook for making the arts accessible.  Copies of this handbook, as well as copies of the nondiscrimination regulations identified above, may be obtained by writing to the Office of Civil Rights, National Endowment for the Arts, 1100 Pennsylvania Avenue, N.W., Washington, DC  20506-0001.

The Endowment, in partnership with the National Assembly of State Arts Agencies, has produced a 700-page document entitled, Design for Accessibility: An Arts Administrators Guide.  It provides detailed guidance on making access an integral part of an organization's staffing, mission, budget, and programs.  The Guide is available from the National Assembly of State Arts Agencies, 1029 Vermont Avenue, N.W., 2nd Floor, Washington, DC 20005 (202/347-6352).  The cost is $66.00 for nonprofits and $96.00 for others.

*Office of Management & Budget (OMB) Circulars, Statutes, and
Regulations that Govern Your Award*

b.  **Section 504 - Self-Evaluation.**  A self-evaluation must be on file at your organization.  The Endowment has developed a <u>Program Evaluation Workbook</u> that may be used by a recipient to conduct a self-evaluation to determine if it is in compliance with 504 requirements.  If you have not previously conducted this self-evaluation or wish to update the results of previously conducted evaluations, you may wish to request a copy of the <u>Program Evaluation Workbook,</u> free of charge, from the Office of Civil Rights, at the Endowment's address listed in Item 7a above.

c.  **Labor Assurance**.  You must also certify to the Endowment that you will comply with the labor standards set out in "29 CFR Part 505 - Labor Standards on Projects or Productions Assisted by Grants from the National Endowment for the Arts and Humanities."  This is required by the National Foundation on the Arts and the Humanities Act of 1965, as amended (20 U.S.C. 951 et seq.).  A recipient provides this assurance by signing and returning to the Grants & Contracts Office the Request for Advance or Reimbursement form which contains the "Assurances as to Labor Standards" on the reverse side.  This form is included in your award package.  A copy of 29 CFR Part 505 may be obtained through a link on the Endowment's website at the address indicated in Item 5 above.

d.  **Other Assurances**.  Recipients are also required to execute projects, productions, workshops and programs in accordance with the requirements of the National Endowment for the Arts' regulations implementing Executive Orders 12549 and 12689, "Debarment and Suspension," and the Drug-Free Workplace Act of 1988; and 20 U.S.C. Sec. 951 et. seq., the Endowment's enabling legislation that requires "artistic excellence and artistic merit" to be included in the criteria upon which grants are awarded.  Copies of these regulations may be obtained by writing to the Endowment's Office of Civil Rights at the address indicated in Item 7a above.

8.  **Lobbying**

Recipients are prohibited from conducting political lobbying, as defined in relevant statutes, regulations, and OMB Circulars, within a Federally supported grant or cooperative agreement project.  In addition, recipients are prohibited from using Federal funds for lobbying specifically to obtain grants or cooperative agreements.  Recipients are requested to note the following regarding lobbying activities:

JA449

## *Office of Management & Budget (OMB) Circulars, Statutes, and Regulations that Govern Your Award*

a.    **18 U.S.C. Sec. 1913 Lobbying with Appropriated Moneys**.

"No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business."

b.    **OMB Circular A-122 - "Lobbying" Revision.**  OMB Circular A-122, Cost Principles for Nonprofit Organizations "Lobbying" Revision, published at 49 Federal Register 18260 (April 27, 1984), makes clear that lobbying, as defined therein, is an unallowable cost.  OMB Circular A-122 generally defines lobbying as conduct intended to influence the outcome of elections or to influence elected officials regarding pending legislation, either directly or through specific lobbying appeals to the public.  Recipients are urged to review carefully OMB Circulars A-122 "Lobbying" Revision and A-110.

c.    **Certification Regarding Lobbying to Obtain Grants** (Section 319 of Public Law 101-121, codified at 31 U.S.C. Sec. 1352).  This law prohibits the use of Federally-appropriated funds to pay costs associated with lobbying members of Congress, employees of Congress, and employees of Federal agencies with respect to the award or amendment of any Federal grant, cooperative agreement, contract, or loan.  While applicants, grantees, and cooperators may use non-Federal funds for such activities, use of these funds must be disclosed to the Federal agency.  The law exempts from the disclosure requirement the lobbying activities of long-term employees (those employed or expected to be employed for more than 130 days) of an applicant or grantee.  The law also exempts from the definition of lobbying certain agency and legislative liaison activities and professional and technical services by applicants and grantees.

JA450

## *Office of Management & Budget (OMB) Circulars, Statutes, and Regulations that Govern Your Award*

This law requires applicants who request or are recommended to receive more than $100,000 in Federal funds to execute a certification, prior to award, that they have not and will not use Federally-appropriated funds for lobbying; that they will disclose (through a government standard form) the use of other funds for lobbying activities; and that they will require
similar certifications from subgrantees or contractors who receive more than $100,000 under the grant-supported project.

Copies of the Endowment's regulations implementing Section 319 of Public Law 101-121 are published at 45 CFR Part 1158.  Recipients are urged to review these regulations carefully.

9.    **Drug-Free Workplace Act Requirements**

A recipient must maintain on file the place(s) that work is being performed under this award, i.e., street address, city, state and zip code.

10.    **Suspension, Termination and Debarment**

OMB Circular A-110, Sections 61 & 62 and the Common Rule, Sections 1157.43 and .44, respectively, provide uniform suspension and termination procedures for Federal awards.  Endowment regulations implementing Executive Orders 12549 and 12689, "Debarment and Suspension," also provide additional guidance.  These regulations are published at 45 CFR Part 1154.  If you or your organization is suspended or debarred by one Federal agency, you are suspended or debarred by all Federal agencies.

Grants or cooperative agreements may be terminated in whole or in part--

a.    by the Endowment, if a recipient materially fails to comply with the terms and conditions of an award;

b.    by the Endowment with the consent of the recipient, in which case the two parties shall agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion of the project to be terminated; or

c.    by the recipient upon sending to the Endowment written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion of the project to be terminated.

## *Office of Management & Budget (OMB) Circulars, Statutes, and Regulations that Govern Your Award*

However, if the Endowment determines that the reduced or modified portion of the award will not accomplish the purposes for which the award was made, it may terminate the award in its entirety either unilaterally or with the consent of the recipient.

When the Endowment determines that a recipient has failed to comply with the terms of the award, the Endowment may suspend or terminate the award for cause. Normally, this action will be taken only after the recipient has been notified of the deficiency and given sufficient time to correct it, but this does not preclude immediate suspension or termination when such action is required to protect the interests of the government.

11. **The Native American Graves Protection and Repatriation Act of 1990** applies to any organization which controls or possesses Native American human remains and associated funerary objects, and which receives Federal funding, even for a purpose unrelated to the Act. (25 U.S.C. 3001 et seq.)

12. **National Historic Preservation Act of 1966, as amended.** This law applies to any Federal funds that would support either the planning or major renovation of any structure eligible for or on the National Register of Historic Places, in accordance with Section 106 of the National Historic Preservation Act of 1966. This law also applies to new construction that would affect such properties. The Arts Endowment will consult with your State Historic Preservation Officer, as required, to determine the impact of your plan or renovation on the structure or any affected properties. You may be requested to provide additional information on your project to ensure compliance with the National Historic Preservation Act. Any change in your renovation or construction plans must be submitted to the Arts Endowment for review and approval prior to undertaking any of the proposed changes. (16 U.S.C. 470)

13. **National Environmental Policy Act of 1969.** This law applies to any Federal funds that would support an activity which may have environmental implications. You may be requested to provide information to the Arts Endowment in response to specific questions in accordance with the National Environmental Policy Act of 1969. The Arts Endowment will then determine whether to undertake an environmental assessment or issue a finding of no significant impact. A finding of no significant impact requires no additional action by the Arts Endowment or you. (42 U.S.C. Section 4332)

## *Authorizing Official*

12.  **Authorizing Official**.  An authorizing official is an official of a recipient organization who has authority to legally bind the organization.  For purposes of administering this award, the following apply:

    a.  **Application Form**.  Authorizing officials identified on your application can sign revised budgets, cash requests, final reports, and can make requests to amend an award.

    b.  **Signature Authorization Form**.  If you wish to have other individuals act as authorizing officials either for this or any other Endowment award, a completed signature authorization form (a copy is provided on page 32 and on the Endowment's website) or a letter making such a request--with the appropriate signatures included--must be submitted to the Endowment's Grants & Contracts Office.  Please submit updated forms if changes in authorizing officials occur within your organization *or* every four years.

    [*NOTE: Colleges and universities may delegate authority to a fiscal officer to sign cash requests and financial status reports by submitting a signature authorization form to the Endowment's Grants & Contracts Office.  This delegation **and** signature must be on file in the Endowment's Grants & Contracts Office on a signature authorization form.*]

    c.  **By Virtue of Position**.  The following are considered to be authorizing officials for this or any award you may receive, whether or not they have signed an application:

        (1)  for nonprofit organizations (excluding colleges and universities) -- chairman or officer of the board, president, executive director or individual of similar rank; or

        (2)  for college and universities -- chancellor, provost, president, trustee, or individual of similar rank; or

        (3)  for cities or municipalities, or departments thereof -- mayor, city manager/administrator, designated department, agency, or office official, or individual of similar rank; or

        (4)  for states or departments thereof -- governor, executive director, or designated department, agency or office officials, or individual of similar rank.

JA453

## *Authorizing Official*

    d.    **Endowment Panelist**.  Please be advised that any person serving as an Endowment panelist generally can act as an authorizing official. However, no panelist may serve on a panel reviewing an application from an organization with which he or she is affiliated.  In addition, no panelist may act as an authorizing official for a project where the application was reviewed by the panel he or she served on.  This prohibition is in effect throughout the entire grant period.

## *How To Obtain Your Award Funds*

13.    **Requesting Payment**

a.    **Requests for Advance or Reimbursement**.  Requests for payment must reflect expenses already incurred (reimbursement) and/or to be incurred (advance) within 30 days or less from the date the authorizing official (see Item 12) signs the payment request form.  In either instance, funds must be **immediately disbursed** upon receipt.  Generally, you cannot request funds to cover expenditures incurred prior to the beginning of the project period.  (*Grant recipients will find detailed instructions for completing the Request for Advance or Reimbursement in their grant award package.*)

[**NOTE:**  If interest is earned on advances of funds, recipients should refer to either OMB Circular A-110, Section 22 or the Common Rule, Section 1157.21 for information regarding its disposition.]

(1)    **Requests received prior to start date**.  These requests will be processed so that the recipient receives funds following the project start date.  The receipt of payment will be timed to coincide with the advance period identified on the cash request form.  Again, funds must be **immediately disbursed** upon receipt.

(2)    **Geographic Location of Project Activity form (*yellow*)**.  This form must be returned to the Endowment *before* any grant funds will be released.

(3)    **Electronic Funds Transfer**.  Funds can **only** be remitted via Electronic Funds Transfer to your financial institution ("bank").

(4)    **Faxed Transmissions**.  Organizations may fax requests to the Grants & Contracts Office.

b.    **Labor Assurance**.  It is essential that you read the "Assurances as to Labor Standards" printed on the reverse of your Request for Advance or Reimbursement form.  By signing this form, you are certifying to these assurances.  (See Item 7c.)

c.    **Alternative Method of Payment**.  Recipients currently on working capital advance, cost reimbursement, or certification should refer to the appropriate guidelines previously provided.

JA455

## *If There Are Changes in Your Project*

14.    **Award Amendments**

All requests to amend the project scope, project period, matching requirements, or budget of your award are to be submitted by an authorizing official, in writing, to the Endowment's Grants & Contracts Office **before** implementation.  **Each request must include:**

- **10-digit grant number,**
- **specific project change(s) requested,**
- **justification for the change(s),**
- **revised project budget, if applicable, and**
- **update on geographic location of grant activities, if applicable.**

After consultation with Endowment staff, the Grants & Contracts Office will notify recipients in writing of the Endowment's response.  Until you receive written approval from the Grants & Contracts Office, you may only incur costs consistent with the terms and conditions of the award in effect at the time of your amendment request.  Requests are considered on a case-by-case basis. *Approval is not guaranteed*.

a.    **Project Scope**.  Recipients are required to carry out a project consistent with the proposal approved for funding by the Endowment.  If changes in the project are believed necessary, the recipient **must** follow the procedures outlined above.

b.    **Consortium Member Changes (Grants only)**.  The lead member of a consortium must seek approval **before** any changes are made within the consortium membership.  If changes to the membership are believed necessary, then you **must** follow the procedures outlined above.  In addition to the above you also:

☞    must provide the Endowment with written concurrence from any consortium member(s) that is dropping out of the project; and

☞    must obtain from any consortium member(s) that is being added a signed letter of commitment that details its involvement in the project.  (For your convenience, a consortium member commitment form is now available on the Endowment's website as indicated in Item 5 above.)

JA456

## *If There Are Changes in Your Project*

c.  **Project Period Extensions (Time Amendments) & Liquidation of Obligations**.  Recipients are responsible for ensuring that all project activities and the commitment of project funds take place within the official award period (i.e., the period of support stated in the award or an amendment letter).  As soon as you become aware that your project cannot be completed within the time frame set out in the award, you must request a time amendment; this request should be submitted at least 30 days before the current end date of your award.

Recipients are also responsible for ensuring that all obligations incurred under an award are liquidated within 90 days after the end of the funding period--to coincide with the submission of the Financial Status Report.  Therefore, a time amendment must be requested if all obligations cannot be liquidated within 90 days.

d.  **Matching**.  The Endowment will not waive matching requirements except under the most unusual circumstances.  Such requests must be accompanied by a new budget that reflects the revised commitment to the project.

e.  **Budget Revisions**.  The enclosed project budget reflects the information contained in your application or proposal and any revisions made by the Endowment at your request or in order to bring the project budget into compliance with Endowment guidelines and applicable Federal regulations and requirements.   The following changes in the project budget are permissible, as noted below:

**Significant** changes to the project budget such as those that
- 👍 increase the grant amount
- 👍 change the scope of the award
- 👍 add indirect costs, permanent equipment, or foreign travel

*require* prior written approval from the Endowment.

**Minor** changes to the project budget such as
- 👍 transfers among direct costs
- 👍 how Federal funds are allocated to approved project costs
- 👍 elimination or addition of an allowable project cost which does not affect the scope

***do not*** require a written approval from the Endowment.

JA457

## *If There Are Changes in Your Project*

Refer to "Unallowable Costs" in the *Financial management Guide for Non-Profit Organizations* (included in the award package) for line items that may not be included in or added to the project budget.

15.    **Change in Key Person(s)**

Unless your award specifies to the contrary, prior approval for a change in key persons associated with the project as outlined in OMB Circular A-110, Section 25 or the Common Rule, Section 1157.30 is waived.  This waiver ***does not*** apply to changes to artists or other individuals identified in your award letter. (See Item 14a, Project Scope Amendments.)

16.    **Foreign Travel Requests**

All travel outside the United States, its territories, and Canada that was not identified in your application must be specifically approved in writing by the Grants & Contracts Office before travel is undertaken.  Additionally, any foreign air travel (inclusive of persons or property) that is paid in whole or in part with Endowment funds must be performed on a U.S. air carrier or a foreign air carrier under an air transport agreement with the United States when these services are available.  U.S. air-carrier service is considered available even though a comparable or different kind of service can be provided at less cost by a foreign air carrier and/or foreign air-carrier service is preferred by, or is more convenient for, the traveler.

U.S. air-carrier service is considered to be **unavailable** only under the following conditions:

a.    when the traveler's origin or destination airport is a gateway airport abroad (i.e., the airport from which the traveler last embarks en route to the United States or at which the individual first arrives when traveling from the United States), and the use of a U.S. air carrier would extend the time in travel status by at least 24 hours more than travel by a foreign air-carrier;

b.    when a traveler while en route must transfer to another flight and the use of a U.S. air carrier would extend his or her time in travel status by at least six hours more than travel by a foreign air carrier;

### *If There Are Changes in Your Project*

c.      when travel time on a scheduled flight by a foreign air carrier is three hours or less and service by a U.S. air carrier would involve twice as much travel time; or

d.      when travel is between two points outside the U.S. and the use of a foreign air carrier would eliminate two or more aircraft changes en route.

If you discover that service on a U.S. flag air carrier or a foreign air carrier under an air transport agreement with the United States is not available, you must request an exception in writing from the Endowment.  All requests should be sent to the Grants & Contracts Office for approval.

## *Reporting & Recordkeeping*

17.    **Grantee Reporting Requirements**[3]

Your grant award package includes a document entitled "Reporting Requirements."  This document provides guidance on the reporting requirements relevant to this grant.  The Endowment may request additional reports as necessary.

a.    **Geographic Reports**.  A geographic report is required to identify the geographic locations of grant activities.  Specific instructions for submitting your geographic report are included in your grant award package (i.e., "Reporting Requirements" document and cash request instructions).

b.    **Progress Reports**.  A progress report is generally required from **all** Endowment grant recipients.  Specific instructions for submitting your progress report are included in your grant award package (i.e., "Reporting Requirements" document and cash request instructions).

c.    **Special Reporting Requirements**.  Some discipline/fields may require that certain information be submitted to the Endowment before grant funds can be released (i.e., a signed recording contract, copyright release, etc.) or at other times during the conduct of the grant.  Specific instructions will be included in your grant award package as applicable.

d.    **Final Reports**.  A Final Report package including the Financial Status Report, two copies of the Final Descriptive Report, and any required work product(s) must be submitted not later than 90 days after the grant ending date.  Send to:

> Grants & Contracts Office
> Final Reports Section, Room 618
> National Endowment for the Arts
> Nancy Hanks Center
> 1100 Pennsylvania Avenue, N.W.
> Washington, DC  20506-0001

[*NOTE:  Private metered postmarks will **NOT** be accepted as proof of timely mailing.*]

---

[3]*All reporting requirements for cooperators are included in the cooperative agreement.*

National Endowment for the Arts                          20                          General Terms

## *Reporting & Recordkeeping*

The necessary final report forms for your grant are included in your grant award package.  Carefully review your final reporting requirements to determine the narrative information required and whether a product is also required.  Also note that an authorizing official (see Item 12) must sign the Financial Status Report to verify that the project for which Endowment funds were awarded has been carried out.

