# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

RHODE ISLAND LATINO ARTS; NATIONAL QUEER THEATER; THE THEATER OFFENSIVE; THEATRE COMMUNICATIONS GROUP,

*Plaintiffs-Appellees,*

v.

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in the Official Capacity as Acting Chair of the National Endowment for the Arts,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Rhode Island
No. 0:25-cv-00079-WES-PAS

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

RONALD G. LONDON
D GILL SPERLEIN
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
ronnie.london@fire.org
gill.sperlein@fire.org
(215) 717-3473

Counsel for *Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), counsel for *amicus curiae* certifies that (1) *amicus* does not have any parent corporations; and (2) no publicly held corporations hold 10 percent or more of the stock or of any ownership interest in *amicus*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ................................................. iii

INTEREST OF *AMICUS CURIAE* ................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................2

ARGUMENT ........................................................6

I.    Projects Funded by the NEA Are Not Government Speech. ...........7

    A.    The NEA has not historically funded projects to communicate government messages. .....................................8

    B.    The Public Does Not Perceive Projects Funded by the NEA as Government Speech. ................................................12

    C.    The NEA Does Not Control the Speech of Its Grant Recipients. ...........................................................14

    D.    The NEA's approval of a project does not convert the artist's speech into the government's own. ...........................18

II.   The NEA's Plan to Implement Executive Order 14168 by Suppressing Disfavored Viewpoints Violates the First Amendment. ..................................................20

    A.    The NEA's plan for implementing Executive Order 14168 is impermissibly viewpoint based. ...........................21

    B.    The First Amendment bars the government from discriminating based on viewpoint when funding private speech. .......................................................23

III.  The NEA's Implementation of the EO is an Unconstitutional Condition. ..................................................29

CONCLUSION ............................................................35

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ........................................................................29, 32

*Arkansas Ed. Television Comm'n v. Forbes,*
523 U.S. 666 (1998) ........................................................................27

*Arkansas Writers' Project, Inc. v. Ragland,*
481 U.S. 221 (1987) ........................................................................25

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,*
473 U.S. 788 (1985) ........................................................................21

*FCC v. League of Women Voters of Cal.,*
468 U.S. 364 (1984) ........................................................5, 14, 27, 33

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ........................................................20, 26, 28

*Joseph Burstyn, Inc. v. Wilson,*
343 U.S. 495 (1952) ........................................................................3

*Kaplan v. California,*
413 U.S. 115 (1973) ........................................................................3

*Leathers v. Medlock,*
499 U.S. 439 (1991) ........................................................................25

*Legal Servs. Corp. v. Velazquez,*
531 U.S. 533 (2001) ........................................3–5, 7, 18, 26, 27, 33

*Matal v. Tam,*
582 U.S. 218 (2017) ........................................2, 11, 20–22, 26, 28

*Nat'l Endowment for the Arts v. Finley,*
524 U.S. 569 (1998) ........................................4–6, 22–26, 28

*Nat'l Pub. Radio, Inc. v. Trump,*
No. 25-cv-1674 (RDM), 2026 WL 877434 (D.D.C. Mar. 31, 2026) .........5

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ...................................................................5

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ...............................................2, 5, 29, 30

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ..................................4, 6, 7, 13–15, 17

*Regan v. Taxation With Representation of Wash.*,
   461 U.S. 540 (1983) ......................................................4, 24, 34

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .................................................4, 5, 20, 28

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ...............................................................33, 34

*Rutan v. Republican Party of Ill.*,
   497 U.S. 62 (1990) ................................................................31

*Schad v. Borough of Mount Ephraim*,
   452 U.S. 61 (1981) ..................................................................3

*Shurtleff v. City of Boston*,
   596 U.S. 243 (2022) ............................................................7, 8

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991) ...............................................................25

*Speiser v. Randall*,
   357 U.S. 513 (1958) ........................................................30, 32

*Texas v. Johnson*,
   491 U.S. 397 (1989 ..................................................................3

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ..................................................................7

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) .......................................................8, 14, 17

*W. Va. State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ..............................................................................7

**Statutes**

20 U.S.C. § 951 .......................................................4, 9, 11, 12, 14, 34

20 U.S.C. § 954 ...................................................................................12

42 U.S.C. § 2996 .................................................................................27

Pub. L. 96–297, July 1, 1980, 94 Stat 827 ..............................................16

**Regulations**

90 Fed. Reg.  8615, 8616 (Jan. 20, 2025) .......................................6, 20, 21

**Other Authorities**

Defending Women from Gender Ideology Extremism and
  Restoring Biological Truth to Federal Government,
  Exec. Order No. 14168 ..................................6, 7, 20–22, 25, 29, 30, 32

*Grant Announcement—FY 2025*, Nat'l Endowment for the Arts ...........13

*Grants for Art Projects*, Nat'l Endowment for the Arts............................9

*Grants*, Nat'l Endowment for the Arts..................................................10

*History of the Vietnam Veterans Memorial: The Inspiration,*
  Vietnam Veterans Mem'l Fund ...........................................................16

