No. 25-2113

# In the United States Court of Appeals for the First Circuit

RHODE ISLAND LATINO ARTS; NATIONAL QUEER THEATER; THE THEATER OFFENSIVE; THEATRE COMMUNICATIONS GROUP,

*Plaintiffs-Appellees*,

v.

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, IN HER OFFICIAL CAPACITY AS THE ACTING CHAIR OF THE NATIONAL ENDOWMENT FOR THE ARTS,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Rhode Island

**BRIEF OF *AMICI CURIAE* AMERICAN ASSOCIATION OF PHYSICIANS FOR HUMAN RIGHTS, INC. D/B/A GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ+ EQUALITY; FENWAY HEALTH; THE LGBTQIA+ CANCER NETWORK; SAGE; WAVES AHEAD; AND GLBT HISTORICAL SOCIETY IN SUPPORT OF PLAINTIFFS-APPELLEES**

Omar Gonzalez-Pagan, No. 1167550
Karen L. Loewy, No. 98898
**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**
120 Wall Street, 19th Floor
New York, New York 10005
(212) 809-8585

Kenneth D. Upton, Jr. No. 1194475
**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**
3656 N. Halsted Street
Chicago, IL 60613
(312) 605-3224

Matthew W. Costello, No. 1186843
Elijah T. Rockhold, No. 1224045
**NIXON PEABODY LLP**
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 345-1000

Tammy Nguyen, No. 1210941
**NIXON PEABODY LLP**
70 W. Madison Street
Chicago, IL 60602
(312) 977-4150

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amici have no parent corporations, are not publicly held, and no publicly held corporation owns 10% or more of any Amicus's stock.

Date: June 12, 2026

/s/ Matthew W. Costello
Matthew W. Costello
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST AND IDENTITY OF AMICI CURIAE ...............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.....................................5

ARGUMENT.........................................................................................................8

    A.   The NEA's Selection of Privately Created Art Is Not Government Speech and Remains Subject to First Amendment Scrutiny. ...................................8

    B.   The Final Notice Imposes an Unconstitutional Viewpoint-Based Funding Condition...................................................................................................10

    C.   The Government's Own Asymmetry Admission Confirms Viewpoint Discrimination and Distinguishes *Finley*. .....................................................13

    D.   The Final Notice's Reasoning Has Already Spilled Across Federal Grantmaking.................................................................................................14

    E.   The Final Notice Also Contradicts Congress's Program-Specific Mandates. .....................................................................................................20

CONCLUSION ...................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Advocs. for Arts v. Thomson*,
532 F.2d 792 (1st Cir. 1976) ...................................................................10

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..........................................................................10, 11

*AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*,
42 F.3d 1 (1st Cir. 1994)........................................................................12

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health*,
795 F. Supp. 3d 678 (D. Md. 2025).......................................6, 15, 17

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
786 F. Supp. 3d 237 (D. Mass. 2025)...............................................6, 15

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)...................................................................................11

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)................................................................................20

*Bragdon v. Abbott*,
524 U.S. 624 (1998)................................................................................20

*Brooklyn Inst. of Arts & Scis. v. City of New York*,
64 F. Supp. 2d 184 (E.D.N.Y. 1999)...................................................12

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026).......................................................................8, 11

*Esperanza Peace & Just. Ctr. v. City of San Antonio*,
316 F. Supp. 2d 433 (W.D. Tex. 2001) ...............................................12

*Iancu v. Brunetti*,
588 U.S. 388 (2019)................................................................................13

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019).................................................................13

iii

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984)................................................................................10

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001)............................................................................8, 11

*Matal v. Tam*,
582 U.S. 218 (2017)............................................................................9, 13

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004) ...................................................................10

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)........................................................................*passim*

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024).................................................................................11

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025)...........................................................7

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004) ...................................................................10

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)..........................................................................10, 13

*S.F. AIDS Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025)...............................................7, 15

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022).................................................................................8

*Strout v. Albanese*,
178 F.3d 57 (1st Cir. 1999) .....................................................................9

*Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.*,
868 F.2d 473 (1st Cir. 1989) ...................................................................9

*Thakur v. Trump*,
No. 25-4249, 2026 WL 1466303 (9th Cir. May 26, 2026) (*per
curiam*) ...............................................................................................11, 15

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)..................................................................................8

**Federal Statutes**

20 U.S.C. § 951(7)....................................................................................8

29 U.S.C. § 794(a) ................................................................................20

42 U.S.C. § 283p...................................................................................18

42 U.S.C. §§ 300ff...............................................................................20

42 U.S.C. § 18116.................................................................................20

**Regulations**

24 C.F.R. § 574.603(b) ........................................................................20

**Other Authorities**

L. Tribe, *American Constitutional Law* § 11-5 (2d ed. 1988)..................................9

## INTEREST AND IDENTITY OF AMICI CURIAE[1]

*Amici* are national and local nonprofit organizations that serve lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people. *Amici* receive and rely on federal funding to provide a broad array of services to vulnerable LGBTQ people, including healthcare services, research, social services, housing, educational programming, and historical preservation. As a result, *Amici* have an interest in how the Court adjudicates this case.

**American Association of Physicians for Human Rights, Inc., d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA")**, is a national nonprofit membership organization whose mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments. GLMA's members include approximately 1,700 physicians, researchers, academics, health-profession students, and other health professionals nationwide. Several GLMA members have had NIH research grants terminated or applications delayed or withheld because their work relates to LGBTQ+ health. The affected recipients include Boston-based researchers whose terminated grants studied cardiovascular health, dementia, stigma, intimate-partner

---

[1] In accordance with Rule 29 of the Federal Rules of Appellate Procedure, *Amici* state that no party authored any part of this brief and that no person other than *Amici* and their counsel contributed any funds for the preparation or submission of this brief.

1

violence, alcohol misuse, and mental health in transgender and other LGBTQ+ populations.

**Fenway Health** is a federally qualified health center based in Boston, Massachusetts, whose mission is to provide healthcare to the LGBTQ+ community and to all people through access to highest quality healthcare, supportive services, education, research, and advocacy. A significant part of Fenway Health's patient population is LGBTQ+. About 42% of Fenway Health's patient population has a sexual orientation other than heterosexual, and about 12% of Fenway Health's patient population is transgender. In 2001, Fenway launched The Fenway Institute, an interdisciplinary center for research, training, education, and policy development focusing on national and international health issues, especially related to LGBTQ+ communities.

**The Cancer Network d/b/a the LGBTQIA+ Cancer Network** is a nonprofit organization that works to improve the lives of LGBTQIA+ cancer survivors and those at risk for cancer through education, training of healthcare providers, and advocating for LGBTQIA+ survivors in mainstream cancer organizations, the media, and research. LGBTQIA+ Americans already face discrimination in the healthcare system—a problem that is particularly acute for transgender people. The LGBTQIA+ Cancer Network has been part of countering that discrimination via

2

training and technical assistance funded through a CDC award for cancer and tobacco disparity networks.

**Services and Advocacy for Gay, Lesbian, Bisexual, and Transgender Elders ("SAGE")** is the country's oldest and largest organization dedicated to improving the lives of LGBTQ+ older people. Founded in 1978 and headquartered in New York City, SAGE is a national organization that offers supportive services and resources to LGBTQ+ older people and their caregivers, advocates for public policy changes that address the needs of LGBTQ+ older people and provides training for organizations that serve LGBTQ+ older people. SAGE relies on federal funding to operate a variety of programs.

**Waves Ahead, Corp.** is a non-profit direct services organization dedicated to working with and supporting vulnerable and underserved populations across Puerto Rico by providing culturally responsive mental health services, leadership development, education, and community-building and connection opportunities. Through its four community centers across Puerto Rico (in San Juan, Maunabo, Isabela, and Cabo Rojo), Waves Ahead offers free and accessible mental health services, psychosocial support, support groups, educational workshops, wellness activities, and community development programs. Waves Ahead focuses its programming on LGBTQ+ individuals, seniors, people experiencing housing instability, women-head-of-households, and other subpopulations. Waves Ahead

relies on federal funding to provide several of its services, including transitional housing and work to combat anti-LGBTQ+ violence.

