No. 25-2113

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

RHODE ISLAND LATINO ARTS; NATIONAL QUEER THEATER;
THE THEATER OFFENSIVE; THEATRE COMMUNICATIONS GROUP,

*Plaintiffs-Appellees,*

v.

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in the official
capacity as Acting Chair of the National Endowment for the Arts,

*Defendants-Appellants.*

On Appeal from a Judgment of the United States District Court
for the District of Rhode Island

**BRIEF OF *AMICI CURIAE* NATIONAL COALITION AGAINST CENSORSHIP,
AUTHORS GUILD, DRAMATISTS GUILD, ELECTRIC LITERATURE,
POETS & WRITERS, AND ANNIE DORSEN
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Dated: June 17, 2026

Andrew F. Sellars
Kendra K. Albert
ALBERT SELLARS LLP
769 Centre Street, Suite 199
Boston, MA 02130
(617) 798-7922
andy@albertsellars.law

Counsel for *Amici Curiae*

On the brief:

Lee Rowland
Erika Sanders
National Coalition Against Censorship
29 Broadway #1400
New York, NY 10006

**CORPORATE DISCLOSURE STATEMENT**

*Amici* National Coalition Against Censorship; The Authors Guild Inc.; Dramatists Guild of America, Inc.; Electric Lit Inc.; and Poets & Writers, Inc. each do not have a parent corporation and there is no corporation that owns 10% or more of any of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF CONTENTS ......................................................................ii

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE.................................................................................. vi

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ............... x

ARGUMENT ....................................................................................1

    I.    Arts Organizations Are Especially Vulnerable to Capricious Viewpoint Discrimination ........................................................ 7

    II.   *Amici*'s Experiences Show the Chilling Effects of the Executive Order. ...................................................................................... 11

    III.   The NEA's Actions Illustrate Why This Capricious Agency Action Harms Protected Expression. ...........................................18

    IV.   The Implementation in the Final Notice Constitutes Impermissible Viewpoint Discrimination. ..........................................................21

CONCLUSION ........................................................................... 23

**TABLE OF AUTHORITIES**

**Cases**

*Am. Council of Learned Soc'ys v. Nat'l Endowment for the Humanities*, No. 25-cv-3657, 2026 WL 1256545 (S.D.N.Y. May 7, 2026).........................................................2, 10, 19

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1962) ..............................................................4

*Dombroski v. Pfister*, 380 U.S. 479 (1965) .........................................................................18

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952)............................................................7

*Motor Vehicle Mnfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...........20

*N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996)......................18

*NAACP v. Button*, 371 U.S. 415 (1963)..............................................................................17

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025), *appeal docketed*, No. 25-5148 (D.C. Cir. argued Feb. 6, 2026) ............9

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...........................................5, 6

*Nat'l Rifle Ass'n v. of Am. v. Vullo*, 602 U.S. 175 (2024) ...................................................10

*R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351 (D.R.I. 2025), *appeal docketed* No. 25-2113 (1st Cir. Nov. 17, 2025) ......................1, 2, 5, 6, 9, 18, 19, 23

*Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988) (en banc)....7

*Ridley v. MBTA*, 390 F.3d 65 (1st Cir. 2004)........................................................................6

*Schiff v. U.S. Off. of Pers. Mgmt.*, 784 F.Supp.3d 380 (D. Mass. 2025) ..................2, 19, 21

*Shelton v. Tucker*, 364 U.S. 479 (1960) ..............................................................................21

*Stanton v. Brunswick Sch. Dep't*, 577 F. Supp. 1560 (D. Me. 1984) ..................................10

*Talbott v. United States*, --- F.4th ---, 2026 WL 1532205 (D.C. Cir. Jun. 1, 2026)............2

*Thakur v. Trump*, --- F.4th ---, 2026 WL 1466303 (9th Cir. May 26, 2026) ..................23

*United States v. Skrmetti*, 605 U.S. 495 (2025).....................................................................9

*Van Wagner Boston, LLC v. Davey*, 770 F.3d 33 (1st Cir. 2014) ........................................21

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .................................................. 23

**Statutes**

20 U.S.C. § 953 ..........................................................................................................................20

20 U.S.C. § 954 ..................................................................................................................... 5, 18

20 U.S.C. § 959 .........................................................................................................................5, 19

M.G.L. Ch. 2 § 26 ........................................................................................................................1

**Other Authorities**

ALFRED F. YOUNG, MASQUERADE: THE LIFE AND TIMES OF DEBORAH SAMPSON, CONTINENTAL
SOLDIER (2004) ....................................................................................................................1

Annie Dorsen, *NEA Grant Termination Tracker* (last visited Jun. 10, 2026) ................. 11

*Arts & Culture Advocacy Program*, NCAC (last visited Jun. 10, 2026) ...........................13

David Remnick, *Trump Dishonors the Kennedy Center*, THE NEW YORKER
(Dec. 20, 2025) .................................................................................................................. 22

David Smith, *"The Greatest Propaganda Op in History": Trump's Reshaping of US
Culture Evokes Past Antidemocratic Regimes*, THE GUARDIAN (Feb. 16, 2025) ............. 22

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) .......................................... 2, 3

Halimah Marcus, *Why Electric Literature Isn't Applying to the NEA*, ELECTRIC LIT
(Mar. 25, 2025) .................................................................................................................. 16

