No. 25-2113

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

RHODE ISLAND LATINO ARTS; NATIONAL QUEER THEATER; THE THEATER OFFENSIVE; THEATRE COMMUNICATIONS GROUP,

*Plaintiffs-Appellees*,

v.

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in the official capacity as Chair of the National Endowment for the Arts,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Rhode Island

# BRIEF FOR PLAINTIFFS-APPELLEES

David D. Cole (Bar No. 5776)
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

Lynette Labinger (Bar No. 23027)
Cooperating counsel
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF RHODE ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
LL@labingerlaw.com

Vera Eidelman (Bar No. 1220845)
Scarlet Kim (Bar No. 1177295)
Lauren Yu (Bar No. 1220844)
Brian Hauss (Bar No. 1183865)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org
scarletk@aclu.org
lyu@aclu.org
bhauss@aclu.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, the undersigned counsel for Plaintiffs Rhode Island Latino Arts ("RILA"), National Queer Theater ("NQT"), The Theater Offensive ("TTO"), and Theatre Communications Group ("TCG") certifies that RILA, NQT, TTO, and TCG are nonprofit organizations with no corporate parent and that they are also not publicly held.

Dated: June 16, 2026

By: */s/ Vera Eidelman*
Vera Eidelman

*Counsel for Plaintiffs-Appellees*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

STATEMENT OF THE CASE ..... 3

A. The National Foundation on the Arts and the Humanities Act of 1965… ..... 3

B. The 1990 Amendments ..... 5

C. *NEA v. Finley* ..... 7

D. Executive Order 14168 and This Lawsuit ..... 8

STANDARD OF REVIEW ..... 13

SUMMARY OF ARGUMENT ..... 13

ARGUMENT ..... 16

I. The Final Policy and Certification Requirement Violate the First Amendment ..... 16

A. *Finley* prohibits viewpoint discrimination in NEA grants ..... 17

B. The First Amendment prohibits viewpoint discrimination in government funding programs designed to facilitate private speech ..... 22

C. Nonpublic forum doctrine reflects the same prohibition ..... 24

D. The Government's arguments to the contrary fail ..... 27

1. When the government funds private speech, the First Amendment prohibits viewpoint discrimination both inside and outside of the program ..... 27

2. The First Amendment is not limited to direct regulation ..... 29

E. NEA grants are not government speech ..... 30

II. The Final Policy and Certification Requirement Violate the APA ..........34

A. The Final Policy and Certification Requirement exceed the NEA's statutory authority ..........34

B. The Final Policy and Certification Requirement are arbitrary and capricious ..........39

III. The Government Has Forfeited Its Arguments About Scope of Relief, and the District Court Did Not Abuse Its Discretion in Granting Relief ..........45

A. The Government has forfeited its arguments about scope of relief.. ..........46

B. The district court properly vacated and set aside the Final Policy. ..........47

C. The scope of the district court's injunction was proper ..........50

CONCLUSION ..........52

CERTIFICATE OF COMPLIANCE ..........53

CERTIFICATE OF SERVICE ..........54

APPELLEES' ADDENDUM ..........55

# TABLE OF AUTHORITIES

**Cases**

*Agency for International Development v. Alliance for Open Society International, Inc.*,
570 U.S. 205 (2013)....................28

*Allina Health Services v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014)....................47

*American Great Lakes Ports Association v. Zukunft*,
301 F. Supp. 3d 99 (D.D.C. 2018)....................48

*Arkansas Education Television Commission v. Forbes*,
523 U.S. 666 (1998).................... 25, 26

*Bella Lewitzky Dance Foundation v. Frohnmayer*,
754 F. Supp. 774 (C.D. Cal. 1991)....................5

*Bridgeport Hospital v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024)....................47

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962)....................39

*California ex rel. Lockyer v. United States Department of Agriculture*,
459 F. Supp. 2d 874 (N.D. Cal. 2006)....................49

*California v. Bernhardt*,
472 F. Supp. 3d 573 (N.D. Cal. 2020)....................41

*California v. United States Department of Education*,
132 F.4th 92 (1st Cir. 2025)....................45

*Chamber of Commerce of United States v. Federal Election Commission*,
69 F.3d 600 (D.C. Cir. 1995)....................44

*Chamber of Commerce of United States v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)....................41

*Chevron, U.S.A., Inc. v. National Resource Defense Council, Inc.*,
467 U.S. 837 (1984)....................43

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)....................17

*Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*,
561 U.S. 661 (2010)....................25

*City and County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018)....................39

*City of Kansas City v. Department of Housing and Urban Development*,
923 F.2d 188 (D.C. Cir. 1991) .................... 40, 42

*Cornelius v. NAACP Legal Defense and Education Fund, Inc.*,
473 U.S. 788 (1998)....................26

*Corner Post, Inc. v. Board of Governors of Federal Reserves Systems*,
603 U.S. 799 (2024).................... 48, 49

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009).................... 40, 45

*General Electric Company v. Joiner*,
522 U.S. 136 (1997)....................48

*Griffin v. Secretary of Veteran Affairs*,
288 F.3d 1309 (Fed. Cir. 2002)....................27

*Hannegan v. Esquire*,
327 U.S. 146 (1946)....................24

*Harvey v. Veneman*,
396 F.3d 28 (1st Cir. 2005) .................... 14, 22, 34

*Housatonic River Initiative v. United States Environmental Protection Agency*,
75 F.4th 248 (1st Cir. 2023) ....................40

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................35

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025)....................49

*Johanns v. Livestock Marketing Association*,
544 U.S. 550 (2005) ..... 33

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*,
322 F.3d 26 (1st Cir. 2003) ..... 46

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) ..... 23

*Legal Services Corporation v. Velazquez,*
531 U.S. 533 (2001) ..... *passim*

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ..... 35, 43

*Louisiana v. Biden*,
543 F. Supp. 3d 388 (W.D. La. 2021) ..... 41

*MacRae v. Mattos*,
106 F.4th 122 (1st Cir. 2024) ..... 13

*Make the Road New York v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ..... 49, 50

*Matal v. Tam*,
582 U.S. 218 (2017) ..... *passim*

*McGriff v. City of Miami Beach*,
84 F.4th 1330 (11th Cir. 2023) ..... 31

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004) ..... 22, 34

*Miller v. California*,
413 U.S. 15 (1973) ..... 35

*Minnesota State Board for Community Colleges v. Knight*,
465 U.S. 271 (1984) ..... 25

*Miot v. Trump*,
818 F. Supp. 3d 126 (D.D.C. 2026) ..... 48

*Motor Vehicles Manufacterers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*,
463 U.S. 29 (1983) .......... *passim*

*National Association of Waterfront Employers v. Solis*,
665 F. Supp. 2d 10 (D.D.C. 2009) .......... 49

*National Cable Telecommunication Association v. Brand X Internet Services*,
545 U.S. 967 (2005) .......... 43

*National Council of Nonprofits v. Office of Management and Budget*,
763 F. Supp. 3d 36 (D.D.C. 2025) .......... 43

*NEA v. Finley*,
524 U.S. 569 (1998) .......... *passim*

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 48

*North Carolina Fisheries Association, Inc. v. Brown*,
917 F. Supp. 1108 (E.D. Va. 1996) .......... 49

*Northeastern Florida Chapter, Associated General Contractors of America v. Jacksonville*,
508 U.S. 656 (1993) .......... 20

*Olsen v. United States*,
414 F.3d 144 (1st Cir. 2005) .......... 44

*Ortiz v. Gaston County Dyeing Machine Company*,
277 F.3d 594 (1st Cir. 2002) .......... 46

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005) .......... 31, 32

*Perry Education Association v. Perry Local Educators' Association*,
460 U.S. 37 (1983) .......... 26

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .......... 32

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) .......... 2, 13, 19

*Rhode Island v. Trump*,
781 F. Supp. 3d 25 (D.R.I. 2025)....................41

*Ridley v. Massachusetts Bay Transport Authority*,
390 F.3d 65 (1st Cir. 2004) .................... *passim*

*Rosenberger v. Rector and Visitors of University of Virginia*,
515 U.S. 819 (1995).................... 17, 22, 25, 29

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) .................... 13, 47

*Rust v. Sullivan*,
500 U.S. 173 (1991).................... 24, 28, 29

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022).................... 30, 32, 33

*Smiley v. Citibank (South Dakota), N.A.*,
517 U.S. 735 (1996)....................45

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022)....................48

*Texas v. United States*,
691 F. Supp. 3d 763 (S.D. Tex. 2023)....................49

*Thakur v. Trump*,
__ F.4th __, No. 25-4249, 2026 WL 1466303 (9th Cir. May 26, 2026)..... 20, 28

*Thakur v. Trump*,
163 F.4th 1198 (9th Cir. 2025)....................20

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017)....................20

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025).................... 49, 50

*United States v. Franklin*,
51 F.4th 391 (1st Cir. 2022) ....................47

*United States v. Maldonado*,
708 F.3d 38 (1st Cir. 2013) ....................................................................49

*United States v. Nixon*,
418 U.S. 683 (1974)................................................................................40

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000)................................................................................22

*United States v. Roache*,
171 F.4th 137 (1st Cir. 2026) .................................................................47

*United States v. Tsarnaev*,
595 U.S. 302 (2022)........................................................................ 47, 48

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015)................................................................................33

*Washington Toxics Coalition v. United States Department of Interior*,
457 F. Supp. 2d 1158 (W.D. Wash. 2006)...............................................49

*Woonasquatucket River Watershed Council v. United States Department of Agriculture*,
778 F. Supp. 3d 440 (D.R.I. 2025)..........................................................41

**Statutes**

20 U.S.C. § 951 ........................................................................... 1, 3, 38

20 U.S.C. § 953(c) .........................................................................................5

20 U.S.C. § 954(c) .......................................................................................1, 3

20 U.S.C. § 954(d) ............................................................................ *passim*

20 U.S.C. § 955(b) .......................................................................................5, 7

20 U.S.C. § 955(f)...................................................................................... 7, 39

20 U.S.C. § 959(c) ...........................................................................................7

20 U.S.C. § 960 ...............................................................................................3

5 U.S.C. § 706 ......................................................................... 34, 39, 47, 49

National Foundation on the Arts and the Humanities Act of 1965, Pub. L. No. 89-209, 79 Stat. 845 (1965) .......... 3, 4, 5

**Other Authorities**

111 Cong. Rec. 23963 (1965) .......... 4

135 Cong. Rec. 16284 (1989) .......... 5

136 Cong. Rec. 28624 (1990) .......... 36

91 Fed. Reg. 32198 (May 29, 2026) .......... 12

Black's Law Dictionary (8th ed. 2004) .......... 48

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) .......... 8, 9, 42

H.R. Rep. No. 89-618 (1965) .......... 4

S. Rep. No. 89-300 (1965) .......... 3

The Independent Commission, *A Report to Congress on the National Endowment for the Arts* (1990) .......... 6

**Treatises**

Charles Alan Wright et al., 11A *Federal Practice and Procedure* § 2941 (3d ed. 2026) .......... 48

## INTRODUCTION

Congress created the National Endowment for the Arts ("NEA") for "the purpose of enabling" those with "exceptional talent" in the arts to create art free from political influence. 20 U.S.C. § 954(c). Congress designed the NEA not to promote government views, but to "create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry." *Id.* § 951(7). In 1990, Congress reinforced its commitment to freedom of expression and viewpoint neutrality, directing that "artistic excellence and artistic merit are *the* criteria by which applications [for NEA funding] are to be judged." *Id.* § 954(d)(1) (emphasis added).

