**No. 25-2113**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

RHODE ISLAND LATINO ARTS; NATIONAL QUEER THEATER; THE THEATER OFFENSIVE; THEATRE COMMUNICATIONS GROUP,

Plaintiffs-Appellees,

v.

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in the official capacity as Chair of the National Endowment for the Arts,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Rhode Island

---

# REPLY BRIEF FOR APPELLANTS

---


BRETT A. SHUMATE
*Assistant Attorney General*

CHARLES CALENDA
*United States Attorney*

DANIEL TENNY
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9039*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendants-Appellants National Endowment for the Arts and Mary Anne Carter certify that they are governmental parties that do not have parent corporations and that no publicly held corporations own more than ten percent of any of their stock.

# TABLE OF CONTENTS

**Page**


INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ........................................................................................... 5

I. The Final Notice Does Not Violate The Administrative Procedure Act ............ 5

 A. The Final Notice Is Consistent with the Statutory Framework Governing Evaluation of Applications for Competitive Grant Funding ........................................................................... 5

 B. The Final Notice Is Reasonable and Reasonably Explained .................. 10

II. The Final Notice Does Not Violate The First Amendment .............................. 14

 A. The First Amendment Does Not Require the NEA to Be Viewpoint Neutral in Awarding Grants .................................................. 14

 B. The NEA's Funding Decisions Express the Government's Own Views ........................................................................................ 23

III. The District Court's Remedy Is Overbroad ...................................................... 24

CONCLUSION ....................................................................................... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .......... 4, 22

*American Pub. Health Ass'n v. National Inst. of Health*,
145 F.4th 39 (1st Cir. 2025) .......... 26

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) .......... 18

*Building & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......... 9

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 12

*Finley v. National Endowment for the Arts*,
100 F.3d 671 (9th Cir. 1996) .......... 19

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .......... 26

*Iancu v. Brunetti*,
588 U.S. 388 (2019) .......... 18

*Legal Aid Servs. of Or. v. Legal Servs. Corp.*,
608 F.3d 1084 (9th Cir. 2010) .......... 20

*Legal Services Corp v. Velazquez*,
531 U.S. 533 (2001) .......... 20, 21

*Marijuana Pol'y Project v. United States*,
304 F.3d 82 (D.C. Cir. 2002) .......... 20

*Matal v. Tam*,
582 U.S. 218 (2017) .......... 24

*McGriff v. City of Miami Beach*,
84 F.4th 1330 (11th Cir. 2023) .......... 24

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004) .................................................... 14, 17

*Mezibov v. Allen*,
411 F.3d 712 (6th Cir. 2005) .................................................... 20

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .................................... 1, 4, 5, 8, 14, 15, 17, 18, 19, 21

*Rosenberger v. Rector & Visitors of the University of Virginia*,
515 U.S. 819 (1995) .................................................... 19, 20

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005) .................................................... 24

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .................................................... 15

*Rust v. Sullivan*,
500 U.S. 173 (1991) .................................................... 4, 14, 17

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018) .................................................... 25

*TEC Eng'g Corp. v. Budget Molders Supply, Inc.*,
82 F.3d 542 (1st Cir. 1996) .................................................... 26

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) .................................................... 22, 23

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .................................................... 16

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .................................................... 25, 26

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
513 U.S. 18 (1994) .................................................... 26

**Statutes:**

5 U.S.C. § 702 .................................................... 26

20 U.S.C. § 951(5) ........ 1

20 U.S.C. § 951(6) ........ 1, 6

20 U.S.C. § 951(9) ........ 6

20 U.S.C. § 951(10) ........ 6

20 U.S.C. § 951(11) ........ 1, 3

20 U.S.C. § 954(d) ........ 1

20 U.S.C. § 954(d)(1) ........ 5, 15

20 U.S.C. § 954(d)(2) ........ 5

20 U.S.C. § 955(f) ........ 2

**Regulatory Materials:**

Exec. Order No. 14168,
90 Fed. Reg. 8615 (Jan. 30, 2025) ........ 2, 11

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the Supreme Court has recognized, the National Endowment for the Arts (NEA) has limited resources to allocate and accordingly must "deny the majority of grant applications that it receives, including many that propose 'artistically excellent' projects." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 585 (1998). In order to carry out its grant-making authority, Congress has provided the agency with wide latitude to choose which projects warrant the government's endorsement in the form of an award of highly competitive funding. *Id.* at 587-88. The statute directs the agency to evaluate all applications based on aesthetic and subjective judgments regarding which projects have sufficient "artistic excellence and artistic merit," "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," and ensure that awards are "consistent with the purposes" of the statute. 20 U.S.C. § 954(d). These purposes include Congress's objective to fund art that reflects the "rich cultural heritage" of the United States, *id.* § 951(6), that helps to "achieve an orderly continuation of free society," *id.* § 951(11), and Congress's concern that any "public sponsorship" of art "should contribute to public support and confidence in the use of taxpayer funds," *id.* § 951(5). According to this statutory authority, NEA conducts its grant-making function as a patron of the arts, which inherently requires the agency to express its own views of what constitutes "artistic excellence and artistic merit" when making funding determinations and

selecting which applicants (among the thousands who are simultaneously considered and denied), are worthy of public funding and NEA sponsorship.