Grantees who fail to submit required final reports for any grant(s) are ineligible to receive subsequent funding for five years following the final report due date of the grant(s) or until the delinquent final reports are submitted; **whichever occurs first**.  Acceptability of final reports may also affect eligibility. In addition, failure to submit required final reports within 210 days from the grant end date will result in the Endowment withdrawing any undisbursed funds remaining on the grant with the delinquent reports.

18.    **Matching Requirements**

a.    **Grants.**  The Financial Status Report is used to verify that any required match has been met.  Unless otherwise stated in the grant award letter and/or reflected in the project budget, it is a condition of this grant that Endowment funds may not exceed 50 percent of the total cost of the project.

If you received a grant that specifies that Federal funds must be matched *3 to 1*, please refer to the enclosed addendum on matching for additional terms and conditions.

b.    **Cooperative Agreements.**  Specific matching requirements and how to report them are outlined in the cooperative agreement.

c.    *Ineligible* **Matching Resources**.  The following items are not eligible matching resources:

- Resources which have been used to match another Endowment grant or other Federal program(s).

- Appropriated Federal funds (i.e., funds from any Federal agency, including the Arts Endowment).

## *Reporting & Recordkeeping*

- Contributions or gifts transferred to your organization that are subject to restriction such that the funds cannot be used to support your grant project.

- Gifts (testamentary or otherwise) that are not available to your organization during the grant period.

[**NOTE:** *The obligation of the Endowment shall not be increased unless agreed to in writing by the Chairman or a duly authorized representative.*]

19.    **Indirect Costs**

The following applies only to those recipients who have indirect costs included in their approved project budget.

The rate that is used for calculating indirect costs reflects either an already negotiated rate with a Federal agency or an estimate.  If an estimate, a rate proposal **must** be submitted to the oversight Federal agency immediately after you have been advised of an award or within three months after the start date of the period of support.  Similarly, in the event your rate expires during the project period, you must submit a proposal to renegotiate in sufficient time for the rate to be negotiated before the conclusion of the period.  If the negotiated rate exceeds the rate specified in the approved project budget, the application of a higher rate is subject to the limitations set forth in either OMB Circulars A-21, A-87, or A-122, as applicable.  In no event will additional Federal funds be awarded to support an increase in indirect costs.  A negotiated rate lower than the rate included in the project budget or failure to negotiate a rate by the end of the project period may result in decreased Federal support if the total non-Federal costs applied toward your Endowment-supported project are insufficient to satisfy the award's matching requirement.

[*NOTE: Questions about indirect costs should be directed to the Endowment's Office of Inspector General at (202) 682-5402.*]

20.    **Subgranting**

This section applies only to state art agencies, regional art organizations, and designated local art agencies.

JA462

## *Reporting & Recordkeeping*

a.    **General Requirements**

    (1)    **Subgranting to Organizations**.  The Federal laws, rules, regulations and OMB Circulars that apply to Endowment organizational grant recipients and cooperators which are nonprofits, institutions of higher education and hospitals, generally also apply to such organizations when they receive a subgrant through an Endowment-supported award.

    (2)    **Subgranting to Units of State and Local Government**.  The Federal laws, rules, regulations and OMB Circulars that apply to Endowment organizational grant recipients and cooperators which are units of state and local government generally also apply to such organizations when they receive a subgrant through an Endowment-supported award.

    (3)    **Subgranting with Individuals**.  Please ensure that in your subgrant agreements you include a requirement that the subgrantee (a) provides you with final reports and any other information or reports necessary for you to fulfill all applicable reporting requirements; (b) adheres to the prohibition against lobbying within a Federally-supported grant or cooperative agreement  (Item 8); (c) uses U.S. air-carriers for foreign travel (Item 16), and (d) maintains records pertinent to the grant or cooperative agreement for three years following submission of the final report.  Finally, consistent with 41 U.S.C. 10a-10c, "Buy American Act," subgrantees should be encouraged to purchase American-made equipment and products (Item 25).

b.    **State Arts Agencies**.  A state arts agency should require a progress report from its subgrantees.  States have the discretion to determine when these reports must be submitted.

c.    **Artistic Excellence and Artistic Merit**.  In accordance with the Endowment's enabling legislation (20 U.S.C. Sec. 951 et seq.), you must include "artistic excellence and artistic merit" in the review criteria used to make the subgrant awards.

JA463

## *Reporting & Recordkeeping*

21.     **Record Retention**

Following the submission of financial status reports, recipients must maintain financial records, supporting documents, statistical records, and all other records pertinent to an award consistent with the provisions outlined in OMB Circular A-110, Section 53 and the Common Rule, Section 1157.42, as applicable.  Generally, the retention period is three years from the date the final financial status report is filed.

22.     **Financial Management Standards**

OMB Circular A-110, Section 21 and the Common Rule, Section 1157.20, as applicable, prescribe standards for financial management systems of grantees and cooperators, i.e., accounting systems, internal controls, allowable costs, cash management, etc.  The financial management systems of recipient organizations and their subrecipients must meet these standards.  (The Inspector General has written a publication, "Financial Management Guide for Non-Profit Organizations," which contains practical information on what is expected in terms of fiscal responsibility.  Copies of this publication are included in applicable award packages.)

23.     **Program Income**

Income earned by a recipient (during the award period) that results from activities supported under an Endowment award is considered to be program income.  Such earnings include, but are not limited to, income from fees for services performed, the use or rental of real or personal property acquired with grant or cooperative agreement funds, admission fees, etc.  The Endowment utilizes the cost-sharing or matching method of program income.  As such, program income may be used as part of the non-Federal match for an award, or for additional costs of the Endowment-supported project, or for use in other projects in the arts that are consistent with those supported by the Endowment.

24.     **In-Kind (Third-Party) Contributions**

If in-kind (third-party) contributions are included as income in your approved project budget, they must also be included in the project's total direct costs and reflected as such in your accounting records.  The basis for determining the valuation of volunteer services and donated property or space must be documented and must conform to the principles set out below.

## *Reporting & Recordkeeping*

a.    Volunteer services that are provided to the grantee by professional and technical personnel, consultants, and other skilled and unskilled labor may be counted as match if the service is an integral and necessary part of the approved project.  Volunteer services shall be valued at rates consistent with those ordinarily paid for similar work within the grantee organization.  If the grantee does not have employees performing similar work, the rates will be consistent with those ordinarily paid by other employers for similar work in the same labor market. In either case, a reasonable amount of fringe benefits may be included in the valuation.

b.    When an employer furnishes the services of an employee, these services shall be valued at the employee's regular rate of pay (plus an amount of fringe benefits that is reasonable), provided these services involve the same skills for which the employee is normally paid.

c.    The value of donated equipment shall not exceed the fair market value of equipment of the same age and condition at the time of donation, and the value of loaned equipment shall not exceed its fair rental value.

d.    The value of donated space shall not exceed the fair rental value of comparable space, as established by an independent appraisal of comparable space and facilities in a privately-owned building in the same locality.

e.    The value assigned to donated supplies or other expendable property should be reasonable and should not exceed the fair market value of the property at the time of donation.

[**NOTE:**  Refer to Attachment B of the *"Financial Management Guide for Non-Profit Organizations"* (included in the award package) for sample documentation of in-kind (third-party) contributions.]

25.    **Equipment**

The award letter constitutes Endowment approval for equipment purchases in the project budget.  Before purchasing equipment not identified in the award application, the recipient must obtain formal approval from the Grants Office.  A recipient is encouraged, whenever possible, to purchase American-made equipment in accordance with the Buy American" Act (41 U.S.C. 10a-10c).

## *Reporting & Recordkeeping*

Unless otherwise specified in the award, title to equipment purchased or fabricated under the award vests in the recipient, without further obligation to the Federal government, with the understanding it will be used for the project activities or for similar activities for which it was obtained.  The Endowment reserves the right, however, to stipulate at the time of award specific disposition instructions for when the equipment is no longer needed by the recipient (e.g., a transfer of title to the Federal government or a third party).

26.    **Personnel Activity ("Time & Effort") Reports**

OMB circulars require that compensation for personnel services charged to Federal awards, in whole or in part, be properly documented.  The required documentation is prescribed by the cost principles applicable to the recipient organization.  (See Item 6.)

Recipients, ***except as noted below***, are required to maintain personnel activity reports for any employee whose salary is charged, in whole or in part, to either the award or the matching funds.  A sample format is provided on page 31 of this document as well as in the "Financial Management Guide for Non-Profit Organizations," at Attachment A.   (An organization may choose some other format if appropriate to its scale of operations.)  While required to maintain personnel activity reports, recipients are generally **not** required to submit these to the Endowment.

**EXCEPTION**.  Because Federal agencies may apply less restrictive administrative requirements for small awards, the Endowment waives the requirement to maintain personnel activity reports for a grant to a nonprofit organization or educational institution in the amount of $25,000 or less.  This waiver **does not apply** to those who are subject to the Common Rule.  *[NOTE: This waiver applies **only** to the need for these organizations to maintain personnel activity reports.  Recipients are still obliged to keep other appropriate records (e.g., payroll records, documentation of in-kind services, etc.) verifying the salary and wage costs attributed to either the Federal or matching funds.]*

Questions about personnel activity reports should be directed to the Endowment's Office of Inspector General at (202) 682-5402.

## *Audit Matters*

27.    **A-133 Audit Requirements**

OMB Circular A-133, "Audits of States, Local Governments and Nonprofit Organizations," includes specific guidance for conducting financial and compliance audits.  The threshold for requiring an audit is $300,000 in *yearly expenditures* of Federal awards.  This amount is the aggregate of funds from **all** Federal sources.  Please carefully review these audit requirements and direct any questions to the Endowment's Office of Inspector General at (202) 682-5402.

A copy of OMB Circular A-133 maybe obtained either through a link on the Endowment's website (see Item 5), or by writing the OMB Publications Office, New Executive Office Building, Room 6236, Washington, DC 20503.

28.    **Award Confirmation for Audit Purposes**

Recipients who wish to confirm, primarily for audit purposes, the exact amount of an award or payment received from the Endowment, should contact the Endowment's Finance Office at (202) 682-5407 or mail their requests to the Finance Office, National Endowment for the Arts, Room 624, 1100 Pennsylvania Avenue, N.W., Washington, DC  20506-0001.

[*NOTE:  Confirmations **MUST** include grant or cooperative agreement number(s), otherwise the Finance Office will **NOT** be able to process your request.*]

29.    **CFDA Numbers (Catalog of Federal Domestic Assistance)**

The Catalog of Federal Domestic Assistance tracks every grant program (including cooperative agreements) in the Federal government and assigns it a specific number.  As required by OMB Circular A-133, provided below is a list of Endowment programs with their applicable CFDA numbers:

45.024    Grants to Organizations and Individuals
*(Awards made through the categories of Creation & Presentation, Heritage & Preservation, Education & Access, and Planning & Stabilization)*

### *Audit Matters*

45.025     Partnership Agreements
*(Awards for State Arts Agencies & Regional Arts Organizations for partnership activities only)*

45.026     Leadership Initiatives
*(Includes awards through ArtsREACH and Folk Arts Infrastructure)*

45.201     Arts & Artifacts Indemnity

**JA468**

## *Copyright and Cataloging Information*

30.  **Copyright**

You may arrange to copyright any materials you develop from the work you undertake during the project period without prior approval from the Endowment.  For procedural information, write or call:  Library of Congress, Registrar of Copyrights, Washington, DC 20559-6000 (202/707-3000).

Unless otherwise specified in the award, the Endowment is not entitled to receive royalties from work supported or made possible by a grant or cooperative agreement; however, the Endowment retains a royalty-free right to use such work for Federal government purposes (e.g., the use of final report work products to document the results of its grant programs).

31.  **Library of Congress Cataloging in Publication Data**

It is strongly recommended that any publication that might result from this award be cataloged by the Cataloging in Publication Division of the Library of Congress before it is prepared for final printing.  This method of cataloging enables libraries to acquire and process books quickly.  Also, entering these titles in a national bibliographic database leads to greater dissemination of publications, thereby benefiting the recipient.  To accomplish this, the recipient must submit galley proofs or front material (title page, preface or introduction and table of contents) to the Library of Congress at least 10 days prior to publication.  For procedural information, write or call:  Library of Congress, Cataloging in Publication Division, Washington, DC  20540 (202/707-6452, press #5 on menu).

**JA469**

## *Questions?*

32.     **Endowment Staff**

Cooperators, please refer to your cooperative agreement for names of contact persons available to answer questions.

Grantees, if you have any questions, please contact the Grants & Contracts Office at 202/682-5403 concerning administrative or technical requirements, or the Endowment discipline/field office identified in your award document concerning programmatic requirements at 202:

| | | | |
|---|---|---|---|
| Arts in Education | 682-5563 | Museum | 682-5452 |
| Dance | 682-5452 | Music | 682-5590/5487 |
| Design | 682-5452 | Mus. Theater | 682-5509/5020 |
| Endowments/Cash Res. | 682-5411 | Opera | 682-5438/5600 |
| Folk & Traditional Arts | 682-5658 | Presenting | 682-5591 |
| Literature | 682-5787/5771 | State & Reg. | 682-5430 |
| Local Arts Agencies | 682-5581/5586 | Theater | 682-5020/5509 |
| Media Arts | 682-5452 | Visual Arts | 682-5452 |
| Multidisc./Intnatl | 682-5658 | | |

For individuals with a hearing impairment, the Endowment has a telecommunications device (TDD) located within its Office for AccessAbility (TTY number 202/682-5496).

Individuals who do not use conventional print should contact the Endowment's Office for AccessAbility at 202/682-5532 for help in acquiring a cassette recording of these General Terms.

# Ex. B

7/14/25, 2:52 PM

Case 1:25-cv-00079-WES-PAS Legal Requirements and Assurance of Compliance | National Endowment for the Arts Page 36 of 49 PageID
#: 1247



Menu

# Legal Requirements and Assurance of Compliance

## Legal Requirements

**NOTE: This list highlights some of the significant legal requirements that may apply to an applicant or recipient; however, it is not exhaustive. More information regarding these and other legal requirements may be found at Appendix A of the** General Terms & Conditions </grants/manage-your-award>**, which set forth the National Policy and Other Legal Requirements, Statutes, Regulations, and Executive Orders that Govern Your Award. There may be other applicable legal requirements that are not listed in this document. It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

JA472

Case 1:25-cv-00079-WES-PAS    Document 25-1    Filed 07/16/25    Page 37 of 49 PageID
#: 1248

1. By law, the National Endowment for the Arts may support only those organizations:

- **That are tax-exempt**. Organizations qualifying for this status must meet the following criteria:

  1. No part of net earnings may benefit a private stockholder or individual.
  2. Donations to the organization must be allowable as a charitable contribution under Section 170(c) of the Internal Revenue Code of 1954, as amended.

  For further information, go to the Internal Revenue Service's (IRS) website <http://www.irs.gov>.

- Who have not had their IRS status revoked. It is your responsibility to ensure that your status is current at the time of the application and throughout the life of your award.

- **That compensate all professional performers and related or supporting professional personnel on National Endowment for the Arts-supported projects at no less than the prevailing minimum compensation**. (This requirement is in accordance with regulations that have been issued by the Secretary of Labor in 29 CFR Part 505 <http://www.gpo.gov/fdsys/pkg/cfr-1998-title29-vol3/pdf/cfr-1998-title29-vol3-chap-id2.pdf>. This part does not provide information on specific compensation levels.)

JA473

Case 1:25-cv-00079-WES-PAS Document 25-1 Filed 07/16/25 Page 38 of 49 PageID #: 1249

- **That ensure that no part of any National Endowment for the Arts-supported project will be performed under or engaged in working conditions which are unsanitary, hazardous, or dangerous to the health and safety of the employees involved**.

JA474

2. **Some legal requirements apply to every applicant. For example:**

- **Compliance with the federal requirements** that are outlined in the Assurance of Compliance below

- **Debarment and Suspension procedures**. The applicant must comply with requirements set forth in Subpart C of 2 CFR 180, as adopted by the National Endowment for the Arts in 2 CFR Part 3254. Failure to comply may result in the debarment or suspension of the recipient, and the National Endowment for the Arts suspending, terminating, and/or recovering the funds. More information on Debarment and Suspension procedures can be found in the GTCs.

- **Federal Debt Status** (OMB Circular A-129

    <https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/a129/a-129.pdf>). Processing of applications will be suspended when applicants are delinquent on federal tax or non-tax debts, including judgment liens against property for a debt to the federal government. An organization's debt status is displayed in the System for Award Management (SAM). New awards will not be made if an applicant is still in debt status as of September 1 of the fiscal year listed on this funding opportunity.

JA475

7/14/25, 2:52 PM
Case 1:25-cv-00079-WES-PAS    Document 25-1    Filed 07/16/25    Page 40 of 49 PageID
Legal Requirements and Assurance of Compliance | National Endowment for the Arts
#: 1251

- **Labor Standards** (29 CFR Part 505

  <https://www.govinfo.gov/app/details/cfr-2023-title29-vol3/cfr-2023-title29-vol3-

  part505>). Recipients must comply with the standards set out in

  Labor Standards on Projects or Productions Assisted by Grants

  from the National Endowments for the Arts.