J. Scruggs and J. Swerdlow, *To Heal a Nation: The Vietnam
  Veterans Memorial* (1985)...................................................................16

Nat'l Endowment for the Arts, *Annual Report 1981* (1981) .............15, 16

Nat'l Endowment for the Arts, *National Endowment for the Arts:
  A History, 1965–2008* (Mark Bauerlein ed., 2009) ..............................11

*Timeline of NEA Highlights: 1968*, Nat'l Endowment for the Arts........10

*Timeline of NEA Highlights: 1980*, Nat'l Endowment for the Arts........10

*Timeline of NEA Highlights: 1981*, Nat'l Endowment for the Arts........15

*Timeline of NEA Highlights: 1994*, Nat'l Endowment for the Arts........10

**INTEREST OF *AMICUS CURIAE*[1]**

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to the speakers' views through public advocacy, strategic litigation, and *amicus curiae* filings in cases implicating expressive rights. *See, e.g.*, *Stanford Daily Publ'g Corp. v. Rubio*, 820 F. Supp. 3d 974 (N.D. Cal. 2026) (counsel for Plaintiffs); *Reges v. Cauce*, 162 F.4th 979 (9th Cir. 2025) (counsel for Plaintiff); *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025) (counsel for Plaintiffs).

FIRE regularly participates as *amicus* in this Circuit in furtherance of its nonpartisan defense of freedom of expression. *See, e.g.*, Brief for FIRE as *Amicus Curiae* Supporting Plaintiffs-Appellants, *Fellers v. Kelley*, No. 25-1442 (1st Cir. Jul. 1, 2025); Brief for First Amend. Lawyers Assoc., FIRE, *et al.*, as *Amici Curiae* Supporting Plaintiffs-Appellants,

---

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to filing of this brief.

*Grant v. Trial Ct. of Mass.*, 137 F.4th 1 (1st Cir. 2025) (No. 25-1380); Brief for FIRE as *Amicus Curiae* Supporting Neither Party, *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297 (D. Mass. 2024) (No. 24-10092). And FIRE routinely participates as *amicus* in cases that threaten to expand the government-speech doctrine at the expense of individual freedom. *See*, *e.g.*, Brief for FIRE Supporting Petitioners, *Little v. Llano County*, No. 25-284 (U.S. Oct. 7, 2025); Brief for FIRE as *Amicus Curiae* Supporting Plaintiffs-Appellees, *Penguin Random House v. Gibson*, No. 25-13181 (11th Cir. Feb. 17, 2026).

FIRE files this brief to caution that the government-speech doctrine "is susceptible to dangerous misuse," *Matal v. Tam*, 582 U.S. 218, 235 (2017), and to emphasize that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Because the National Endowment for the Arts (NEA) funds private—not government—speech, it may not exclude applicants who express disfavored ideas. It is "fundamental" that "the First Amendment

was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) (citation modified) (internal citation omitted). Art "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). There is no doubt "pictures, films, paintings, drawings, and engravings ... have First Amendment protection," *Kaplan v. California*, 413 U.S. 115, 119–20 (1973), as do "motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). And the government may not suppress any form of expression, including art, "simply because society finds [it] offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

These principles apply with full force when the government supports expressive activity through funding or by creating institutions dedicated to dissemination of ideas, like libraries or museums. Congress created the NEA to foster artistic expression by artists and arts

organizations. 20 U.S.C. § 951. It does not author the works it funds, dictate its content, or deliver a government message. Rather, it supports the creation of private expression.

Although the government generally has no obligation to subsidize private speech in this way, once it elects to do so, it remains bound by constitutional limits. Except in the narrow circumstance where the government is itself speaking, *see Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009), it may not use public funding to disfavor viewpoints or condition benefits on the surrender of constitutional rights. *See Velazquez*, 531 U.S. at 548–49; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995) (rejecting viewpoint discrimination in funding for student organizations where "the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers").

As the Supreme Court has repeatedly reinforced, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 548 (1983)). When Congress established a system of public

broadcasting, it could not condition funding on the surrender of editorial independence. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 382 (1984). When it funded legal services for the poor, it could not prohibit recipients from challenging welfare laws. *Velazquez*, 531 U.S. at 548–49. And when the government establishes institutions to facilitate the exchange of ideas, public officials may not manipulate them to impose partisan orthodoxy. *Finley*, 524 U.S. at 587; *see also Rosenberger*, 515 U.S. at 834.

These cases reflect the broader constitutional principle that "even though a person has no 'right' to a valuable governmental benefit … there are some reasons upon which the government may not rely" in granting or withholding it. *Sindermann*, 408 U.S. at 597. As one court recently observed, "the First Amendment draws a line, which the government may not cross, at efforts to use government power—including the power of the purse—'to punish or suppress disfavored expression.'" *Nat'l Pub. Radio, Inc. v. Trump*, No. 25-cv-1674 (RDM), 2026 WL 877434, at *1 (D.D.C. Mar. 31, 2026) (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024)). Here, the NEA's Final Notice, ADD.46, (Notice) crosses that line by leveraging grants to suppress disfavored expression in

implementing President Trump's Executive Order prohibiting the use of federal funds to promote gender ideology. Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government, Exec. Order No. 14168, § 3(g), 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025), JA319 (EO).