**The GLBT Historical Society** is a San Francisco-based nonprofit organization and global leader in LGBTQ+ public history. It operates the nation's first museum of LGBTQ+ history and culture and maintains one of the world's largest repositories of LGBTQ+ historical materials, including archives documenting transgender, nonbinary, and gender-expansive people throughout American history. GLBT Historical Society has received federal funding for nearly twenty years, including from the National Endowment for the Humanities ("NEH") and the National Archives, allowing the GLBT Historical Society to preserve, digitize, catalog, and make accessible thousands of materials for public research. In April 2025, NEH terminated a $10,000 grant that had been awarded to preserve approximately 1,500 rare and unique LGBTQ archival posters; the termination notice provided no grant-specific explanation despite the project's alignment with NEH's cultural-preservation goals.

*Amici* respectfully submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal is not about whether the National Endowment for the Arts (the "NEA") may exercise artistic judgment within its statutory mandate. It is about whether the Government may convert a discretionary funding program into a one-way penalty on a single disfavored viewpoint—speech that affirms transgender, nonbinary, and queer identities—and then attempt to immunize that penalty from First Amendment scrutiny by relabeling it "government speech."

The district court correctly answered no. By the government's own admission, the NEA's implementation of the Executive Order (the "Final Notice") operates as a one-way ratchet: a finding that a project "promote[s] gender ideology" "could weigh against" funding but "in no circumstance" could weigh in favor of it. Add.10. That asymmetry is not an accident of drafting; it is purposeful. It burdens speech that affirms transgender, nonbinary, and queer identities precisely because the Government rejects that viewpoint.

*Amici* speak for the LGBTQ+ physicians, researchers, historians, artists, and community-serving organizations that bear the downstream costs of the rule the NEA defends. They have already watched the imposition of the same ideological viewpoint as a penalty that the NEA defends here migrate well beyond the arts—into the National Institutes of Health ("NIH") with regards to LGBTQ+ health research; the National Endowment for the Humanities ("NEH") with regards to

5

historical preservation; the Health Resources and Services Administration ("HRSA") with regards to services for people living with HIV; the Office for Victims of Crime ("OVC") and the Office on Violence Against Women ("OVW") with regards to services for victims of violence; the Substance Abuse and Mental Health Services Administration ("SAMHSA") with regards to mental-health programs, and the U.S. Department of Housing and Urban Development ("HUD") with regards to housing assistance.[2] The government has imposed this viewpoint-based penalty across grants, without regard for the contours of any particular program. As such, how this Court treats the Final Notice will not stay within the NEA.

*Amici* respectfully submit this brief to highlight three points for the Court's consideration. *First*, the NEA's selection of privately created art is not government speech: history, public perception, and control all confirm that the funded expression

---

[2] *See, e.g.*, *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health*, 795 F. Supp. 3d 678 (D. Md. 2025) (preliminary injunction against NIH/HHS directives and grant terminations related to LGBTQ+ health research); *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 786 F. Supp. 3d 237 (D. Mass. 2025), *stay denied*, Nos. 25-1611, 25-1612 (1st Cir. July 18, 2025) (denying stay of orders setting aside NIH policy directives and grant terminations), *application for stay granted in part and denied in part sub nom. Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (Aug. 21, 2025) (denying stay of order setting aside NIH policy directives but granting stay as to terminations on jurisdictional grounds); *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) (enjoining enforcement of Gender Order funding provisions against LGBTQ+ healthcare, cultural, and social-service plaintiffs), *appeal pending*, No. 25-4988 (9th Cir.).

belongs to the artist, not the agency. *Second*, the Final Notice is a textbook structure of viewpoint discrimination—a one-way negative weighting of a single contested viewpoint—and the Government's own asymmetry admission distinguishes *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), and confirms the constitutional defect. *Third*, affirmance is essential because the same theory has already been used to defund LGBTQ+ medical research, public-health studies, historical preservation, victim services, and housing assistance across the federal grantmaking apparatus.