INTERNATIONAL DATA ON GOVERNMENT SPENDING ON THE ARTS, NAT'L ENDOWMENT FOR THE
ARTS (Jan. 2000) ..................................................................................................................8

John F. Kennedy, Letter to Theodate Johnson, MUSICAL AMERICA, Oct. 1960. .............. 7

Melissa Ford Gradel, *A Message From the Executive Director*, POETS & WRITERS MAG.
(Jan. 2026) ...........................................................................................................................15

Michael Paulson, *Hundreds of Artists Call on N.E.A. to Roll Back Trump's Restrictions*,
NEW YORK TIMES (Feb. 18, 2025) ................................................................................... 11

*National Endowment for the Arts (NEA) – Insights and Best Practices*, Off. of the Vice
Provost for Research, TUFTS UNIV. (Oct. 2025) ........................................................... 8

*Poets & Writers* (last visited Jun. 10, 2026) ..................................................................... 14

*State Arts Funding Projected to Decrease 7.7% in 2026*, Ams. for the Arts Action Fund (Sept. 8, 2025) ................................................................................................................. 8

Tara Copp, Lolita C. Baldor & Kevin Vineys, *War Heroes and Military Firsts are Among 26,000 Images Flagged for Removal in Pentagon's DEI Purge*, Assoc. Press (Mar. 7, 2025) .................................................................................................................. 10

*The Statement*, Collective Courage (last visited Jun. 11, 2026) ..................................... 13

*Who Pays for the Arts? Global Lessons in Cultural Funding*, Global Leaders Institute for Arts Innovation (June 10, 2025) ........................................................................ 8

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

*Amici* are a coalition of arts and arts-supporting organizations, and one individual artist, each of whom work daily to promote and defend the arts in the United States. As detailed below, *amici* have each experienced harms related to the National Endowment for the Arts' implementation of the President's Executive Order targeting use of funding to promote a view of "gender ideology" contrary to his own. *Amici* write to express how the challenged Final Notice has caused widespread harm to the American arts.

The **National Coalition Against Censorship** ("NCAC") is an alliance of more than 60 national nonprofit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC's mission is to protect the freedom of thought, inquiry, and expression and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of artists, authors, readers, publishers, booksellers, teachers, librarians, students, and others. NCAC is dedicated to defending robust First Amendment protections of the public's access to art, literature, and culture. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The **Authors Guild Inc.** (the "Authors Guild") was founded in 1912, and is a national non-profit association of more than 17,000 professional, published writers of all genres. The Authors Guild counts historians, biographers, academicians,

journalists, poets, translators, and other writers of non-fiction and fiction as members. The Authors Guild works to promote the rights and professional interest of authors in various areas, including copyright, fighting censorship, and taxation. Many Authors Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. One of the Authors Guild's primary areas of advocacy is to protect the free expression rights of authors.

The **Dramatists Guild of America, Inc.** (the "Dramatists Guild") is a trade association that has been advocating for the professional interests of theater writers since 1912. The Dramatists Guild formed the Dramatist Legal Defense Fund (the "DLDF") in 2009 to focus on the issues of copyright protection and free expression in the dramatic arts. The DLDF is governed by a committee that includes writers and lawyers, all well-established within the theatre industry.

The rights of dramatists to own their copyrights and to control their work are the founding principles on which the Dramatists Guild is based, and dramatists have forgone unionization, accepting an economically disadvantaged labor status, in order to preserve these rights. To be meaningful to writers, these rights depend on a robust ecosystem of non-profit theaters around the country being able to present and produce new dramatic works in their communities that represent the full spectrum of American society.

**Electric Lit Inc.** ("Electric Literature") is a nonprofit digital publisher with the mission to make literature more exciting, relevant, and inclusive. It is committed to investing in artists who lack creative support in order to cultivate a vibrant community that reflects myriad voices. Work published by Electric Literature and its literary magazines has been recognized by Best American Short Stories, Essays, Poetry, and Comics, the Pushcart Prize, Best Canadian Short Stories, The Best of the Small Presses, and the O. Henry Prize. Electric Literature is invested in pushing traditional publishing boundaries to support emerging and marginalized writers, while ensuring readers can engage with literature regardless of socioeconomic status.

**Poets & Writers, Inc.** is the nation's leading nonprofit organization serving creative writers. Founded in 1970, its mission is to foster the professional development of poets and writers, to promote communication throughout the literary community, and to help create an environment in which literature can be appreciated by the widest possible public. It advances this mission through its flagship publication, *Poets & Writers Magazine*, online resources that help writers navigate the marketplace and connect to the literary community, and programs that provide professional development and financial support for writers. Poets & Writers' work is rooted in the belief that literature is vital to sustaining a vibrant culture and guided by its core values of service, inclusivity, integrity, and excellence and by its commitment to becoming an anti-racist organization.

**Annie Dorsen** is a theater director and lawyer. She is the recipient of a

MacArthur Fellowship, the Spalding Gray Award, a Guggenheim Fellowship, a Foundation for Contemporary Arts Grant to Artists Award, and the Herb Alpert Award in the Arts. As a director, she has developed and directed projects that span multiple disciplines and domains, including the Broadway musical *Passing Strange*, Questlove's *Shuffle Culture* at the Brooklyn Academy of Music, and multiple projects at major European performing arts festivals encompassing performance art, dance, and opera. As a lawyer, Dorsen works to advance the interests of artists through advocacy, writing, and public speaking.