Yet the Government now asks this Court to find, for the first time in NEA history and contrary to statute, that the NEA can disfavor projects specifically because they express views the President disfavors (namely, the "promotion" of "gender ideology"). As the court below correctly held, this violates both the First Amendment and the Administrative Procedure Act ("APA").

With respect to the First Amendment, viewpoint discrimination is prohibited when the government allocates support for private artistic speech. The Supreme Court said as much in *NEA v. Finley*, 524 U.S. 569 (1998). In that case, artists challenged an amendment to the NEA's authorizing statute directing that grant applications must be judged for their "artistic excellence and artistic merit," "taking into consideration general standards of decency and respect for the diverse beliefs

and values of the American public." 524 U.S. at 572. The artists argued that the "decency and respect" clause was unconstitutionally viewpoint-based.

The Supreme Court disagreed—but not because viewpoint discrimination would be constitutional. Instead, it found no such discrimination in the text. Noting that Congress had "declined" to disallow or penalize "any particular viewpoints," and that the NEA had implemented the clause not by applying "decency and respect" as substantive criteria, but merely by requiring diversity in review panels, the Court upheld the provision. *Id.* at 581–82. Critically, the Court cautioned that "[i]f the NEA *were* to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case," for "*even in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas*." *Id.* at 587 (emphasis added) (citation modified) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 550 (1983)).

The NEA has now done precisely what the Supreme Court warned against. It has singled out one idea—"promoting gender ideology"—for disfavor precisely because the government (and more precisely, the President) disagrees with it. That violates the First Amendment.

And it also violates the APA because it is contrary to the Constitution, is not authorized by the NEA statute, and is arbitrary and capricious. The phrase "artistic

excellence and artistic merit" cannot be read to mean "only political views the President approves of." This Court should affirm.

## STATEMENT OF THE CASE

### A. The National Foundation on the Arts and the Humanities Act of 1965

Congress created the NEA by enacting the National Foundation on the Arts and the Humanities Act of 1965 (the "Act"). Pub. L. No. 89-209, 79 Stat. 845 (1965) (codified at 20 U.S.C. §§ 951–960). In order to provide "support for . . . the arts," Congress pledged federal funding to the NEA "to help create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry." §§ 2(5), 4(b), 79 Stat. at 845, 846 (codified at 20 U.S.C. §§ 951(7), 953(b)).

The Act tasked the NEA with offering grants to artists and arts organizations for "productions" and "projects" that foster "artistic creativity" and "create opportunities for individuals to develop artistic talents." §§ 3(d), 5(c), 79 Stat. at 846 (codified as amended at 20 U.S.C. §§ 952(d), 954(c)).

Congress intended for the NEA to support private artistic expression, free from political or ideological controls. As the Senate Report noted, "no undue preference should be given to any particular style or school of thought or expression." S. Rep. No. 89-300, at 3–4 (1965). The report devoted an entire section to "Freedom of Expression," and stated that the NEA should give "the fullest attention to freedom of artistic and humanistic expression." *Id.* The House Report

similarly rejected "attempts at political control of culture," and stated that the NEA is meant "to decentralize the arts in the United States" and to support "the activities of private citizens." H.R. Rep. No. 89-618, at 21 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 3186, 3190, 3205. Congress's intent was to have "Government assistance, but not intervention," "support but not control," and "stimulation but not participation." 111 Cong. Rec. 23963 (1965) (statement of Rep. John S. Monagan).

Congress took several steps to insulate grantees' speech from government control. First, Congress required that funding criteria be based on artistic excellence and merit, not political viewpoint. The Act originally directed support for works of "artistic and cultural significance, giving emphasis to American creativity and . . . professional excellence"; those "meeting professional standards or standards of authenticity, irrespective of origin which are of significant merit"; and those "that will encourage and assist artists and enable them to achieve standards of professional excellence." *See* § 5(c)(1)–(3), 79 Stat. at 846–47. As amended in 1990, the Act explicitly requires that "artistic excellence and artistic merit are the criteria by which applications are judged." 20 U.S.C. § 954(d)(1).

Second, as an "assurance against federal interference in the arts," H.R. Rep. No. 89-618, at 15, 1965 U.S.C.C.A.N. at 3200, Congress forbade the NEA from "exercis[ing] any direction, supervision, or control over the policy determination,

personnel, or curriculum, or the administration or operation of any . . . institution, organization, or association." § 4(c), 79 Stat. at 846; 20 U.S.C. § 953(c).

Third, Congress required that the Chair and members of the National Council on the Arts be arts experts guided by artistic merit, not politicians. *See* § 5(a), 78 Stat. 905; *see also* 20 U.S.C. § 955(b). As Senator Claiborne Pell explained, "when we structured the Endowment, we were careful to put the artistic decisionmaking . . . away from the influence of government." 135 Cong. Rec. 16284 (1989).

**B. The 1990 Amendments**

In 1989, controversy arose around the NEA's funding of two projects. Congress responded by (1) stipulating in the 1990 appropriations bill that no NEA funds could be used for "materials which in the judgment of [the NEA] may be considered obscene"; (2) requiring "all grantees [to] certify in writing that they would not utilize federal funding to engage in projects inconsistent with the criteria in the 1990 appropriations bill"; and (3) creating an Independent Commission to review the NEA's grantmaking procedures and standards. *Finley*, 524 U.S. at 574–75 (citations omitted).[1]

Recognizing that "[t]he need to prevent centralized federal control of culture" and the "importance of freedom of expression" are central to the NEA, the

[1] A court later struck down the certification requirement as unconstitutionally vague and chilling. *See id.* (citing *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774 (C.D. Cal. 1991)). The government declined to appeal.

Commission recommended that it rescind the certification requirement and not enact any "legislative changes [that would] impose specific restrictions on the content of works of art supported by the Endowment." The Indep. Comm'n, *A Report to Congress on the National Endowment for the Arts* 15–16, 89 (1990). The Commission concluded "that the thousands of grant decisions the Endowment makes cannot be determined on a grid of legislative directions," and that review panels "must not be dominated by any particular interest, viewpoint or school." *Id.* at 61, 66. It also noted that a Legal Task Force of six constitutional law scholars had advised that "a particularly powerful case might be made" that "funding denials [that] are the product of invidious discrimination with the aim of suppressing a particular message and for no other reason . . . [are] unconstitutional." *Id.* at 85–86.[2]

Congress then rejected two amendments to the Act: one that "would have virtually eliminated the NEA," and one that would have prohibited grants to works "denigrating . . . a particular religion . . . individual, or group" on the basis of specific characteristics. *Finley*, 524 U.S. at 576 (citation omitted). Instead, Congress adopted "a bipartisan compromise," *id.*, which (1) directs the Chair to "ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs

[2] The Task Force members were Floyd Abrams, Geoffrey Stone, Kathleen Sullivan, Michael McConnell, Ted Olson, and Henry Monaghan.

and values of the American public," and (2) "clearly indicate[s] that obscenity is without artistic merit, is not protected speech, and shall not be funded." 20 U.S.C. § 954(d).

As amended, the Act now requires three levels of review—all including individuals with expertise in the arts, and all based on artistic excellence and merit. First, panels "of individuals reflecting a wide geographic, ethnic, and minority representation as well as . . . diverse artistic and cultural points of view," including "lay individuals who are knowledgeable about the arts," "recommend applications . . . solely on the basis of artistic excellence and artistic merit." *Id.* § 959(c). Then, the Council—selected with "due regard to equitable representation," and including 18 "private citizens" with "broad knowledge of," "expertise" in, or "profound interest in the arts"—reviews the panel recommendations. *Id.* § 955(b)(1)(C), (f). Finally, the Chair reviews those recommendations, and makes a final yes-or-no decision based on "artistic excellence and artistic merit." *Id.* §§ 954(d)(1), 955(f).

### C. *NEA v. Finley*

In *NEA v. Finley*, four artists and a national arts organization challenged the new "decency and respect" clause, arguing that, among other things, it constituted unconstitutional viewpoint discrimination. *Finley*, 524 U.S. at 577–78. The Supreme Court disagreed because it concluded the clause imposed no substantive viewpoint screen.

The Court noted that the NEA had implemented the clause through process, not substance, and that members of Congress and the Commission had specifically cautioned against "start[ing] down th[e] road of prohibiting categories of expression" or imposing "distinct viewpoint-based standards for funding." *Id.* at 570, 581–82. The NEA maintained that the "decency and respect" clause is "merely hortatory," and that those reviewing applications for NEA grants would not apply "decency and respect" as substantive criteria. *Id.* at 581–82. The Court agreed that the clause is "advisory" and "imposes no categorical requirement," such that it does not direct viewpoint discrimination. *Id.* at 580–81.

At the same time, the Court cautioned that it "would confront a different case" if the NEA were to deny grants to projects because they express disfavored viewpoints, for "even in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." *Id.* at 587 (citation omitted).