The agency guidance that plaintiffs challenge here (Final Notice) is entirely consistent with this statutory framework. The Final Notice discusses what steps the NEA will take to implement Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025), consistent with its statutory authorities. The Final Notice states that the NEA Chairperson, who has final authority to approve a grant application that has been recommended to her under 20 U.S.C. § 955(f), will review all proposed projects—including projects that promote gender ideology—under the applicable statutory standards and may deny applications that have been recommended to her if she determines, in her independent judgment, that the project does not warrant funding under those subjective criteria.

Plaintiffs urge that the Final Notice is unconstitutional because, in their view, it places projects that promote gender ideology at a categorical disadvantage in competing for NEA funding. But, as established in the government's opening brief, the Final Notice does not announce such a policy. On the contrary, the Final Notice rejected a ban on projects promoting gender ideology in favor of a case-by-case approach wherein the Chairperson considers whether to award funding to such projects according to the same subjective criteria that she applies to all projects. Plaintiffs' concern is thus not with the Final Notice itself, but rather, with their assumption that the Chairperson is likely to uniformly treat the promotion of gender

ideology as detrimental, rather than beneficial, to an application when she considers the relevant statutory standards.

At bottom, plaintiffs' position is that the Chairperson must somehow apply the highly subjective statutory standards entirely divorced from her own views about whether the content of a project is worthy of public endorsement. To state that logic is to refute it. By its terms, the statute permits the Chairperson to consider, *inter alia*, whether a proposed project is consistent with general standards of decency, whether awarding funding to that project (as opposed to some other project) would best reflect the diverse beliefs and values of the American public, and whether awarding funding to that project (rather than another project) would contribute to public confidence in the use of taxpayer funds to sponsor art. It is not possible to make such decisions entirely agnostic of viewpoint; the basic statutory criteria call for aesthetic judgments regarding the value of the project that cannot be divorced from consideration of the expressive content of competing applicants' productions or the messages contained therein.

To take just one example, one of the statutory purposes of the grant program is to help "achieve an orderly continuation of free society." 20 U.S.C. § 951(11). It can thus hardly be expected that the Chairperson would be agnostic as to whether a proposed project promotes democratic ideals or other forms of government. Given a choice between two technically proficient art projects, a hypothetical Chairperson could well determine that the project that promotes democracy warrants government

funding while a project espousing conflicting views does not. But if plaintiffs were correct that the Chairperson cannot disadvantage one viewpoint over another, then the Chairperson could not make such a judgment; she would either have to fund both projects (regardless of her views on whether the second project fit the appropriate statutory standards), or neither project.

The First Amendment does not require that result. To the contrary, as the Supreme Court made clear in *Finley*, when the government acts as a *patron* rather than a *regulator*, it can generally choose what to fund without regard to principles of viewpoint neutrality that apply in other contexts. 524 U.S. at 587. That principle is generally true in the context of selective subsidies. *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013); *Finley*, 524 U.S. at 587-88; *Rust v. Sullivan*, 500 U.S. 173, 192 (1991). And it applies with special force here, where the statute does not merely direct the government to selectively award funding, but to make subjective, aesthetic determinations that amount to a public endorsement of the artistic merit and excellence of a project. The government need not be viewpoint neutral in expressing its own views.

## ARGUMENT

### I. The Final Notice Does Not Violate The Administrative Procedure Act

#### A. The Final Notice Is Consistent with the Statutory Framework Governing Evaluation of Applications for Competitive Grant Funding

As established in the government's opening brief (at 18-28), the NEA's notice setting forth the steps that the agency may lawfully take to implement Executive Order 14168 is entirely consistent with the statutory framework governing the administration of NEA grants. As plaintiffs acknowledge, the statute requires the NEA to distinguish among grant proposals based on the NEA's perception of the proposal's "artistic excellence and artistic merit." 20 U.S.C. § 954(d)(1). This standard requires the NEA to take into account "general standards of decency and respect for the diverse beliefs and values of the American public," *id.*, and ensure that awards are "consistent with the purposes" of the statute, *id.* § 954(d)(2).