- The Drug-Free Workplace Act of 1988

  <https://www.govinfo.gov/content/pkg/uscode-2020-title41/html/uscode-2020-title41-

  subtitleiv-chap81-sec8103.htm> (41 U.S.C. 8101 et seq. and 2 CFR Part

  3256). The recipient is required to publish a statement regarding

  its drug-free workplace program as well as to comply with other

  requirements.

JA476

3. **Some legal requirements apply depending upon what activity the award is funding. For example:**

- If your project activities have the potential to impact any structure that is eligible for or on the National Register of Historic Places, adjacent to a structure that is eligible for or on the National Register of Historic Places, or located in an historic district, you will be asked to provide additional information about your project or take additional action so that the agency can review and comply with the National Historic Preservation Act <https://www.achp.gov/protecting-historic-properties> (NHPA). NHPA also applies to any planning activities that may affect historic properties or districts. The additional agency review must be completed prior to any agency funds being released.

- If your project activities have the potential to impact the environment or environmentally sensitive resources, you will be required to provide information in accordance with the National Environmental Policy Act <https://www.epa.gov/laws-regulations/summary-national-environmental-policy-act> (NEPA). The additional agency review must be completed prior to any agency funds being released.

JA477

- If your project activities include any contract over $2,000 involving the construction, alteration, or repair of public buildings or public works, the contract must contain a clause setting forth the minimum wages to be paid to laborers and mechanics employed under the contract in accordance with The Davis-Bacon and Related Acts (DBRA). More information on DBRA can be found in the GTCs </grants/manage-your-award> under the "Other National Policies" heading.

- Projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 USC 952(j)-(l); 20 USC 954(d),(l).

4. **Some legal requirements apply depending upon who the applicant is. For example:**

- The Native American Graves Protection and Repatriation Act of 1990 (25 U.S.C. 3001 et seq.) applies to any organization that controls or possesses Native American cultural items, such as human remains or associated funerary objects and receives Federal funding, even for a purpose unrelated to the Act.

JA478

Case 1:25-cv-00079-WES-PAS    Document 25-1    Filed 07/16/25    Page 43 of 49 PageID #: 1254

5. **In addition, State Arts Agencies must meet the requirements in Section 954(g)(2) of the National Endowment for the Arts' authorizing legislation, which state:**

"In order to receive assistance under this subsection in any fiscal year, a State shall submit an application for such grants at such time as shall be specified by the Chairperson and accompany such applications with a plan which the Chairperson finds—

(A) designates or provides for the establishment of a State agency (hereinafter in this section referred to as the "State agency") as the sole agency for the administration of the State plan;

(B) provides that funds paid to the State under this subsection will be expended solely on projects and productions approved by the State agency which carry out one or more of the objectives of subsection (c);

(C) provides that the State agency will make such reports, in such form and containing such information, as the Chairperson may from time to time require, including a description of the progress made toward achieving the goals of the State plan;

(D) provides—

  i. assurances that the State agency has held, after reasonable notice, public meetings in the State to allow all groups of artists, interested organizations, and the public to present views and make recommendations regarding the State plan; and

ii. a summary of such recommendations and the State agency's response to such recommendations; and

(E) contains--

i. a description of the level of participation during the most recent preceding year for which information is available by artists, artists' organizations, and arts organizations in projects and productions for which financial assistance is provided under this subsection;

ii. for the most recent preceding year for which information is available, a description of the extent projects and productions receiving financial assistance from the State arts agency are available to all people and communities in the State; and

iii. a description of projects and productions receiving financial assistance under this subsection that exist or are being developed to secure wider participation of artists, artists' organizations, and arts organizations identified under clause (i) of this subparagraph or that address the availability of the arts to all people or communities identified under clause (ii) of this subparagraph.

No application may be approved unless the accompanying plan satisfies the requirements specified in this subsection."

JA480

# Assurance of Compliance

**By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance**.

We may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement.

The applicant certifies that it does not discriminate:

- On the grounds of race, color, or national origin, in accordance with **Title VI of the Civil Rights Act of 1964**, as amended (42 U.S.C. 2000d et seq.), implemented by the National Endowment for the Arts at 45 CFR 1110.

- Solely on the grounds of disability, in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. 794), as amended, implemented by the National Endowment for the Arts at 45 CFR 1151, and the **Americans with Disabilities Act of 1990** ("ADA"), as amended, (42 U.S.C. 12101 et seq.).

JA481

- On the basis of age, in accordance with the **Age Discrimination Act of 1975,** as amended (42 U.S.C. 6101 et seq.), implemented by the National Endowment for the Arts at 45 CFR 1156.

- On the basis of sex, in any education program or activity, in accordance with **Title IX of the Education Amendments of 1972,** as amended (20 U.S.C. 1681 et seq.).

In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:

- The applicant will comply with all applicable Executive Orders while the award is being administered.  Executive orders are posted at whitehouse.gov/presidential-actions. However, all compliance with EO 14168 is governed exclusively by the NEA's predecisional guidance

  <https://www.arts.gov/sites/default/files/final.notice.implementation.eo14168.pdf>

  concerning that EO, and not by the terms of these Assurances.

JA482

Case 1:25-cv-00079-WES-PAS    Document 25-1    Filed 07/16/25    Page 47 of 49 PageID
#: 1258

- The applicant's compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of the False Claims Act, 31 U.S.C. § 3729(b)(4), pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025.

  The applicant does not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173.

  <u>See FAQ on these certification requirements</u> </grants/legal-requirements-and-assurance-of-compliance/frequently-asked-questions>

The applicant will inform the public that persons who believe they have been discriminated against on the basis of race, color, national origin, disability, sex, or age may file a complaint with the Director of Civil Rights at the National Endowment for the Arts.

The applicant will forward all complaints for investigation and any finding issued by a Federal or state court or by a Federal or state administrative agency to:

Director, NEA Office of Civil Rights
Email: civilrights@arts.gov

The applicant shall maintain records of its compliance and submission for three (3) years. The applicant will compile, maintain and permit access to records as required by applicable regulations, guidelines or other directives.

JA483

The applicant must also certify that it will obtain assurances of compliance from all subrecipients and will require all subrecipients of National Endowment for the Arts funds to comply with these requirements.

The United States has the right to seek judicial or administrative enforcement of this assurance.

## Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

**About** </about>

**Contact Us**

</about/leadership-staff/all-staff>

**Civil Rights**

</about/civil-rights-office>

JA484

7/14/25, 2:52 PM
Case 1:25-cv-00079-WES-PAS    Document 25-1    Filed 07/16/25    Page 49 of 49 PageID
#: 1260
Legal Requirements and Assurance of Compliance | National Endowment for the Arts

FOIA </about/freedom-of-information-act-foia-guide>

No Fear Act

</about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

Inspector General

</about/inspector-general>

Accessibility

</impact/accessibility>

Privacy Policy

</privacy>

Disclaimers

</about/website-disclaimers>

Open Government

</about/open-government>

USA.gov

<http://www.usa.gov/>

Section 508 Accessibility </section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-grant-scam>

---

400 7th Street, SW, Washington, DC 20506
202.682.5400

JA485

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

---

RHODE ISLAND LATINO ARTS, et al.,

                           *Plaintiffs*,

                             *v.*

NATIONAL ENDOWMENT
FOR THE ARTS, et al.,

                           *Defendants*.

Case No. 25-cv-79-WES-PAS

---

**SECOND SUPPLEMENTAL DECLARATION OF VERA EIDELMAN**

I, Vera Eidelman, declare as follows:

1.      I am a Senior Staff Attorney with the American Civil Liberties Union Foundation and counsel for Plaintiffs in the above-captioned action. I submit this declaration in support of Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment.

2.      Attached as Exhibit 1 is a true and correct copy of a webpage published by the National Endowment for the Arts ("NEA") with the title "Assurance of Compliance," available at https://www.arts.gov/about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/assurance-of-compliance. The same webpage is accessible through the following URL: https://www.arts.gov/open/civil-rights-office/assurance-of-compliance.

3.      Attached as Exhibit 2 is a true and correct copy of the NEA's "Assurance of Compliance: Certification FAQ" webpage, available at https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance/frequently-asked-questions.

**JA486**

4.      Attached as Exhibit 3 is a true and correct copy of the NEA's "Applicants & Recipients of Federal Financial Assistance" webpage, available at https://www.arts.gov/about/civil-rights-office/applicants-recipients-of-federal-financial-assistance.

5.      Attached as Exhibit 4 is a true and correct copy of the NEA's "Civil Rights FAQs for Applicants and Grantees" webpage, available at https://www.arts.gov/about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/what-we-do/FAQs.

6.      Attached as Exhibit 5 is a true and correct copy of the NEA's "Some of Your Responsibilities as a Federal Award Recipient" webpage, available at https://www.arts.gov/grants/manage-your-award/some-of-your-responsibilities-as-a-federal-award-recipient.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2025.

/s/ Vera Eidelman
Vera Eidelman

JA487

# EXHIBIT 1



Menu

# Assurance of Compliance

**By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance**.

We may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement.

The applicant certifies that it does not discriminate:

JA489

- On the grounds of race, color, or national origin, in accordance with **Title VI of the Civil Rights Act of 1964**, as amended (42 U.S.C. 2000d et seq.), implemented by the National Endowment for the Arts at 45 CFR 1110.

- Solely on the grounds of disability, in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. 794), as amended, implemented by the National Endowment for the Arts at 45 CFR 1151, and the **Americans with Disabilities Act of 1990** ("ADA"), as amended, (42 U.S.C. 12101 et seq.).

- On the basis of age, in accordance with the **Age Discrimination Act of 1975,** as amended (42 U.S.C. 6101 et seq.), implemented by the National Endowment for the Arts at 45 CFR 1156.

- On the basis of sex, in any education program or activity, in accordance with **Title IX of the Education Amendments of 1972,** as amended (20 U.S.C. 1681 et seq.).

In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:

- The applicant will comply with all applicable Executive Orders while the award is being administered.  Executive orders are posted at whitehouse.gov/presidential-actions.

**JA490**

- The applicant's compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of the False Claims Act, 31 U.S.C. § 3729(b)(4), pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025.

The applicant does not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173.

See FAQ on these certification requirements </grants/legal-requirements-and-assurance-of-compliance/frequently-asked-questions>

## Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

**JA491**

About </about>

Contact Us </about/
leadership-staff/all-staff>

Civil Rights </about/
civil-rights-office>

No Fear Act </about/
civil-rights-office/
applicants-for-employment-
and-employees/no-fear-
act>

FOIA </about/freedom-of-
information-act-foia-guide>

Inspector General </
about/inspector-general>

Accessibility </impact/
accessibility>

Privacy Policy </
privacy>

Disclaimers </about/
website-disclaimers>

Open Government </
about/open-government>

USA.gov <http://
www.usa.gov/>

Section 508
Accessibility </
section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-
grant-scam>

400 7th Street, SW, Washington, DC
20506
202.682.5400

**JA492**

# EXHIBIT 2

Case 1:25-cv-00079-WES-PAS      Document 30-1      Filed 08/01/25      Page 9 of 33 PageID #: 1445



Menu

# ASSURANCE OF COMPLIANCE: Certification FAQ

**Date: 6/10/2025**

**Previously, there was a court injunction that prevented the implementation of these requirements. What is the status of that injunction?**

Federal agencies are now required to implement this executive order. In February 2025, a federal district court issued a preliminary injunction against Federal agencies implementing this certification requirement. However, the following month, the higher court temporarily paused enforcing the injunction pending the outcome of the appeal. The district court case is in the United States District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, and the appeal of that case is in the United States Court of Appeals for the Fourth Circuit, No. 25-1189.

JA494

**Will these certifications change in the future?**

The NEA cannot predict or advise on the future action of any judicial body. Future court rulings may require further changes to the implementation of this certification term. We will promptly update the Assurance of Compliance page with any required information.

**In plain language, what do these provisions mean if I apply for a federal award?**

There are two provisions you will have to certify to in the course of applying for, and receiving, a federal award. The first requires you to certify that your organization's compliance with federal anti-discrimination laws is material to our decision to issue any payment. The second requires you to certify that you do not operate any DEI programs that violate federal anti-discrimination laws.

**Do I have to certify that I do not operate any DEI programs that do not comply with federal law even if those programs are not the subject of my federal award?**

Yes. The certification requirement requires you to certify that any DEI-related activity you conduct, regardless of its connection to your federal award, does not violate applicable federal anti-discrimination laws.

**May I operate programs that "promote DEI" if I receive a federal award from the NEA?**

Yes, provided that your programs do not violate federal antidiscrimination laws. Applicants may not intentionally discriminate on the basis of race, color, or national origin in their programs or activities under federal law, whether or not those activities are

JA495

funded by a federal grant. Whether or not a particular activity constitutes unlawful discrimination does not turn solely on whether it is labeled "DEI" or uses terminology such as "diversity," "equity," or "inclusion."

For example, applicants with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all participants regardless of race, color, national origin, or other protected criteria.

**How do I know if a DEI program violates federal antidiscrimination laws?** The NEA cannot provide legal counsel to applicants, grantees, or other outside parties. If you are concerned that a program you are operating may violate federal antidiscrimination law, you may refer to public resources on these laws, or obtain private counsel. For more information about federal antidiscrimination laws that may apply to your award, you may visit the Office of Civil Rights' webpage for Applicants & Recipients of Federal Financial Assistance </about/civil-rights-office/applicants-recipients-of-federal-financial-assistance>.

# Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

JA496

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

About </about>

Contact Us </about/leadership-staff/all-staff>

Civil Rights </about/civil-rights-office>

FOIA </about/freedom-of-information-act-foia-guide>

No Fear Act </about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

Inspector General </about/inspector-general>

Accessibility </impact/accessibility>

Privacy Policy </privacy>

Disclaimers </about/website-disclaimers>

Open Government </about/open-government>

USA.gov <http://www.usa.gov/>

Section 508 Accessibility </section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-grant-scam>

**JA497**

400 7th Street, SW, Washington, DC
20506
202.682.5400

**JA498**

# EXHIBIT 3

JA499

Case 1:25-cv-00079-WES-PAS    Document 30-1    Filed 08/01/25    Page 15 of 33 PageID #: 1451



Menu

# Applicants & Recipients of Federal Financial Assistance

What We Do </about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/what-we-do>

Civil Rights FAQs for Applicants and Grantees </about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/faqss>

Assurance of Compliance </about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/assurance-of-compliance>

Section 504 Self-Evaluation Workbook </about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/section-504-self-evaluation-workbook>

NEA's Office of Accessibility </imapact/accessibility>

Department of Justice Office of Federal Coordination and Compliance <https://www.justice.gov/crt/fcs>

NEA's Civil Rights Complaint Process </about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/external-complaints-process>

**JA500**

NEA's Civil Rights Complaint Form Package </sites/default/files/oct-15-2024-

civil-rrghts-office-complaint-package-english.pdf>

# Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

**About** </about>

**Contact Us** </about/leadership-staff/all-staff>

**Civil Rights** </about/civil-rights-office>

**No Fear Act** </about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

**FOIA** </about/freedom-of-information-act-foia-guide>

**Inspector General** </about/inspector-general>

**JA501**

Accessibility </impact/

accessibility>

Privacy Policy </

privacy>

Disclaimers </about/

website-disclaimers>

Open Government </

about/open-government>

USA.gov <http://

www.usa.gov/>

Section 508

Accessibility </

section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-

grant-scam>

---

400 7th Street, SW, Washington, DC
20506
202.682.5400

**JA502**

# EXHIBIT 4



Menu

# Civil Rights FAQs for Applicants and Grantees

All applicants for funding from the National Endowment for the Arts (NEA) are required to certify that they are in compliance with the civil rights statutes that govern nondiscrimination in Federally assisted programs. In other words, your organization can not discriminate or prevent participation in your program or activity on the basis of race, color, national origin, disability, age and sex. NEA's Civil Rights Office's responsibility is to determine the civil rights compliance status of applicants for and recipients of Federal financial assistance from the NEA. Listed for your information are Frequently Asked Questions (FAQs) commonly asked by NEA applicants grantees.

**COMPLIANCE:**

**1.  What is an "Assurance of Compliance"?**
An Assurance of Compliance is a written agreement with a Federal agency in which an institution/organization agrees to comply with the statutes that govern nondiscrimination in Federally assisted programs.

JA504

The NEA's Assurance of Compliance </open/civil-rights-office/assurance-of-compliance> covers all applicants for Federal financial assistance in connection with any grant or cooperative agreement awarded. Electronic signature on an NEA application form assures and certifies that the applicant will comply with these statutes.

## 2. What are the civil rights statutes?

Organizations receiving Federal funding will not discriminate:

On the grounds of race, color, or national origin, in accordance with Title VI of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000d et seq.).

On the grounds of disability, in accordance with Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and the Americans with Disabilities Act of 1990 ("ADA") (42 U.S.C. 12101-12213). The ADA's requirements apply regardless of whether you receive federal funds.

On the basis of age, in accordance with the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.).

On the basis of sex, in any education program or activity, in accordance with Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.).

## 3. How do the civil rights statutes impact my program and activity?

As an applicant for NEA funding or NEA grantee, you are required to comply with all civil rights statutes that govern Federal financial assistance. In other words, your program or activity should not create barriers to or prevent participation for individuals on the basis of race,

**JA505**

color, national origin, disability, age or sex.

### 4.  How long must I comply with the civil rights statutes?

Each time you receive funding from the NEA, you must comply with the above statutes through the entire period of support. If you purchase equipment or other tangible items with NEA funds, your organization must comply as long as the stated purchase is used by your organization.

### 5.  What are "Pre-Award and Post Award Reviews"

Prior to and after approval of funding, the NEA may request information from you to determine whether your organization is in compliance with the nondiscrimination statutes.  Information may be requested in the form of checklists, questionnaires or surveys.