The First Amendment question presented in this case is straightforward: whether the government may use a federal arts-funding program to disadvantage artistic expression because of its viewpoint. Under longstanding First Amendment principles, the answer is no. The Court should affirm the district court's judgment.

## ARGUMENT

The law is clear: When the government funds private expressive activity, it may not condition funding in a viewpoint discriminatory manner. *Finley*, 524 U.S. at 587. Defendants try to avoid this longstanding precedent by invoking the government-speech doctrine, AOB 31–33, but NEA-funded projects do not meet the Supreme Court's criteria for government speech. *See Pleasant Grove*, 555 U.S. at 467. The NEA's implementation of the EO leads to the inevitable result that projects like those proposed by Plaintiffs-Appellees that "promote[] and

6

affirm[] the lived experiences of transgender and nonbinary people" JA10, will not receive NEA funding. The implementation of the EO therefore violates a fundamental First Amendment principal: The government cannot punish speech based on viewpoint. *Velazquez*, 531 U.S. at 548–49; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–43 (1994).

## I.     Projects Funded by the NEA Are Not Government Speech.

History, public perception, and the limited degree of governmental control over NEA-subsidized projects confirm that NEA grants fund private expression, not government speech. *See Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). This distinction matters. It is a "fixed star in our constitutional constellation" that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), though at the same time, the government is empowered to espouse its own messages, and such "government speech is not restricted by the Free Speech Clause." *Pleasant Grove City*, 555 U.S. at 469.

Although the line between government and private speech "can blur" in some publicly funded programs, *Shurtleff*, 596 U.S. at 252, the Supreme Court applies a "holistic inquiry" to distinguish government speech from private expression that considers: (1) the history of the expression at issue; (2) the public's likely perception of the speaker; and (3) the extent to which the government has shaped or controlled the expression. *Id.*; *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–10 (2015). Those considerations establish that NEA grants operate to fund private expression, not government speech, and accordingly are subject to First Amendment limits.

### A. The NEA has not historically funded projects to communicate government messages.

The NEA's history does not support its government speech argument because, since its inception, the NEA's grant program has existed to foster, not control, intellectual and cultural production. Congress created the National Endowments for the Arts and Humanities to encourage artists to express themselves though art,[2] whether it be

---

[2] The National Endowment on the Arts and the Humanities Foundation serves as an umbrella for the NEA and the National

music, dance, or the visual arts, declaring that "[t]he arts and the humanities belong to all the people of the United States," 20 U.S.C. § 951(1), and provide federal support to "complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations." 20 U.S.C. § 951(5). That Congress historically intended for the NEA to encourage private artistic expression rather than fund government messaging is clear in the law. It explicitly acknowledges "no government can call a great artist or scholar into existence" but may instead foster "a climate encouraging freedom of thought, imagination, and inquiry" and provide "the material conditions facilitating the release of this creative talent." *Id.* § 951(7).

The NEA's unambiguous purpose finds reinforcement in practice. Through its Grants for the Arts Projects (GAP),[3] the NEA provides funds

---

Endowment for the Humanities, which operate as independent agencies. 20 U.S.C.A. § 951, *et seq.*

[3] *Grants for Art Projects*, Nat'l Endowment for the Arts, https://www.arts.gov/grants/grants-for-arts-projects [https://perma.cc/Q4DH-GF3D].

for a wide array of projects in multiple disciplines.[4] In addition, NEA

funding has fostered the creation of art by underwriting support

structures.

For example, it issued a grant to help develop the Westbeth

building to provide artists housing and other services in New York's

Greenwich Village,[5] and a grant to support the Joyce Theater, one of the

world's foremost dance venues.[6] Other programs support artistic

research and education such as the Wolf Trap Foundation for the

Performing Arts, which the NEA funded to study how preschoolers learn

through the arts.[7] If funding from the NEA makes these numerous and

---

[4] Plaintiffs seek funding under the NEA's GAP, JA 21–23, but the NEA also supports the arts through a wide array of other funding programs. *Grants*, Nat'l Endowment for the Arts, https://www.arts.gov/grants [https://perma.cc/3SRX-BG57].

[5] *Timeline of NEA Highlights: 1968*, Nat'l Endowment for the Arts, https://www.arts.gov/timeline/1960s/1968 [https://perma.cc/CMP2-Y4ZR].

[6] *Timeline of NEA Highlights: 1980*, Nat'l Endowment for the Arts, https://www.arts.gov/timeline/1980s/1980 [https://perma.cc/VWH9-AG89].