Indeed, numerous agencies across the government are already using the logic of the Gender Order, as well as that of the Final Notice, to condition federal funding on recipients' adherence to the administration's singular (and discriminatory) viewpoint: "to deny the existence of transgender persons entirely." *S.F. AIDS Found.*, 786 F. Supp. 3d at 1216. The government is thus engaging in a comprehensive campaign to impose ideological conformity using its power of the purse, not to properly define a particular government program, but to single out transgender people, and those who express perspectives supporting them, for discrimination and opprobrium. *See PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025) ("The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist.").

7

As the Supreme Court recently reaffirmed, the First Amendment does not permit the Government "to enforce orthodoxy in thought or speech in this country." *Chiles v. Salazar*, 146 S. Ct. 1010, 1029 (2026). Having chosen to subsidize private expression, research, and social and health advocacy and services, the Government may not pick winners and losers based on viewpoint.

## ARGUMENT

### A. The NEA's Selection of Privately Created Art Is Not Government Speech and Remains Subject to First Amendment Scrutiny.

The Government's lead theory is that the NEA's selection of private art for partial funding is itself government speech and therefore immune from viewpoint-discrimination scrutiny. Each of the Supreme Court's three government-speech factors cuts the other way: history, public perception, and control. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208–09 (2015); *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). *History*: Congress created the NEA to "help create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry," 20 U.S.C. § 951(7), not to transmit any single governmental message. *Public perception*: audiences attribute a funded play, exhibition, or performance to the artist who made it, not to the agency that helped pay for it. *Control*: the NEA's final approval authority does not give it editorial control over the artist's expression. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001); *Finley*, 524 U.S. at

8

587. Taken together, no factor supports treating selective NEA grants as the Government's own message.

The district court correctly held that NEA-funded art is private speech. Add.15. The relevant expression is the artwork, performance, exhibition, or project created by the grantee, not the Government's act of awarding funds; the public attributes that expression to the artist; and the NEA's final approval authority does not give it control over the artist's message. *See* Add.15–16, 25–26. Just as the Court recognized in *Matal v. Tam* that registered trademarks are not transformed into government speech by federal registration, NEA-funded art does not become the Government's message merely because the agency selects which projects receive funding. 582 U.S. 218, 235–36 (2017). This Court has likewise recognized that the First Amendment protects private expression that the government chooses to subsidize, even when that expression diverges from the government's own views. *See Strout v. Albanese*, 178 F.3d 57, 63 (1st Cir. 1999); *cf. Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.*, 868 F.2d 473, 482 (1st Cir. 1989) ("[I]t is important to monitor the government's 'undoubtedly broad power' to decide which activities to subsidize, to ensure that the exercise of that power does not penalize citizens who disagree with the government.") (quoting L. Tribe, *American Constitutional Law* § 11–5 (2d ed. 1988)).

9

That limiting principle is essential here. If NEA grants became government speech whenever the Government chose among applications, the same reasoning could sweep in NIH research, NEH archives, HRSA HIV studies, OVC victim-services programs, SAMHSA mental-health programs, and HUD housing programs, none of which are reasonably understood as the Government's own speech.

### B.    The Final Notice Imposes an Unconstitutional Viewpoint-Based Funding Condition.

Even in selective subsidy programs, the Government may not leverage discretionary funding criteria into a penalty on disfavored viewpoints or aim at the suppression of dangerous ideas. *Finley*, 524 U.S. at 587; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) ("*AID*"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) ("[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts."); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 380–81, 398–99 (1984); *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004) ("The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another."); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82, 95 (1st Cir. 2004) ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses."); *Advocs. for Arts v. Thomson*, 532 F.2d 792,

798 (1st Cir. 1976). "Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Velazquez*, 531 U.S. at 548–49. Nor may the Government "leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15; *see also Thakur v. Trump*, No. 25–4249, 2026 WL 1466303, at *7–11 (9th Cir. May 26, 2026) (*per curiam*) (denying funding to DEI-related research constitutes unlawful viewpoint discrimination under the First Amendment).