This brief is filed pursuant to Federal Rule of Appellate Procedure 29(a)(2). Appellants and Appellees have consented to this brief.

## STATEMENT OF AUTHORSHIP AND
## FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* certify that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the *amici curiae* or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

# ARGUMENT

The National Endowment for the Arts ("NEA") has announced a funding initiative called "America250," supporting arts projects celebrating the anniversary of our nation's founding. *See R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 367 (D.R.I. 2025), *appeal docketed* No. 25-2113 (1st Cir. Nov. 17, 2025). To obtain this funding, NEA applicants must pass through an administrative gauntlet to ensure that they do not "promote gender ideology"—a hopelessly nebulous assessment that ensures viewpoint discrimination by the government, and causes widespread confusion and self-censorship among grantees that is anathema to the First Amendment and the Administrative Procedure Act ("APA").

Picture a Massachusetts regional theater company's plans to mark the occasion with a new play profiling a local hero from the American Revolution: Deborah Sampson, the official heroine of the Commonwealth of Massachusetts, *see* M.G.L. Ch. 2 § 26, who disguised herself as a man named Robert Shurtliff to fight in the Continental Army. *See* ALFRED F. YOUNG, MASQUERADE: THE LIFE AND TIMES OF DEBORAH SAMPSON, CONTINENTAL SOLDIER 93–94 (2004). The company commissions a playwright to develop the concept. But when the company receives the first draft, it grows concerned. The issue is not the play's quality or the suitability for the audience. It is not the scenes depicting Sampson's distinguished service, her discharge by Henry Knox upon the discovery of her true identity, or Paul Revere's pleas to Congress to have her pension reinstated. *See id.* at 138–40, 152, 227–34. It is instead a depiction of

the stage performance that Sampson gave following the Revolutionary War. In it, she would appear on stage, purport to extol the virtues of traditional gender roles, then depart the stage, change into her Army uniform, and return to perform an elaborate military drill demonstrating her combat skill. *See id.* at 197–202.

The company's concern, in short, is the United States government. The company has planned to apply for an NEA grant but has no idea if this depiction of a historical war heroine would be seen as the use of NEA funds "to promote gender ideology" in violation of Executive Order 14168 (the "Executive Order"). *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025). In truth, no one is sure. The Executive Order, after all, never actually says what "gender ideology" *is,* only what it "replaces," and what it "includes." *Id.* at 8615–16; *see Talbott v. United States*, --- F.4th ---, 2026 WL 1532205 at *8 (D.C. Cir. Jun. 1, 2026); *Am. Council of Learned Soc'ys v. Nat'l Endowment for the Humanities*, No. 25-cv-3657, 2026 WL 1256545 at *8 (S.D.N.Y. May 7, 2026) (agents flagged each National Endowment for the Humanities grant for termination solely "based on its perceived relationship to . . . gender ideology"). Nor has the government explained what it means to "promote" such ideology. *R.I. Latino Arts*, 800 F. Supp. 3d at 368 (discussing the lack of definition of the term "promote" in the Executive Order); *see also Schiff v. U.S. Off. of Pers. Mgmt.*, 784 F.Supp.3d 380, 396 (D. Mass. 2025) (finding that the Office of Personnel Management failed to consider what precisely it means to "promote" gender ideology in its implementation of the Executive Order).

Applying this subjective and undefined mandate to any given work of art illustrates the absurd guesswork that grantees must undergo to even attempt compliance. Would depicting Sampson's post-war performances "permit[] the false claim that males can identify as and thus become women and vice versa"? *See* Exec. Order No. 14168, 90 Fed. Reg. at 8615. Does it matter that it is depicted in this play-within-a play, showing what Sampson actually did after the War? Would it depend on whether the real Sampson expressed a non-cisgender identity? Or whether the play's author, director, or actors are gender nonconforming? And perhaps most essentially: is a theater company inherently "promoting" any subject it tackles in a performance?

In the absence of any formal definition or guidance from the NEA about what it means to promote gender ideology, the only rational move for artists is to avoid art that questions traditional gender roles altogether. This chilling effect is the harm that the plaintiffs–appellees sued to prevent, and that *amici* can attest is felt widely in the artistic community.

*Amici* are arts and expression organizations and advocates who have either experienced firsthand the confusion wrought by the NEA's Final Notice or have worked closely with those who have been adversely impacted. They write to explain how, given the limited investment in the arts and their inherent commercial uncertainty, a Final Notice that implements the Executive Order in any form places arts organizations in an untenable position. Either they must align their artistic

output with the federal government's preferred viewpoints, or face a heightened risk of economic failure by losing access to arts grants. To put arts organizations in this lose-lose position flouts the will of Congress, undermines the artistic freedom the NEA was designed to support, and violates both the Constitution and the APA.