**D. Executive Order 14168 and This Lawsuit**

On January 20, 2025, President Trump signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO" or "EO"). Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025). The EO defines its purpose as resisting "ideologues who deny the biological reality of sex." *Id.* § 1. In the White House's view, "gender ideology" refers to a set of "wrong," "internally inconsistent,"

and "false" beliefs, which "replace[] the biological category of sex with an ever-shifting concept of self-assessed gender identity," thereby "attack[ing]" women" and "the validity of the entire American system." *Id.* §§ 1, 2(f). The EO forbids the use of federal funds "to promote gender ideology," and directs "[e]ach agency [to] assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* §§ 2, 3(g).

The NEA first implemented the EO on February 6, 2025. It required all applicants to certify, under penalty of judicial enforcement, that they "understand[] that federal funds shall not be used to promote gender ideology" and "will comply with all applicable Executive Orders." JA94, 96. This requirement rendered any project that appeared to "promote gender ideology" ineligible for funding.

On March 6, 2025, Plaintiffs—three individual arts organizations, Rhode Island Latino Arts ("RILA"), National Queer Theater ("NQT"), and The Theater Offensive ("TTO"), and one member organization, Theatre Communications Group ("TCG")—challenged the NEA's implementation, alleging that it violated the First Amendment, APA, and Fifth Amendment. JA4, JA10–41. Based on the artistic merit and excellence of their work, Plaintiffs had collectively been offered more than 50 NEA grants since 1998. JA116, JA123, JA131–32, JA140. They sued because they wanted to submit applications for projects that administration officials might consider to "promote gender ideology." These projects involve transgender,

nonbinary, intersex, and queer characters or actors; celebrate and affirm transgender, nonbinary, intersex, and queer people; or explore themes of sex, gender, and identity. JA117–120, JA123, JA125–26, JA134–36, JA141–43.

Five days later, on March 11, 2025, the NEA announced that it would "no longer require applicants to certify their compliance with [the Gender Ideology EO] while the outcome of this litigation is pending." JA147. Six days after that (and ten days before the hearing on Plaintiffs' motion for preliminary relief), on March 17, 2025, the NEA "rescinded all implementation of the EO" in order to undergo a "new evaluation of the EO." JA217.

On April 3, 2025, the district court denied Plaintiffs' motion for preliminary relief in light of the NEA's ongoing re-evaluation. While concluding that "Plaintiffs can demonstrate a likelihood of success on the merits of their APA and First Amendment claims," the court gave the NEA "the opportunity to make its own considered decision about whether to implement the EO at all, given the obvious tension between the EO and the explicit language of the [Act]." JA252, JA271–72.

On April 30, the NEA issued a notice ("Notice") announcing its new policy ("Final Policy" or "Policy"). The Notice stated that changes were "needed to incorporate the EO in the NEA's grant application review process." JA363. The Policy provided that the Chair will now review all grant recommendations for "whether the proposed project promotes gender ideology." JA364. In discovery,

which the district court granted because the Notice was insufficiently clear, JA7–8, Defendants acknowledged that the Chair's conclusion that a project "promotes gender ideology" would be relevant and could only "weigh against the project's final approval." JA373 ("den[ying]" that it will make no difference and "admit[ting]" that it could only be a negative factor).

The NEA also resurrected the prohibition on using NEA funds to "promote gender ideology" and the certification requirement (collectively, the "Certification Requirement") by again requiring applicants to certify that they "will comply with all applicable Executive Orders," no longer exempting the Gender Ideology EO. JA410.

When Plaintiffs moved for summary judgment, the NEA amended the certification yet again, this time to state that "all compliance with [the Gender Ideology EO] is governed exclusively by the [Final Policy]," JA482—but failed to reflect this change across the NEA's website, leaving the "comply with all applicable Executive Orders" language on many pages accessed by Plaintiffs. *See* JA490.

The district court granted Plaintiffs summary judgment on First Amendment and APA grounds. The court found it undisputed that "[w]ith the Final Notice in effect, projects deemed to promote gender ideology are less likely to be approved for NEA funding." JA544. It held that the Policy violates the First Amendment because it is "a restriction on artists' speech, and one that is viewpoint based." *Id.* In

addition, the court held that the "Final Notice violates the APA because the NEA's authorizing statute does not empower the Chairperson to categorically disfavor applications for promoting certain views," JA564–65, and "because it is arbitrary and capricious." JA570. "There is no examination of relevant data, there are no findings of fact, and there is zero explanation of what it means for a project to 'promote gender ideology,' let alone how that concept relates to artistic merit, artistic excellence, general standards of decency, or respect for the diverse beliefs and values of the American public." JA571. The court enjoined Defendants "from applying a viewpoint-based standard of review to Plaintiffs that disfavors applications deemed 'to promote gender ideology,'" including any requirement that applicants comply with the Gender Ideology EO, and "vacate[d] and set[] aside Defendants' current plan to implement the Executive Order." JA533–34, 575 n.10.[3]

---

[3] On May 29, 2026, the NEA, along with more than 40 other agencies, published a Notice of Proposed Rulemaking that, if it becomes final, would (1) provide that, "to the maximum extent permitted by law, the [NEA] . . . must ensure that Federal awards and subawards are not used to fund, promote, encourage, subsidize, or facilitate . . . Gender ideology as defined in [the EO]," and would (2) require a senior NEA official to ensure that all funded projects "demonstrably advance the President's policy priorities" and do not "promote, encourage, subsidize, or facilitate . . . [d]enial by the recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic." 91 Fed. Reg. 32198 (May 29, 2026), §§ 200.205(b), 200.300(b). Comments are due July 13.

## STANDARD OF REVIEW

This Court reviews a district court's summary judgment decision *de novo*, *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024), and a grant of injunctive relief for abuse of discretion, *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000).

## SUMMARY OF ARGUMENT

The NEA's imposition of a categorical burden on applicants who "promote gender ideology" in their proposals contravenes the First Amendment, the NEA's governing statute, and the APA. Because Congress established the NEA to support private artistic expression, not to espouse an official government view, the First Amendment and the Act both prohibit the NEA from discriminating in its arts grants based on whether the artist expresses a view the President seeks to suppress.

In *NEA v. Finley*, the Supreme Court reaffirmed that "even in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." 524 U.S. at 587 (citation modified) (quoting *Regan*, 461 U.S. at 550). The Court rejected a facial challenge to the Act's "decency and respect" clause only because it interpreted the statute not to require viewpoint discrimination. *Id.* at 581–83. At the same time, it expressly cautioned against applying that clause "in a manner that raises concern about the suppression of disfavored viewpoints." *Id.* at 587. Yet that

is precisely what the NEA has now done, by singling out one particular viewpoint for disfavored treatment.

Mischaracterizing *Finley* as accepting viewpoint discrimination as part of the NEA's work, the Government argues that the only First Amendment restriction on grantmaking is that the government cannot limit grantees' speech on their "own time and dime." That ignores not only *Finley*'s express admonition to the contrary, but other Supreme Court and First Circuit precedent as well. When the government "create[s] a program to facilitate private speech," not to advance its own message, it cannot discriminate based on viewpoint. *Harvey v. Veneman*, 396 F.3d 28, 42–43 (1st Cir. 2005); *see also Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 541 (2001). Were it otherwise, the government could use its outsized financial authority to skew private speech wherever it provides funding, from public universities to legal aid services. Equally, it could leverage its discretionary authority over all kinds of government benefits—from broadcast licenses to trademark registration—to skew the marketplace of ideas in its preferred ideological direction. The First Amendment forbids that, and for good reason.

Nonpublic forum doctrine supports the same result, as it requires that even where the government has opened a forum only for a select group of speakers, it must not discriminate on the basis of viewpoint. Because NEA grantmaking is competitive, it is not a designated or traditional public forum. *See Finley*, 524 U.S.

at 586. But even where, as here, the government is selective in its support of private speech, it must not discriminate on the basis of viewpoint. *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95 (1st Cir. 2004).

The Government seeks to evade this uniform precedent demanding viewpoint neutrality by invoking the government speech doctrine. But as Congress made clear from the start, the NEA is not a conduit for the dissemination of government propaganda; rather, it is an endowment to support the private expression of artists. The Government concedes that NEA-funded art is private speech, but insists that the NEA's choice to fund that art is itself government speech, and therefore the NEA can discriminate on viewpoint without First Amendment constraint. The government made a virtually identical argument about the registration of trademarks, a form of selective government support of private speech, in *Matal v. Tam*, 582 U.S. 218 (2017). And the Supreme Court rejected the claim that the government's authority to select which marks to register made the trademark program "government speech," maintaining that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, [the] government could silence or muffle the expression of disfavored viewpoints." *Id.* at 235.

The Policy and Certification Requirement also violate the APA. Nothing in the Act authorizes the NEA to disfavor art that "promotes gender ideology." The statute directs that "artistic merit and excellence are *the* criteria by which

applications are to be judged." 20 USC § 954(d)(1) (emphasis added). The NEA's addition of a viewpoint-based factor, prohibition, and certification all exceed what the Act authorizes.

Moreover, the NEA has not offered any reasoned explanation for its newly minted viewpoint screen. In essence, the Government claims that "because the President said so" suffices, and that the Policy is so obviously correct that it needs no explanation at all. Accepting either of those as a "reasoned explanation" would eviscerate the APA's protection against arbitrary and capricious agency decisions.

Finally, the district court did not abuse its discretion by ordering vacatur of the Policy or enjoining Defendants from requiring Plaintiffs to comply with the EO when using NEA funds. Vacatur is the statutorily defined, customary remedy for an APA violation. And an injunction against the Policy of discriminating against projects that "promote gender ideology" necessarily includes relieving Plaintiffs of the burden of not communicating such views with NEA funds or swearing to the same.

## ARGUMENT

### I. The Final Policy and Certification Requirement Violate the First Amendment.

The Final Policy violates the First Amendment because it imposes a burden on a particular viewpoint disfavored by the President. As the Supreme Court recently reaffirmed, "'[v]iewpoint discrimination' . . . represents 'an egregious form' of

content regulation, and governments in this country must nearly always 'abstain.'" *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). That principle applies equally where the government is directly regulating speech and where, as here, it is discriminating in the provision of government benefits for private expression. The Supreme Court has already stated that this rule applies to NEA funding, and precedent of the Supreme Court and this Court reinforces the point. The government cannot launder viewpoint discrimination in subsidies for private speech by declaring that its selection of which speech to support is "government speech" immune from First Amendment review.