These are inherently value-laden judgments. As the Supreme Court has recognized, for example, the Chairperson must evaluate "the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, [and] its suitability for or appeal to special audiences." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 585, 586-87 (1998). Whether and how a proposed project chooses to discuss theories of biological sex and gender can of course be relevant to those considerations.

Plaintiffs' contrary contention ignores the criteria that plaintiffs themselves trumpet and the reality of awarding competitive funding according to highly subjective standards. Plaintiffs emphasize that the statute expressly mentions "'the diverse beliefs and values of all persons and groups,' 'the diversity of excellence that comprises our cultural heritage,' and our 'multicultural artistic heritage'" as valid considerations, Br. 38 (quoting 20 U.S.C. §§ 951(6), (9), (10)), while at the same time insisting that whether a project embraces an understanding of gender ideology that the President finds divisive is categorically irrelevant to the Chairperson's deliberations. Plaintiffs' disagreement with the views expressed in the President's Executive Order is not a basis for contending that they are categorically irrelevant to funding decisions under the relevant statutory framework.

From their implausible insistence that NEA must be entirely agnostic on issues the statute authorizes the Chairperson to consider, plaintiffs pivot to a mischaracterization of the agency action at issue in this case. The Final Notice retreated from the sort of categorical rule that plaintiffs criticize, stating instead that applications for projects that may be deemed to promote gender ideology will be evaluated according to the same terms and procedures as applications for all other types of projects. ADD.46 ("The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced."); *see also* ADD.46 ("Applicants will not be required to certify that no federal funds are used to promote gender ideology. Thus, there is no eligibility bar to submitting an application

related to promoting gender ideology."). In all cases, applications will be assessed on a grant-by-grant basis by advisory panels, the Council, and (if recommended by the Council) the Chairperson for "Artistic Excellence and Artistic Merit, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." ADD.46. The notice thus does not impose any extra-statutory conditions; it simply states that the NEA will consider the President's policy directive in Executive Order 14168 only to the extent it is relevant to the criteria expressed in the statute.

Plaintiffs therefore attack a straw man when they note that Congress "declined to disallow any particular viewpoints" when it amended the statute in 1990, Br. 36 (quotation marks omitted), or assert that the Chairperson will apply criteria that have "nothing to do" with artistic excellence or merit. Br. 37-38. Likewise, plaintiffs' cursory assertion (Br. 19, 21) that the NEA's alleged "Certification Requirement" is unlawful, cannot be reconciled with the record. Although the NEA's initial steps to implement the Executive Order required applicants to certify compliance with the Order, J96, the NEA withdrew that requirement before issuing the Final Notice at issue here, JA146-47; JA217-18. And the notice itself expressly states that no such certification is required. ADD.51 ("The process does not include an eligibility bar, nor does it include a certification requirement."); ADD.53. The district court did not

conclude otherwise. *See* ADD.43 n.10 (noting that plaintiffs "dispute" whether the NEA has reinstated that requirement without purporting to resolve the dispute).[1]

If any projects that promote gender ideology are rejected by the Chairperson, it will not be merely because the project promotes gender ideology. Instead, it will be because she has determined, as she is entitled to do, that a project that has been recommended to her by the Council does not meet the relevant statutory criteria to be awarded competitive funding. The Final Notice explains, for example, the Chairperson may decline to award funding to a project (whether or not it promotes gender ideology) if she determines that, "despite the Council's recommendation, the contemporary relevance of a particular application or its suitability to a special audience, or that its educational value leaves something to be desired." ADD.50. Those are all criteria the Chairperson is expressly entitled to consider. *See Finley*, 524 U.S. at 586-87.

Plaintiffs are probably correct that, to the extent that such matters are relevant to the statutory considerations in a particular case, the Chairperson is more likely to

---

[1] Plaintiffs contend that, notwithstanding the Final Notice's express statement that "[t]he process does not include an eligibility bar, nor does it include a certification requirement," ADD.51; ADD.53, the agency has incorporated a certification requirement into its Assurance of Compliance, which requires applicants to certify that they "will comply with all applicable Executive Orders." Br. 9. The Final Notice's specific statements disclaiming any certification requirement, which supersede any general references, plainly demonstrate that no certification requirement exists.

prefer projects that promote the statutory goals in a manner consistent with the President's guidance. But a member of the Executive Branch applying flexible statutory criteria in a manner consistent with the President's direction is unremarkable. The President's "faithful execution of the laws enacted by the Congress" "allows and frequently requires the President to provide guidance and supervision to his subordinates." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). "Those officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law." *Id.* And where, as here, the Executive Order "directs [the President's] subordinates how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law,'" the agency must consider what lawful steps it may take to implement the Order. *Id.* (second alteration in original) "[I]f the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.*

Considering the President's priorities in the course of making statutorily mandated determinations is different from imposing a "handicap" for certain projects, separate and apart from the statutory criteria themselves. *See* Br. 21 n.5. As discussed above, the statute entails making certain value-laden judgments, and there is nothing inappropriate about making them with the President's directives in mind.