Typical questions asked during a pre-award or post award review include:

Does the applicant/grantee offer its benefits or services without regard to race, color, national origin, sex, age, or disability?

Has the applicant/grantee announced through various public media outlets its program and activity?

Does your facility deny access to persons on the basis of race, color, national origin, sex, age or disability?

### 504 SELF-EVALUATION

### 1.  What is a Section 504 self-evaluation?

A review of an organization's programs, activities, and facility for the

**JA506**

purpose of access for people with disabilities. The NEA's Section 504 Self-Evaluation Workbook is available on NEA's website and it is periodically emailed.

### 2.  I have the 504 Workbook, what is the next step?

Conduct a self-evaluation using the Workbook and keep it on file. Various resource tools are available for completing the self-evaluation, including the Section 504 of the Rehabilitation Act regulations <http://www.ada.gov/cguide.htm#anchor65610>, *Design for Accessibility:  A Cultural Administrator's Handbook* </publications/design-accessibility-cultural-administrators-handbook>, and the ADA National Network <http://adata.org/>. If you require further assistance, please contact the NEA's Accessibility Office at (202) 682-5532 (voice), (202) 682-5496 (TTY) or at https://arts.gov/impact/accessibility </impact/accessibility>.

### 3.  Should my completed Section 504 Self-Evaluation Workbook be submitted to the NEA?

No, the Workbook is your organization's internal accessibility planning and compliance tool. The workbook should be maintained on file with your organization for a period of three years following receipt of funding. During this period the book should be made available to the public and NEA upon request. Note that the NEA's Office of Inspector General requests this document as part of the overall audit process.

For more information, please contact NEA's Civil Rights Office at (202) 682-5454 or at www.arts.gov/about/civil-rights-office </about/civil-rights-office>

### CIVIL RIGHTS COMPLAINTS

**JA507**

**1.  I am an applicant, what happens if a civil rights complaint is filed against my organization?**

As an applicant (applying for funding from NEA), the NEA does not have jurisdiction to investigate the allegation but may reserve the right to conduct a pre-award review. If the information requested reveals a possible civil rights issue, we will work with your organization to address the problem. Dependent upon the status of your application, we may defer action or not make an award on the application until corrective action has taken place.

**2.  I am a grantee, what happens if a civil rights complaint is filed against my organization?**

As a grantee (funding has been awarded), once NEA determines jurisdiction, the NEA's Civil Rights Office will investigate the allegation(s). If the investigation reveals a violation, we will work with your organization to help bring it into to compliance through a written agreement between your organization and the NEA. Failure to adhere to the agreement could result in the NEA taking enforcement action, such as suspending funding or return of funds.

<u>**COMMON QUESTIONS FROM ARTS ORGANIZATIONS:**</u>

*Below are answers to frequently asked questions from arts organizations related to civil rights compliance with federal funding. Responses are generally very fact specific. If you have additional questions, feel free to reach out to us at civilrights@arts.gov or grants@arts.gov.*

**1**. **As a cultural organization we often host events with a specific demographic or cultural focus. Is this a civil rights issue?**

JA508

**A**: The NEA has a history of funding culturally specific and/or culturally celebratory and educational programs. In the federal funding context, a focus or an emphasis on a specific culture or demographic is permissible, but exclusion is not.

2. **If the performance character list for a stage production lists characters as certain ethnicities or ages, would that raise a civil rights review?**

**A**: Generally, in the federal funding context, a focus or an emphasis on a specific culture or demographic is permissible, but exclusion is not. However, for narrative/storytelling and/or historical accuracy purposes in an arts production, specific age range and/or racial demographic for casting is generally not viewed as a civil rights issue.

3. **How should programs that wish to implement policies around vaccination status and/or mask wearing of participants operate? Is this a civil rights issue?**

**A**: Vaccination status and/or mask wearing is currently not a matter of federal civil rights law and is not at issue in a civil rights review. It is recommended to follow current CDC guidance in relation to arts programs and activities.

4. **Our arts program is specifically intended for adults with developmental disabilities. Can we apply for NEA funds for our program?**

**A**: The requirements under NEA regulations are that you cannot exclude people from participating and that you must allow anyone to audition or apply to your program. However, you may set specific criteria for selection or participation as a focus.

**JA509**

**5**. **Our theater is applying for funding for multiple performances of a specific play. Do we need to provide ASL, captions, audio description, etc., at every performance?**

**A**: The underlined requirements under NEA regulations require that you provide *effective communication* and *auxiliary aids* to enable people with disabilities to access funded programs, which can include American Sign Language, captions, audio description, assisted listening systems and devices, large print, and Braille materials. Best practices for accessibility include providing large print programs and assistive listening systems and devices at *every* performance; sign language interpretation, open captions, and audio description at *specific, advertised* performances; and accommodations such as Braille and additional sign language-interpreted, captioned, or audio-described performances *upon request.*

**6**. **Our arts center will hold a program on the second floor of our building, but we do not have an elevator to the second floor. Can we hold our program on the second floor if we offer to also show the program in a separate room on the accessible first floor for those who cannot use the stairs?**

**A**: The requirements under NEA regulations require funded programs to be in an *integrated* setting. That is, you cannot provide a fully accessible, integrated experience if you put people with mobility disabilities in a space separated from the rest of your viewing audience. If there were an equal number of people in each space, however, you could use two spaces.

**7**. **We offer tours of our museum by one of our museum guides. Is it**

JA510

**allowable to offer a separate museum tour in ASL for deaf audiences?**

**A**: Yes, you can offer a separate tour in ASL as long as you allow anyone to participate in either tour.

**8**. **Our arts council will sponsor a tour of community galleries, studios, and other art spaces. Not all of them are ADA compliant. Can we receive NEA funding for this art tour?**

**A**: The requirements under NEA regulations require that people with disabilities must be able to access the spaces in which funded programming takes place. If venues are not physically accessible, you must provide alternate access to the programming in those spaces, such as online galleries or virtual tours. However, the number of inaccessible spaces must be kept to a bare minimum, with a majority of the spaces accessible to all audiences. Best practice is to limit the tour(s) funded by the NEA grant to only accessible locations.

## Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

JA511

About </about>

Contact Us </about/
leadership-staff/all-staff>

Civil Rights </about/
civil-rights-office>

No Fear Act </about/
civil-rights-office/

FOIA </about/freedom-of-
information-act-foia-guide>

applicants-for-employment-

Inspector General </
about/inspector-general>

and-employees/no-fear-

act>

Accessibility </impact/
accessibility>

Privacy Policy </
privacy>

Disclaimers </about/
website-disclaimers>

Open Government </
about/open-government>

USA.gov <http://
www.usa.gov/>

Section 508
Accessibility </
section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-
grant-scam>

400 7th Street, SW, Washington, DC
20506
202.682.5400

**JA512**

# EXHIBIT 5



Menu

# SOME OF YOUR RESPONSIBILITIES AS A FEDERAL AWARD RECIPIENT

In accepting a National Endowment for the Arts award, your organization assumes legal, financial, administrative, and programmatic responsibility for administering the award in accordance with any provisions included in the award; the statutes, regulations, and Executive Orders governing Federal financial assistance awards; and the relevant General Terms and Conditions. While the NEA may provide you with reminders regarding award requirements, the absence of receiving such notice does not relieve you of your responsibilities.

**Submission of a Payment Request constitutes your agreement to comply with all the terms and conditions of the award. Failure to**

JA514

**comply with these requirements may result in suspension or termination of the award and our recovery of funds. In addition, the United States has the right to seek judicial enforcement of these obligations.**

As an Award Recipient you are required to:

1. Comply with the terms and conditions of your award, including the GTCs, 2 CFR 200, and any specific terms and conditions that apply to the award.

2. Maintain an active registration in the System for Award Management (SAM.gov) with current information about your entity at all times during which your entity has an active award or application under consideration.

3. Ensure the efficient and effective administration of the federal award through sound management practices.

4. Administer federal funds in a manner consistent with the U.S. Constitution, federal statutes, regulations, and the terms and conditions of your federal award.

5. Maintain accounting practices consistent with the cost principles in 2 CFR 200 and that support the accumulation of costs as required by these cost principles, including maintaining adequate documentation to support costs charged to the federal award.

JA515

6. Maintain a sound financial management system that records separately within its general accounting system the receipt and disbursement of grant funds and cost sharing contributions and that monitors the expenditure of these funds against the approved award budget.

7. Have in place written procedures for determining the allowability of costs, the disbursement of federal funds, procurement, conflict of interests, compensation for personal services, leave policies, classification of participant costs, relocation policies, and travel reimbursement for staff on official business.

8. Document the time and effort spent by all employees/staff/personnel on approved project activities.

9. Conduct all procurement transactions in an open and free competition and ensure that procurement contracts for more than the simplified acquisition threshold that are not awarded by competitive bids or offers are justified and documented.

10. Carry out your project activities as approved by the NEA at the time of award and, if amended, as acknowledged in writing by the Office of Grants Management.

11. Request written approval from the NEA Office of Grants Management for any changes to your project prior to implementing the changes.

12. Acknowledge the NEA's support in all materials publicizing or resulting from project activities.

13. Submit all financial and performance reports by the due dates as required by the terms and conditions of the award.

**JA516**

Case 1:25-cv-00079-WES-PAS     Document 30-1     Filed 08/01/25     Page 32 of 33 PageID #: 1468

14. Comply with requirements concerning record retention and the federal government's rights of access to records and personnel.

15. Have an audit performed that meets the requirements of 2 CFR 200 Subpart F - Audit Requirements whenever you expend $1,000,000 or more in federal funds during a fiscal year.

## Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

**About** </about>

**Contact Us** </about/leadership-staff/all-staff>

**Civil Rights** </about/civil-rights-office>

JA517

FOIA </about/freedom-of-information-act-foia-guide>

No Fear Act </about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

Inspector General </about/inspector-general>

Accessibility </impact/accessibility>

Privacy Policy </privacy>

Disclaimers </about/website-disclaimers>

Open Government </about/open-government>

USA.gov <http://www.usa.gov/>

Section 508 Accessibility </section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-grant-scam>

---

400 7th Street, SW, Washington, DC 20506
202.682.5400

**JA518**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, *et al.* | |
| Plaintiffs, | |
| *v.* | Civil Action No. 25-cv-79-WES-PAS |
| NATIONAL ENDOWMENT FOR THE ARTS, *et al.*, | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF DANIEL BEATTIE**

I, Daniel Beattie, declare as follows:

1.      I am the Director of Guidelines and Panel Operations at the National Endowment for the Arts ("NEA"). I have held that position since October 2020. As Director of Guidelines and Panel Operations, I am responsible for the modification of agency-wide funding opportunity guidelines and instructions for competitive grant programs, as well as oversight of the agency's advisory panel review process.

2.      I have worked at the National Endowment for the Arts since 1999. Prior to my current position, I was a program analyst in the Office of Guidelines and Panel Operations from 2012 to 2020, during which time I updated agency funding guidelines. I have also held the following roles during my tenure with the agency: acting director of arts education (2011-2012), grant program coordinator/officer (2008-2011), grant program specialist (2001-2008), and research assistant in the Office of the Chair (1999-2001).

3.      The webpage on which NEA presents its certification requirements for all grant-in-aid applicants and recipients is headlined, "Legal Requirements and Assurance of Compliance" and is available at https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance. I attached a true and accurate copy of that webpage as Exhibit B to my July 15, 2024, Declaration filed in this case as ECF 25-1.

**JA519**

4.      There are two sections of the preceding webpage. The first is headlined, "Legal Requirements." That section lacks any information about any Executive Orders or language about certifications. The second section of this webpage is headlined, "Assurance of Compliance." The first paragraph under that headline reads, in full (bold emphasis added):

> By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all **applicable** executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance.

The penultimate bullet point of this section then reads, in full:

> The applicant will comply with all applicable Executive Orders while the award is being administered.  Executive orders are posted at whitehouse.gov/presidential-actions. However, all compliance with EO 14168 **is governed exclusively** by the NEA's predecisional guidance concerning that EO, and not by the terms of these Assurances.

5.      The language in the immediately preceding excerpt that reads "predecisional guidance" links to https://www.arts.gov/sites/default/files/Final.Notice.Implementation.EO14168.pdf. As set forth on pages 1, 6, and 8, this policy states that the NEA's certification requirement does not encompass EO 14168.

6.      In responding to the NEA's summary judgment motion, Plaintiffs identified two statements on two different NEA webpages that, they contend, contrary to the preceding specific statements, that the NEA continues to impose a requirement that grant applicants certify that they will comply with EO 14168. Each of those two statements that Plaintiffs have identified are qualified and consistent with the preceding specific statements that the NEA does not require any grant applicants to certify their compliance with EO 14168, as shown by the bold language set forth below.

7.      The first statement that the Plaintiffs cite appears on the NEA webpage https://www.arts.gov/about/civil-rights-office/applicants-recipients-of-federal-financial-assistance/assurance-of-compliance and had read only (emphasis added), "The applicant will comply with all **applicable** Executive Orders while the award is being administered. Executive orders

JA520

are posted at whitehouse.gov/presidential-actions." The NEA has added to that statement the sentence, "However, all compliance with EO 14168 is governed exclusively by the NEA's predecisional guidance concerning that EO, and not by the terms of these Assurances," as set forth in the true and accurate copy of that webpage comprising **Exhibit A** to this declaration. In addition, the NEA has hyperlinked the words "predecisional guidance" in this sentence to the same link that Paragraph 5 describes.

8.      The second statement that the Plaintiffs cite appears on the NEA webpage https://www.arts.gov/grants/manage-your-award/some-of-your-responsibilities-as-a-federal-award-recipient and reads (emphasis added):

> In accepting a National Endowment for the Arts award, your organization assumes legal, financial, administrative, and programmatic responsibility for administering the award in accordance with any provisions included in the award; the statutes, regulations, and Executive Orders **governing** Federal financial assistance awards; and the relevant General Terms and Conditions. While the NEA may provide you with reminders regarding award requirements, the absence of receiving such notice does not relieve you of your responsibilities.

The NEA has added a new sentence before the last one quoted above. That additional sentence reads: "However, all compliance with EO 14168 is governed exclusively by the NEA's predecisional guidance concerning that EO, and not by any content that appears on this page," as set forth in the true and accurate copy of that webpage comprising **Exhibit B** to this declaration. In addition, the NEA has hyperlinked the words "predecisional guidance" in this sentence to the same link that Paragraph 5 describes.

I, Daniel Beattie, declare under penalty of perjury that the foregoing is true and correct.

Executed on August 8, 2025

_____
Daniel Beattie
Director of Guidelines and Panel Operations
National Endowment for the Arts

**JA521**

# Ex. A

NATIONAL ENDOWMENT for the ARTS arts.gov | AMERICA 250

Menu

</>

# Assurance of Compliance

**By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance**.

We may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement.

The applicant certifies that it does not discriminate:

- On the grounds of race, color, or national origin, in accordance with **Title VI of the Civil Rights Act of 1964**, as amended (42 U.S.C. 2000d et seq.), implemented by the National Endowment for the Arts at 45 CFR 1110.

- Solely on the grounds of disability, in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. 794), as amended, implemented by the National Endowment for the Arts at 45 CFR 1151, and the **Americans with Disabilities Act of 1990** ("ADA"), as amended, (42 U.S.C. 12101 et seq.).

- On the basis of age, in accordance with the **Age Discrimination Act of 1975,** as amended (42 U.S.C. 6101 et seq.), implemented by the National Endowment for the Arts at 45 CFR 1156.

- On the basis of sex, in any education program or activity, in accordance with **Title IX of the Education Amendments of 1972,** as amended (20 U.S.C. 1681 et seq.).

In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:

- The applicant will comply with all applicable Executive Orders while the award is being administered.  Executive orders are posted at whitehouse.gov/presidential-actions. However, all compliance with EO 14168 is governed exclusively by the NEA's predecisional guidance

  <https://www.arts.gov/sites/default/files/final.notice.implementation.eo14168.pdf>

  concerning that EO, and not by the terms of these Assurances.

JA524

8/8/25, 7:20 AM

Case 1:25-cv-00079-WES-PAS    Document 33-1    Filed 08/08/25    Page 7 of 14 PageID
Assurance of Compliance | National Endowment for the Arts
#: 1524

- The applicant's compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of the False Claims Act, 31 U.S.C. § 3729(b)(4), pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025.

  The applicant does not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173.

  See FAQ on these certification requirements </grants/legal-requirements-and-assurance-of-compliance/frequently-asked-questions>

# Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

Newsletter Signup </sign-up-for-updates>

Magazine Signup </form/sign-up-for-american-artscape-magazine>

JA525

About </about>

Contact Us

</about/leadership-

staff/all-staff>

Civil Rights

</about/civil-rights-office>

No Fear Act

</about/civil-rights-

office/applicants-for-

employment-and-

employees/no-fear-act>

FOIA </about/freedom-of-

information-act-foia-guide>

Inspector General

</about/inspector-general>

Accessibility

</impact/accessibility>

Privacy Policy

</privacy>

Disclaimers

</about/website-

disclaimers>

Open Government

</about/open-government>

USA.gov

<http://www.usa.gov/>

Section 508

Accessibility </section-

508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-

grant-scam>

400 7th Street, SW, Washington, DC
20506
202.682.5400

JA526

# Ex. B

NATIONAL ENDOWMENT for the ARTS arts.gov

AMERICA 250™

Menu

</>

# SOME OF YOUR RESPONSIBILITIES AS A FEDERAL AWARD RECIPIENT

In accepting a National Endowment for the Arts award, your organization assumes legal, financial, administrative, and programmatic responsibility for administering the award in accordance with any provisions included in the award; the statutes, regulations, and Executive Orders governing Federal financial assistance awards; and the relevant General Terms and Conditions. However, all compliance with EO 14168 is governed exclusively by the NEA's predecisional guidance <https://www.arts.gov/sites/default/files/final.notice.implementation.eo14168.pdf>

concerning that EO, and not by any content that appears on this page. While the NEA may provide you with reminders regarding award requirements, the absence of receiving such notice does not relieve you of your responsibilities.