[7] *Timeline of NEA Highlights: 1994*, Nat'l Endowment for the Arts, https://www.arts.gov/timeline/1990s/1994 [https://perma.cc/RSD9-6SXN].

varied projects government speech, "the Federal Government is babbling prodigiously and incoherently" rather than conveying a government message. *Tam*, 582 U.S. at 219.

But the government never intended NEA-funded projects to constitute government speech. Contrasting the NEA to earlier New Deal programs, the NEA wrote in 2009 that "the Arts Endowment was created neither to provide work for the unemployed *nor to deliver a political message.*" Nat'l Endowment for the Arts, *National Endowment for the Arts: A History, 1965–2008* 1 (Mark Bauerlein ed., 2009) (emphasis added).[8] "Neither the Arts Endowment nor the artists or arts administrators who advised the agency over the past four decades have sought to align the NEA with a sociopolitical agenda." *Id.* at 2. Even Defendants-Appellants acknowledge in their opening brief that the "purposes of the [NEA] include Congress's objective to fund art that reflects the 'rich cultural heritage' of the United States," AOB at 18 (citing 20 U.S.C. § 951(6)), not to voice government-approved messages.

---

[8] https://www.arts.gov/sites/default/files/nea-history-1965-2008.pdf [https://perma.cc/N4R5-ZSSM]

Nothing in the NEA's decades-long history suggests an intention that the agency serve as a bully pulpit or that its funding be used to deliver government speech through its funded projects.

**B.    The Public Does Not Perceive Projects Funded by the NEA as Government Speech.**

Given the purpose of NEA grants, the composition projects those grants fund, and the relationship between the NEA and grant recipients, the public is unlikely to perceive NEA funded projects as government speech. Thus, Defendants-Appellants cannot demonstrate the second factor necessary to establish government speech—public perception. Congress designed the NEA grant program to enable groups and individuals "to provide or support … projects and productions that will encourage and assist artists and enable them to achieve wider distribution of their works, to work in residence at an educational or cultural institution, or to achieve standards of professional excellence," 20 U.S.C. § 954(c)(3), and to "facilitat[e] the release of … creative talent." 20 U.S.C. § 951(7). None of these stated purposes reflect an intention to convey a government message, nor is the public likely to perceive one.

Moreover, NEA-supported projects are only partially funded by the government, JA64, review criteria are limited to artistic excellence and

artistic merit, JA69, and the relationship between the NEA and the funded organizations is generally temporally limited. JA83 ("The NEA generally allows a period of performance of up to two years."). Review of projects funded for FY2025 suggests they typically do not permanently reside on federal land, and are often ephemeral and abstract, such as dance, music, and theater.[9] And the NEA does not take ownership of NEA-funded projects. Grant recipients retain the right to register copyrights for material developed during an NEA-funded project. JA200. It is difficult to imagine how the public would perceive such projects to be government speech.

Because the federal government does not control NEA-supported projects, the public is unlikely to associate them with the government. This distinguishes NEA-supported art from monuments the government selects for permanent display in public parks, "closely identified in the public mind with the government unit that owns the land," *Pleasant Grove,* 555 U.S. at 472, or license plates that "serv[e] the governmental

---

[9] *Grant Announcement—FY 2025*, Nat'l Endowment for the Arts, https://www.arts.gov/sites/default/files/Fall2024_DisciplineListReport.pdf [https://perma.cc/P2KQ-CGPR].

purposes of vehicle registration and identification." *Walker*, 576 U.S. at 212. The degree of control exercised by the government in those contexts is absent for NEA grant recipients—by design.

**C.    The NEA Does Not Control the Speech of Its Grant Recipients.**

Nor can the NEA demonstrate that it exercises the type of control necessary to transform funded projects from private expression to government speech. Rather, Congress explicitly declined to control the messages of NEA-funded projects in order to achieve its stated objective of creating "material conditions facilitating the release of … creative talent." 20 U.S.C. § 951(7). This is comparable to the way Congress ceded control over public broadcasting to fulfill the Corporation for Public Broadcasting's mission of creating alternative viewpoints and promoting independent editorial judgment. *See League of Women Voters of Cal.*, 468 U.S. at 367–69.

It is instructive that in *Pleasant Grove*, the Supreme Court clarified why control over "[p]ermanent monuments displayed on public property" means they "typically represent government speech" rather than expression subject to First Amendment scrutiny. *Pleasant Grove*, 555 U.S. at 470. As the Court explained, "[a]cross the country, 'municipalities

14

generally exercise editorial control over donated monuments through prior submission requirements, design input, requested modifications, written criteria, and legislative approvals of specific content proposals.'" *Id*. at 472 (internal citation omitted). Not only is such control absent from NEA grants, it is antithetical to the program's purpose of fostering private artistic expression and thus explicitly disclaimed by required disclosures.