Most recently in *Chiles v. Salazar*, the Supreme Court held that a state law that restricted a licensed therapist from "speak[ing] with *interested* clients about steps they might take to change unwanted behaviors, expressions, or attractions related to sexual orientation or gender identity" engaged in viewpoint discrimination. 146 S. Ct. at 1026 (emphasis added). In doing so, the Court reaffirmed that "the First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country." *Id.* at 1029. *Chiles* thus confirms that a restriction that permits one side of a debate, while suppressing the other, is viewpoint discrimination. *Id.* at 1023; *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024) ("Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors.") (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). That asymmetry—permitting

11

speech that rejects the very existence of transgender people while burdening speech that affirms it—is precisely the structure of the Gender Order and the Final Notice it spawned.

The Final Notice falls on the forbidden side of the line. It does not merely ask whether a project is artistically excellent or likely to engage audiences; it directs the Chair to treat "promot[ing] gender ideology" as a negative factor because of the views expressed. *See* Add.27–29. That is the subsidy-as-penalty scenario *Finley* reserved, not the neutral consideration of "decency and respect" *Finley* upheld. Courts have repeatedly invalidated materially similar subsidy withdrawals targeting LGBTQ+ expression. *See Esperanza Peace & Just. Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433, 447, 454–56 (W.D. Tex. 2001) (rescission of grant to nonprofit because group purportedly "advocat[ed] a gay and lesbian lifestyle" was unconstitutional viewpoint discrimination; "if [the government] chooses to [fund the arts], it must award the grants in a scrupulously viewpoint-neutral manner") (cleaned up); *Brooklyn Inst. of Arts & Scis. v. City of New York*, 64 F. Supp. 2d 184, 198, 202 (E.D.N.Y. 1999) (city could not penalize museum with loss of operating subsidy "because of the perceived viewpoint of the works"); *AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 11 (1st Cir. 1994) (enjoining rejection of HIV-related advertising as viewpoint discrimination).

12

Nor does the absence of an absolute eligibility bar save the Notice. A negative thumb on the scale is enough: "if a [government] bar is viewpoint-based, it is unconstitutional," even when the benefit is discretionary. *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *see also Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) (government may not withhold a benefit for a censorious purpose).

## C.　The Government's Own Asymmetry Admission Confirms Viewpoint Discrimination and Distinguishes *Finley*.

The NEA acknowledges that, under the Final Notice, if the Chair concludes that a project "promotes gender ideology," that factor "could weigh against the project's final approval," but "in no circumstance" could it "weigh in favor of the project's final approval." Add.27–28. The Government's concession makes the constitutional defect unmistakable. That is not neutral artistic judgment. It is a one-way ratchet against a disfavored viewpoint—the textbook definition of viewpoint discrimination. *See Rosenberger*, 515 U.S. at 829 ("viewpoint discrimination is . . . an egregious form of content discrimination"); *Matal*, 582 U.S. at 248 (Kennedy, J., concurring) (a rule that "single[s] out a subset of messages for disfavor based on the views expressed" is viewpoint discrimination).

*Finley* upheld a materially different standard. The "decency and respect" consideration there was "merely hortatory," did not introduce a viewpoint-based penalty, and did not single out one side of a contested issue for disfavor. 524 U.S. at 580, 583, 587. The Final Notice does exactly what *Finley* said would present a

13

different case: it turns subjective grant criteria into a penalty for disfavored ideas. *Id.* at 592 (Scalia, J., concurring in the judgment) (consideration of a proposed project's viewpoint is viewpoint-based discrimination even if it is not "conclusive"). Nor can the Government escape that conclusion by characterizing the gender-ideology criterion as merely one "factor" among many.