*Amici* share specific examples below of the harms that have occurred and would continue under any implementation of the Executive Order. As detailed in Section II below, arts organizations of all sizes and scopes have suffered considerable loss and harm dealing with the NEA's response to the Executive Order. The ambiguous and subjective definition inherent in "gender ideology" and the clear animus towards non-cisgender persons and stories have led many to forego NEA funding despite the considerable risk in doing so. Still others fear that accepting funding will expose them to punishment for their programming, should the NEA and the organization differ on what it means to "promote gender ideology." All of this sends chills across the entire American arts industry, harming our culture and violating the First Amendment. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1962) (striking Rhode Island's Commission that reviewed books for obscenity in part because "[t]he distributor is left to speculate whether the Commission considers [t]his publication" unlawful).

Government funding of art, of course, always raises concerns about interference with an artist's message. Congress squared that circle through the careful procedural considerations embodied in the National Foundation on the Arts

and Humanities Act. The statute provides for diverse advisory panels who make recommendations to the National Council on the Arts, who then review and make recommendations to the NEA Chairperson. 20 U.S.C. § 959(c); *see R.I. Latino Arts*, 800 F. Supp. 3d at 358.

Thus, even while the NEA is prohibited from funding "[p]rojects, productions, workshops, and programs that are determined to be obscene," 20 U.S.C. § 954(d)(2), it *must* refrain from engaging in viewpoint discrimination in funding. Indeed, its structure and mandates compel viewpoint diversity. Its panels must be composed of "individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view," and the panels are instructed to judge projects "solely on the basis of artistic excellence and artistic merit." 20 U.S.C. § 959(c). This prohibition on viewpoint discrimination saved the NEA's statute from its last major legal challenge. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 583 (1998) (the statutory provisions "do not engender the kind of directed viewpoint discrimination that would prompt this Court to invalidate a statute on its face").

The NEA's Final Notice turns all of its own history and purpose on its head by asserting the power of the Chairperson to make one final, viewpoint-based pass at all funded programs to make sure that the transphobia of the current President is echoed in the artistic output of the United States. Few notions could be so repugnant to the free speech rights embodied in our Constitution. *Ridley v. MBTA*, 390 F.3d 65, 82

(1st Cir. 2004) ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses.").

Appellant suggests that all of this is permissible under the Supreme Court's precedent in *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), as if to say that because *some* decisions must be made given limited arts funding, *all* factors that the NEA might consider are constitutionally permissible. *See* App't Br. at 12. This misstates *Finley*, and misunderstands the Constitution. *Finley* is clear that viewpoint discrimination was different in kind than the limitation of funding for works viewed to be obscene. As the district court observed, most of the substantive discussion of *Finley*, including its public forum analysis and tolerance for some restriction on at least arguably obscene art, does not apply in this case. *R.I. Latino Arts*, 800 F. Supp. 3d at 364–65. The NEA today looks past the artistic form to its underlying message, and engages in viewpoint discrimination on that basis. This renders the Final Notice presumptively invalid. *See id.* at 368–69.

The NEA's actions are therefore contrary to law, and only a total injunction would halt the harm experienced by arts organizations. The Final Notice must be vacated under the APA. *See* 5 U.S.C. § 706. The permanent injunction is also necessary to ensure that the NEA does not attempt to reimpose this viewpoint discrimination through other means. The unlawfulness of the Chair's review stems directly from the Executive Order's unclear directive that federal funds must not be used for the

"promotion of gender ideology," and thus any form of implementation would suffer from the same constitutional infirmity.

I. **Arts Organizations Are Especially Vulnerable to Capricious Viewpoint Discrimination**

The arts are the voice of a nation, and robust arts programs are a sign of a flourishing democracy. "There is a connection, hard to explain logically but easy to feel, between achievement in public life and progress in the arts." John F. Kennedy, Letter to Theodate Johnson, MUSICAL AMERICA, Oct. 1960, at 11.[1] Applying First Amendment protection to motion pictures, Justice Clark wrote that film is a "significant medium for the communication of ideas" and "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). The same can be said for all good art. The freedom of "artistic organizations and individuals themselves to pick and choose among ideas, to winnow, to criticize, to investigate, to elaborate, to protest, to support, to boycott, and even to reject is essential if 'free speech' is to prove meaningful." *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 904 (1st Cir. 1988) (en banc).

Despite their integral role in shaping and amplifying public discourse, arts organizations across the United States operate under considerable financial strain.

---

[1] *Available at* https://archive.org/details/sim_musical-america_1960-10_80_11/.

Budgets are slim, especially for more locally-oriented arts organizations. Public funding in the arts is more limited in the United States than in other peer nations. *See* INTERNATIONAL DATA ON GOVERNMENT SPENDING ON THE ARTS, NAT'L ENDOWMENT FOR THE ARTS (Jan. 2000),[2] (finding that the federal, state, and local governments in the United States collectively spend an average of $6 per person on public arts, compared to the United Kingdom's $26, Australia's $25, and Canada's $46); *Who Pays for the Arts? Global Lessons in Cultural Funding*, GLOBAL LEADERS INSTITUTE FOR ARTS INNOVATION (June 10, 2025)[3] (comparing three types of arts funding models used in various countries). State-level funding for the arts has declined, and given increased economic uncertainty, this trend is unlikely to change. *State Arts Funding Projected to Decrease 7.7% in 2026*, AMS. FOR THE ARTS ACTION FUND (Sept. 8, 2025).[4]

This makes the NEA an especially important source of funding—meaning that even perceived preferences carry outsized weight. The competitive nature of NEA grants further exacerbates the issue. *National Endowment for the Arts (NEA) – Insights and Best Practices*, Off. of the Vice Provost for Research, TUFTS UNIV. (Oct. 2025)[5] ("Applications are very competitive and less than 10% of applications are awarded, so

---

[2] https://www.arts.gov/impact/research/publications/international-data-government-spending-arts
[3] https://www.globalleadersinstitute.org/blog-post/who-pays-for-the-arts-global-lessons-in-cultural-funding/
[4] https://www.artsactionfund.org/state-arts-funding-projected-decrease-2026
[5] https://viceprovost.tufts.edu/national-endowment-arts-nea-insights-and-best-practices

meeting NEA's mission is key to a compelling submission.").