### A. *Finley* prohibits viewpoint discrimination in NEA grants.

*Finley* makes clear that the general prohibition on viewpoint discrimination applies to the provision of NEA grants. In that case, four artists and an arts organization challenged the Act's then-new language directing the NEA to administer grants based on "artistic excellence and artistic merit . . . , taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *See* 524 U.S. at 572 (quoting 20 U.S.C. § 954(d)(1)). The artists maintained that the "decency and respect" clause introduced impermissible viewpoint discrimination. The Court upheld the statute only by interpreting it *not* to authorize viewpoint discrimination. And in doing so, it warned

that "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case." *Id.* at 587. *This* is that case.

The Government mischaracterizes *Finley* as blessing viewpoint-based determinations. *See* Br. 29. It did not. The Court denied a facial challenge to the "decency and respect" provision by rejecting only the artists' statutory interpretation, not the constitutional principle they advanced. The Court upheld the statute precisely because it credited the NEA's interpretation of it as *not* authorizing viewpoint discrimination.

The Court emphasized "that the legislation was aimed at reforming procedures rather than precluding speech," and that, in enacting § 954(d), "Congress declined to disallow any particular viewpoints." 524 U.S. at 582. It detailed the NEA's decision to implement § 954(d)(1) "merely by ensuring that the members of the advisory panels that conduct the initial review of grant applications represent geographic, ethnic, and esthetic diversity." *Id.* at 577. And it concluded that, even if the clause were read to impact more than process, introducing "decency and respect" as "considerations" would not, "in practice," "preclude or punish the expression of particular views," because the concepts of "decency and respect" are too nebulous to direct viewpoint discrimination. *Id.* at 580–81, 583 (crediting artists' argument that "one would be hard-pressed to find two people in the United States who could

agree on what 'the diverse beliefs and values of the American public' are, much less on whether a particular work of art 'respects' them" (citation modified)).

Critically, the Court cautioned that "[i]f the NEA *were* to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or to impose a "burden calculated to drive 'certain ideas or viewpoints from the marketplace,'" "a more pressing constitutional question would arise." *Id.* at 587 (emphasis added) (citation omitted). The Court emphasized that "the First Amendment certainly has application in the subsidy context," *id.* at 587–88, requiring that, "even in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." *Id.* at 587 (citation modified) (quoting *Regan*, 461 U.S. at 550). The Court warned that if the decency and respect clause were "applied in a manner that raises concern about the suppression of disfavored viewpoints," it could run afoul of that principle. *Id.*

The Final Policy is precisely what *Finley* warned against: a "penalty on disfavored viewpoints." *See* JA373 (denying that a project promoting "gender ideology" will "make no difference" and admitting it can only be a negative factor). The Certification Requirement goes even further, imposing a viewpoint-based prohibition on the use of NEA funds. JA410, JA490.

*Finley* refutes the Government's contention that "when acting as a *patron* rather than a *regulator*, the government can generally choose what to fund without

regard to principles of viewpoint neutrality." *See* Br. 16. Were that the case, *Finley* would not have meticulously disclaimed the presence of viewpoint discrimination in the Act before upholding its constitutionality—and it certainly would not have cautioned against applying the Act in a viewpoint-based way. *But see Finley*, 524 U.S. at 587. As the Ninth Circuit recently explained "the government misreads *Finley*" in making this argument. *Thakur v. Trump*, 163 F.4th 1198, 1205 (9th Cir. 2025). Even "where the government establishes a subsidy program, it may not discriminate between speakers within that program to suppress viewpoints with which it disagrees." *Thakur v. Trump*, __ F.4th __, No. 25-4249, 2026 WL 1466303, at *8 (9th Cir. May 26, 2026) (citation omitted) ("*Thakur II*"); *id.* at *10 (upholding preliminary injunction against federal agencies' viewpoint-based terminations of grants, including for research deemed to "promote gender ideology," "[b]ecause the agencies' termination of grants is aimed at the suppression of viewpoints with which the government disagrees").[4]

[4] The Government's argument that viewpoint neutrality would require the NEA "to equally fund projects that denounce [democracy]" if it chose "to fund a project that promotes democracy" misunderstands viewpoint neutrality. Br. 16. The First Amendment imposes no affirmative right to funding for any viewpoint—only a right for applicants not to be disadvantaged because they express a viewpoint the government disfavors. *Cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) ("the express discrimination . . . is not the denial of a grant" but rather "the inability to compete on an equal footing in the bidding process") (citing *Ne. Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993)). The government is free, under the government speech doctrine, to establish a program designed to express the government's pro-

The Government argues that, even if *Finley* prohibited a viewpoint-based *bar* on funding, the Policy imposes only a burden. *See* Br. 33; *see also id.* at 19 (conceding that "[w]hen this lawsuit was originally filed, the NEA had layered some additional requirements on top of the statutory considerations," namely "a categorical bar on funding projects that promote gender ideology" and a certification "that [applicants] would not use federal funding to promote such ideology").

As an initial matter, the Certification Requirement does impose a categorical bar by forbidding the use of federal funds to "promote gender ideology." But, even if the Government were correct on the facts, it would be wrong on the law. *Finley*'s warning was not limited to prohibitions. The Supreme Court equally cautioned against "penalt[ies]," and applying the Act in a manner that "raises concern about" or "threatens" "the suppression of disfavored viewpoints." 524 U.S. at 583, 587. As Justice Scalia explained in his concurrence, the government's consideration of viewpoint need not be "conclusive" to constitute viewpoint discrimination. *Id.* at 592 (Scalia, J., concurring). Were it otherwise, a government employer could "impos[e] a five-point handicap on all black applicants for civil service jobs," just as long as "it d[id] not compel the rejection of black applicants." *Id.*[5]

democracy messages as government speech. But the NEA grants program is manifestly not that. *See infra* section I.E.

[5] Justice Scalia would have held that the "decency and respect" clause was viewpoint discriminatory *and* nevertheless constitutional. As noted above, the majority

It is blackletter First Amendment doctrine that the government is prohibited not merely from "silenc[ing]" disfavored views, but also from "muffl[ing]" them. *Matal*, 582 U.S. at 235 (involving denial of registration, a government benefit); *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("[B]urdens must satisfy the same rigorous scrutiny as . . . bans."). To violate the First Amendment, the government need only "favor some viewpoints or ideas at the expense of others," not exclude them entirely. *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004); *Ridley*, 390 F.3d at 82 (describing viewpoint discrimination as "prefer[ring] one particular viewpoint in speech over other perspectives on the same topic"). That is exactly what the Final Policy does.

### B. The First Amendment prohibits viewpoint discrimination in government funding programs designed to facilitate private speech.

*Finley* is merely a specific application to the NEA of the general principle that when the government "create[s] a program to facilitate private speech," it cannot discriminate based on viewpoint. *Harvey*, 396 F.3d at 42–43 (citing *Velazquez,* 531 U.S. at 541; *Rosenberger*, 515 U.S. at 833); *see also McGuire*, 386 F.3d at 62 (recognizing availability of viewpoint discrimination claims in the "context [of]

---

disagreed on both counts, and the NEA disclaimed any viewpoint discrimination. Here, Defendants have admitted that projects "promoting gender ideology" will face a handicap. JA 373. To the extent that the Government is arguing, as a factual matter, that the Policy does not impose a viewpoint-based *penalty*, it contravenes its own admissions, JA373, and the court's factual finding below, JA542–43.

government funding of speech" (citing *Velazquez,* 531 U.S. at 548–49)); *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) (*Finley* is part of a "line of cases reflect[ing] the Supreme Court's continued cautionary admonition that the First Amendment will not tolerate the administration of subsidy programs with a censorious purpose").

As *McGuire* and *Harvey* both note, *Velazquez* also rests on this rule. There, the Supreme Court held that, when funding legal representation, Congress could not prohibit lawyers who receive federal funds from challenging existing welfare laws. *See* 531 U.S. at 536, 549. The Supreme Court explained that, though "Congress was not required to fund an . . . attorney to represent indigent clients" or even "to fund the whole range of legal representations," once it did, "Congress [could not] define the scope of the litigation it funds to exclude certain vital theories and ideas." *Id.* at 548. "The salient point," the Court wrote, was that the "program was designed to facilitate private speech, not to promote a governmental message." *Id.* at 542. Because "[t]he lawyer is not the government's speaker" and "private speech is involved," "[n]either the latitude for government speech nor its rationale applies." *Id.* at 542, 548. Instead, the First Amendment's ban on viewpoint discrimination governs. *Id.*

Were the government free to discriminate on the basis of viewpoint in funding private speech, the government could prohibit public university professors from

expressing officially disfavored views in their government-funded research and teaching. *But see Rust v. Sullivan*, 500 U.S. 173, 200 (1991) (the government's funding of public universities does not give it *carte blanche* to regulate speech there). So, too, if the Government were correct, it could allocate subsidies to the press based on whether a media outlet parroted the administration's views on "gender ideology" or anything else. *But cf. Hannegan v. Esquire*, 327 U.S. 146, 151–53 (1946) (holding that "subsidy" in mailing costs cannot be withheld because a newspaper or periodical "failed to meet some standard of worth or value or propriety"). The government has unparalleled financial resources, and when it uses them not to express its own views, but to support private speech, it cannot leverage that funding to skew the marketplace of ideas to suppress views the President disfavors.

### C. Nonpublic forum doctrine reflects the same prohibition.

The principle that the government cannot manipulate its resources to disfavor particular viewpoints when supporting private speech is also reflected in forum doctrine, which holds that, even in a "nonpublic forum"—namely one the government has *not* opened for indiscriminate access by all or even particular types of speakers—the government cannot discriminate on the basis of viewpoint.

"Nonpublic forums" refer to "assistance" the government offers "to certain persons in communicating with . . . listeners [who are not] acting for the government"—that is, government support for non-government speech. *Minn. State*

*Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 282 (1984). The rules governing nonpublic forums insist that when the government "is dangling the carrot of subsidy, not wielding the stick of prohibition," it still must not discriminate on the basis of viewpoint. *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 683 (2010) (citation omitted); *see also Velazquez*, 531 U.S. at 544 ("As this suit involves a subsidy, limited forum cases . . . may not be controlling in a strict sense, yet they do provide some instruction."); *cf. Rosenberger*, 515 U.S. at 835 (applying forum doctrine to "funding of speech").