### B. The Final Notice Is Reasonable and Reasonably Explained

Plaintiffs urge (Br. 40-45) that the Final Notice was arbitrary and capricious because, in their view, the NEA did not adequately explain why it decided to impose a "penalty" on promoting gender ideology. As noted above, that is not what the notice does, and therefore no explanation regarding said "penalty" was required of the agency. Instead, the agency guidance does nothing more than explain that the President's policy priorities regarding the use of federal funds to promote gender ideology will affect decisionmaking only to the extent they are relevant to the considerations that the Chairperson is statutorily authorized to account for.

Plaintiffs' complaint (Br. 41) that the "sole basis" identified for the action is the Executive Order once again ignores the limited effect of the notice. All the notice does is explain the limited respect in which the Executive Order will affect the agency's decisionmaking, and the agency does not need any authority beyond the Executive Order to do that. A determination with a broader sweep might require more justification, but the notice expressly concluded that it would be improper to disqualify projects from NEA funding *because of* their promotion of gender ideology, ADD.46, and that instead, such applications for such projects should be evaluated against the same statutory standards as all other applications. The notice then methodically explained how the promotion of gender ideology might be relevant to specific statutory criteria the Chairperson is entitled to consider and the limited, though important, role that those criteria play in the agency's considerations.

ADD.51. That explanation is more than sufficient to satisfy the demands of the Administrative Procedure Act.

Plaintiffs reiterate the district court's flawed argument (Br. 43-44) that the Final Notice does not define what it means for a project to "promote gender ideology." As explained in the government's opening brief (at 27), however, the Final Notice expressly references Executive Order 14168, which itself defines "gender ideology." ADD.46; 90 Fed. Reg. at 8615-16. And plaintiffs' claim that the notice does not explain how the promotion of gender ideology can be relevant to the statutory criteria is belied by the specific examples provided within the notice. The notice states, for example, that "in reviewing an application that promotes gender ideology," the Chairperson could consider (as she can with respect to *all* applications, regardless of whether or not they promote gender ideology) "whether or not the specific elements of that project align with general standards of decency and respect for the diverse beliefs and values of the American public, or whether those elements indicate a sufficient level of anticipated public interest in or appreciation of the project, or are likely to be suitable for or appeal to intended audiences." ADD.51. Plaintiffs' demand (Br. 44) that NEA provide further explanation rests on the mistaken premise that the Final Notice makes the promotion of gender ideology a dispositive funding criterion. It does not. The relevance, if any, of the factors identified in the Final Notice depends on the Chairperson's individualized application of those standards to each proposed project as she determines which are worthy of NEA funding.

Plaintiffs' reliance (Br. 40) on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) is therefore misplaced. Plaintiffs criticize the NEA for failing to provide a reasoned explanation for any "Certification Requirement" (Br. 41), but as discussed, the NEA withdrew that requirement and the Final Notice they challenge expressly states that the NEA's implementation of the Executive Order "does not include a certification requirement." ADD.53. Nor does the Final Notice depart from the agency's prior practice in any other significant manner. On the contrary, it states that the agency will continue to apply statutory criteria to proposed projects on an individualized basis, as it always has. ADD.46 ("The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced."). To the extent the notice discusses gender ideology at all, it is only to explain the limited respect in which the Chairperson may consider the President's policy directives under the applicable statutory standards. That explanation does not alter the governing standards for evaluating applications, and plaintiffs' arguments to the contrary rest on a fundamental mischaracterization of the agency action at issue.

Finally, plaintiffs assert (Br. 45) that the notice is arbitrary because it does not address how the agency's implementation of the Executive Order might chill speech. But any expressed views by the agency about what types of artistic endeavors are more worthy of funding will, at the margin, encourage or discourage artists to pursue those endeavors. To the extent that it does not merely rehash their mistaken view that NEA is making decisions based on inappropriate considerations, plaintiffs'

argument about "chilling" largely amounts to a suggestion that NEA should be less transparent about its views of issues relevant to the standards it is called upon to apply. There is nothing improper about making standards public, to the extent possible, thus allowing artists to make more informed choices about whether to pursue funding.