**Submission of a Payment Request constitutes your agreement to comply with all the terms and conditions of the award.  Failure to comply with these requirements may result in suspension or termination of the award and our recovery of funds. In addition, the United States has the right to seek judicial enforcement of these obligations.**

As an Award Recipient you are required to:

1. Comply with the terms and conditions of your award, including the GTCs, 2 CFR 200, and any specific terms and conditions that apply to the award.

2. Maintain an active registration in the System for Award Management (SAM.gov) with current information about your entity at all times during which your entity has an active award or application under consideration.

3. Ensure the efficient and effective administration of the federal award through sound management practices.

4. Administer federal funds in a manner consistent with the U.S. Constitution, federal statutes, regulations, and the terms and conditions of your federal award.

5. Maintain accounting practices consistent with the cost principles in 2 CFR 200 and that support the accumulation of costs as required by these cost principles, including maintaining adequate documentation to support costs charged to the federal award.

6. Maintain a sound financial management system that records separately within its general accounting system the receipt and disbursement of grant funds and cost sharing contributions and that monitors the expenditure of these funds against the approved award budget.

7. Have in place written procedures for determining the allowability of costs, the disbursement of federal funds, procurement, conflict of interests, compensation for personal services, leave policies, classification of participant costs, relocation policies, and travel reimbursement for staff on official business.

8. Document the time and effort spent by all employees/staff/personnel on approved project activities.

9. Conduct all procurement transactions in an open and free competition and ensure that procurement contracts for more than the simplified acquisition threshold that are not awarded by competitive bids or offers are justified and documented.

10. Carry out your project activities as approved by the NEA at the time of award and, if amended, as acknowledged in writing by the Office of Grants Management.

11. Request written approval from the NEA Office of Grants Management for any changes to your project prior to implementing the changes.

JA530

12. Acknowledge the NEA's support in all materials publicizing or resulting from project activities.

13. Submit all financial and performance reports by the due dates as required by the terms and conditions of the award.

14. Comply with requirements concerning record retention and the federal government's rights of access to records and personnel.

15. Have an audit performed that meets the requirements of 2 CFR 200 Subpart F - Audit Requirements whenever you expend $1,000,000 or more in federal funds during a fiscal year.

# Stay Connected to the National Endowment for the Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

Contact Us

Civil Rights

**About** </about>

</about/leadership-staff/all-staff>

</about/civil-rights-office>

JA531

## No Fear Act

FOIA </about/freedom-of-information-act-foia-guide>

</about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

## Inspector General

</about/inspector-general>

## Accessibility

</impact/accessibility>

## Privacy Policy

</privacy>

## Disclaimers

</about/website-disclaimers>

## Open Government

</about/open-government>

## USA.gov

<http://www.usa.gov/>

## Section 508 Accessibility </section-508-accessibility>

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-grant-scam>

---

400 7th Street, SW, Washington, DC
20506
202.682.5400

JA532

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
RHODE ISLAND LATINO ARTS, et al.,       )
                                        )
        Plaintiffs,                     )
                                        )
    v.                                  )    C.A. No. 25-79 WES
                                        )
NATIONAL ENDOWMENT FOR THE ARTS,        )
et al.,                                 )
                                        )
        Defendants.                     )
_____)

MEMORANDUM AND ORDER

WILLIAM E. SMITH, Senior District Judge.

Before the Court are Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion"), Dkt. No. 22, and Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Summary Judgment Motion ("Defendants' Motion"), Dkt. No. 24. Plaintiffs are three arts groups that applied for grants from the National Endowment for the Arts ("NEA") and a membership organization that represents such groups. Defendants are the NEA and its Acting Chairperson. Pursuant to an Executive Order, the NEA intends to disfavor grant applications that "promote gender ideology." Plaintiffs allege this practice would violate the First Amendment, the Administrative Procedure Act ("APA"), and the Fifth Amendment. Because the Court agrees with Plaintiffs regarding their First Amendment and APA claims, but not their Fifth Amendment claim,

**JA533**

Plaintiffs' Motion is granted in part and denied in part, and Defendants' Motion is denied in part and granted in part.

Defendants are therefore enjoined from applying a viewpoint-based standard of review to Plaintiffs that disfavors applications deemed "to promote gender ideology," and the Court vacates and sets aside Defendants' current plan to implement the Executive Order.

## I.    BACKGROUND

### A. The NEA's Authorizing Statute

The National Foundation on the Arts and the Humanities Act of 1965 ("NFAHA") declares, as amended, that "[t]he arts . . . belong to all the people of the United States." 20 U.S.C. § 951(1). The NFAHA further provides that "it is necessary . . . for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." Id. § 951(7). In accordance with these principles, the NFAHA established the NEA, which provides financial assistance to groups and certain individuals "of exceptional talent engaged in or concerned with the arts." Id. § 954(c). Among the priorities identified in the funding program at issue in this case are "projects and productions which have substantial . . . artistic and cultural significance, giving emphasis to American creativity

2

**JA534**

and cultural diversity," and those with similar significance "that reach, or reflect the culture of, a minority, inner city, rural, or tribal community." Id. § 954(c)(1), (4).

Because the drafters and subsequent amenders of the NFAHA were concerned about the NEA being leveraged as an instrument of "political control of culture," they took several steps to ensure that grants are awarded based on talent alone, irrespective of the artists' viewpoints or the messages conveyed in their works. See Am. Compl. ¶ 18, Dkt. No. 15 (quoting H.R. Rep. No. 89-618, at 21 (1965)); see also id. ¶ 22 ("Congress's intent was to have 'Government assistance, but not intervention[;] . . . support but not control[;] . . . stimulation but not participation.'" (omissions in original) (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. John S. Monagan))).

One safeguard against political interference is a prohibition against federal supervision or control over the policies, personnel, or operations of grant recipients. 20 U.S.C. § 953(c). Another safeguard is the nested, multilayer review process that underlies each individual grant decision. Working outward from the innermost layer, this process begins with an advisory panel's review of a grant application; the panel is required to "recommend applications . . . solely on the basis of artistic excellence and artistic merit." Id. § 959(c). Notably, the NEA must "ensure

3

**JA535**

that all panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." Id. § 959(c)(1).

From there, the NEA's National Council on the Arts (the "Council") is required to make recommendations concerning whether to approve applications determined by the advisory panels to have artistic excellence and artistic merit. Id. § 955(f)(1). Just as the composition of the advisory panels ensures a diversity of viewpoints and backgrounds, so too does that of the Council. In selecting a voting member of the Council, the President must "give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the arts and shall make such appointments so as to represent equitably all geographical areas in the United States." Id. § 955(b)(1), (1)(C). Each of the Council's eighteen voting members "shall hold office for a term of six years, and the terms of office shall be staggered." Id. § 955(c).

At the outermost layer of review is the Chairperson, who may not approve or disapprove any application until it is recommended for approval by the Council, and who may not approve an application for which the Council has made a negative recommendation. Id. § 955(f)(2); see also id. § 955(b)(1) (requiring the President to

4

**JA536**

consider equitable representation in appointment of Chairperson). In establishing regulations and procedures for the NEA's funding program, the Chairperson must ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." Id. § 954(d)(1). The NFAHA further provides that "[i]n selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under [the program at issue here], the Chairperson shall give particular regard to artists and artistic groups that have traditionally been underrepresented." Id. § 954(c). The Chairperson and voting members of the Council are appointed by the President and confirmed by the Senate, id. §§ 954(b)(1), 955(b)(1)(C); and members of the advisory panels are appointed by the Chairperson, id. § 959(c)(6). The Chairperson serves a four-year term and is eligible for reappointment. Id. § 954(b)(2).

This complex statutory framework demonstrates Congress's intent to insulate the NEA from political control and to encourage the freedom of expression. As a Senate committee report on the original version of the NFAHA explained:

> It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. One of the artist's and humanist's great

> values to society is the mirror of self-examination which they raise so that society can become aware of its shortcomings as well as its strengths . . . . Countless times in history artists and humanists who were vilified by their contemporaries because of their innovations in style or mode of expression have become prophets to a later age.  Therefore, the committee affirms that the intent of this act should be the encouragement of free inquiry and expression. . . .  [C]onformity for its own sake is not to be encouraged, and . . . no undue preference should be given to any particular style or school of thought or expression.

Am. Compl. ¶ 22 (omissions in original) (quoting S. Rep. No. 89-300, at 3-4 (1965)); see also id. (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. Henry Helstoki) ("The Federal Government will supply the money, but the artists and their organizations will suggest the proposals, select the performances which are to be produced and do all the planning.  The Federal Government will be the means, but the end product will be the sole responsibility of the performing artists.")).

**B. The Instant Litigation**

**1. The Executive Order (the "EO")**

On January 20, 2025, President Trump signed Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  Id. ¶ 48. According to Section 2(f) of the EO:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this

6

**JA538**

false claim as true.  Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.  Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

Exec. Order No. 14168, § 2(f), 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025).  The EO has multiple substantive provisions, but relevant to this case is Section 3(g), which declares that "[f]ederal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."  Id. § 3(g), 90 Fed. Reg. at 8616.

### 2. Initial EO Implementation and Lawsuit

The President signed the EO about three weeks ahead of the application deadline for the semiannual Grants for Arts Project ("GAP"), the NEA's premier grant program.  Am. Compl. ¶¶ 35, 38. The submission deadline for the current funding cycle was initially set for February 13, 2025.  Id. ¶ 38.  On February 6, however, the NEA updated its application procedure and pushed the final deadline to March 24, with an intermediate deadline set for March 11.  Id. ¶¶ 38, 41.  The updated procedure required applicants to confirm that, if selected, they (1) would "comply with all applicable Executive Orders while the award [was] being administered" and (2) "underst[ood] that federal funds shall not be used to promote

7

**JA539**

gender ideology, pursuant to Executive Order No. 14168." Statement of Undisputed Facts ("PSUF") ¶ 28, Dkt. No. 23.

Plaintiffs are three individual arts groups — Rhode Island Latino Arts ("RILA"), National Queer Theater ("NQT"), and The Theater Offensive ("TTO") — and one member organization, Theatre Communications Group ("TCG"). Id. ¶¶ 45, 76, 102, 119. On March 6, Plaintiffs filed a Complaint alleging the NEA's implementation of the EO violated the First Amendment, APA, and Fifth Amendment; they also moved for a preliminary injunction. Am. Compl. ¶ 6; see Compl. ¶¶ 96-123, Dkt. No. 1.

### 3. Rescission of EO Implementation and Denial of Preliminary Injunction

After Plaintiffs filed their lawsuit, the NEA rescinded its implementation of the EO, pushed back the application deadline a second time, now to April 7, and announced it would re-implement the EO following a "new evaluation . . . in accordance with the [APA]." PSUF ¶¶ 31-33; Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 70-71, Dkt. No. 11-1. According to the NEA, "[t]his new consideration and evaluation process [would be] complete[d] by April 16, 2025" — nine days after the revised deadline — and the NEA would "implement and make public the final decision resulting from that process by April 30, 2025." Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 71.

Because the NEA had rescinded its implementation of the EO,

8

**JA540**

Defendants argued that Plaintiffs' claims were nonjusticiable, and they urged the Court to deny Plaintiffs' motion for a preliminary injunction.  In a Memorandum and Order entered April 3, the Court found that Plaintiffs' claims were justiciable under the voluntary cessation exception to the mootness doctrine.  Mem. & Order 20-23, Dkt. No. 13.  Applying this exception, the Court found that if a prohibition on the use of NEA funds to "promote gender ideology" were reinstated, it would likely violate the First Amendment and the APA.  Id. at 24-41.  The Court nevertheless denied Plaintiffs' motion for a preliminary junction.  Id. at 46.  Although Plaintiffs demonstrated a likelihood of success on the merits of their claims and showed irreparable harm, the Court found that the balance of the equities and public interest weighed heavily in Defendants' favor, in large part because an injunction would "short circuit" the NEA's then-pending administrative review process.  Id. at 42-46.

**4. Re-Implementation of EO and Motions for Summary Judgment**

As promised, the NEA published its final decision regarding the implementation of the EO (the "Final Notice") on April 30.[1]  See Admin. R. ("AR") 207, 215, Dkt. No. 19.   The Final Notice

---

[1] The Court uses the term "Final Notice" because that is the name given to the corresponding file in the Administrative Record. See the drop-down Table of Contents for Admin. R. ("AR"), Dkt. No. 21.

**JA541**

states that the "existing multi-tiered application review process will remain unchanged," and that the Chairperson will implement the EO "by evaluating projects that promote gender ideology based on the existing statutory criteria at the final stage of application review."[2]  Id. at 207.  In other words, neither when advisory panels determine that certain applications "have artistic excellence and artistic merit," 20 U.S.C. § 955(f)(1), nor when the Council "make[s] recommendations to the Chairperson concerning . . . whether to approve [those] applications," id. § 954(f), (f)(1), will the NEA implement the EO.  Rather, the Chairperson will independently assess those applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology," on a "case-by-case" basis.  AR 208.  If the Chairperson "concludes that a proposed project 'promotes gender ideology," it will not be "denied solely" for that reason, but it "could weigh against the project's final approval."  Defs.' Objs. & Resp. Pls.' 1st Set Reqs. Admis. ("Defs.' Admiss.") 2, Dkt. No. 21; see Text Order (June 4, 2025).  In no circumstance, however, could it "weigh in favor of the project's final approval."

---

[2] "The Chair[person's] review of proposed projects follows shortly after the Council has made its recommendations," which traditionally does not happen "until the end of the third week of October." Defs.' Resps. Pls.' Statement Facts & Separate Statement Undisputed Facts ("DSUF") ¶ 4, Dkt. No. 25.

Defs.' Resps. Pls.' Statement Facts & Separate Statement Undisputed Facts ("DSUF") ¶ 40, Dkt. No. 25 (emphasis added).

In their Amended Complaint, Plaintiffs allege that the Final Notice violates the First Amendment, APA, and Fifth Amendment; and they move for summary judgment on all claims.  Am. Compl. ¶¶ 112-141; Pls.' Mem. L. Supp. Mot. Summ. J. (Pls.' Mem.") 1-2, Dkt. No. 22-1.  Defendants move for summary judgment on all claims as well. Defs.' Mot. 1-3.

## II.  LEGAL STANDARD

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Viscito v. Nat'l Plan. Corp., 34 F.4th 78, 83 (1st Cir. 2022) (quoting Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017)).  "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." Scottsdale Ins. v. United Rentals (N. Am.), Inc., 977 F.3d 69, 72 (1st Cir. 2020).

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA.  Bos.

11

**JA543**

Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016).

**III. DISCUSSION**

On the First Amendment claim and all three APA claims, the Court grants summary judgment to Plaintiffs; on the Fifth Amendment claim, however, the Court grants summary judgment to Defendants.

**A. First Amendment Claim**

The Court finds that the NEA's Final Notice violates the First Amendment because it is a viewpoint-based restriction on private speech. A threshold issue is whether NEA-funded art is government speech or private speech. If NEA-funded art is government speech, then restrictions on that speech do not implicate the Free Speech Clause of the First Amendment. Because the Court determines that NEA-funded art is private speech, it next considers whether the Final Notice amounts to a restriction on that speech and, if so, what type of restriction.

With the Final Notice in effect, projects deemed to promote gender ideology are less likely to be approved for NEA funding. The Final Notice is thus a restriction on artists' speech, and one that is viewpoint based, because it assigns negative weight to the expression of certain ideas on the issue of gender identity. The Final Notice is thus presumptively unconstitutional. Because the restriction cannot withstand judicial scrutiny, the Court

12

**JA544**

concludes that the Final Notice violates the First Amendment.

**1. Government or Private Speech**

The Court must first determine whether the Free Speech Clause of the First Amendment applies to the NEA's funding program.  "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."  Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009).  The line between private speech and government speech "can blur," however, when "the government invites the people to participate in a program."  Shurtleff v. City of Boston, 596 U.S. 243, 252 (2022).  That is what Congress did when it decided to fund the arts through the NEA.  In these situations, a court must assess whether the program is designed to "transmit the government's message" or facilitate private expression.  Id.; see id. at 271 (Alito, J., concurring).  If the former, then participation in the program is government speech, and the government can restrict the viewpoints expressed in the program without implicating the Free Speech Clause.  If the latter, then participation in the program is private speech, and the Free Speech Clause applies.

To determine whether participants in a program are engaged in government speech or private speech, a court considers "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the

13

**JA545**

extent to which the government has actively shaped or controlled the expression."[3]  Id.  These considerations have led the Supreme Court to hold that "the messages of permanent monuments in a public park constituted government speech, even when the monuments were privately funded and donated."  Id.  (citing Summum, 555 U.S. at 470-73).  Similarly, the Supreme Court held that Texas's specialty license plate designs are government speech, even when the designs are proposed by private parties, because license plates "long have communicated messages from the States," the designs "are often closely identified in the public mind with the State," and "Texas maintains direct control over the messages conveyed" on the plates. Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 210-13 (2015) (brackets omitted).

On the other hand, the Supreme Court held that "trademarking words or symbols generated by private registrants" were private speech because even though the government "had to approve each proposed mark, it did not exercise sufficient control over the

---

[3] As the Supreme Court has emphasized, these considerations do not amount to "rigid factors."  See Shurtleff v. City of Boston, 596 U.S. 243, 252 (2022); see id. at 261-76 (Alito, J., concurring) (criticizing the majority's "factorized approach" and advocating a method of review in which "government speech occurs if — but only if — a government purposefully expresses a message of its own through persons authorized to speak on its behalf, and in doing so, does not rely on a means that abridges speech").