The National Vietnam Memorial illustrates the distinction between government funding of private speech and the government speaking on its own behalf. In 1981, the NEA approved a request from the Vietnam Veterans Memorial Fund (VVMF) to partially fund a competition to select the design team for the memorial.[10] In a blind selection process, an independent committee selected graduate student Maya Lin's design for the memorial. The NEA announced the award supporting the design selection competition in its annual report which included a statement

_____

[10] *Timeline of NEA Highlights: 1981*, Nat'l Endowment for the Arts, https://www.arts.gov/timeline/1980s/1981 [https://perma.cc/ZE58-EUWP]; *Annual Report 1981*, Nat'l Endowment for the Arts, https://www.arts.gov/sites/default/files/NEA-Annual-Report-1981.pdf [https://perma.cc/BU49-EPF8].

that the NEA's "role is to respond to the needs of the field rather than direct or interfere in the creative activities of individual artists or cultural organizations." Nat'l Endowment for the Arts, *Annual Report 1981*, at 4 (1981). The NEA contributed funds for the design competition but did not control the design of the memorial or its message. Thus, the NEA's funding of the selection process constituted government funding for private expression, not the government speaking for itself.

But factors other than NEA funding ultimately contributed to making the National Vietnam Memorial government rather than private speech. The VVMF solicited Congress to provide two acres of land for the memorial on the National Mall, and Congress did so. *See* Pub. L. 96–297, July 1, 1980, 94 Stat 827.[11] As part of that process, Congress imposed "submission requirements, design input, requested modifications, written criteria, and legislative approvals of specific content proposals,"—the type of activities the Court identified as indicia of

---

[11] *See also History of the Vietnam Veterans Memorial: The Inspiration*, Vietnam Veterans Mem'l Fund, https://www.vvmf.org/About-The-Wall/history-of-the-vietnam-veterans-memorial [https://perma.cc/79LY-VKS8]; J. Scruggs and J. Swerdlow, *To Heal a Nation: The Vietnam Veterans Memorial* (1985).

government control in *Pleasant Grove*, 555 U.S. at 472. The resulting permanent memorial constructed on federal land and subject to government control is an example of government speech.

The contrast between the NEA's role in funding the Vietnam Veterans Memorial design competition and the federal government's role in approving and constructing the memorial as a permanent installation on federal land illustrates why NEA funding alone does not convert private expression into government speech. The NEA neither selected the message nor dictated the artistic choices of the designer; it merely supplied resources to facilitate her independent expression. Only when the government exercised authority over the memorial's content, design, and placement on federal land did indicia of government speech emerge.

Recipients of the NEA grants at issue here, conversely, retain control over the expressive content of their work, while the agency's role is limited to identifying projects that merit public support. Because the NEA does not exercise the type of editorial authority, content control, or final approval power that characterized the government action in *Pleasant Grove* and *Walker*, the speech of NEA grant recipients remains

17

private speech subject to First Amendment limits on government oversight and restrictions.

### D. The NEA's approval of a project does not convert the artist's speech into the government's own.

The NEA's principal argument that its grant awards communicate its view that funded projects possess artistic merit and excellence worthy of public support, rendering them government speech, confuses governmental approval of a project with governmental endorsement of its message. AOB at 31. *Every* grant program necessarily communicates that the government considers a funded project worthy of support, but that does not transform the recipient's speech into the government's own. To hold otherwise would collapse the distinction between government funding and government speech and improperly allow the government to evade First Amendment constraints whenever it subsidizes private expression. *See Velazquez*, 531 U.S. at 547 ("Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.").

As the district court correctly recognized, the relevant speech is the artwork NEA grant recipients produce—not the agency decision to fund the work. Order, fn. 4, ADD.15. ("In this case, the relevant act of

participation is the production of art that is funded by the NEA. It is therefore the art—not the NEA's decision to fund the art—that is the proper focus of the Court's government speech inquiry."). The NEA neither creates nor controls the messages conveyed by funded works, so its approval of a project cannot convert the artist's expression into government speech. "[T]he government can endorse a project as good art without further endorsing all the messages or viewpoints it conveys. In short, the government may speak for itself when it approves an artist's work, but that does not mean the artist speaks for the government when it produces that work." Order, ADD.23–24.

****

For all these reasons, the government-speech doctrine provides no basis for exempting the NEA's grant program from First Amendment scrutiny. The Supreme Court has repeatedly distinguished between the government's decision to fund private expression and the government's decision to speak for itself. The NEA's theory would erase that distinction, converting countless recipients of public grants into instruments of government speech despite an absence of government authorship, editorial control, or responsibility for the messages conveyed.

Neither government-speech cases nor common sense support such a result.

## II. The NEA's Plan to Implement Executive Order 14168 by Suppressing Disfavored Viewpoints Violates the First Amendment.

The NEA's plan to implement Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government, Exec. Order No. 14168, § 3(g), 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025), JA319 ("the EO"), violates the fundamental First Amendment tenet that "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). Any such regulation "found to discriminate based on viewpoint" is "an 'egregious form of content discrimination,' which is 'presumptively unconstitutional.'" *Tam*, 582 U.S. at 248 (Sotomayor, J., concurring) (quoting *Rosenberger*, 515 U.S. at 829–830). That includes the NEA's Notice implementing the EO vacated below, and the standards and commands NEA imposed to implement the EO that the district court enjoined.