That distinction is dispositive. The Final Notice burdens projects that affirm transgender and nonbinary identities while leaving projects that reject those identities free from any comparable negative weighting. Sustaining the Final Notice would license the Government to convert every discretionary grant program into a viewpoint filter.

**D.    The Final Notice's Reasoning Has Already Spilled Across Federal Grantmaking.**

The risk that the NEA's interpretation of the Gender Order will spill into other federal grantmaking is not speculative; it has already materialized. Within months of the Gender Order, federal agencies began using its "promotes gender ideology" standard—and parallel "agency priorities" formulations—to terminate, freeze, or chill grants in biomedical research, HIV prevention, victim services, mental health,

14

historical preservation, and housing.[3] Federal courts in the District of Maryland, the District of Massachusetts, and the Northern District of California have already preliminarily enjoined materially identical funding penalties. *See Am. Ass'n of Physicians for Hum. Rts.*, 795 F. Supp. 3d 678; *Am. Pub. Health Ass'n*, 786 F. Supp. 3d 237, *stay denied*, Nos. 25–1611, 25–1612 (1st Cir. July 18, 2025); *S.F. AIDS Found.*, 786 F. Supp. 3d 1184. And the Ninth Circuit affirmed a preliminary injunction with regards to the government's termination of research funding because the research, *inter alia*, promoted "gender ideology." *Thakur*, 2026 WL 1466303, at *3, *8–11. The Gender Order's funding theory does not respect agency boundaries; affirmance here will set the rule for them all.

*Health research*. NIH has terminated hundreds of LGBTQ+ research grants using boilerplate language that itself admits viewpoint discrimination: "Research programs based on gender identity are often unscientific, have little identifiable

---

[3] *Amici* recognize that some applications of the Gender Order to these entities may involve purely private speech, while others may involve speech within the context of government-funded programs. Critically, when choosing entities and services to subsidize, the government may not condition the funding on the basis of viewpoint as the Gender Order directs. *AID*, 570 U.S. at 214. Further, the Gender Order's demands implicate an organization's private speech, like the decision of what to call themselves on funding applications or how to address their transgender patrons. *See S.F. A.I.D.S. Found.*, 786 F. Supp. 3d at 1219 ("[U]nder Defendants' logic, an organization receiving federal funds to provide public health services—as many of Plaintiffs do—would not be able to refer to the clients they serve under that project by any pronoun that would 'promote gender ideology,' even when addressing them by such pronouns is pure speech that has no relation to the public health objectives for which the federal grants they receive aim to fund.").

return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs." *See* Compl., *Am. Ass'n of Physicians for Hum. Rts., Inc.*, No. 25–cv–01620–LKG, ECF No. 1 ¶¶ 89, 93 (D. Md. May 20, 2025); *id.*, ECF No. 92, at 5 (D. Md. Aug. 1, 2025) (entering preliminary injunction). The HHS-supplied template singles out a topic for disfavor because of the views it is presumed to express—the same one-way ratchet the NEA defends here, expressed in the same pejorative vocabulary as the Gender Order itself.

The human and scientific stakes are concrete, and several land squarely within this Circuit. Dr. Carl Streed, Jr., Research Director for the Gender Care Center at Boston Medical Center and an Associate Professor at Boston University School of Medicine, had two K01 grants—studying cardiovascular health and dementia in transgender populations—and an R01 on which he is co-investigator terminated, with two additional applications withheld or unreasonably delayed. Compl., *Am. Ass'n of Physicians for Hum. Rts.*, ECF No. 1 ¶¶ 21, 105 (D. Md. May 20, 2025). Dr. Gabriel Murchison, an Assistant Professor at Boston University School of Public Health, had his K99/R00 grant studying stigma, intimate-partner violence, and alcohol misuse in transgender and nonbinary young adults terminated mid-stream. *Id.* ¶¶ 31, 112. Dr. Michelle Birkett's R01 on the drivers of HIV transmission, Dr. Gregory Phillips's R01 grants on alcohol use among LGBTQ+ youth and improving