This makes the viewpoint discrimination espoused in the Final Notice all the more insidious. Arts organizations will do all they can to fit the brief and stand out from their peers. This means that the NEA need not categorically bar disfavored views on gender identity and expression in order to have impact. *Any* negative weight toward arts initiatives that espouse a contrary view will translate into how organizations approach the NEA, given how dependent they can be on such funding. *Cf. Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 775 F. Supp. 3d 100, 114 (D.D.C. 2025), *appeal docketed*, No. 25-5148 (D.C. Cir. argued Feb. 6, 2026) (noting that "even a temporary pause in funding" to nonprofits "would destroy their ability" to function).

As the district court found, the NEA has already confessed that widely held viewpoints on gender—say, that gender has been a distinct concept from biological sex from time immemorial, that persons with a gender identity other than cisgender have long been subject "to a lengthy history of *de jure* discrimination" which continues to this very day and indeed has only amplified in recent years, *see United States v. Skrmetti*, 605 U.S. 495, 601 (2025) (Sotomayor, J., dissenting), that this discrimination is contrary to the values of equality that this country espouses, and that to deny this reality is to insult the memory of countless Americans stretching back to our nation's founding—would always harm a project compared to its competitors. *See R.I. Latino Arts*, 800 F. Supp. 3d at 368. The result will be self-

censorship of not only broader projects, but also specific words, lest they be semantic trigger points. Agencies implementing this Executive Order have flagged words as benign as "identity," or misinterpreted proper nouns as offending terms. *Am. Council of Learned Soc'ys*, 2026 WL 1256545 at \*11; Tara Copp, Lolita C. Baldor & Kevin Vineys, *War Heroes and Military Firsts are Among 26,000 Images Flagged for Removal in Pentagon's DEI Purge*, Assoc. Press (Mar. 7, 2025)[6] (reporting that the Department of Defense deleted references to the Enola Gay aircraft in a purge of diversity, equity, and inclusion content from a government database). This is an impermissible chill on freedom of expression.

Such discrimination frustrates the aims of free speech, but it also frustrates the aims of art. As a matter of law, such viewpoint discrimination is abhorrent and violative of the First Amendment. *Nat'l Rifle Ass'n v. of Am. v. Vullo*, 602 U.S. 175, 187 (2024) ("At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."). As a matter of art, the goal of artistic creation is often to challenge the viewer's preconceived notions, to expand their horizons, and to leave them seeing the world a little bit differently. *See Stanton v. Brunswick Sch. Dep't*, 577 F. Supp. 1560, 1574 (D. Me. 1984) ("[T]he open expression of individual views and tastes, the exposure of the public to new and challenging ideas, and the promotion of a continually widening

---

[6] https://apnews.com/article/dei-purge-images-pentagon-diversity-women-black-8efcfaec909954f4a24bad0d49c78074

exposure of the society to new information is effective to shape the public consensus. These are all processes which underlie and are intended to be secured by the First Amendment."). Many arts organizations must angle for NEA funding to survive. Unless the district court is affirmed, to angle for that funding means that artists will avoid depiction of gender nonconformity or discussion of gender identity in any form.

## II. *Amici*'s Experiences Show the Chilling Effects of the Executive Order.

This chilling effect has become reality with the implementation of the Final Notice. *Amici* write to illustrate the field-wide impact of the Final Notice. For example, *amicus* Annie Dorsen is an accomplished theater director and attorney who has been at the forefront of artist organizing in response to both the NEA's implementation of President Trump's executive orders and the NEA's widespread grant cancellations. In response to the former, Dorsen facilitated an open letter from artists to the NEA leadership urging the agency to reconsider the new guidelines. Michael Paulson, *Hundreds of Artists Call on N.E.A. to Roll Back Trump's Restrictions*, NEW YORK TIMES (Feb. 18, 2025).[7] In response to the latter, Dorsen established a crowdsourced spreadsheet to collect data on the impact of cancellations on the field. *See* Annie Dorsen, *NEA Grant Termination Tracker* (last visited Jun. 10, 2026).[8]

---

[7] https://www.nytimes.com/2025/02/18/arts/nea-artists-letter-trump-restrictions.html
[8] https://docs.google.com/spreadsheets/d/1cHCTXssMWuMweRLUjGQKtsck_rg7v4t Mg7cpfzDQil8/htmlview

Over the course of these two initiatives, between roughly February and July 2025, Dorsen spoke with dozens of arts leaders representing all artistic disciplines, from big city arts centers with multimillion-dollar budgets to small community-based groups in rural counties. Dorsen encountered universal confusion as to the meaning of the NEA's new guidelines, the process by which the agency intended to make funding decisions, and the potential legal consequences of applying. Many institutions that had regularly received NEA funding across multiple presidential administrations decided not to apply out of fear of misconstruing the language of the guidelines. Many reported having spent time and resources developing applications that they now planned to abandon, worrying they would run afoul of new criteria they didn't fully understand. Coming on the heels of the agency's unprecedented mass cancellation of grants, leaders expressed reasonable concern that there was a connection between the NEA's new guidelines and the terminations. Nearly without exception, they either deemed it wiser not to apply at all, or to apply only with projects that did not touch disfavored content or involve artists from disfavored groups.