The rule for nonpublic forums parallels the lesson of *Finley* and *Velazquez*: "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998); *see also Ridley*, 390 F.3d at 95 (citing *Finley* for the governing standard in nonpublic forums).

The Government argues that forum doctrine is inapposite here because *Finley* concluded that the plaintiffs' "reliance on . . . *Rosenberger*" was "misplaced" in that case. 524 U.S. at 586. But in distinguishing *Rosenberger*, *Finley* merely rejected the idea that NEA grantmaking is akin to a *designated* forum for all speech by a particular class of speakers. It explained that *Rosenberger* did not govern because the student funds in that case were designed to "indiscriminately 'encourage a diversity of views from private speakers,'" while the NEA grantmaking in *Finley*

was a "competitive process" that rests on "esthetic" judgments. *Id.* This distinction only highlights the fact that, while NEA funding may not be a designated public forum, the rules for nonpublic forums apply—or, at a minimum, "provide some instruction." *See Velazquez*, 531 U.S. at 544.

Nonpublic forums involve government support of private speech that is selective, not indiscriminate. In *Perry Educ. Association v. Perry Local Educators' Association*, for example, the Supreme Court held that an in-school mailing system was a nonpublic forum because "[p]ermission to use" it had to "be secured from the individual building principal," and was not "granted as a matter of course to all." 460 U.S. 37, 47 (1983). Similarly, in *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, the Court held that a charity drive for federal employees was a nonpublic forum because the government "limit[ed] participation" to "'appropriate' voluntary agencies," as defined by "extensive admission criteria," and "require[d] . . . permission from federal and local Campaign officials." 473 U.S. 788, 804 (1998). And in *Arkansas Education Television Commission*, the Court held that candidate entry in a debate on public broadcast was a nonpublic forum because the government "made candidate-by-candidate determinations as to which of the eligible candidates would participate." 523 U.S. at 680.

Thus, "'selectivity' and 'discretionary access' are defining characteristics of non-public fora, which unlike public fora are not intended to be open to all speech."

*Ridley*, 390 F.3d at 95 (quoting *Griffin v. Sec'y of Veteran Affs.*, 288 F.3d 1309, 1323 (Fed. Cir. 2002)). Yet, notwithstanding that selectivity, the government is not permitted to discriminate on the basis of viewpoint. *Id.* (citing *Finley*, 524 U.S. at 589–90).

In short, all roads lead to the same destination: whether this case is viewed through the lens of *Finley*, government funding cases, or nonpublic forum doctrine, the Final Policy violates the First Amendment because it discriminates on the basis of viewpoint.

### D. The Government's arguments to the contrary fail.

#### 1. When the government funds private speech, the First Amendment prohibits viewpoint discrimination both inside and outside of the program.

The Government first argues that the *only* First Amendment prohibition with respect to government funding of private speech is the bar on using its funds to control speech outside the funded program, on the grantees' "own time and dime." Br. 29–30. Not only does this contradict all the caselaw discussed above, but the two cases the Government cites for the proposition—*Rust* and *Agency for International Development v. Alliance for Open Society International, Inc.*—do not support it. They both hold that in government speech programs, conditions that extend beyond the program violate the First Amendment. But neither holds that when the government supports private speech, rather than hiring speakers to express its own

message, it can discriminate on the basis of viewpoint. As the Ninth Circuit recently held in rejecting this argument, "[t]o be sure, the government may violate unconstitutional-conditions principles when it imposes restrictions on speech outside the contours of a program, but the government offers no support for the assertion that this is the *only* constraint on the government's funding decisions." *Thakur II,* 2026 WL 1466303, at *11. To the contrary, "Supreme Court precedent defeats [it]." *Id.*

In *Open Society*, the Supreme Court struck down a requirement that organizations adopt "a policy explicitly opposing prostitution and sex trafficking" in order to receive federal funds. 570 U.S. 205, 210 (2013). Though the Court explained that, "[*i*]*n the present context*, the relevant distinction . . . is between conditions that define the limits of the government spending program . . . and conditions that seek to leverage funding to regulate speech outside," it nowhere limited the First Amendment's reach to that alone. *Id.* at 214–15 (emphasis added).

Similarly, in *Rust*, the Court upheld a restriction on speech within a government speech program. The challenged regulations excluded doctors receiving Title X funds from providing abortion-related advice as beyond the scope of Title X: "preconceptional services" designed to "support preventative family planning services, population research, [and] infertility services," not advice about what to do postconception. 500 U.S. at 178. As the Court subsequently explained, *Rust* rested

"on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech." *Velazquez*, 531 U.S. at 541; *see also Rosenberger*, 515 U.S. at 833 ("[In *Rust*], the government . . . used private speakers to transmit specific information pertaining to its own program."). But *Rust* expressly rejected the proposition that the *only* First Amendment limit on government funding is a prohibition on restrictions that reach outside of the program. It held that "funding by the Government, even when coupled with the freedom of the fund recipients to speak outside the scope of the Government-funded project, is [not] invariably sufficient to justify Government control over the content of expression." 500 U.S. at 199. Where, as here, a program is "expressly dedicated to speech activity," additional First Amendment doctrines govern. *Id.*

**2. The First Amendment is not limited to direct regulation.**

Taking an even bigger swing, the Government suggests that the First Amendment only prohibits viewpoint discrimination when the government is "directly regulat[ing]" private speech, not when it is allocating government support for private speech. *See* Br. 30. But as noted above, *Finley*, *Velazquez*, and the nonpublic forum doctrine cases all reject that proposition.

The Government's error is highlighted by its effort to distinguish several cases prohibiting viewpoint discrimination in government support of private speech as "direct regulation" cases. *See* Br. 30. Not one of these cases considered a "direct

regulation." *Matal* is about federal trademark registration, a government benefit to private speech. 582 U.S. at 225; *Shurtleff v. City of Boston* considered access to a government flagpole, 596 U.S. 243, 248 (2022); and *Ridley* assessed a public transit system's decisions not to display certain advertisements on its properties, 390 F.3d at 72. In each case, the plaintiffs remained free to spread their messages—just without the benefit of government support. *See, e.g.*, *Matal*, 582 U.S. at 225 ("Without federal registration, a valid trademark may still be used in commerce."); *Ridley*, 390 F.3d at 86 ("Our case does not involve a criminal prohibition, but only a refusal to accept advertising."). And yet in each case, the First Amendment prohibited viewpoint discrimination. So, too, here.

### E. NEA grants are not government speech.

The Government concedes "that the art projects that the NEA may or may not fund is private speech and not government speech." Br. 30. Even without this concession, it would be clear that each factor of the "holistic" government speech inquiry—the history of the expression at issue, the public's likely perception as to whether the government or a private person is speaking, and the extent to which the government has controlled the expression, *see Shurtleff*, 596 U.S. at 252—supports that conclusion.

With respect to history, the Act makes clear that the NEA exists to fund private art, not government propaganda. *See, e.g.*, *supra* pp. 3–7 (detailing legislative

history); *supra* p.7 (describing statutorily-required multi-layer review by those with experience in the arts, and on basis of artistic excellence). With respect to public perception, the court below found it "unlikely that members of the public would think that NEA-funded artists speak for anyone but themselves," particularly "given the diversity of views reflected in the projects that the NEA—even when accounting for changes in presidential administrations—has decided to fund." ADD.22–23 ; *see also* Appellees' Addendum ("App.ADD") at 5 n.3 (listing examples). NEA-funded art is billed as the work of private organizations, JA425, JA430, and every project is also publicly supported by other sources of funding, JA64, JA425. Finally, with respect to control, the NEA does not suggest substantive changes to projects, JA424–25, JA430, JA435, and funded organizations retain all intellectual property rights in the works, JA430.

For the reasons detailed above, that is enough to resolve this case. But the Government argues that the question is not whether the funded work is government or private speech; instead, it asks whether the decision to fund or not belongs to the government. Br. 31. That is the wrong focus, as the Supreme Court has made clear.[6]

[6] The Government cites *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1336 (11th Cir. 2023) and *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("*PETA*") to suggest that the government need not be viewpoint neutral in its arts funding decisions specifically. But neither case held that arts funding *writ large* is government speech. Instead, each court assessed the specific arts program before it and held it to be government speech in light of its particular history, public perception, and government control. *See McGriff*, 84 F.4th

The Supreme Court rejected the contention that selectivity in government support makes that support government speech in *Matal*—and it did so precisely because the "government speech" label "is susceptible to dangerous misuse" as a workaround to permit viewpoint discrimination. 582 U.S. at 235; *see also Shurtleff*, 596 U.S. at 262 (Alito, J., concurring) (warning that the government speech doctrine may be used "as a subterfuge for favoring certain private speakers over others based on viewpoint" (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009))).

In *Matal*, the government argued that the Trademark Office's selective decisions to grant trademarks transformed the trademarks into government speech. The Court disagreed, holding that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." 582 U.S. at 235. "For this reason, we must exercise great caution before extending our government-speech precedents." *Id.* In *Matal*, the private trademark itself, not the decision to register it, was thus the focus of the government-versus-private-speech inquiry. *Id.*

---

at 1332, 1334–35 (holding that an art installation that was part of a city festival constituted government speech because the government not only funded but also (1) "t[ook] ownership over the art, (2) control[led] how the art was to be disseminated, and (3) subject[ed] the art to the reasonable satisfaction of the City Manager"); *PETA,* 414 F.3d 23, 25–26 (holding that government-sponsored display of "sculptures of 100 donkeys and 100 elephants" that the government itself had preformed and over which the government "retained ownership" and "the right of design approval" was government speech).

The Government's position here has the same "radical implications." *See Shurtleff*, 596 U.S. at 262–63 (Alito, J., concurring). If the Government were correct, *every* government program providing selective support to private speech would be immune from First Amendment scrutiny. This would include access to nonpublic forums, support for public universities, subsidies to the press, and any number of registration programs. *See id.* at 263 (noting impact for the government's "editorial control" over "[b]ooks on the copyright registry"). It would mean that the NEA could adopt a policy of refusing to fund performances critical of any of President Trump's policies. And it would mean that the government could refuse to grant copyrights or condition research funding on that basis, too.