Plaintiffs' asserted concern that the Final Notice will "plainly cause arts organizations to self-censor or not to apply for NEA grants at all," Br. 45, is based on concerns about the policy that the notice expressly repudiated. To support this proposition, plaintiffs cite declarations by arts organizations stating that they self-censored or chose not to apply for grants because they were concerned about penalties for falsely certifying that they do not promote gender ideology or else were concerned that they would be barred from eligibility for funding. *Id.* (citing JA117-19, JA140-42, JA220-22, JA226). Those subjective fears have no relation to the notice itself, which repeatedly states that artists will not have to certify compliance with the Executive Order and that "there is no eligibility bar to submitting an application related to promoting gender ideology." ADD.46; ADD.51; ADD.53. "The only criteria all applications are subject to are those set forth in the enabling statute, which the agency has always enforced." ADD.46.

## II. The Final Notice Does Not Violate The First Amendment

### A. The First Amendment Does Not Require the NEA to Be Viewpoint Neutral in Awarding Grants

As explained, the Final Notice does not penalize or restrict speech. Instead, the Final Notice states that the NEA will consider all applications for grant funding under the same statutory standards upheld in *Finley*. To the extent the application of those factors results in the denial of funding, that action does not abridge anyone's freedom of speech; private entities remain free to engage in whatever speech they would like on their own time and dime. In the context of selective subsidies, the government may permissibly "allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Finley*, 524 U.S. at 587-88. The government may thus choose "to fund one activity to the exclusion of the other"; such conduct does not unconstitutionally "discriminate[] on the basis of viewpoint." *Id.* at 588 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)); *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004) (recognizing that in the context of "government funding of speech," "viewpoint discrimination is permitted in some situations").

That principle applies with special force here, where Congress has directed NEA to award limited funding on the basis of highly selective and subjective criteria that amount to a government endorsement of the art. In such circumstances, where the government acts as a *patron* (rather than a regulator) of the arts, the only speech

directly controlled or regulated is the NEA's own speech. The government is permitted to control its own message. Indeed, it is often "the very business of government to favor and disfavor points of view." *Finley*, 524 U.S. at 598 (Scalia, J., concurring in the judgment); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009) (The government is "'entitled to say what it wishes' and to select the views that it wants to express" free from "'First Amendment scrutiny.'" (citation omitted)).

Plaintiffs reject all of this analysis in favor of the extreme position that the government must maintain viewpoint neutrality in every aspect of its funding decisions. But they do not even attempt to explain how that would be possible. As discussed, the statutory standards Congress directed the NEA to apply are inherently subjective and the award of funding according to those criteria necessarily will reflect the Chairperson's views of what constitutes "artistic excellence and artistic merit," and of the "general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). And the Supreme Court has recognized that it is appropriate to consider whether the project is suitable for its intended audiences. *See Finley*, 524 U.S. at 585; ADD.50-51. It cannot reasonably be expected that these highly subjective criteria can be applied to a particular application divorced from the Chairperson's own views about the expressive content and message of the application. Messages of hate and divisiveness are less likely to respect American values than messages supporting democracy and First Amendment values. It would be extraordinary to suggest that the Chairperson is constitutionally compelled to be

indifferent between the two or that the Chairperson's determinations cannot reflect the priorities of the agency which accord with the President's policy directives.

Plaintiffs relegate the untenable consequences of their position to a footnote. *See* Br. 20 n.4. In responding to the suggestion that NEA's decision to fund pro-democracy projects would, on their theory, require NEA to equally fund anti-democracy projects, plaintiffs appear to recognize that, under their theory, the proponents of the anti-democracy projects have a "right . . . not to be disadvantaged because they express a viewpoint the government disfavors." *Id.* Thus, according to plaintiffs, if NEA is selecting between a pro-democracy and anti-democracy project, it cannot consider any preference for one message or the other when making a funding decision. The only case they cite for that extraordinary proposition is a Free Exercise Clause case about "a policy of categorically disqualifying churches and other religious organizations from receiving grants under its playground resurfacing program." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 454 (2017). *Trinity Lutheran* is inapposite and further displays plaintiffs' misunderstanding of the Final Notice (which, again, does not impose a penalty or categorical bar to applications promoting gender ideology) and the subjective funding discretion that the Chairperson is statutorily authorized to exercise in her consideration of the relevant funding criteria. The present case is not about disqualifications based on features of the applicant that are irrelevant to the artistic merit of its submission, but rather about

plaintiffs' claim that the government must fund art projects without regard to the views expressed in those art projects themselves.