14

**JA546**

nature and content of those marks to convey a governmental message in so doing." Shurtleff, 596 U.S. at 252-53 (citing Matal v. Tam, 582 U.S. 218 (2017)). And it also held that Boston's flag-raising program, in which the city occasionally let private groups hoist their own flags in place of the Boston flag on one of three flagpoles in front of city hall — the flags of the United States and Massachusetts flew from the other poles — was also private speech. Shurtleff, 596 U.S. at 248. For despite "the historical practice of flag flying at government buildings," the city had no "meaningful involvement in the selection of flags or the crafting of their messages." Id. at 258.

These precedents lead the Court to conclude that NEA-funded art is private speech, not government speech.[4] Indeed, all three considerations discussed above — history, public perception, and

---

[4] Defendants contend the relevant inquiry is not whether NEA-funded art is government speech, but whether the NEA's decision to fund that art is government speech. Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply") 4-5, Dkt. No. 32. That cannot be right. When the NEA decides to fund certain art, that is an example of "the government invit[ing] the people to participate in a program." Shurtleff, 596 U.S. 243, 252 (2022). The Court must therefore determine whether speakers participating in the program are "exercising a power to speak for [the] government" or speaking for themselves. See id. at 268 (Alito, J., concurring). In this case, the relevant act of participation is the production of art that is funded by the NEA. It is therefore the art — not the NEA's decision to fund the art — that is the proper focus of the Court's government speech inquiry.

control — weigh in favor of Plaintiffs.[5]

### a. History

The Court first considers the "history of the expression at issue."  Shurtleff, 596 U.S. at 252.  The objective here is to determine whether the relevant speech has traditionally been used to "communicate[] messages from the [government]."  Walker, 576 U.S. at 210-11.

There is no question that, historically, art has been used as a medium to communicate the government's messages and that often the government has relied on the work of private artists to achieve that goal.  Were the Court "to consider only that general history," it would find that the first factor of the government-speech test favors Defendants.  Shurtleff, 596 U.S. at 253.  But the Court is wary of painting with too broad a brush.  Notwithstanding the general history of government involvement in the arts, the history of the specific arts-funding program at issue here suggests that its participants are engaged in private speech.[6]

_____

[5] The Court takes heed of Justice Alito's warning that, because the government-speech doctrine "is susceptible to dangerous misuse," the Supreme Court "must exercise great caution before extending [its] government-speech precedents."  Matal v. Tam, 582 U.S. 218, 235 (2017).

[6] Supreme Court precedent suggests that the general history of the expression involved and the specific history of the program at issue are both relevant to government-speech analysis.  See

16

**JA548**

At its inception, the NEA was designed not as an instrument of political communication but as a vehicle for private expression. That much is clear from the text of the NFAHA, which declares that "[t]he arts . . . belong to all the people of the United States," 20 U.S.C. § 951(1), and moreover directs "the Federal Government to help create and sustain not only a climate encouraging freedom of thought . . . but also the material conditions facilitating the release of this creative talent," id. § 951(7); see also supra Part I.A (discussing structure and legislative history of NFAHA).

Despite this origin story, Defendants suggest that subsequent controversies surrounding the NEA — and amendments to the NFAHA that were passed in response — complicate the historical analysis. See Defs.' Mot. 8-11, 21.  In 1990, Congress amended the NFAHA following public controversy over two "provocative works," neither of which received funding directly from the NEA but rather from "organization[s] that received NEA support."  Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 574-75 (1998).  The first was a "retrospective of photographer Robert Mapplethorpe's work," which "included homoerotic photographs that several Members of Congress

---

Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 210-12 (2015) (considering both histories); see also id. at 218-29 (citing Cornelius v. NAACP Leg. Def. & Educ. Fund, 473 U.S. 788, 804-06 (1985) (discussing history of specific fundraising program involved in that case).

condemned as pornographic," and the second was "Andres Serrano's work Piss Christ, a photograph of a crucifix immersed in urine." Id. at 574. With the help of an independent commission, Congress amended the NFAHA with the provisions now codified at § 954(d), which require the Chairperson to ensure (1) that "general standards of decency and respect for the diverse beliefs and values of the American public" are considered in the distribution of NEA funds, and (2) that projects "determined to be obscene are prohibited from receiving" NEA support. See Pub. L. No. 101-512, § 103, 104 Stat. 1915, 1963 (1990). Defendants also highlight language that was added to the NFAHA's findings and purpose section:

> [T]he Government must be sensitive to the nature of public sponsorship. Public funding of the arts . . . is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines.
>
> . . . .
>
> The arts . . . reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups.

Defs.' Mot. 11 (quoting Pub. L. No. 101-512, § 101, 104 Stat. at 1961 (codified at 20 U.S.C. § 951(5), (6))) (second omission in original).

In the Court's view, none of these additions transformed the

18

**JA550**

NEA into a means for communicating the government's messages.  If anything, the 1990 amendments demonstrate that Congress intended to preserve the NEA as a vehicle for private speech, despite the potential for public controversy.  See Finley, 524 U.S. at 582 (quoting 136 Cong. Rec. 28674 (1990) ("If [Congress has] done one important thing in this amendment, it is this.  We have maintained the integrity of freedom of expression in the United States.")).  As noted in Finley, the independent commission "cautioned Congress against the adoption of distinct viewpoint-based standards for funding" and, consistent with that recommendation, "Congress declined to disallow any particular viewpoints."  524 U.S. at 581-82.  Instead, Congress emphasized the importance of respecting the "diverse beliefs" of all Americans while accounting for "general standards of decency"[7] and ensuring that obscenity, which is not

---

[7] In the Court's view, the "decency" component of 20 U.S.C. § 954(d)(1) is akin to requirements that school libraries take "educational suitability" into account when selecting the books on their shelves.  See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 584 (1998) (citing Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 871 (1981)).  Such requirements may be permissible.  Id.  But even if the NEA has some degree of content-based discretion over its funding choices, "that discretion may not be exercised in a narrowly partisan or political manner," because "[o]ur Constitution does not permit the official suppression of ideas."  Pico, 457 U.S. at 870-71; see also Matal, 582 U.S. at 243 (noting "some content- and speaker-based restrictions may be allowed" depending on the nature of the forum, but "'viewpoint discrimination' is forbidden." (quoting

protected by the First Amendment, is ineligible for NEA funding. 20 U.S.C. § 954(d)(1), (2); see also United States v. Williams, 553 U.S. 285, 288 (2008) (noting obscenity is unprotected speech). None of these changes suggest that Congress reformed the NEA into a medium for communicating government messages at the expense of other views.  Rather, this chapter of the NEA's history reinforces the notion that it was designed to support free expression through the use of public funds, despite the resulting challenges.

As a final note on the history front, Defendants contend that "government patronage of the arts reflects a historical tradition of government speech."  Defs.' Mot. 19.  Although the Court agrees as a general matter, the cases Defendants cite in support of their argument demonstrate the risks of employing an overly broad reading of history in this context.  See id. at 19 n.16.  One case involved a public art exhibit organized around specific themes in which the host city not only funded, but also took ownership of, the winning installations and provided the venue for their display.  McGriff v. City of Miami Beach, 84 F.4th 1330, 1332-35 (11th Cir. 2023). Another involved the Smithsonian Institution's decisions over which art it chooses to exhibit in the National Portrait Gallery. Raven v. Sajet, 334 F. Supp. 3d 22, 25-26 (D.D.C. 2018).  And a

---

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 831 (1995))).

20

**JA552**

third involved a congressional art competition in which the works were selected to represent a particular House district, sponsored by the House member for that district, and displayed on the Capitol grounds.  Pulphus v. Ayers, 249 F. Supp. 3d 238, 240-41 (D.D.C. 2017).[8]

None of these examples capture the unique history and purpose of the NEA, let alone the NEA's relationship with the art that it funds.  To be sure, these considerations are better addressed under the rubrics of public perception and control.  But the NEA stands in contrast to the government-funded arts programs discussed in these cases, which in turn undermines Defendants' argument about history.  In conclusion, the "history of the expression at issue," defined narrowly as NEA-funded art, supports a finding that such art is private speech.  See Shurtleff, 596 U.S. at 252.

### b. Public Perception

The Court next considers "whether the public would tend to view the speech at issue as the government's." Id. at 255.  Another way of framing the inquiry is whether, in transmitting a message through art using NEA funds, an artist "likely intends to convey

---

[8] For a discussion of the fourth case that Defendants cite, People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23 (D.C. Cir. 2005), see Mem. & Order 35, Dkt. No. 13.  See Defs.' Cross-Mot. Summ. J. & Opp'n Pls.' Summ. J. Mot. ("Defs.' Mot.") 19 n.16, Dkt. No. 24.

to the public that the [government] has endorsed that message."
Walker, 576 U.S. at 212.  As with the history factor, the public-perception factor supports Plaintiffs' contention that NEA-funded art is private speech.

Unlike the programs involved in the cases Defendants cite above, the NEA does not take ownership of or designate a venue for the works that it funds.  Instead, NEA-funded art "is billed as the work of the artists and funded organization[s], not the NEA," DSUF ¶ 21, and must be "supported by other sources of funding" in addition to the NEA, id. ¶ 24; see 20 U.S.C. § 954(e).  Moreover, NEA-funded art "is typically performed or exhibited in private venues and galleries, or in public parks and streets not owned by the NEA, but rather other government actors who require separate, distinct approvals."  DSUF ¶ 25; contra Raven, 334 F. Supp. 3d at 25-26; Pulphus, 249 F. Supp. 3d at 240-41.  And "NEA-funded organizations retain the intellectual property rights in their NEA-funded works."  DSUF ¶ 26; contra McGriff, 84 F.4th at 1332-35.

Based on these facts about NEA-funded art, the Court finds it unlikely that members of the public would think that NEA-funded artists speak for anyone but themselves, and certainly not for the government.  That is especially true given the diversity of views reflected in the projects that the NEA — even when accounting for

22

**JA554**

changes in presidential administrations — has decided to fund. See, e.g., Pls.' Mem. 15 n.3 (citing examples in which the NEA has funded projects with conflicting themes and that appear to clash with the relevant administration's policy views).  Indeed, if the government is speaking through recipients of NEA funding, then it is "babbling prodigiously and incoherently, saying many unseemly things, and expressing contradictory views."  Matal, 582 U.S. at 236 (citation modified).

Notwithstanding the above, Defendants argue that "the public perceives the NEA's seal of approval as the government speaking." Defs.' Mot. 25.  True, recipients of NEA funding must acknowledge, "in a prominent manner," that their projects are supported in part by an award from the NEA and display the NEA's logo in materials related to their projects.  Id.; see DSUF ¶ 23.  But "if private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints."  Matal, 582 U.S. at 235. Furthermore, many artists likely seek NEA support in part because the prestige of receiving a grant could translate to other funding opportunities.  See Defs.' Mot. 7 n.5 (citing, inter alia, Decl. Giselle Byrd ¶ 19, Dkt. No. 2-5).  In this respect, the NEA's seal of approval functions as an endorsement, and one that signals to prospective funders the artistic merits of a given project.  But

23

**JA555**

the government can endorse a project as good art without further endorsing all the messages or viewpoints it conveys.  In short, the government may speak for itself when it approves an artist's work, but that does not mean the artist speaks for the government when it produces that work.

The Court therefore concludes that when it comes to NEA-funded art, "the public's likely perception" is that a private person, not the government, "is speaking."  Shurtleff, 596 U.S. at 252.

### c. Control

The final consideration is the extent to which the government has "actively controlled" the production of NEA-funded art and "shaped the messages" that the art conveys.  Id. at 256.  In this context, it matters less that the NEA has final approval authority over each project, see id. at 252-53 (citing Matal, 582 U.S. 218), and that it contributes — by providing partial funding — to the means of production, see id. at 256 (discussing Boston's provision of hand crank for raising flags).  Rather, what matters most is the NEA's control over the art's "content and meaning" because "that type of control would indicate that [it] meant to convey the [art's] messages."  Id.

This factor weighs decisively in favor of a conclusion that NEA-funded art is private speech.  As with the trademarks at issue

24

in Matal, the NEA "does not dream up" the art that it funds, "and it does not edit [the projects] submitted for [approval]." Matal, 582 U.S. at 235.  In fact, when Plaintiffs received NEA funding in the past, the NEA neither "suggested to applicants that they should make substantive changes to their projects" nor "otherwise offered feedback on the substance of a project." DSUF ¶¶ 17-18.  Moreover, "[w]hen the NEA has given feedback on proposals, it has been about how to better frame an applicant's pitch to make it a more competitive application, not about changing the project itself." Id. ¶ 19 (emphasis added).  And NQT, which hosts an annual theater festival, has received approval for NEA funding in previous cycles before even deciding which plays to include in the relevant year's festival.  See Suppl. Decl. Adam Odsess-Rubin ¶ 14, Dkt. No. 22-4.  In scenarios like this, the NEA cannot be said to control, or even be aware of, the content or viewpoints of the works that it funds.  See Pls.' Opp'n Defs.' Cross-Mot. & Reply Supp. Pls.' Mot. ("Pls.' Reply") 12-13, Dkt. No. 31.

Defendants discredit Plaintiffs' declarations to the extent that Plaintiffs' experiences do not "establish any fact relative" to the NEA in general.  See, e.g., DSUF ¶ 18.  But Defendants mount no evidence that would allow the Court to look beyond Plaintiffs' experiences and make general findings about the NEA's control over the content and meaning of the art that it funds.  Relatedly, the

25

**JA557**

Final Notice proclaims that "the NEA has historically expressed a preference for certain projects, which often reflect administration priorities." AR 211. But there is no evidence in the record that, prior to this funding cycle, the NEA has solicited applications through its GAP program for projects that espouse specific themes, much less advance the administration's policy preferences. Id. (discussing current funding cycle's "America250" program); see generally DSUF (providing no examples from previous cycles). Contra McGriff, 84 F.4th at 1332-35. Instead, Defendants' control argument rests on the NEA's final approval authority. See Defs.' Mot. 28-30. But for all the reasons above, that is insufficient.

The Court concludes that the history, public perception, and government's control of the expression at issue — NEA-funded art — all demonstrate that such art is not government speech, but private speech.

## 2. Nature of Speech Restriction

Because NEA-funded art is private speech, the Free Speech Clause of the First Amendment applies to any restrictions that are placed on that speech. The Court must therefore review the Final Notice to determine whether it restricts artist's speech and, if it does, the type of restriction at issue. The latter question is important to the extent this case implicates the Supreme Court's

26

**JA558**

forum precedents.  See Finley, 524 U.S. at 586 (suggesting NEA is not a limited public forum and, by implication, is thus a nonpublic forum); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 830 (1995) (describing university's student activities fund as a "metaphysical" limited public forum).  Depending on the nature of the forum involved, "some content- and speaker-based restrictions may be allowed."  Matal, 582 U.S. at 243.  But in all cases, "'viewpoint discrimination' is forbidden."  Id. (quoting Rosenberger, 515 U.S. at 831); see also Shurtleff, 596 U.S. at 275-76 (Alito, J., concurring) (noting that if Boston had created a nonpublic forum, it could have restricted use of its flagpole to certain subject matters, but "it could not have employed viewpoint-discriminatory criteria to bar otherwise-eligible speakers from expressing their views on those subjects").

The Court concludes that the Final Notice restricts artists' speech, and that it does so on the basis of viewpoint.  As defined in the EO, "gender ideology" "permit[s] the false claim that males can identify as and thus become women and vice versa," and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."  EO § 2(f), 90 Fed. Reg. at 8615-16.  The EO further provides that "[f]ederal funds shall not be used to promote gender ideology," and that "[e]ach agency shall assess grant conditions and grantee preferences [to] ensure grant

27

**JA559**

funds do not promote gender ideology." Id. § 3(g), 90 Fed. Reg. at 8616.

The Final Notice states that the Chairperson will assess NEA funding applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology," on a "case-by-case" basis. AR 208. It does not further define what it means to "promote gender ideology." But it notes that "[t]he EO requires executive agencies to take all necessary steps, as permitted by law, to ensure that agency funds are not used to promote gender ideology." Id. at 207 (emphasis added).

Defendants concede that if the Chairperson "concludes that a proposed project 'promotes gender ideology,' that factor could weigh against the project's final approval." Defs.' Admiss. 2. To be sure, the Chairperson "will not disqualify a project from consideration solely on [the Chairperson's] conclusion that a proposed project 'promotes gender ideology.'" Id. But in no circumstance could that conclusion "weigh in favor of the project's final approval." DSUF ¶ 40.

From the Court's perspective, these concessions demonstrate that projects deemed to "promote gender ideology" are less likely to receive NEA funding. In other words, the NEA intends to disfavor applications that promote gender ideology precisely because they promote gender ideology. The Final Notice therefore

**JA560**

promises to penalize artists based on their speech.  If the NEA restricted all applications that touched on the subject of "gender ideology," or on the relationship between sex and gender more broadly, that would amount to a content-based restriction on artists' speech.  See Rosenberger, 515 U.S. at 828-29.  Because the Final Notice targets the promotion of specific ideas about these topics, however, the NEA is engaged in viewpoint discrimination, which is "an egregious form of content discrimination."  Id. at 829; see also Finley, 524 U.S. at 587 (upholding 20 U.S.C. § 954(d)(1) but noting it "would confront a different case" "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints").  Therefore, regardless of whether forum analysis applies to the NEA, the Final Notice is presumptively invalid because it is viewpoint discriminatory.  See Cornelius, 473 U.S. at 806; Shurtleff, 596 U.S. at 275-76 (Alito, J., concurring); see also Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004).