**A.   The NEA's plan for implementing Executive Order 14168 is impermissibly viewpoint based.**

The NEA's implementation of the EO's requirements that "[f]ederal funds shall not be used to promote gender ideology," and that each agency must "assess grant conditions and grantee preferences" toward that end, is unconstitutionally viewpoint based on its face. EO at § 3(g), 90 Fed. Reg. 8615, 8616; JA319. "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Tam*, 582 U.S. at 248 (Sotomayor, J., concurring) (citing *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Yet the NEA's Notice describes a policy in which applications for projects that "promote" gender ideology are disfavored and less likely to receive NEA funding. ADD.46.

"The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Tam*, 582 U.S. at 249 (Sotomayor, J., concurring). As in *Tam*, by mandating—or, in this case, prohibiting—

21

positivity regarding certain gender ideologies, "the law here might silence dissent and distort the marketplace of ideas." *Id.*

The NEA attempts to obscure the policy's viewpoint-focused purpose by invoking the general considerations allowed in *Finley*, where the Court held the NEA was required to "take 'decency and respect' into consideration" but not to treat them as viewpoint-based determinative factors. 524 U.S. at 582. In doing so, the Court considered a legislative record indicating that "Congress declined to disallow any particular viewpoints" and thus did not intend to require NEA rejection of grant applications based on viewpoint. *Id.* This stands in stark contrast to President Trump's EO that the NEA is implementing here, which explicitly states "[f]ederal funds shall not be used to promote gender ideology" and requires "[e]ach agency [to] assess grant conditions and grantee preferences [to] ensure grant funds do not promote gender ideology." EO, § 3(g); JA319.

If anything, the government here implicitly embraces the policy's viewpoint-based focus in its government-speech argument that it "need not be viewpoint neutral in expressing its own views." AOB at 16. While the Constitution may allow the government to discriminate based on

viewpoint when it speaks on its own behalf, NEA grants do not fund the government's "own views" as already shown (*see supra* § I), and the First Amendment bars viewpoint discrimination when the government funds private expression, as it does with the NEA's various grant programs.

**B.    The First Amendment bars the government from discriminating based on viewpoint when funding private speech.**

The government overreads the Supreme Court's decision in *Finley* in seeking to support the NEA's viewpoint-based mandate. The Supreme Court held in *Finley* that a policy requiring NEA funding decisions to consider "general standards of decency and respect for the diverse beliefs and values of the American public" did not violate the First Amendment, because it "merely add[ed] some imprecise considerations to an already subjective selection process." *Finley*, 524 U.S. at 572, 590. But the NEA's claim here that this means "the government can generally choose what to fund without regard to principles of viewpoint neutrality that apply in other contexts," AOB 16 (citing *Finley*, 524 U.S. at 587–88), seriously misreads the case.

The NEA focuses on a sentence in *Finley* (commencing section II-B of the opinion) which says that "although the First Amendment certainly

has application in the subsidy context … the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Finley*, 524 U.S. at 587. As a threshold matter, even standing alone, this does not suggest the NEA can make funding decisions *based on viewpoint*. And the rest of *Finley* makes that perfectly clear.

In fact, the paragraph immediately preceding the language that NEA quotes unequivocally holds that it may not make funding decisions based on viewpoint. As the Court stressed, "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria *into a penalty on disfavored viewpoints*, then we would confront a different case" because the Court has stated that, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Id.* (emphasis added) (quoting *Regan,* 461 U.S. at 448).

Thus, far from supporting the government's position, *Finley* makes clear that although the government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake, it may not allocate funds based on viewpoint. *Id.* ("[I]f a subsidy were 'manipulated' to have a 'coercive

effect,' then relief could be appropriate.") (citing *Arkansas Writers'*

*Project, Inc. v. Ragland,* 481 U.S. 221, 237 (1987) (Scalia, J., dissenting));

*Leathers v. Medlock,* 499 U.S. 439, 447 (1991) ("[D]ifferential taxation of

First Amendment speakers is constitutionally suspect when it threatens

to suppress the expression of particular ideas or viewpoints"). As the

Court explained, "a more pressing constitutional question would arise if

Government funding resulted in the imposition of a disproportionate

burden calculated to drive 'certain ideas or viewpoints from the

marketplace.'" *Finley*, 524 U.S. at 587 (quoting *Simon & Schuster, Inc. v.*

*Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 116 (1991)).

The NEA's policy implementing the EO, which requires agencies to

"remove all statements, policies, regulations, forms, communications, or

other internal and external messages that promote or otherwise inculcate

gender ideology" does precisely that. *See* EO §3(e) at 8618, JA 319. The

Notice acknowledges that "[t]he EO requires executive agencies to take

all necessary steps, as permitted by law, to ensure that agency funds are

not used to promote gender ideology," thus recognizing that it requires

the NEA to use grant funding to suppress disfavored ideas. ADD.46. And

that is precisely what *Finley*—and the First Amendment—expressly forbid.