16

health-disparity measurement, Dr. Heather Littleton's R34 pilot trial on teen-dating violence and alcohol use among LGBTQ+ youth, and Dr. Laura Graham Holmes's K23 affirming-psychosocial-intervention grant for sexual and gender minority autistic people were all terminated using the same boilerplate. *Id.* ¶¶ 107–11. The District of Maryland enjoined NIH's policy on August 1, 2025, finding the agency directives, in HHS Secretary Kennedy's and the NIH Director's own words, "make clear the NIH's policy to terminate any research grant funding on transgender or gender identity issues, because the research relates to such issues." *Am. Ass'n of Physicians for Hum. Rts.*, 795 F. Supp. 3d at 697.

*Victim services and violence prevention*. The Department of Justice's Office for Victims of Crime has terminated grants whose only "offense" was serving transgender survivors. FORGE, Inc.—an organization that derives roughly ninety percent of its revenue from federal grants—had its $749,908 "Transgender Victims of Crime Toolkit" grant terminated on April 22, 2025, mid-development, as "no longer effectuat[ing] the program goals or agency priorities," along with its $500,000 BJA "Keeping Ourselves Whole" hate-crimes grant addressing anti-transgender violence. *See* Munson Supp. Decl. ¶¶ 4–10, 26–29, *S.F. AIDS Found.*, No. 4:25–cv–01824–JST, ECF No. 73 (N.D. Cal. May 16, 2025). On the OVW "Stalking" grant on which FORGE remained a partner, the program manager instructed that "FORGE's tip sheets and all other LGBTQ+ related content should

17

not be submitted," and that any materials submitted "with LGBTQ+ content . . . would be denied." *Id.* ¶ 36. That is unmistakable viewpoint policing, not neutral grant administration.

*HIV prevention and culturally competent care*. The Los Angeles LGBT Center's NIH-funded "Race & Place" study on the intersection of racial inequality, substance use, and HIV outcomes was terminated using HHS's DEI boilerplate, and its $1.5 million OFVPS Intimate Partner Violence Training Program grant was placed under directives forbidding the use of words like "LGBT," "queer," and "transgender" in new materials. *See* Hollendoner Supp. Decl. ¶¶ 3, 14–17, 26, *S.F. AIDS Found.*, No. 4:25–cv–01824–JST, ECF No. 57 (N.D. Cal. Apr. 7, 2025). The San Francisco AIDS Foundation lost NIH support for its Doxy-PEP STI-prevention study—work that 42 U.S.C. § 283p expressly directs NIH to "encourage." *See* TerMeer Supp. Decl. ¶¶ 9–12, *id.*, ECF No. 58 (N.D. Cal. Apr. 7, 2025). Baltimore Safe Haven—an organization founded by and for Black transgender women, with roughly eighty percent of its budget from federal grants, including HUD Continuum of Care funds for transitional housing and a CDC-funded HIV-prevention subaward—has censored its own clinic's name, dropping "Gender Affirming" from the title and avoiding the words "transgender," "gender affirming," and "TLGBQIA+" in new proposals to preserve its funding. *See* Dammons Second Supp. Decl. ¶¶ 4–7, 10–14, *S.F. AIDS Found.*, No. 4:25–cv–01824–JST, ECF No. 72 (N.D.

18

Cal. May 16, 2025). The chilling effect the First Amendment guards against is not theoretical here; it is line-edited into flyers and grant applications.

*Historical preservation*. NEH terminated GLBT Historical Society's grant to preserve approximately 1,500 rare LGBTQ archival posters even though the project had already been approved as part of NEH's American Tapestry initiative, with no grant-specific explanation. *See* Ordeñana Decl. ¶¶ 3, 5, 9, 11–12, *S.F. AIDS Found.*, No. 4:25–cv–01824–JST, ECF No. 56 (N.D. Cal. Apr. 7, 2025). That example ties the arts-and-culture context directly to this appeal: if the Government may penalize "gender ideology" in NEA grants, it can—and already does—suppress both contemporary artistic expression about LGBTQ+ lives and the historical record of those lives.