*Amicus* the National Coalition Against Censorship ("NCAC") has gathered similar stories across the arts community. NCAC's Arts and Culture Advocacy program works directly with artists, curators, and cultural institutions on the ground who have experienced censorship pressures. *See Arts & Culture Advocacy Program,*

NCAC (last visited Jun. 10, 2026).[9] Additionally, NCAC collaborates with cultural institutions to adopt internal policies that ensure the protection of curatorial discretion. NCAC staff have repeatedly heard concerns from cultural institutions and individuals about their confusion regarding the Final Notice.

In response to these concerns, NCAC and the Vera List Center for Art and Politics convened a group of cultural leaders in May 2025 to discuss needs and develop strategies in response to threats to artistic freedom. The NEA's changing requirements and processes were chief among those concerns expressed at the meeting. This convening ultimately led to a subset of the group creating a nationwide statement of values and principles for arts and culture, asking institutions and individuals in the cultural sector to commit to guarding artistic freedom and institutional independence, ultimately garnering hundreds of signatures. *The Statement*, COLLECTIVE COURAGE (last visited Jun. 11, 2026).[10] An outgrowth of this statement, NCAC began the Collective Courage Conversation Series in an effort to bring together people working across the arts, culture, and advocacy fields to explore the challenges and possibilities of upholding free expression in the arts today. Audience questions at these events have made evident the cultural sector's high level of unease and lack of clarity around the implications of the Final Notice.

*Amici* also have direct experience with the uncertainty, confusion, and

---

[9] https://ncac.org/project/arts-culture-advocacy-program
[10] https://www.collective-courage.com

transphobic exclusion embodied in the Executive Order. For example, *amicus* Poets & Writers is a nonprofit organization that seeks to provide resources for the professional development of creative writers. Until last year, it consistently received NEA funding for over two decades, which the organization used to develop and expand *Poets & Writers Magazine*, a noted professional journal for writers, and its website pw.org, which features databases of opportunities for writers, a national literary events calendar, the Poets & Writers Directory featuring credentialed authors, and original editorial content about writing and publishing. *Poets & Writers* (last visited Jun. 10, 2026).[11]

In the spring of 2025, the NEA informed Poets & Writers that its current grant had been "terminated" because it did not align with the new administration's priorities, although at the time of notice the grant period was nearly finished and funding had already been disbursed. At the same time, Poets & Writers was still awaiting an answer regarding its grant application for the 2026 fiscal year. When the usual notification window for grant decisions passed without any word from the NEA, Poets & Writers assumed that this grant would not be approved given the previous grant's termination. Then, to Poets & Writers' surprise, the NEA awarded the organization $70,000 in July 2025.

This unexpected turn of events immediately sparked internal concern about

---

[11] https://www.pw.org/

whether to accept the new NEA grant. Staff recall attending many meetings with colleagues from other organizations, as the literary community sought to understand the implications of accepting NEA grants given the ever-changing requirements and review processes. There was considerable concern about the potential legal ramifications if a grantee organization was found to have violated the vague and confusing prohibition against "promoting gender ideology." When Poets & Writers' Board met in early September 2025, it voted unanimously to decline the grant. Board members expressed that they were unsure what the state of the legal validity of the Executive Order and Final Notice were given this pending litigation. The Board and staff leadership were concerned that the NEA's interpretation of what it means to "promote gender ideology" or how it might seek to implement the Executive Order in the future would prohibit the organization from serving transgender and gender nonconforming writers or featuring them in its publications. *See* Melissa Ford Gradel, *A Message From the Executive Director*, POETS & WRITERS MAG. (Jan. 2026)[12] ("It is not clear what criteria they are using—much less what 'gender ideology' even means, or what its promotion might entail.").

*Amicus* Electric Literature is a nonprofit digital publisher that strives for excellence and inclusivity in the writing it selects, spotlighting hundreds of writers and reaching millions of readers. A core component of its work is featuring writers of

---

[12] https://www.pw.org/content/from_poets_writers_inc_81

all backgrounds, including those who identify as transgender. Electric Literature received grant funding from the NEA for nearly a decade, beginning in 2016. Across both Democratic and Republican administrations, the NEA consistently selected Electric Literature for funding based on the quality and mission of their work. As a small literary nonprofit that began operations on a shoestring budget, NEA funding was essential to Electric Literature's survival.