If the Government were correct, government speech cases would look no further than whether the government exercised any selectivity in what it funded. Yet the Supreme Court consistently asks whether the funded speech—not the decision to fund—expresses a government message or that of a private speaker. *See, e.g.*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he dispositive question is whether the generic advertising at issue is the Government's own speech . . . ."); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) (considering whether "specialty license plates," not the money expended on them, "convey government speech"); *Matal*, 582 U.S. at 235 ("At issue here is the content of trademarks that are registered by the PTO . . . .").

The critical question is not whether the government support is selective, but whether the government provides support "to convey a governmental message" or to "facilitate private speech." *Velazquez*, 531 U.S. at 541–42 (citation omitted); *see also Harvey*, 396 F.3d at 42–43; *McGuire*, 386 F.3d at 62. The court below was thus right to hold that the NEA-funded works are private speech, and that the viewpoint discrimination at issue here violates the First Amendment.

## II. The Final Policy and Certification Requirement Violate the APA.

The Final Policy and Certification Requirement violate the APA because they (1) are contrary to constitutional right,[7] (2) exceed the NEA's statutory authority and (3) are arbitrary and capricious. Nothing in the Act authorizes the NEA to weigh a specific viewpoint negatively, yet that is what the Policy does. And even if the Policy were not contrary to statute and the Constitution, the agency has not, and cannot, offer any reasoned explanation for this change in policy.

### A. The Final Policy and Certification Requirement exceed the NEA's statutory authority.

The APA directs courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). Courts "must exercise their independent judgment in deciding whether an agency

[7] The APA requires courts to "hold unlawful and set aside" agency action "found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As explained above, the Final Policy and Certification Requirement violate the First Amendment.

has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

Here, the Act directs the NEA to fund meritorious art without regard to its viewpoint:

> [T]he Chairperson shall ensure that
>
> (1) artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public; and
>
> (2) applications are consistent with the purposes of this section. Such regulations and procedures shall clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded . . . .

20 U.S.C. § 954(d)(1)–(2). Thus, "artistic excellence and artistic merit are *the* criteria by which applications are judged." *Id.* § 954(d)(1) (emphasis added). And § 954(d)(2) identifies only obscenity—an unprotected category of speech, *see Miller v. California*, 413 U.S. 15 (1973)—as ineligible because it is, by definition, "without artistic merit." 20 U.S.C. § 954(d)(2); *see also Finley*, 524 U.S. at 581 ("When Congress has in fact intended to affirmatively constrain the NEA's grant-making authority, it has done so in no uncertain terms.").[8]

[8] The text, structure, purpose, and history of the Act establish that the Act does not authorize the NEA to disfavor a grant application because it "promotes gender ideology." But even if the Act were ambiguous, the constitutional avoidance doctrine counsels the same reading. *Iancu v. Brunetti*, 588 U.S. 388 (2019). As noted above, *Finley* cautioned that the Court would "uphold the constitutionality of the provision"

The Government argues that the 1990 amendments somehow authorize its newfound viewpoint discrimination, Br. 18, 24, but those amendments made "artistic excellence and artistic merit" the express criteria for funding. *See* 20 U.S.C. § 954(d)(1). Congress did so in response to a congressionally appointed commission that "cautioned Congress against the adoption of distinct viewpoint-based standards for funding." *Finley*, 524 U.S. at 581. And, through the amendments, Congress "declined to disallow any particular viewpoints." *Id.* at 582 (noting that the sponsors asked, "If we start down that road . . . where do we end? Where one Member's aversions end, others with different sensibilities and with different values begin" (quoting 136 Cong. Rec. 28624 (1990) (statement of Rep. Tom Coleman))).

The Government is thus incorrect in claiming that the Chair may "uniformly treat the promotion of certain views as detrimental, rather than beneficial, to an application." Br. 22. The Government concedes as much when it describes the NEA's initial policy of barring funding to applications that "promote gender ideology" as "layer[ing] some *additional requirements* on top of the statutory considerations." *Id.* at 19 (emphasis added). Yet the Government now maintains that the Act allows the NEA to "take into account" whether a project "promotes gender ideology" "at least

---

*unless* "§ 954(d)(1) is applied in a manner that raises concern about the suppression of disfavored viewpoints." *Finley*, 524 U.S. at 587. Interpreting the Final Policy and Certification Requirement to fall outside the bounds of the Act would avoid allowing such an application and the "pressing constitutional question" it would raise. *See id.*

to the extent that [it is] relevant to the evaluation of a statutory factor," *id.* at 20, 23, namely, whether it "align[s] with general standards of decency and respect for the diverse beliefs and values of the American public" or is likely to appeal to or be suitable for certain audiences. *Id*. at 20.

As explained above and in *Finley*, the "decency and respect" clause governs process, not substance—and even if it could reach substance, any implementation that disfavors a particular view would run contrary to both the Act and the Constitution. *See Finley*, 524 U.S. at 587. A viewpoint-based consideration cannot be shoehorned into the statutorily mandated factors of merit and excellence. Deciding that a project should be penalized for its political views is different in kind from deciding whether the project is, for example, aesthetically pleasing, moving, technically proficient, or awe-inspiring. And considering whether the project's "promotion of gender ideology" is "relevant to" a factor, Br. 20, is a far cry from categorically maintaining that it can only be a negative, *see* JA373.[9]

Defendants have thus exceeded the Act by imposing an extra-statutory negative weight to one specific political consideration having nothing to do with

[9] The Government takes issue with the district court's conclusion that the Policy "categorically disfavor[s] applications for promoting certain views," suggesting "there is nothing categorical about the notice" because it "rejected the ban on projects promoting gender ideology." Br. 21–22. But the Policy need not impose a *ban* to be categorical; it is categorical because it treats the entire category of projects that "promote gender ideology" negatively. *See also supra* note 5.

artistic excellence—whether an application "promotes gender ideology." Doing so directly contravenes Congress's purpose in establishing the NEA: funding "the release of . . . creative talent," insulated from political pressures, in order "to help create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry." 20 U.S.C. § 951(7).

The Government relies on 20 U.S.C. § 951(5)—which requires public funding to "serve public purposes the Congress defines"—to argue that the Act permits the NEA to implement the President's opposition to particular political viewpoints in grantmaking, but that is wrong. Section 951(5) is one of ten declarations, and it does not create a new purpose; it merely harkens back "to the conditions that traditionally govern the use of public money." Those traditions have nothing whatsoever to do with the President's personal opposition to what he deems "gender ideology."

The Act's other declarations overwhelmingly caution against political interference. They find that the "arts . . . belong to all the people of the United States," should be designed to prevent "people of all backgrounds" from becoming "unthinking servants," and must "encourag[e] freedom of thought, imagination, and inquiry." 20 U.S.C. § 951(1), (4), (7). It is not the President's views, but "the diverse beliefs and values of all persons and groups," "the diversity of excellence that comprises our cultural heritage," and our "multicultural artistic heritage as well as support [for] new ideas" that matter. *Id.* § 951 (6), (10); *see also City & Cnty. of S.F.*

*v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."). By disfavoring only expression that "promotes gender ideology"—and not expression that opposes it—the condition flouts these express purposes.

Finally, the Government's argument that the Chair's statutory role supports her ability to deny an application for political, viewpoint-based reasons also misses the mark. The Government is correct that the Chair has final authority to approve applications, Br. 24, but it ignores the fact that the Chair must also ensure that applications are evaluated according exclusively to the statutory criteria. 20 U.S.C. §§ 954(d), 955(f). And those do not authorize viewpoint-based penalties.

### B. The Final Policy and Certification Requirement are arbitrary and capricious.

The APA also requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The agency must "articulate a satisfactory explanation . . . including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). It cannot "rel[y] on factors which Congress has not intended it to consider," ignore "an important aspect of the problem," "offer[] an

explanation . . . that runs counter to the evidence," or rely on an "implausible" explanation. *Id.* (citation omitted).

In addition, an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). It must "display awareness that it *is* changing position." *Id.* (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)); *see also Housatonic River Initiative v. U.S. Env't. Prot. Agency*, 75 F.4th 248, 270 (1st Cir. 2023). Where it creates a new policy, the agency "must show that there are good reasons for [it]." *Fox Television Stations*, 556 U.S. at 515.

The Final Policy and Certification Requirement mark a radical departure from longstanding agency precedent—with no more explanation than, in essence, "the President opposes 'gender ideology.'" Under the APA, the NEA was required to acknowledge the change and explain itself. *See Fox Television Stations*, 556 U.S. at 515. Yet, even as it concedes that it took action to "incorporate the EO in the NEA's grant application review process," JA363, it offers no "satisfactory" or "rational" explanation for doing so. *State Farm*, 463 U.S. at 43.

Because courts "cannot accept as evidence of reasoned decisionmaking a *post hoc* rationalization for agency action," the NEA's reasoning must appear in the administrative record. *City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991). Here, the administrative record is devoid of any reasoned

decisionmaking. It consists only of the Act, a smattering of cases, the EO, the Grants for Arts Projects guidelines, and the Final Notice. It does not even mention the re-implemented Certification Requirement, making that plainly arbitrary and capricious.

As for the penalty on "promoting gender ideology," the Notice cites only the EO as its explanation. But the government cannot simply cite an executive order in lieu of offering a reasoned explanation. *Cf. Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (that a rule is based on an executive order "hardly seems to insulate [it] from judicial review under the APA"). Indeed, district courts in this circuit and across the country have found agency actions to be arbitrary and capricious when they were based solely on the fact of an executive order, without some reasoned explanation. *See, e.g.*, *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 46 (D.R.I. 2025), *appeal dismissed*, No. 25-1477 (1st Cir. Nov. 25, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025); *Louisiana v. Biden*, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), *vacated and remanded on other grounds*, 45 F.4th 841 (5th Cir. 2022); *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020).

Even if an executive order could serve as the sole basis for action, *this* EO fails to provide a satisfactory explanation. It offers no explanation of how "gender

ideology" relates to artistic merit or excellence, the statutory criteria for NEA funding. It does not explain how its prohibition on "gender ideology" would apply to the arts—whether, for example, a transgender person working as part of a theater production's stage crew or a play that involves cross-dressing constitutes "promoting gender ideology"—much less how that might affect the aesthetic merit of the work. Indeed, the EO does not even mention arts funding or the NEA.