Plaintiffs' brief also takes the unlikely position (Br. 17-22) that *Finley*, which rejected a First Amendment challenge to the statute at issue here, somehow also requires the Chairperson to make determinations entirely free from considerations of viewpoint. But as established in the government's opening brief, *Finley* makes clear that decisions about what the NEA will (and will not) fund is subject only to deferential First Amendment review. That is because, when the government chooses what speech to fund—as long as it does not take other action to actively suppress speech—"the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193); *see also id.* at 597-98 (Scalia, J., concurring in the judgment) ("[T]he NEA itself is nothing less than an institutionalized discrimination . . . . Nonetheless, it is constitutional, as is the congressional determination to favor decency and respect for beliefs and values over the opposite because such favoritism does not 'abridge' anyone's freedom of speech."); *McGuire*, 386 F.3d at 62 ("Another sort of context involves government funding of speech, where viewpoint discrimination is permitted in some situations . . . ." (citation omitted)).

Plaintiffs confuse the Supreme Court's determination that the statutory text "imposes no categorical requirement," and does not "constrain the NEA's grant-making authority" or else "compel[] the NEA to deny funding on the basis of

viewpoint discriminatory criteria," *Finley*, 524 U.S. at 581, with a conclusion that NEA is prohibited from taking viewpoint into account at all. Other parts of the *Finley* opinion make plaintiffs' error plain. In explaining that consideration of the statutory factors was "indisputably constitutional" in at least some applications, *Finley* expressly blessed the NEA's consideration of "decency" because "[e]ducational programs are central to the NEA's mission," and "it is well established that 'decency' is a permissible factor where 'educational suitability' motivates its consideration." *Id.* at 584; *see also id.* (favorably citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986) for the proposition that it is a "highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse").[2] Plaintiffs do not seriously argue that considerations of decency—considerations that *Finley* expressly stated that the NEA may consider, where appropriate—are viewpoint neutral. *Cf. Iancu v. Brunetti*, 588 U.S. 388, 396-99 (2019) (holding that denial of trademark for use of vulgar language discriminated based on viewpoint). Plaintiffs' assertion that *Finley* prohibits *any* consideration of viewpoint when making funding determinations is entirely unsupported.

[2] This was a core point of disagreement between the majority and Justice Scalia, who interpreted the statute to require consideration of decency and respect "in evaluating *all* applications—not, for example, just those applications relating to educational programs, or intended for a particular audience," but nevertheless agreed that the statute was constitutional. *See Finley*, 524 U.S. at 591 (Scalia, J., concurring in the judgment) (citation omitted).

Plaintiffs' argument also entirely ignores *Finley*'s discussion of *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819 (1995). *Finley* was a direct response to a divided panel of the Ninth Circuit that applied *Rosenberger* viewpoint-neutrality requirement to the NEA's grant program. *Finley v. National Endowment for the Arts*, 100 F.3d 671, 683 (9th Cir. 1996) ("Although NEA awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint."), *rev'd*, 524 U.S. 569. The Supreme Court held that the Ninth Circuit majority's "reliance on our decision in *Rosenberger* . . . is misplaced" because of the "competitive process according to which the grants are allocated." *Finley*, 524 U.S. at 586. The Court explained that "in the context of arts funding, . . . the Government does not indiscriminately 'encourage a diversity of views from private speakers.'" *Id.* Instead, its "mandate is to make esthetic judgments" based upon an "inherently content-based 'excellence' threshold for NEA support." *Id.* That set the NEA's grant program "apart from the subsidy at issue in *Rosenberger*—which was available to all student organizations that were 'related to the educational purpose of the University'" as well as "from comparably objective decisions on allocating public benefits, such as access to a school auditorium or a municipal theater." *Id.* (quoting *Rosenberger*, 515 U.S. at 824). Because of the highly competitive and unique nature of this patronage program, *Rosenberger* did not apply. *Id.*; *accord id.* at 598-99 (Scalia, J., concurring in the judgment).

Plaintiffs make no attempt to reconcile their view of *Finley* as prohibiting any consideration of viewpoint in NEA grant funding with the Supreme Court's lengthy discussion distinguishing *Rosenberger*. Plaintiffs assert (Br. 25-26) that this discussion "merely rejected the idea that NEA grantmaking is akin to a *designated* forum for all speech," but left open the possibility that NEA funding is a nonpublic forum. But this misses the critical point. *Rosenberger* held that a public university's decision to deny funding based on viewpoint was unlawful. 515 U.S. at 835-37. If—as plaintiffs insist is the case—NEA funding decisions must likewise be viewpoint neutral, it would have been entirely unnecessary for the Court to have distinguished *Rosenberger*.