### 3. Application of Judicial Scrutiny

Viewpoint discrimination is traditionally subject to strict scrutiny, which requires the government to prove the restriction is "narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).  Defendants make no

effort to argue the Final Notice satisfies any type of judicial scrutiny, let alone strict scrutiny; indeed, Defendants have not even asserted the state interest behind the NEA's new policy, aside from complying with the EO. See generally Defs.' Mot. Therefore, the Court finds that the Final Notice fails judicial scrutiny and thus violates the First Amendment.

**B. APA Claims**

The Court also finds that the Final Notice violates the APA. The APA requires courts to "hold unlawful and set aside agency action" that, inter alia, is in excess of statutory authority, arbitrary and capricious; or contrary to a constitutional right. 5 U.S.C. § 706(2)(A)-(C). Although the APA "embodies a 'basic presumption of judicial review,'" agency action is not reviewable unless it is "final." Dep't of Com. v. New York, 588 U.S. 752, 771 (2019) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 140 (1967)); see 5 U.S.C. § 704. To satisfy this requirement, the action must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation modified).

**1. Final Agency Action and Ripeness**

The Court finds that the Final Notice is reviewable as final

**JA562**

agency action because it marked the consummation of the NEA's "consideration and evaluation process" about how to implement the EO and determined that the Chairperson has the right, if not the obligation, to assess NEA grant applications based on viewpoint-discriminatory criteria. See Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 71.  And it also stated that the Chairperson would exercise this right when reviewing applications submitted during the current funding cycle.  Defendants argue there is no final agency action because Plaintiffs' applications might not advance to the final stage of review, when the Chairperson will exercise this purported right.  Defs.' Mot. 33.  In any event, Defendants contend, "Plaintiffs undisputedly lack any right" to receive NEA grants, which are competitive.  Id. at 34.

Defendants' arguments are unavailing.  No application will be approved without first being assessed according to the criteria. The assessment is thus a prerequisite to acceptance and, therefore, all applications are subject to it.  By way of an analogy, imagine that an elite college announces that it will assess student applications based on applicants' race, but only during the final stage of review when most applicants are no longer in contention. Just because the admissions policy will be enforced against only some applicants does not change the fact that it applies to all applicants.  So too here.  Nor do Plaintiffs claim a right to

receive NEA grants.   Rather, they claim a right to have their applications assessed according to criteria that are not viewpoint discriminatory, and that the Final Notice violates that right. See Pls.' Reply 18.  The Court thus finds that the Final Notice is reviewable under the APA.

Relatedly, the Court finds that Plaintiffs' APA claims are ripe because the issues are fit for judicial review and Plaintiffs will face hardship if the Court withholds consideration.  See Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). Relevant to this inquiry is whether the issues are "purely legal" and whether "further factual development" is necessary.  Id. at 812.  The issues are fit for judicial review because whether the Chairperson has power to assess applications based on viewpoint-discriminatory criteria is a purely legal question.  Furthermore, Plaintiffs will face hardship if the Court withholds consideration of this question, because if it turns out the Chairperson lacks the power asserted, then Plaintiffs' applications will have been assessed according to unlawful criteria.

In summary, the Final Notice is reviewable, and Plaintiffs' APA claims are ripe.  The Court therefore considers the merits of Plaintiffs' APA claims.

**2. In Excess of Statutory Authority**

The Court finds that the Final Notice violates the APA because

the NEA's authorizing statute does not empower the Chairperson to categorically disfavor applications for promoting certain views. See 5 U.S.C. § 706(2)(C). The "command of the APA" is "that 'the reviewing court' — not the agency whose action it reviews — is to 'decide all relevant questions of law' and 'interpret . . . statutory provisions.'" Loper Bright Enters. v. Raimondo, 603 U.S. 369, 398 (2024) (omission in original) (quoting 5 U.S.C. § 706). Therefore, "in deciding whether an agency has acted within its statutory authority," courts "must exercise their independent judgment" and, in doing so, provide no deference to the agency's interpretation. Id. at 392, 412. Here, the relevant question is whether the Final Notice is inconsistent with the NEA's authorizing statute, the NFAHA.

In attempting to reconcile the Final Notice with the NFAHA, the Court can only conclude that "the NEA [has tried] to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." Finley, 524 U.S. at 587. According to the Final Notice, the Chairperson will conduct a "case-by-case review . . . of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology." AR 208. This independent assessment will occur during the final stage of the application process — after the advisory panels have determined whether certain

33

**JA565**

applications "have artistic excellence and artistic merit," and after the Council has "ma[d]e recommendations to the Chairperson concerning . . . whether to approve" those applications. 20 U.S.C. § 955(f), (f)(1); see AR 210-12.  During these earlier stages, neither the advisory panels nor the Council will consider whether proposed projects promote gender ideology; only the Chairperson will do that.  See Defs.' Mot. 33; AR 207-09, 212-14.  If the Chairperson concludes that a proposed project promotes gender ideology, the effect can only be negative.  See supra Part III.A.2.

As to what empowers the Chairperson to categorically disfavor projects that promote certain viewpoints, Defendants offer two theories.  First, the Final Notice posits that the Chairperson has statutory authority to make an independent assessment of artistic excellence and artistic merit, and that whether a project promotes gender ideology is relevant to that assessment.  See AR 210-11. Second, Defendants contend that the NFAHA empowers the Chairperson to consider whether a project aligns with "general standards of decency and respect for the diverse beliefs and values of the American public," with the implication being that a project that promotes gender ideology does not.  Defs.' Mot. 35-36 (discussing 20 U.S.C. § 954(d)(1)).

Both theories conflict with the NFAHA.  To be sure, the NFAHA affords the Chairperson some discretion over whether to approve

34

**JA566**

applications that have made it past the first two rounds of review. When exercising that discretion, the Chairperson will be assessing content.  See Finley, 524 U.S. at 585-86.  Even so, neither the statute's instruction to employ the "subjective criteria" of excellence and merit nor its "vague exhortation" to consider decency and respect for diverse beliefs — i.e., viewpoint diversity — empowers the Chairperson to adopt an explicit policy of viewpoint discrimination.  See id. at 583-84, 587.

Although the Chairperson has final approval authority over whether the NEA should fund certain projects, the NFAHA vests most of the substantive power to review those projects in the advisory panels and the Council.  And the statute constrains the discretion of those entities as well.  The Chairperson must "utilize advisory panels," which are required to recommend applications "solely on the basis of artistic excellence and artistic merit."  20 U.S.C. § 959(c).  Those recommendations go to the Council, which in turn "make[s] recommendations to the Chairperson concerning" whether to approve those application and how much funding to provide for each. Id. § 955(f)(1)-(2).  The Council cannot recommend applications to the Chairperson that have not been determined by the panels to have artistic excellence and artistic merit.  Id. § 955(f)(1). And the Chairperson "may not approve an application with respect to which the Council makes a negative recommendation."  Id.

§ 955(f)(2).   Therefore, the panels' discretion constrains the Council's discretion, which in turn constrains the Chairperson's.[9]

This multistep review process reflects the NFAHA's stated purpose of "encouraging freedom of thought," id. § 951(7), as well as a broader effort to minimize the influence of politics over the NEA's funding decisions.   See supra Part I.A (discussing NFAHA's legislative history).   Other features of the statute speak to those intentions as well.   The Chairperson is directed to "ensure that all advisory panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view."   20 U.S.C. § 959(c)(1).   Furthermore, the panels must include "lay individuals who are knowledgeable about the arts but who are not engaged in the arts as a profession and do not belong to arts organizations or artists' organizations. Id. § 959(c)(2).   Panel members are appointed by the Chairperson. Id. § 959(c)(6).

As for the Council, its eighteen voting members must be "private citizens" who are widely recognized for their involvement in the arts and include "practicing artists, civic cultural

---

[9] The statute contains one exception not relevant here, which allows the Council to delegate its authority to the Chairperson for certain applications and with significant limitations.   See 20 U.S.C. § 955(f).

JA568

leaders, members of the museum profession, and others who are professionally engaged in the arts." Id. § 955(b)(1)(C). Although appointed by the President, the Council's voting members serve staggered, six-year terms and cannot be reappointed for two years after their terms expire. Id. § 955(c). The NFAHA instructs the President to "give due regard" to different types of diversity in making the appointments. Id. § 955(b)(1)(C).

In contrast, the Chairperson has no statutorily prescribed qualifications and serves a four-year term. Id. § 954(b). This lopsidedness in the statutory scheme confirms that the NFAHA is designed to shield the NEA's review process from politics. For one, unlike the final stage of review, which is entrusted to a single person, the first two stages of review are entrusted to multimember deliberative bodies that represent cross sections of the American public. Furthermore, unlike the decision to give the Chairperson a four-year term, the fact that Congress gave the Council's voting members a staggered, six-year term with a two-year bar on reappointment suggests that it meant for them to be insulated from political influence. See Beck v. Tex. Bd. of Dental Exam'rs, 204 F.3d 629, 636 (5th Cir. 2000). And as noted above, when it comes to experience or expertise in the arts, the NFAHA contemplates a marked asymmetry between the Council and advisory panels on one side and the Chairperson on the other. This in turn

37

**JA569**

suggests that the Chairperson's role in the application review process is designed to be more formal than substantive.

Given these considerations, the Court finds it impossible to square the Final Notice with the NEA's authorizing statute. Although the NFAHA gives the Chairperson the final word over whether to approve applications for NEA grants, the Chairperson cannot use that power to downgrade applications simply because they promote disfavored views. The Court therefore finds that the Final Notice violates the APA because it exceeds the Chairperson's statutory authority under the NFAHA.

**3. Arbitrary and Capricious**

The Final Notice also violates the APA because it is arbitrary and capricious. <u>See</u> 5 U.S.C. § 706(2)(A). In determining whether final agency action is arbitrary and capricious under the APA, a reviewing court must consider "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" <u>Dep't of Com.</u>, 588 U.S. at 773 (quoting <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.</u>, 463 U.S. 29, 43 (1983)). The scope of review is narrow, and a court "may not substitute [its] judgment for that of the [agency]." <u>Id.</u> That said, final agency action may be arbitrary and capricious "if the agency has relied on factors which

38

**JA570**

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

The NEA's only explanation for its decision to categorically disfavor applications that promote gender ideology is that it will "serve the public by . . . furthering the current administration's priorities as provided in the [EO]," AR 214, which states that "[f]ederal funds shall not be used to promote gender ideology." EO § 3(g), 90 Fed. Reg. at 8616.  The administrative record — which consists of the NFAHA, "a smattering of cases," the EO, the NEA's grant application guidelines, and the Final Notice — is devoid of reasoned policy analysis and is devoted instead to defending the NEA's decision on legal grounds.  Pls.' Mem. 22; see generally AR. There is no examination of relevant data, there are no findings of fact, and there is zero explanation of what it means for a project to "promote gender ideology," let alone how that concept relates to artistic merit, artistic excellence, general standards of decency, or respect for the diverse beliefs and values of the American public.  In short, the NEA has made no effort to justify its policy on any grounds aside from complying with the EO.

**JA571**

Defendants' basic argument is that the NEA is accountable to the public and the President executes the public's will; therefore, the Final Notice cannot be arbitrary and capricious because it "reflects a policy directive that the President issued." Defs.' Mot. 37. To be sure, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." Dep't of Com., 588 U.S. at 781. But a "decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order." Louisiana v. Biden, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), vacated and remanded on other grounds, 45 F.4th 841 (5th Cir. 2022). Because the NEA has failed to explain its action outside of complying with the EO, the Court concludes that the Final Notice is arbitrary and capricious in violation of the APA.

**4. Contrary to Constitutional Right**

Finally, for the reasons discussed in Part III.A, the Final Notice is unlawful under the APA because it violates Plaintiffs' constitutional rights to free speech.

**C. Fifth Amendment Claim**

The Court finds that Defendants are entitled to summary judgment on Plaintiffs' Fifth Amendment claim. The Fifth Amendment to the U.S. Constitution prohibits deprivations of "life, liberty,

**JA572**

or property, without due process of law." U.S. Const. amend. V.
Under the void-for-vagueness doctrine, a law may violate the Fifth
Amendment if it (1) does not "provide the kind of notice that will
enable ordinary people to understand what conduct it prohibits" or
(2) "may authorize and even encourage arbitrary and discriminatory
enforcement." City of Chicago v. Morales, 527 U.S. 41, 56 (1999).

"The degree of vagueness that the Constitution tolerates — as
well as the relative importance of fair notice and fair enforcement
— depends in part on the nature of the enactment," including the
subject matter involved and the penalties at stake. Vill. of
Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498-
99 (1982). "In particular, the [Supreme] Court has 'expressed
greater tolerance of enactments with civil rather than criminal
penalties because the consequences of imprecision are
qualitatively less severe.'" Sessions v. Dimaya, 584 U.S. 148,
156 (2018) (quoting Hoffman Ests., 455 U.S. at 498-99). But
"perhaps the most important factor affecting the clarity that the
Constitution demands of a law is whether it threatens to inhibit
the exercise of constitutionally protected rights. If, for
example, the law interferes with the right of free speech or of
association, a more stringent vagueness test should apply."
Hoffman Ests., 455 U.S. at 499.

Plaintiffs contend that the Final Notice is void for vagueness

on both notice and enforcement grounds.  Regarding notice, they argue that the NEA's failure to explain what it means to "promote gender ideology" has left Plaintiffs uncertain of what exactly the Chairperson intends to disfavor.  Pls.' Mem. 25-27.  As a result, Plaintiffs have submitted applications that "steer 'far clear' of anything that might be deemed to [promote gender ideology]."  Id. at 27 (quoting Finley, 524 U.S. at 588).  Regarding enforcement, Plaintiffs argue that the Final Notice "significantly broadens the discretion of one person, the NEA Chair, exacerbating the potential for arbitrary or discriminatory enforcement."  Pls.' Reply 26; see Pls.' Mem. 29.

Notwithstanding the substantive merits of Plaintiffs' notice argument, the Court finds it unavailing because the NEA adopted the Final Notice after Plaintiffs had already submitted their grant applications.  See supra Part I.B.3-4.  Plaintiffs' enforcement argument also fails because the Final Notice does not broaden the Chairperson's discretion; rather, it specifies how the Chairperson intends to use that discretion.  To be sure, this use of discretion violates the First Amendment and the APA for the reasons discussed above, see supra Part III.A-B, and the Final Notice promises both arbitrary and discriminatory enforcement.  But that does not make the Final Notice unconstitutionally vague.  Defendants are thus entitled to summary judgment on Plaintiffs' Fifth Amendment claim.

**D. Remedy**

The Court declares that the Final Notice is unconstitutional and unlawful; vacates and sets aside the Final Notice, 5 U.S.C. § 706(2); and instructs Plaintiffs to submit an application for fees and other expenses, 28 U.S.C. § 2412(d).

In addition to vacatur of the Final Notice, Plaintiffs seek permanent injunctive relief. Am. Compl. 36-37. The Supreme Court has recently cautioned federal courts to ensure that "injunctions are [no] broader than necessary to provide complete relief to each plaintiff with standing to sue." Trump v. CASA, Inc., 606 U.S. 831, 861 (2025). The Court finds that here, complete relief requires at least that Defendants be permanently enjoined from (1) applying to Plaintiffs — including members of TCG — a viewpoint-based standard of review that disfavors applications deemed "to promote gender ideology," and (2) requiring Plaintiffs — including members of TCG — to comply with the EO when using NEA funds.[10]

---

[10] The parties dispute whether the NEA has reinstated the "certification requirement" in its "Assurance of Compliance." See Pls.' Opp'n Defs.' Cross-Mot. & Reply Supp. Mot. Summ. J. (Pls.' Reply") 17 n.15; Defs.' Reply 2-3; see also Mem. & Order 17-20. In any event, it follows that if Defendants are enjoined from disfavoring applications for federal funds that "promote gender ideology," they should be enjoined from requiring applicants to comply with an executive order stating that "[f]ederal funds shall not be used to promote gender ideology" should they receive those funds. See Exec. Order No. 14168, § 3(g), 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025).

Accordingly, the Court orders (1) and (2).  If Plaintiffs believe the injunction as stated falls short of complete relief, the Court instructs them to provide briefing on this issue within fourteen (14) days of the date of this order; Defendants will have seven (7) days to respond; and Plaintiffs will have seven (7) days to reply.

Plaintiffs are entitled to injunctive relief because they have shown "actual success on the merits" of their First Amendment claim, irreparable harm would occur absent such relief, and "the public interest would not be adversely affected by an injunction." Doe v. R.I. Interscholastic League, 137 F.4th 34, 40 (1st Cir. 2025); see Nken v. Holder, 556 U.S. 418, 435 (2009) (noting the third and fourth injunction factors "merge when the Government is the opposing party"); Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). As for the public interest factor, the Court denied Plaintiffs' earlier request for preliminary injunctive relief largely because an injunction at that time would have impeded the NEA's then-pending administrative review process. See Mem. & Order 42-44.  Because that process has since concluded, this consideration no longer applies.  And the public interest is not on the government's side when it uses a program designed to promote free expression to

44

**JA576**

squash it instead.

Finally, the scope of the injunction does not affect the broad scope of vacatur under 5 U.S.C. § 706(2). See CASA, 806 U.S. at 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action.").

**IV.   CONCLUSION**

For the reasons above, Plaintiffs' Motion for Summary Judgment, Dkt. No. 22, is GRANTED IN PART and DENIED IN PART; and Defendants' Cross-Motion for Summary Judgment, Dkt. No. 24, is DENIED IN PART and GRANTED IN PART.


IT IS SO ORDERED.