Contrary to the government's suggestion, *Finley* did not broadly declare that the NEA's funding decisions are entirely immune from First Amendment scrutiny. Instead, the Court emphasized the unique nature of the NEA's mandate, which involves aesthetic judgments based on subjective criteria of artistic excellence, while making clear "the First Amendment certainly has application in the subsidy context." *Finley*, 524 U.S. at 583–84, 587. If anything, the government's reliance on *Finley* is even less persuasive when one considers the Supreme Court's more recent decisions in *Tam*, a unanimous decision establishing that "giving offense is a viewpoint," 582 U.S. at 243, and *Brunetti*, in which the Court held that "the 'immoral or scandalous' criterion in the Lanham Act [is] viewpoint-based." *Brunetti*, 588 U.S. at 394 (citation modified).

In various cases, the Court has drawn on public forum principles to conclude that viewpoint neutrality is constitutionally required when the government chooses to subsidize private speech. In *Velazquez*, for example, the Court invalidated congressionally imposed restrictions on the speech of legal aid attorneys funded by the Legal Services

26

Corporation—a District of Columbia non-profit created by Congress under the Legal Services Corporation Act to distribute federal funds to local organizations providing legal services to indigent clients. 531 U.S. at 536; 42 U.S.C. § 2996 *et seq.* The Court borrowed concepts from public forum cases and other circumstances where the government sought to subsidize "a diversity of views" to hold it "may not design a subsidy to effect this serious and fundamental restriction" on private speech.[12] 531 U.S. at 543–44. In doing so, it analogized the subsidy conditions to viewpoint-based restrictions in public forums and restrictions imposed on the editorial independence of public broadcasters, and held the First Amendment bars the government "from using the forum in an unconventional way to suppress speech inherent in the nature of the medium." *Id.* (citing *Arkansas Ed. Television Comm'n* v. *Forbes,* 523 U.S. 666, 676 (1998) and *League of Women Voters*, 468 U.S. at 396-97). So, too, here.

---

[12] The Court observed that the public forum doctrine "may not be controlling in a strict sense" to speech subsidies but that public forum cases "do provide some instruction" regarding the applicable First Amendment principles. *Velazquez,* 531 U.S. at 544.

Likewise, in *Rosenberger,* which held a public university's withholding of funds from a Christian student group was unconstitutionally viewpoint-based—a category error deemed "an egregious form of content discrimination"—the Court described the student activity fund as "a forum more in a metaphysical than in a spatial or geographic sense." 515 U.S. at 829–30. And the same principles constrain the government's ability to discriminate based on viewpoint in administering the trademark registration system under *Tam*, 582 U.S. at 243, and *Brunetti*, 588 U.S. at 404. Nothing in *Finley* contradicts these basic principles.

Taken together, these decisions foreclose the government's attempt to recast viewpoint discrimination as ordinary funding discretion. *Finley* permits the NEA to make inherently subjective judgments about artistic excellence but does not permit it to weaponize those judgments to exclude disfavored viewpoints from a program that funds private expression. That conclusion follows whether the Court analogizes such funding programs to public forums or simply applies the settled rule that the government may not use subsidies to suppress disfavored viewpoints. Where, as here, the government conditions access to a speech subsidy on whether the applicant avoids a prohibited viewpoint, the First

Amendment's rule is straightforward: The government may choose whether to fund private speech, but once it does so, it may not distribute those funds on the basis of viewpoint.

### III. The NEA's Implementation of the EO is an Unconstitutional Condition.

The NEA's implementation of the EO violates the First Amendment for the separate reason that it imposes an unconstitutional condition by forcing applicants to choose between protected artistic expression and a fair opportunity to compete for public arts funding. The government underscores as much in arguing that "[w]hen the NEA declines to award competitive funding to an art project, it does not restrict that artist's speech, it merely declines to subsidize it." AOB 16. That premise is not a defense to an unconstitutional-conditions claim; it is the reason the doctrine exists.

Although a public benefit may be discretionary, the government may not require the surrender of constitutional rights as the price of receiving it. As the Supreme Court put it, "even though a person has no 'right' to a valuable governmental benefit," the government "may not deny [it] to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."

29

*Sindermann*, 408 U.S. at 597; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 221 (2013) (holding government may not condition funding on recipients' agreement to "pledge allegiance to the Government's policy of eradicating prostitution"). Otherwise, the government could indirectly "produce a result which [it] could not command directly." *Sindermann*, 408 U.S. at 597 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

The NEA's implementation of the EO's command that "[f]ederal funds … not be used to promote gender ideology," EO § 3(g), JA319, constitutes an unconstitutional condition because it forces applicants to choose between speaking freely through their art and competing on equal terms for a public benefit created to support private artistic expression. Admittedly, NEA withdrew its initial implementation of the EO requiring applicants to certify that as grant recipients they would not use NEA funds to "promote gender ideology." But the Notice functionally preserved that unconstitutional condition by requiring, at the final stage of review, assessment of whether a project "promotes gender ideology." ADD.46–47, 50–51. And if the Chairperson concludes that a project does so, that conclusion "could weigh against the project's final approval," and

in no circumstance may it "weigh in favor of the project's final approval." JA560; ADD.28.