The throughline across these examples is unmistakable. Whether the agency is NIH, OVC, OVW, NEH, HRSA, HUD, SAMHSA, or the NEA, the operative rule is the same: a project that affirms transgender or nonbinary identities is disfavored because it affirms transgender or nonbinary identities. That is the Final Notice's logic, and it is the logic that has already swept across the federal grantmaking enterprise. Affirming the district court draws the constitutional line the First Amendment requires. Reversing would license its erasure—agency by agency.

**E.    The Final Notice Also Contradicts Congress's Program-Specific Mandates.**

The spillover problem is also statutory. While these statutory schemes are not necessarily applicable to the instant case, the government—through the Gender Order and the Final Notice as an example—has indicated its willingness to impose a particular viewpoint on a wide variety of federal activity. But Congress has directed federal agencies to support programs serving communities disproportionately affected by HIV, health disparities, violence, homelessness, and other public-health needs; the logic of the Gender Order and Final Notice invert those mandates by treating truthful, identity-affirming work with LGBTQ+ communities as suspect. *See, e.g.*, 42 U.S.C. §§ 300ff, 300ff–121(a); 42 U.S.C. § 18116; 24 C.F.R. § 574.603(b). And as the Supreme Court has recognized, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). That conflict reinforces why the First Amendment problem here cannot be cabined to NEA grants.

Congress has likewise prohibited disability-based discrimination in federally funded programs, 29 U.S.C. § 794(a), and HIV status remains a protected disability under that provision. *See Bragdon v. Abbott*, 524 U.S. 624, 631–32 (1998). Programs that the Final Notice's reasoning has already touched—HIV prevention, gender-affirming care, and related services—sit squarely within these statutory protections.

20

The Executive Branch cannot use a discretionary funding criterion to undo what Congress has commanded.

## CONCLUSION

Federal grantmaking has been an indispensable engine of LGBTQ+ health research, public-health and social services, historical preservation, violence-prevention programming, and housing assistance. The Gender Order, as implemented by the Final Notice and agency analogues, would convert that engine into an instrument of viewpoint suppression: defunding HIV and cardiovascular research because it acknowledges transgender patients; terminating victim-services grants because they serve transgender survivors; line-editing words like "transgender" and "LGBT" out of training materials; erasing LGBTQ+ history from federally supported archives; and chilling the next generation of LGBTQ+ scientists, clinicians, artists, and historians from even applying.

Affirmance does not compel the NEA to fund any particular project. It holds the Government to the rule it has followed for sixty years: when it chooses to subsidize private expression, research, and care, it may not pick winners and losers by viewpoint. *Amici* respectfully urge the Court to affirm.

Dated: June 12, 2026

Respectfully submitted,

*/s/ Matthew W. Costello*

Omar Gonzalez-Pagan, No. 1167550
Karen L. Loewy, No. 98898
**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**
120 Wall Street, 19th Floor
New York, New York 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org


Kenneth D. Upton, Jr. No. 1194475
**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**
3656 N. Halsted Street
Chicago, IL 60613
(312) 605-3224
kupton@lambdalegal.org

Matthew W. Costello, No. 1186843
Elijah T. Rockhold, No. 1224045
**NIXON PEABODY LLP**
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 345-1000
mcostello@nixonpeabody.com
erockhold@nixonpeabody.com

Tammy Nguyen, No. 1210941
**NIXON PEABODY LLP**
70 W. Madison Street, Suite 5200
Chicago, IL 60602
(312) 977-4150
tpnguyen@nixonpeabody.com


*Counsel for Amici Curiae*

22

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4,737 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the Microsoft Word word-processing system used to prepare the brief.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Matthew W. Costello*
Matthew Costello

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the Electronic Case Filing system on June 12, 2026, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Matthew W. Costello*
Matthew Costello