In the spring of 2025, Electric Literature received a nearly identical letter to that which Poets & Writers received, informing it that its grant had been terminated because it was no longer in keeping with the current administration's priorities. Shortly before receiving the termination letter, Electric Literature decided to forgo submitting an application for NEA funding for the 2026 fiscal year. Then-executive director Halimah Marcus penned a public statement explaining the decision, writing that the term "gender ideology" is both "condescending" and "unintelligible." Halimah Marcus, *Why Electric Literature Isn't Applying to the NEA*, ELECTRIC LIT (Mar. 25, 2025).[13] Staff did not know, in theory or in practice, what it meant to certify that Electric Literature does not "promote gender ideology." But because publishing trans writers is an essential part of Electric Literature's mission, staff believed that certifying as such, or participating in a system that reviews applicants based on whether they promote gender ideology, would put them at risk of either being denied

---

[13] https://electricliterature.com/why-electric-literature-isnt-applying-to-the-nea/

or later losing NEA funding. Because the Executive Order penalizes organizations like Electric Literature for *refusing* to discriminate, taking NEA funding that is governed by the Executive Order would have violated Electric Literature's mission.

Faced with the choice of either accepting funding with the risk of a future rug pull, or changing their work in a way antithetical to their mission to avoid that risk, Electric Literature's staff decided that they would instead look toward other funding streams. The decision to forego the prospect of NEA funding, which has been a consistent resource for Electric Literature for years, meant that the organization now must rely more on unpredictable funding sources, like individual giving. Having tenuous funding has made it more difficult to engage in long-term planning and has required staff to shift their own time and attention toward less familiar fundraising terrain.

Thus systemically and individually, *amici* have experienced first-hand what the entire American arts world knows: there is omnipresent fear and bewilderment that is tied directly to the NEA's implementation of the Executive Order. Free speech doctrine teaches the importance of ensuring precision in laws and regulations to avoid chill and give these constitutional freedoms "breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963). When rules that affect speech are unclear, the consequences are dire: the speaker must choose whether "to engage in the expressive activity, thus courting prosecution, or to succumb to the threat, thus forgoing free expression." *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 14

(1st Cir. 1996). Reversing the district court or crafting an injunction too narrowly would force members of the arts world to "hammer[] out the structure of the [regulation] piecemeal, with no likelihood of obviating similar uncertainty for others." *Dombroski v. Pfister*, 380 U.S. 479, 491 (1965).

Arts organizations across the country understood the Executive Order's animus against transgender people, even as they were confused about the exact boundaries of "gender ideology" that might cause serious negative consequences. The NEA's discriminatory judgment is repugnant to the First Amendment because it clearly imposes a particular viewpoint around conceptions of gender as a condition of federal funds. *See R.I. Latino Arts*, 800 F. Supp. 3d at 368. But it also frustrates the intent of Congress, as instead of securing funding for "projects and productions which have substantial national or international artistic and cultural significance," 20 U.S.C. § 954(c)(1), the Final Notice chills and deters many of the leading arts organizations in the United States from engaging with the NEA at all.

III. **The NEA's Actions Illustrate Why This Capricious Agency Action Harms Protected Expression.**

This combination of the discriminatory substance of the Executive Order, the confusion felt in the arts community by its adoption within the Final Notice, and its clear violation of the will of Congress is why the district court's findings on the APA must be affirmed. What constitutes the promotion of gender ideology, what "gender ideology" even means, and what one should do about the fact that compliance with

the Executive Order forces speakers to deny historical and scientific reality is as clear as mud. *See Schiff*, 784 F. Supp. 3d at 396. The government apparently has no idea how to administer this either, coming up with no better solution than rough keyword searches of words and phrases through grants and grant applications. *See Am. Council of Learned Soc'ys*, 2026 WL 1256545 at *9 (providing examples of keyword searches used by U.S. DOGE Service staff in reviewing similar grants); *see also Schiff*, 784 F. Supp. 3d at 396 n.7 (in discussing what would "promote" or "inculcate" gender ideology, "[c]ommon sense and any dictionary would suggest that both verbs require more than the mere use of the acronym LGBTQ"). Arts organizations cannot possibly know what forms of art therefore cross the line, and thus they will be chilled from engaging in work that features any gender nonconformity. Even their lawyers would struggle to determine its contours, let alone stay abreast as injunctions are imposed, appealed, stayed, and re-imposed.

The Final Notice is also contrary to Congressional will. Congress made clear that federal arts funding is not supposed to express the aesthetic views of the President, but instead represent a broad cross-section of the American people, with advisory panels selected to "reflect[] a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view" that should inform NEA funding. 20 U.S.C. § 959(c)(1). Indeed, the statute insulates the subjective views of the NEA Chair, and by extension, the President, from the process. *See R.I. Latino Arts*, 800 F. Supp. 3d at 370–71. The goal, after all, is to

promote the arts broadly, not to transform the federal arts budget into the President's personal concert calendar. Congress also made clear that the NEA may not interfere with the "policy determination, personnel, or curriculum, or the administration or operation" of any funded organization. 20 U.S.C. § 953(c). It is thus not a "surprising notion that Congress expects" the NEA to operate "without regard to the President's" subjective views. *Contra* App't Br. at 15. It is *exactly* what Congress intended, to insulate critical arts funding from any one person's aesthetic tastes to ensure a diverse and inclusive arts funding process.

The NEA discards all of this in favor of a standard where the process would proceed as Congress intended, but then at the last moment would consider the President's expressed views on matters of gender (not a straightforward task, for the reasons discussed above), inquire into the expressed viewpoint of the art (which is itself rarely straightforward), and then grant some form of demerit if the two viewpoints contrast. These are factors "which Congress has not intended it to consider," and its explanation of the choice is "so implausible that it could not be ascribed to a difference in view." *Motor Vehicle Mnfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is a radical recasting of arts administration away from a carefully managed and aesthetically-oriented process into one where art of all kinds may be funded, unless its handling of gender-related topics makes the President queasy.