In addition, "the choice made," *State Farm*, 463 U.S. at 43—that is, assigning a negative weight to grant applications that "promote gender ideology"—does not even conceivably further the EO's stated aim of "defend[ing] women's rights and protect[ing] freedom of conscience." § 1, Exec. Order 14168, 90 Fed. Reg. 8615. Art that "promotes gender ideology" does not deny women any rights or intrude on anyone's freedom of conscience.

To the extent that the Government is now arguing that its action was based on the President's "policy views" about "gender ideology" more broadly, *see, e.g.*, Br. 26, 28, that is a *post hoc* rationalization, *see City of Kansas City*, 923 F.2d at 194, and an inadequate one at that. As detailed above, Congress did not authorize the NEA to enforce the President's personal political views in arts funding—to the contrary, it designed the Act to insulate the NEA from political considerations. *See supra* pp. 3–5 (noting Act's focus on freedom of thought and diversity of viewpoints, and efforts to insulate NEA from politics). "[F]urthering the President's wishes cannot

be a blank check" to enable arbitrary action. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025).

It is of course true that an agency's inconsistency with past practice is not, in and of itself, an APA violation, in part because an agency may reconsider "the wisdom of its policy . . . in response to . . . a change in administrations." *See Nat'l Cable Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (alteration in original) (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 863–64 (1984), *overruled by Loper Bright Enters.*, 603 U.S. 369)). But if the mere fact of a new administration were sufficient to satisfy the APA, any change in policy by that new administration would be absolved of the APA requirement to explain its work. *See id.* ("[u]nexplained inconsistency" between administrations can be "a reason for holding an interpretation to be . . . arbitrary and capricious"); *see also State Farm*, 463 U.S. at 57 ("an agency changing its course" because of a new "view of what is in the public interest" must still "supply a reasoned analysis").

The Government also claims that the Notice is self-explanatory. Far from it. The Notice does not define "gender ideology" or explain how "promoting gender ideology" is relevant to "artistic merit and artistic excellence." Indeed, it reflects so much "(potentially intentional) ambiguity" that the district court granted limited discovery to better understand it. JA7–8 (recognizing that "supplementation of the

record may be permissible where there is a 'failure to explain administrative action as to frustrate effective judicial review'" (quoting *Olsen v. United States*, 414 F.3d 144, 155–56 (1st Cir. 2005))).

The Government separately asserts that the NEA need not explain itself, because applying the criteria will occur case-by-case, Br. 27, but that misunderstands Plaintiffs' challenge: it is not to any particular denial of funding, but to the *policy* of explicitly taking into account "whether the proposed project promotes gender ideology," JA364, and having that factor "weigh against the project's final approval," JA373. *Cf. Chamber of Com. of U.S. v. Fed. Election Comm'n*, 69 F.3d 600, 606 (D.C. Cir. 1995) (finding a rule arbitrary and capricious because there was "no defense" of the "differential treatment" that the rule would introduce).

Finally, the NEA also failed to consider "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, namely (1) the Act, and (2) how the Final Policy and Certification Requirement would chill protected speech. There is no evidence in the administrative record that the NEA considered how discriminating against "gender ideology" comported with the statute. *Id.* ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . ."). The Government contends that the Notice "methodically explained" how "promoting gender ideology" relates to the Act, Br. 27–28, but it merely asserts that the Chair "may evaluate projects promoting gender ideology in a manner

consistent with the NEA's statutory framework," without any explanation as to how "promoting gender ideology" is even relevant to artistic excellence or merit, or for that matter, decency or respect for diversity. *See* JA368.

Nor does the Notice address in any respect the Policy or Certification Requirement's potential to chill speech. They will both plainly cause arts organizations to self-censor or not to apply for NEA grants at all. *See* JA117–19, JA140–42, JA220–22, JA226. Those effects were known to the NEA before it issued the new Policy and Certification Requirement, yet it did not even address them. *Cf. California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025) (noting the agency's failure to "properly consider[] the reliance interests of grant recipients and program participants"); *see also Fox Television Stations*, 556 U.S. at 515 (an agency must "provide a more detailed justification" when "its prior policy has engendered serious reliance interests that must be taken into account" (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

## III. The Government Has Forfeited Its Arguments About Scope of Relief, and the District Court Did Not Abuse Its Discretion in Granting Relief.

The Government makes two arguments regarding the scope of relief: first, that the district court should not have granted vacatur because the injunction was sufficient to provide complete relief, and second, that the district court should not have enjoined Defendants from implementing the Certification Requirement because the Government claimed that there was no certification requirement. Br. 45–

46. Having raised these arguments for the first time on appeal, the Government has forfeited them. In any event, they are unavailing.

### A. The Government has forfeited its arguments about scope of relief.

A party cannot raise an issue for the first time on appeal. *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 45 n.8 (1st Cir. 2003) ("Normally, we will not entertain an argument on appeal of summary judgment that was not raised before the district court." (citing *Ortiz v. Gaston Cnty. Dyeing Mach. Co.*, 277 F.3d 594, 597 (1st Cir. 2002))).

Below, Plaintiffs clearly sought both an injunction and vacatur, and relief against the Certification Requirement. Plaintiffs' Motion for Summary Judgment asked the district court to:

(1) "declare the Final Policy and certification requirement unconstitutional,"

(2) "enjoin Defendants and . . . anyone acting in concert with them, from implementing, applying, or taking any action whatsoever to implement either of these policies or requirements against Plaintiffs," and

(3) "hold unlawful and set aside (1) the policy of penalizing applicants that appear to 'promote gender ideology' and (2) the certification requirement with respect to the Gender Ideology EO."

App.ADD.1–2. In its cross-motion and opposition, the Government could have raised its concerns about vacatur or an injunction against the Certification Requirement, yet it failed to raise any objections to the scope of requested relief. *See* App.ADD.7–8 (table of contents for Government's brief below); *see also* ECF No.

24 (full brief below). Accordingly, the Government has forfeited its opportunity to make those arguments now.

### B. The district court properly vacated and set aside the Final Policy.

Even if the Government could raise these arguments for the first time before this Court, the district court did not abuse its discretion in vacating the Final Policy. In reviewing a district court's injunction for abuse of discretion, *see Ross-Simons of Warwick, Inc.*, 217 F.3d at 14, a court "must not substitute its judgment for that of the district court" and instead "must defer to the lower court's 'sound judgment,' so long as its decision falls within its 'wide discretion' and is not 'manifestly erroneous.'" *United States v. Tsarnaev*, 595 U.S. 302, 322–23 (2022) (citations omitted); *see also United States v. Roache*, 171 F.4th 137, 143 (1st Cir. 2026) ("Under this standard, we examine the district court's legal conclusions de novo, its findings of fact for clear error, and its judgment calls with considerable deference." (quoting *United States v. Franklin*, 51 F.4th 391, 396 (1st Cir. 2022))).

The district court's decision to grant vacatur was proper because the APA states that a court "*shall* . . . hold unlawful and set aside agency action, findings, and conclusions." 5 U.S.C. § 706 (emphasis added). "When an agency's action is unlawful, 'vacatur is the normal remedy.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv.*

*Sys.*, 603 U.S. 799, 837–42 (2024) (Kavanaugh, J., concurring) ("that the phrase 'set aside' in the APA authorizes vacatur" is a "straightforward and long-accepted conclusion"). Granting vacatur is thus the customary remedy for an APA violation.

The Government argues that vacatur is impermissible because it is duplicative of an injunction. But the two remedies are distinct. Injunctions "require a party either to do or to refrain from doing some act," Charles Alan Wright et al., 11A *Federal Practice and Procedure* § 2941 (3d ed. 2026), and operate "*in personam*," *Nken v. Holder*, 556 U.S. 418, 428 (2009) (quoting Black's Law Dictionary 800 (8th ed. 2004)). In contrast, vacatur is directed at a policy, not an actor, and negates an existing action rather than binding the parties' actions going forward. *See Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring); *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022); *Miot v. Trump*, 818 F. Supp. 3d 126, 156 (D.D.C. 2026). By setting aside an agency action, vacatur "re-establish[es] the status quo absent the unlawful agency action"; it does not impose a new obligation. *Texas*, 40 F.4th at 220; *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103–04 (D.D.C. 2018), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020).

Even if the remedies were duplicative, that would not make the district court's decision "manifestly erroneous." *See Tsarnaev*, 595 U.S. at 323 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)). Courts regularly grant both injunctions and

vacatur to address the harms stemming from the same government conduct.[10] *See United States v. Maldonado*, 708 F.3d 38, 42 (1st Cir. 2013) (abuse of discretion occurs only "if no reasonable person could agree with the judge's ruling").

In addition, the Government maintains that vacatur is inappropriate because it has an effect on nonparties. Br. 45. But that would invalidate vacatur in every APA case. The APA is directed at "agency action," *see, e.g.*, 5 U.S.C. § 706(2), and the notion that it should be limited in scope to only the parties is "far-reaching" and "both novel and wrong." *Corner Post, Inc.*, 603 U.S. at 826–27 (Kavanaugh, J., concurring) ("It 'disregards a lot of history and a lot of law.'" (citation omitted)); *see also Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (collecting cases where the Supreme Court issued universal relief under the APA).

Citing *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the Government argues that equitable principles preclude relief to nonparties across the board—but, as the

---

[10] *See, e.g.*, *Illinois v. Noem*, 813 F. Supp. 3d 282, 312–13 (D.R.I. 2025), *appeal dismissed*, No. 26-1182 (1st Cir. May 7, 2026); *Texas v. United States*, 691 F. Supp. 3d 763, 796 (S.D. Tex. 2023), *aff'd in relevant part, modified in part*, 126 F.4th 392 (5th Cir. 2025); *California ex rel. Lockyer v. U.S. Dep't of Agriculture*, 459 F. Supp. 2d 874, 919 (N.D. Cal. 2006), *aff'd* 575 F.3d 999 (9th Cir. 2009); *Wash. Toxics Coal. v. U.S. Dep't of Interior*, 457 F. Supp. 2d 1158, 1200–01 (W.D. Wash. 2006), *appeal dismissed*, Nos. 06-35873, 06-35891, 06-35899 (9th Cir. May 7, 2007); *Nat'l Ass'n of Waterfront Emps. v. Solis*, 665 F. Supp. 2d 10, 19 (D.D.C. 2009); *N.C. Fisheries Ass'n, Inc. v. Brown*, 917 F. Supp. 1108 (E.D. Va. 1996).

district court correctly noted, *CASA* explicitly disclaimed any effect on APA vacatur. ADD.45; *see also CASA*, 606 U.S. at 847 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."). And that makes sense, given that *CASA* involved interpretation of the Judiciary Act of 1789, which endowed courts with the authority to hear cases in equity, *id.* at 841, and the APA is a separate statutory grant of judicial authority. *See also Make the Road N.Y.*, 2025 WL 3563313, at *34.