For similar reasons, plaintiffs' reliance on *Legal Services Corp v. Velazquez*, 531 U.S. 533 (2001), is misplaced. As explained in the government's opening brief (at 40-42), *Velazquez* is inapposite here because the program at issue there was treated as a "limited public forum." *See Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1094 (9th Cir. 2010) ("The [*Velazquez*] Court analyzed the grantee plaintiffs' unconstitutional conditions claim through the lens of the Court's limited public forum cases."); *see also Mezibov v. Allen*, 411 F.3d 712, 720 (6th Cir. 2005) (stating that "*Velazquez* involved . . . a government funding program that the Court deemed a limited public forum for First Amendment purposes"); *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 87 (D.C. Cir. 2002). Indeed, *Velazquez* emphasized that "like the program in *Rosenberger*, the [Legal Services Corporation] program was designed to facilitate private speech"—specifically, to ensure communications between attorneys

and clients who would not otherwise afford legal assistance. 531 U.S. at 542, 546-47. As discussed, *Finley* rejected this exact analogy, distinguished *Rosenberger*, and held that the NEA's grant program was not a limited public forum. Neither *Velazquez* nor any of the limited public (or nonpublic) forum cases on which plaintiffs rely—none of which concern selective subsidy programs (Br. 29-30)—have any application here.

Further, *Velazquez* emphasized the Court's unique concern with a subsidy condition that effected a "serious and fundamental restriction on advocacy of attorneys and the functioning of the judiciary," stressing that there was "no alternative channel for expression of the advocacy" that the government sought to restrict. 531 U.S. at 544, 546-47. No such restriction exists here; any applicant for NEA funding who does not receive it remains free to create whatever art they desire, whether on their own time and dime or with the support of other sponsors. *See Finley*, 524 U.S. at 597 (Scalia, J., concurring in the judgment) ("The NEA is far from the sole source of funding for art . . . .").

Much of plaintiffs' argument amounts to an effort to leverage language in *Finley* to negate the holding of *Finley* itself. They cite (Br. 19) the statement in *Finley* that NEA might violate the First Amendment "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or to impose a "burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" *Finley*, 524 U.S. at 587. That statement, which the Court did not expand upon, cannot plausibly mean that NEA had no authority to make

determinations of the sort that the Court expressly contemplated earlier in the opinion. Rather, subsequent cases make clear that it is impermissible to leverage discretionary funding to seek to affect speech outside of the funded program, while it remains permissible for the government to control the funded program itself. *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217-18 (2013).

Plaintiffs rely (Br. 20, 28) upon the Ninth Circuit's recent decision in *Thakur v. Trump*, 176 F.4th 1187 (9th Cir. 2026) (per curiam) for the proposition that the Supreme Court has never held that unconstitutional-conditions principles are the "only" constraint on government funding decisions. Tellingly, however, plaintiffs identify no selective subsidy case in which the Supreme Court has held that merely declining to subsidize certain speech that expresses a particular viewpoint "penalizes" or suppresses that speech. And *Thakur* itself is readily distinguishable. That case involved the *termination* (rather than the award) of already-awarded diversity, equity, and inclusion grants. In addressing the argument that it no more violated the constitution to terminate grants that reflected a particular viewpoint than it did to issue those grants in the first place, the Ninth Circuit emphasized that there is a "critical distinction between creating or ceasing a particular program (or subsidy, or forum), on one hand, and discriminating against disfavored speaker viewpoints within a program (or subsidy, or forum), on the other," *Thakur*, 176 F.4th at 1202, and that the widespread termination of already-awarded grants based on viewpoint was "aimed at the suppression of viewpoints with which the government disagrees," *id.* at 1203; *see*

*also id.* (distinguishing *Finley* on the ground that the Ninth Circuit was not presented with a facial challenge to statutory criteria but with an as-applied challenge to particular termination decisions). That reasoning plainly does not apply here in this facial challenge to the NEA's structuring of a grant program.[3]

### B. The NEA's Funding Decisions Express the Government's Own Views

Finally, plaintiffs' arguments regarding government speech doctrine (Br. 30-34) entirely misunderstand the government's argument on this score. Plaintiffs assert that the "NEA exists to fund private art, not government propaganda." Br. 30. But the government has never claimed that the art projects the NEA subsidizes constitute government speech. The government's position has always been that in operating this unique grant program, the government acts as a *patron* of the arts, rather than a regulator of speech or a monitor of a forum. To the extent those patronage decisions have an effect on speech, it is the NEA's *own* speech in stating—implicitly through funding and explicitly by adding various indicia of NEA approval to funding projects—that the agency believes that the art project meets the highest standards of artistic excellence and merit and that it is worth of public funding and sponsorship by the agency. *See* Opening Br. 29-33. Whether viewed through the doctrinal lens of selective subsidies or government speech, it is clear that the unique nature of the

[3] In addition to being readily distinguishable, *Thakur* was also wrongly decided, and the government intends to seek certiorari from that erroneous decision.

statutory scheme and the NEA's role as a patron of the arts necessarily requires the government to express its own views when making funding determinations. The government is not required to be (nor can it be) viewpoint neutral when expressing those views. *See, e.g.*, *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1336 (11th Cir. 2023); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005).