_William E. Smith_
William E. Smith
Senior District Judge
Date: September 19, 2025

45

**JA577**

**AGENCY:**

National Endowment for the Arts.

**ACTION:**

Notice.

**SUMMARY:**

In order to implement the President's Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* ("EO 14168" or "the EO"), the Chair[1] of the National Endowment for the Arts (NEA) has determined that appropriate action is needed to incorporate the EO in the NEA's grant application review process. Per the NEA Chair's authority under 20 U.S.C. § 959, the NEA publishes this explanation of its intended action to implement EO 14168.

The EO requires executive agencies to take all necessary steps, as permitted by law, to ensure that agency funds are not used to promote gender ideology. As set forth below, the NEA will implement EO 14168 on a grant-by-grant basis, in a manner that is consistent with the U.S. Constitution, the Administrative Procedure Act (APA), the NEA enabling statute 20 U.S.C. § 954, *et seq*. and its established policies and procedures regarding application review.

The statute 20 U.S.C. § 954(d)(1) confers upon the NEA Chair the discretionary authority to award a grant, or to decline to award a grant, and empowers the Chair as the final step in ensuring that each application represents "artistic excellence" and "artistic merit".[2] The NEA will adhere to Congress' direction for the Chair to judge applications on the basis of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.[3]

The Chair will continue to review grant applications based on the statutory requirements. The existing multi-tiered application review process will remain unchanged. The Chair will implement EO 14168 by evaluating projects that promote gender ideology based on the existing statutory criteria at the final stage of application review.

Applicants will not be required to certify that no federal funds are used to promote gender ideology. Thus, there is no eligibility bar to submitting an application related to promoting gender ideology. The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced. Under these criteria, there is no room for viewpoint discrimination. This implementation process is consistent with the First and Fifth Amendments as well as the APA. No applicant should suffer harm under this process, which essentially utilizes the existing statutory review scheme that the agency currently follows.

---

[1] If the position of Chair is vacant, then "Chair" will refer to such official performing the functions and duties of the Chair, in the absence of a Chair being officially appointed and confirmed.
[2] See also 20 U.S.C. § 955(f)(2).
[3] 20 U.S.C. § 954(d)(1).

**JA578**

The case-by-case review by the Chair of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology, will in general provide a significant public benefit by (1) furthering the current administration's priorities as provided in EO 14168; (2) providing more clarity to applicants on how EO 14168 is being implemented by the NEA; and (3) better informing applicants on whether and how to apply for NEA funding opportunities.

**DATES:**

The grant application review process set out in this Notice will be effective upon publication and will be applicable to all pending applications.

**FOR FURTHER INFORMATION, CONTACT:**

Ann Eilers, Deputy Chair for Management and Budget, National Endowment for the Arts, at (202) 682-5534, or by email at eilersa@arts.gov; Jennifer Lindow Eskin, Senior Advisor for Strategy, Programs, & Engagement, National Endowment for the Arts, at (202) 682-5781, or by email at eskinj@arts.gov.

**SUPPLEMENTARY INFORMATION:**

**I.    Background**

On January 20, 2025, the President issued EO 14168, "*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.*" [4]  The order addressed a broad series of priorities related to the President's concerns about gender ideology and included among other things the following provisions:

> Sec. 2(g) Federal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.
>
> Sec . 3(e) Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.
>
> Sec. 8(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

On February 6, 2025, the NEA decided to implement EO 14168 by requiring applicants to certify that "the applicant . . . understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168[. . .]."[5] On March 17, 2025, the NEA rescinded that

---

[4] Exec. Order No. 14,168, 2025 WL 327882 (Pres.): *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 FR 8615.

[5] Memorandum and Order, ECF 13, 7:2.

requirement and is issuing this memorandum to clarify its process for implementing the EO, to the extent permitted by law.[6]

This Notice outlines the NEA's grant application review standards and processes, and how it will implement EO 14168 in that review process.

## II.    Grant Application Review

### A.  Project-based Reviews

Applicants are judged based on their application materials for their proposed projects, and not any other activities they may conduct that exist beyond the four corners of their application. There are additional factors that must be considered by the NEA. For instance, an organization that has been suspended or debarred may not receive federal funds. There are also project types that are ineligible because the NEA has chosen not to fund them – for instance, construction projects or projects with significant entertainment or social activities.  Also, there are projects for which the NEA has stated a preference, such as projects supporting the work of artists and arts organizations in contributing to the health and well-being of individuals and communities.

### B.  Review Standards -- Artistic Excellence and Artistic Merit

The NEA's enabling statute provides two specific criteria in reviewing grant applications: Artistic Excellence and Artistic Merit.[7] Additionally, there is a secondary factor that is required to be considered: general standards of decency and respect for the diverse beliefs and values of the American public."[8]  The Grants for Arts Projects guidelines describe the Artistic Excellence and Artistic Merit as follows:

#### i.      Artistic Excellence.

The artistic excellence of the project includes:
- The quality of the artists and other key individuals, works of art, organizations, arts education providers, artistic partners, and/or services involved in the project.

#### ii.     Artistic Merit.

The artistic merit of the project includes:
- The value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency.
- The ability to carry out the project based on such factors as the appropriateness of the budget, clarity of the project activities, resources involved, and the qualifications of the project's personnel and/or partnerships.

---

[6] *Id.*, at 10:3-11:11.
[7] 20 U.S.C. § 954(d)(1).
[8] *Id.*

**JA580**

- Clearly defined goals and/or proposed outcomes and an appropriate plan to determine if those goals and/or outcomes are met. This includes, where relevant, measures to assess student and/or teacher learning in arts education.
- Evidence of direct compensation to artists, makers, art collectives, and/or art workers.
- As applicable: Engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

## C. Review Process

The above Artistic Excellence and Artistic Merit standard of review is implied in every phase of the review process, which is outlined below.

1. Once the application submission deadline is closed, NEA staff reviews each of the applications submitted by the deadline for completeness and other eligibility issues.
2. If NEA staff determines that an application is complete and meets all eligibility requirements, each application is reviewed by a panel of arts experts (and a layperson) under the Artistic Excellence and Artistic Merit.
3. Each application receives a score between 1 and 10 on each artistic excellence and merit criteria. The panels provide their recommendations.
4. The panel recommendations are submitted to the National Council on the Arts, which deliberates, votes on the applications before them, and proposes funding levels for the applications recommended for Chair's approval.
5. Chair reviews the Council's recommendations and has the "final authority" to approve or deny an application.[9]

## D. Chair's Discretion

The NEA's authorizing legislation, 20 U.S.C. § 954, *et seq.*, authorizes the Chair, and the Chair alone, to create the terms by which a program of grants in aid may be disbursed to organizations and individuals. Particularly, Artistic Excellence and Artistic Merit, taken together, give the Chair the discretion to award a grant, or to decline to award a grant, and situates the Chair as the final step in ensuring that each application represents "artistic excellence" and "artistic merit". Her final approval authority granted by the enabling statute is more than a mere perfunctory role. The Congress compels the Chair to either affirm or reject the Council's assessment of a project's excellence and/or merit. In exercising this authority, the Chair does so based on the particulars of each application as they relate to artistic excellence and merit. As the Court wrote in Finley, "the NEA's mandate is to make aesthetic judgments" which are "inherently content-based", and "[a]ny content-based considerations that may be taken into account are a consequence of the nature of arts funding; the NEA has limited resources to allocate among many "artistically excellent" projects, and it does so on the basis of a wide variety of subjective criteria."[10]

---

[9] 20 U.S.C. § 955(f)(2).
[10] *Natal Endowment for the Arts v. Finley*, 524 U.S. 569, 571 (1998).

**JA581**

### E. Final Decision by the Chair

#### i. Artistic Excellence and Artistic Merit

In assessing the artistic excellence and artistic merit of applications, the Chair considers among other things: the quality of the artists, works of art, organizations, arts education providers, artistic partners; the value and appropriateness of the project to the organization's mission, artistic field, artists, audience, community, and/or constituency; budget, project's clarity, resources, and project staff and partners' qualifications; clearly defined goals and/or proposed outcomes and an appropriate plan; evidence of compensation to artists; as applicable, engagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability.

#### ii. Content-based considerations recognized in *Finley*

In doing so, the Chair may make content-based judgments. The Court in *Finley* wrote that "Any content-based considerations that may be taken into account are a consequence of the nature of arts funding; the NEA has limited resources to allocate among many "artistically excellent" projects, and it does so on the basis of a wide variety of subjective criteria."[11] The *Finley* Court also noted that "[t]he agency may decide to fund particular projects for a wide variety of reasons, 'such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form.'"[12] For example, the Chair may find that despite the Council's recommendation, the contemporary relevance of a particular application or its suitability to a special audience, or that its educational value leaves something to be desired.

#### iii. Agency priorities

The NEA has historically expressed a preference for certain projects, which often reflect administration priorities. For example, the current NEA Grants for Arts Projects program guidelines encourage arts projects including activities that:

(1) Celebrate the nation's rich artistic heritage and creativity by honoring the semiquincentennial of the United States of America (America250);
(2) Originate from or are in collaboration with HBCUs, tribal colleges and universities, American Indian and Alaska Native tribes, Hispanic serving institutions, Asian American and Pacific Islander communities, and organizations that support the independence of people with disabilities;
(3) Support health and well-being of people and communities through the arts; and,
(4) Support existing and new technology-centered creatives practices across all artistic disciplines and forms.

---

[11] *Finley*, at 571.
[12] *Finley*, at 585.

### III.    Implementing EO 14168

The Chair's evaluation of projects promoting gender ideology will be to the extent practicable by law and in a manner consistent with the U.S. Constitution and federal laws and regulations, including the NEA statute, and agency policies and procedures.

To implement EO 14168, the Chair may evaluate projects promoting gender ideology in a manner consistent with the NEA's statutory framework of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public. In doing so, the Chair may consider factors including program priorities. As noted in *Finley*, assessments of Artistic Excellence and Artistic Merit may include (but are not limited to) considering "the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form."[13]

In reviewing applications, the Chair will make the decision on a grant-by-grant basis, relying on the criteria outlined in Section II above.  For example, in reviewing an application that promotes gender ideology, the Chair could consider whether or not the specific elements of that project align with general standards of decency and respect for the diverse beliefs and values of the American public, or whether those elements indicate a sufficient level of anticipated public interest in or appreciation of the project, or are likely to be suitable for or appeal to intended audiences.[14] The process does not include an eligibility bar, nor does it include a certification requirement.

### IV.    This Implementation Procedure Complies with Constitutional and APA Requirements.

### A.  This Implementation Process Complies with the First Amendment.

### i.  NEA Grantmaking Constitutes Government Speech.

The NEA's grantmaking decisions constitute a form of government speech and therefore are not subject to scrutiny under the Free Speech Clause of the First Amendment.[15]  NEA grantmaking constitutes government speech in accordance with the three-factor test outlined in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), following the decision in *Pleasant Grove City v. Summum.*[16]

First, the history of the expression indicates that the NEA is communicating a message: namely that the project receiving federal support meets the highest standards of Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse

---

[13] *Finley*, at 585.
[14] Id.
[15] *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209 (2015).
[16] *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 129 S. Ct. 1125 (2009).

**JA583**

beliefs and values of the American public.[17]  In creating the NEA, Congress did not intend for the Government to fund "art for art's sake", but rather art that serves a public purpose, including "to achieve a better understanding of the past, a better analysis of the present, and a better view of the future", to enable and support projects "which have substantial national or international artistic and cultural significance", and to "[foster] mutual respect for the diverse beliefs and values of all persons and groups".[18]  Congress recognized in the NEA's enabling legislation that "[p]ublic funding of the arts and humanities is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines."[19]

Second, NEA-funded projects "are often closely identified in the public mind with the [Government]."[20]  NEA-funded projects are required to credit the NEA and to include the NEA logo on project websites and promotional materials, making it likely to convey that the Government endorses the Artistic Excellence and Artistic Merit of the project.[21]  It is reasonable for the public to conclude that taxpayer-funded projects are closely identified with the Government, and that the Government is conveying a message that these projects exemplify artistic excellence and merit and respect for the diverse values of Americans, and are an appropriate use of taxpayer resources.

Third, the NEA maintains control, including through exercising final approval authority over the projects NEA funds, through a highly selective process.[22]  NEA's project selection is therefore a form of Government speech.

### ii.  This Implementation Process Does Not Include Viewpoint Discrimination.

Even if NEA-funded projects constitute private speech, the NEA will not impose an eligibility bar and will not engage in viewpoint discrimination. Per the NEA's statutory criteria, applications will be judged based upon Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.[23]

As noted in *Finley*, the NEA has limited resources and "must deny the majority of the grant applications that it receives, including many that propose "artistically excellent projects.  The agency may decide to fund particular projects for a wide variety of reasons, 'such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form.'"[24]

---

[17] 20 U.S.C. § 954 (d)(1).
[18] 20 U.S.C. § 951 (3) and (6); 20 U.S.C. § 954 (c)(1).
[19] 20 U.S.C. § 951 (5).
[20] *Walker*, at 211.
[21] *Walker*, at 211; *Summum*, at 472.
[22] *Walker*, at 210; *Summum*, at 473.
[23] 20 U.S.C. § 951(d)(1).
[24] *Finley*, at 585.

In the context of these decisions, "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake."  NEA legislation mandates that "[p]ublic funds … must ultimately serve a public purpose the Congress defines", and the Court held in *Finley* that "Congress may 'selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.'  In doing so, 'the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.'"[25]

## B.  This Implementation Process Complies with the Fifth Amendment.

The NEA's implementation of EO 14168 does not include the enactment of any rules or requirements that are unconstitutionally vague under the Fifth Amendment.  It does not include a certification requirement and therefore does not subject applicants to potential criminal penalties for making false statements.[26]  This process does not include a bar to eligibility.  Instead, the NEA will consider projects promoting gender ideology in a manner consistent with the NEA's statutory framework of Artistic Excellence and Artistic Merit.  The Court in *Finley* established that this framework is not constitutionally vague, writing that "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."[27]

## C.  This Implementation Process Complies with the Administrative Procedure Act.

The NEA's implementation of EO 14168 does not include any agency actions that would violate the Administrative Procedure Act for exceeding the NEA's statutory authority, being arbitrary and capricious, or being contrary to a constitutional right.  The NEA is not instituting an eligibility bar, nor is it mandating a certification requirement.  Instead, the NEA will consider projects promoting gender ideology in a manner consistent with the NEA's existing statutory framework of Artistic Excellence and Artistic Merit.

## V.   Other Considerations in the Review Process

The case-by-case review by the Chair of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology, seeks to serve the public by (1) furthering the current administration's priorities as provided in EO 14168; (2) providing more clarity to applicants on how EO 14168 is being implemented by the NEA; and (3) better informing applicants on whether and how to apply for NEA funding opportunities. Alternatively, a decision to not establish an implementation process would adversely affect the ability of the NEA to comply with the President's mandates and Administration priorities.  A decision to establish a different implementation process, such as subjecting applications with proposed projects promoting gender ideology to a different review standard and process, or establishing an eligibility bar, would adversely affect applicants and the NEA's ability to implement the EO in a manner consistent with its enabling statute, the Constitution, and the APA.

---

[25] *Finley*, at 587-8.
[26] *Bella Lewitzky Dance Found. v. Frohnmayer,* 754 F. Supp. 774, 781 (C.D. Cal. 1991), in which the finding of unconstitutional vagueness was the result of a certification requirement.
[27] *Finley*, at 589.

JA585

**VI.    Regulatory Requirements: Administrative Procedure Act (APA)**

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation. The NEA is merely adopting a general statement of policy, i.e., a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[28] As section 20 U.S.C. § 951 provides, final application review decisions are made by the Chairman of the NEA "in their discretion." This Notice clarifies the NEA's process for implementing EO 14168 to the extent permitted by law.  In clarifying that applications for projects that promote gender ideology will be considered within the NEA's existing statutory framework, the NEA is not instituting a legislative rule that would be subject to requirements for notice-and-comment rulemaking and a delayed effective date.

**VII.    Termination and No Private Rights**

The Chair retains the sole discretion to terminate this grant application review process at any point. This process is being implemented as a matter of the Chair's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

Mary Anne Carter
Senior Advisor
National Endowment for the Arts

April 16, 2025

Amended April 30, 2025 to correct contact information.

---

[28] *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979).

**UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF RHODE ISLAND**


RHODE ISLAND LATINO ARTS, ET AL.

     Plaintiffs,

     v.                                        1:25-cv-00079-WES

NATIONAL ENDOWMENT FOR THE ARTS,
ET AL.

     Defendants.

### JUDGMENT

     This action came to be heard before the Court and a decision has been rendered. Upon consideration whereof, it is now hereby ordered, adjudged, and decreed as follows:

     Pursuant to Fed. R. Civ. P. 58, judgment is hereby entered in accordance with the Court's Memorandum and Order of September 19, 2025.

     It is so ordered.


September 19, 2025              By the Court:

                               /s/ Hanorah Tyer-Witek
                               Clerk of Court

**JA587**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

RHODE ISLAND LATINO ARTS, *et al.*,

      Plaintiffs,

   *v.*

NATIONAL ENDOWMENT FOR THE ARTS, *et al.*,

      Defendants.

Civil Action
No. 25-cv-79-WES-PAS

**NOTICE OF APPEAL**

Notice is hereby given that the United States of America, on behalf of all Defendants, appeals to the United States Court of Appeals for the First Circuit from the final judgment that the district court (Smith, J.) entered in favor of the Plaintiffs on September 19, 2020 (ECF No. 35).

Dated: November 17, 2025

Respectfully submitted,

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,

By their Attorneys

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
kevin.bolan@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on November 17, 2025, I filed this document and its attachments through the Court's ECF system, thereby electronically serving all parties of record in this action.

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant United States Attorney