That is a condition on a benefit. It functionally tells artists that they will improve their chances of receiving federal support by self-censoring and avoiding protected expression the government disfavors. And it warns artists and organization that proscribed points of view will weigh against applications. The message is clear: projects promoting gender ideology need not apply.

NEA insists there is no constitutional problem because the Notice does not impose an automatic bar. AOB 14–15. But unconstitutional conditions need not be absolute. For example, although no one has a constitutional entitlement to a government job, the First Amendment forbids officials not only from terminating public employees based on their association with a political party, but also from imposing less severe employment burdens—such as denying promotions, transfers, or recall after layoffs. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75–76 (1990). This is because the result is the same—the government action "interferes with the freedom to believe and associate, or to not believe and not associate." *Id*. A penalty on protected expression remains a penalty when

31

it operates as a thumb on the scale because the "deterrent effect is the same as if the State were to [levy fines] for … speech." *Speiser*, 357 U.S. at 518–19 (holding due process requires "procedures amply adequate to safeguard against invasion of speech which the Constitution protects" even outside the context of criminal proceedings). And in a highly competitive grant program, a government-imposed negative factor can be a decisive deterrent.

The relevant distinction is between conditions that define the limits of a spending program and conditions that leverage funding to burden protected speech. *Agency for Int'l Dev.*, 570 U.S. at 214–15. The NEA may define grant categories, identify allowable costs, require matching funds, exclude lobbying, or decline to fund obscenity (properly defined), to name a few permissible spending limits. Those rules structure the program. But the EO condition does something different. It tells applicants that work expressing certain viewpoints within otherwise eligible art will count against them. That restriction does not define the funded activity. Rather, it pressures the recipient to alter and/or forgo viewpoints in expression the program exists to support.

Congress did not create the NEA to transmit the President's views about gender or anything else. It did so to support private artistic expression. A condition that pressures artists to rewrite plays, organizations to reshape festivals, or storytelling programs to excise a government-proscribed idea is unconstitutional because it distorts the very function of federal arts support. *See Velazquez*, 531 U.S. at 544; *see also League of Women Voters*, 468 U.S. at 378 ("[B]roadcasters are engaged in a vital and independent form of communicative activity. As a result, the First Amendment must inform and give shape to the manner in which Congress exercises its regulatory power in this area.").

The government argues it "has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." AOB 29 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). But the purpose of the federal program at issue in *Rust* was "to subsidize family planning services which will lead to conception and childbirth, and declining to 'promote or encourage abortion.'" *Rust*, 500 U.S. at 193. Therefore, the Court held that "prohibiting counseling, referral, and the provision of information regarding abortion as a method of family planning [was] designed to ensure that the limits of the federal program

are observed." *Id.* In other words. the restriction was a condition defining the scope of the government-funded program—not requiring recipients to alter private expression. *Id.*

Nor is this case like *Regan*, which upheld a content—but not viewpoint—based treasury regulation prohibiting non-profits from engaging in lobbying. *Regan*, 461 U.S. at 544–46. Congress enacted the tax code provisions providing exemptions to nonprofit civic welfare organizations to "promote the public welfare." *Id.* at 544. The NEA's *raison d'être*, conversely, is to foster "a climate encouraging freedom of thought, imagination, and inquiry" and to provide "the material conditions facilitating the release of this creative talent." 20 U.S.C. § 951(7). A condition that pressures artists to censor expression does not define that mission; it distorts it.

That is exactly what unconstitutional conditions do. The government did not terminate the NEA's grant program. It continued funding private artistic expression but made the inclusion of one viewpoint a strike against their application. The First Amendment protects that private expression, and the unconstitutional-conditions

doctrine prohibits using NEA funding to force artists to choose between their speech and their eligibility for public support.

## CONCLUSION

Because NEA-funded projects are not government speech, and the First Amendment prohibits the government from discriminating based on viewpoint when it funds private speech, the Court should affirm the district court's judgment.

Dated: June 12, 2026

/s/ *Ronald G. London*

RONALD G. LONDON
D GILL SPERLEIN
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
ronnie.london@fire.org
gill.sperlein@fire.org
(215) 717-3473

Counsel for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

This document complies with the word limit stated in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,452 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. 32(a)(6), because it has been prepared in Microsoft Word using a 14-point proportionally spaced typeface, Century Schoolbook.

Dated: June 12, 2026

/s/ *Ronald G. London*

RONALD G. LONDON

Counsel for *Amicus Curiae*

# CERTIFICATE OF SERVICE

I certify that on June 12, 2026, the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the First Circuit using the Court's CM/ECF system, which will send a notification to the attorneys of record in this matter.

Dated: June 12, 2026

/s/ *Ronald G. London*

RONALD G. LONDON

Counsel for *Amicus Curiae*