Because professional arts in the United States depend upon the NEA either

directly or indirectly, if this Final Notice is allowed to stand or if the NEA is not enjoined from these considerations, the only economically available pathway is to avoid ever putting forward any work of art that the organization suspects that the NEA Chair might think that the President would believe promotes "gender ideology." No play about Deborah Sampson. No showcase of the works of Frida Kahlo or Kent Monkman. No annotated republishing of the diaries of Lou Sullivan. No retrospective on Andy Warhol's *Altered Images* series. Possibly even no performance of *Twelfth Night*. Perhaps all of these would be allowed, or perhaps they would be allowed if the artists and subjects involved were each portrayed negatively. But a rational arts organization would simply avoid any speech "which might displease those who control [its] professional destiny." *Shelton v. Tucker*, 364 U.S. 479, 486 (1960); *see also Van Wagner Boston, LLC v. Davey*, 770 F.3d 33, 34 (1st Cir. 2014) ("First Amendment rights are fragile, and it is not only the occasional abuse of censorship power but also the threat inherent in the existence of that power that may chill protected expression.").

## IV. The Implementation in the Final Notice Constitutes Impermissible Viewpoint Discrimination.

The government, somehow, claims that the viewpoint discrimination inherent in the Final Notice is "entirely unremarkable," as an ongoing reflection of the idea that "the NEA Chairperson will take account of the President's views." App't Br. at 13; *see Schiff*, 784 F. Supp. 3d at 394 n.6 ("Perhaps the [defendants] think that when

Executive Branch officials believe a President has told them to engage in viewpoint discrimination, those officials must do so. []This ignores the requirements of the First Amendment. . . . Period."). That is a blithe way to characterize the formal propagandization of the current president's cultural preferences, including through artistic programs. *See* David Smith, *"The Greatest Propaganda Op in History": Trump's Reshaping of US Culture Evokes Past Antidemocratic Regimes*, THE GUARDIAN (Feb. 16, 2025);[14] *see also* David Remnick, *Trump Dishonors the Kennedy Center*, THE NEW YORKER (Dec. 20, 2025).[15]

More to the point, surrounding unconstitutional actions with bland adjectives does not render them constitutional. Indeed, there appears to be no limiting principle to the government's argument. If the President (through the NEA Chair) can use "discretionary authority to award a grant, or to decline to award a grant," on a "grant-by-grant basis" on the basis of gender identity and expression, *see* App't Add. 46, so too could he limit the funding of art that espouses views that align with Democratic or Republican policy preferences, or of certain religions, or even confine grants to works that celebrate him personally.

The government argues that *Finley* controls the result here, but that is wrong. As the district court confirmed, *Finley* reflects the judgment of Congress *not* to

---

[14] https://www.theguardian.com/us-news/2025/feb/16/trump-culture-democracy
[15] https://www.newyorker.com/news/the-lede/trump-dishonors-the-kennedy-center

"disallow any particular viewpoints," even when limiting grants from the funding of allegedly obscene works. *R.I. Latino Arts*, 800 F. Supp. 3d at 364 (quoting *NEA v. Finley*, 524 U.S. at 581–82). Even under the more deferential framework of *Finley*, "in all cases, 'viewpoint discrimination is forbidden.'" *Id.* at 368 (cleaned up) (quoting *Matal v. Tam*, 582 U.S. 218, 243 (2017)); *see Thakur v. Trump*, --- F.4th ---, 2026 WL 1466303 at **8, 11 (9th Cir. May 26, 2026) (distinguishing the diversity, equity, and inclusion and gender ideology executive orders from both *Finley* and the valid content choices that can be made under the holding in *Agency for Int'l Dev. v. All. for Open Soc'y*, 570 U.S. 205 (2013)). Indeed, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). For many Americans, it is through their art that they express their views on these and other matters. To allow the NEA, for the first time, to limit arts funding based on viewpoints would ignore that celestial guidance and turn arts funding into another form of propaganda.

## CONCLUSION

For the reasons stated herein, *amici* respectfully request that this Court affirm the judgment of the district court.

Dated: June 17, 2026

Respectfully submitted,

/s/ Andrew F. Sellars

Andrew F. Sellars
Kendra K. Albert
ALBERT SELLARS LLP
769 Centre Street, Suite 199
Boston, MA 02130
(617) 798-7922
andy@albertsellars.law

Counsel for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's rules. The document contains 6,470 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word, in the font Crimson Pro.

Dated: June 17, 2026

/s/ Andrew F. Sellars

Andrew F. Sellars
ALBERT SELLARS LLP
769 Centre Street, Suite 199
Boston, MA 02130
(617) 798-7922
andy@albertsellars.law

Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2026, I caused the foregoing Brief of *Amici Curiae* to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: June 17, 2026

/s/ Andrew F. Sellars

Andrew F. Sellars
ALBERT SELLARS LLP
769 Centre Street, Suite 199
Boston, MA 02130
(617) 798-7922
andy@albertsellars.law

Counsel for *Amici Curiae*