### C. The scope of the district court's injunction was proper.

Nor did the district court abuse its discretion in enjoining Defendants from requiring Plaintiffs "to comply with the EO when using NEA funds"—that is, requiring grantees not to "promote gender ideology" in funded art, and requiring them to swear to the same. ADD.43. The Government argues that, because the court noted that the parties disputed whether any certification requirement remained in place at the time, it made no "attendant findings" that would justify granting this relief. Br. 45.

But that ignores the district court's reasoned explanation for the relief, which rests on its assessment of the Final Policy: "[I]t follows that if Defendants are enjoined from disfavoring applications for federal funds that 'promote gender ideology,' they should be enjoined from requiring applicants to comply with an executive order stating that '[f]ederal funds shall not be used to promote gender

ideology' should they receive those funds." ADD.43 n.10 (second alteration in original). In other words, enjoining a ban on using NEA funds to "promote gender ideology" and the related certification were part and parcel of enjoining the Final Policy. If Defendants cannot disfavor projects that "promote gender ideology," they also cannot prohibit grantees from "promoting gender ideology" with NEA funds or force grant applicants to swear to the same.

Enjoining the Certification Requirement was necessary to provide full relief to the Plaintiffs from the Final Policy's viewpoint discrimination. Indeed, its resurrection served to recreate one of "the features of the initial policy that plaintiffs had deemed most problematic." *See* Br. 21. After issuance of the Final Policy, the NEA's website again required compliance with executive orders without any disclaimer regarding the Gender Ideology EO. JA410. This persisted even after the NEA purported to change the language in the course of summary judgment briefing below. JA490. And the record shows that such certification and compliance requirements made RILA, NQT, TTO, TCG, and TCG members fearful of criminal penalties tied to false certifications or "promoting gender ideology," and would deter them from applying for NEA funding in the future. JA416, JA424, JA428–29, JA434–35. An injunction against the Certification Requirement was thus a proper remedy.

## CONCLUSION

This Court should affirm the court below.

Dated: June 16, 2026

Respectfully Submitted,

/s/ *Vera Eidelman*

David D. Cole (Bar No. 5776)
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

Lynette Labinger (Bar No. 23027)
Cooperating counsel
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF RHODE ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
LL@labingerlaw.com

Vera Eidelman (Bar No. 1220845)
Scarlet Kim (Bar No. 1177295)
Lauren Yu (Bar No. 1220844)
Brian Hauss (Bar No. 1183865)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org
scarletk@aclu.org
lyu@aclu.org
bhauss@aclu.org

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 12,609 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman font type and size 14 font size.

Dated: June 16, 2026

By: *_/s/ Vera Eidelman_*
Vera Eidelman

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: June 16, 2026

By: *<u>/s/ Vera Eidelman</u>*
Vera Eidelman

*Counsel for Plaintiffs-Appellees*

# APPELLEES' ADDENDUM

## TABLE OF CONTENTS[1]

Plaintiffs' Motion for Summary Judgment, ECF No. 22 (June 30, 2025)……………………………………………………………App.ADD.1

Excerpt from Memorandum of Law in Support of Motion for Summary Judgment, ECF No. 22-1 (June 30, 2025)……………………...……App.ADD.4

Table of Contents of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Summary Judgment Motion, ECF No. 24 (July 16, 2025)……………………………………….………………App.ADD.6

[1] The Appellees' Addendum includes brief excerpts from the record below that Appellants did not include in the Joint Appendix or Addendum but are raised by their brief.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, et al.,<br>*Plaintiffs*,<br>*v.*<br>NATIONAL ENDOWMENT FOR THE ARTS, et al.,<br>*Defendants*. | Case No. 1:25-cv-00079-WES-PAS |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs hereby move the Court for summary judgment with respect to their claims for relief under the First Amendment and Fifth Amendments to the United States Constitution, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. Plaintiffs request that the Court declare that Defendants' (1) policy of penalizing applicants that appear to "promote gender ideology" in their applications for National Endowment for the Arts ("NEA") funding and (2) requirement that applicants seeking NEA grants certify that they will "comply with all applicable Executive Orders," including Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("the Gender Ideology EO"), are unconstitutional in violation of the First and Fifth Amendments and unlawful under the APA; enjoin Defendants and all their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever to implement either of these policies or requirements against Plaintiffs; and hold unlawful and set aside (1) the policy of penalizing applicants that appear to

"promote gender ideology" and (2) the certification requirement with respect to the Gender Ideology EO.

In support of the motion, Plaintiffs rely on the accompanying Memorandum of Law; Statement of Undisputed Facts; Supplemental Declarations of Vera Eidelman, Adam Odsess-Rubin, and Giselle Byrd, and accompanying exhibits; Second Supplemental Declarations of Marta V. Martínez and Emilya Cachapero; the pleadings and papers on file in this action; and any argument and evidence presented on the hearing of this motion.

Pursuant to Local Rule 7(c), Plaintiffs request oral argument for this motion.

Dated: June 30, 2025

Respectfully submitted,

*/s/ Vera Eidelman*
Vera Eidelman*
Scarlet Kim*
Lauren Yu*
Brian Hauss*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
veidelman@aclu.org
scarletk@aclu.org
lyu@aclu.org
bhauss@aclu.org

*/s/ Lynette Labinger*
Lynette Labinger, Esq., (Bar No. 1645)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF RHODE ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903
401.465.9565
LL@labingerlaw.com
Cooperating counsel

David D. Cole*
600 New Jersey Ave. NW

Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

*Admitted *pro hac vice*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER,THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP,

*Plaintiffs*,

*v.*

NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,

*Defendants*.

Case No. 25-cv-79-WES-PAS

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, not the NEA. *See* SUF ¶ 21. They are put on either at private theaters or in public streets or parks that require separate permissions from and agreements with private entities or other government bodies. *Id.* ¶ 24. The work often sits within a body of past work by the funded organization that reflects the mission and audience of that organization. *Id.* ¶ 22. While the NEA is listed as a funder in the programs, it is, by requirement, one among many. *Id.* ¶ 23. And the funded organizations retain all intellectual property rights in the works. *Id.* ¶ 26.[3]

**iii. The Government's Control Over NEA-Funded Art is Minimal.**

The third factor, too, "favors th[e] conclusion" that NEA-funded art is private speech, for the NEA's control over the funded works' expression "is minimal" and "does not extend to the content or viewpoint of the message conveyed." Mem. and Order 37, ECF No. 13. The NEA chooses whether or not to fund a project, but it does not otherwise shape that project. In Plaintiffs' experience, the NEA does not suggest substantive changes to projects. *See* SUF ¶¶ 17–19. While program officers may help applicants frame their projects in the most competitive way possible, they do not offer any changes to or suggestions for the substance of the projects themselves. *Id.* ¶ 18.

---

[3] Moreover, as with trademarks, if the NEA were speaking through the work it funds, "the Federal Government [would be] babbling prodigiously and incoherently," "saying many unseemly things," and "expressing contradictory views." *See Matal*, 582 U.S. at 236. *Compare, e.g.,* NEA Grant Search, American Conservatory Theatre Foundation: Grant 1934952-32-25 (2025), https://perma.cc/95GS-XYXS (funding play about "entrepreneurs attempting to secure venture capital in Silicon Valley" for "audiences in San Francisco") *with* NEA Grant Search, Shakespeare Theatre: Grant 1917104-32-24 (2024) https://perma.cc/WHZ2-DDWN (funding play that "examine[s] capitalism and the personal choices that led to one of the largest financial crises in US history); *compare* NEA Grant Search, Concerned Citizens for Humanity, Ltd.: Grant 98-4200-5009 (1998), https://perma.cc/RPK8-TDZQ (funding creative "public information materials that promote sexual responsibility and abstinence") *with* NEA Grant Search, Phoenix Theatre, Inc.: Grant 01-3200-5140 (2001), https://perma.cc/D8Q5-JCBN (funding " 'Fourplay,' a series of plays that explore sexual mores at the beginning of a new century").

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

RHODE ISLAND LATINO ARTS, *et al.*,

Plaintiffs,

*v.*

NATIONAL ENDOWMENT FOR THE ARTS, *et al.*,

Defendants.

Civil Action
No. 25-cv-79-WES-PAS

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STANDARD OF REVIEW ........ 3

BACKGROUND ........ 4

1965: the NEA's genesis ........ 4

1989-1990: Public controversy, the Independent Commission, and the Act's amendment ........ 8

The Supreme Court's 1998 *Finley* decision ........ 11

The NEA's selective, partial grant-making process ........ 13

EO 14168 ........ 15

The NEA's April 16, 2025, predecisional guidance ........ 15

ARGUMENT ........ 17

I. Because the NEA's selection of arts projects for partial funding is government speech, Plaintiffs' First Amendment claim fails. ........ 17

A. The NEA has historically spoken (for 60 years) by selecting arts projects as worthy of public and private support. ........ 19

B. The public perceives the NEA's seal of approval as the government speaking. ........ 25

C. The NEA controls the government speech with its power to approve the arts projects it funds. ........ 28

II. The NEA's predecisional guidance does not violate the Fifth Amendment. ........ 31

III. Because the NEA's implementation of the EO will occur only when the Chair makes final decisions about which projects to fund, there is no final agency action and Plaintiffs' non-constitutional APA claims are not ripe. ........ 33

IV. The broad discretion delegated by Congress to the NEA's Chair encompasses the NEA's predecisional guidance, precluding both of Plaintiffs' non-constitutional APA claims. ........ 35

A. The Act, as amended, permits the NEA to consider more than merely "artistic excellence" and "merit" in evaluating grant applications to ensure accountability to the public. ........ 35

B. The NEA's predecisional guidance is not arbitrary and capricious, and instead reflects valid executive branch policy preferences. ........ 37

CONCLUSION ........................................................................................................................39