Plaintiffs do not advance their contrary position through their reliance (Br. 31-32) on *Matal v. Tam*, 582 U.S. 218 (2017). That case invalidated the Lanham Act's bar on the registration of disparaging trademarks. Although evenly split between two non-majority opinions (Justice Gorsuch took no part in the consideration or decision of the case), all members of the Court agreed that trademark registration did not constitute government speech and that the provision violated the First Amendment because it discriminated on the basis of viewpoint. Notably, however, four of the eight Justices expressly distinguished the registration of trademarks from *Finley* and other cases involving "cash subsidies or their equivalent," opining that the "federal registration of a trademark is nothing like the programs at issue in these cases." 582 U.S. at 240 (plurality opinion).

## III. The District Court's Remedy Is Overbroad

The government's opening brief establishes that the district court's remedy is overbroad in two respects. First, the court vacated the Final Notice on a universal basis without any serious consideration of whether traditional equitable principles

supported that remedy. Second, the court enjoined the government from requiring plaintiffs to certify compliance with the Executive Order without making any factual findings that would support this injunction. As discussed, the Final Notice does not require any such certifications and indeed expressly states that no certification is required. ADD.51. The district court thus did not—and could not—find that plaintiffs suffered irreparable harm from a hypothetical certification requirement, which only underscores that the district court's remedy is broader than necessary to afford plaintiffs complete relief. *See Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025).

Plaintiffs urge (Br. 46) that the government has forfeited any arguments about the scope of relief. Although the government's cross-motion for summary judgment did not specifically raise any arguments regarding whether traditional equitable principles supported plaintiffs' request for a universal injunction and vacatur, the district court clearly recognized the need to apply *CASA* when determining the scope of relief. *See* ADD.43-44. But the court misapplied *CASA* insofar as it did not exercise any equitable discretion regarding whether to vacate the notice or issue an injunction that was duplicative of that vacatur. Because this issue was passed upon below, this Court should consider the government's arguments regarding the errors in the court's legal reasoning. *See Sindi v. El-Moslimany*, 896 F.3d 1, 27-28 (1st Cir. 2018).

Moreover, the government plainly raised its concerns about plaintiffs' objections to the (non-existent) certification requirement, as evidenced by the fact that the district court acknowledged that the parties "dispute" whether the NEA had

reinstated the certification requirement. ADD.43 n.10. At a minimum, the court was required to resolve that dispute before it entered a permanent injunction. *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544-45 (1st Cir. 1996) ("Though the district court enjoys considerable discretion . . . its decision to grant or deny a[n] . . . injunction must be supported by adequate findings of fact and conclusions of law."). The government could not possibly have raised an argument related to the court's failure to make such findings prior to the court's decision. These arguments are accordingly not forfeited.

Plaintiffs assert (Br. 47-48) that vacatur is the "normal remedy" under the APA and therefore it should not matter whether the vacatur is duplicative of an injunction. As noted in the government's opening brief, however, (at 44), this Court has referenced vacatur as a traditional equitable remedy. *See American Pub. Health Ass'n v. National Inst. of Health*, 145 F.4th 39, 50 (1st Cir. 2025) (affirmatively citing *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994) for the proposition that "vacatur" is an "equitable remedy"—"a type of declaratory relief that will guide an agency as it decides upon its future course of conduct"). It thus stands to reason that, like all equitable remedies, vacatur is discretionary, not automatic or compelled. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006); *CASA*, 606 U.S. at 843-44 (emphasizing that longstanding equitable principles preclude relief to nonparties); *cf.* 5 U.S.C. § 702 (the APA does not affect the "power or duty of the court" to "deny relief on" any "equitable ground").

Plaintiffs further raise various arguments (Br. 47-48, 51) that support why, in its view, vacatur and a duplicative injunction were necessary to provide complete relief, but the critical point is that it was incumbent on the district court to make these findings. It did not do so. At a minimum, the absence of such findings warrants a remand.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CHARLES CALENDA
*United States Attorney*

DANIEL TENNY

*s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9039*
*Jennifer.l.utrecht@usdoj.gov*

July 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,458 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2026, I electronically filed the foregoing corrected brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

*s/ Jennifer L. Utrecht*
Jennifer L. Utrecht